**BLEICHMAR FONTI & AULD LLP**
Lesley E. Weaver (Bar No. 191305)
555 12th Street, Suite 1600
Oakland, California 94607
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

*Counsel for Co-Lead Plaintiff Martin Dugan*
*and Co-Lead Counsel for the Putative Class*

**POMERANTZ LLP**
Jennifer Pafiti (Bar No. 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (212) 661-8665

*Counsel for Co-Lead Plaintiff Leon Yu*
*and Max Wisdom Technology Limited and*
*Co-Lead Counsel for the Putative Class*

*[Additional counsel on signature page]*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TALIS BIOMEDICAL SECURITIES LITIGATION | Case No. 3:22-cv-00105-SI |
| | CLASS ACTION |
| THIS DOCUMENT RELATES TO: | **CO-LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT** |
| ALL ACTIONS | |
| | Date: November 4, 2022 |
| | Time: 10:00 A.M. |
| | Courtroom: 1 |
| | Judge: Hon. Susan Illston |

## **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................. 1

II.     FACTUAL ALLEGATIONS ........................................................................................... 3

        A.      Talis Seeks to Capitalize on the COVID-19 Pandemic and Conduct the IPO.............. 3

        B.      At the Time of the IPO, Talis One Was Non-Functional Due to Design Issues
                and High Invalid Rates and Could Not Be Manufactured at Scale........................... 3

        C.      The Exchange Act Defendants Falsely Claim That Talis Is "Ready to Go"
                and Has "Terrific" Results, While Knowing the Opposite Is True............................. 6

        D.      Defendants Finally Admit That Talis Cannot Produce at Scale and There Is
                No Timeline for Commercial Launch.................................................................... 8

        E.      Post-Class Period Events .................................................................................. 9

III.    ARGUMENT .................................................................................................................. 9

        A.      The Complaint States Claims under the Securities Act ........................................... 10

                a.      The Securities Act Claims Do Not Sound in Fraud....................................... 10

                b.      Securities Act Material Misstatements and Omissions.................................. 11

                        i.      "Ordered 5,000 Instruments" .................................................... 11

                        ii.     Manufacturing.......................................................................... 12

                        iii.    Performance and Reliability ...................................................... 13

                        iv.     Talis's Testing and EUA Submission......................................... 15

                        v.      Material Omissions in Violation of Item 303 and Item 105 .............. 17

        B.      The Complaint States Claims under the Exchange Act ........................................... 18

                a.      The Exchange Act Defendants Made Material Misstatements....................... 18

                        i.      False Statements that Talis Had "Ordered 5,000 Instruments" ......... 18

                        ii.     "Ready to Go" and "Ship Product in a Very Timely Manner";
                                "Terrific Results"; "Great Product" ......................................... 18

                        iii.    Cartridge Manufacturing Capability ................................................ 20

                        iv.     Validation of Cartridge Manufacturing Lines.................................. 21

                b.      The CC Establishes a Strong Inference of Scienter ....................................... 22

                        i.      Core Operations Supports Scienter.............................................. 23

                        ii.     Former Employee Allegations Support Scienter ............................. 24

                        iii.    The Officer Defendants' Public Statements Support Scienter........... 25

                        iv.     The Officer Defendants Had Continuous Access to Information
                                Contradicting Their Misstatements.......................................... 26

                        v.      Abrupt Executive Departures Support Scienter................................. 26

                        vi.     Collective Scienter Is Adequately Pleaded ...................................... 27

        C.      The Confidential Witness Allegations Are Well-Pleaded ....................................... 27

IV.     CONCLUSION.............................................................................................................. 30

i

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

# TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).............................................................................................................. 2, 9

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................................... 9

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .................................................................................. 24, 25, 28

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) .............................................................. 13

*Carr v. Zosano Pharma Corp.*,
2021 WL 3913509 (N.D. Cal. Sept. 1, 2021) ................................................................... 24

*Cheever v. Huawei Device USA, Inc.*,
2019 WL 8883942 (N.D. Cal. Dec. 4, 2019) ............................................................ 12, 18

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ...................................................................................... 23, 26

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)............................................................................................. 16

*Cutler v. Kirchner*,
696 Fed. App'x 809 (9th Cir. 2017) ............................................................................... *passim*

*Edenbrook Cap., LLC v. RhythmOne Plc*,
2019 WL 1791419 (N.D. Cal. Apr. 24, 2019) ................................................................. 14

*Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*,
2021 WL 1056549 (N.D. Cal. Mar. 19, 2021)................................................................. 24

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ....................................................................................... 22

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) .................................................................................... 11, 19

*Flynn v. Sientra*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) ..................................................... 15, 23, 24

*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*,
2022 WL 716653 (D. Utah Mar. 9, 2022) ..................................................................... 16

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

*Glazer Cap. Mgmt., LP v. Magistri,*
    549 F.3d 736 (9th Cir. 2008) ................................................................................................ 27

*In re Allied Nevada Gold Corp. Sec. Litig.,*
    743 F. App'x 887 (9th Cir. 2018) ......................................................................................... 13

*In re Amgen Inc. Sec. Litig.,*
    2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ...................................................................... 22

*In re Atossa Genetics Inc Sec. Litig.,*
    868 F.3d 784 (9th Cir. 2017) ................................................................................................ 16

*In re BioMarin Pharm. Inc. Sec. Litig.,*
    2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ............................................................... 17, 29, 30

*In re Calpine Corp. Sec. Litig.,*
    288 F. Supp. 2d 1054 (N.D. Cal. 2003) ................................................................................ 10

*In re Charles Schwab Corp. Sec. Litig.,*
    257 F.R.D. 534 (N.D. Cal. 2009) .......................................................................................... 10

*In re Convergent Technologies Sec. Litig.,*
    948 F.2d 507 (9th Cir. 1991) .................................................................................................. 2

*In re Countrywide Fin. Corp. Sec. Litig.,*
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................ 10

*In re CV Therapeutics, Inc.,*
    2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ........................................................................ 29

*In re Gilead Scis. Sec. Litig.,*
    536 F.3d 1049 (9th Cir. 2008) ................................................................................................ 9

*In re Immune Response Sec. Litig.,*
    375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................................... 21

*In re Lyft Inc. Sec. Litig.,*
    484 F. Supp. 3d 758 (N.D. Cal. 2020) ............................................................................ 10, 18

*In re Nektar Therapeutics Sec. Litig.,*
    34 F.4th 828 (9th Cir. 2022) ................................................................................................. 15

*In re NVIDIA Corp. Sec. Litig.,*
    768 F.3d 1046 (9th Cir. 2014) ......................................................................................... 24, 27

*In re Quality Sys., Inc. Sec. Litig.,*
    865 F.3d 1130 (9th Cir. 2017) ....................................................................................... 3, 25, 27, 29

*In re QuantumScape Sec. Class Action Litig.,*
    2022 WL 137729 (N.D. Cal. Jan. 14, 2022) ................................................................... 21, 29

iii

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ........................................................................................... 29

*In re Stac Electronics Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996) ....................................................................................... 11

*In re Twitter, Inc. Sec. Litig.*,
   2021 WL 4166725 (N.D. Cal. Sept. 14, 2021) ....................................................... 20, 25

*In re Vaxart, Inc. Sec. Litig.*,
   576 F. Supp. 3d 663 (N.D. Cal. 2021) .......................................................................... 24

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ....................................................................................... 23

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ............................................................................... 2, 9, 10

*Kipling v. Flex Ltd.*,
   2020 WL 7261314 (N.D. Cal. Dec. 10, 2020)............................................................... 30

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ..................................................................................... 26

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ....................................................................................... 24

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ..................................................................................... 23

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) ....................................................................................... 16

*Mulligan v. Impax Labs., Inc.*,
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................................................ 21

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)............................................................................... 13, 17, 19, 20

*Pirani v. Slack*,
   445 F. Supp. 3d 367 (N.D. Cal. 2020) .................................................................... 10, 18

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ................................................................................ 23, 26

*Prodanova v. H.C. Wainwright & Co., LLC*,
   993 F.3d 1097 (9th Cir. 2021) ..................................................................................... 23

*Rabkin v. Lion Biotechnologies, Inc.*,
   2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ................................................................. 24

iv

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ............................................................................................. 26

*Rihn v. Acadia Pharms. Inc.*,
   2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) .................................................................... 24

*Roberts v. Zuora, Inc.*,
   2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ....................................................... 20, 26, 29

*Rubke v. Capitol Bancorp Ltd*,
   551 F.3d 1156 (9th Cir. 2009) ........................................................................................... 16

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ........................................................................... 2, 13, 15, 22

*Shenwick v. Twitter, Inc.*.
   282 F. Supp. 3d 1115 (N.D. Cal. Oct. 16, 2017) ............................................................... 25

*Skiadas v. Acer Therapeutics Inc.*,
   2020 WL 3268495 (S.D.N.Y. June 16, 2020) ............................................................... 23, 25

*South Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ............................................................................................. 23

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ..................................................................................... 10, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................................................... 22

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ............................................................................................... 16

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996) ............................................................................................... 20

*Wong v. Arlo Techs.*,
   2019 WL 7834762 (N.D. Cal. Dec. 19, 2019) ................................................................... 10

*Zaghian v. Farrell*,
   675 F. App'x 718 (9th Cir. 2017) ...................................................................................... 21

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ..................................................................................... 23, 27, 30

**STATUTES**

15 U.S.C. § 77k ............................................................................................................................. 1, 10

15 U.S.C. § 77o ............................................................................................................................. 1, 30

v

15 U.S.C. § 77z ........................................................................................................................... 12

15 U.S.C. § 78j ............................................................................................................................. 1

15 U.S.C. § 78t ........................................................................................................................ 1, 30

17 C.F.R. § 229.105 ................................................................................................................... 18

17 C.F.R. § 229.303 .............................................................................................................. 17, 18

17 C.F.R. § 240.10b-5 .................................................................................................................. 1

21 C.F.R. § 820.3 ....................................................................................................................... 22

**OTHER AUTHORITIES**

Fed R. Civ. P. 8 ..................................................................................................................... 2, 10

Fed R. Civ. P. 9(b) ..................................................................................................................... 10

Fed R. Civ. P. 12(b)(6) ................................................................................................................. 2

Court-appointed Co-Lead Plaintiffs Martin Dugan, Leon Yu, and Max Wisdom Technology Limited (together, "Plaintiffs") respectfully submit this opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint (ECF No. 83) ("MTD").

<b><u>STATEMENT OF THE ISSUES TO BE DECIDED</u></b>

Whether the Consolidated Class Action Complaint (ECF No. 74) ("Complaint" or "CC") states a claim under §§ 11 and 15 of the Securities Act of 1933 ("Securities Act") and §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.[1]

<b><u>MEMORANDUM OF POINTS AND AUTHORITIES</u></b>

## I.     INTRODUCTION

In early 2021, Talis Biomedical Corporation ("Talis" or the "Company") sought to manufacture a single product:  the Talis One COVID-19 test.  At the time, COVID-19 vaccinations were just beginning and testing was the primary defense, with demand far exceeding supply.  Talis's ability to quickly mass-produce an accurate, reliable test that provided immediate results in doctors' offices was thus crucial.  *See* ¶¶40-41.  In this context, Talis's February 11, 2021 IPO raised $254 million from investors by touting Talis One as "highly accurate" and "reliable," detailing strong test results, and stating that Talis had "ordered 5,000 instruments" for delivery in just a few weeks.

In truth, at the time of the IPO, Talis One was merely a Theranos-like "dummy box" that suffered from significant manufacturing, technical, and regulatory problems and had no viable path to commercialization.  These existing, internally known issues included testing chambers that were too small and two defective parts, resulting in a non-functional device that, even by November 2021, had such a high invalid rate (the percentage of tests that do not yield usable results) that sales representatives were not allowed to turn it on with potential clients.  Today, Talis still has no working product, and on August 2, 2022, abandoned its COVID-19 test entirely—a fact Defendants' MTD carefully omits.  Talis stock, offered at $16.00/share in the IPO, currently trades at just $0.84/share.

Ignoring these facts, Defendants wrongly claim that this case is about "the benefit of hindsight" or the "materialization of fully disclosed risks."  But "[t]here is a difference between knowing that any

---

[1] Capitalized terms not defined herein have the meanings set forth in the Complaint.  Citations to "¶_" are to the Complaint.  Emphasis is added and citations are omitted unless otherwise stated.

product-in-development may run into a few snags, and knowing"—as here—"that a particular product has already developed problems so significant as to require months of delay." *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 515 (9th Cir. 1991). None of Talis's boilerplate, highly general risk factors (MTD at 5) disclosed the existing, internally known facts that doomed Talis One, including its flawed design and defective parts. And while Defendants claim that Talis did not "rush[] to market," they had no problem rushing to conduct an IPO based solely on a product that never worked reliably and could not be manufactured at scale. Defendants' statements were classic falsehoods and half-truths actionable under controlling authority. *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016) ("[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.") (cleaned up). Their MTD should be denied.

First, Plaintiffs' Securities Act strict liability claims are adequately alleged under any standard, though subject only to Rule 8 notice pleading. Defendants concede that the Registration Statement falsely claimed Talis had "ordered 5,000 instruments" when it had merely ordered "components." The Registration Statement further claimed Talis One was "accurate and reliable," ¶158, even as it suffered from such a high invalid rate that it still cannot be commercially produced or sold. The CC details a litany of Talis One's interrelated problems that existed before the IPO, amply supporting a "reasonable inference that [Defendants are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Defendants offer no affirmative explanation for their misstatements and merely raise factual disputes that have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6). *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1013 (9th Cir. 2018).

Second, Plaintiffs' Exchange Act claims against Talis, former CEO Brian Coe, current CEO Rob Kelley, and CFO Roger Moody (the "Exchange Act Defendants") should also be sustained.

As to scienter, while the PSLRA does not require a "smoking gun" or trial-level proof at the pleading stage, the CC's consistent and corroborating factual allegations give rise to a strong inference that Coe and other senior executives knew, or were at least reckless as to, Talis One's serious problems when they chose to speak. For example, in May 2021, after Coe was personally told that there were serious issues with manufacturing timelines, he falsely declared that Talis was "very much ready to

2

go" and begin commercial production.  In August 2021, Talis first revealed "delays" and Coe was terminated, while his replacement (Blaser) served for just *one week*.  Further, Talis was required—by a contract Coe signed—to "report[] the reason" for delays to the federal government.  It would be absurd to suggest that Talis's management had no knowledge or access to information about the severe, ongoing problems with the Company's only product.  Defendants' efforts to dispute individual allegations in isolation and their self-serving assertion that "Talis and its officers acted in good faith as they sought to launch a complex new product" are not even plausible, much less more compelling.

Finally, Defendants cannot escape the CC's well-pleaded allegations by attacking the five former Talis employees ("FEs") who detailed the existing, internally known problems with Talis One. The CC describes each FE "with sufficient particularity to support the probability that a person in the position . . . would possess the information alleged," *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017).  Each FE provided information based on their personal experience and direct observation of Talis One, and their knowledge is further corroborated by Defendants' own admissions.

## II.  FACTUAL ALLEGATIONS

### A.  Talis Seeks to Capitalize on the COVID-19 Pandemic and Conduct the IPO

Talis was founded in 2010 by Defendants Coe and Ismagilov.  ¶¶27-28.  In 2020, Talis started to develop a COVID-19 molecular diagnostic test on a platform called Talis One, comprised of a box-shaped analyzer and a consumable cartridge with the sample for testing.  ¶¶32-35.  The Talis One COVID-19 test was slated to be the source of "[s]ubstantially all" of Talis's initial revenue, ¶216.

By late 2020, Talis was moving rapidly to conduct an IPO.  Defendants were motivated to do so because Talis nearly ran out of cash:  in October 2020, its auditor determined "that there is substantial doubt about [Talis's] ability to continue as a going concern."  ¶¶38-39.  Talis also sought to capitalize on a rapidly closing window to sell a new COVID-19 test before demand cooled and competing tests captured the market.  ¶40.  Talis would need to persuade investors that its product provided fast, accurate, reliable results and could be manufactured at scale.  ¶¶35, 40-41.

### B.  At the Time of the IPO, Talis One Was Non-Functional Due to Design Issues and High Invalid Rates and Could Not Be Manufactured at Scale

Talis conducted its IPO on February 11, 2021 and raised $254 million.  ¶72.  Unknown to

3

investors, however, Talis had no viable path to commercialization due to manufacturing delays, persistently high invalid rates, and inherent design problems. The Registration Statement's boilerplate risk disclosures (MTD at 5) cannot immunize Defendants for concealing these existing, material negative facts. For example, Talis warned that Talis One "may contain errors or defects or be subject to reliability issues" when such issues already existed—an actionable misstatement. ¶¶160-61.

Talis was not capable of producing Talis One at scale:   At the time of the IPO: Talis's manufacturing efforts were already severely delayed:

- Talis One was merely a concept model with incomplete engineering, and it was **not possible** to go from prototype to full production at volume—a 100-fold increase—due to manufacturing, design, and supply chain issues. ¶¶47-48.

- For much of 2020, only two people worked on the test, and there was incompetency at every level:  marketing, R&D, and planning. ¶45; *see also* ¶¶36, 43.

- Talis management ignored many technical challenges. For example, an issue with leaking cartridges only began to be addressed in December 2020, after being known for a year, and was communicated to all of management based on a user study. ¶48. Talis's culture contributed to overly aggressive timelines that had no basis. ¶46.

- Talis was significantly behind its own internal production schedules. In December 2020, senior director of supply chain Tony Cunningham posted a weekly schedule that indicated a Q4 2020 production goal of 1,000 instruments that Talis did not come close to meeting. ¶¶49-50. Cunningham—who was CFO Moody's direct report—also knew of supply issues by August 2020 but downplayed concerns. ¶49.

- There was no contingency planning or scheduling buffer, a strategy that originated with CEO Coe; it was not possible for Talis to produce 1 million cartridges per month. ¶51.

Talis thus had no prospect of launching the Talis One COVID-19 test, much less reaching full-scale production in 2021. Nonetheless, the Registration Statement falsely claimed that Talis had "ordered 5,000 instruments" for delivery "through the first quarter of 2021" (*i.e.*, by March 31, seven weeks later) and that "automated cartridge manufacturing lines capable of producing one million cartridges per month" were expected to "scale to full capacity through 2021."

Talis One was non-functional before and after the IPO: The Registration Statement touted the "accuracy and reproducibility" Talis One had "demonstrated to date" and warned that "[o]ur diagnostic tests **may** contain errors or defects or be subject to reliability issues" when such issues had already occurred. ¶¶160-61. And in violation of Item 303 and Item 105, the Registration Statement

4

omitted these known issues and their material risk to commercial production. ¶¶166-67.  In reality:

- High invalid rates were known before January 2021, and should have been no surprise given a lack of pretesting of the Talis One design and design issues, including chamber sizes in the cartridges that were too small for proper Limits of Detection (the lowest concentration that a test can consistently identify with high probability). *See* ¶212(ii)-(iii).

- On November 12, 2021, FE-4 turned on the Talis One device and it said "***invalid, invalid, invalid***" 20 or 30 times.  ¶55.  The same day, FE-4's supervisor, Alex de los Reyes, told FE-4 that the analyzer had such a high invalid rate that Talis could not risk operating the machine in front of doctors; FE-4 was instructed to use video presentations instead.  *Id.*

- After Talis received its EUA (on November 5, 2021), the invalid rate had been and remained above 10%.  ¶56.

- On December 6, 2021, when confronted about the high invalid rate, Mai Nguyen (Product Manager) stated that two parts in the test—a gasket and a plastic piece—didn't work.  ¶57.

Talis botches its crucial EUA application:  On January 29, 2021, just before the IPO, Talis submitted a regulatory application for Emergency Use Authorization (EUA) from the FDA.  Talis's application failed to meet FDA standards and was rejected within weeks.  ¶¶59-71.

The FDA requires companies seeking EUAs for COVID-19 tests to use a "high sensitivity" comparator assay.  The comparator assay is a third-party COVID-19 test used as a benchmark of the new test's performance.  Because such analysis is comparative, the comparator assay's sensitivity— its ability to reliably detect the SARS-CoV-2 virus—is key (¶¶64-66); Defendants concede that the "reliability and validity of a new test's data depends largely on" the comparator assay.  (MTD at 4.)

The FDA's Molecular Diagnostic Template for Commercial Manufacturers (July 28, 2020) required applicants to use "only" a "comparator assay that has established high sensitivity" and asked applicants to consult with the FDA in advance "to discuss options to establish sensitivity." ¶67.  These requirements were well-established by January 2021, by which point dozens of COVID-19 tests had obtained EUAs. ¶62.  In weekly "virtual town halls," the FDA emphasized during 2020 that applicants should use the "***best possible standard***" and that the comparator assay was "***extremely important***."[2]

While the Registration Statement claimed Talis One was "[h]ighly accurate," ¶146, unknown to investors, Talis's EUA submission used a weak comparator assay with performance issues that was

---

[2] *See* Park Decl., Ex. A at 7; Ex. B at 20.

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

contrary to FDA standards and lacked sufficient sensitivity.  ¶68.  Talis's founders and Board—including four Ph.Ds and an M.D. (*see* ¶169)—surely understood the importance of a sensitive comparator assay.  Indeed, in April 2021, shortly after the IPO, Talis's co-founder Defendant Ismagilov published an article that placed Talis's flawed comparator assay squarely in the "***low-sensitivity***" category and deemed it "***substantially less sensitive***."[3]  Ismagilov and Talis knew—but did not disclose—this crucial fact in the IPO.[4]

In response to Talis's application, the FDA quickly requested "additional information," which the Registration Statement vaguely mentioned.  Before responding, however, Defendants pushed through the IPO on February 11, 2021. ¶72. Talis stock began trading on NASDAQ the next day. ¶73.

Just two weeks later, by February 26, 2021, the FDA rejected Talis's comparator assay as lacking "sufficient sensitivity to support Talis's EUA application."[5]  ¶75.  Talis concealed this fact for a full ***10 days***, until Monday, March 8, 2021.  When Talis revealed the FDA's response and that it had withdrawn its EUA submission, the Company's inflated share price began to collapse. ¶¶75-76.

**C.    The Exchange Act Defendants Falsely Claim That Talis Is "Ready to Go" and Has "Terrific" Results, While Knowing the Opposite Is True**

After Talis's first EUA application failed, Talis's senior management continued to mislead the market by touting Talis's purportedly concrete progress towards manufacturing at scale.  The Class Period begins on March 30, 2021, when Talis filed a Form 10-K claiming that "through 2021," cartridge production would "scale to full capacity" of "one million . . . per month," and that Talis had "ordered 5,000 instruments." ¶80.  The next day, Talis's share price rose 12.72%. ¶81.

---

[3] Ismagilov's article stated that "[h]igh-sensitivity tests have LOD values equivalent to ~$10^2$ to $10^3$ [*i.e.*, 100 to 1,000] copies/mL of sample, whereas ***low-sensitivity*** tests have LOD values equivalent to ~$10^5$ to $10^7$ [*i.e.*, 100,000 to 10 million] copies/mL," that "sensitivity of RT-qPCR tests ranges from highly sensitive (e.g., 180 NDU/mL for PerkinElmer and 450 NDU/mL for Zymo Research) to ***substantially less sensitive*** (e.g., 180,000 NDU/mL for TaqPath COVID-19 Combo Kit and 540,000 NDU/mL for Lyra Direct SARS-CoV-2 Assay)," and that "FDA's NDU/mL is approximately equivalent to the copy/mL scale used in this paper."  Park Decl., Ex. C at 2, 8.  The Registration Statement said Talis's comparator assay had a limit of detection (LOD) of 180,000 NDU/mL (Kirby Decl., Ex. B at 47 of 56), placing it well within the "low-sensitivity" category.

[4] The final, peer-reviewed version, published in February 2022, stated that the study forming the basis for the article was "conducted between September 2020 and June 2021."  Park Decl., Ex. E at 1.

[5] Talis stated that the FDA's communication occurred in "late February" 2021. ¶75.  Friday, February 26 was the last business day of the month.

6

But Talis continued to face the same design, manufacturing, and reliability issues that existed before the IPO.  As of April 2021, it remained expensive and difficult to manufacture the machines, which had to be made by hand.  ¶214(iii).  Unsurprisingly, the mounting delays in Talis's only product were promptly reported and known to senior management; in May 2021, Coe was personally briefed over several weeks on the serious issues with the manufacturing timelines for Talis One.  ¶213(ii).  And in the same month, then-SVP of R&D Ramesh Ramakrishnan reportedly provided a new timeline to Coe, who rejected it; Ramakrishnan resigned within days.  ¶211(vi).

Nonetheless, on Talis's first earnings call on May 11, 2021, CEO Coe falsely assured investors that Talis was ready to begin production of Talis One "in a *very timely manner*" once EUA approval was granted, and was "*very much ready to go*."  ¶190.  These statements had no basis given the known manufacturing delays, high invalid rate, and what Coe had been told.  ¶¶90, 211(vi), 215(i).  Indeed, as set forth below, Talis still was not "ready to go" even by March 2022 (¶250) or August 2022.

On August 10, 2021, Talis first admitted manufacturing "delays," ¶239—a reality that had been known to Coe for months and directly contradicted his assurances three months earlier.  ¶92.  During the August 10 conference call, Coe nonetheless sought to restore investor confidence by stating that "our results really look terrific" and "we're *way ahead* on our ability to produce product."  ¶94.  These statements were false:  Talis still was not ready to begin manufacturing, ¶215(i), and Talis One continued to suffer from a high invalid rate that foreclosed and/or dramatically delayed commercial production.  ¶94.

On August 10, 2021, Talis's 2Q21 8-K and Chief Operating Officer Liu also claimed that Talis's cartridge production lines were "in the final stages" and "final steps of validation."  ¶¶95, 98-99.  Under established industry and regulatory definitions of "validation," these statements meant Talis had extensively scrutinized the cartridge production lines and was on the verge of consistent production at scale.  But Talis was nowhere near the "final stages of validation" on the cartridge lines in August 2021.  By September 2021, Talis still had not validated the lines, which was significant and one of the major factors in not launching Talis One.  ¶100.  And Defendants eventually revealed that they were only "beginning to evaluate the performance of cartridges" in November 2021, confirming that Talis had not reached the "final stages of validation" in August 2021.

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

Having failed to deliver a working product over six months after the IPO, on August 30, 2021, CEO Coe was terminated, effective immediately, with no permanent replacement. ¶101.

On November 5, 2021, the FDA granted Talis's second EUA submission, and on November 15, 2021, Talis announced that it would use a "measured approach" to conduct a "limited rollout" of Talis One starting in 1Q22, revealing that it was still not ready to manufacture at scale. ¶¶102-04. Even then, Talis made no mention of the device's high invalid rates long known internally. Defendant Kelley claimed that the "commercial team ha[d] been busy assessing and generating demand in this extremely dynamic COVID market," ¶228, but Talis One remained little more than a "dummy box" that sales representatives were instructed not to turn on at doctors' offices and hospitals. ¶214(iv).

On December 1, 2021, Brian Blaser replaced Coe as CEO. Blaser served for just **one week** before resigning on December 8, 2021. ¶105. FE-4 was told that Blaser left due to major fraud. *Id.*

**D.      Defendants Finally Admit That Talis Cannot Produce at Scale and There Is No Timeline for Commercial Launch**

On March 15, 2022, after the market closed, Talis revealed that it "has not started its phased launch . . . due to challenges with manufacturing." ¶¶106-07. During the March 15, 2022 earnings call (the first with Defendant Kelley as CEO), Kelley admitted that there was no "timeline for commercial launch," the "yield and consistency" of manufacturing was not "sufficient to support commercialization," and Talis was only "beginning to evaluate the performance of cartridges" in November 2021, despite claiming to be in the "final stages of validation" in August 2021. ¶¶108-10. And for the first time, Talis publicly admitted a "rate of invalid or failed tests" of "above 10%" (*see* ¶109)—a fact that was internally known before the IPO, over a year earlier. ¶¶53 (FE-2), 55 (FE-4), 56 (FE-5). Talis also revealed that it had started a "manufacturing review process" with a consultant, was laying off 25 percent of its work force, and that COO Liu was stepping down. ¶¶112, 250.

Further, Talis's 2021 Form 10-K filed on March 15, 2022, revealed for the first time that Talis had merely "ordered **components** for **up to** 5,000 instruments"—not the "instruments" themselves, as Talis had falsely claimed in the IPO and repeated every subsequent quarter. ¶¶111, 155, 207-08.

This negative information drove a 23.08% decline in Talis's share price. ¶252.

While Defendants claim that "[i]nvestors had been repeatedly and extensively warned about

8

this possibility since Talis went public" (MTD at 10), they miss the point: the "possibility" was in fact a certainty that existed and was known even before the IPO.[6]

### E.    Post-Class Period Events

On May 10, 2022, Kelley revealed that Talis would be making "modifications" to its "manufacturing processes, quality controls and supply conformance" and admitted that purportedly "minor design modifications" were required.  ¶¶114-15.

Finally, on August 2, 2022, Talis abandoned its COVID-19 test entirely, citing "evolving market dynamics with COVID testing and the current financial environment," and laid off another 35% of its employees.  Park Decl., Ex. F at 4.  On August 12, 2022, Talis disclosed that it has asked the FDA "to revoke the [EUA] for the Talis One COVID-19 Test System[] . . . because the Company *no longer planned to pursue commercialization of the Talis One COVID-19 Test System in the United States*."  Park Decl., Ex. H at 2.

Thus, 18 months after going public, Talis has finally abandoned its COVID-19 test—a product that was deeply flawed from inception and never had a viable path to commercialization.

### III.    ARGUMENT

On a motion to dismiss, courts must "accept[] the allegations . . . as true, and read[] them in the light most favorable to [plaintiff]."  *Orexigen*, 899 F.3d at 1013.  Plaintiffs need not provide "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the factual allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact," and the motion should be denied "so long as the plaintiff alleges facts to support a theory that is not facially implausible . . . ."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d

---

[6] Defendant Moody's self-serving claim that there was no "fundamental design issue" (*id.*) is belied by the fact that Talis had to hire external consultants and change the design—and that Talis One still has not launched—and entitled to no weight at this stage.  Further, Moody's vague claim that "we realized that there are a number of things that we had to tighten up" (Kirby Decl. Ex. O at 9) cannot overcome the CC's factual allegations that the design, manufacturing, and reliability issues had long existed and been internally known.

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

1049, 1057 (9th Cir. 2008) (reversing dismissal). Under controlling authority, dismissal is warranted "only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible." *Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011) (emphasis in original).

### A.    The Complaint States Claims under the Securities Act

Section 11 imposes strict liability where a registration statement "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Pirani v. Slack*, 445 F. Supp. 3d 367, 377 (N.D. Cal. 2020) (citing 15 U.S.C. § 77k). "At the pleading stage, 'Section 11 places a relatively minimal burden on a plaintiff.'" *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 768 (N.D. Cal. 2020).

### a.    The Securities Act Claims Do Not Sound in Fraud

Rule 8's plausibility standard applies because the Securities Act allegations are "separate and distinct" from the Exchange Act claims and there are "no averments of fraud underlying the Securities Act claims." *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1078 (N.D. Cal. 2003).

Defendants are wrong to argue that the Section 11 claim "sounds in fraud" and is subject to Rule 9(b) (MTD at 26). "Although Section 11 claims require a misrepresentation, they are not inherently fraud-based." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 545 (N.D. Cal. 2009). Indeed, the CC's references to "concealed" facts and "misleading" statements (MTD at 26) align precisely with Section 11, which imposes liability for material omissions and "misleading" statements. 15 U.S.C. § 77k. Further, the Securities Act claims are brought against different defendants than the Exchange Act claims and based on different statements made at different times.[7] *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1163 (C.D. Cal. 2008).[8]

Under Rule 8, Plaintiffs "are not obligated to plead with particularity." *Calpine*, 288 F. Supp. 2d at 1079. In any event, all that Rule 9(b) requires is to "allege the 'who, what, when, where, and how' of the [misstatements]." *Orexigen*, 899 F.3d at 1008. The CC does so.

---

[7] Coe and Moody are the only Securities Act defendants who also face fraud claims.

[8] Defendants' citation to *Wong v. Arlo Techs.*, 2019 WL 7834762, at *5-6 (N.D. Cal. Dec. 19, 2019) does not change this result, as the *Arlo* plaintiff broadly alleged that all defendants "knowingly or recklessly engaged in . . . fraud" at the time of the offering.

10

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

### b. Securities Act Material Misstatements and Omissions

The CC's factual allegations, taken as true, establish a reasonable inference of falsity.  Because Talis had not ordered 5,000 instruments, Talis was unable to produce at scale, and Talis One suffered from high invalid rates and poor design, "it is plausible that a reasonable investor . . . would have the impression of a state of affairs materially different from the reality that" the challenged statements concealed.  *Cutler v. Kirchner*, 696 Fed. App'x 809, 814 (9th Cir. 2017).  By contrast, Defendants' denials require multiple unreasonable factual assumptions at the pleading stage, including that (a) there is no difference between 5,000 "components" and "instruments," (b) Talis fixed the production delays, faulty design, and quality problems before the IPO, yet the same issues recurred later; (c) Talis had a working analyzer, yet de los Reyes falsely said the invalid rate was so high that Talis could not operate the machine in front of potential clients, and FE-4 was told not to turn it on with clients; and (d) Talis did not use a weak comparator assay, but the FDA arbitrarily rejected it anyway.

### i. "Ordered 5,000 Instruments"

The statement that Talis "ha[d] ordered 5,000 instruments . . . be delivered beginning in the fourth quarter of 2020 through the first quarter of 2021" was false.  Talis revealed in March 2022 that it had only "ordered **components** for **up to** 5,000 instruments."  ¶156.  Unable to dispute falsity, Defendants challenge only materiality, claiming that "no reasonable investor would have the impression that Talis was simply awaiting delivery of 5,000 completed instruments."  (MTD at 18.)  Such conclusory speculation fails.  Indeed, Defendants' own authority recognizes that materiality "is a fact-specific determination that should ordinarily be assessed by a jury," and "only" if "the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law."  *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996); *see also Fecht v. Price Co.*, 70 F.3d 1078, 1080–81 (9th Cir. 1995) (same).

In all events, the misstatement is material.  "5,000 instruments" represented tens of millions of dollars in product.  The "temporary—and rapidly closing—window" to launch made timing "crucial to investors and analysts," ¶40, while "components" would require time-consuming assembly, ¶111, and Talis was behind its internal production schedules before the IPO.  These circumstances highlight

11

the material difference between ordering "instruments" and "components,"[9] as does Defendants' own admission that "the manufacturing process is complex." (MTD at 6.) Talis still does not have 5,000 completed instruments 19 months after the IPO. *See* Park Decl., Ex. G. Nor can Defendants attack materiality by invoking various statements about Talis's "contract manufacturer" and materials (MTD at 17), none of which neutralize the false statement that Talis had "ordered 5,000 instruments."[10]

### ii. Manufacturing

The Registration Statement's claims that (1) Talis One was "designed . . . to be low-cost and manufactured at scale," and (2) Talis's "automated cartridge manufacturing lines" were "capable of producing one million cartridges per month" and expected to "scale to full capacity through 2021" (¶¶152-54) are both actionably false and misleading.

"[L]ow-cost and Manufactured at Scale": Defendants ignore (and have waived any challenge to) falsity. This statement of present fact was materially false and misleading given Talis's existing design problems and inability to perform "low-cost" manufacturing "at scale." Even by April 2021, Talis One was expensive to manufacture and Talis did not have a manufacturer at full scale. ¶214(iii).

"Capable of Producing One Million Cartridges Per Month": This statement is an affirmative misrepresentation of present fact; production at that scale was not possible in 2021. ¶51. Further, the PSLRA's safe harbor does not protect the statement that the lines "will scale to full capacity through 2021," as it excludes forward-looking statements "made in connection with an initial public offering," 15 U.S.C. § 77z- 2(b)(2)(D). The "bespeaks caution" doctrine also does not apply, as Defendants have waived it by "rais[ing] it only in [a] footnote"[11] (*see* MTD at 30 n.38), and they cannot make the "stringent showing" that "reasonable minds could not disagree that the challenged statements were not

---

[9] Thus, Defendants' claim that the CC "does not plead any facts suggesting investors would have valued the Company differently" absent this misstatement (MTD at 18 n.22) is incorrect. And whether two analyst reports from March 2022 specifically mention the misstatement is beside the point.

[10] The CC also alleges that the statement is false because Talis had *not* "ordered 5,000 instruments . . . to be delivered . . . through the first quarter of 2021," but had only ordered for delivery "through the third quarter of 2021," two quarters later, as Talis revealed shortly after the IPO. ¶156. Defendants' bare speculation that could have been the result of "subsequent developments" (MTD at 30 n.39) fails to read the CC's allegations in the light most favorable to Plaintiffs and should be rejected.

[11] *Cheever v. Huawei Device USA, Inc.*, 2019 WL 8883942, at *3 (N.D. Cal. Dec. 4, 2019).

12

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

misleading." *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *8 (N.D. Cal. Aug. 7, 2020).

Even viewed as an opinion, the "scale to full capacity" statement is actionable because it omitted material information that "conflict[ed] with what a reasonable investor would take from the statement." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). Talis One's delays and design flaws (such as high invalid rates, the missed Q4 2020 production goal, and management's failure to plan for contingencies) ensured that "full capacity" production would never be achieved in 2021. These are not merely "some fact[s] cutting the other way," *Omnicare*, 575 U.S. at 189, but show the statement had "no basis" when made. *In re Allied Nevada Gold Corp. Sec. Litig.*, 743 F. App'x 887, 888 (9th Cir. 2018); *Cutler*, 696 Fed. App'x at 814 (positive statements gave impression "materially different from the reality" of serious problems).

### iii.   Performance and Reliability

The Registration Statement claimed that (1) "[t]he test cartridge for COVID-19 diagnosis contains a NAAT designed for optimal sensitivity and specificity to provide highly accurate results," (2) Talis's "value proposition" was "that our tests are just as accurate and reliable as central lab testing," and Talis One was "designed to . . . incorporate safety and convenience features," (3) there was "no guarantee that the accuracy and reproducibility we have demonstrated to date will continue," and Talis's "diagnostic tests may contain errors or defects or be subject to reliability issues. ¶¶158-61. In choosing to make these positive statements, Defendants were "bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Arena*, 840 F.3d at 705–06. These statements are actionable because they failed to disclose that Talis One was neither accurate nor reliable due to its flawed design and high invalid rate.

<u>Contemporaneous Falsity</u>: Defendants' speculation that the problems with Talis One only occurred after the IPO (MTD at 28 n.37) ignores the CC's plausible allegations and is hardly "so convincing that [Plaintiffs'] explanation is *im*plausible." *Starr*, 652 F.3d at 1216–17 (emphasis in original). Talis One's design remained constant, and Defendants cannot explain why Talis would have taken a product that was functioning properly at the time of the IPO, then ***made it worse*** by introducing defective parts to make it unreliable and inaccurate. Their argument that a single "clinical study" provided to the FDA showed "invalid rates under 10%" (MTD at 19 n.25) merely raises a fact issue.

13

In all events, the more reasonable inference is that Talis provided non-representative data to the FDA: multiple Talis personnel observed higher invalid rates before the IPO and during the Class Period, including just seven days after the EUA was granted, ¶¶53 (FE-2), 55 (FE-4), 56 (FE-5).  Further, a Talis employee stated that the FDA only required "simulations" and did not physically inspect devices to ensure they worked, ¶57, heightening the inference that the actual invalid rate was persistently high.

Defendants Cannot Re-Interpret the Statements:  Defendants next resort to wordplay, claiming that "highly accurate results" referred solely to the "design" of the NAAT (nucleic acid amplification test), not the "performance" of Talis One as a whole (MTD at 28).  But the statement focused on the "test cartridge for COVID-19 diagnosis" and how it would "provide highly accurate results," and the accuracy of Talis One was an overriding concern in the IPO.  See ¶41.  What reasonable investor would read this statement to mean that **only** the NAAT was designed to be highly accurate, while Talis One as a whole was inaccurate and unreliable?  Similarly, the statement that "[a]n important factor in our ability to commercialize our products is collecting data that supports the value proposition of our products, and in particular that our tests are just as accurate and reliable as central lab testing" (¶158) did not merely state a hypothetical "value proposition" that Talis could never achieve.  Instead, it conveyed that Talis One was "just as accurate and reliable as central lab testing"—or at minimum, that the available data were consistent with and did not foreclose that "value proposition."[12]  Since Defendants' preferred interpretation "is not the only, or even most likely, interpretation," it cannot support a finding that the statements were "not misleading as a matter of law at this stage." *Edenbrook Cap., LLC v. RhythmOne Plc*, 2019 WL 1791419, at *7 (N.D. Cal. Apr. 24, 2019).

Material:  Defendants' claim that "any alleged omission was immaterial" defies common sense.  Defendants described Talis One as "highly accurate" and "reliable" when it wasn't; in turn, Talis One's inaccuracy and unreliability, driven by its high invalid rate and inherent design issues, have prevented Talis One from being launched to this day and pushed Talis's share price below $1.00.  There is no requirement at the pleading stage to provide expert analysis on precisely how the device's

---

[12] Defendants cannot escape this result by pointing to a boilerplate disclaimer (which does not even refer to accuracy or reliability) (MTD at 29), since Talis's high invalid rates and design issues already existed and were known.  ¶212(ii)-(iii).

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

inadequate chamber sizes and non-functioning parts made it inaccurate and unreliable, although the CC specifically identifies these issues and explains how Defendants' own scientists and engineers linked them Talis One's inability to "consistently identify [COVID-19] with high probability" (¶54) and high invalid rates (¶214(v)). Defendants' citation to *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 837 (9th Cir. 2022)—an Exchange Act case subject to the PSLRA's heightened pleading standard—does not support their argument. *Nektar* involved a dispute over "highly technical" study data where the allegations did not show that "investors would find one study outcome to be meaningfully different from another." *Id.* This bears no resemblance to Defendants' simple, material misstatements that Talis One was "highly accurate" and "reliable" when it was not.

Risk Disclosures Actionable: Defendants' purported risk disclosures that Talis's "diagnostic tests *may* contain errors or defects or be subject to reliability issues" are actionable in light of the *known* defects and reliability issues that had come to fruition before the IPO. *See Cutler*, 696 F. App'x at 813 (risk factors "misleading because they disclosed a risk 'in the abstract' but omitted the fact that it had 'already . . . come to fruition'"); *Flynn v. Sientra*, 2016 WL 3360676, at *10 (C.D. Cal. June 9, 2016) (misstatements not shielded by warnings about "risks . . . in the abstract, with no indication that the risk[s] 'may already have come to fruition'"). Defendants' claim that "Plaintiffs have not alleged that these purported issues existed at any time" (MTD at 29) simply ignores the CC.

### iv. Talis's Testing and EUA Submission

The Registration Statement misleadingly (1) touted detailed positive test results for Talis One, including performance measured against a comparator assay, and claimed that Talis One was "[h]ighly accurate," with "very low limits of detection" and testing results "suggestive of clinical sensitivity and specificity"; (2) stated that the FDA had requested "additional information on our test"; and (3) warned that there was "no assurance" an EUA would be granted. ¶¶146-51. These statements are actionably misleading because Talis used an inadequate comparator assay that violated FDA standards, and its EUA submission was doomed from inception. The FDA quickly rejected Talis's submission, a fact Talis withheld for 10 days. ¶74. The Registration Statement made no mention of the flawed comparator assay—an existing, known fact—and thereby omitted material "adverse information that cut[] against the positive information" Defendants chose to tout. *Arena*, 840 F.3d at 705–06; *see also*

15

*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, 2022 WL 716653, at *5 (D. Utah Mar. 9, 2022) (statements about COVID-19 test materially misleading despite literal truth).  Defendants' responses fail.

Contemporaneous Falsity:  Citing irrelevant case law,[13] Defendants argue that Talis's failure to meet objective FDA standards was a "subjective judgment" that rested on the "FDA's opinion" and did not exist "when the Registration Statement became effective on February 11, 2021."  (MTD at 27.)  Not so:  that the comparator assay violated the FDA's requirement to use a "high sensitivity" comparator assay was a hard, objectively verifiable fact that existed before the IPO and was known (or knowable) to Defendants at the time.[14]  Based on research started well before the IPO, Defendant Ismagilov's ***own article*** (judicially noticeable for his words) placed Talis's flawed comparator assay in the "low-sensitivity" category.[15]  *Supra* at 6.  Thus, at the time of the IPO, the comparator assay was "low-sensitivity"—Ismagilov wrote as much—and failed to meet the FDA's requirements.  This establishes contemporaneous falsity, and Defendants cannot blame the FDA for their own failure.

That Talis disclosed that the FDA had requested "additional information" before the IPO, without specifying what information was requested, further supports falsity.  *See In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017) (disclosure of FDA letter without mentioning concerns raised in letter was misleading).  Defendants' speculation that the FDA letter might not have challenged the comparator assay ignores the CC's allegations (¶147); notably, they have not offered the FDA letter for the Court's review.  And Defendants' citation to *Tongue v. Sanofi*, 816 F.3d 199, 212, 214 (2d Cir. 2016), is inapposite because *Tongue* involved only "ordinary" risks of FDA non-approval and a drug that the FDA eventually accepted "without further clinical trials."  By contrast,

---

[13] Unlike *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 169 (3d Cir. 2014), where a drug study allegedly failed to meet the issuer's internal threshold for statistical significance, this case has nothing to do with "[i]nterpretations of clinical trial data."

[14] To be sure, under Section 11 it is sufficient that "the omitted information exist[] at the time the registration statement became effective," *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1164 (9th Cir. 2009); actual knowledge is not required.  Defendants mis-cite *Wong v. Arlo* in this regard.

[15] There is no "truth on the market" issue from the Registration Statement indicating that Talis's comparator assay had a 180,000 NDU/mL LOD.  Ismagilov's article stating that such a comparator assay was "low-sensitivity" was published two months after the IPO, and in all events, the Registration Statement must be truthful and not misleading on its own; "investors are not generally required to look beyond a given document to discover what is true and what is not," *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008).

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

Talis's flawed comparator assay was a clear violation of FDA standards that exceeded "ordinary" risks, resulted in the EUA's immediate failure, and required Talis to perform an entirely new study.

Not Opinions:  The challenged statements are not opinions.  None was prefaced with "we believe" or similar language, ¶¶146-51, or involved Talis "interpreting its test results."  Rather, the statements reported hard facts (*e.g.*, that Talis One was "[h]ighly accurate" and "exactly matched the central lab comparator test results," ¶146) that were misleading because they omitted another hard fact—that the comparator assay violated FDA requirements.  No "interpretation" is required, and Defendants' citations to *In re Dynavax* and *Rigel* are thus inapposite.  Whatever Talis purportedly believed, the omitted information was objectively material to a reasonable investor (as Defendants do not dispute) and should have been disclosed.  *See In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *12 (N.D. Cal. Jan. 6, 2022) (statements actionable where information about FDA "concerns" and "heightened risk of denying approval . . . might be material to a reasonable investor . . . because the 'total mix' of information would tilt much more against approval than without the information").  Finally, any purported opinion statements are actionable under *Omnicare* because they (1) embedded false facts (*e.g.*, that the "high PPA and NPA" was "driven by [Talis One's] very low limits of detection" when they were in fact "driven by" the weak comparator assay, ¶¶146-47) and (2) "omit[ted] material facts" about Talis's "knowledge" that "conflict with what a reasonable investor would take from the statement," *Omnicare*, 575 U.S. at 189, including that Talis knew its comparator assay was "low-sensitivity" and deficient.  *Supra* at 5-6.

### v.  Material Omissions in Violation of Item 303 and Item 105

Item 303 required Talis to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(3)(a)(ii).  The Registration Statement violated Item 303 by omitting (1) the risk that the FDA would reject Talis's flawed comparator assay and (2) the high invalid rates plaguing Talis One.  Defendants do not dispute that both were trends or uncertainties that were reasonably likely to have a material, unfavorable effect on Talis's business.  Instead, Defendants only dispute whether the CC alleges "that any Individual Defendant" or "Talis management" was aware of these matters at the time of the IPO.

17

This argument fails for two reasons.  First, Item 303 does not require that a specific individual defendant actually knew of the concealed trends and uncertainties; the regulation requires disclosure of matters "known to management."  17 C.F.R. § 229.303(3)(a); *Slack*, 445 F. Supp. 3d at 386 (trend sufficiently alleged to be known to company); *Lyft*, 484 F. Supp. 3d at 770 (same). The CC meets this standard by alleging that Talis management was aware of the risk posed by the weak comparator assay (¶¶147, 212(i); *see also supra* at 5-6) and aware of the high invalid rates (¶¶212(ii), 214(iv)-(v), 215(ii)).  Second, whether Talis "was aware of the FDA's determination regarding the comparator assay at the time of the IPO" is a red herring because Item 303 addresses known **uncertainties**. Regardless of whether the FDA had made a final "determination" before the IPO, the comparator assay—which was known to be insufficient, as detailed above—created a known, material uncertainty that Talis's EUA submission would fail, and disclosure was required.

Item 105 required Talis to disclose the material factors that made an investment in Talis speculative or risky.  Defendants' sole response is "raised only in [a] footnote[]" and thus waived. *Cheever*, 2019 WL 8883942 at *3.  On the merits, the CC alleges an Item 105 violation because the Registration Statement failed to inform investors of the specific, known, material risks concerning the comparator assay or Talis One's high invalid rates, and generic, boilerplate warnings about hypothetical future risks are insufficient where the "present reality" renders the investment risky.  *Lyft*, 484 F. Supp. 3d at 776 n.7; *see also Slack*, 445 F. Supp. 3d at 386; *Cutler*, 696 Fed. App'x at 813.

### B.    The Complaint States Claims under the Exchange Act

The Exchange Act Defendants challenge only two elements:  falsity and scienter.

#### a.   The Exchange Act Defendants Made Material Misstatements

##### i.   False Statements that Talis Had "Ordered 5,000 Instruments"

Defendants do not contest falsity as to these statements (¶¶207-08), and their materiality argument fails for the reasons above, *supra* at 11-12.

##### ii.   "Ready to Go" and "Ship Product in a Very Timely Manner"; "Terrific Results"; "Great Product"

The Exchange Act Defendants made a series of misstatements claiming that Talis was ready to ship the Talis One to customers promptly and touting its results and quality.  On May 11, 2021,

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

Defendant Coe told an analyst that "[w]e feel we'll be in a position to ship product in a very timely manner following an [EUA] approval. . . . [W]e feel very much ready to go on our end." ¶190.  On August 10, 2021, Coe stated:  "[O]ur results really look terrific.  From a company perspective, we're way ahead on our ability to produce product relative to almost any company our size historically." ¶197.  On November 15, 2021, Kelley stated "[w]e think we've got a great product here," ¶205, and Moody stated that Talis's "investments in launch preparation [were] beginning to come to fruition," ¶203.  Each statement was materially false and misleading when made.

Actionable under *Omnicare*:  The Exchange Act Defendants wrongly describe these statements as mere "hopeful views" that are non-actionable under *Omnicare*.  But Coe's statement about "terrific" results and Talis being "way ahead on our ability to produce product," and Moody's declaration about Talis's "investments in launch preparation," are statements of fact, not opinion; none is prefaced with "I believe."  And the statements are actionable in all events.  In May 2021 Coe was personally told by FE-3 that the manufacturing timeline faced serious issues, dovetailing precisely with how, in the same month, Coe was unwilling to adjust the timeline and rejected a new timeline proposed by the SVP of R&D (who then resigned).  ¶90.  Similarly, FE-4 was told in April 2021 that Talis did not have a manufacturer at full scale and was manufacturing *by hand*.  ¶214(iii).  Just three months after Coe's May 2021 "ready to go" statement, Talis announced delays in launch, a "shortness of time [that] is circumstantial evidence that the optimistic statements were false when made," particularly given the "absence of any indication of an intervening catastrophic event."  *Fecht*, 70 F.3d at 1083-84.  And throughout this period, Talis One suffered from high invalid rates.  ¶¶53, 55-56.  In short, Talis has never been "ready to go" and never had "a great product" or "terrific" results.

These existential problems go far beyond "some fact cutting the other way," *Omnicare*, 575 U.S. at 189.  By omitting "material facts" that "conflict with what a reasonable investor would take from the statement itself," *id.*, these statements are actionable.  *See also Cutler*, 696 F. App'x at 814 (opinion statements that product was "working," "ready to scale," and capable of integrating acquisitions "quickly" actionable where reasonable investor "would have the impression of a state of affairs materially different from the reality that [product] caused up to a half-year decline in cash collections in each country it rolled out to").  The "context," discussed below, also confirms that the

19

omitted facts made the statements misleading to a "reasonable" investor, *Omnicare*, 575 U.S. at 194.[16]

Not "Corporate Optimism": These statements are not "inactionable expressions of corporate optimism" because they made specific claims that can be objectively verified, including through documents and other evidence showing Talis's internal production status, timelines, and testing results. Moreover, "general statements of optimism, when taken in context, may form a basis for a securities fraud claim." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) ("everything [was] going fine" held actionable misstatement in context of seeking to "prevent shareholder flight" after negative news); *see also Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *10 (N.D. Cal. Apr. 28, 2020) (optimistic statements actionable where "defendants did not have a reasonable basis to believe" them "because they were aware of undisclosed [contradictory] facts"). Here, the relevant context is analyst skepticism about Talis's ability to timely launch a reliable, accurate product: Defendant Coe asserted that "our results really look terrific" in response to an analyst who said "you missed your first EUA, your products are delayed[] . . . everything is dramatically pushed out from where it was." ¶197. Similarly, Kelley assured analysts that "we've got a great product here" in the context of questions about why Talis was only beginning a "limited rollout." ¶205. This information was crucial to investors in the context of Talis's prior delays and the temporary, rapidly closing launch window. ¶40.

Not Forward-Looking: Coe's "ready to go" statement is not forward-looking because it purported to describe the current state of affairs, and its "truth or falsity could be discerned when it was uttered." *In re Twitter, Inc. Sec. Litig.*, 2021 WL 4166725, at *3 (N.D. Cal. Sept. 14, 2021). In all events, the PSLRA's safe harbor does not apply given Coe's actual knowledge of falsity (*supra* at 7) and the absence of meaningful cautionary language.[17]

### iii. Cartridge Manufacturing Capability

Talis's SEC filings materially misrepresented that Talis had invested in cartridge

---

[16] The Exchange Act Defendants do not explain how the purported "'customs and practices' of the biotech industry" (MTD at 16) could shield their misstatements. No industry has license to lie.

[17] Defendants also claim to be confused (MTD at 16 n.17) about why two additional statements are false and misleading (¶¶198, 205). The CC is clear as to both: Talis did *not* adopt a "phased approach" to launch in case "some small thing arises," but because Talis One was already unreliable and Talis could not manufacture it at scale. ¶¶198-99. For the same reasons, Talis did not further delay launch to avoid "damage to reputation" from "go[ing] to market with a product too quickly." ¶¶205-06.

20

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

manufacturing lines "capable of producing one million Talis One cartridges per month" that would "scale to full capacity by the end of 2021" or "through 2021."  ¶¶185, 187, 194, 200; *see also* ¶¶196, 202 (statements that "[t]he ramp up of our [Talis One] manufacturing efforts[] . . . is expected to be completed by the end of 2021").  These statements were materially misleading for the reasons set forth *supra* at 12-13.  Similarly, Defendant Moody's assurance that Talis was "on track to bring up our automated lines, and we've begun doing so" (¶189) "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists."  *In re QuantumScape Sec. Class Action Litig.*, 2022 WL 137729, at *8 (N.D. Cal. Jan. 14, 2022).

The PSLRA's safe harbor does not apply because these misstatements are not forward-looking: they addressed the "then-existing capabilities" of Talis's manufacturing lines and represented that the lines were at that time ready to scale up in 2021. *Cutler*, 696 Fed. App'x at 815; *see also QuantumScape*, 2022 WL 137729 at *9 (statement that speaker "expect[ed]" costs to decline described the existing state of affairs); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 964-655 (N.D. Cal. 2014) ("[S]tatements that a project is 'on-track,' 'on-budget,' or 'on-schedule,' are not forward-looking but statements relating to current conditions.").  In all events, the statements are actionable under the safe harbor because the delays and high invalid rates known to Talis's senior executives demonstrate actual knowledge, and the statements were not accompanied by "tailored," "non-boilerplate warnings" of Talis One's problems, *Zaghian v. Farrell*, 675 F. App'x 718, 720 (9th Cir. 2017), that "discredit[ed] the alleged misrepresentations to such an extent that the risk of real deception drops to nil." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005).

### iv.  Validation of Cartridge Manufacturing Lines

On August 10, 2021, Talis stated that it had "[c]ompleted installation and [was] in the final stages of validation for the first set of automated cartridge production lines." ¶192.  But Talis still had not validated its production lines by September 2021, ¶215(iii), and on March 15, 2022, at the end of the Class Period, Defendant Kelley finally conceded that Talis was just "***beginning*** to evaluate the performance of cartridges coming off our high-yield lines" in November 2021.  ¶193.

Defendants' admission establishes that the prior statements about Talis being in the "final stages of validation" in August 2021 were false when made.  In the medical device industry,

21

"validation" means "that a process has been subject to such scrutiny" that its result "can be practically guaranteed." ¶97. Federal regulations similarly require "objective evidence" that a process "consistently produces" a product "meeting its predetermined specifications."[18]  Thus, Kelley's disclosure that Talis was just beginning to evaluate the cartridges produced by its automated lines in November 2021 revealed that Talis could not have been in the "final stages of validation" in August 10, 2021, three months earlier.  Defendants' only response is to dispute the meaning of the word "validation," speculating that Talis might somehow have validated the "lines" without checking the cartridges they produced, and complaining that "FE-5 does not state *which* production lines had not been validated."  (MTD at 17 (emphasis in original).)  Such arguments fail given the authoritative definitions of "validation," the fact that only one production line had been installed, ¶99, and COO Liu's August 2021 claim that the line had "been used to produce thousands of cartridges," ¶95.  Plaintiffs have amply alleged that the "validation" statements were false because Talis did not properly validate the line in August 2021; at best, Defendants' arguments merely raise a fact issue for discovery.

### b.  The CC Establishes a Strong Inference of Scienter

Plaintiffs allege facts raising a strong inference of scienter, which includes "deliberate recklessness."  *Arena*, 840 F.3d at 705. The "inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322- 23 (2007).  A "strong inference" means "a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference" of nonfraudulent intent. *Id.* at 310.  The inference "need not be irrefutable . . . or even the most plausible," and no "smoking-gun" is required.  *Id.* at 324-26.  Plaintiffs "need not prove [their] case at the outset," but only allege "facts which, if true, substantiate an explanation at least as plausible as a nonfraudulent alternative." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1033, 1035 (9th Cir. 2016); *see also In re Amgen*

---

[18] "Validation means confirmation by examination and provision of objective evidence that the particular requirements for a specific intended use can be consistently fulfilled. (1) Process validation means establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications."  21 C.F.R. § 820.3(z), (z)(1).

*Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014) ("tie goes to the [p]laintiff").

Collectively, the facts alleged support a cogent, compelling inference of scienter by showing a senior management team that repeatedly claimed the Company's sole product was "on track" and "ready to go," even as they knew and had access to completely different internal facts. Further, the Exchange Act Defendants were motivated by Talis's "going concern" problem, which gave them an "incentive to gamble" by repeatedly misrepresenting Talis One's status to boost the Company's share price in the aftermath of the IPO. *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020). And Defendants' claim that an absence of insider stock sales "negates scienter is contrary to controlling case law." *Sientra*, 2016 WL 3360676 at *15.

Defendants' only proposed competing inference—that Talis's executives somehow had no knowledge or access to information about the numerous, persistent problems with Talis One, despite being personally told of serious issues with manufacturing timelines, being required to report delays to the federal government, and speaking publicly about Talis One's status on every earnings call—is not plausible, much less more compelling. Defendants' improper efforts to "attack individual allegations in isolation . . . cannot overcome the overwhelming evidence drawn from a holistic view." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012).[19]

### i. Core Operations Supports Scienter

The first two independent prongs of the core operations inference apply in light of the CC's allegations of executives' personal involvement in Talis's operations, detailed below. *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). The third prong also applies. During the Class Period, Talis One was the core—and entirety—of Talis's business. Talis had no products

---

[19] Defendants' cited cases fail. For example, *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108-09 (9th Cir. 2021), rejected scienter allegations based on the CEO's position alone. In *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017), unlike here, there were no actionable misstatements and no allegations that any confidential witness informed a corporate officer of the issues. In *Zucco*, 552 F.3d at 996-98, 1000-01, the confidential witnesses were not "in a position to be personally knowledgeable," and the "remaining allegations demonstrate[d] only that there was some disagreement within the corporation over its accounting processes." The CC also pleads far more than in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) ("general awareness" of "day-to-day workings" of business) and *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062-63 (9th Cir. 2014) (no specific allegations of defendants' access or review).

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

approved for sale and focused exclusively on bringing Talis One to market, and payments under the RADx Contract for doing so were Talis's *only* source of revenue during 2021. CEO Coe co-founded the Company in 2010, with over a decade of experience before the IPO. ¶27. Talis One "played such a central role in [Talis's] . . . plan that it 'would be absurd to suggest that management was without knowledge' of its deficiencies." *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 672–73 (N.D. Cal. 2021); *see also Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862 (N.D. Cal. Feb. 15, 2018) (scienter may be imputed "based on the inference that key officers have knowledge of the 'core operations' of the company"); *Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *8–9 (S.D. Cal. Sept. 19, 2016) ("incredible to conclude that" CEO and other executives "were not aware" of manufacturing and quality issues with "most advanced product candidate" that was "critical" to company's success); *Sientra*, 2016 WL 3360676 at *15 (same).[20]

### ii.  Former Employee Allegations Support Scienter

FE statements establish the Officer Defendants' knowledge of problems with Talis's sole product, including distribution to all of management of a user study showing leaking cartridges (¶211(iii)); in May 2021, FE-3 *personally briefing Coe* "over several weeks" on serious issues with the manufacturing timelines and Coe rejecting an adjusted timeline[21] (¶¶211(vi), 213(ii)); and executives' reporting of presales (tracked in Salesforce) to the Board (¶214(ii)). Whether Coe "agreed" with what he was told (MTD at 22) is irrelevant, as executives cannot simply "ignore the facts and plead ignorance of the risk." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008). Further, since Talis One was the Company's only product, it is no surprise that multiple employees on different teams were aware of high invalid rates, an issue known throughout the Company (FE-2, 4, and 5). *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)

---

[20] Defendants' cited cases do not change this result. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014), denied the inference where there were no factual allegations that *anyone* at the issuer "had knowledge" of the problem; here, Coe was expressly told as much. The allegations in *Carr v. Zosano Pharma Corp.*, 2021 WL 3913509, at *12 (N.D. Cal. Sept. 1, 2021), did not include information from former employees or establish that management was focused on a single product.

[21] Defendants' citation to *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*, 2021 WL 1056549, at *5 (N.D. Cal. Mar. 19, 2021), is irrelevant because it involved a confidential witness who "did not personally attend" the briefing calls and meetings with the CEO.

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

("any number of company employees would be in a position to infer the" misrepresented facts).  The interrelated problems with Talis One "had the very obvious effect" of delaying, and ultimately foreclosing, its launch.  *Id.*  Defendants cannot simply disregard these well-pleaded allegations.

### iii.   The Officer Defendants' Public Statements Support Scienter

Further supporting a strong inference of scienter, the public statements of the Officer Defendants and other senior executives demonstrate their close involvement in, and detailed personal knowledge of, Talis One's status.  *See Shenwick v. Twitter, Inc..* 282 F. Supp. 3d 1115, 1147 (N.D. Cal. Oct. 16, 2017) ("assertion that [d]efendants were unaware of an alleged issue can be directly contradicted by the fact that [they] specifically addressed it in [their] statement[s]").

During Talis's first post-IPO earnings call, Coe discussed the Company's "operational and commercial activities to support our anticipated launch of our COVID-19 test" and claimed that "we look very closely at our assay's performance," while Moody discussed automated lines, assured investors that "we are on track to bring up our automated lines," and reported that for the prior quarter the Company's only revenue related to development of the COVID-19 test, while all expenses related to R&D for the test and developing the commercial team to sell it.  Kirby Decl., Ex. F at 5.  Further, after the Class Period Moody admitted that he "originally established" Talis's "manufacturing and operations" functions "as we pivoted to developing our COVID test and scale up [sic] manufacturing in mid-2020."  Kirby Decl., Ex. T at 5.  Kelley, the Chief Commercial Officer before becoming CEO in December 2021, spoke in detail about Talis One's launch on November 11, 2021 and March 15, 2022.  Liu, who reported to Coe, publicly stated that "we'll be monitoring" the "demand" for cartridges, ¶227.  *See Quality Sys.*, 865 F.3d at 1145 (strong inference of scienter when "executives themselves told investors they had real-time access to, and knowledge of, [] information").

Further "bolster[ing] the inference of scienter" are the "temporal proximity" of "only [three] months" between Coe's May 2021 "ready to go" statement and Talis's August 2021 admission of delays, *Twitter*, 282 F. Supp. 3d at 1148, and the "altered wording," *Acer*, 2020 WL 3268495 at *10, of Talis's 2021 10-K—signed and certified by Kelley and Moody—which revealed that Talis had merely ordered "components," not 5,000 "instruments."

In light of these allegations, "it is a logical, and strong, inference that [the Officer Defendants]

25

were aware of the alleged severe and pervasive problems" plaguing Talis One at the time of their public statements. *Sientra*, 2016 WL 3360676 at *15.

### iv. The Officer Defendants Had Continuous Access to Information Contradicting Their Misstatements

Defendants wrongly contend that "the CC must allege facts showing [the Officer Defendants] ***actually had*** such information at the time of their statements; 'access' is not enough." (MTD at 23) (emphasis in original) (citing *Align*, 856 F.3d at 620). That is not the law; their cited authority states that "actual access to the disputed information may raise a strong inference of scienter." *Align*, 856 F.3d at 620; *Reese v. Malone*, 747 F.3d 557, 575, 577 (9th Cir. 2014) (scienter adequately pleaded where defendant's statements "strongly suggest[ed] she had access to the disputed information").

The CC's allegations more than meet this standard. Pursuant to the RADx Contract with the NIH—which was signed by Defendant Coe (¶220) and provided the Company's only source of revenue in 2021 (2021 10-K at 5)—Talis was required to report on "manufacturing, supply chain, [and] production rates" to NIH, and if a milestone delivery was delayed, to "report[] the reason" and provide "an updated schedule." ¶221. In July and October 2021, "[d]ue to delays in meeting certain milestones, [Talis] received several extensions to the [RADx] Contract [of] the time to perform the remaining milestones." 2021 10-K at 13; *see also* 3Q21 10-Q at 12. These extensions necessarily required Talis to report the "reason" for the milestone delays to NIH, which further links the Officer Defendants to the "data" and "reports" required by the RADx Contract and strongly indicates that such data contradicted their positive public statements. *Reese*, 747 F.3d at 571-72.[22] This is further corroborated by the FE accounts, which establish that the Officer Defendants "were in possession of contemporaneous, contradictory information." *Zuora*, 2020 WL 2042244 at *11.

### v. Abrupt Executive Departures Support Scienter

Six months after the IPO—and just weeks after Talis first disclosed delays—CEO Coe suddenly resigned, effective immediately. That Coe agreed to serve as an "advisor" is irrelevant, as

---

[22] No such facts were present in *Intuitive Surgical*, 759 F.3d at 1062-63 (no witnesses had "direct access to executives"; no allegations about contents of reports) or *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036-37 (9th Cir. 2002) (bare allegations of "access" and sale of 1.4% of stock).

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

this was merely a pretext for a non-compete.[23]  Coe was dismissed from an executive role responsible for SEC filings and public statements as Talis One's problems were being publicly revealed.  And Coe's permanent replacement, Blaser, resigned after only *seven days*, purportedly due to "personal matters"—an implausible claim even before considering FE-4's report that Blaser left because of major fraud.  Finally, COO Liu left on the last day of the Class Period, when Talis admitted Talis One was still not ready for production.[24]  Given Coe and Liu's involvement with the misrepresented facts, and Blaser's one-week stint as CEO, their abrupt departures are highly suggestive of misconduct.

### vi.  Collective Scienter Is Adequately Pleaded

Contrary to Defendants' argument in a footnote (MTD at 24 n.32), the CC specifically alleges collective scienter (¶¶234-35).  Talis was a small company devoted solely to a single product.  Even without imputing the Officer Defendants' scienter, the accumulation of misrepresented and concealed problems that delayed—and ultimately doomed—Talis One were known throughout the Company, including by management-level non-defendants.  *See, e.g.*, ¶¶211(iii) and (vi), 214(iv) and (v)).  This "create[s] a strong inference that at least *some* corporate officials knew of the falsity upon publication." *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) (emphasis in original).

### C.    The Confidential Witness Allegations Are Well-Pleaded

Finally, the CC includes "each confidential witness's job description and responsibilities" and describes the five FEs "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Quality Sys.*, 865 F.3d at 1145.  These allegations support both falsity and scienter given "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).

First, each FE is qualified to speak credibly about Talis One from personal knowledge.  Two

---

[23] *See* Park Decl., Ex. D, Section 3(g) (agreement that Coe "will not engage in any other work activity for any other business entity involving point-of-care molecular diagnostics for infectious disease" for nine months).

[24] Unlike in *NVIDIA*, 768 F.3d at 1062-63, the CC "connect[s]" each of these individuals to the issues misrepresented by the Exchange Act Defendants.

27

engineers (FE-1 and FE-3) and a senior scientist with a Ph.D. in molecular genetics (FE-2) were based in Talis's Menlo Park headquarters and personally observed serious problems with Talis One before the IPO. FE-4 and FE-5, in sales and technical support roles, confirmed that the problems continued throughout the Class Period. As in *Berson*, 527 F.3d at 985, where the Ninth Circuit rejected the defendants' argument that confidential witnesses were not in a position to know "because they were 'engineers or technical editors' rather than managers," Defendants here merely "quibble" about the basis for portions of the FEs' statements. These arguments fail because the Talis One—an integrated platform comprised of an analyzer and consumable cartridge—was the Company's sole focus, and each FE was in a position to "know" or "reasonably deduce" the information attributed to them, *id.* As to the only statements Defendants specifically challenge on this ground:

- FE-1, a senior R&D engineer who joined Talis in 2016 and worked on the cartridge, had reason to know that Talis had failed to produce sufficient instruments in Q4 2020 based on a schedule posted by Cunningham, who was responsible for supply chain issues for the analyzer and cartridge. ¶211(iv).

- FE-2, who worked on developing the COVID-19 assay, knew of Talis's unrealistic manufacturing timeline given the minimal staffing in FE-2's area and FE-2's observation of incompetency at every level. ¶212(v).

- FE-3 had "personal knowledge of manufacturing timelines" (MTD at 12) because FE-3's work involved "the transfer of consumable designs to manufacturing," ¶213, and in May 2021, FE-3 *personally* briefed Coe regarding manufacturing timelines, ¶213(ii), which explicitly establishes a basis for FE-3's (and Coe's) knowledge.[25]

- FE-4, an account manager for the western region, knew Talis One was little more than a "dummy box" because on or around November 12, 2021, FE-4 turned on a Talis One device and encountered a repeated "invalid" message, was told by Alex de los Reyes that the invalid rate was so high that Talis could not operate the machine in front of potential clients, and discussed the issue with Mai Nguyen (who cited two faulty parts in the test). ¶214(iv)-(v). As an account manager, FE-4 was also positioned to know about Talis's use of Salesforce software to track pre-sale efforts and that these sales were tracked by management and reported to the Board. ¶214(i), (ii).

- FE-5, who ran a technical support team for Talis One, learned about the high invalid rates and production line validation issues that delayed that launch. ¶215(ii), (iii).

Underscoring their reliability, the FEs "present overlapping and corroborative information,"

---

[25] Furthermore, both FE-2 and FE-3 indirectly reported to then-SVP of R&D Ramesh Ramakrishnan, who proposed a new manufacturing timeline to Coe in May 2021. ¶¶211(vi), 212, 213.

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

*QuantumScape*, 2022 WL 137729 at *9, and "directly corroborate the independent testimony of one another." *In re CV Therapeutics, Inc.*, 2004 WL 1753251 (N.D. Cal. Aug. 5, 2004). **All five** FEs confirmed that Talis was not able to produce Talis One at scale before the IPO or during the Class Period (¶¶211(ii), (v); 212(iii), (v); 213(i)-(ii); 214(iii), (v); 215(iii)), and three FEs confirmed that Talis One's high invalid rates were persistent and known (¶¶212(ii); 214(iv)-(v); 215(ii)). Further, the FEs' allegations are consistent with Defendants' own admissions: Talis admitted delays in August 2021 (¶92) and in March 2022 conceded the high invalid rates and manufacturing problems (¶108) that the FEs observed far earlier. *See BioMarin*, 2022 WL 164299 at *11 (allegations from confidential witness "cohere with other allegations," including company's later admissions).

Second, that some FEs were not "employed . . . during the *entire* Class Period does not in itself render their statements unreliable as a matter of law." *Zuora*, 2020 WL 2042244 at *11. The FEs' employment collectively covers the entire Class Period; three were at Talis during the IPO; and FE-4 was at Talis for the full Class Period:



The FEs confirm that Talis One suffered serious, persistent problems before the IPO and throughout the Class Period. For example, FE-1 (who left in March 2021) confirmed that serious issues existed even before the Class Period, while other FEs confirmed that the same issues persisted after FE-1's departure. ¶¶213(ii), 215(i); *see Quality Sys.*, 865 F.3d at 1145 (witness who left before class period relevant to establishing management's access to information during class period); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (pre- and post-class period information relevant "to confirm what a defendant should have known during the class period").

Third, Defendants' "hearsay" argument is a red herring. Plaintiffs' FE allegations readily meet

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

the plausibility standard, and there is no basis to conduct a "mini-trial on the admissibility of the evidence" at this stage. *BioMarin*, 2022 WL 164299 at *11 n.8. Further, while "the fact that a confidential witness reports hearsay does not automatically disqualify his statement," *Zucco*, 552 F.3d at 997 n.4,[26] the only four statements Defendants challenge are non-hearsay or otherwise corroborated:

- FE-1 determined that Talis was not "ready to go" into production in May 2021 based on personal experience with multiple manufacturing, design, and supply chain issues also observed by others[27] (¶211(i)-(v));

- It is relevant in itself that FE-4's contact at another company stated that CEO Blaser left Talis due to major fraud, and Defendants offer no other plausible reason why Blaser left Talis after just *seven days* (¶248);

- FE-5 was told Talis One's invalid rate had been and remained above 10%, a fact corroborated by FE-2 and FE-4 (¶¶214(iv)-(v); 215(ii)); and

- FE-4's account of persistent launch delays (¶214(iv)) aligns with **every other FE** (¶¶211-13, 215). Further, the CC specifically alleges "when" and "by whom" (MTD at 12) FE-4 was told that the device should not be turned on with customers (November 12, 2021; FE-4's supervisor de los Reyes, ¶214(iv)) and that the FDA did not physically inspect devices (December 6, 2021; Product Manager Mai Nguyen, reporting information from Roeding and Lai, ¶214(v)).

Fourth, while a confidential source's direct contact with individual defendants is irrelevant to falsity and unnecessary for scienter, FE-3 personally briefed Defendant Coe in May 2021 about serious issues with manufacturing timelines for Talis One. All other FEs provide additional details that, analyzed holistically, confirm that the CC adequately alleges falsity and scienter.

## IV.    CONCLUSION

For the reasons stated above, the MTD should be denied.[28] Alternatively, Plaintiffs respectfully request leave to amend.

---

[26] In *Kipling v. Flex Ltd.*, 2020 WL 7261314, at *11 (N.D. Cal. Dec. 10, 2020), the claims depended solely on CW allegations that lacked specificity, while the FEs here provide sufficient "context" about their sources, *id.*, and Talis's own disclosures corroborate them.

[27] Further, FE-1's report that "it was rumored that in or around May 2021," Coe rejected a new timeline proposed by the then-SVP of R&D, who resigned within days, ¶211(v), is corroborated by FE-3 personally briefing Coe on problems with the manufacturing timelines in May 2021. ¶213.

[28] Defendants raise no distinct arguments concerning the "control person" claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act. *See* MTD at 30 n.41.

Dated: September 16, 2022

Respectfully submitted,

By: /s/ Jonathan D. Park
**POMERANTZ LLP**
Jennifer Pafiti (Bar No. 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (212) 661-8665
jpafiti@pomlaw.com

Jeremy A. Lieberman (*pro hac vice* application forthcoming)
J. Alexander Hood II (*pro hac vice*)
James M. LoPiano (*pro hac vice*)
Jonathan D. Park (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com
jpark@pomlaw.com

*Counsel for Co-Lead Plaintiff Leon Yu and Max Wisdom Technology Limited and Co-Lead Counsel for the Putative Class*

**BLEICHMAR FONTI & AULD LLP**
Joseph A. Fonti (*pro hac vice*)
jfonti@bfalaw.com
Evan A. Kubota (*pro hac vice*)
ekubota@bfalaw.com
7 Times Square, 27th Floor
New York, New York 10036
Tel: (212) 789-1340
Fax: (212) 205-3960

– and –

Lesley E. Weaver (Bar No. 191305)
lweaver@bfalaw.com
555 12th Street, Suite 1600
Oakland, California 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020

31

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)

*Counsel for Co-Lead Plaintiff Martin Dugan and Co-Lead Counsel for the Putative Class*

**THE SCHALL LAW FIRM**
Brian Schall (Bar No. 290685)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Co-Lead Plaintiff Martin Dugan*

32

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT (Case No 3:22-cv-00105-SI)