COOLEY LLP
Patrick E. Gibbs (183174)
(pgibbs@cooley.com)
Shannon M. Eagan (212830)
(seagan@cooley.com)
Samantha A. Kirby (307917)
(skirby@cooley.com)
Jessie Simpson LaGoy (305257)
(jsimpsonlagoy@cooley.com)
3175 Hanover Street
Palo Alto, California 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

*Attorneys for Defendants Talis Biomedical Corporation,
Brian Coe, J. Roger Moody, Jr., Felix Baker, Raymond
Cheong, Melissa Gilliam, Rustem F. Ismagilov,
Kimberly J. Popovits, Matthew L. Posard, Randal Scott,
and Robert J. Kelley*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TALIS BIOMEDICAL SECURITIES LITIGATION | Case No. 22-cv-00105-SI |
| | CLASS ACTION |
| THIS DOCUMENT RELATES TO: | **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT** |
| ALL ACTIONS | |
| | Date:        November 4, 2022<br>Time:        10:00 A.M.<br>Courtroom:    1<br>Judge:       Hon. Susan Illston |

COOLEY LLP

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................................ 1

II. FE ALLEGATIONS ARE UNRELIABLE ................................................................. 1

III. PLAINTIFFS' SECURITIES ACT CLAIMS SHOULD BE DISMISSED ...................... 3

    A. Section 11 Claim Sounds in Fraud ................................................................ 3

    B. Plaintiffs Fail to Plead Falsity Under Any Standard ...................................... 4

        1. 5,000 Instruments (¶ 155) ................................................................ 4

        2. Cartridge Manufacturing (¶ 153) ..................................................... 5

        3. Design and Performance (¶¶ 158, 160) ............................................ 6

        4. Comparator Assay/Testing and EUA Submission (¶¶ 146, 148, 150) ........ 9

    C. Talis Complied with Item 303 and Item 105 ............................................... 11

IV. PLAINTIFFS' EXCHANGE ACT CLAIMS SHOULD BE DISMISSED ...................... 12

    A. Plaintiffs Fail to Plead Falsity For Any Challenged Statement ...................... 12

        1. 5,000 Instruments (¶ 207) ................................................................ 12

        2. Readiness to Produce Product (¶¶ 190, 197, 198, 203, 205) ..................... 12

        3. Manufacturing (¶¶ 185, 187, 189, 194, 196, 200, 202) ........................... 14

        4. Validation (¶ 192) ............................................................................ 15

    B. Plaintiffs Fail to Plead Scienter ................................................................... 15

V. CONCLUSION ......................................................................................................... 18

COOLEY LLP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allied Nevada Gold Corp. Sec. Litig.*,
   743 F. App'x 887 (9th Cir. 2018) ..................................................................................... 5

*In re Atossa Genetics Inc. Securities Litigation*,
   868 F.3d 784 (9th Cir. 2017) ......................................................................................... 10

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ......................................................................................................... 5

*Berson v. Applied Signal Techology, Inc.*,
   527 F.3d 982 (9th Cir. 2008) .................................................................................... 2, 16

*In re BioMarin Pharm. Inc. Sec. Litig.*,
   2022 WL 164299 (N.D. Cal. Jan. 6, 2022) .................................................................... 3

*Carr v. Zosano Pharma Corp.*,
   2021 WL 3913509 (N.D. Cal. Sept. 1, 2021) ............................................................... 17

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ......................................................................................... 16

*Cutler v. Kirchner*,
   696 F. App'x 809 (9th Cir. 2017) .................................................................................... 5

*In re CV Therapeutics, Inc.*,
   2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) .................................................................. 3

*Edenbrook Cap., LLC v. RhythmOne Plc*,
   2019 WL 1791419 (N.D. Cal. Apr. 24, 2019) ................................................................. 8

*Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*,
   2021 WL 1056549 (N.D. Cal. Mar. 19, 2021) ......................................................... 15, 18

*In re Facebook, Inc. Sec. Litig.*,
   477 F. Supp. 3d 980 (N.D. Cal. 2020) ............................................................................ 6

*Flynn v. Sientra, Inc.*,
   2016 WL 3360676 (C.D. Cal. June 9, 2016) ................................................................. 17

*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*,
   2022 WL 716653 (D. Utah Mar. 9, 2022) ...................................................................... 9

COOLEY LLP

*Glazer Cap. Mgmt., LP v. Magistri,*
549 F.3d 736 (9th Cir. 2008) ............................................................................................... 18

*Guangyi Xu v. ChinaCache Int'l Holdings Ltd.,*
2017 WL 114401 (C.D. Cal. Jan. 9, 2017) ............................................................................ 4

*Immanuel Lake v. Zogenix, Inc.,*
2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) ...................................................................... 10

*Inchen Huang v. Higgins,*
2019 WL 1245136 (N.D. Cal. Mar. 18, 2019) ...................................................................... 18

*Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.,*
2020 WL 1244936 (N.D. Cal. Mar. 16, 2020) ................................................................. 2, 17

*Lehmann v. Ohr Pharm. Inc.,*
2019 WL 4572765 (S.D.N.Y. Sept. 20, 2019) ...................................................................... 18

*Lipton v. Pathogenesis Corp.,*
284 F.3d 1027 (9th Cir. 2002) .............................................................................................. 16

*Loc. 353, I.B.E.W. Pension Fund v. Zendesk, Inc.,*
2022 WL 614235 (9th Cir. Mar. 2, 2022) ............................................................................ 17

*In re Lyft Inc. Securities Litigation,*
484 F. Supp. 3d 758 (N.D. Cal. 2020) ................................................................................. 11

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
513 F.3d 702 (7th Cir. 2008) ................................................................................................ 16

*In re Metricom Sec. Litig.,*
2004 WL 966291 (N.D. Cal. Apr. 29, 2004) .......................................................................... 4

*Mulligan v. Impax Labs., Inc.,*
36 F. Supp. 3d 942 (N.D. Cal. 2014) ................................................................................... 14

*In re Nektar Therapeutics Securities Litigation,*
34 F.4th 828 (9th Cir. 2022) ................................................................................................... 8

*Nguyen v. Endologix, Inc.,*
962 F.3d 405 (9th Cir. 2020) .......................................................................................... 15, 18

*In re Nimble Storage, Inc. Sec. Litig.,*
252 F. Supp. 3d 848 (N.D. Cal. 2017) ................................................................................. 14

*In re NVIDIA Corp. Sec. Litig.,*
768 F.3d 1046 (9th Cir. 2014) .............................................................................................. 17

COOLEY LLP

iii

*Pirani v. Slack Technologies, Inc.*,
  445 F. Supp. 3d 367 (N.D. Cal. 2020) ................................................................. 11

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014)...................................................................... *passim*

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017)................................................................. 3, 17

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022) ..................................................... 3, 14

*Rabkin v. Lion Biotechnologies, Inc.*,
  2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ................................................ 17

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014)......................................................................... 16

*In re Restoration Robotics, Inc. Sec. Litig.*,
  417 F. Supp. 3d 1242 (N.D. Cal. 2019) ...................................................... 11

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012)......................................................................... 17

*Rihn v. Acadia Pharms. Inc.*,
  2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) ............................................. 17

*Roberts v. Zuora, Inc.*,
  2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ......................................... 3, 13

*Sakkal v. Anaplan Inc.*,
  557 F. Supp. 3d 988 (N.D. Cal. 2021) ......................................................... 15

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015)............................................................... 9

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)............................................................................. 3

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................. 16, 17

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020)............................................... 17

*Smith v. NetApp, Inc.*,
  2021 WL 1233354 (N.D. Cal. Feb. 1, 2021) ............................................... 13

Cooley LLP

iv

*In re Solarcity Corp. Sec. Litig.*,
274 F. Supp. 3d 972 (N.D. Cal. 2017) ...................................................................................... 16

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996)......................................................................................... 6, 8

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)........................................................................................ 10

*In re Twitter, Inc. Sec. Litig.*,
2021 WL 4166725 (N.D. Cal. Sept. 14, 2021) ...................................................................... 14

*In re Vaxart, Inc. Sec. Litig.*,
576 F. Supp. 3d 663 (N.D. Cal. 2021) ................................................................................ 17

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996)......................................................................................... 13

*Webb v. Solarcity Corp.*,
884 F.3d 844 (9th Cir. 2018)........................................................................................ 18

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 ...................................................................................................... 16

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)......................................................................................... 5

COOLEY LLP

## I.    INTRODUCTION

Plaintiffs' Opposition to the Motion to Dismiss employs a range of tactics to distract from the shortcomings of the CC, none of which undermine Defendants' Motion.

*First*, Plaintiffs attempt to invoke the renown of Theranos and suggest that Talis provided incomplete data to the FDA, but they allege no facts to support their innuendo. Plaintiffs' fixation on claiming fraudulent conduct before, during, and after the IPO underscores that their Section 11 claim sounds in fraud but does nothing to rescue the CC.

*Second*, Plaintiffs repeatedly seek to amend the CC through their Opposition, including by relying on extrinsic documents not referenced in the CC. That they would do so effectively concedes that their pleading fails to state a claim on its own.

*Third*, unable to effectively rebut that the FEs are unreliable, Plaintiffs exaggerate what the FEs actually say and repeatedly obscure (or disregard) the chronology of events—pretending that each FE's statements apply equally throughout the relevant time period, and ignoring the FEs' varying periods of employment and the different circumstances Talis faced at different points in time. Plaintiffs do this because they cannot show (as they must) why each challenged statement was false or misleading *when made*.

*Fourth*, Plaintiffs stake out a theory that makes no sense: that Talis One was "known" to be "doomed" from inception. They do not come close to explaining why Talis would knowingly use an insufficient comparator assay for its flagship product (that would inevitably result in the failure of its pending EUA), and then spend over a year trying to bring an inherently flawed product to market. The far more compelling inference is that Talis sought to address a pressing public need and bring its first product to market in a time of unprecedented uncertainty. While Plaintiffs make much of Talis's post-Class Period decision to discontinue commercialization efforts for its test, this is merely another attempt to plead fraud by hindsight. Plaintiffs' effort to conjure a fraud from a disappointing business result fails, and the CC should be dismissed with prejudice.

## II.    FE ALLEGATIONS ARE UNRELIABLE

Plaintiffs' Opposition does not salvage the unreliable FE allegations. (Mot. at 11–12.) First, it repeats the CC's conclusory allegations about "personal knowledge" (Opp. at 27–29) but makes

COOLEY LLP

1

no effort to explain specifically *how* the FEs would have known the facts attributed to them.[1] (Mot. at 12.) Nor do the allegations live up to Plaintiffs' hype: each low-level FE reports different and relatively minor issues at varying points in time. Plaintiffs characterize these statements as broad conclusions about Talis One, but allege no facts suggesting that any FE had a factual basis for such sweeping conclusions. (*See* Mot. at 18–20; ¶ 211 (**FE-1** reporting one alleged instance of a missed production target in Q4 2020, yet claiming large-scale manufacturing was not possible); ¶ 212 & Opp. at 28 (alleging "incompetency at every level" and "no realistic [manufacturing] timeline" based on "minimal staffing in **FE-2**'s area" sometime in 2020); Opp. at 28 (using circular reasoning to argue that because **FE-3** allegedly "briefed Coe [on] manufacturing timelines," this somehow establishes a basis for FE-3's knowledge); *id.* & ¶ 214 (claiming functionality problems based on anecdotal experience and hearsay from late 2021 and inferring executive knowledge of sales data based on **FE-4**'s general knowledge of Salesforce).)[2] This is not enough. *See Iron Workers Loc. 580 Joint Funds v. Nvidia Corp.*, 2020 WL 1244936, at *10 (N.D. Cal. Mar. 16, 2020) (FE knowledge about one part of a business does not establish knowledge of the bigger picture).[3]

Plaintiffs next argue that that all five FEs "confirmed" Talis was not able to produce Talis One at scale, and that three FEs (2, 4, and 5) "confirmed" high invalid rates were persistent and known (Opp. at 28–29), but the CC does not actually say either. FE-2, FE-3, and FE-5 did not address scale at all. FE-1, who allegedly discussed scale, left the Company in March of 2021, well before the EUA was approved and as Talis was still early in the process of scaling manufacturing. No FE corroborates FE-1's story.[4] As to high invalid rates, FE-2's report from sometime before leaving Talis in October 2020 cannot plausibly shed light on what the invalid rate was, or what was known about it, when Talis submitted its first EUA in January 2021, went public in February, or any point thereafter. FE-4 and FE-5 reference invalid rates in late 2021, after the EUA was approved, at a completely different phase of manufacturing ramp up, and shortly before Talis itself

---

[1] Unless otherwise stated, all internal citations and quotations are omitted and all emphasis is added.
[2] Plaintiffs do not even attempt to demonstrate FE-5's personal knowledge, stating only that FE-5 "learned about" allegedly contradictory information. (Opp. at 28.)
[3] These allegations are easily distinguishable from *Berson v. Applied Signal Techology, Inc.*, 527 F.3d 982, 985, 987 (9th Cir. 2008), which found that lower-level FEs could infer the existence of specific and "devastating" stop-work orders because they put "numerous employees out of work."
[4] FE-4's passing reference to "scale" is based solely on unreliable hearsay. (¶ 214(iii); Mot. at 12.)

disclosed an uptick in invalid rates.[5] No FE purports to close the gap between these two periods.[6]

Further, the Opposition barely contests that certain FE statements are hearsay but asks the Court to consider them anyway. (Opp. at 30.) *BioMarin* only reinforces Defendants' point: "the test for plausibility of confidential witness allegations is more demanding than general pleading standards." 2022 WL 164299, at *11 n.8. "Admissibility" is not at issue—what matters is that none of the Opposition's explanations render the FE statements any less "vague" or "unreliable." *Id.*; Mot. at 12. Plaintiffs revert to their flawed theory of corroboration, claim that FE-1's determination about Talis was based on "personal experience" two months after FE-1 left, and inexplicably state "[i]t is relevant in itself" that an **unnamed contact** at an **unnamed company** shared with FE-4 his theory about Blaser's departure. (Opp. at 30 & nn.26, 27.)[7] These hearsay allegations are unreliable.

Last, Plaintiffs do not contest that only one FE (FE-3, whose assertions fail for reasons described *infra* p. 15) allegedly ever had direct contact with any individual defendant. (Opp. at 30.) This lack of direct contact is relevant to both prongs of the FE analysis. *See, e.g.*, *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014); Mot. at 11, 21–23.

### III.   PLAINTIFFS' SECURITIES ACT CLAIMS SHOULD BE DISMISSED

#### A.   Section 11 Claim Sounds in Fraud

Plaintiffs formalistically argue that Rule 8 applies because the Securities Act allegations are "separate and distinct" and do not contain "averments of fraud" (so they say). (Opp. at 10.) But they do not explain how the conduct forming the basis of the Section 11 claim differs from the Section 10(b) claim, nor grapple with allegations that expressly bridge them—including that after

---

[5] Plaintiffs do not challenge Talis's disclosure that the invalid rate in the clinical study supporting its July 2021 EUA application was under 10%. (Mot. at 9–10; Ex. O at 9.)

[6] Plaintiffs cannot use an FE relay-race and over-generalized "issues" to close the gaps in their timeline. Their authorities (at 28–29) are thus unavailing. *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 732 (N.D. Cal. 2022) (FEs corroborated by expert and publications); *In re CV Therapeutics, Inc.*, 2004 WL 1753251, at *2, *9 (N.D. Cal. Aug. 5, 2004) (CWs had direct access to supportive information, directly corroborated one another, and were corroborated by FDA concerns predating statements); *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *11 (N.D. Cal. Jan. 6, 2022) (FE allegation in line with later admission); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) (FEs employed during class period and largely together); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (CW served as COO shortly before the class period and spoke directly to executive knowledge); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (concrete sales data known to executives).

[7] That the CC names persons who shared **some** information with FE-4 does not explain how those individuals learned such information or why they were sharing it. (*See* Opp. at 30.)

the IPO "management *continued to* mislead the market in an attempt to *preserve the positive façade that had enabled Talis to conduct the IPO*." (¶ 13; Mot. at 26.) If anything, Plaintiffs double down on their fraud narrative by invoking a high-profile fraud case and claiming Talis's test was "deeply flawed from inception and never had a viable path to commercialization." (Opp. at 1, 9.) Under Ninth Circuit authority, Section 11 claims "sound in fraud" where, as here, they rely on the same factual allegations and underlying conduct as a Section 10(b) claim. (Mot. at 26.) Thus, Plaintiffs "cannot allege fraud based on a series of events occurring before the offering and on essentially identical events continuing after the offering, and then scissor out a non-fraud claim from the center of that unified course of conduct in order to evade the Rule 9(b) requirement." *In re Metricom Sec. Litig.*, 2004 WL 966291, at *24 (N.D. Cal. Apr. 29, 2004). This claim is subject to Rule 9(b).

### B.      Plaintiffs Fail to Plead Falsity Under Any Standard

The lack of reliability for Plaintiffs' FE allegations is reason enough to dismiss the CC. But even setting that aside, Plaintiffs fail to allege falsity under either Rule 8 or Rule 9(b).

### 1.      5,000 Instruments (¶ 155)

Plaintiffs insist Talis's statement that it had "ordered 5,000 *instruments*" is actionable because Talis later stated it had "ordered *components for* up to 5,000 *instruments*." (Opp. at 11–12.) The Motion challenged *both* falsity and materiality. There was no affirmative falsity (because the statement about ordering instruments is not "directly contradicted" by ordering instrument components) and no misleading omission (because when read in the context of numerous disclosures about instrument manufacturing, no reasonable investor would have understood the statement to mean that 5,000 fully-assembled instruments would be dropped on Talis's doorstep).[8] (Mot. at 17–18; *see Guangyi Xu v. ChinaCache Int'l Holdings Ltd.*, 2017 WL 114401, at *5 (C.D. Cal. Jan. 9, 2017) (plaintiffs must show statement "conveyed a false or misleading impression" "*when read in light of all the information then available* to the market").)

In any case, Plaintiffs' materiality arguments fail. They imply (without factual basis) that

---

[8] Plaintiffs mischaracterize Defendants' argument about the timing of delivery. (Mot. at 30 n.39; Opp. at 12 n.10.) The Registration Statement stated that the instruments were "to be delivered" through Q1 (the then-present quarter). That two months later Talis stated instruments were to be delivered through Q3 does not, without more, mean the first statement was inaccurate *when made*.

components would require time-consuming assembly resulting in a materially different time-to-market. But as of the IPO and for nine months after, Talis was awaiting EUA approval and could not have launched regardless of how many instruments it had on hand. And Plaintiffs cannot simply waive off myriad disclosures about instrument manufacturing that are part of the "total mix" of information. *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988); Mot. at 17–18. In this context, it is absurd to suggest that investors would have had a significantly different impression of Talis's overall health and prospects if it had inserted the word "components" into the sentence in question.

### 2. Cartridge Manufacturing (¶ 153)

Regarding the statement that Talis had invested in automated lines "capable of producing one million cartridges per month" that it "expect[ed] [would] scale to full capacity through 2021" (¶ 153), Plaintiffs' arguments fail in every respect. (Mot. at 14–15, 30.)

**Not False or Misleading:** Plaintiffs do not contest that Talis actually invested in lines with that capacity, but argue this statement is a "misrepresentation of present fact" because "production at that scale was not possible in 2021." (Opp. at 12.) Plaintiffs' argument, however, is based entirely on FE-1's conclusory opinion (¶¶ 51, 154), not on allegations of any specific facts. Moreover, the CC does not say *when* FE-1 said this or what timeframe FE-1 was referring to, nor does FE-1 provide any basis for this opinion other than to mention a lack of "contingency planning" and "scheduling buffer."[9] (¶ 211(v).) Plaintiffs' omission argument fares no better. None of the allegedly omitted facts meet the high bar for an omission claim under *Omnicare,* as Plaintiffs' own authority illustrates.[10] (*See also* Mot. at 14–15, 30.)

Plaintiffs also argue (but did not plead) that the sentence, Talis "designed the Talis One platform to be low-cost and manufactured at scale," was false based on Talis's "inability to perform

---

[9] Plaintiffs do not pretend to explain how FE-1, who was responsible for one narrow function related to cartridge manufacturing (¶ 51) was "in a position" to "personally" know that production overall was an impossibility. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009). And since FE-1 left Talis in March 2021, FE-1's alleged knowledge is wholly irrelevant to similar statements challenged under Section 10(b) made on or after March 30, 2021. *See infra* p. 14.

[10] *In re Allied Nevada Gold Corp. Sec. Litig.* involved contemporaneous knowledge that opinions were misleading (including that the company had sought permission from regulators to investigate remediating the undisclosed issues). 743 F. App'x 887, 888 (9th Cir. 2018). And the product in *Cutler v. Kirchner* was described as "ready to scale" and "capable of integrating acquisitions 'quickly,'" but as it was rolled-out to new markets, it caused a significant decline in cash collections (an important metric for the company). 696 F. App'x 809, 814–15 (9th Cir. 2017).

COOLEY LLP

5

'low-cost' manufacturing 'at scale.'" (Opp. at 12.)[11] They refer vaguely to "design problems." (*Id.*) And they mention an FE statement about manufacturing "machines" (not cartridges, ¶ 214(iii)), but did not plead this as a reason why the statement is misleading (¶ 154) and cannot amend the CC through their Opposition.[12] *In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1020 (N.D. Cal. 2020). Moreover, Plaintiffs characterize this statement as saying that Talis One was already being manufactured at scale for a low-cost. That is unreasonable given: (1) Talis's specific warnings to the contrary (Ex. B at 18, 20–22), (2) the EUA had not yet been granted, and (3) Talis expressed the "belief" that this "design" "***could***" lead to scale-up (*i.e.*, it had not yet occurred) (*id.* at 118).

**Forward-Looking:** Plaintiffs argue that the bespeaks caution doctrine does not protect statements about when the lines were "expected" to scale in the future, but there is more than "enough cautionary language . . . that reasonable minds could not disagree [the statement was] not misleading."[13] *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996); Opp. at 12–13. Among other things, Talis specifically warned that the lines "are not complete and could incur substantial delays . . . and may not perform as anticipated" and that Talis or its manufacturing partners "may be unable to successfully increase the manufacturing capacity for any of [Talis's] products in a timely or cost-effective manner, or at all." (Mot. at 5; Ex. B at 20, 22.)

### 3. Design and Performance (¶¶ 158, 160)

Plaintiffs present no viable challenge to Talis's statements about design and performance.

**Not False or Misleading:** To start, Plaintiffs do not explain why high invalid rates would undermine statements about the design and intended performance of the test. (Mot. at 28–29.) But in any event, the Motion does not "speculate[] that the problems with Talis One only occurred after the IPO." (Opp. at 13.) Rather, it argued that the CC does not meet a basic pleading requirement: facts allegedly omitted from a Registration Statement must have allegedly existed at the time of the

---

[11] Plaintiffs complain that the Motion did not quote this sentence. It was challenged for the same reasons as the rest of the statement (¶ 154) and fails for the reasons herein and in the Motion (at 14, 18–20, 30): the allegedly omitted facts were not adequately pled and do not render it misleading.
[12] In any event, the allegation that the machine was "expensive" to manufacture in ***April 2021*** does not remotely address whether Talis One would be "low cost" to manufacture ***at scale***. (¶ 214(iii).)
[13] Defendants did not waive this argument. (Opp. at 12.) Plaintiffs challenged the same statement under both Sections 10(b) and 11. Defendants explained that the Section 11 claim failed for the reasons already discussed, under the bespeaks caution doctrine. (Mot. at 15, 30 & n.38.)

COOLEY LLP

REPLY ISO DEFS.' MOTION TO DISMISS
CASE NO. 22-CV-00105-SI

IPO. (Mot. at 28 n.37.) As described *supra* p. 2, FE-2's unadorned assertion does not allege high invalid rates when the Registration Statement became effective. And Plaintiffs allege no facts suggesting that invalid rates in late 2021 (FE-4 and FE-5) say anything about invalid rates at the time of the IPO nine months earlier. (Opp. at 13–14.) On the contrary, the CC and documents incorporated by reference are flatly inconsistent with the idea that invalid rates were constant before, during, and long after the IPO. Talis disclosed that the study supporting its July 2021 EUA reflected invalid rates below 10%.[14] (Mot. at 9–10.) But in pre-marketing studies performed in parallel with manufacturing scale-up (beginning in fall 2021), invalid rates climbed over 10%. (*Id.*) Talis delayed the launch to address this issue and brought the rates back down in a few months by modifying the manufacturing process; no "fundamental design issue[s]" were discovered. (*Id.*) This renders Plaintiffs' inference that FE allegations about invalid rates in late 2021 revealed inherent design issues (and thus reflected test functionality at the time of the IPO) an implausible fiction.

No doubt because the study from July 2021 undermines Plaintiffs' narrative, they resort to accusing Talis of "provid[ing] non-representative data to the FDA." (Opp. at 14.) This "inference" is entirely unreasonable (and undermines their protests that this claim does not sound in fraud). Grasping at straws, Plaintiffs note that according to FE-4, the FDA "only required 'simulations.'" (*Id.*) Setting aside that this is unreliable double-hearsay, the **FDA's** requirements have no bearing on the test's invalid rate, nor do they justify Plaintiffs' unfounded speculation about Talis's data.

Plaintiffs also accuse Defendants of "wordplay" (Opp. at 14), but their interpretation strips away all context and disregards the statement's plain language. Plaintiffs first take a sentence about the **assay** (nucleic acid amplification test, or NAAT) (¶ 158)—which Talis said was "designed for optimal sensitivity and specificity to provide highly accurate results"—and pretend it guaranteed how Talis One "as a whole" (*e.g.*, cartridge and instrument) would perform.[15] (Opp. at 13–14.) No reasonable investor would read the statement in that way. (Mot. at 28–29.) It appeared in a section about "Talis One tests" (which also referenced tests to detect other infections) and explained how

---

[14] Referring to the study does not raise a "fact issue." (Opp. at 13.) The CC does not challenge the study, the findings for which were reported in a document incorporated by reference into the CC.
[15] Even if that were what the statement said, the CC does not adequately plead facts showing it was false or misleading when made. (*See, e.g.*, Mot. at 11–12, 19–20, 28 n.37; *supra* pp. 2–3.)

the technical design of the assay reduced the chance it would fail to detect mutations in the virus. (Ex. B at 126–29.) It would make no sense for an investor to extrapolate this to Talis One "as a whole."[16] Plaintiffs concede they have not pled the assay was flawed. (Mot. at 28.) And to the extent they argue this statement addressed "performance," the very next section is about that topic, and titled "Performance of the Talis One COVID-19 test." (Ex. B at 127–29.)

Plaintiffs likewise misinterpret a sentence about the need to collect data supporting the "value proposition" of Talis's products as a guarantee that Talis One was, at that time, "just as accurate and reliable as central lab testing." (Opp. at 14; ¶ 158.) Even taking on this skewed interpretation, the CC does not plead that contemporaneous data contradicted it. Plaintiffs discount the warning in the next sentence that the data collected "may not be favorable or consistent with our existing data or may not be statistically significant or compelling," but it was not "boilerplate" just because it did not use the words "accurate" or "reliable." (Opp. at 14 n.12; Ex. B at 24.)

**Immaterial:** Plaintiffs reduce these same statements to single terms to make them sound like "simple, material misstatements" (Opp. at 15) rather than the type of "highly technical" information in *In re Nektar Therapeutics Securities Litigation*, 34 F.4th 828, 837 (9th Cir. 2022). This is a tacit admission that the full statements would not have "misled a reasonable investor about the nature of his or her investment." *Stac*, 89 F.3d at 1403–04. Talis did not just state that Talis One was "reliable." (Opp. at 14–15.) Talis discussed the need to collect data supporting the value proposition of its products, including that they were "just as accurate and reliable ***as central lab testing***." (¶ 158.) Plaintiffs shy away from this because they cannot show that the alleged deficiencies rendered Talis One less reliable ***than central lab testing***, or how much less reliable— let alone why that delta would have been material to a reasonable investor.[17] *Nektar*, 34 F.4th at 837 ("we do not know from the complaint whether a somewhat lower fold-change would have been material to investors"). Likewise, Plaintiffs pluck two words from a technical discussion of the

---

[16] This case is thus unlike *Edenbrook Cap., LLC v. RhythmOne Plc*, 2019 WL 1791419, at *7 (N.D. Cal. Apr. 24, 2019), which involved two plausible competing interpretations of a statement.

[17] Plaintiffs overstate their allegations in claiming that Talis's "scientists and engineers" linked the alleged deficiencies to Talis One's accuracy and reliability. (Opp. at 15.) They quote from a definition of LoD that appears in ¶ 54 but was not provided by FE-2 (¶ 212). And in ¶ 214(v), FE-4 (in sales) relays a conversation with a "product manager"; the CC insinuates, but tellingly does not expressly say, that the product manager attributed the invalid rates to the "non-functional" parts.

8

*assay* and claim Talis simply said Talis One was "highly accurate" (it did not, ¶ 158). But the CC does not plead how the allegedly non-functioning parts relate to the assay or that a reasonable investor would find material any resulting difference in the assay's "sensitivity and specificity."

**Risk Disclosures:** Plaintiffs argue that Talis's risk disclosures (¶ 160) are actionable based on "known" issues, but whistle past the fact that the CC does not allege such issues existed at any time, much less contemporaneous with the IPO (unlike the cases they cite). (Opp. at 15.)

### 4.    Comparator Assay/Testing and EUA Submission (¶¶ 146, 148, 150)

**Not False or Misleading:** Plaintiffs' arguments that statements related to Talis One's test results and initial EUA submission were misleading turn on one question the CC fails to answer: whether, at the time of the IPO, it was an "existing, known fact" (Opp. at 15) that the FDA concluded it could not ensure that Talis's comparator assay was sensitive enough to support Talis's EUA application. Plaintiffs fail to plead falsity for any of these statements because the FDA's determination about the comparator assay was not knowable or known until after Talis went public.

Plaintiffs insist the comparator assay's sufficiency was "a hard, objectively verifiable fact that existed before the IPO." (Opp. at 16.) But the CC alleges no facts suggesting that, as of the IPO, the FDA had concluded it could not ensure the assay was sufficiently sensitive, much less communicated such a conclusion to Talis. Nor does it allege that the FDA (before the IPO) offered "hard" or "objective" guidance for what constituted a "high sensitivity" comparator. As far as anyone can tell from the CC, the FDA's determination was news to the market and Talis alike. That is not enough to plead contemporaneous falsity.[18] *See In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 543 (S.D.N.Y. 2015) ("That information—that the Advisory Committee had reached negative view of the sBLA, and that the FDA rejected the sBLA . . . —was new to the market and to defendants alike. . . . [U]nder the securities laws, '[c]orporate officials need not be clairvoyant[.]'").

Tellingly, instead of citing objective ***FDA*** guidance, Plaintiffs seek to rely on an article co-authored by Ismagilov (an Individual Defendant), which postdates the IPO by several months and

---

[18] *Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, 2022 WL 716653, at *5 (D. Utah Mar. 9, 2022) is inapt. (Opp. at 15–16.) There, the court held a statement that a test "***consistently and repeatedly*** achieved 100% clinical sensitivity and specificity" was misleading because, *inter alia*, it omitted that results of other studies—which the speaker knew about at the time—reflected a lower accuracy.

is not cited in the CC. (Opp. at 16.) Again, Plaintiffs cannot amend the CC through the Opposition. In any event, Ismagilov and his co-authors' views on analytical sensitivity in a draft article from April 2021 says nothing about the **FDA's view** about the sensitivity of Talis's comparator assay as of February 11, 2021. Plaintiffs' unspoken assumption that the "FDA's requirements" necessarily corresponded with the views in this article has no basis and ignores that "high" and "low" are relative terms with no inherent, objective meaning. Their attempt to substitute this article for FDA standards is both procedurally improper and substantively unsound, and it should be rejected.

Just as Plaintiffs cannot use this extrinsic article to fill the gaping hole in their allegations, they cannot allege falsity by speculating that the FDA's request for "additional information" prior to the IPO meant the comparator assay "clearly violated" FDA standards.[19] (Opp. at 16–17.) Indeed, their conjecture cuts the other way: if the comparator assay did not meet the "objectively verifiable" standard for "high sensitivity," what additional information would the FDA have needed? Because Plaintiffs have not alleged that the risks related to the request for additional information "presented a special challenge not of the kind normally confronted by pharmaceutical companies seeking FDA approval," their attempt to distinguish *Tongue v. Sanofi*, 816 F.3d 199, 212 (2d Cir. 2016), is unavailing.[20] (Opp. at 16–17; Mot. at 27–28; *cf. Immanuel Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *9 (N.D. Cal. Jan. 27, 2020) (falsity not pled by "parroting" deficiency identified by FDA and claiming company concealed deficiency and corresponding "high risk" of rejection).)[21]

**Opinion Statements:** Plaintiffs claim these statements do not involve the interpretation of clinical trial data, and thus are not opinions; this is specious.[22] (Opp. at 17.) The CC challenges a

---

[19] Plaintiffs misleadingly assert that Defendants "speculat[ed]" "the FDA letter might not have challenged the comparator assay." (Opp. at 16.) Not so. Defendants simply pointed out that the CC did not allege facts "regarding what 'additional information' the FDA sought"—which is of course relevant to assessing whether Plaintiffs have met their pleading burden. (Mot. at 27.)

[20] As in *Tongue*, the FDA ultimately approved Talis's test. That Talis chose to **withdraw** its request for CLIA-moderate authorization and perform a previously-planned study to support CLIA-waived authorization does not make the comparison less apt. (Mot. at 4 & n.5, 6.)

[21] Nor is this case like *In re Atossa Genetics Inc. Securities Litigation*, 868 F.3d 784, 801–03 (9th Cir. 2017), where the CEO opined that "FDA clearance risk has been achieved," but did not disclose that the product was not FDA-cleared and the FDA had warned about that lack of clearance. Talis disclosed the FDA's request and, in the following sentence (omitted from the CC), warned "[t]here can be no assurances that the FDA will authorize" its EUA. (Mot. at 5; Ex. B at 18.)

[22] Opinions need not begin with the words "we believe" (Opp. at 17), as Plaintiffs' own authority reflects. *See Atossa*, 868 F.3d at 801 (statement "FDA clearance risk has been achieved" is an opinion; "it is the speaker's personal definition of 'achieved' that here produces the opinion").

lengthy statement wherein Talis discussed several studies of its test and offered its interpretation of the meaning and implications of the results. In it, Talis stated: "The high PPA and NPA reflected in the assessments and studies described above is suggestive of clinical sensitivity and specificity in the broader clinical population and is driven by the very low limits of detection possible on the Talis One platform." (¶ 146.) This is clearly an opinion, and would not have been misleading even if the FDA had expressed "concerns" about the comparator assay used in one such study. (*See* Mot. at 27–28.) Plaintiffs' argument that Talis's opinions are actionable because of "embedded false facts" fails too. According to Plaintiffs, the "high PPA and NPA" were not driven by the low limits of detection, but by the weak comparator assay. (Opp. at 17.) This (unsupported) view merely illustrates Defendants' argument that such determinations are *opinions*. As such, *Talis's* view is also an opinion, and is not rendered misleading by Plaintiffs' contrary opinion. (Mot. at 27–28.)

Finally, Plaintiffs argue certain "hard facts" in this statement were misleading because they omitted the allegedly flawed comparator assay. (Opp. at 17.) This makes no sense, because both such "facts" plainly referenced results from the *preclinical assessment* that used a *different comparator assay* than the one Plaintiffs complain about from the clinical validation study. (¶ 146.)

### C.    Talis Complied with Item 303 and Item 105

**Item 303:** Plaintiffs repeat their flawed arguments about invalid rates and the comparator assay in a final, futile attempt to save their Section 11 claim. (Opp. at 17–18.) They also mischaracterize the Motion (at 30), which did dispute that the CC alleged "the *existence* of a trend or uncertainty" "'presently known to management' and 'reasonably likely to have material effects on [Talis's] financial condition or results of operation.'" To reiterate: as described herein and in the Motion, Plaintiffs have not adequately pled that at the time of the IPO, Talis One "suffered from a high invalid rate that foreclosed and/or dramatically delayed commercial production" *or* that management knew this *or* that the comparator was "known to be insufficient" (Opp. at 18; ¶ 166).[23]

**Item 105:** Plaintiffs' only substantive response is to reiterate their position that risks about

---

[23] Unlike *Pirani v. Slack Technologies, Inc.*, 445 F. Supp. 3d 367 (N.D. Cal. 2020) and *In re Lyft Inc. Securities Litigation*, 484 F. Supp. 3d 758 (N.D. Cal. 2020), Plaintiffs have failed to plead knowledge for any Securities Act Defendant (or "management"). *See, e.g., In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1264 (N.D. Cal. 2019) ("Plaintiff must establish knowledge on the part of Defendants regarding any alleged trend of abandonment.").

the comparator assay and invalid rates were known and material (they were not, for the reasons already discussed) and to broadly characterize Talis's risk factors as "generic" and "boilerplate" (they were neither *see, e.g.*, Ex. B at 21–26, 28–29) without addressing any of them specifically.

## IV.    PLAINTIFFS' EXCHANGE ACT CLAIMS SHOULD BE DISMISSED

Nothing in the Opposition demonstrates that the CC adequately pleads falsity or scienter.

### A.    Plaintiffs Fail to Plead Falsity For Any Challenged Statement

#### 1.    5,000 Instruments (¶ 207)

Plaintiffs fail to plead falsity and materiality for the reasons discussed *supra* pp. 4–5.

#### 2.    Readiness to Produce Product (¶¶ 190, 197, 198, 203, 205)

The Opposition fails to overcome the Motion's arguments (at 15–16) that Defendants' views and expectations about manufacturing and launch preparations should be dismissed.

**Opinion Statements:** Plaintiffs do not dispute that ¶ 190 ("we feel . . . ready to go") and ¶ 205 ("We think we've got a great product") are opinions. But they contend Coe's view about "terrific" results and being "way ahead on our ability to produce product" (¶ 197) and Moody's assessment that "investments in launch preparation are beginning to come to fruition" (¶ 203) are factual statements because the speakers did not say "I believe." (Opp. at 19.) Again, it is the content and context of a statement (which Plaintiffs do not address) that render it an opinion—not magic words. *Supra* n.22. Both expressed the speaker's view and neither is an objectively-verifiable fact.

In any event, Plaintiffs fail to show these statements are actionable as opinions or otherwise. (Opp. at 19.) They span seven months—from before the second EUA was submitted to after it was approved—but Plaintiffs do not account for these vastly different contexts, and focus mainly on Coe's May 11, 2021 response to an analyst's question about "hypothetically" shipping product after approval. Coe stated, "[w]e feel we'll be in a position to ship product in a very timely manner following approval," noted that Talis had a commercial team in place, and concluded "we feel very much ready to go on our end." (¶ 190.) Plaintiffs do not identify a single particularized allegation that Coe had information in hand that contradicted this statement (or rendered it misleading) when he spoke. FE-3 supposedly briefed Coe on "manufacturing timelines," but the CC does not allege this occurred on or before May 11 or that Coe agreed with FE-3's view about "serious" issues.

COOLEY LLP

REPLY ISO DEFS.' MOTION TO DISMISS
CASE NO. 22-CV-00105-SI

(Mot. at 19.) The "rumor" shared by FE-1 that "in or around May 2021" (months after FE-1 left) Coe rejected a "new timeline" fails for the same reasons.[24] The temporal proximity between Coe's statement about shipping *after approval* and delays announced in August is not circumstantial evidence of fraud given the delay in submitting the EUA (due to lower prevalence of COVID during study enrollment, Ex. J at 8), and that the EUA had not yet been granted in August.[25] Finally, the invalid rate allegations do not correspond to the timeframe of these statements and are not alleged to have been communicated to any speaker. *Supra* pp. 2–3. All told, these scattered "facts" just "cut the other way"—none are "existential problems" (Opp. at 19) or render the statements misleading.

**Corporate Optimism:** Plaintiffs' halfhearted argument that these statements are capable of objective verification (Opp. at 20) does not overcome the fact that they are classic examples of inactionably vague corporate optimism. The Opposition attempts to dodge this conclusion as to two statements (¶¶ 197, 205) by noting that statements of optimism may be actionable in certain contexts. But both of Plaintiffs' cases involved "context" that is not present here: the optimistic statements contradicted concrete, undisclosed facts that were contemporaneously known to the speaker. *Warshaw v. Xoma Corp.*, 74 F.3d 955, 957–59 (9th Cir. 1996) (company "made repeated assurances" that FDA approval was "imminent" when it knew product would never be approved); *Zuora*, 2020 WL 2042244, at *10 (defendants "aware of undisclosed [contradictory] facts"). Plaintiffs' argument that the statements are actionable because they were made in response to analyst questions about disclosed product delays and launch strategy fares no better. (*See* ¶ 197 & Ex. J at 9–10; ¶ 205 & Ex. L at 8.) *Cf. Intuitive Surgical*, 759 F.3d at 1060 (distinguishing *Xoma* because "'the market already knew' of the difficulties facing Intuitive . . . . [i]n context, any reasonable investor would have understood Intuitive's statements as mere corporate optimism").

**Forward-looking:** Coe's May statement did not "describe the current state of affairs." (Opp. at 20.) He opined that Talis "will" be in a position to ship product "*following an approval*," then discussed related underlying assumptions about commercial preparedness efforts. (¶ 190.) The

---

[24] FE-4 states that as of April 2021 the "machine" was made by hand. (¶ 214.) Investors knew this, as Talis disclosed as much in the IPO. (Ex. B at 135 ("instrument assembly is largely manual").)
[25] Such temporal proximity, even if found, can only bolster a complaint—"without more" it does not satisfy Rule 9(b). *Smith v. NetApp, Inc.*, 2021 WL 1233354, at *7 (N.D. Cal. Feb. 1, 2021).

entire statement is forward-looking: "examined as a whole, [it] related to future expectations." *Intuitive Surgical*, 759 F.3d at 1059; *cf. In re Twitter, Inc. Sec. Litig.*, 2021 WL 4166725, at *3 (N.D. Cal. Sept. 14, 2021) (statement "MAU trend has already turned around" described "concrete circumstances ***that ha[d] already occurred***," unlike statement about "preparedness" to meet goal) (emphasis in original). Coe's statement was accompanied by meaningful cautionary language (Ex. F at 4), and the CC has not pled actual knowledge of falsity, *see* Mot. at 15–16 & *infra* pp. 15–18.[26]

### 3.   Manufacturing (¶¶ 185, 187, 189, 194, 196, 200, 202)

**Cartridge Manufacturing:** Statements about Talis's investments in lines it "expected" would scale "to full capacity through 2021" (¶ 185) or "to meet demand through 2021" (¶¶ 187, 194, 200) are not false or misleading for the reasons discussed *supra* pp. 5–6 and in the Motion at 14–15. They are also clearly forward-looking. In arguing that these statements "represented that the lines were at that time ready to scale up in 2021" (Opp. at 21), Plaintiffs brush past their plain language, which conveyed nothing more than an expectation about when the lines would scale. In contrast, Plaintiffs' authorities involve statements about the then-present state. *See QuantumScape*, 580 F. Supp. 3d at 737 (statement described expected lower relative cost due to "current state of [the defendant's] technology"); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 964 (N.D. Cal. 2014) (statement was "a representation of present fact regarding the status of Impax's response to the FDA"). Talis's statements are immunized by the safe harbor. (*See supra* p. 6 & Mot. at 16.)

**"[O]n track to bring up our automated lines" and had "begun doing so":** The Opposition does not explain why Moody's May 2021 statement is actionable. (Opp. at 21; ¶ 189.) The CC does not allege that Talis had ***not*** begun bringing up the lines, and Plaintiffs ignore binding authority showing that the "on track" portion is forward-looking.[27] (Mot. at 16 & n.19.)

**"Ramp up of manufacturing efforts":** These vague statements do not convey expectations about the lines and are not rendered misleading for the reasons in the Opposition (at 21). (¶¶ 196, 202.) They are also plainly forward-looking and protected by the safe harbor. (Mot. at 15–16.)

---

[26] The CC pleads no facts to support Plaintiffs bare speculation that Talis adopted a phased approach to commercialization for reasons other than those Talis discussed. (Opp. at 20 n.17; ¶¶ 198, 205.)
[27] The Motion also argued this statement is inactionable corporate optimism and opinion. (Mot. at 16.) Plaintiffs do not argue otherwise and thus concede it. *See, e.g.*, *In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 854 n.8 (N.D. Cal. 2017) ("on track" statement is inactionable puffery).

#### 4.    Validation (¶ 192)

Plaintiffs' challenge to Talis's August 2021 statement about being in the "final stages of validation for the first set of automated cartridge production lines" relies on a definition of "process validation" that they do not allege Talis referenced in the statement, or ever. (Opp. at 21–22.) Plaintiffs also ignore the glaring defects in FE-5's bare assertion that "Talis had not validated its production lines," which lacks, for instance, any reference to time. (¶ 215(iii).) Plaintiffs have not "amply alleged" that "Talis did not properly validate the line in August 2021"—nor, critically, did Talis state validation was complete at that time. All told, nothing in the Opposition changes the fact that Plaintiffs cannot plead falsity under the PSLRA by treating a statement about when Talis began "evaluating" cartridges as an "admission" about when "lines" were "validated." (Mot. at 16–17.)

#### B.    Plaintiffs Fail to Plead Scienter

Plaintiffs' use of "[s]trong rhetoric"—describing "serious" and "pervasive problems" (Opp. at 2–3, 7, 19, 23–30)—"is not a substitute for particular[] facts giving rise to a strong inference of scienter." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020). Separately or together, the CC fails to support any inference of intent or recklessness—much less a compelling one.[28]

**FE Allegations.** Not one of the four FE allegations at the heart of Plaintiffs' scienter argument suggests fraud. (Opp. at 24 (citing ¶¶ 211(iii), 211(vi), 213(ii), 214(ii)).) ***First***, Plaintiffs rely on FE-1's reference to a "user study showing leaking cartridges," but do not provide any details about it or connect it to any challenged statement (nor do they acknowledge that the alleged issue was addressed at the end of 2020, before the IPO). *See Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 999 (N.D. Cal. 2021) (CW reports irrelevant where not "tethered to any [challenged] statements"); Mot. at 21 & n.27. ***Second***, Plaintiffs rely on FE-3's alleged briefing with Coe but fail to explain why the CC lacks ***any detail*** about it, despite it being the ***only*** alleged direct contact with any Officer Defendant. (Mot. at 22.)[29] ***Third***, Plaintiffs misleadingly suggest that "Coe reject[ed] an adjusted timeline" as part of FE-3's alleged briefing, when in reality this allegation comes from a

---

[28] The Opposition (at 23 n.19) cherry-picks ways in which (some of) Defendants' authorities differ from the present case, but does not address, or even acknowledge, the Motion's actual arguments.
[29] Plaintiffs' attempt (at 24 n.21) to distinguish *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*, 2021 WL 1056549, at *5 (N.D. Cal. Mar. 19, 2021), highlights the CC's defects. Why, if FE-3 ***attended*** the briefings, does the CC lack the requisite detail about them? (¶ 213(ii).)

"rumor" FE-1 learned after leaving the Company. (*See supra*, pp. 2–3, 13; Mot. at 21.)[30] **Fourth**, Plaintiffs rely on alleged "reporting of presales" by FE-4, but again fail to explain how this data (even if reported to the Board) relates to any challenged statement.[31]

**No Access to Contradictory Information.** Plaintiffs maintain that mere access to contradictory information supports an inference of scienter (Opp. at 26), but their authorities required that the defendants ***actually*** possess the information. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (no scienter where plaintiff alleged "access" but not "direct knowledge"); *Reese v. Malone*, 747 F.3d 557, 575–77 (9th Cir. 2014) (scienter where public statements "irrefutabl[y]" reflected actual access; no scienter where no facts reflected actual access). Here, no actual access to contradictory information is alleged or can be inferred. The Opposition repeats deficient allegations about reporting requirements under the RADx contract, but the CC fails to allege the specific contents of any report, that any Officer Defendant prepared or reviewed any report, or that the information in the reports rendered any challenged statement false or misleading when made.[32] (Mot. at 23–24.)[33]

**Public Statements.** Nor do statements by Coe, Moody, Kelley, or non-Defendant Liu "about Talis One's status" support an inference of scienter. (Opp. at 23, 25.) None of the statements in the Opposition (several of which do not appear in the CC) support the notion that the speakers were aware of any of the "alleged issue[s]" (or any other information rendering the challenged statements false or misleading when made). (*Id.* at 25 (quoting *Shenwick v. Twitter, Inc.*, 282 F.

---

[30] *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) is of no help to Plaintiffs. (Opp. at 24.) The CC does not allege that Coe ignored any facts. And in any event, simply alleging that an employee communicated their view to an executive does not establish scienter. *Cf. Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1194 (9th Cir. 2021 (no knowledge where no facts showed CEO "accepted" employees' "views" that goals were "impossible to achieve"); Mot. at 22 n.28.

[31] For the reasons discussed above (pp. 2–3), scienter cannot be inferred from FE allegations relating to "high invalid rates." (Opp. at 24–25.) Moreover, to the extent there were "high invalid rates" at any point in time, their import does not come close to the "devastating" stop-work orders in *Berson*, which "halt[ed] tens of millions of dollars of work." 527 F.3d at 984–85.

[32] By failing to address them in opposition, Plaintiffs have abandoned any argument that scienter can be inferred from Talis's contract with thinXXS or the FDA's EUA approval letter. *See In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 991 (N.D. Cal. 2017); *see also* Mot. at 24 & n.31.

[33] Plaintiffs (at 26 & n.22) suggest this case is unlike *Intuitive Surgical*, but the CC too fails to allege "direct access" to executives or the contents of the reports. 759 F.3d at 1062–63. And more compellingly than in *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036–37 (9th Cir. 2002), it does not allege any stock sales or actual access—it only alleges the contract "***indicate[s]***" access. (¶ 222.)

Supp. 3d 1115, 1147 (N.D. Cal. 2017).)[34] Moreover, Plaintiffs' argument that scienter is supported by the "temporal proximity" between Coe's May 2021 "ready to go" statement and Talis's August 2021 "admission of delays," actually cuts the other way. In *Twitter*, 282 F. Supp. 3d at 1148, the defendants responded evasively to questions after providing aggressive projections, whereas here, Talis told its investors about delays as soon as they were known.[35]

**Core Operations.** Just because Plaintiffs argue that Talis One was "the core" of Talis's business (Opp. at 23–24) does not mean that an intent to defraud can or should be imputed to the Officer Defendants.[36] *See Iron Workers*, 2020 WL 1244936, at *12 (core operations did not apply just because gaming was NVIDIA's "core business"); Mot. at 23.[37] The CC is devoid of facts suggesting that the vague and minor issues with Talis One were (1) ***known*** to any Officer Defendant (*see supra* pp. 15–16); (2) ***understood*** by any Officer Defendant to render any challenged statement false or misleading (*see In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 883 (9th Cir. 2012)); or (3) of such ***prominence*** that knowledge can be imputed to the Officer Defendants. *See Loc. 353, I.B.E.W. Pension Fund v. Zendesk, Inc.*, 2022 WL 614235, at *2 (9th Cir. Mar. 2, 2022).[38]

**Executive Departures.** Plaintiffs fail to show that any executive departure was suspicious; as such, none supports scienter. (Mot. at 24–25.) Instead, Plaintiffs (again) attempt (at 26–27) to

---

[34] Plaintiffs' authorities are inapt. (Opp. at 25–26.) In *Twitter*, 282 F. Supp. 3d at 1147 and *Quality*, 865 F.3d at 1145, the defendants admitted to actual access of data and there were particularized allegations of contemporaneous data that contradicted their statements—neither are present here. Similarly, the "severe and pervasive problems" in *Flynn v. Sientra, Inc.*, in which "several regulatory agencies" flagged problems with manufacturing and quality control, do not compare to those alleged here. 2016 WL 3360676, at *15 (C.D. Cal. June 9, 2016).

[35] Talis's addition of the word "components" is not comparable to the "altered wording" (Opp. at 25) in *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020), where the company materially changed its description of FDA advice from unqualified to hedged.

[36] Plaintiffs do not come close to satisfying the first two prongs of core operations. (Opp. at 23.) There are no (1) "specific ***admissions***" by the Officer Defendants "of detailed involvement in the minutia of [Talis's] operations," or (2) "witness accounts demonstrating that executives had actual involvement in creating false [or ***any***] reports." *Intuitive Surgical*, 759 F.3d at 1062.

[37] *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014) remains firmly on point; there are no particularized allegations here of the Officer Defendants' actual knowledge. Likewise, *Carr v. Zosano Pharma Corp.*, 2021 WL 3913509, at *12 (N.D. Cal. Sept. 1, 2021), rejected a virtually identical argument about "a relatively small company focused on a single product."

[38] Plaintiffs' authorities (at 24) involved far more prominent facts upon which to infer knowledge. *See In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 673 (N.D. Cal. 2021) (significant contents of reports conveyed to leadership); *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *12 (N.D. Cal. Feb. 15, 2018) ("pervasive [stock promotion] scheme," in part when defendants were the only full time employees); *Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *8–9 (S.D. Cal. Sept. 19, 2016) (admission of actual access to key information); *see also supra* n.34.

improperly amend the CC with the new and irrelevant fact that Coe's Consulting Agreement contained a (standard) non-compete clause. Plaintiffs have not, however, argued that Coe did **not** stay on as an advisor to Talis. As to the timing of Coe's and non-Defendant Liu's departures, the CC identifies no facts "refuting the reasonable assumption" that they left for non-nefarious reasons. *See Inchen Huang v. Higgins*, 2019 WL 1245136, at *14 (N.D. Cal. Mar. 18, 2019). Last, Plaintiffs repeat FE-4's unreliable allegation that Blaser left because of fraud but provide no facts supporting their conclusion that the stated "personal matters" were "implausible." *See Elec. Workers*, 2021 WL 1056549, at *7 ("sudden resignation" not "suspicious" when due to a "family health matter").

**Collective Scienter.** To the extent collective scienter is even a viable theory (Mot. at 24 n.32), none of the allegations referenced in the Opposition (at 27) come close to pleading it. *Cf. Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 743 (9th Cir. 2008) (example of collective scienter is where a car manufacturer announces it sold one million SUVs when it in fact sold zero).

**Holistic Analysis.** The theory that Defendants knew Talis One was "doomed" from the start (Opp. at 2, 15, 27) "has no basis in logic or common experience." *Endologix*, 962 F.3d at 408, 415– 16 ("[i]t is improbable that [a company] would stake its existence on a drug . . . that [it] thought was doomed to failure"). The Officer Defendants could not be "motivated" to inflate Talis's stock price by its short-lived "going concern" problem (Opp. at 23), when it was alleviated by raising $126 million in financing well before the IPO.[39] (¶¶ 38–39.) This argument is even less compelling because no Officer Defendant sought to **benefit** from this alleged stock boost. *See Endologix*, 962 F.3d at 415.[40] There is no "tie" in plausibility here. The far more compelling inference is that Defendants acted in good faith to get their product to market during the unprecedented challenges of a global pandemic, repeatedly cautioned against foreseeable delays, and updated investors accordingly. *Id.* at 408, 419; *Lehmann v. Ohr Pharm. Inc.*, 2019 WL 4572765, at *6 (S.D.N.Y. Sept. 20, 2019) ("It cannot be the case that *ex ante* intent is based on *ex post* results."); Mot. at 25.

**V.    CONCLUSION**

For the reasons above and in the Motion, the CC should be dismissed with prejudice.

---

[39] Further, a company's general "motive to boost . . . stock prices in the months surrounding the [] IPO" is not sufficient to allege scienter. *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018).
[40] Even if not "fatal," *Sientra*, 2016 WL 3360676, at *15, a lack of stock sales cuts against scienter.

Dated:  October 14, 2022                          COOLEY LLP


                                                  By:   /s/ Patrick E. Gibbs
                                                        Patrick E. Gibbs

                                                  *Attorneys for Defendants Talis Biomedical
                                                  Corporation, Brian Coe, J. Roger Moody, Jr.,
                                                  Felix Baker, Raymond Cheong, Melissa
                                                  Gilliam, Rustem F. Ismagilov, Kimberly J.
                                                  Popovits, Matthew L. Posard, Randal Scott,
                                                  and Robert J. Kelley*

COOLEY LLP

REPLY ISO DEFS.' MOTION TO DISMISS
CASE NO. 22-CV-00105-SI