Pages 1 - 28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON

IN RE: TALIS BIOMEDICAL          )
SECURITIES LITIGATION            )  No. C 22-0105 SI
                                 )
                                 )  San Francisco, California
                                 )  Friday
                                 )  November 4, 2022
_____  )  10:00 a.m.

**TRANSCRIPT OF ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff:**          BLEICHMAR FONTI & AULD LLP
                            555 12th Street
                            Suite 1600
                            Oakland, California 94607
                      BY:   **LESLEY E. WEAVER, ESQ.**

                            BLEICHMAR FONTI & AULD LLP
                            7 Times Square
                            27th Floor
                            New York, New York 10036
                      BY:   **JOSEPH A. FONTI, ESQ.**
                            **EVAN A. KUBOTA, ESQ.**

**For Defendants:**         COOLEY LLP
                            3175 Hanover Street
                            Palo Alto, California 94304
                      BY:   **PATRICK E. GIBBS, ESQ.**

**For Movant:**             POMERANTZ LLP
                            600 Third Avenue
                            Suite 2000
                            New York, New York 10016
                      BY:   **JONATHAN PARK, ESQ.**

Reported By:    *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
               *Official Reporter - US District Court*
               *Computerized Transcription By Eclipse*

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco*
*(415) 431-1477*

Friday - November  4, 2022                          9:54 a.m.

                       P R O C E E D I N G S

                             ---0O0---

        THE CLERK:  Calling Civil Matter 22-CV-105, In Re Talis Biomedical Securities Litigation.

    Counsel, please state your appearances for the record starting with plaintiff.

        MS. WEAVER:  Good morning , Your Honor.  This is Leslie Weaver of Bleichmar Fonti on behalf of plaintiff Martin Dugan.

    And with me today are my partners Joe Fonti and Evan Kubota, and Mr. Kubota will be presenting original argument for the plaintiff today.

        THE COURT:  Good morning.

        MS. WEAVER:  Good morning.

        MR. FONTI:  Good morning.

        MR. PARK:  Good morning, Your Honor.  Jonathan Park of Pomerantz LLP.  I'm here for co-lead plaintiff Leon Yu and his investment company Max Wisdom Technology, Limited.  Thank you.

        THE COURT:  Good morning.

        MR. GIBBS:  Good morning, Your Honor.  This is Patrick Gibbs from Cooley on behalf of the defendants.

        THE COURT:  Good morning.

    This is defendant's motion to dismiss the consolidated

class action complaint, and I will be happy to hear argument from both of you on the motion in a moment.

First, I wanted to say, however, that part of the motion includes significant requests for judicial notice by the defendant, to begin with, and then in a responsive way by the plaintiffs, and I would -- I'll rule on those things.

And basically I will allow the SEC filings to come in and a couple of the transcripts of phone calls to come in.  Most of the rest I will not.

And I would urge you all to take a close look at *In Re Calpine Corp*., but there is also -- and there's a new Ninth Circuit case that directly speaks to this, which is the *Kohva v. Orexigen Therapeutics*, 899 F.3d 988.

So take a look at that and others along those lines because the point is we're getting extremely extensive Requests for Judicial Notice in cases like this where the judicial notice is either not required or utterly inappropriate.  So I would urge you all to carefully review your Requests for Judicial Notice before you make them.

So that -- I just wanted to say that up front because we probably won't be talking about that any more.

Beyond that, I'll tell you my preliminary view is that the motion should be granted with leave to amend in order to clarify and specify the allegations in the Complaint.  That's where I'm starting, but I will be happy to hear from both of

you.

Now, Mr. Gibbs, it's your motion, but I think probably it would be appropriate for the plaintiffs to go first.

So who did you say was going to argue for plaintiffs? Mr. Kubota?

**MR. KUBOTA:** Yes, Your Honor.  I'll be arguing for plaintiffs.

**THE COURT:** Okay.

**MR. KUBOTA:** I think I would say at the outset that we appreciate the Court's guidance and, of course, any -- any amendment to address the concerns we would consider.

I think what's important to note as well is that in our view the core of the case is the misstatements and omissions made in the IPO that support strict liability under Section 11 of the 33 Act, and in that regard what the briefing on the motion, I think, revealed is that, in particular, the statement that they ordered 5,000 instruments just was not true.

There was no real --

**THE COURT:** What's the material difference between ordering the instruments and ordering the components of the instruments?

**MR. KUBOTA:** Yes, Your Honor.

So this -- when I say "instrument," I'm referring to the box shaped analyzer into which the cartridges were inserted. And what defendants said in their filings is that the analyzer

was extremely complex and involved over 500 sub-assemblies and components.

So it's basically the difference between having the actual device that they would sell to customers for $14,000 as compared to components that required further assembly, testing and time to get ready for launch.

I would also note that, you know, the 5,000 instruments for $14,000 each is $70 million in revenue. And perhaps most importantly when they went public in February of last year, they said that they had ordered the 5,000 instruments to be delivered by the end of first quarter; that is, by the end of March 7, weeks later.

So it was really conveying to investors and the class that there was a real product that was being manufactured, about to be delivered and would be ready for launch. And here we are almost at the end of 2022 and that didn't happen.

And I know Your Honor mentioned the Request for Judicial Notice, but after we filed the Complaint, of course, the company has now entirely withdrawn the COVID test from the market.

So I covered the 5,000 instruments, and there are a few other statements that I think are at the core of the Section 11 claims.

The other was on the accuracy and reliability of the device that was asserted in the IPO, and in that regard we have

consistent observations from a PhD senior scientist, a territory account manager and a technical associate director that the device had a very high invalid rate both before and after the IPO.  And the invalid rate means a test submitted on the device didn't work; that it just didn't generate a valid result.

And the responses that came out in defendants papers, I think, are fundamentally fact intensive.  They basically seem to say that there was a gap in time.  And because some of the observations were from 2020, before the IPO, and others were in fall of 2021, about eight months after, that what the former employees observed somehow doesn't support the falsity of those statements.  And we don't think that's correct.

And perhaps the Court's ruling on judicial notice will affect this, but defendant's argument was basically that Talis submitted data to the FDA in July of with 2021 that supposedly showed an invalid rate of under 10 percent.  We don't think that's judicially noticeable and certainly not for its truth.

But in any event, the Complaint alleges that the data provided at that time was the result of simulations and that the FDA did not physically inspect the devices.  That's Paragraph 57 of the Complaint.

And in *Berson versus Applied Signal* the Ninth Circuit rejected a very similar argument where defendants argued at the pleading stage that certain stop work orders may have expired

or that two of them might have been renewals of a prior order, and the circuit explained that plaintiff's confidential witnesses suggest otherwise so these disputes must at least await discovery.  And we think the same is true here.

There's also a set of statements around the comparator assay and that's the benchmark used to evaluate a new COVID test.  It was critical because the FDA required companies to use a high sensitivity comparator.  Talis used a low sensitive comparator.

I know we alleged that based on the PhD senior scientist who was there before the IPO and said the comparator was weak in what they submitted to the FDA.

We also have the article from the co-founder.  We will certainly highlight in any event the pleading where he -- or at least before the IPO and then roughly less than two months afterward that a low sensitivity comparator is one that requires over 100,000 copies of the virus to trigger a positive result.  Talis's comparator required 180,000.  So it was well within the low sensitivity category as he defined it.  And he's a defendant in this case, and he signed the registration statement.

So we think that's a very strong basis to -- to allege that the statements around the comparator were false and misleading when made.

And I would also note that defendant submitted the

*Cloudera* case earlier this week.  That's, in our view, fundamentally irrelevant.

What the Court held there is that an article published two years after the statements was too remote in time and, most importantly, it didn't even use the specific terms at issue and the statements being challenged.

And here the research was started before the IPO, the article came out less than two months later, and it used the exact same term as the FDA standard, "high sensitivity."

*Cloudera* was also a 34 Act case with a PSLRA heightened standard, whereas here the statements about the comparator are only being challenged under Section 11.

In addition, I would highlight the omissions claims under item 303 and 105.  I know Your Honor is familiar with those from the *Slack* case and other securities class actions, but whether or not defendants were certain that the FDA would reject the comparator, in our view that was a specific known risk that required disclosure under Item 105, and it was material for the company.

And it was also a known uncertainty under Item 303 which is specifically geared towards situations like this where management is aware of a contingency.  Perhaps it hasn't happened yet, but if it materializes, the results could be materially negative for -- for the registrant.

And, again, the co-founder of the company, who was on the

board and signed the registration statement, clearly knew that the comparator was low sensitivity at the time of the offering.

**THE COURT:**  So on that you would say the fact that they disclosed over and over again that we don't have the license.  We don't have permission to go forward and it's uncertain whether we'll get it, that that's not adequate because this is something specific they did know about and didn't disclose?  Is that what you're saying?

**MR. KUBOTA:**  Correct.  The general language that they might not get the approval was, as you pointed out, highly general and it also doesn't go to what they already knew, which is that the comparator was low sensitivity.

Very briefly on the 34 Act claims, I think defendant's briefing focused extensively on them, but in our view they are really a bolt on.  Because this is an IPO case, the presence of claims under the 34 Act doesn't expand the class at all.  It's the same class.  And it also doesn't really affect the damages.

But I would highlight two of the statements that we think where falsity is particularly clear.

The first is on Talis's May 11th, 2021 earnings call. This is the first time they held the earnings call as a public company, and it was three months after the IPO.  The first FDA submission had failed and analysts were intensively focused on when Talis was going to launch the product and what the timelines looked like.  So this was a crucial juncture for the

company and what Mr. Coe said was that:  We feel ready to go and we are ready to ship product in a very timely manner.

What we allege in the Complaint, based on the former employees' accounts, which are really uniform on this point, and there are five of them, is that there was no factual basis for that statement at the time that it was made.

In particular, one of the cartridge engineers, that's Former Employee 3, had personally briefed Mr. Coe over several weeks on serious issues of the timelines.

Another cartridge engineer, that's Former Employee 1, reported that the SVP of R&D had proposed a new timeline to Coe, who rejected it, and that the statement that the company was ready to go had no basis.

In that regard, you know, defendants tried to parse the statement and say it might be forward looking or it might be an opinion, but Mr. Coe did not say, "We might be ready to go a year from now," and we aren't today.

What he said, I think, was very clear; that they were ready to go, of course, recognizing that the FDA had not yet granted the approval.  And when the approval finally did come in November of 2021, they still weren't ready.  And, obviously, they weren't ready at the end of the class period in March of this year, and they have now withdrawn the product.

I also would note that Mr. Coe's statement in May was basically effective to stabilize the share price of the

company, which had come down somewhat from the IPO, but basically held in the range of 10- to $12 a share through August of last year.  When the company revealed delays, Mr. Coe was terminated, and I think today it's currently trading at about 66 cents and the company faces delisting.

And what's notable about defendant's papers is they really don't provide any factual basis, much less a reasonable one, for Mr. Coe to say that Talis was ready to go and ship product in a very timely manner three months after the IPO.  And the fact that --

THE COURT:  Well, he said they felt it.  They felt ready to go on our end.  Isn't that pretty squashy?

MR. KUBOTA:  Correct, Your Honor.  I think in context, though, that was really conveying substantive content to the market.

The reason the analyst asked the question is because timing was key.  The window to get the test into the market was closing.  The company itself alluded to that and, obviously, now missed the window.

And the fact that he said we feel.  To the extent that it's an *Omnicare* analysis, there was no basis for Mr. Coe to believe that statement, and he certainly concealed material facts that made the statement misleading in context to a reasonable investor.

THE COURT:  Okay.  Thank you.

Mr. Gibbs.

MR. GIBBS:  Thank you, Your Honor.

If there are any particular areas of interest to the Court, I would be happy to go directly there.  Otherwise, I propose to just respond to what Mr. Kubota has said here.

THE COURT:  All right.

MR. GIBBS:  So focusing first on the statements in the registration statement, the reference to the 5,000 instruments versus the 5,000 components.  Your Honor is asking exactly the right question and just to flesh that point out a little bit, it's really important to keep in mind where the company was in the process, as well as all of the additional disclosures that were made in the registration statement at the same time as the statement about ordering 5,000 instruments.

The company has submitted an EUA.  Doesn't yet have approval for the product.  The company is planning for a commercial launch sometime during the year, but the registration statement is replete with warnings about the complexity and the difficulty of scaling up manufacturing of this brand new product, which is extremely complicated because it involves several components.

It involves a test, an assay, the actual test that figures out whether the sample reflects COVID or not.

There is the cartridge, the disposable item that takes the sample from the person and is used to conduct a test.

And then there's the instrument, which is the box that Mr. Kubota has alluded to.

And this is the first time that the company is launching any product, much less a product that incorporates both a test as well as an instrument.

And so in that setting where FDA approval is still up in the air, where it is crystal clear that commercialization and manufacturing at any level of scale are still in the future and still subject to enormous risk and uncertainty, in that setting it doesn't make a difference whether they say "We ordered components for 5,000 instruments" or "We ordered 5,000 instruments," because even if they had ordered 5,000 instruments, it's still subject to all of the uncertainty, all of the risks that are being disclosed concurrently with that statement.

On the allegations about the device invalid rate before and after the IPO, the -- plaintiff's counsel, I think, is misperceiving the burden here in arguing about whether our position is fact intensive or not.

The starting point here is it is plaintiff's burden to allege facts showing that a statement is false or misleading when made, which means they have to allege facts that existed at the time the statement was made and they have to show that those existing facts, undisclosed to the market, render the statements false or misleading when made.

Plaintiff here simply assumed that you can connect invalid rates in October of 2020 to invalid rates in November and December of 2021 and you can assume that those invalid rates were consistent throughout the time period.

It's their burden to allege facts supporting that argument and that inference, and they have alleged no facts that support it. What they have admitted is that in the meantime the company submits data to the FDA and the FDA approves based on the data.

I would submit that to infer that the rate was high in October 2020 and remained high constantly throughout the entire period when the FDA actually approved the product is not a reasonable inference and certainly doesn't come close to supporting an inference of falsity as to statements made at the time of the IPO or in the months immediately after the IPO.

I don't think there's anything wrong with our Request for Judicial Notice or incorporation for reference as to the fact that the revised EUA submitted in July reflected rates under 10 percent; but even if you just ignore that fact, you still have the basic foundational problem that plaintiffs haven't alleged any facts which support an inference about what the invalid rates were in February or March or April or May or any other subsequent month until you get all the way to November and December of 2021, which, by the way, is very shortly before the company itself discloses that there has been an uptick in

invalid rates.

And so there is nothing about any of the allegations in this Complaint that suggest anything other than the company disclosed the uptick in invalid rates when they observed them.

I want to move now to the allegations about the comparator assay.  Another foundational problem here is that -- that you heard it in the presentation here.  Plaintiffs treat words like "high sensitivity" and "low sensitivity" as if they are objective, as if they are defined, and ignore the fact that they are inherently relative.  A certain test could be high sensitivity compared to one test and low sensitivity compared to another test.  So you can't just say "high sensitivity," "low sensitivity."

The issue here isn't whether something was high or low in some abstract sense.  The issue here is whether the test was sufficiently sensitive for the FDA to approve an EUA based on the results from that comparator assay.

We know that the FDA in this instance concluded that it was not, but there is no allegation of fact in this Complaint to show that that was the case as of the IPO date.  We don't know when the FDA reached the conclusion that this particular comparator assay in this instance was not sufficiently sensitive.

THE COURT:  Well, isn't there a --

MR. GIBBS:  To approve the application --

**THE COURT:**  Isn't there an allegation the defendants knew that going into it?

**MR. GIBBS:**  There is a conclusory allegation to that effect and a lot of argument to that effect.

And I just -- I want to note parenthetically that completely undermines the plaintiff's argument that the Section 11 claims should be treated separately because that argument clearly shows that the Section 11 claim sounds in fraud, and the argument you heard here today is clearly one of knowledge.

Now, that doesn't mean they successfully alleged it, but that's clearly their theory of the case.

So as to that, what they've brought into the case -- and this is clearly an improper attempt at requesting judicial notice because it's -- it's an article published after the IPO. It existed when they filed their complaint.  There's no reason why they couldn't have included it in their complaint.  I'm sure they will next time, and we can talk about it.  But it's clearly improper at this stage.  They are clearly trying to amend their Complaint.

Even if it were part of the Complaint though, if you read the article itself, it doesn't say:  We knew that this particular comparator assay was insufficiently sensitive for the FDA to approve an EUA on that basis.  It doesn't say anything like that.

It has a list of tests with measures of sensitivities and in that list the tests that Talis used is lower in sensitivity than some other tests, and it establishes one benchmark for what's high or what's low. And that's what Mr. Coe just referenced.

There is no allegation that that definition of low sensitivity is exactly the same one that the FDA was using at the time of the EUA submission and the registration statement.

There's certainly no allegation that as of the registration statement, Talis knew that that was the definition that the FDA was going to use. And so it doesn't get them there even if the Court considers it. It doesn't even come close.

It is a -- it's using words that are far too imprecise. They are inherently relative. They are not defined, and it has no reference to whatever benchmark or standard the FDA was using when it concluded that that particular comparator assay was not sufficient for purposes of this application.

I would say the same argument goes to the known risk or uncertainty argument that plaintiff's counsel has laid out here. They are only able to say it was a known risk or uncertainty with hindsight and by mischaracterizing that subsequent article along the lines I've just suggested.

But they have alleged no facts showing that as of the date the registration statement was filed, there was someone at

Talis who actually believed that the strength or weakness of the comparator assay was a known risk.

They certainly disclosed the risk that the FDA might not approve their application, and there's nothing alleged here to show that the company actually believed or understood that there was a specific additional risk about the choice of this comparator assay as compared with some other comparator assay. So that doesn't get them there either. Certainly, not given that this claim plainly sounds in fraud, and they have to do more than just allege falsity. They have to allege scienter, and they are nowhere near that here.

I will -- I'll move now to the 34 Act claims. It is surprising to me to hear that the 34 Act claims are just a bolt on. That's certainly not the sense that one gets when one reads the very lengthy Complaint.

And I can tell you that a bunch of individuals who are being accused of intentionally deceiving shareholders are not going to lightly brush aside the fact that they have been accused of this fraud because it's a bolt on.

If they have a fraud case, they need to bring a fraud case and they need to plead the facts to support it. If they don't, then they shouldn't have brought it in the first place.

I would submit now they want to downplay the importance of the 34 Act claim because they know they can't meet that standard. They know the fact that they brought the 34 Act

claim is -- is requiring them to meet a higher standard on their Section 11 claim.  They can't run away from that fact just by saying it's a bolt on.

Setting that aside, about that May 11, 2020 call, Your Honor is exactly right that talking about being "we feel we're ready to go" is extremely "squishy" I think was the word.

More than that though, you know, this is a theme.  It's a technique we see quite a bit.  You know, "ready to go" isn't -- wasn't some abstract statement.  It was made in the context of a particular series of questions and answers.

I would urge the Court to please look very carefully at that statement to the extent there is any issue here, because there are different parts of the statement addressing different issues.  Part of which is manufacturing.  Part of which is getting a sales organization ready to go to do the commercial launch.  And the statement "we feel we're ready to go on our end" is coming immediately after the discussion about the creation of the sales organization.  It's not about manufacturing.

At a minimum, it's extremely ambiguous what we feel "we're ready to go" means.  Is it about manufacturing?  Is it about commercial launch and having a commercial team or a sales team?  Is it everything?  It's too unclear to support a fraud claim.

Setting that aside, the allegedly undisclosed facts don't support the inference that Mr. Coe's May 11th statement was

also misleading, much less that it was knowingly so.

Counsel referred to the fact that we haven't offered a factual basis for Mr. Coe's statements. Again, that's not our burden on the Motion to Dismiss. We're not required to come in here with evidence to prove that his statement was true. That would be absurd.

It's plaintiff's burden to plead particularized facts showing that it was false and particularized facts supporting a strong inference that he knew it was false.

Here what you heard about was statements attributed to FE-3, who said he briefed Coe sometime in May -- we don't know when -- about issues. That's it. That doesn't come close to supporting the inference that the "ready to go" statement was false. It certainly doesn't support the inference that it was fraudulent.

We also heard about a statement attributed to FE-2, to the point that FE-2 supposedly proposed a new timeline and it was rejected. Again, that doesn't come close to supporting an inference that what Mr. Coe said on the May 11th call was false or misleading, much less knowingly so. At most, it suggests that there may have been disagreements among different people inside the company about what's the right timeline to use, what is a reasonable timeline to use, and whether the existing timeline was going to work.

I'm sorry. I just -- my notes are bad. I think it was

FE-1 he referenced, not FE-2.  So I apologize.  So much for my handwriting.

**THE COURT:**  FE-2 talked about the rumor, but FE-3 briefed Coe on serious issues with the manufacturing timeline.  So it's not just issues.  It's issues with the manufacturing timeline that he's talking about.

**MR. GIBBS:**  Fair enough.  I still don't think that gets you anywhere near to particularized facts supporting an inference of falsity, and it certainly doesn't support a strong inference of an intent to mislead or fraud.

One can have different opinions about the reasonableness of a forward-looking timeline.  So FE-3 may very well have thought there were serious issues.  Other people may have disagreed.

And by the way, there is no independent set of factual allegations in here to explain why FE-3 is qualified to render an opinion about the reasonableness of the manufacturing timelines relative to anyone else.

I would note that FE-3 worked on a very specific part of this project.  FE-3 worked on the consumables, which are the cartridges, which, again, is one piece of this very complex platform that includes the instruments in the test itself.

But other than that, sort of bare information that FE-3 was working on the design of consumables, I don't think there's any factual basis in here to assume that when FE-3 says there

are issues with the manufacturing timeline, that that's necessarily dispositive or renders false or misleading Mr. Coe's belief, his stated belief that they would be ready to go if and when they get approval for the test.

I think I've addressed everything that Mr. Kubota said. Otherwise, I'm happy to address any other issues.

Oh, I'm reminded. We also don't have allegations supporting a timing point; right? With a --

THE COURT: Sorry. Again?

MR. GIBBS: Allegations about timing. FE-3 and FE-1 are alleged to have done these things, made these statements, but there's no specific allegations that this information existed as of the date Mr. Coe made the statement or much less that it was conveyed to him. So I just -- I want to finish off that point.

Otherwise, I think things are pretty well covered in the briefing. I'm happy to address any other questions the Court might have.

THE COURT: No, that's fine.

Do you wish to respond, Mr. Kubota?

MR. KUBOTA: Yes, Your Honor.

To take Mr. Gibbs' points in basically the same order. On the 5,000 instruments versus components stated in the IPO, what Mr. Gibbs was saying about how this was the first time they were building and launching the product is exactly why that

statement was so important.  It was a concrete statement about a factual matter that had supposedly already happened, that they had ordered the 5,000 instruments.  And none of the generic risk factors indicated that was false.

For example, if you look at Page 5 of their Motion to Dismiss, when there are a number of bullet points, the first risk factor mentions that the commercial launch could be delayed if they do not receive the FDA approval.

The second one mentions that they rely on third parties to manufacture the platform and that there is risk that they will not have sufficient quantities of their products.  Obviously, that has no bearing on the falsity of the statement of present and historical fact that they had already ordered 5,000 instruments.

And on the materiality of that statement, when they changed the language from "instruments" to "components," the stock dropped 23 percent.  That was on March 15th, 2022.

With respect to the invalid rate and this argument about sort of a gap with data submitted to the FDA, Mr. Gibbs obscured part of the Complaint, which is we actually allege and the senior scientist, Former Employee 2, who was there before the IPO, reported that the invalid rate was driven by design problems, including cartridge sizes that were too small.

So in our view that is more than sufficient to support a reasonable inference of contemporaneous falsity.  The design

issue is not something that went away between 2020 and the IPO in February of 2021.

And in fall 2021, in November, the territory account manager, FE-4, investigated why the device didn't work and was told by Talis personnel, her name is Mai, and she's identified by name in the Complaint, that the test had two defective parts that didn't work. Again, we believe that's something that existed and was inherent to the device. It's not something that changed after the IPO.

With respect to the comparator assay, Mr. Gibbs tried to make the point that high and low sensitivity are subjective terms. They don't have any defined meaning and they are all relative.

It remains the fact that the article by Talis's cofounder used exactly the same term as the FDA requirement. And, you know, it doesn't make it a fraud claim, as Mr. Gibbs was saying. It's merely to address his point that Talis somehow didn't know that the FDA would reject the assay or didn't understand how the FDA would interpret "high sensitivity."

I would also add that defendants accelerated and completed the IPO before they disclosed that the FDA had requested additional information. Defendants, obviously, have not provided the FDA's letter to the Court. It's not in their RJN, even though they submitted almost 300 pages of other extrinsic material. And we believe that letter bears significantly on

what they knew at the time of the offering.

With respect to the risks and uncertainty points on the fraud comparator, again, what the senior scientist, Former Employee 2, said is that it was known before the IPO that the submission used a weak comparator.  So that was a fact that existed at the time and supports the item 105 and 303 omissions claims.

I think I also heard Mr. Gibbs say that scienter is required and that's plainly not the law.  You know, at most if the claim were to sound in fraud, Rule 9(b) would apply, but that requires allegations of the who, what, when and where. It -- you know, doesn't ingraft a scienter element onto a strict liability statutory claim.

With respect to the 34 Act, Mr. Coe's "ready to go" statement, we heard some parsing that maybe it didn't refer to Talis's ability to manufacture the product, but Paragraph 190 of the Complaint sets forth the question and answer.  And the analyst's question was specifically about:  How soon can you ship the product out to the customers?  And his response said: We feel we will be in a position to ship product in a very timely manner following an approval.

So that really has nothing to do with the commercial team or any extraneous issue.  It's on this laser focused issue of when the company could actually ship the device that they said they had ordered 5,000 copies of.

It's also a statement that's capable of objective verification.  It's really not puffery or inactionable optimism because, obviously, their internal documents and reports will show what they had on hand, the status of production and whether they really were ready to go at any point around the time of the statement.

And as to Mr. Gibbs' argument that, you know, it's our burden to plead facts showing falsity and scienter, fair enough.  As the Court pointed out, the allegation is that the engineer, Former Employee 3, briefed Mr. Coe on serious issues of manufacturing timelines.  So we go beyond the general there.

And also I think Mr. Gibbs ultimately is looking for a smoking gun or an irrefutable inference at the pleading stage, which, obviously, *Intel Labs* in the Supreme Court has held we're not required to provide.

As to the disagreement point, I don't think there's any basis for that in the pleading, and it's -- it's wholly speculative.  The facts that existed at the time of the IPO and that were reported to Mr. Coe in May of 2021 make that a completely implausible and certainly not more compelling inference than that Mr. Coe knew or recklessly disregarded the falsity of his statements.

And as to allegations about the reliability of FE-3, the cartridge engineer who briefed Mr. Coe, you know, this is not some officious intermeddler who just showed up at Talis's

headquarters and started talking to the CEO.  This is an engineer who had been there since 2016, five years before the briefing, and was obviously senior enough that he was able to brief Mr. Coe over several weeks.  And the same engineer also communicated directly with a scientific advisor to the board about the overly aggressive timelines.  That's in Paragraph 213 of the Complaint.

So the notion to sort -- that they can sort of pick apart and recast these former employees as low level individuals who didn't have any relevant insight into the state of affairs at the company I think just doesn't hold up.  These are highly qualified and they provide consistent and corroborating allegations.

THE COURT:  Do you know how many employees Talis had?

MR. KUBOTA:  Yes, Your Honor.  So it bounced around. I think at the time of the IPO the most recent public information was 136 employees.

At some point, you know, they started to staff up, and I think it probably peaked at closer to 200.  But they have recently, unfortunately, terminated about half of their work force, so I think they are back to about 100 at this point.

THE COURT:  Okay.  Thank you.

Okay.  Anything else for now?

(No response.)

MR. GIBBS:  I have a couple things I would like to

correct, but I don't think Your Honor needs to hear them.  So we'll submit, unless the Court has questions.

            THE COURT:  All right.  Matter submitted.  Thank you both very much.

            MR. GIBBS:  Thank you, Your Honor.

            MR. KUBOTA:  Thank you, Your Honor.

        (Proceedings adjourned.)

*Debra L. Pas, CSR, RPR, RMR, CRR*
*Official Reporter - U.S. District Court - San Francisco*
*(415) 431-1477*

### CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Friday, November 18, 2022