COOLEY LLP
Patrick E. Gibbs (183174)
(pgibbs@cooley.com)
Shannon M. Eagan (212830)
(seagan@cooley.com)
Samantha A. Kirby (307917)
(skirby@cooley.com)
Jessie Simpson LaGoy (305257)
(jsimpsonlagoy@cooley.com)
3175 Hanover Street
Palo Alto, California 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

*Attorneys for Defendants Talis Biomedical Corporation,
Brian Coe, J. Roger Moody, Jr., Felix Baker, Raymond
Cheong, Melissa Gilliam, Rustem F. Ismagilov,
Kimberly J. Popovits, Matthew L. Posard, and Randal
Scott*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TALIS BIOMEDICAL SECURITIES LITIGATION | Case No. 22-cv-00105-SI |
| | CLASS ACTION |
| THIS DOCUMENT RELATES TO: | **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED COMPLAINT** |
| ALL ACTIONS | Date:        May 5, 2023 |
| | Time:        10:00 a.m. |
| | Courtroom:   1 |
| | Judge:       Hon. Susan Illston |

COOLEY LLP

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................................ 1

STATEMENT OF RELIEF SOUGHT ............................................................................... 1

STATEMENT OF THE ISSUES........................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................... 1

I.      INTRODUCTION ................................................................................................... 1

II.     STATEMENT OF FACTS ...................................................................................... 3

        A.      Talis Applies for an EUA .......................................................................... 4

        B.      Talis Discloses Its Pre-Revenue Status and Production Challenges ..... 6

        C.      Talis Discloses Broad Risks ..................................................................... 7

        D.      The FDA Defers Authorization on the Initial EUA Application ........... 8

III.    PROCEDURAL HISTORY AND NEW (AND REMOVED) ALLEGATIONS IN
        THE AC ................................................................................................................... 8

IV.     THE FORMER EMPLOYEE ALLEGATIONS ARE UNRELIABLE ............... 10

        A.      The Holdover FE Allegations Remain Insufficient .............................. 10

        B.      The New FEs Are Unreliable ................................................................. 11

V.      STANDARD OF REVIEW .................................................................................. 13

VI.     PLAINTIFFS' SECTION 11 CLAIM SHOULD BE DISMISSED UNDER RULE
        9(B) ........................................................................................................................ 13

VII.    PLAINTIFFS' SECTION 11 CLAIM ALSO FAILS UNDER RULE 8 ............. 15

        A.      Manufacturing and "Ordered 5,000 Instruments" (Statements 1-2 (¶ 68)) ........... 15

                1.      Plaintiffs' Interpretation of Statements 1 and 2 Ignores Talis's
                        Ample Risk Disclosures and the Total Presentation of the
                        Registration Statement ............................................................. 15

                2.      The Challenged Statements Are Not Materially False or Misleading ...... 17

        B.      "Reliability" and "Accuracy" (Statements 3-7, ¶ 127) ........................ 20

        C.      Plaintiffs Fail to Allege A Violation of Item 303 or Item 105 ............ 26

                1.      Talis's Disclosures Related to FDA Approval Satisfy Item 303 and
                        Item 105 ..................................................................................... 26

                2.      Talis's Disclosures Related to Reliability and Scale-Up Satisfy Item
                        303 and Item 105 ....................................................................... 28

        D.      Plaintiffs' Amended Complaint Fails Because of Negative Causation .............. 29

VIII.   PLAINTIFFS' SECTION 15 CLAIMS FAIL ..................................................... 30

IX.     CONCLUSION ..................................................................................................... 30

Cooley LLP

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Ashcroft v. Iqbal,*
5
    556 U.S. 662 (2009)..............................................................................................13

6

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988)..............................................................................................17
7

*Bell Atl. Corp. v. Twombly,*
8
    550 U.S. 544 (2007)..............................................................................................13

9

*Belodoff v. Netlist,*
10
    2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) .........................................................26

11

*Berg v. Velocity Fin., Inc.,*
    2021 WL 268250 (C.D. Cal. Jan. 25, 2021) ..........................................................26
12

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,*
13
    856 F.3d 605 (9th Cir. 2017)................................................................................21

14

*In re Cloudera, Inc. Sec. Litig.,*
15
    2022 WL 14813896 (N.D. Cal. Oct. 25, 2022)......................................................16

16

*Colyer v. Acelrx Pharms., Inc.,*
    2015 WL 7566809 (N.D. Cal. Nov. 25, 2015)................................................22, 23
17

*Dura Pharm., Inc. v. Broudo,*
18
    544 U.S. 336 (2005)..............................................................................................30

19

*Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.,*
20
    2021 WL 1056549 (N.D. Cal. Sep. 15, 2021) .......................................................13

21

*Fadia v. FireEye, Inc.,*
    2016 WL 6679806 (N.D. Cal. Nov. 14, 2016)................................................12, 25
22

*Francisco v. Abengoa, S.A.,*
23
    481 F. Supp. 3d 179 (S.D.N.Y. 2020)....................................................................28

24

*Golubowski v. Robinhood Markets, Inc.,*
25
    2023 WL 1927616 (N.D. Cal. Feb. 10, 2023) ................................................22, 23

26

*Huang v. Avalanche Biotech., Inc.,*
    2016 WL 6524401 (N.D. Cal. Nov. 3, 2016)........................................................17

27

28

Cooley LLP

**TABLE OF AUTHORITIES**
(continued)

Page

*Jackson v. Loews Hotels, Inc.*,
    2019 WL 6721637 (C.D. Cal. July 24, 2019) ......................................................................... 10

*Kipling v. Flex Ltd.*,
    2020 WL 7261314 (N.D. Cal. Dec. 10, 2020) ........................................................... 11, 12, 25

*Kovtun v. VIVUS, Inc.*,
    2012 WL 4477647 (N.D. Cal. Sep. 27, 2012) ......................................................................... 13

*Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003) ..................................................................................... 30

*In re Metawave Commc'ns Corp. Sec. Litig.*,
    629 F. Supp. 2d 1207 (W.D. Wash. 2009) .............................................................................. 13

*In re Nektar Therap. Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) ................................................................................................... 12

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ................................................................................................... 10

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018) ..................................................................................... 22

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) .......................................................................................................... 15, 21

*Padnes v. Scios Nova Inc.*,
    1996 WL 539711 (N.D. Cal. Sept. 18, 1996) ......................................................................... 23

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ................................................................................................. 28

*In re Progenity, Inc. Sec. Litig.*,
    2023 WL 219345 (S.D. Cal. Jan. 13, 2023) ....................................................... 23, 27, 28, 29

*In re Rackable Sys., Inc. Sec. Litig.*,
    2010 WL 3447857 (N.D. Cal. Aug. 27, 2010) ....................................................................... 10

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ........................................................................................... *passim*

*Rubke v. Capitol Bancorp Ltd*,
    551 F.3d 1156 (9th Cir. 2009) ........................................................................................... 15, 20

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

4    *In re Sanofi Sec. Litig.*,
        87 F. Supp. 3d 510 (S.D.N.Y. 2015) ................................................................... 27

5    *Sgarlata v. PayPal Holdings, Inc.*,
6       409 F. Supp. 3d 846 (N.D. Cal. 2019) ................................................................ 11

7    *In re Stac Elec. Sec. Litig.*,
        89 F.3d 1399 (9th Cir. 1996) ....................................................................... 14, 15
8
      *Stadnick v. Vivint Solar, Inc.*,
9       861 F.3d 31 (2d Cir. 2017) ................................................................................. 27

10    *Steckman v. Hart Brewing, Inc.*,
11       143 F.3d 1293 (9th Cir. 1998) ........................................................................... 26

12    *In re Talis Biomedical Corp. Sec. Litig.*,
        2022 WL 17551984 (N.D. Cal. Dec. 9, 2022) .............................................. *passim*
13
      *Tongue v. Sanofi*,
14       816 F.3d 199 (2d Cir. 2016) ......................................................................... 26, 27

15    *Underwood v. Coinbase Global, Inc.*,
16       2023 WL 1431965 (S.D.N.Y. Feb. 1, 2023) ...................................................... 18

17    *In re Velti PLC Sec. Litig.*,
        2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ................................................. 29, 30
18
      *In re Worlds of Wonder Sec. Litig.*,
19       35 F.3d 1407 (9th Cir. 1994) .............................................................................. 15

20    *In re YogaWorks, Inc. Sec. Litig.*,
21       2020 WL 2549290 (C.D. Cal. Apr. 23, 2020) ................................................ 9, 18

22    *Yourish v. California Amplifier*,
        191 F.3d 983 (9th Cir. 1999) .............................................................................. 14
23
      *Zucco Partners, LLC v. Digimarc Corp.*,
24       552 F.3d 981 (9th Cir. 2009) ................................................................. 10, 11, 12

25    **Statutes**

26    15 U.S.C. § 77k(e) ................................................................................... 29, 30

27

28

**TABLE OF AUTHORITIES**
(continued)

Page

21 U.S.C.
§ 360bbb-3(a)(2) ................................................................................................... 4
§ 360bbb-3(e)(3) ............................................................................................... 4, 19

Securities Act of 1933
§ 11 ............................................................................................................... *passim*
§ 15 .......................................................................................................... 1, 3, 30

**Other Authorities**

17 C.F.R.
§ 229.105(a) ....................................................................................................... 26
§ 229.303(3)(a)(ii) .............................................................................................. 26

21 C.F.R.
§ 820.3(l) ............................................................................................................ 16

85 F.R. 7316-01 (Feb. 7, 2020) ............................................................................ 4

87 F.R. 2163-01 (Jan. 13, 2022) ........................................................................... 5

Federal Rules of Civil Procedure
Rule 8 ............................................................................................................. 1, 15
Rule 9(b) .................................................................................................... 1, 13, 14
Rule 12(b)(6) .................................................................................................. 1, 13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: NOTICE IS GIVEN**

that on May 5, 2023, at 10:00 a.m., Defendants will and hereby do move to dismiss with prejudice

all claims asserted in the Amended Consolidated Class Action Complaint ("Amended Complaint"

or "AC").  This Motion is made under Federal Rules of Civil Procedure 8, 9(b), 12(b)(6), and the

Private Securities Litigation Reform Act of 1995 (the "PSLRA").  This Motion is based on the

pleadings; the Memorandum of Points and Authorities; the Request for Judicial Notice and

Consideration of Documents Incorporated by Reference ("RJN"); the Declaration of Shannon

Eagan and exhibits thereto; and any other matter which may be submitted at the hearing.

**STATEMENT OF RELIEF SOUGHT**

Defendants seek an order dismissing the AC with prejudice for failure to state a claim.

**STATEMENT OF THE ISSUES**

Does the AC fail to state claims under §§ 11 and 15 of the Securities Act of 1933?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

This Court dismissed Plaintiffs' previous complaint for failure to plead material falsity.  The

AC fails to remedy the defects identified by the Court.  Plaintiffs' new FE allegations remain

conclusory, lacking in factual support and personal knowledge, and are vague as to time and detail.

Plaintiffs challenge two categories of statements: (1) that Talis's products were "manufactured"

by third parties and Talis had "ordered 5,000 instruments" (Statements 1-2[1], ¶ 68); and (2) about

the Talis One design (Statements 3-7, ¶ 127).  Plaintiffs also claim Talis violated Items 303 and

105 by omitting information about its chances of FDA authorization and reliability.  None of these

alleged misstatements or omissions are actionable.

The Court dismissed Plaintiffs' previous challenge to the statement that Talis had "ordered

5,000 instruments" because they had not "adequately alleged why stating that Talis was ordering

'instruments' rather than 'components for instruments' was false or misleading."  *In re Talis*

---

[1] Talis attaches an exhibit summarizing the challenged statements at Exhibit 9.  All references to "¶" refer to the AC.  All emphases are added unless otherwise noted.

*Biomedical Corp. Sec. Litig.,* 2022 WL 17551984, at *13 (N.D. Cal. Dec. 9, 2022) ("Order"). Shifting tack, Plaintiffs now claim reasonable investors would have understood the word "instruments" to mean "finished goods" or "finished devices"—a term the challenged statement never used—such that investors expected Talis to sell nearly $100 million in products soon after it went public. But Talis disclosed it had no sales team, no FDA-authorized product to sell, and did ***not*** expect to recognize revenue until after it received FDA authorization. Plaintiffs also challenge the statement that Talis "ordered" 5,000 instruments, but the allegedly undisclosed "facts"—that Talis had not "paid" for the order, entered into a capacity agreement, did not meet FDA manufacturing regulations, and experienced manufacturing challenges—do not render this statement false or misleading. Moreover, Plaintiffs do not challenge that Talis placed "purchase commitments" and entered into "non-cancellable" contracts for $33 million in instruments, secured by a corresponding line of credit, that would become due in 2021. Ex. 7 at 108.

Plaintiffs next challenge statements about Talis's product design, which they recast as promises about the Talis One's final accuracy and reliability. But the AC strategically omits language reflecting that these are classic statements of opinion, and then fails to adequately plead that those opinions are false or misleading. The Court previously dismissed similar arguments because, even accepting Plaintiffs' flawed interpretation, they failed to sufficiently allege the Talis One platform (or any part of it) had high invalid rates at the time of the IPO. Order at *18. Plaintiffs attempt to paper over these defects by inserting boilerplate language—"at the time of the IPO"—and touting allegations about purported invalid rates from two new FEs. But Plaintiffs place more weight on their new FEs than they can bear. The AC dedicates a single substantive paragraph to FE-8, a former "sales focused" employee, who makes wholly conclusory allegations about ranging invalid rates in "different lots of devices." ¶ 131. And FE-6, an HR professional, claims "the failure rate was discussed" at weekly meetings, such that FE-6 knew the failure rate ranged as high as 20%, but never says how, when, or by whom that information was presented. ¶ 132.

Finally, Plaintiffs try to resuscitate their Item 303 and Item 105 claims. The Court rejected this theory because Plaintiffs neither "allege[d] that the FDA had set forth objective criteria for the sensitivity of a comparator assay," nor alleged "that at the time of the offering the FDA had

1    determined that the comparator assay lacked sufficient sensitivity to support Talis's application and

2    that the FDA had communicated that information to Talis."  Order at *20-21.  In an effort to fill

3    this void, Plaintiffs invent an FDA "requirement" of a specific limit of detection ("LoD") threshold

4    for the sensitivity of comparator assays, but fail to identify where or when that "requirement" was

5    made public by the FDA.  In any event, Talis disclosed the specific LoD of the comparator assay it

6    used to support its Emergency Use Authorization ("EUA") application and warned it could not

7    assure that its EUA would be granted.  In other words, Talis disclosed the information Plaintiffs

8    contend was omitted.

9        Setting falsity aside, Plaintiffs' claims separately fail because the AC demonstrates negative

10   causation.  Plaintiffs first filed suit on January 7, 2022, and, under Section 11, Plaintiffs cannot

11   recover for damages after that date.  But the AC alleges that the truth about the "5,000 instruments"

12   and "high invalid rates" was first disclosed to the public in March 2022.  Because Defendants

13   cannot be held to have caused decreases in stock prices *before* an alleged disclosure, Plaintiffs

14   cannot prove that the challenged statements legally caused the alleged losses.

15       This is not a case of a company pulling the wool over investors' eyes.  This is a case of plaintiffs

16   plucking out-of-context fragments from a robust registration statement to allege falsity in hindsight.

17   While the AC seeks to complicate and obfuscate, the actual story is simple: Talis sought to meet an

18   urgent public health need during an unprecedented pandemic and failed to achieve regulatory

19   authorization on an economically viable timeline.  The scientific process ended, as it often does, in

20   disappointment.  But Talis thoroughly disclosed that risk and specifically warned investors that if

21   it did not receive a timely EUA, its commercial launch could be delayed or halted.  To find plausible

22   Section 11 and 15 claims in these circumstances would chill innovation and turn the Securities Act

23   into a cudgel for every regulatory failure.  The Court should dismiss the AC with prejudice.

24   **II.    STATEMENT OF FACTS**

25       The Court's previous dismissal order summarized much of the relevant background of this

26   securities class action, and Defendants incorporate those facts herein.  *Id.* at *1-9.

27

28

COOLEY LLP

DEFS.' MTD AMENDED COMPLAINT
CASE NO.  22-CV-00105-SI

1

### A.  Talis Applies for an EUA

2    Talis is a pre-commercial biotechnology company developing diagnostic tests.  Order at *1.  In

3    February 2020, soon after COVID-19 reached the United States, the Secretary of Health and Human

4    Services ("HHS") declared a public health emergency under Section 564 of the Federal, Food,

5    Drug, and Cosmetic Act.  ¶ 51.  Based on that determination, the HHS issued four EUA declarations

6    for medical products, including one for in vitro diagnostics.  *See* 85 F.R. 7316-01 (Feb. 7, 2020).

7    These declarations allowed the FDA to bypass normal authorization procedures, and issue EUAs

8    for medical products that may be effective in diagnosing, treating, or preventing COVID-19.  21

9    U.S.C. § 360bbb-3(a)(2).  When issuing an EUA, the FDA has the discretion to waive certain

10    regulatory requirements, including pre-market application of 510(k) clearance, as well as certain

11    manufacturing requirements.  *See* 21 U.S.C. § 360bbb-3(e)(3).  In response to the pandemic, Talis

12    worked quickly towards building a COVID-19 test and obtaining an EUA.

13    In 2020, the FDA's EUA guidance for COVID-19 test candidates was a moving target.  In July

14    2020, the FDA published a template ("July Template"), which "contain[ed] nonbinding

15    recommendations."  Ex. 2 at 1; ¶ 163.  The FDA cautioned that the July Template "should be

16    viewed only as recommendations, unless specific regulatory or statutory requirements are cited,"

17    and "the use of the word *should* means that something is suggested or recommended, but not

18    required."  Ex. 2 at 1 (emphasis in original).  The July Template stated:

19
20
21
22
> Positive percent agreement **should** be calculated in comparison to an EUA RT-PCR test.  We **recommend** using only a high sensitivity EUA RT-PCR assay which uses a chemical lysis step followed by solid phase extraction of nucleic acid (e.g., silica bead extraction). ***If available***, FDA **recommends** selecting a comparator assay that has established high sensitivity with an internationally recognized standard or FDA SARS-CoV-2 Reference Panel. Please contact CDRH-EUA-Templates@fda.hhs.gov to discuss options to establish [] sensitivity….

23    *Id.* at 16; ¶ 163.  For studies to support point-of-care indication, the July Template recommended

24    "[a]ll patients tested during the clinical study with the POC device **should** also be tested by an FDA

25    authorized SARS-CoV-2 molecular assay."  Ex. 2 at 33.  And "[t]he comparator method selected

26    ***should*** be one of the more sensitive EUAs on the FDA website…."  *Id.*; *see also* ¶ 164 (same).

27    The FDA never defined or established required thresholds for "high sensitivity" or "more

28    sensitive" assays.  Consistent with this gap, Plaintiffs' prior complaint did "not allege that the FDA

set additional criteria for what did or did not constitute a 'high sensitivity' assay." Order at *5. Yet seven months later, Plaintiffs now contend "[t]he FDA required all 'high sensitivity' comparator assays to have a limit of detection (LoD) better than 18,000 NDU/mL." ¶ 166. Plaintiffs offer no citation to support this purported FDA requirement. Nor do Plaintiffs allege when it went into effect, or when or how it was made public.[2]

In truth, the FDA said the opposite. On September 16, 2020, Timothy Stenzel, the FDA Director overseeing the office that authorized COVID-19 tests, stated that the FDA recommended use of the "best possible standard." Ex. 3 at 7; ¶ 178. But Dr. Stenzel then explained: "*we don't look in particular at LOD for a number of reasons*." Ex. 3 at 8. This is because "*there's no international standard so it's really hard to set something that can be applied evenly across all technologies* and developers but also *it's not always the direct relationship between LOD and clinical performance* especially if you want to be sure and identify people who have transmissible levels of virus." *Id.*

As of December 7, 2020, the most recent update to the FDA's SARS-CoV-2 Reference Panel Comparative Data ("Reference Panel"), the FDA still had not expressly required all "high sensitivity" assays to have an LoD better than 18,000 NDU/mL. Ex. 4. The FDA made clear "the panel is ***not*** a replacement for the analytical and clinical validation recommendations the FDA has provided in the EUA templates." *Id.* at 3. Instead, the Reference Panel demonstrated that, as of December 2020, one month before Talis submitted its EUA application, the FDA had granted EUAs to tests with product LoDs ranging from 180 NDU/ml to ***600,000*** NDU/mL. *Id.* at 6-13. The FDA authorized that 600,000 NDU/mL test in the same month it issued the July Template. *See* Ex. 1.[3]

---

[2] Similarly, Plaintiffs contend "[t]he FDA requires invalid rates to be below 10% and prefers a rate under 5%," but cite to no authority for this purported requirement. ¶ 125. Plaintiffs also do not allege when this requirement took effect. To the extent Plaintiffs cite the July Template, the threshold they reference only applied to n-swab pooling strategies: "[a]cceptance criteria should be at least 95% agreement with the expected results and an invalid rate of < 5%." *Id.*; Ex. 2 at 31-32. Moreover, the July Template also made clear that "use of the word *should* means that something is suggested or recommended, but not required." Ex. 2 at 1.

[3] Although the BMC-CReM authorization letter includes the watermark "Revoked," the EUA was not revoked until December 8, 2021, when Boston Medical Center confirmed that the BMC-CReM test was no longer performed and requested withdrawal of its EUA. *See* 87 F.R. 2163-01 (Jan. 13, 2022) (revoking BMC-CReM COVID-19 Test EUA at BMC's request on December 8, 2021).

Cooley LLP

5

Defs.' MTD Amended Complaint
Case No. 22-cv-00105-SI

Before submitting its EUA application, Talis conducted a clinical validation study comparing its COVID-19 test to an FDA-authorized comparator assay, which "was found to have a limit of detection of 180,000 NAAT Detectable Units/mL in the FDA SARS-CoV-2 Reference Panel."  Ex. 7 at 127-29.  Plaintiffs do not dispute that this comparator assay was FDA-authorized and used in a central laboratory, do not dispute its LoD was different than what Talis disclosed, and do not dispute that the LoD of Talis's test (500 viral particles/mL) was "substantially more sensitive" than the FDA-authorized comparator assay it used.  *Id.* at 128.

Talis submitted its initial EUA on January 29, 2021.  ¶ 157; Ex. 7 at 1.  In its Registration Statement, Talis disclosed that during the FDA's "preliminary review" of Talis's EUA submission, the FDA asked Talis to "provide it with additional information" regarding Talis's test "prior to initiating its substantive review."  ¶ 179; Ex. 7 at 18.  Talis also disclosed that it expected to "promptly provide" that information to the FDA.  Ex. 7 at 18.  At the same time, the Company warned investors "[t]here can be no assurances" that the FDA would approve its EUA application.  *Id.*  Talis disclosed that if its EUA was not approved, "***the commercial launch of such products could be significantly delayed***, which would adversely impact [Talis's] business … and future growth prospects could be materially and adversely affected." *Id.*; *id.* at 19 (similar); *id.* at 44 (similar).

### B.    Talis Discloses Its Pre-Revenue Status and Production Challenges

Talis went public on February 12, 2021.  ¶ 205.  Talis disclosed that it had developed the Talis One System, a diagnostic platform comprised of three distinct components: (1) single-use test cartridges that prepare and store patient samples, (2) a box-shaped instrument that analyzes the samples, and (3) software.  Ex. 7 at 2-3.  The Talis One cartridge is a shelf-stable and single-use test cartridge designed to fully integrate proprietary assays with sample preparation.  *Id.* at 122-23. The first assay for which Talis sought FDA authorization was its COVID-19 test.  *Id.* at 129.

Talis also disclosed it had "no products approved for commercial sale," and did "not expect to generate any meaningful revenue unless and until [it] obtain[ed] regulatory approval of and commercializ[ed] [its] Talis One Platform."  *Id.* at 105.  Talis further warned investors that, even if it received EUA approval for the Talis One COVID-19 test, commercial success was not guaranteed

because Talis's manufacturing process was complex and it may not be able to manufacture at scale. *Id.* at 22; *see also id.* at 20 ("[M]anufacturing of [the] Talis One instrument and cartridge involves over 500 raw materials, intermediates and subassemblies").

As to cartridge production, Talis explained that it had invested in automated cartridge manufacturing lines capable of producing approximately one million cartridges per month. *Id.* at 116. It simultaneously warned investors that these lines were not "complete and could incur substantial delays, costs and may not perform as anticipated, and any failure to perform as anticipated … could prevent us from launching our Talis One platform with COVID-19 test if we receive marketing authorization." *Id.* at 20.

As to instrument production, Talis disclosed that it contracted with a third-party manufacturer to provision and assemble its instrument, a process that was largely manual. *Id.* at 135. Talis also stated it had ordered 5,000 instruments from its instrument contract manufacturing partner, *id.* at 118, and had entered into "non-cancellable contractual obligations" with its manufacturers. *Id.* at 108. Plaintiffs do ***not*** challenge Talis's disclosures that it had made $33 million in "firm purchase commitments" for "Talis One instruments." *Id.* As collateral for that purchase commitment, Talis secured a $33M line of credit with JP Morgan. *Id.* Talis disclosed to investors that payments for its instrument purchase commitments would become due in less than one year. *Id.*; *see also id.* at F-57 (disclosing $81.3 million in "firm purchase commitments … related to … manufacturing capacity and certain inventory related items" "expected to be incurred in 2021").

### C.   Talis Discloses Broad Risks

As the Court recognized, the Registration Statement contained "fulsome" disclosures regarding Talis's business, regulatory, and manufacturing risks related to their EUA and Talis One commercialization, which Defendants incorporate herein. Order at *5-6, 12. As relevant to Plaintiffs' new allegations, Talis also warned:

- "A significant portion of our commercial strategy is dependent upon the initial commercialization of our Talis One platform with COVID-19 test pursuant to an EUA …. If we do not receive [FDA] marketing authorizations in a timely manner … we may not be able to commercialize our products successfully or at all." Ex. 7, at 19.

- "Unfavorable results from ongoing preclinical and clinical studies could result in delays, modifications or abandonment of ongoing analytical or future clinical studies, or

abandonment of a product development program, or may delay, limit or prevent regulatory approvals or clearances or commercialization of our products…." *Id.* at 20.

- "We do not have any commercial-scale manufacturing facilities." *Id.*

- "[A]ll entities involved in the manufacture of our products, are subject to extensive regulation. We do not control the manufacturing process of, and are completely dependent on, our contract manufacturing partners for compliance with these regulations." *Id.* at 21.

- "In addition, we do not currently have a sales force or any experience in selling our instrument or tests, to date." *Id.* at 27.

### D.     The FDA Defers Authorization on the Initial EUA Application

After the IPO, Talis withdrew its initial EUA application based on FDA feedback.  ¶ 211.  In a March 8, 2021 press release, Talis announced it intended "to submit an EUA application ... early in [Q2] 2021" and "[t]he planned clinical validation study was designed with a different comparator assay, which Talis believes will address the FDA's concerns."  Order at *6.  In July 2021, Talis submitted a second EUA application, which the FDA approved on November 8, 2021.  *Id.* at *7.

Unfortunately, what Talis warned of—"if we do not receive an EUA … the commercial launch of such products could be significantly delayed"—happened.  Ex. 7 at 18. While disappointing, it does not make the Registration Statement false.

### III.    PROCEDURAL HISTORY AND NEW (AND REMOVED) ALLEGATIONS IN THE AC

On December 9, 2022, the Court granted Defendants' motion to dismiss Plaintiffs' Consolidated Complaint.  The Court dismissed Plaintiffs' Section 11 claims because they were based on unreliable former employees and failed to allege a false, material statement about Talis's manufacturing, design, performance, reliability, or FDA submissions.  Order at *12-21.

Plaintiffs now challenge seven statements in the Registration Statement, divided into two categories: (1) Talis misrepresented that its instruments were "manufactured" by third parties and that it had "ordered 5,000 instruments" to be delivered beginning in Q4 2020 through Q1 2021 (Statements 1-2, ¶ 68); and (2) the Talis One (and its various subparts) was designed to be "highly accurate" and "reliable." (Statements 3-7, ¶ 127); *see* Ex. 9.  Plaintiffs further contend that Talis violated Item 303 and Item 105 because it allegedly omitted both the "known, material uncertainty that the FDA would reject Talis's comparator assay because it was not 'high sensitivity,'" ¶ 154, and the known, material uncertainty of Talis One's alleged high invalid rate and failure rate.  ¶ 185.

**New FE Allegations:** The AC adds allegations from three additional former employees (FE-6, FE-7, and FE-8), all of which are conclusory and unreliable, as described *infra*.

**Manufacturing Allegations:** In support of their challenge to Statements 1-2 about manufacturing and "5,000 instruments," Plaintiffs claim reasonable investors understood these statements to mean that Talis was currently manufacturing at scale and would soon sell "finished devices" to customers to generate nearly $100 million in revenue. ¶¶ 70, 73, 82. Plaintiffs contend these statements were false because Talis had not ordered or manufactured instruments, merely had a capacity agreement, and had not paid for orders. ¶ 71. The AC concedes that Talis had "lots of prototypes" on hand, ¶ 131, but does not explain where those instrument lots came from. Nor does the AC dispute that Talis held a line of credit as collateral for its instrument purchases. Ex. 7 at 108.

**Performance Allegations:** In support of their challenge to Statements 3-7, Plaintiffs now allege the Talis One instrument "at the time of the IPO" suffered from invalid rates "up to 15%" and failure rates "up to 20%." ¶¶ 131, 132. Plaintiffs reach this conclusion based on a single-paragraph conclusion from FE-8 and from FE-6's attendance at "weekly business review meetings … where the failure rate was discussed." ¶ 132.

**FDA Allegations**: As explained *supra*, Plaintiffs allege for the first time that the FDA set a threshold LoD requirement of 18,000 NDU/ml for "high sensitivity" comparator assays. ¶ 166. In support, Plaintiffs cite to the S-1 of a Talis competitor, ¶ 176, and cite to a draft article from Defendant Ismagilov that says nothing about the FDA's sensitivity requirements. ¶¶ 168-71. Plaintiffs further allege (without support) that the FDA required invalid rates be below 10%. ¶ 125.

**Removed Allegations:** In amending their complaint, Plaintiffs also removed allegations that undermine their new theory. Specifically, the previous complaint alleged that Talis had an internal "Q4 2020 goal of producing 1,000 instruments," but that "Talis produced far fewer instruments in the quarter." ECF 74 ¶¶ 50, 211(iv). Now Plaintiffs allege that *zero* instruments were manufactured before the IPO in February 2021. ¶ 71. Plaintiffs' wholesale removal of a previous allegation that is flatly inconsistent with their new theory calls into question the plausibility of their claims.[4]

---

[4] Plaintiffs deleted these allegations but cannot "simply erase" them from the case. *In re YogaWorks, Inc. Sec. Litig*., 2020 WL 2549290, at *3 (C.D. Cal. Apr. 23, 2020) (citation omitted). Where Plaintiffs "merely omit[] previously-pled material information that harms" their case, it may

IV.    THE FORMER EMPLOYEE ALLEGATIONS ARE UNRELIABLE

A.    The Holdover FE Allegations Remain Insufficient

The Court previously rejected the FE allegations because they were conclusory, lacked factual support, were based on vague hearsay and rumors, and were often indefinite or silent as to time. Order at *12.  Like the dismissed complaint, the AC's heavy reliance on statements attributed to FEs is insufficient to plead falsity.  The AC fails to establish that the FEs have reliable, personal knowledge of the facts alleged, nor do the FE statements reflect that any challenged statement was false when made.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).

**FE-1** was a former Talis engineer who worked on cartridges (not instruments) until March 2021.  ¶¶ 89-90.  As in the prior complaint, FE-1 broadly alleges "that Talis One was a concept model" and it "was not possible" to go to "full production at volume" "at the time of the IPO." ¶ 90.  Plaintiffs fail once again to provide "any meaningful detail" to support FE-1's "vague" and "conclusory" allegations.  Order at *15, n.13.  Nor does FE-1 explain how working on cartridges positioned FE-1 to have personal knowledge about the *instrument*, let alone whether it was "production worthy" or could be brought "to market."  ¶¶ 90, 97; *see also Zucco*, 552 F.3d at 997 (rejecting unspecific CW allegations).

**FE-2** was a "senior scientist" focused on diagnostics and assay development who did not work at Talis during the IPO, having left in October 2020, ¶ 133, and thus cannot have reliable personal knowledge of facts that would contradict the challenged statements.  *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020) (finding "ample basis to question aspects of CW1's claimed knowledge" where challenged statements "were made after CW1 left").  In any event, FE-2 offers the same allegations as to Talis One's invalid rate and Talis's comparator assay that the Court already found to be vague and conclusory, albeit with more vulgar language.  Order at *18, *20; *compare* ECF 74 ¶¶ 212(i-ii), *with* ¶¶ 18, 133-34, 173, 180.  FE-2's only new allegation is a vague anecdote relating to "In Vitro Diagnostics," from which FE-2 draws unsupported conclusions about Talis's processes as a whole.  ¶ 136; *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 3447857, at *9

be "characterized as judicial admissions that Plaintiff[s] ha[ve] not cured." *Jackson v. Loews Hotels, Inc.*, 2019 WL 6721637, at *3 (C.D. Cal. July 24, 2019) (collecting cases).

1    (N.D. Cal. Aug. 27, 2010) (rejecting CWs' "vague assertions" about financial conditions).

2        **FE-3** was a cartridge engineer who worked at Talis until June 2021.  ¶ 113.  Plaintiffs devote a

3    single paragraph to FE-3, but the allegations attributed to FE-3 all post-date the IPO.  *Id.*  (alleging

4    "serious issues with manufacturing timelines for the Talis One" in "May 2021").

5        **FE-4** was a salesperson who joined Talis days before the IPO.  ¶ 111.  FE-4's general allegations

6    about invalid rates fare no better than last time.  None of FE-4's allegations specifically predate the

7    IPO, and the AC repeats the allegations in the CC from which "[t]he Court [could not] infer that

8    issues with 'high invalid rates' that existed in November and December of 2021 … were present in

9    February 2021."  Order at *18, 26 n.16 ("[C]ourts in this district reject CW allegations based on

10   hearsay where the CWs fail to 'provide[] any context surrounding when, why, or how these

11   individuals provided [the] CW[] with information.'") (quoting *Kipling v. Flex Ltd.*, 2020 WL

12   7261314, at *11 (N.D. Cal. Dec. 10, 2020), *aff'd sub nom. Nat'l Elevator Indus. Pension Fund v.*

13   *Flex Ltd.*, 2021 WL 6101391 (9th Cir. Dec. 21, 2021)).

14       **FE-5** did not work at Talis at the time of the IPO (joining five months *after* Talis went public),

15   and FE-5's allegations about alleged invalid rates in late Fall 2021 also post-date the IPO by nine

16   to eleven months.  ¶¶ 140-41, 143; *see also Zucco*, 552 F.3d at 996.

17       **B.    The New FEs Are Unreliable**

18       Plaintiffs try to fill the gaps identified by the Court about Talis's production capabilities and

19   invalid rates as of the IPO, but those attempts fail because they rely on hearsay and conclusions.

20       **FE-6**[5] is an HR professional who is not alleged to have **_any_** personal knowledge regarding

21   regulatory submissions or clinical/commercial manufacturing.  FE-6's allegations are mired in

22   double or triple hearsay and do not provide any factual basis for FE-6's sweeping claims.  *See*

23   *Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 858 (N.D. Cal. 2019) (reliance on hearsay

24   "must weigh against reliability"); *Zucco*, 552 F.3d at 998, n.4.  FE-6 speculates about Talis One's

25   alleged failure rate, ¶ 132, and manufacturing capabilities, ¶¶ 84, 91, 115, but the AC fails to explain

26   how a member of the HR department was positioned to know, let alone opine on, technical and

27

28   _____
     [5] FE-6's credibility is also suspect because FE-6 purports to hold a title that did not exist; Talis had
     no "Chief Human Resources Officer."  *See* Ex. 7 at 150 (identifying all executive officers).

business intricacies. *See Zucco*, 552 F.3d at 996 (rejecting accounting allegations from HR CW who "had no firsthand knowledge of the workings of the finance or corporate departments").

Plaintiffs assert that FE-6 "knew" that "Talis One had a failure rate that was between 10% and 20%" because FE-6 attended "weekly business review meetings ... where the failure rate was discussed." ¶ 132. But the AC provides no detail about who spoke at these meetings, who (if anyone) reported the purported 10-20% failure rate, what they actually said, what the basis of any statements were, or when they said it. *See Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *16 (N.D. Cal. Nov. 14, 2016) (noting FE allegations about meetings must give "information about precisely what was said by the parties in these meetings"). And Plaintiffs cite to no source, FDA or otherwise, for their definition of "failure rate," ¶ 124, which only FE-6 uses. ¶ 132.

There is a similar disconnect in the AC's attempt to demonstrate FE-6's knowledge of manufacturing. The AC alleges that FE-6 "participated in top-level business review meetings weekly, and was privy to information about Talis's third-party manufacturers and vendors," but stops short of recounting what was specifically said at those meetings. ¶ 84. Where, as here, an FE makes allegations about information gathered from "unnamed colleagues in engineering and other departments" and from attending "weekly meetings … that detailed the production problems," the FE must "specify who gave [the FE] this alleged information; [] provide dates or details of the discussions; and [] explain how these colleagues knew the information." *Kipling*, 2020 WL 7261314, at *10-11 (rejecting allegations from a human resources FE based on attendance at weekly business meetings) (internal quotations omitted). Without alleging what was specifically reported, FE-6's allegations are not reliable.

**FE-7** was a former intern and engineer who worked on software design, ¶ 92, and was five reporting tiers below Talis's C-suite. ¶¶ 92, 113. FE-7 contends Talis had "an imperfect product that did not meet Talis's internal benchmarks for a final product," ¶ 94, but does not indicate what those benchmarks were or how they were missed. *In re Nektar Therap. Sec. Litig.*, 34 F.4th 828, 837 (9th Cir. 2022) (CW's "conclusory adjectives" insufficient). FE-7's only specific allegation is about Talis One's software user interface—not its instrument, cartridge, or assay—which is not inconsistent with, or even relevant to, any challenged statement. ¶ 94.

1    **FE-8**, a former VP of Product "focused on sales," alleges that Talis had "different lots of

2    prototype devices, and the invalid rate ranged from 5% to 15% among the lots." ¶ 131.  Despite

3    being referenced repeatedly in the AC (¶¶ 13, 110, 129, 133, 137, 186), FE-8's actual allegations

4    total a single, conclusory paragraph. ¶ 131. The AC does not explain how a sales VP was positioned

5    to know the invalid rates among the "lots" of "devices." *In re Metawave Commc'ns Corp. Sec.*

6    *Litig.*, 629 F. Supp. 2d 1207, 1215 (W.D. Wash. 2009) (even if "descriptions are sufficient to meet

7    the employment identification … Plaintiffs must still provide details on each [FE]s basis for

8    knowledge of the facts … alleged"); *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *17 (N.D. Cal.

9    Sep. 27, 2012) (questioning knowledge basis of sales CWs where company had no FDA-approved

10   product).  Even setting that aside, FE-8 never explains how invalid rates were measured, whether

11   it was in a clinical or manufacturing setting, or what caused the invalid rates.  Nor does FE-8 state

12   how many devices were in each lot, when or by whom they were produced, what the invalid rates

13   were as between lots, or whether FE-8 discussed these alleged invalid rates with anyone at Talis.

14   **V.    STANDARD OF REVIEW**

15       Under Rule 12(b)(6), a complaint must be dismissed if it fails to allege facts that "plausibly"

16   state a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007).  Where a complaint "pleads

17   facts that are merely consistent with a defendant's liability, it stops short of the line between

18   possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

19   "[T]he court is not required to accept as true allegations that contradict exhibits attached to the

20   Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory,

21   unwarranted deductions of fact, or unreasonable inferences." *Elec. Workers Pension Fund, Loc.*

22   *103, I.B.E.W. v. HP Inc.*, 2021 WL 1056549, at *2 (N.D. Cal. Sep. 15, 2021) (citation omitted).

23   **VI.    PLAINTIFFS' SECTION 11 CLAIM SHOULD BE DISMISSED UNDER RULE 9(B)**

24       Rule 9(b) applies to Plaintiffs' Section 11 claim because it sounds in fraud.  The relevant inquiry

25   is whether "the complaint allege[s] a unified course of fraudulent conduct ...." *In re Rigel Pharm.,*

26   *Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012) (alteration in original).  The purpose of Rule 9(b)

27   is to "deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect

28   professionals from the harm that comes from being subject to fraud charges, and to prohibit[]

plaintiff[s] from unilaterally imposing upon the courts, the parties and society enormous social and economic costs absent some factual basis." *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) (citation omitted) (alterations in original). That purpose is acutely served here because Plaintiffs inject inflammatory public accusations to denigrate Talis's executives, ¶¶ 215-16, 220-22, and the AC describes a unified course of fraud:

- "Talis was a fundamentally different—and far less valuable—business than investors **were led to believe**." ¶ 6.

- Talis's statements were "like warning a hiking companion to walk slowly because there might be a ditch ahead, despite **knowing** that the Grand Canyon lies one foot ahead." ¶14.

- "[Talis] asserted that [it] was preparing 'for a potential commercial launch as early as the first quarter of 2021' … **to create the impression** that Talis had a working product." ¶ 58.

- "As time passed, to **maintain the illusion** that Talis One was a real product, **Talis sought to conceal** absence of production and lack of inventory from potential customers." ¶ 116.

- "Talis One was little more than a '**dummy box**' that sales representatives were instructed not to turn on," ¶ 138, which Plaintiffs previously called "**Theranos-like**." *See* ECF 88 at 1.

- "[A]ny data on invalid rates that Talis submitted to the FDA **was not representative of Talis One's actual invalid rate**." ¶ 145.

Plaintiffs allege not innocent or negligent mistakes, but knowing falsity and intentional misstatements. Though Plaintiffs have tried to superficially evade Rule 9(b), their "nominal efforts to disclaim allegations of fraud with respect to its section 11 claims are unconvincing where," as here, "the gravamen of the complaint is fraud." *Rigel*, 697 F.3d at 885.

Plaintiffs have not met, and cannot meet, Rule 9(b). The AC relies on a series of implausible inferences drawn from unreliable FEs and cherry-picked sources. This does not constitute the type of "inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants" necessary to satisfy Rule 9(b). *Yourish v. California Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999). Plaintiffs offer no concrete support for their "general claim of the existence of non-public information that is inconsistent with the substance of identified representations," and the AC is thus "insufficient under Rule 9(b)." *Id.* at 996.[6]

---

[6] Indeed, the AC rehases many of the same allegations from the CC, which also brought claims under the Exchange Act. *See* Order at *22, 26 (acknowledging that Plaintiffs alleged fraud based on the "5,000 instruments" statement and argued Talis committed fraud "because the Talis One was unreliable and could not launch at scale"). "Where … a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under

# VII.   PLAINTIFFS' SECTION 11 CLAIM ALSO FAILS UNDER RULE 8

"The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment."  Order at *12 (quoting *Stac*, 89 F.3d at 1403).  Plaintiffs must show that the statement "was false at the time of the" IPO and "cannot use the benefit of 20-20 hindsight" to create a Section 11 violation.  Order at *12 (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994)).

## A.   Manufacturing and "Ordered 5,000 Instruments" (Statements 1-2 (¶ 68))

Plaintiffs challenge two statements related to instrument ordering and manufacturing:

1. "Our products are manufactured by several third parties, including a single contract manufacturer that provisions the parts and assembles our instrument."  Ex. 7 at 135.

2. "We have ordered 5,000 instruments from our instrument contract manufacturing partners to be delivered beginning in the fourth quarter of 2020 through the first quarter of 2021."  *Id.* at 118.

The Court has already rejected Plaintiffs' challenge to Talis's statement that it had ordered 5,000 instruments "to be delivered through the first quarter of 2021."  *See* Order at *12-13.  Nothing in the AC suffices to plead that this statement—or the newly challenged statement about third-party manufacturers—was false or misleading when made.

### 1.   Plaintiffs' Interpretation of Statements 1 and 2 Ignores Talis's Ample Risk Disclosures and the Total Presentation of the Registration Statement

"[A]n investor reads each statement within [an offering] document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).  With that in mind, the Court, in assessing a plaintiff's allegations, should consider the "full text of the [offering documents], including portions which were not mentioned in the complaint."  *In re Stac*, 89 F.3d at 1405 n.4.  Plaintiffs stitch together the two challenged statements and then scissor away all surrounding context and risk disclosures.  After having done so, Plaintiffs contend the statements "gave reasonable investors the impression that after a decade of development," Talis had a product "that was presently being 'manufactured' *at scale*, with 5,000

---

section 10(b) of the Exchange Act, we can assume that it sounds in fraud."  *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (dismissing amended complaint with prejudice).

1    *finished devices* already 'ordered'" such that "Talis had ordered functional, *finished devices* that

2    were *ready to be sold to generate revenue*." ¶ 70, 73.

3           To reach this farfetched interpretation, Plaintiffs screenshot an image of the instrument portion

4    of the Talis One and conclude—without explanation or supporting facts—that the "Registration

5    Statement made clear that an 'instrument' is a complete, finished device." ¶ 74.  Plaintiffs then cite

6    to an FDA definition of "finished device" and a GAAP definition of "finished goods" to argue

7    reasonable investors understood that "Talis had purportedly ordered finished devices because only

8    finished devices are capable of functioning and ready to be sold to generate revenue," ¶ 81, and

9    expected Talis to generate $77.5-$95.5 million in revenue.  ¶ 82.[7]  This claim fails for two reasons.

10          *First*, the challenged statements nowhere use the term "finished device," and Plaintiffs plead

11   no facts that would turn the meaning of the word "instruments"—one part of the Talis One—into

12   a "finished" product ready for sale.  *See In re Cloudera, Inc. Sec. Litig.*, 2022 WL 14813896, at *8,

13   *15 (N.D. Cal. Oct. 25, 2022) (dismissing securities claims based on "special or nuanced meaning"

14   when Defendants never used the alleged term of art) (citation omitted).  Talis expressly disclosed

15   that it was "scaling up" its production capabilities, Ex. 7 at 135, and faced significant manufacturing

16   challenges that may impede its path to commercialization, which is flatly inconsistent with the

17   notion that Talis was ready to sell products immediately.  *Id.* at 20, 22, 25.

18          *Second*, the idea that Talis had "ordered functional, finished devices that were ready to be sold"

19   is belied by even a cursory understanding of the FDA authorization process.  Talis disclosed it had

20   "no products approved for commercial sale," and did "not expect to generate any meaningful

21   revenue unless and until we obtain regulatory approval of and commercialize [its] Talis One

22   Platform." *Id.* at 9, 105.  Indeed, Talis disclosed it did not even have a sales force.  *Id.* at 27.

23          Plaintiffs' reference to the GAAP definition of "finished good" is particularly misplaced

24   because Talis specifically stated that it did "*not* capitalize pre-launch inventory costs until future

25   commercialization is considered probable and the future economic benefit is expected to be

26

---

27   [7] Moreover, the regulation that Plaintiffs cite to for the definition of "finished good" actually
     includes "accessories" (a word that Plaintiffs conveniently hide behind ellipses).  *Compare* ¶ 78,

28   *with* 21 C.F.R. 820.3(l) ("Finished device means any device *or accessory to any device* that is
     suitable for use or capable of functioning, whether or not it is packaged, labeled, or sterilized.").

realized," which would not occur "***prior to obtaining an EUA*** or other FDA marketing authorization." *Id.* at 110; *see also id.* at 100 (similar), F-12 (similar) F-48 (similar). Plaintiffs' reference to control design and manufacturing regulations is similarly off-point because Talis never stated it had a finished device, and expressly told investors it did ***not*** have FDA marketing authorization and would instead need to obtain an EUA before it could market and sell the Talis One. *See id.* at 6 ("An EUA would allow us to market and sell our Talis One platform and COVID-19 test without 510(k) clearance or any other marketing authorization."). Thus, in full context, no reasonable investor would have understood the Registration Statement to mean instruments were being "manufactured at scale" with "finished devices that were ready to be sold to generate revenue." ¶¶ 70, 73; *see Huang v. Avalanche Biotech., Inc.*, 2016 WL 6524401, at *4 (N.D. Cal. Nov. 3, 2016) ("Statements must be considered in the context of their total presentation.").

Plaintiffs' overreach confirms that the AC does not plead any plausible facts suggesting investors would have valued Talis differently if it had inserted the words "components for up to [5,000 instruments]" in this statement. *See Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988) ("[M]ateriality depends on the significance the reasonable investor would place on the withheld or misrepresented information."). Reasonable investors do not live in vacuums. As of the IPO, and for nine months after, Talis was awaiting an EUA and could not have launched regardless of how many instruments it had on hand. And Plaintiffs cannot simply waive off myriad disclosures about instrument manufacturing that are part of the "total mix" of information. In this context, Plaintiffs cannot plausibly suggest that investors would have had a significantly different impression of Talis's commercial prospects if it had inserted the word "components" into the sentence in question.

### 2. The Challenged Statements Are Not Materially False or Misleading

Even indulging Plaintiffs' myopic reading of Statements 1 and 2, their claim still fails because they have not alleged facts that plausibly demonstrate the statements were false when made. Critically, Plaintiffs do not challenge statements that Talis entered into "non-cancellable contractual obligations" for $33 million worth of "instruments," Ex. 7 at 108, secured a corresponding $33 million line of credit as collateral, *id.*, and expected those payments to be due in "less than one year," and "to be incurred in 2021." *Id.* at 108, F-57. Those undisputed statements dispel any notion

that Talis had not ordered "5,000 instruments" from its manufacturer.

Moreover, Plaintiffs make a remarkable about-face from their previous complaint, which alleged that Talis "could not manufacture the Talis One *at scale*" and that Talis had an internal goal of producing 1,000 instruments in Q4 2020 and "*produced* far fewer *instruments* in [Q4 2020]." ECF 74 at 10; *compare* Order at *3 (citing ECF 74 ¶ 50), *id.* at *14 (citing ECF 74 ¶ 154), *with* AC ¶¶ 69, 85.  The Court dismissed those claims because Talis had sufficiently disclosed the manufacturing challenges it faced.  Order at *14-16.  Plaintiffs now change their story and contend that "*no* Talis One instruments were being 'manufactured' or 'assemble[d]' for delivery to Talis at the time of the IPO." ¶¶ 69, 85.  Because the prior allegations contradict Plaintiffs' central assertion that no instruments had been produced at the time of the IPO, Plaintiffs' claims may be dismissed on this ground alone.  *See YogaWorks*, 2020 WL 2549290, at *3 (dismissing Section 11 claims because removing previously pled facts did not "simply erase those allegations from the case"); *see also Underwood v. Coinbase Global, Inc.*, 2023 WL 1431965, at *8 (S.D.N.Y. Feb. 1, 2023) (dismissing Section 12 claims that relied on alleged facts contradicted by prior complaint).[8]

Plaintiffs further offer a litany of reasons why the statements might be false, but none directly contradict the challenged statements or render them misleading.

**Capacity Agreement:** Plaintiffs allege Talis had "a capacity agreement … that reserved capacity to produce instruments in the future," but that is entirely consistent with "ordering 5,000 instruments."  The source of that new allegation, FE-6 (the HR professional with the embellished title), provides no details about that agreement or why it would preclude an instrument order.  ¶ 84.  Tellingly, none of the engineer FEs allege that no instruments were manufactured or delivered.

**Payment:** Plaintiffs allege Talis had not paid for instruments, but that too does not contradict the "5,000 instruments" statements.  ¶ 106.  Incredibly, Plaintiffs accuse Talis of "not disclos[ing] that none of this amount had been paid by the time of the February 2021 IPO."  ¶ 107.  But Talis *did* disclose that it had secured its $33 million instrument order with a corresponding line of credit that was due in "less than one year."  Ex. 7 at 108.  Plaintiffs ask the Court to infer that Talis would

---

[8] FE-8's statement that there were "different lots of prototype devices" also refutes Plaintiffs' argument that no instruments were manufactured or delivered.  ¶ 131.  Notably, FE-8 does not allege that Talis manufactured these "lots" of "devices."

Cooley LLP

18

Defs.' MTD Amended Complaint
Case No. 22-cv-00105-SI

execute a $33 million line of credit and enter into "non-cancellable" "firm purchase commitments ... of ... instruments" without actually ordering those instruments, but that is simply implausible.

**Manufacturing Regulations:** Plaintiffs' invocation of the FDA current good manufacturing practice and regulations for medical devices (the "Quality System Regulation" or QSR) is a red-herring and does not plausibly contradict the statement that 5,000 instruments had been ordered. ¶¶ 78, 87, 95-100. *First,* Plaintiffs cite to FDA regulations for the principle that reasonable investors must have understood "instruments" to mean "finished devices." But if Plaintiffs assume reasonable investors possess in-depth knowledge of those regulations, then such investors would also understand that FDA regulations define "manufacture" to include not just production of devices, but also "designing," and hence Talis' reference to "manufacture" was truthful and not misleading as Plaintiffs themselves acknowledge that Talis at least had a working prototype of the device at the time of the IPO. ¶ 93. *Second,* the applicability of QSR was far from certain as Talis's receipt of an anticipated EUA would likely have rendered some or all of the QSR inapplicable. *See* 21 U.S.C. § 360bbb-3(e)(3); *see also* Ex. 1 at 4 (granting EUA and waiving "[c]urrent good manufacturing practice requirements, including the [QSR] with respect to the design, manufacture, packaging, labeling, and storage of your product"). As Talis disclosed, "[a]n EUA would allow [Talis] to market and sell [its] Talis One platform and COVID-19 test without 510(k) clearance or ***any other marketing authorization.***" Ex. 7 at 6.

**No Delivery:** Plaintiffs baldly allege "Talis's manufacturer had not delivered any Talis One instruments by the time of the IPO," but that is contradicted by its allegations in the previous complaint and in the current complaint. ¶ 109. Notably, no former employees contend that instruments had not been delivered by the time of the IPO.[9] Instead, Plaintiffs rely on post-IPO statements to suggest that "[a]fter the IPO, Talis[] ... had no product to sell." ¶¶ 111-118. Those post-IPO statements do not support an inference of falsity at the time of the IPO. That is particularly so when the risk Talis warned of ultimately happened: "if we do not receive an EUA ... the

---

[9] Plaintiffs play fast-and-loose with their own complaint. Plaintiffs first alleged that FE-7 stated during FE-7's "***tenure,***" i.e. from January 2019-March 2021, Talis had "five to ten 'working prototypes.'" ¶¶ 92, 93. Plaintiffs then stretch that statement to suggest "***at the time of the IPO***, Talis's engineers only had five to ten 'working prototypes.'" ¶ 110.

1    commercial launch of such products could be significantly delayed." Ex. 7 at 18.

2        **Delivery As of IPO Date:** Even if the Court were to credit the unsupported conclusions that no

3    instruments had been delivered to Talis at the time of the IPO, that would still not render the

4    challenged statements false.  Talis indicated that, at the time of the IPO, it had ordered 5,000

5    instruments with the expectation that they would "***be delivered beginning in*** [Q4 2020] through

6    ***the first quarter of 2021***." Ex. 7 at 118.  Generalized allegations about deliveries as of the IPO

7    date does not mean "Talis either knew that delivery could not begin in the fourth quarter of 2020

8    through the first quarter o[f] 2021, or that that the order for delivery was actually for a later time."

9    Order at *13.  Whether there was a later delay—like there was after Talis withdrew its initial EUA

10   application—has no bearing on the statements' accuracy at the time of the IPO.  *See Rubke*, 551

11   F.3d at 1164 (Section 11 claims must be based on "omitted information [that] existed at the time

12   the registration statement became effective").

13       **B.    "Reliability" and "Accuracy" (Statements 3-7, ¶ 127)**

14       The Court previously dismissed Plaintiffs' Section 11 claims challenging various statements in

15   Talis's S-1 about the Talis One, cartridge, and assay's design features.  The Court dismissed

16   Plaintiffs' claims because, "[e]ven accepting plaintiffs' assertions about how reasonable investors

17   would interpret the challenged statements, none of the FE allegations state that the Talis One

18   platform—or any part of it—had high invalid rates or design issues at the time of the IPO."  Order

19   at *18.  The AC does not correct those flaws and it should meet the same fate.

20       Plaintiffs challenge five statements related to the Talis One's design and design features:

21   3.  "The Talis One Platform incorporates core proprietary technologies into a compact, easy-to-
22       use instrument, that utilizes single use test cartridges and software, including a central cloud
         database, which are designed to work together to provide levels of testing accuracy equivalent
23       to a central laboratory." Ex. 7 at 96.

24   4.  "We designed the Talis One platform to provide central lab levels of accuracy at the point-of-
         care." *Id.* at 130.

25   5.  "The test cartridge for COVID-19 diagnosis contains a nucleic acid amplification test (NAAT)
26       designed for optimal sensitivity and specificity to provide highly accurate results." *Id.* at 126.

27   6.  "Highly accurate—The Talis One platform incorporates a shelf-stable, single-use test cartridge
         that is designed to fully integrate a nucleic acid amplification test (NAAT) with sample
28       preparation, including nucleic acid extraction and purification. . . . In a preclinical assessment
         comparing the Talis One platform to a reference lab test on 60 matched anterior or mid-turbinate

20

nasal specimens, the Talis One test exactly matched the reference lab results with 100% positive percentage agreement (PPA) and 100% negative percentage agreement (NPA) for detection of SARS-CoV-2, the virus that causes COVID-19." *Id.* at 117.

7. "An important factor in our ability to commercialize our products is collecting data that supports the value proposition of our products, and in particular that our tests are just as accurate and reliable as central lab testing." *Id.* at 24.

None of these statements, many of which are quoted in the AC without essential context and risk disclosures, are actionable.

### 1. The Challenged Statements Do Not Guarantee Performance

To plead a false opinion statement, plaintiffs "must allege both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017) (quoting *Omnicare*, 575 U.S. at 184–86). Similarly, when plaintiffs rely on theories that statements of fact in an opinion statement are materially misleading, they must allege "the supporting fact[s] [the speaker] supplied [is] untrue." *Id.* at 616. And under a theory of omission, plaintiffs must allege "facts going to the basis for the issuer's opinion ... whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.*

Plaintiffs' central theory on Statements 3-7 is that, because the Talis One purportedly had high invalid rates at some point, Talis's statements regarding the Talis One's design and purpose are false because "Talis One frequently failed or generated unusable results." ¶ 128. But importantly, Plaintiffs do ***not*** contest the underlying performance data that supported Talis's opinion statements that the Talis One was designed to provide "central lab levels of accuracy" and designed to be "highly accurate." For instance, Plaintiffs do not dispute that:

- Talis conducted a clinical study in a "centralized laboratory using the CDC [RT-PCR] test," Ex. 7 at 127.

- Talis's preclinical study compared its test to "an FDA-authorized reference lab test." *Id.*

- Talis's test results "exactly matched the central lab comparator test results with 100% positive percentage agreement (PPA) and 100% negative percentage agreement (NPA) for the detection of SARS-CoV-2." *Id.*

- Talis had similar results in a later clinical study. *Id.* at 128.

Cooley LLP

21

Defs.' MTD Amended Complaint
Case No. 22-cv-00105-SI

- Talis One's LoD of "500 viral particles per [mL] or 150 copies of genomic RNA per [mL]," was "substantially more sensitive that the comparator test used in this clinical validation study, which was found to have a [LoD] of 180,000 [NDU/mL]." *Id.*[10]

The AC does not challenge the truth of these disclosures or argue that Talis's statements regarding the Talis One's performance were inaccurate. This failure to dispute Talis's performance data renders hollow any challenges to Statements 3-7, as Plaintiffs have failed to identify ***any*** facts plausibly indicating that Talis did not actually believe its public statements, or that the facts underlying Talis's opinions about Talis One's design and value proposition were untrue. *See, e.g.*, *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 580-81 (S.D.N.Y. 2018) (holding statement not false when plaintiff did not dispute the underlying data the challenged statement was based on), *aff'd sub nom.* 771 Fed. App'x 51 (2d Cir 2019); *see Golubowski v. Robinhood Markets, Inc.*, 2023 WL 1927616, at *5 (N.D. Cal. Feb. 10, 2023) (dismissing Section 11 claims because "[a] company's statements are 'inactionable' if they merely 'restate accurately reported historical information'") (citation omitted).

Statements 3-7 do not offer any conclusions about Talis's *final* accuracy or reliability; they instead say only how the Talis One platform was *designed* to work. Statements 3 and 4 describe design goals, while Statement 5 references the design of the NAAT alone (which Plaintiffs do not challenge). Statement 6 describes the design attributes of the Talis One platform and Talis's opinion on the competitive benefits of those designs. *Cf.* Order at *15 (finding the statement "We *designed* the Talis One platform *to be* low cost and manufactured at scale … did not say that the Talis One platform was currently low cost and manufactured at scale"); s*ee Colyer v. Acelrx Pharms., Inc.*, 2015 WL 7566809, at *6-7 (N.D. Cal. Nov. 25, 2015) (statement about what medical device was "designed to address" was not a "promise[] [to] investors [the product] would be a perfect device"). And Statement 7 merely sets forth the anodyne disclosure that Talis's ability to commercialize its product depended in part on collecting further data to demonstrate its ability to

---

[10] Indeed, Plaintiffs omit from the AC the following portion of Statement 6 that appears in the ellipsis: "Our Talis One COVID-19 test reaches limits of detection as low as 500 viral particles per milliliter." Ex. 7 at 117; *see* ¶ 127 (omitting language). Plaintiffs' decision not to challenge Talis's clinical performance statements marks a 180 from its last complaint. *Compare* ECF 74 at ¶ 146 (challenging performance statements as false and misleading) *with* ECF 104 at ¶ 127 (declining to challenge statements about performance). Plaintiffs do ***not*** challenge the efficacy of the Talis test.

provide accurate tests.[11]

In the AC, Plaintiffs cut multiple clauses from the challenged statements that clearly indicate they are statements of belief.  *See, e.g.*, Ex. 7 at 117 (Statement 6) ("The Talis One platform is designed to have the following capabilities which *we believe would* create a competitive advantage …. *We believe* this sample preparation step *… has the potential* to result in higher sensitivity…."); *id.* at 130 (Statement 4) ("*We believe* this [design] *could* result in higher sensitivity and specificity than other alternatives that omit the sample preparation step.").  Such statements are non-actionable. *See In re Progenity, Inc. Sec. Litig.*, 2023 WL 219345, at *8-10 (S.D. Cal. Jan. 13, 2023) (dismissing Section 11 challenge to statement beginning with "[w]e believe"); *Golubowski*, 2023 WL 1927616, at *8-10 (dismissing challenges to opinion statements about business strategy regarding "safety and reliability" because "Plaintiffs allege not that [the company] falsely misrepresented any facts but merely … failed to live up to its … goals of … platform reliability").

The full context of the challenged statements provides the basis for Talis's opinion—the performance results from Talis's clinical studies, including that its test demonstrated an LoD of 500 viral particles per mL—which Plaintiffs do not contest.  *See* Ex. 7 at 127-130.  Plaintiffs' mere critique of Talis's methodology—the comparator assay it used—while failing to challenge the underlying data disclosed in the Registration Statement, does not render Talis's views about how the Talis One was *designed* to work inaccurate, which dooms this falsity theory.  *See Rigel*, 697 F.3d at 879  (finding no falsity where plaintiff did not allege defendants "misrepresented their own statistical methodology, analysis, and conclusions, but instead criticize[ed] only the statistical methodology employed"); *Colyer*, 2015 WL 7566809, at *6-10 (dismissing complaint where plaintiff alleged defendant withheld device error rate, which did not render statements about device's design and intended use misleading); *Padnes v. Scios Nova Inc.*, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996) (dismissing because plaintiff did not plead "facts sufficient to explain why" statements about clinical performance were false when underlying data was not challenged).

---

[11] Statement 7 further disclosed: "The data collected from any studies we complete may not be favorable or consistent with our existing data …."  Ex. 7 at 24.  The Court already expressed its doubt that Statement 7 "can be interpreted as a statement that the Talis One was, at the time of the IPO, 'just as accurate and reliable as central lab testing,' particularly given the extensive risk disclosures about the Talis One."  Order at *18, n.14.  That result holds equally true here again.

Cooley LLP

23

Defs.' MTD Amended Complaint
Case No. 22-cv-00105-SI

1

**2.      The FE Allegations Do Not Support A Finding of Falsity**

2        Even crediting Plaintiffs' flawed reading, they have not pled that high invalid rates existed at

3   the time of the IPO.  The Court dismissed the last complaint because Plaintiffs alleged no concrete

4   facts about the invalid rates as of February 2021 nor provided a non-conclusory explanation for the

5   invalid rates (or even which parts of the Talis One were affected).  *See* Order at *18.  The same

6   deficiencies infect the Amended Complaint.

7        Plaintiffs continue to rely on irrelevant temporal allegations.  As before, Plaintiffs make

8   allegations about purported invalid rates well before the IPO.  ¶¶ 133-34 (from FE-2 who worked

9   at Talis until October 2021).  As before, Plaintiffs still make allegations well after the IPO.  ¶ 140

10  (FE-5, who did not work at Talis until seven months *after* the IPO); ¶¶ 138-39, 143 (FE-4, a

11  salesperson who made general allegations from April-December 2021).  And, as before, Plaintiffs

12  continue to offer imprecise and contradictory explanations for the alleged invalid rates. For

13  example, FE-2 still attributes the "high invalid rates" to chamber size, while FE-4 points to a

14  "gasket" and "plastic piece," and FE-5 refers to general "problems with the cartridge." ¶¶ 134, 143.

15       In a superficial effort to patch the temporal deficiency, Plaintiffs pepper their allegations with

16  the qualifier "at the time of the IPO," but those allegations fall flat because they are wholly

17  conclusory.  For example, FE-8 alleges "there were different lots of prototype devices, and the

18  invalid rates ranged from 5% to 15% among these lots." ¶ 131.  But in that single paragraph, FE-

19  8 fails to explain how a sales-focused employee (at a company without a sales force) would have

20  knowledge of how (or if or by whom) invalidity was measured, and when these "lots of devices"

21  were tested.  And rather than plead specific facts that could resolve Plaintiffs' internal contradiction

22  for the particular cause of the high invalid rate, FE-8 provides no explanation at all.  *See* Order at

23  *18 (declining to credit FE-5 because FE-5 did "not attribute the high invalid rate to any particular

24  cause").  Even if Talis did have "different lots of prototype devices" with an invalid rate ranging

25  "from 5% to 15%," that does not contradict any challenged statement.  Missing from FE-8 is how

26  many "lots" Talis had and how many lots were in which invalid rate range at the time of the IPO.

27       Plaintiffs' reliance on FE-6 is likewise misplaced.  *See* Section IV *supra*.  FE-6 contends that

28  "in February 2021, Talis One had a failure rate that was between 10% and 20%," and Plaintiffs

Cooley LLP

24

Defs.' MTD Amended Complaint
Case No.  22-cv-00105-SI

claim that FE-6 "knows this from attending weekly business review meetings … where the failure rate was discussed." ¶ 132.[12]  Critically, FE-6 does ***not*** expressly allege that the purported failure rate was shared ***during*** a weekly meeting, let alone provide the requisite specificity as to *who* made that alleged statement, *what* the statement was based on, or *when* the statement was made.  *See Kipling*, 2020 WL 7261314, at *10-11 (rejecting allegations attributed to former HR employee allegedly learned during "weekly meetings" when the FE "conspicuously fail[ed] to state that these meetings described missed projections"); *Fadia*, 2016 WL 6679806, at *16 (similar).  FE-6's "confirmation" that "invalid test results accounted for a portion of the failure rate," omitting even an approximation of *what* portion or how FE-6 learned this information, is just the sort of vague pleading the Court has already rejected.  *See* Order at *18 (FE statement regarding "high invalid rate" conclusory where the CC "d[id] not state exactly what that means, how that fact was known, who knew it, or during what time frame").  And like FE-8, FE-6 does not point to any "particular cause" for the failure rate.[13]

### 3. Allegations Talis Submitted Unrepresentative Data Are Baseless

Plaintiffs draw from triple (or perhaps quadruple) hearsay that was allegedly shared with FE-4 to accuse Talis of submitting data to the FDA that "was not representative of Talis One's actual invalid rate at the time of the IPO." ¶ 145.  But that alleged conversation took place in December 2021, nearly a year after Talis submitted its first EUA application and after its second submission had been granted.  FE-4 does not even specify *which* EUA application the alleged conversation referred to.  The AC tries to imply that this conversation referred to the pre-IPO submission, but that is unsupported and is just the sort of baseless allegation of fraud that runs through the AC.[14]

---

[12] Plaintiffs rely on an uncited definition of "failure rate," which only a non-engineer (FE-6) references. ¶ 124.

[13] Plaintiffs assert that "three former Talis employees confirmed that at the time of the IPO, [the instrument] was neither accurate nor reliable," but that misstates their own complaint. ¶ 129. Only FE-6 and FE-8 made allegations about invalid or failure rates at the time of the IPO.

[14] Plaintiffs' last fleeting attempt to establish the falsity of Statements 3-7 is nothing more than an effort to cherry-pick data from a single study to divine an industry-wide standard. ¶ 146. That a single study of a single point-of-care test found a low invalid rate does not usurp Plaintiffs' decision not to challenge the truth of the performance-related statements. Nor does it support Plaintiffs' contention that "central lab tests" as a whole "had an invalid rate at or near zero," *id.*, or have any bearing on whether Talis's test was "designed to … provide central lab levels of accuracy." ¶ 127.

**C.      Plaintiffs Fail to Allege A Violation of Item 303 or Item 105**

Item 303 requires an issuer to disclose adverse trends or uncertainties that are "presently known to management" and "reasonably likely to have material effects on the registrant's financial condition or results of operation." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998); 17 C.F.R. § 229.303(3)(a)(ii).  Item 105 requires an issuer to disclose "material factors that make an investment … speculative or risky." 17 C.F.R. § 229.105(a).  As discussed above, Talis disclosed the risks and uncertainties of its EUA application, product reliability, and production lines, among many other disclosures.  Plaintiffs again fail to allege the existence of an undisclosed trend or uncertainty that was known to Talis at the time of the IPO.  *See* Order at *12, 21.

**1.      Talis's Disclosures Related to FDA Approval Satisfy Item 303 and Item 105**

*First*, even if the Court were to indulge Plaintiffs' unsupported FDA "require[ment]" to use a comparator assay with an LoD of 18,000 NDU/mL, Talis disclosed the precise information Plaintiffs accuse it of omitting.  Plaintiffs contend that Talis failed to "warn[] investors that Talis had used a comparator assay that was within the 'low-sensitivity' range." ¶ 183.  But Talis disclosed that (i) it used a comparator assay with "180,000 NDU/mL"; (ii) "[t]here can be no assurance that the COVID-19 test [it was] developing … will be granted an EUA"; (iii) a failure to receive an EUA would render Talis "unable to sell this product in the near future," and (iv) the "FDA requested that [Talis] provide it with additional information on [Talis's] test." Ex. 7 at 128, 9, 18.

If the FDA truly required comparative testing with an LoD sensitivity threshold different than the comparator assay Talis disclosed, reasonable investors would have been attuned to that alleged standard.  *Tongue v. Sanofi*, 816 F.3d 199, 213 (2d Cir. 2016) (affirming dismissal of Section 11 claim because "where a complex financial instrument whose value is tied to FDA approval is involved, investors may be expected to keep themselves apprised of the FDA's public positions on testing methodology").  Thus, Talis's disclosure of the 180,000 NDU/mL sensitivity of its comparator assay, coupled with its disclosure that it could not ensure FDA approval, "cannot form the basis for a Regulation S-K violation or the nondisclosure of an adverse trend." *See Belodoff v. Netlist*, 2009 WL 1293690, at *12 (C.D. Cal. Apr. 17, 2009); *Berg v. Velocity Fin., Inc.*, 2021 WL 268250, at *9 (C.D. Cal. Jan. 25, 2021) (dismissing 303 and 105 claims because defendant

1    disclosed relevant facts that preceded risk disclosure about viability of nonperforming loans);

2    *Progenity*, 2023 WL 219345, at \*14 (similar); *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d

3    Cir. 2017) (disclosure gave "ample warning that [defendant's] business could be affected" by

4    changes to relevant regulatory scheme).

5        ***Second***, Plaintiffs conspicuously cite no direct support for their new theory that the FDA

6    published a requirement that "high sensitivity comparator assays [] have a [LoD] better than 18,000

7    NDU/ml." ¶ 166.  Indeed, the FDA expressly advised it did not "***look in particular at LOD***...."

8    Ex. 3 at 8.  Far from establishing an "objective, established requirement," ¶ 165, the July Template

9    specifically said the FDA's recommendations were ***not*** requirements.  *See* Section II-A *supra*; Ex.

10   2 at 1.  And as of December 2020, the FDA had granted EUAs to tests with LoDs as high as 600,000

11   NDU/mL.  *See* Ex. 4; Ex. 1.  At most, Plaintiffs have identified a difference in subjective scientific

12   opinion, but that does not constitute falsity.  *Rigel*, 697 F.3d at 879.

13       ***Third***, neither the FDA's follow-up questions to Talis nor Talis's subsequent decision to pursue

14   a second EUA has any bearing on the adequacy of Talis's prior disclosures.  Order at \*21 ("[T]hat

15   the FDA had requested 'additional information' does not show any conflict with the statements in

16   the Registration Statement.");  *Tongue*, 816 F.3d at 211 (2d Cir. 2016) (noting "sophisticated

17   investors … fully expect that Defendants and the FDA were engaged in a dialogue").  Nor do the

18   securities laws hold life sciences companies to a standard of clairvoyance.  *See In re Sanofi Sec.*

19   *Litig.*, 87 F. Supp. 3d 510, 541-42 (S.D.N.Y. 2015) (collecting cases holding that defendants have

20   no duty to disclose FDA feedback), *aff'd*, 816 F.3d 199 (2d Cir. 2016).

21       ***Fourth***, Plaintiffs' draw a befuddling comparison to Lucira, a fellow developmental-phase

22   diagnostic company that went public in early 2021, to argue how "competitors understood the term

23   'high sensitivity.'" ¶ 176.  But as Lucira's S-1 states: "High sensitivity shows a well matched

24   comparator but ***does not*** reflect an assay's LoD."  Ex. 6 at 122.  Moreover, Plaintiffs omit that

25   Lucira conducted two clinical studies, one of which used a comparator assay with the ***same***

26   sensitivity as Talis's study.  *See id.* at 131 (conducting central laboratory clinical study using

27   TaqPath assay); ¶ 171, n.22 (alleging that TaqPath COVID-19 Combo kit had a 180,000 NDU/mL);

28   Ex. 7 at 128 (disclosing Talis's comparator assay had a 180,000 NDU/mL).  If anything, Plaintiffs'

reference to Lucira demonstrates a *lack* of common understanding of "high sensitivity."

***Fifth***, Plaintiffs' reference to a December 2020 draft article authored by Rustem Ismagilov also does not demonstrate that "high sensitivity" was defined and required by the FDA. *See* Ex. 5. Dr. Ismagilov did ***not*** "explain" that certain tests were "high sensitivity"—he reached no such conclusions because that is not what his experiment tested. Rather, his research measured the gradual rise in viral loads for humans exposed to COVID-19. The draft article's description of a range of "high" and "low" sensitivity tests was merely a general comparison, and Dr. Ismagilov reached no scientific conclusions about specific test sensitivity thresholds—let alone any that would trump the FDA's failure to issue a regulation setting a bright-line LoD boundary.[15] [16]

## 2. Talis's Disclosures Related to Reliability and Scale-Up Satisfy Item 303 and Item 105

Plaintiffs contend that Talis should have disclosed that reliability issues may delay its commercial launch. ¶ 185. That claim fails for at least three reasons. ***First,*** Talis ***did*** disclose that reliability issues or regulatory delay could adversely affects its business. Among other disclosures, Talis explained that its manufacturing "lines are not complete and could incur substantial delays… and may not perform as anticipated," that "quality issues may arise during scale up activities," and that its tests could "be subject to reliability issues." Ex. 7 at 20, 22, 25. These "fulsome disclosures" are all Regulation S-K requires. Order at *12, 21.

***Second***, Plaintiffs fail to allege that Talis had "actual knowledge" of any material adverse trend or uncertainty, beyond the information already disclosed. Plaintiffs rely on unreliable FE allegations that do not actually identify the invalid rate as of February 11, 2021 *or* allege that any Defendant knew as much. ¶¶ 131, 132, 186, 187; *see Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (affirming dismissal because "[m]issing are allegations linking *specific* reports and their contents to the executives"); *Progenity*, 2023 WL

---

[15] The April 2021 version of this article is irrelevant to an analysis of Talis's knowledge at the time of the IPO, but it equally inapposite. *See* Order at 21 (dismissing Item 303 and 105 claims because Plaintiffs failed to show knowledge of trends or uncertainties "at the time of the IPO").

[16] Lead Plaintiff Dugan's claim also fails because he lacks standing to pursue this claim. He did not buy shares of Talis common stock until after Talis's March 8, 2021 press release where it announced it had withdrawn its EUA application because of FDA concerns about its comparator assay. ¶¶ 30, 211; *see Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 205-207 (S.D.N.Y. 2020) (dismissing claims where lead plaintiffs purchased shares after alleged corrective disclosures).

219345, at *14 (rejecting Items 303 and 105 allegations where plaintiffs "have not established that Defendants knew or had reason to know of" trend or uncertainty). As discussed above, Plaintiffs do not adequately allege that the Talis One suffered from high invalid rates *at the time of the IPO*.

**Third**, Plaintiffs' passing reference to an unsupported FDA requirement "of an invalid rate below 10%" cannot save their claims. ¶¶ 188, 125 (concluding the "FDA requires invalid rates below 10%" without cite), ¶ 130 (same). In an attempt to find any public FDA statement including a percentage tied to the word "invalid," Plaintiffs obfuscate by conflating the recommended acceptance rate that the FDA published for testing involving ***pooled samples*** (i.e., multiple swabs in a single volume of transport media) with the concept of an "invalid rate" or failure rate for an in vitro diagnostic test. Ex. 2 at 19-32. But Talis disclosed it was not pursuing an EUA "for use in pooling samples for testing." Ex. 7 at 53. Further, post-IPO allegations cannot impute knowledge of an alleged Regulation S-K violation at the time of the IPO. *See Progenity*, 2023 WL 219345, at *15. Thus, Talis's March 2022 reference to "FDA guidance"—not a requirement—that "mentioned that you had to be below 10% to have a viable product" cannot create knowledge in hindsight of any such requirement or establish that a high invalid rate existed at the time of the IPO. ¶ 227, Ex. 8 at 9. Indeed, in that same call, Talis executives noted their "goal to get [the invalid rate] back down under 10% and in line with what our clinical study invalid rate was for our EUA." *Id.*

### D.   Plaintiffs' Amended Complaint Fails Because of Negative Causation

The Court should also dismiss the AC because it reveals that the alleged corrective disclosures of the "5,000 instruments" and "reliability and accuracy" statements first occurred two months *after* Plaintiffs initially filed suit. Section 11 "defendants are afforded an affirmative defense under 15 U.S.C. § 77k(e) to prove that the plaintiff's loss, or some portion thereof, was not caused by the alleged misstatements or omissions in the registration statement." *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *27 (N.D. Cal. Oct. 1, 2015). Section 11 dismissal is appropriate on negative causation when it is "apparent from the face of the [complaint] and judicially noticeable facts" that defendants can "establish the … defense as a matter of law." *Id.* at *28.

Plaintiffs can only recover under Section 11 for the decline in stock price until January 7, 2022, the date the first-filed complaint "was brought." 15 U.S.C. § 77k(e) (capping damages at "the

1  difference between the amount paid for the security (not exceeding the price at which the security

2  was offered to the public) and ... the value thereof *as of the time such suit was brought*, or … the

3  price at which such security shall have been disposed of in the market…").  It is black-letter law

4  that "an investor suffers a cognizable loss caused by the defendant's misstatements or omissions"

5  only when corrective facts become "generally known" and a stock's value drops as a result.  *In re*

6  *Velti*, 2015 WL 5736589, at *29 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 344 (2005));

7  *see also Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 254 (S.D.N.Y.

8  2003) ("Under the 1933 Act, '[t]he price decline before disclosure may not be charged to

9  defendants.'") (citation omitted).  In other words, a plaintiff cannot bring a Section 11 claim based

10  on losses occurring *before* "the corrective disclosures," because the loss must be related to the

11  alleged misstatements or omissions.  *In re Velti*, 2015 WL 5736589, at *29 (granting dismissal of

12  Section 11 claim based on language in 15 U.S.C. § 77k(e) because plaintiff sold stock before the

13  time of the alleged corrective disclosure).

14      Plaintiffs allege that "[o]n March 15, 2022, Talis … reported a barrage of ***new***, negative

15  information from the facts that the Registration misstated and concealed." ¶ 224.  This "new"

16  "barrage" allegedly (1) disclosed to the public that "Talis had merely ordered components for up

17  to 5,000 instruments," rather than ordered 5,000 instruments, and (2) contained the "***first public***

18  ***recognition***—***over a year after the IPO***—that the Talis One suffered from high invalid rates."  ¶¶

19  225, 227.  Just as Plaintiffs would be barred from recovering if they had sold their shares before

20  these disclosures, *In re Velti*, 2015 WL 5736589, at *29, the alleged misstatements could not have

21  caused the losses Plaintiffs seek here because "as of the time such suit was brought," the alleged

22  disclosures had not yet occurred.  15 U.S.C. § 77k(e).

23  **VIII.   PLAINTIFFS' SECTION 15 CLAIMS FAIL**

24      Because Plaintiffs "have not adequately alleged a Section 11 claim, [P]laintiffs have also failed

25  to state any claims under Section 15."  Order at *21; *Rigel*, 697 F.3d at 886.

26  **IX.   CONCLUSION**

27      For the reasons stated, the Court should grant Defendants' motion to dismiss with prejudice.

28

COOLEY LLP

DEFS.' MTD AMENDED COMPLAINT
CASE NO. 22-CV-00105-SI

1

2
Dated: February 17, 2023

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COOLEY LLP

By:        */s/ Patrick E. Gibbs*
                    Patrick E. Gibbs

*Attorneys for Defendants Talis Biomedical Corporation, Brian Coe, J. Roger Moody, Jr., Felix Baker, Raymond Cheong, Melissa Gilliam, Rustem F. Ismagilov, Kimberly J. Popovits, Matthew L. Posard, and Randal Scott*

COOLEY LLP

DEFS.' MTD AMENDED COMPLAINT
CASE NO. 22-CV-00105-SI