**BLEICHMAR FONTI & AULD LLP**
Lesley E. Weaver (Bar No. 191305)
555 12th Street, Suite 1600
Oakland, California 94607
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

*Counsel for Co-Lead Plaintiff Martin Dugan*
*and Co-Lead Counsel for the Putative Class*

**POMERANTZ LLP**
Jennifer Pafiti (Bar No. 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (212) 661-8665

*Counsel for Co-Lead Plaintiff Leon Yu*
*and Max Wisdom Technology Limited and*
*Co-Lead Counsel for the Putative Class*

*[Additional counsel on signature page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TALIS BIOMEDICAL SECURITIES LITIGATION | Case No. 3:22-cv-00105-SI |
| | CLASS ACTION |
| THIS DOCUMENT RELATES TO: | **CO-LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT** |
| ALL ACTIONS | Date:       May 5, 2023 |
| | Time:       10:00 A.M. |
| | Courtroom:  1 |
| | Judge:      Hon. Susan Illston |

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................................... 1

II.   BACKGROUND ........................................................................................................ 4

III.  PLEADING STANDARD............................................................................................ 5

    A.    Rule 8's Plausibility Standard............................................................................ 5

    B.    Rule 9(b) Does Not Apply to Plaintiffs' Non-Fraud Securities Act Claims................. 6

IV.   THE EIGHT FORMER TALIS EMPLOYEES ARE RELIABLE ......................................... 7

    A.    The Three New FEs Are Reliable........................................................................ 8

    B.    The Five Remaining FEs Are Reliable ............................................................... 10

V.    MATERIAL MISSTATEMENTS AND OMISSIONS ARE PLAUSIBLY ALLEGED ............... 12

    A.    False and Misleading Statements That Talis "Ordered 5,000 Instruments," Its Products "Are Manufactured," and the Manufacturer "Assembles" Instruments ............ 12

        1.    The Statements Were False.................................................................. 12

        2.    The Statements Were Materially Misleading .......................................... 16

    B.    False and Misleading Statements About Talis One's Reliability and Accuracy ........ 20

        1.    The Statements Are Not Opinions and Are Actionable in All Events............ 22

            a.    The Statements Are Fact, Not Opinion................................................ 22

            b.    The Statements Are Actionable as Opinions ..................................... 23

    C.    Material Omissions in Violation of Item 105 and Item 303 ...................................... 24

        1.    Omission of the Material, Known Risk and Uncertainty That Talis's Comparator Assay Violated FDA Standards and Faced Rejection ................ 25

        2.    Omission of the Material, Known Risk and Uncertainty of Talis One's Unreliability ...................................................................................... 28

VI.   DEFENDANTS FAIL TO PROVE NEGATIVE CAUSATION........................................... 29

VII.  CONCLUSION.......................................................................................................... 30

## TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................... 1, 2, 5

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988)....................................................................................................... 18, 20

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................................ 5

*Belodoff v. Netlist*,
2009 WL 1293690 (C.D. Cal. Apr. 17, 2009) .................................................................. 26

*Berg v. Velocity Fin., Inc.*,
2021 WL 268250 (C.D. Cal. Jan. 25, 2021) .................................................................... 26

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .................................................................................... *passim*

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) .................................................................. 26

*Colyer v. Acelrx Pharms., Inc.*,
2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) ................................................................ 23

*Dahlia v. Rodriguez*,
735 F.3d 1060 (9th Cir. 2013) ................................................................................... 5, 13

*Davis v. Salesforce.com, Inc.*,
2022 WL 1055557 (9th Cir. Apr. 8, 2022) ..................................................................... 15

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ......................................................................................... 5

*Fadia v. FireEye, Inc.*,
2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ................................................................. 9

*Farrar v. Workhorse Group, Inc.*,
2021 WL 5768479 (C.D. Cal. Dec. 2, 2021) .................................................................... 8

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ..................................................................................... 16, 18

*Ferdik v. Bonzelet*,
963 F.2d 1258 (9th Cir. 1992) ........................................................................................ 7

ii

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  2023 WL 2532061 (9th Cir. Mar. 16, 2023)................................................................ 9, 12, 21, 24

*Golubowski v. Robinhood Markets, Inc.*,
  2023 WL 1927616 (N.D. Cal. Feb. 10, 2023) ....................................................................... 22, 23

*Grigsby v. BofI Holding*,
  979 F.3d 1198 (9th Cir. 2020) ........................................................................................................ 7

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983).......................................................................................................................... 12

*Hildes v. Arthur Andersen LLP*,
  734 F.3d 854 (9th Cir. 2013) .................................................................................................... 4, 29

*Huang v. Avalanche Biotech., Inc.*,
  2016 WL 6524401 (N.D. Cal. Nov. 3, 2016) ............................................................................ 17

*In re Allied Nevada Gold Corp. Sec. Litig.*,
  743 F. App'x 887 (9th Cir. 2018) ................................................................................................... 9

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ............................................................................................................ 16

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) ........................................................................................................ 24

*In re BioMarin Pharm. Inc. Sec. Litig.*,
  2022 WL 164299 (N.D. Cal. Jan. 6, 2022) ............................................................................... 11

*In re Charles Schwab Corp. Sec. Litig.*,
  257 F.R.D. 534 (N.D. Cal. 2009)..................................................................................................... 6

*In re Cloudera, Inc. Sec. Litig.*,
  2022 WL 14813896 (N.D. Cal. Oct. 25, 2022).......................................................................... 16

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..................................................................................... 29

*In re CV Therap., Inc.*,
  2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ............................................................................ 10

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ........................................................................................................ 7

*In re Finjan Holdings, Inc.*,
  58 F.4th 1048 (9th Cir. 2023) .......................................................................................................... 7

*In re Lyft Inc. Sec. Litig.*,
  484 F. Supp. 3d 758 (N.D. Cal. 2020) ................................................................................. 26, 28

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

*In re Merix Corp. Sec. Litig.*,
275 F. App'x 599 (9th Cir. 2008) ................................................................ 6, 14

*In re Merrill Lynch Rsch. Reps. Sec. Litig.*,
272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................................. 30

*In re Metawave Commc'ns Corp. Sec. Litig.*,
629 F. Supp. 2d 1207 (W.D. Wash. 2009) .......................................................... 10

*In re Nektar Therap. Sec. Litig.*,
34 F.4th 828 (9th Cir. 2022) ............................................................................... 9

*In re Progenity, Inc. Sec. Litig.*,
2023 WL 219345 (S.D. Cal. Jan. 13, 2023) ................................................. 23, 26

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996) ......................................................................... 7

*In re QuantumScape Sec. Class Action Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. 2022) ......................................................... 22, 23

*In re Rigel Pharm., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ......................................................................... 6, 22

*In re Snap Inc. Sec. Litig.*,
334 F.R.D. 209 (C.D. Cal. 2019) ........................................................................ 30

*In re Stac Elec. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) ......................................................................... 4, 18

*In re Velti Sec. Litig.*,
2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ....................................................... 30

*In re YogaWorks Sec. Litig.*,
2020 WL 2549290 (C.D. Cal. April 23, 2020) .................................................... 14

*Khoja v. Orexigen Therap., Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................. 14, 18, 19

*Kipling v. Flex Ltd.*,
2020 WL 7261314 (N.D. Cal. Dec. 10, 2020) ...................................................... 9

*Kong v. Shirazi-Fard*,
814 F. App'x 292 (9th Cir. 2020) ......................................................................... 7

*Kovtun v. VIVUS, Inc.*,
2012 WL 4477647 (N.D. Cal. Sep. 27, 2012) ..................................................... 10

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) ......................................................................... 4, 18

iv

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ........................................................................................ 9, 11

*McMahan & Co. v. Wherehouse Ent., Inc.*,
  65 F.3d 1044 (2d Cir. 1995)..................................................................................................... 30

*Miller v. Thane Intern., Inc.*,
  519 F.3d 879 (9th Cir. 2008) .................................................................................... 16, 17, 26

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012)...................................................................................................... 30

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013)....................................................................................................... 7

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)........................................................................................................ 7

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
  300 F. Supp. 3d 551 (S.D.N.Y. 2018)....................................................................................... 22

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) .............................................................................................. 18

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*,
  575 U.S. 175 (2015)............................................................................................................ 22, 24

*Padnes v. Scios Nova Inc.*,
  1996 WL 539711 (N.D. Cal. Sept. 18, 1996) ........................................................................... 23

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
  681 F.3d 114 (2d Cir. 2012)...................................................................................................... 26

*Pirani v. Slack*,
  445 F. Supp. 3d 367 (N.D. Cal. 2020) ............................................................................... 20, 27

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir.) ............................................................................................................ 28

*Robb v. Fitbit, Inc.*,
  2017 WL 219673 (N.D. Cal. Jan. 19, 2017) ....................................................................... 10, 22

*Robb v. Fitbit, Inc.*,
  216 F. Supp. 3d 1017 (N.D. Cal. 2016) .............................................................................. 23, 29

*Rubke v. Capitol Bancorp Ltd.*,
  551 F.3d 1156 (9th Cir. 2009) .................................................................................................... 6

*Safron Cap. Corp. v. Leadis Tech., Inc.*,
  274 F. App'x 540 (9th Cir. 2008) ............................................................................................... 6

v

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963).................................................................................................. 12

*SEC v. Enter. Solutions, Inc.*,
    142 F. Supp. 2d 561 (S.D.N.Y. 2001)....................................................................... 19

*SEC v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010) ........................................................................ 3, 17, 19

*Sgarlata v. PayPal Holdings, Inc.*,
    409 F. Supp. 3d 846 (N.D. Cal. 2019) ........................................................................ 9

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)......................................................................................... 26

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011) ............................................................................ *passim*

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (N.D. Cal. Apr. 12, 2016) .......................................................... 10

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)....................................................................................... 26

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976).................................................................................................... 18

*Underwood v. Coinbase Global, Inc.*,
    2023 WL 1431965 (S.D.N.Y. Feb. 1, 2023)............................................................. 14

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) .............................................................................. 6, 7

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ................................................................................. 7, 8

**STATUTES AND REGULATIONS**

15 U.S.C. § 77k................................................................................................... 1, 12, 29

15 U.S.C. § 77o.............................................................................................................. 1

21 U.S.C. § 360bbb-3 ................................................................................................... 27

17 C.F.R. § 229.303 ..................................................................................................... 24

21 C.F.R. § 10.115(d)(3)............................................................................................... 27

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

**OTHER AUTHORITIES**

7A Anderson U.C.C. § 5-103:40 [Rev] (3d ed.) ................................................................ 15

U.C.C. § 5-103(d) ........................................................................................................... 15

Medical Device Accessories Describing Accessories and Classification Pathways For New
    Accessory Types, Food Drug Cosm. L. Rep. P 350897, 2016 WL 7799659 (Dec. 30, 2016)..... 19

Medical Devices; Current Good Manufacturing Practice (CGMP) Final Rule; Quality System
    Regulation, 61 FR 52602-01 (Oct. 7, 1996) ................................................................... 19

Guide to Med. Device Reg. ¶611, 2017 WL 11025341 ..................................................... 19

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

Court-appointed Co-Lead Plaintiffs Martin Dugan, Leon Yu, and Max Wisdom Technology Limited (together, "Plaintiffs") respectfully submit this opposition to Defendants' Motion to Dismiss ("MTD," ECF 107) the Amended Consolidated Class Action Complaint ("AC," ECF 104).

<u>**STATEMENT OF THE ISSUES TO BE DECIDED**</u>

Whether the AC states plausible claims under §§ 11 and 15 of the Securities Act of 1933.[1]

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    INTRODUCTION

Defendants' false and misleading statements told investors that Talis had a working product that had reached the production stage.  But there was no working product.  Talis had not ordered any instruments.  All it had was an unreliable, early-stage prototype that failed up to 20% of the time. There was no location to assemble instruments.  There was no validated process for manufacturing. And because Talis had never placed an order, nothing had been delivered to Talis at the time of the IPO.  This mattered because Talis One was the Company's sole product, and it did not exist, much less function.  Defendants raised over $250 million from the Class on false pretenses, giving rise to strict liability under Section 11 of the Securities Act.

The AC resolves the Court's prior concerns by adding "as much specificity as possible" to "show that the challenged statements were false or misleading when made."  (ECF 101 (the "Order") at 19.)  For example, the AC now expressly alleges that Talis did not order 5,000 instruments (*see id.* at 20) and backs it up with detailed allegations, including that an engineer who worked on the prototype at the time of the IPO (FE-7) said "***[t]o my knowledge, there was no working product***."  ¶93.  The AC also adds two former senior executives (FE-6 and FE-8) who pinpointed Talis One's unreliability at the time of the IPO.  ¶¶131-2.  Section II further details how the AC's resolves the Court's concerns.

Defendants fail to show that the Court cannot "draw the reasonable inference" of material falsity from the facts alleged.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  And they fail to provide an alternative explanation that is both "plausible" and "so convincing that [Plaintiffs'] explanation is

---

[1] Capitalized terms not defined herein have the meanings set forth in the AC (cited as "¶_").  Emphasis is added, and citations and internal quotation marks are omitted, unless otherwise stated.

*im*plausible." *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011) (emphasis in original).

**No Instrument Order or Manufacturing:** Defendants stated that Talis had "ordered 5,000 instruments" and that they were presently being "manufactured" and "assemble[d]." This was false and misleading because at the time of the February 2021 IPO:

- Talis had not ordered any instruments. The manufacturer had nothing to build and only reserved future production capacity. ¶¶83-4.
- Talis had no working product. Instead, it only had an early-stage prototype. ¶93. A prototype is not a finished product. ¶95.
- The prototype was unreliable, generating unusable results up to 20% of the time—a fact reported to Defendants Coe and Moody in weekly meetings. ¶132.
- There was no location to assemble instruments, and the production process was not validated, contrary to FDA regulations and industry standards. ¶¶84, 97-102.
- Talis had not paid the manufacturer, and nothing had been delivered. ¶¶106-10.

Defendants cannot overcome the fact that there was no order and no working product. Instead, to dispute falsity, they largely rely on disputed and irrelevant factual assertions that Talis had "purchase commitments" and a letter of credit. These improper assertions do not show that Talis ordered 5,000 instruments and cannot defeat the AC's plausible allegations, particularly where there was no location to assemble instruments and Talis One was merely a prototype at the time of the IPO.

Defendants' other excuses also fail. The fact that Talis still needed FDA authorization does not make their false statements true; it does not mean Talis "ordered 5,000 instruments." Nor does it dispel the misleading impression that Talis had a working product for near-term launch. Indeed, Defendants themselves told investors that a "potential commercial launch" was weeks away (¶58).

Thus, Defendants provide no alternative explanation for their statements that is both "plausible" and "so convincing that [Plaintiffs'] explanation is *im*plausible." *Starr*, 652 F.3d at 1216-17. With no working product and no location for assembly, any alternative explanation is like claiming that contractors are presently building a house when they do not know the property address, the plans are unfinished, permits have not been obtained, there is no contract, and no one has been paid. This has no basis in "judicial experience [or] common sense." *Iqbal*, 556 U.S. at 679.

Finally, the Court previously questioned why it was materially false and misleading to say Talis was ordering "instruments" rather than "components." The answer is simple: As the Ninth

2

Circuit has held, having a "finished, tested product is almost certainly the single most important piece of information for an investor deciding whether to invest in a start-up company." *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1094-95 (9th Cir. 2010). Here, investors cared intensely about whether Talis had products to sell because that was necessary for Talis to start making money. The 5,000 instruments Talis purportedly ordered (at over $15,000 each) corresponded to at least $77.5 million in revenue. ¶¶81-82. By contrast, components required time-consuming, complex assembly, had no independent value, and could not be sold. ¶¶75-80. With no product, Talis could not launch Talis One, even after obtaining FDA approval. And confirming materiality, when Talis removed the statement that it had "ordered 5,000 instruments" from its Form 10-K in March 2022, Talis's share price immediately dropped 23%. ¶¶225, 228. Talis stock trades at just $0.49 today.

**Accuracy and Reliability:** Defendants falsely claimed that Talis One was "reliable," "[h]ighly accurate," and "designed to provide central lab levels of accuracy." Resolving the Court's concern about contemporaneous falsity, the AC pinpoints the state of affairs at the time of the IPO: Defendants Coe and Moody were told in weekly meetings that Talis One had a failure rate of up to 20% in February 2021 (meaning the tests were invalid or did not meet their specified performance characteristics). ¶132. Defendants cannot (and do not) claim that such a device was "accurate" or "reliable"; competitors had invalid rates of just 1-2%. ¶126. Instead, Defendants assert that their statements are "classic statements of opinion." They did not argue this before, for good reason: the statements are factual and objective. They have nothing to do with subjective belief. And Defendants' argument that Talis One was only "designed" to be accurate and reliable ignores the materially misleading impression their statements created. Where Defendants claimed Talis One was "designed" to work reliably, no reasonable investor would expect that it failed up to 20% of the time.

**Violations of SEC Item 303 and 105:** Items 303 and 105 required Talis to disclose that (1) Talis's comparator assay was low-sensitivity and violated the FDA's "high sensitivity" standard, posing a heightened risk of rejection, and (2) Talis One's unreliability threatened to delay or foreclose launch. But the Registration Statement failed to do so. Talis's generic warning that it might not obtain an EUA does not shield Defendants from liability because Talis's low-sensitivity comparator assay was a specific uncertainty, known to Defendants, that materially heightened the risk of rejection. And

3

Defendants' effort to question whether the FDA had a quantitative standard for "high sensitivity" fails; the AC alleges the FDA standard was a limit of detection (LoD) at or below 18,000 NDU/mL. Whether this is deemed a "recommendation" or a "requirement," Talis's "low-sensitivity" comparator assay—at 180,000 NDU/mL—did not meet it.  Defendant Ismagilov, Talis's co-founder, wrote weeks before he signed the Registration Statement that tests at or above 100,000 copies/mL were "low-sensitivity."  Defendants barely engage with this dispositive party admission, which establishes an actionable omission.

**Risk Disclosures:**  As a matter of law, risk disclosures are irrelevant to Defendants' misstatements of historical and present fact.  *In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1408 (9th Cir. 1996); *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005).  Setting that aside, no risk disclosure told investors that Talis had not ordered instruments, had no working product, and used a "low-sensitivity" comparator assay despite the "high sensitivity" FDA standard.

**Negative Causation:**  Defendants fail to meet their "heavy burden" to "prove[]" that the entire decline in Talis's share price is "not attributable to the alleged misrepresentation[s and] omission[s]." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013).  They offer no explanation for why Talis stock plummeted from its $16.00 IPO price to $3.31 by the time this action was filed on January 7, 2022, and their claim that the truth was "first disclosed" in March 2022 fails.  The misstated and concealed facts left Talis unable to launch at all points after the IPO, causing Talis's stock to drop.

## II.    BACKGROUND

The AC narrows this action to three categories of false and misleading statements and material omissions:  (i) statements that Talis had "ordered 5,000 [Talis One] instruments" that were being "manufactured" and "assemble[d]"; (ii) statements that Talis One was "accurate" and "reliable"; and (iii) actionable omissions, in violation of Items 105 and 303 of SEC Regulation S-K, regarding Talis's comparator assay and Talis One's unreliability.

As to these narrowed claims, the AC adds "as much specificity as possible" to "show that the challenged statements were false or misleading when made."  (Order at 19.)

- **Non-fraud:**  The AC solely asserts Securities Act claims subject to Rule 8.

4

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

- **Misstatements of present and historical fact:**  The AC removes any potentially forward-looking statements, making Talis's risk disclosures irrelevant as a matter of law.

- **New, specific former employee ("FE") allegations:**  Three new FEs (6, 7, and 8) who worked at Talis at the time of the IPO directly observed key facts supporting falsity.  The AC also adds new details regarding the time, sources, and context of the prior FEs' statements.  (Order at 19.)

- **No order of instruments:**  The AC expressly alleges that Talis did not order 5,000 instruments (*see* Order at 20), and that this false statement was material, based on detailed factual allegations.  ¶¶69-118.

- **Unreliable and inaccurate:**  The AC resolves the Court's concern about unreliability before and after the IPO (Order at 27-28) because FE-6 and FE-8 pinpointed the failure rate of up to 20% and invalid rate of up to 15% at the time of the IPO.  ¶¶131-2.

- **"Low-sensitivity" comparator assay:**  The AC alleges "objective criteria" (Order at 30): specifically, that the FDA's "high sensitivity" standard required a LoD of 18,000 NDU/mL or lower, but Talis's comparator assay was 180,000 NDU/mL.  ¶¶166-7.  The AC alleges management's knowledge at the time of the IPO (Order at 31) because Defendant Ismagilov called comparator assays above 100,000 copies/mL "low-sensitivity" in his own research shortly before the IPO.  ¶169.

## III.    PLEADING STANDARD

### A.    Rule 8's Plausibility Standard

Securities Act claims are evaluated solely under the Rule 8 plausibility standard, which requires "a short and plain statement to survive a motion to dismiss."  *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1032 (9th Cir. 2016) (reversing dismissal in part).  Plaintiffs need only plead enough facts "to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  The Court "must accept all factual allegations of the complaint as true and draw all reasonable inferences in favor of [Plaintiffs]."  *Dahlia v. Rodriguez*, 735 F.3d 1060, 1066 (9th Cir. 2013).

The Rule 8(a) plausibility standard "'*does not impose a probability requirement at the pleading stage*; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' to support the allegations."  *Starr*, 652 F.3d at 1217 (emphasis in original) (quoting *Twombly*, 550 U.S. at 556).  And even if the defendants offer a plausible alternative explanation, that

5

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

is not enough to warrant dismissal. Rather, the "complaint survives" unless the "defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible." *Starr*, 652 F.3d at 1216-17 (emphasis in original).

### B.    Rule 9(b) Does Not Apply to Plaintiffs' Non-Fraud Securities Act Claims

Defendants wrongly claim that Rule 9(b) applies because Plaintiffs' Section 11 claim purportedly "sounds in fraud." To the contrary, the AC solely asserts non-fraud Securities Act claims and "neither specifically alleges fraud, nor . . . allege[s] facts that necessarily constitute fraud." *Safron Cap. Corp. v. Leadis Tech., Inc.*, 274 F. App'x 540, 541 (9th Cir. 2008) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104-05 (9th Cir. 2003)).

Defendants cite ***no*** case applying Rule 9(b) to a Securities Act-only pleading. Indeed, "[n]o published Ninth Circuit decision has been found . . . applying Rule 9(b)'s particularity requirement to a Section 11 claim where, as here, the underlying conduct was not also alleged to have constituted fraud." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 546 (N.D. Cal. 2009). Instead, "[c]ourts generally apply Rule 8 to Section 11 claims where *only* non-fraud bases for liability are pled." *Id.* (emphasis in original). ***All*** the cases Defendants cite involved fraud claims and Securities Act claims based on the ***same*** misstatements and allegations.[2] And where courts have erroneously applied Rule 9(b) to Securities Act-only pleadings—as Defendants urge—the Circuit has reversed. *See Safron*, 274 F. App'x at 541; *In re Merix Corp. Sec. Litig.*, 275 F. App'x 599, 599 (9th Cir. 2008).

Not only is Defendants' argument devoid of legal authority, but it mischaracterizes the AC's non-fraud allegations. The AC does not allege "knowing falsity and intentional misstatements." (MTD at 14:15-16.) Rather, it solely asserts non-fraud claims, disclaims fraud (¶¶2, 45, 252), and alleges strict liability and negligence (¶¶255-56). Defendants' cherry-picked quotations do not refer to any "unified course of fraud" or "intentional" misstatement (MTD at 14:5, 15). Instead, they simply

---

[2] *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012) (Section 11 claim based on "***same*** alleged misrepresentations . . . central to [the] ***section 10(b) fraud claim***"); *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) ("***exact same*** factual allegations [used] to allege violations of section 11 [and] fraudulent conduct under ***section 10(b)***").

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

allege falsity; merely track case law;[3] quote former employees (¶138); or do not appear in any pleading (ECF 88 is a brief).  Finally, the ***prior*** complaint's fraud claims cannot trigger Rule 9(b), since "[a]n amended pleading supersedes the original pleading," which "no longer performs any function and is treated [after amendment] as non-existent." *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir. 1992).[4]

## IV.    THE EIGHT FORMER TALIS EMPLOYEES ARE RELIABLE

Plaintiffs' FE allegations are governed by Rule 8 plausibility, as "[a] heightened pleading standard may be imposed only by legislative directive, not by judicial interpretation." *Kong v. Shirazi-Fard*, 814 F. App'x 292, 293 (9th Cir. 2020).[5]  Even for claims subject to Rule 9(b) and the PSLRA's heightened standard, however, FEs need only be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005).  The AC amply does so.

Here, eight former Talis executives, engineers, scientists, and salespeople provided detailed facts that resolve the Court's prior concerns.  The AC alleges each FE's "job description and responsibilities," "exact title," and "to which . . . executive the witness reported" with a "large degree of specificity,"[6] which "support[s] the probability" that each FE knew the facts attributed to them. *Daou*, 411 F.3d at 1015-16.  The "level of detail provided[,] the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources," and other indicia bolster reliability.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d

---

[3] *Compare* ¶14 to *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996); *compare* ¶58 to *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

[4] Nevertheless, the AC also satisfies Rule 9(b) by pleading the "who, what, when, where, and how." *Vess*, 317 F.3d at 1106.  This "*particularity* requirement[]" does not "increase[] the *plausibility* requirement [under] *Twombly* and *Iqbal*," *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1058 (9th Cir. 2023) (emphasis in original), or "require that [an] inference be more than 'plausible.'" *Grigsby v. BofI Holding*, 979 F.3d 1198, 1206 (9th Cir. 2020).  Here, far from a "general claim of the existence of non-public information that is inconsistent with" Defendants' statements (MTD at 14:23-24), the AC pinpoints specific facts that contradict the statements and support material falsity, as detailed herein. These particular allegations "give [D]efendants ample notice" of the basis for falsity and "some assurance that [it] has a basis in fact"; "Rule 9(b) requires no more." *Berson*, 527 F.3d at 989-90.

[5] *Cf. New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 123 (2d Cir. 2013) (in Securities Act case, FE allegations sufficient "[e]ven under the higher standard imposed by the PSLRA").  The Ninth Circuit's test draws on "the Second Circuit's standard." *Daou*, 411 F.3d at 1015 (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)).

[6] ¶¶89 (FE-1); 133 (FE-2); 113 (FE-3); 81 (FE-4); 140 (FE-5); 84 (FE-6); 92-93 (FE-7); 131 (FE-8).

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

981, 995 (9th Cir. 2009). Defendants cannot defeat the FEs' reliability and personal knowledge, and their effort to create premature factual disputes is improper.

### A.    The Three New FEs Are Reliable

**FE-6 (VP of Human Resources, 2018-Jan. 2022):**[7] FE-6's statement that Talis had only reserved future production capacity confirms that Talis had not "ordered 5,000 instruments" at the time of the IPO. ¶84. FE-6 added that at the time of the IPO, there was no location to assemble the instruments, and Talis One was only an early prototype with a flawed and overly complicated design. ¶¶84, 91. Contrary to Defendants' assertion that FE-6 lacks "***any*** personal knowledge" (MTD at 11:20 (emphasis in original)), the AC alleges that FE-6 knew this as a senior executive who reported directly to CEO Coe "and was privy to information about Talis's third-party manufacturers and vendors." ¶84. FE-6 also learned from attending weekly business review meetings with Coe, Moody, and COO Liu that Talis One had a failure rate between 10% and 20% in February 2021. ¶132. Multiple engineers and salespeople corroborate FE-6 as to Talis One's unreliability (¶¶133-34 (FE-2); 131 (FE-8); 139, 141-43, 145 (FE-4 and 5)) and status as a mere prototype (¶¶90, 93-94 (FE-1, FE-7); 111 (FE-4)).

Given these facts, there is no merit to Defendants' patronizing claim that FE-6 could not know about "technical and business intricacies" as an HR professional. (MTD at 11:26-12:1.) Unlike *Zucco*—where a low-level HR employee "had no firsthand knowledge" and was not even employed "during the time period in question," 552 F.3d at 996—FE-6 was one of Talis's most senior executives at the time of the IPO (and three years prior), with direct personal knowledge, including from participating in top-level weekly meetings. Moreover, the absence of a working, reliable product was directly relevant to FE-6's HR role because the timing of any launch impacted staffing needs.[8] It is thus "entirely plausible" that FE-6 knew about the manufacturing and unreliability of Talis One. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (rejecting "quibble" that FEs

---

[7] Defendants claim Talis "had no 'Chief Human Resources Officer'" (MTD at 11 n.5), but do not dispute that FE-6 was Talis's most senior HR executive and reported directly to CEO Coe. ¶84.

[8] *See Farrar v. Workhorse Group, Inc.*, 2021 WL 5768479, at *5 (C.D. Cal. Dec. 2, 2021) ("plausible that an Executive Director of Human Resources would have a basic knowledge of whether Workhorse's manufacturing facility had automation or not" given FE's familiarity "with the qualifications needed for various positions").

8

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

"were 'engineers or technical editors' rather than managers").

Defendants' "hearsay" assertion also fails.  Hearsay statements may be considered if they are "sufficiently reliable, plausible, or coherent," including where they are "specific in time, context and details."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016).  Contrary to Defendants' assertions (MTD at 12), the AC meets this standard:  It alleges "what" was said in the weekly meetings (the failure rate was up to 20%), that Defendants Coe and Moody attended, and that the meetings addressed the failure rate in February 2021.  ¶132.  FE-6 "described conversations that they themsel[f] heard."  *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 2023 WL 2532061, at *15 (9th Cir. Mar. 16, 2023).  This is more than sufficient.  *See In re Allied Nevada Gold Corp. Sec. Litig.*, 743 F. App'x 887, 888 (9th Cir. 2018) (FE observed that "at least one defendant was present at 'daily meetings'" where issues "were discussed"); *Lloyd*, 811 F.3d at 1208.  Defendants' cited cases—all governed by the PSLRA's heightened standard for scienter, inapplicable here—do not change this result.[9]

**FE-7 (Intern and Engineer, Jan. 2019-Mar. 2021**):  FE-7, a system and full-stack engineer at the time of the IPO, stated that Talis had only five to ten working prototypes of Talis One through March 2021.  ¶93.  FE-7 knew this because FE-7 worked on the prototypes.  *Id.*  Based on personal knowledge, FE-7 stated that "***[t]o my knowledge, there was no working product***."  *Id.*[10]  Defendants do not contest FE-7's personal knowledge and ignore these key allegations.  Instead, they only assert that detail is lacking as to a different, subsidiary allegation—how the prototypes missed Talis's "internal benchmarks for a final product," ¶94.  This has no bearing on FE-7's specific factual observation that Talis only had five to ten prototypes, which is far from the "conclusory adjectives" rejected in *In re Nektar Therap. Sec. Litig.*, 34 F.4th 828, 837 (9th Cir. 2022).

**FE-8 (VP of Product, Jan. 2016-Apr. 2022):**  FE-8, a senior executive who reported directly

---

[9] In *Sgarlata v. PayPal Holdings, Inc.*, 409 F. Supp. 3d 846, 857 (N.D. Cal. 2019), the FE provided inconsistent accounts of the meeting, and it was not clear that the defendant even attended, much less "knew" of the data breach at issue.  *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *13-14, 16 (N.D. Cal. Nov. 14, 2016), involved an FE's mere attendance at meetings, with no allegation that the defendants were "exposed to" facts contrary to their statements.  Similarly, in *Kipling v. Flex Ltd.*, 2020 WL 7261314, at *11 (N.D. Cal. Dec. 10, 2020), the relevant information was not discussed in the "meetings for which [the human resources FE] had personal knowledge."

[10] This is corroborated by FE-1 (Talis One was a "prototype," ¶90), FE-4 (in Feb. 2021, Talis "did not have an instrument," ¶111), and FE-6 (at time of IPO, Talis One was in "early prototype stage," ¶84).

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

to Coe, stated that at the time of the IPO, Talis had different lots of prototype devices with invalid rates (included in the failure rate, ¶132) from 5% to 15%. ¶131. This allegation is not "conclusory"; it is quantitative, anchored in time and context, and corroborated by FE-6 (¶132). Defendants question "how a sales VP was positioned to know" this (MTD at 13:4-5), but it is "entirely plausible" that a senior executive responsible for selling Talis One "would know, or could reasonably deduce," the material problems with the Company's only product. *Berson*, 527 F.3d at 985.[11] Defendants' demand for further precision, "such as the frequency of alleged failures and the precise level" of invalid tests, exceeds any pleading standard and "crosses into territory better evaluated on a motion for summary judgment." *Robb v. Fitbit, Inc.*, 2017 WL 219673, at *8 (N.D. Cal. Jan. 19, 2017).[12]

### B.    The Five Remaining FEs Are Reliable

**FE-1 (Engineer and New Product Introduction Manager, Aug. 2016-Mar. 2021):** As a senior engineer designing the cartridge for the Talis One instrument, FE-1 was in a position to know about the instrument's status. FE-1's statements that Talis One was a "prototype instrument," and that full production at volume was not possible at the time of the IPO (¶90), are directly supported by the operations team specifically saying "[w]e can't build it" (*id.*) and "directly corroborate[d]" by "the independent testimony of" FE-4 (¶111), FE-6 (¶84), and FE-7 (¶93) that Talis One was only a prototype at the time. *In re CV Therap., Inc.*, 2004 WL 1753251, at *2 (N.D. Cal. Aug. 5, 2004).

**FE-2 (Senior Scientist, Feb.-Oct. 2020):** FE-2, a Ph.D. senior scientist focused on the Talis One assay (¶133), stated that Talis used the "shittiest comparator [assay]" in its EUA submission before the IPO (¶173), and that Talis One had a high invalid rate (¶¶133-34). While FE-2 departed before the IPO, the Court need not "completely shut its eyes to [pre-class period FE] allegations when examining the overall context." *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *7 (N.D. Cal. Apr. 12, 2016). Even more so because FE-2's account is bolstered by the AC's new allegations, including (i) Ismagilov's Dec. 2020 article defining "low-sensitivity tests" as having LoDs of 100,000

---

[11] Indeed, the AC makes clear that even lower levels of Talis's sales and support organization were privy to information about invalid rates and manufacturing. ¶¶111, 114, 138-39, 141-42.

[12] Defendants' authority is inapposite. *In re Metawave Commc'ns Corp. Sec. Litig.*, 629 F. Supp. 2d 1207, 1216-1219 (W.D. Wash. 2009), and *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *18 (N.D. Cal. Sep. 27, 2012), both involved scienter and the PSLRA's heightened standard, not at issue here.

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

copies/mL or higher (¶169) and Lucira's Jan. 2021 statement that all "high sensitivity" tests "have a LoD of 1,000 [copies]/mL" or lower, while Talis's comparator assay was at 180,000 NDU/mL (¶176); and (ii) as to unreliability, FE-6's and FE-8's observations at the time of the IPO (¶¶131-32).

**FE-3 (Associate Director, Consumables Engineering, Nov. 2016-June 2021):** FE-3, an engineer, briefed Defendant Coe in May 2021 on serious issues with manufacturing timelines for Talis One, and confronted a Board member, who claimed that the aggressive timelines were "inspirational." ¶113. Without challenging FE-3's reliability or personal knowledge, Defendants note that these events occurred after the IPO. But that fact further corroborates the allegations that Talis One was only a prototype and Talis had not ordered instruments at the time of the IPO. ¶¶84, 90, 93-94, 111.

**FE-4 (Territory Account Manager, February 1, 2021 to March 15, 2022):** FE-4—one of the first members of Talis's sales force—confirmed that Talis never had a working product. Most significantly, FE-4's supervisor, Alex de los Reyes, told FE-4 in February 2021 that Talis did not have an instrument. ¶111. Defendants protest that FE-4's allegations do not "specifically predate" the IPO (MTD at 11:6-7), but this February 2021 conversation corroborates the absence of any order, manufacturing, or delivery at the time of the IPO (as do FE-4's later observations).[13] Defendants' "hearsay" argument fails because FE-4's statements are "specific in time, context and details," *Lloyd*, 811 F.3d at 1208; FE-4 reported specific information and "named the person[s] from whom [it] came," with dates, context, and other corroboration. *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *11 (N.D. Cal. Jan. 6, 2022). A "mini-trial on the admissibility of the evidence" is not appropriate. *Id.* at *11 n.8.

**FE-5 (Associate Director of Technical Implementation, Sept. 2021-Mar. 2022):** Responding to the Court's prior concern (Order at 28), the AC alleges that FE-5 learned from meetings

---

[13] FE-4 further explained that after the IPO, Talis's national sales force only had non-functional devices (including an empty "shell") that they were instructed not to turn on with customers (¶¶114, 117-18, 138), and de los Reyes said Talis did not have a manufacturer of instruments at full scale in fall 2021 (¶117). As to the invalid rate: (i) in June 2021 de los Reyes and his supervisor, Anthony Green, told FE-4 that the invalid rate was over 10% (¶139); (ii) FE-4 personally observed repeated invalid results on November 12, 2021 (*id.*); and (iii) FE-4 learned on December 6, 2021 about the origins of the invalid rate and that Talis had only submitted data to the FDA based on "simulations," prompting FE-4 to tell co-workers to prepare for new jobs (¶¶143, 145). The Court has not yet considered FE-4's statements with this additional context and FE-6 and 8's observations at the IPO.

11

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

with COO Liu (and from FE-5's supervisor) that by fall 2021, the invalid rate exceeded 10% and arose from cartridge issues (aligning with FE-2 and FE-4, ¶¶134, 143). While Defendants complain that FE-5's account post-dates the IPO, the persistently high invalid rate corroborates FE-2, 4, 6, and 8.

## V.    MATERIAL MISSTATEMENTS AND OMISSIONS ARE PLAUSIBLY ALLEGED

The Securities Act "substitute[d] a philosophy of full disclosure for the philosophy of *caveat emptor* . . . ." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963). Section 11 "places a relatively minimal burden on a plaintiff," who must "only show a material misstatement or omission." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). Any "untrue statement of a material fact" is actionable, as are misleading statements—those that "omitted to state a material fact . . . necessary to make the statements [made] not misleading"—and omissions of "material fact required to be stated" in the registration statement. 15 U.S.C. § 77k(a).

### A.    False and Misleading Statements That Talis "Ordered 5,000 Instruments," Its Products "Are Manufactured," and the Manufacturer "Assembles" Instruments

In Statements 1 and 2, Defendants falsely claimed that Talis had ordered 5,000 Talis One instruments and that the instruments were presently being "manufactured" and "assemble[d]" (¶68):

1.  "We have ordered 5,000 instruments from our instrument contract manufacturing partners to be delivered beginning in the fourth quarter of 2020 through the first quarter of 2021."

2.  "Our products are manufactured by several third parties, including a single contract manufacturer that provisions the parts and assembles our instrument."

#### 1.    The Statements Were False

Statements 1 and 2 were outright false when made: Talis had ***not*** "ordered 5,000 instruments," and they were ***not*** being "manufactured" or "assemble[d]" by the third party at the time of the IPO. ¶¶69-118. Falsity is governed by "the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*," not a strong inference standard. *Glazer*, 2023 WL 2532061 at *19 (emphasis in original). The AC's detailed, interrelated, corroborating facts, taken as true, plausibly support a "*reasonable inference*" of falsity—that Talis did not order instruments and they were not being manufactured.

**No Order:** Talis had not ordered any instruments at the time of the IPO. ¶¶83-4. At most, as FE-6 explained, Talis merely had a capacity agreement with its manufacturer, meaning that it had reserved capacity to produce instruments sometime in the future—but at the time of the IPO, the

12

manufacturer had nothing to build because the instrument was only in the early prototype stage. ¶84. Defendants do not assert that Talis actually ordered 5,000 instruments. Instead, they dispute whether the capacity agreement "would preclude an instrument order" and claim that reserving future capacity is "entirely consistent" with ordering 5,000 instruments (MTD at 18:18, 20). This argument not only fails to "draw all reasonable inferences in favor of [Plaintiffs]," *Dahlia*, 735 F.3d at 1066, it also ignores the AC and defies common sense. A capacity agreement is not an "order." It only means some instruments *might* be produced in the *future*, but that could *only* happen *if* Talis (a) fixed the prototype, (b) completed validation and other steps required before production, and (c) placed the order. None of that had happened at the time of the IPO (¶¶83-105), further corroborating that Talis did not order 5,000 instruments—it was in no position to do so.

**No Production or Delivery:** Directly contrary to Defendants' present-tense statements, at the time of the IPO, no instruments were being "manufactured" or "assemble[d]" by Talis's "contract manufacturer," much less delivered to Talis. ¶¶109-10. Instead, as an engineer who worked on the prototypes (FE-7) confirmed, Talis only had five to ten imperfect prototypes, but "*no working product*." ¶¶93-94.[14] A prototype is not a finished product. ¶95. FE-1, another engineer, confirmed the instrument was only a "prototype" (¶90); executive FE-6 stated that the instrument remained in the early prototype stage at the time of the IPO (¶84); and sales executive Alex de los Reyes said to FE-4 that Talis did not have an instrument in February 2021 (¶111). Defendants' claim that "no former employees contend that instruments had not been delivered by the time of the IPO" (MTD at 19:21-22) ignores these allegations. And crucially, Defendants ignore that at the time of the IPO, even the *location of assembly* was unresolved (FE-6, ¶84). Plainly, the instruments could not be "assemble[d]" or "manufactured" with no location to do so.

Defendants respond with irrelevant distractions. First, Defendants wrongly claim the AC is a "remarkable about-face" because it alleges there was no production or delivery to Talis, while the prior complaint alleged Talis had "produced far fewer instruments in [Q4 2020]" than its internal goal (MTD

---

[14] Defendants wrongly accuse Plaintiffs of trying to "stretch" FE-7's statements to "the time of the IPO." (MTD at 19 n.9.) FE-7 observed that Talis only had five to ten prototypes "*during* FE-7's tenure," which "ended in March 2021" and *included* the February 2021 IPO. ¶¶93, 110.

13

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

at 18:3-4). There is no contradiction. The prior complaint referred to **Talis's** in-house pilot production of **prototypes**—limited production by Talis "for beta testing and to prove **Talis's** manufacturing capability." (ECF 74 ¶50.) That is separate from the **outsourced** manufacturing of **final instruments** at issue (*i.e.*, the "5,000 instruments" Talis had purportedly "ordered" from its "contract manufacturing partners"), which had not commenced or resulted in any delivery.[15]  Indeed, Talis said it had to complete "pilot manufacturing . . . in-house **before outsourcing**" its manufacturing "to third party contract manufacturers." ¶86. Because there is no contradiction, Defendants' caselaw is inapposite.[16]

Second, Defendants argue that the absence of delivery does "not render the challenged statements false." (MTD at 20:3-4.) But together with the AC's other corroborating allegations, the fact that no instruments had been delivered—when the purported delivery period was 75% complete—further supports a reasonable inference that there was no order, manufacturing, or assembly.

**No Payment:**  Defendants do not dispute that Talis did not pay its manufacturer until five months **after** the IPO—and even then, only paid for "components," not instruments.  ¶¶107-08. Drawing reasonable inferences in Plaintiffs' favor, the absence of payment at the time of the IPO further corroborates that Talis had not ordered 5,000 instruments and they were not being produced.

In response, Defendants claim that Talis had a "firm purchase commitment" for "instruments" and a $33 million letter of credit (LoC). This "improperly ask[s] the [C]ourt to engage in fact-finding in the course of deciding the sufficiency of the Complaint." *Khoja v. Orexigen Therap., Inc.*, 899 F.3d 988, 1006 (9th Cir. 2018).  Defendants' assertions that Talis had a "firm purchase commitment," a "non-cancellable contractual obligation[]," and a letter of credit are not "undisputed"[17] and cannot be accepted for their truth. (Pls.' RJN Opp. at 4-5.)  Moreover, the purported "purchase commitment"

---

[15] Defendants' complaint that FE-8 did not identify who manufactured the "different lots of prototype devices" (MTD at 18 n.8) is irrelevant for this reason.

[16] *Underwood v. Coinbase Global, Inc.*, 2023 WL 1431965, at *8 (S.D.N.Y. Feb. 1, 2023) (directly contradictory allegations of privity/no privity; contract "flatly contradict[ed]" allegations of title); *In re YogaWorks Sec. Litig.*, 2020 WL 2549290, at *2-3 (C.D. Cal. April 23, 2020) (prior allegations informed whether plaintiff "had enough information" to trigger statute of limitations). And in all events, the Ninth Circuit allows "allegations or claims . . . that are inconsistent with or contradicted by allegations or claims made in [the] previous complaint." *Merix*, 275 F. App'x at 599.

[17] The AC calls it a "purported" purchase commitment (¶107) and alleges that Talis did not order instruments, but merely had a capacity agreement (¶¶83-84).

14

and LoC do not mean Talis ordered 5,000 instruments.  Any purported "***purchase*** commitment" or "obligation" was meaningless because the instruments had not been ***ordered***.  And the purported LoC is consistent with merely reserving future production capacity (¶84); it does not mean Talis ordered 5,000 instruments.  Indeed, because LoCs are "independent of the existence . . . of a contract," U.C.C. § 5-103(d), nothing "prevents the parties from issuing a letter of credit calling for payment 'if, as, and when' there is a later obligation."[18]  It is entirely plausible that Talis did not order 5,000 instruments, but—needing a successful IPO—entered "purchase commitments" and obtained a LoC to bolster the appearance of a real product.  This reasonable inference must be drawn in Plaintiffs' favor, while Defendants' alternative is hardly "so convincing that [Plaintiffs'] explanation is *im*plausible." *Starr*, 652 F.3d at 1216 (emphasis in original).

**Regulations Barred Delivery:**  Under FDA regulations and governing industry standards, Talis's manufacturer was barred from delivering any instruments because Talis One's design and manufacturing process had not been validated at the time of the IPO.  ¶¶97-102.  Defendants do not claim that validation occurred.  Instead, they make a convoluted argument that FDA regulations define "manufacture" to include "designing" devices, but that does not change the facts that validation was (a) required before delivery, but (b) had not occurred.[19]  Defendants also speculate that "some or all" of the regulations might not apply after Talis obtained an EUA (MTD at 19:13), but ignore the AC's specific allegations—based on former Talis employees' LinkedIn profiles and other sources—that the relevant FDA regulations and industry standards applied at the time of the IPO (¶¶98 n.5, 100).

In sum, Defendants' piecemeal attacks on falsity are far from an alternative explanation that is "so convincing that [Plaintiffs'] explanation is *im*plausible."  *Starr*, 652 F.3d at 1216 (emphasis in original); *see Davis v. Salesforce.com, Inc.*, 2022 WL 1055557, at *1 (9th Cir. Apr. 8, 2022) (defendant's "plausible" explanation is "not sufficient at the pleading stage to render plaintiffs' facially

---

[18] Existence of underlying contract, 7A Anderson U.C.C. § 5-103:40 [Rev] (3d ed.).  Contrary to Defendants' assertion (MTD at 18:25), the Registration Statement does not say the LoC "secured [Talis's] $33 million instrument order."

[19] No reasonable investor would understand the statement that Talis's "products are manufactured" (¶68) to mean Talis was "designing" Talis One or merely had a few prototypes, as Defendants suggest (MTD at 19:7-12).

15

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

plausible allegations inadequate"). Indeed, Defendants' statements cannot be reconciled with the totality of facts alleged. Where were "5,000 instruments" being "assemble[d]" when the location of assembly was unresolved? How were they being "manufactured" when Talis One was merely an early-stage, unreliable prototype? Given the AC's plausible allegations of falsity, it "survives a motion to dismiss under Rule 12(b)(6)." *Starr*, 652 F.3d at 1216.

## 2. The Statements Were Materially Misleading

Statements 1 and 2 are also actionable because, regardless of their literal truth, they created "the impression of a state of affairs that differ[ed] in a material way" from the reality that existed at the time of the IPO. *Berson*, 527 F.3d at 985; *see also Miller v. Thane Intern., Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("literally accurate" statements "can become, through their context and manner of presentation, devices which mislead investors"). Whether a statement is "misleading" is analyzed under the "objective standard of a 'reasonable investor,'" *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021), and "whether a public statement is misleading . . . is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995).

Defendants' statements about the ordering, production, and delivery of Talis's sole product— and only meaningful revenue source—were highly material to investors. The "fair and reasonable implication an ordinary investor would derive from" the statements, *Miller*, 519 F.3d at 886, was that Talis had a working product, and "5,000 instruments" had been "ordered" and were presently being "manufactured" at scale and "assemble[d]" for delivery.

While Defendants assert that investors would not understand "instruments" to mean "a 'finished' product ready for sale" (MTD at 16:11-12), Defendants themselves explicitly said Talis would ***sell*** "***instrument[s]***" ***to*** "***generate revenue.***" (Defs.' Ex. 7 at 8 ("We intend to offer our Talis One platform to customers via direct purchase of the instrument . . . . [W]e expect to generate revenue in the form of instrument sales . . . .").) [20] And Defendants' assertion that "[n]o reasonable investor"

[20] *In re Cloudera, Inc. Sec. Litig.*, 2022 WL 14813896 (N.D. Cal. Oct. 25, 2022), is irrelevant. *Cloudera* rejected falsity—under the PSLRA's heightened standard, inapplicable here—for statements about "cloud-native" products and "cloud architecture" based on an article that was published ***one to two years later*** and did not use those terms. *Id.* at *8. It has no bearing on the misleading impression Defendants created in the Registration Statement about whether Talis One was being built at the time.

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

expected "instruments were being 'manufactured at scale'" to be sold (MTD at 17:8-9) ignores Defendants' words and "their context and manner of presentation," *Miller*, 519 F.3d at 886:

- Defendants said Talis "***ordered 5,000 instruments***," conveying that Talis One had reached the production stage with a final, working product.  This was not true.

- Defendants' present-tense statements that Talis's products "***are manufactured***" and the manufacturer "***assembles***" the instrument again indicated that Talis had a working product that existed and was already being built.  Again, this was not true.  *See Platforms Wireless*, 617 F.3d at 1094-95 (misleading "present tense" descriptions of product that did not exist).

- Defendants stated that the "5,000 instruments" were "to be ***delivered***" from "the fourth quarter of 2020 through the first quarter of 2021," with a "potential commercial launch as early as the ***first quarter of 2021***" (¶58).  Defendants made these representations more than halfway through the first quarter of 2021 without having placed any order, let alone having received a single device.  ¶¶83-118.

- The Registration Statement used the term "instrument" ***over 100 times***.  ¶¶73-75, 88, 127, 135.  *See Miller*, 519 F.3d at 888 ("[I]n context, [six] repeated references [to NASDAQ] suggest nothing short of actual listing on the NASDAQ.").

Thus, Defendants created the materially misleading impression that Talis had a working product that was being produced for a near-term launch.[21]  Defendants' remaining arguments fail.

**"FDA Authorization Process" Is Irrelevant:**  While Talis needed to obtain an EUA as the final step before ***launch***, Defendants did not say they needed an EUA to begin ***production***.  To the contrary, the purported delivery period for the "5,000 instruments" started in October 2020, months ***before*** Talis's January 2021 EUA application, reinforcing the false impression that instruments were being made and delivered in preparation for launch.[22]

**GAAP Supports Material Falsity:**  Defendants do not dispute that under GAAP, ***only*** Talis One instruments (not components) were "finished goods" that could be sold to generate revenue.  ¶¶79-81.  Having instruments was thus crucial to Talis's ability to generate and book revenue.  In

---

[21] Defendants' citation to *Huang v. Avalanche Biotech., Inc.*, 2016 WL 6524401 (N.D. Cal. Nov. 3, 2016), is irrelevant.  *Huang*—a Rule 9(b) case—held that statements about a drug trial were not misleading where it was unclear if the allegedly omitted interim data even existed, much less was materially negative.  *Id.* at *6.  Here, as detailed above, the concealed facts are far different from Defendants' public statements, and the "context of [the statements'] total presentation," *id.* at *4, supports material falsity:  Defendants described Talis One as an existing product, cited an expected near-term commercial launch, and said Talis would sell "instrument[s]" to "generate revenue."

[22] Defendants' claim that Talis "did not even have a sales force" (MTD at 16:22) is misleading (at best).  Before the IPO, Talis hired FE-4, a western region account manager and "one of the first members of Talis's sales force" (¶81), as well as three sales executives (Defs.' Ex. 7 at 28).

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

response, Defendants point out that Talis would not "capitalize pre-launch inventory costs" prior to obtaining an EUA (MTD at 16:23-17:2), but that is irrelevant. The point is that once Talis obtained the EUA, under GAAP, only instruments could be sold to customers to generate at least $77.5 million in revenue. This confirms the materiality of the statement that Talis had "ordered 5,000 instruments."

**Hypothetical Risk Disclosures Do Not Apply:** Disclosures that Talis was "scaling up" and "faced significant manufacturing challenges" (MTD at 16:15-16) are irrelevant because risk disclosures "appl[y] only to affirmative, forward-looking statements." *Stac*, 89 F.3d at 1408. Here, Plaintiffs challenge no such statements. Instead, Plaintiffs challenge only "statements of historical fact," *Livid*, 416 F.3d at 948, and "descriptions of the present," which "aren't forward-looking." *Berson*, 527 F.3d at 990. In any event, no risk disclosure warned investors that the Talis One instruments had not been ordered and were not being manufactured. Hypothetical, general warnings that "supply *may* become limited or interrupted," "quality issues *may* arise during scale-up," and Talis's "tests may contain errors or defects" (Defs.' Ex. 7 at 20, 22, 25) "only discussed the possibility of future problems" and thus cannot "negate" Defendants' "misstatements." *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019) (risk disclosures "did not warn investors that any of the Credit Check Alerts were stale, let alone close to 70% of them").

**The Misstatements Were Material:** Defendants assert that investors would not have "valued Talis differently" if it had said it ordered "components" instead of instruments. (MTD at 17:13.) But determining materiality "requires delicate assessments" that "are peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Thus, materiality is a "question of fact," *Khoja*, 899 F.3d at 1013, and a "matter for trial," *Basic, Inc. v. Levinson*, 485 U.S. 224, 249 n.29 (1988). "[O]nly if . . . the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." *Fecht*, 70 F.3d at 1081 (cleaned up).

Defendants fall far short: The difference between what they said and the truth was plainly material. To begin, Defendants did not say (and Plaintiffs do not allege) that Talis had ordered "components" at the time of the IPO; the Court cannot assume facts outside the pleading.[23] *See, e.g.,*

---

[23] Talis first said it "ordered components" over a year *after* the IPO, on March 15, 2022 (¶225), but

*Khoja*, 899 F.3d at 1011-12.  Beyond that, components are not instruments.  Ordering 5,000 instruments for delivery within weeks was far different from merely procuring components that could potentially be used to build instruments in the future.[24]  Only instruments are "finished devices" under FDA regulations that can be sold to generate revenue under GAAP; the 5,000 instruments corresponded to at least $77.5 million in revenue for Talis.  ¶¶78-82.  Each instrument contained hundreds of components—which, unlike instruments, were simply raw materials that required time-consuming, complex assembly, had no independent value, and could not be sold.  ¶¶75-80.

Further confirming the material difference between instruments and components:

- A 1996 FDA release explained:  "[D]evices that have been *manufactured* or *assembled* . . . are *clearly not components*, but [meet] the definition of '*finished device*.'" Medical Devices; Current Good Manufacturing Practice (CGMP) Final Rule; Quality System Regulation, 61 FR 52602-01 (Oct. 7, 1996).

- Under FDA guidance, "*components are not finished devices*. . . ."  Medical Device Accessories Describing Accessories and Classification Pathways For New Accessory Types, Food Drug Cosm. L. Rep. P 350897, 2016 WL 7799659 (Dec. 30, 2016).

- A treatise explains:  "Simply put, *finished devices are those that can be used in their existing form*; components require incorporation with other items to result in a finished product."  Guide to Med. Device Reg. ¶611, 2017 WL 11025341.

In this context, the statement that Talis had "ordered 5,000 instruments"—and the impression that Talis had a "finished, tested product"—were highly material to investors.  *Platforms Wireless*, 617 F.3d at 1094-95.  "Whether [Talis] actually had products to sell is clearly relevant information to a potential investor." *SEC v. Enter. Solutions, Inc.*, 142 F. Supp. 2d 561, 577 (S.D.N.Y. 2001).

Defendants' claim that "myriad disclosures about instrument manufacturing" negated materiality (MTD at 17:18-19) fails:  disclosing potential *future* problems does not make *present* misstatements immaterial, much less true.[25]  *Supra* at 18.  Indeed, if anything, the risk disclosures made Defendants' statements *more* material:  they told investors that despite the risks, Talis had

that cannot be used to infer that components had been ordered over a year earlier.

[24] Moreover, Defendants do not dispute the materiality of their misstatements that the instruments were being "manufactured" and "assemble[d]" when they were not.

[25] Defendants also cite "disclosures" that have nothing to do with the misstatements.  For example, saying Talis did not have "commercial-scale manufacturing facilities" (MTD at 8:2) was irrelevant because Talis claimed to have "ordered 5,000 instruments" from a third-party manufacturer.  ¶68.

19

managed to develop a working product and ordered 5,000 instruments that were presently being built. None of that was true. And the purported "context" in Defendants' Exhibit 9 underscores the materiality of Defendants' misstatements. For example, stating that "instrument assembly is largely manual with some automation in testing" and that the "instrument contract manufacturer is scaling up to be able to make up to 500 instruments per week" detail the manner and rate of assembly, reinforcing the false narrative that Talis One instruments were presently being "assemble[d.]"

Moreover, Defendants' hindsight argument that Talis was "awaiting an EUA and could not have launched [for "nine months after" the IPO] regardless of how many instruments it had on hand" (MTD at 17:17-18) ignores controlling law. Materiality means a "'reasonable investor' would have considered the omitted information significant *at the time*." *Basic*, 485 U.S. at 232. Here, it was highly significant at the time of the IPO that Talis had actually ordered 5,000 instruments: the EUA submission was pending, and Talis held itself out as being weeks away from a "potential commercial launch." ¶58. Defendants cannot invoke the first EUA submission's failure *after* the IPO to argue that their misstatements were immaterial when *made*. And even after obtaining an EUA in November 2021, Talis still could not launch Talis One because it did not order (or have) 5,000 instruments.

Finally, Defendants ignore that when Talis removed the statement that it had "ordered 5,000 instruments" from its March 15, 2022 Form 10-K, Talis's share price immediately plunged 23%. ¶¶225, 228. Stock drops of such magnitude "indicate the materiality of this information to investors." *Pirani v. Slack*, 445 F. Supp. 3d 367, 386 (N.D. Cal. 2020).

### B.    False and Misleading Statements About Talis One's Reliability and Accuracy

Statements 3-7 represented that Talis One was highly accurate and reliable (¶127):

3. "The Talis One Platform incorporates core proprietary technologies into a compact, easy-to-use instrument, that utilizes single use test cartridges and software, including a central cloud database, which are designed to work together to *provide levels of testing accuracy equivalent to a central laboratory*."

4. "We designed the Talis One platform to provide *central lab levels of accuracy* at the point-of-care."

5. "The test cartridge for COVID-19 diagnosis contains a NAAT designed for optimal sensitivity and specificity to provide *highly accurate results*."

6. "*Highly accurate*—The Talis One platform incorporates a shelf-stable, single-use test cartridge that is designed to fully integrate a nucleic acid amplification test (NAAT) with

20

sample preparation, including nucleic acid extraction and purification. . . . In a preclinical assessment comparing the Talis One platform to a reference lab test on 60 matched anterior or mid-turbinate nasal specimens, the Talis One test exactly matched the reference lab results with 100% positive percentage agreement (PPA) and 100% negative percentage agreement (NPA) for detection of SARS-CoV-2, the virus that causes COVID-19." (Italics in original.)

7. "An important factor in our ability to commercialize our products is collecting data that supports the value proposition of our products, and in particular that our tests are *just as accurate and reliable as central lab testing*."

These statements were materially false and misleading when made because, at the time of the IPO, Talis One failed up to 20% of the time.  ¶¶131-32.  Addressing the Court's concern (Order at 28), the AC pinpoints these figures at the time of the IPO based on the knowledge of FE-6 and FE-8, senior executives who reported directly to CEO Coe.  FE-6 personally attended weekly meetings with Coe, CFO Moody and COO Liu where the failure rate between 10% and 20% in February 2021 was discussed (¶132), while FE-8 observed that at the time of the IPO, the invalid rate ranged from 5% to 15% among different lots of prototype devices, and rates over 10% were unacceptable (¶131).

These specific, quantitative observations—which must be taken as true—plausibly allege that Talis One was inaccurate and unreliable at the time of the IPO.  Defendants' responses ignore or misstate the AC.  Their assertions that Plaintiffs do not allege "high invalid rates existed at the time of the IPO," and that FE-6 did not say high failure rates were "shared during" weekly meetings (MTD at 24:2-3, 25:3), are simply wrong.[26]  Defendants' claim that there is an "internal contradiction for the particular cause" (MTD at 24:21-22) also fails.  There is no contradiction;[27] in any event, the "particular cause" is a red herring because the AC alleges the failure and invalid rates at the time of the IPO.  What mattered to doctors and hospitals—and to investors—was whether Talis One worked (*see* ¶¶122-3), not the reason for its failure.  And Defendants' demands for details such as "how many lots were in which invalid rate range" (MTD at 24:26) ask the Court to "impose an impossibly high burden" on Plaintiffs, *Glazer*, 2023 WL 2532061 at *14, and "cross[] into territory better evaluated on

---

[26] Defendants' citations to *Fadia* and *Kipling* fail for the reasons above (*supra* n.9):  neither involved an FE who attended meetings where the true facts were conveyed to individual defendants, as here.

[27] FE-2, 4, and 5 consistently attributed Talis One's unreliability to the cartridge.  ¶¶134, 143.

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

a motion for summary judgment." *Fitbit*, 2017 WL 219673 at *8.

### 1. The Statements Are Not Opinions and Are Actionable in All Events

#### a. The Statements Are Fact, Not Opinion

Defendants' efforts to recast their factual misstatements as opinions fail. "[A] statement of fact ('the coffee is hot') expresses certainty about a thing." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*, 575 U.S. 175, 183 (2015). Here, the accuracy and reliability statements "express[] certainty," *id.*, have nothing to do with subjective belief, and are capable of objective verification "as a factual matter" based on Talis's own documents. *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 739 (N.D. Cal. 2022) (statements about product performance not opinions).

**Unrelated "Performance Data":** Defendants argue that all five statements are opinions supported by "underlying performance data" at pages 127-28 of the Registration Statement. (MTD at 21:19.) This is specious for two reasons. First, the "performance data" ***did not measure or mention the failure or invalid rate***; instead, it only referred to Talis One's LoD and PPA and NPA against a comparator. (Defs.' Ex. 7 at 127-8.) Thus, none of the "data" reflected the fact that up to 20% of Talis One results were unusable, while competing products had invalid rates of 1-2% and central lab tests were near zero. Second, none of the statements was based on, or even cited, the "data" at pages 127-28 (with one narrow exception).[28] Indeed, some of the statements (at pages 24, 96, 117, 126, and 130) appear dozens of pages away. For example, Statement 3 (page 96) refers to "levels of testing accuracy equivalent to a central laboratory." No reasonable investor would connect this to a snippet of unrelated data at page 127, over thirty pages later. Unsurprisingly, Defendants cite no case holding that a statement was an opinion based on unrelated data not referenced in the statement itself.[29] *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012), is irrelevant because Talis One's

---

[28] The sole exception is Statement 6, which claims Talis One is "[h]ighly accurate." ¶127. While the statement also asserts that Talis One "exactly matched" the results of an unspecified "reference lab test," with 100% PPA and NPA, that does not negate the misleading impression of calling Talis One "[h]ighly accurate" when it yielded unusable results up to 20% of the time.

[29] In *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 581 (S.D.N.Y. 2018), the statement had a "factual basis" because there was no dispute that the company "had reached the point where it was entitled to recognize revenue." *Golubowski v. Robinhood Markets, Inc.*, 2023 WL 1927616, at *4 (N.D. Cal. Feb. 10, 2023), merely involved "accurately reported historical data."

22

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

inaccuracy and unreliability have nothing to do with "Talis's methodology."[30]  (MTD at 23:16.)

**"Designed to":**  The word "designed" does not convert facts to opinion or insulate Defendants where, as here, the "design" never worked.  *See QuantumScape*, 580 F. Supp. 3d at 724-25, 735-36 (sustaining statements that product was "***designed to***" have better performance and "***designed to*** enable up to 80% longer range compared to today's lithium-ion batteries" where "in reality, the QuantumScape batteries were not better than—and often were much worse than—conventional batteries").  Here, up to 20% of tests failed (and central lab tests had invalid rates at or near zero, ¶146).  It was thus materially misleading to say "[w]e designed the Talis One platform to provide central lab levels of accuracy at the point-of-care" (Statement 4).  By describing positive design characteristics—while concealing that they did not work—the statements created "the impression of a state of affairs that differ[ed] in a material way" from the reality at the time.  *Berson*, 527 F.3d at 985.  This Court applied the same principle in *Robb v. Fitbit, Inc.*, 216 F. Supp. 3d 1017, 1027-28 (N.D. Cal. 2016), finding that positive statements about dedication of resources to ensure accuracy were false and misleading because "Fitbit's heart rate tracking devices were frequently inaccurate and were particularly inaccurate during exercise."  *Id.*[31]

**"We Believe":**  Defendants assert that their statements were prefaced with "We believe," but those words do not appear in three of the five statements (Nos. 3, 5, and 7).  (*See* Defs.' Ex. 9.)  In Nos. 4 and 6, "We believe" only refers to whether Talis One's capabilities create a "competitive advantage" and to a "sample preparation step" that is not at issue.  *Id.*  This does not make the objective factual claims of "central lab levels of accuracy" and being "[h]ighly accurate" into opinions.[32]

### b.  The Statements Are Actionable as Opinions

Even if viewed as opinions, the statements are actionable on two independent grounds under

---

[30] *Padnes v. Scios Nova Inc.*, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996), is likewise irrelevant.

[31] Defendants' citation to *Colyer v. Acelrx Pharms., Inc.*, 2015 WL 7566809, at *6-10 (N.D. Cal. Nov. 25, 2015), fails.  There, the narrow statement said a device was "designed to address" issues with IV delivery, which did not speak broadly to "*all* complications" or "promise[]" a "perfect device."  *Id.* (emphasis in original).  Here, Talis One simply did not do what it was purportedly "designed" to do.

[32] In *In re Progenity, Inc. Sec. Litig.*, 2023 WL 219345, at *8-10 (S.D. Cal. Jan. 13, 2023), unlike here, the alleged misstatement began with "[w]e believe," and the allegedly concealed facts were disclosed. *Golubowski*, 2023 WL 1927616 at *8-10, merely involved puffery about corporate values.

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

*Omnicare*:  they (i) embedded materially false facts and (ii) omitted material facts going to the basis for the opinion.  First, the only two statements that contain the word "believe" (Nos. 4 and 6) embedded false factual assertions that Talis One was "designed . . . to provide central lab levels of accuracy" and was "[h]ighly accurate."  These "embedded statements of fact" were false because Talis One failed up to 20% of the time, making Statements 4 and 6 actionable.  *Omnicare*, 575 U.S. at 185.

Second, "[a] statement of opinion, even if literally accurate, may be rendered misleading by the omission of a material fact."  *Glazer*, 2023 WL 2532061 at *9.  Here, omitting the fact that up to 20% of tests failed made any opinion statements "misleading to a reasonable person reading the statement[s] fairly and in context."  *Omnicare*, 575 U.S. at 194.  The omitted facts (a) "relate directly to the basis for" the opinions (whether Talis One was "accurate" and "reliable"), (b) concern Defendants' "knowledge" (Coe and Moody knew about the failure rate from attending weekly meetings), and (c) "conflict with what a reasonable investor would take away from" the statements. *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017).  Thus, any opinion statements did not "fairly align[] with the information in [Defendants'] possession at the time."  *Omnicare*, 575 U.S. at 189.

### C.    Material Omissions in Violation of Item 105 and Item 303

Item 105 required Talis to disclose the material factors that made an investment in Talis "speculative or risky."  Item 303 required Talis to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(3)(a)(ii).

The Registration Statement violated these disclosure requirements by omitting that (1) Talis's comparator assay was not "high sensitivity" under the FDA's standard, threatening its rejection and the failure of Talis's EUA submission, and (2) Talis One's unreliability threatened to foreclose and/or dramatically delay its commercial launch.  Defendants identify no actual disclosure of these specific, material, and known risks and uncertainties, which threatened to delay—or prevent—the launch of Talis's only product as the window rapidly closed. ¶¶148-50.  Instead, they misstate what was omitted, then invoke irrelevant, boilerplate disclosures of general risks.  These efforts fail.

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

### 1.  Omission of the Material, Known Risk and Uncertainty That Talis's Comparator Assay Violated FDA Standards and Faced Rejection

Contrary to FDA standards, Talis's January 2021 EUA submission used a comparator assay with a 180,000 NDU/mL LoD.  ¶167.  This comparator assay was "low-sensitivity" and violated the FDA's objective definition of "high sensitivity," which called for an LoD below 18,000 NDU/mL. ¶¶18, 166-67.  Using a "low-sensitivity" assay materially heightened the risk of FDA rejection.  ¶181.

The AC plausibly alleges that this heightened risk of rejection was "known" to Talis management, as Item 303 requires, because Defendant Ismagilov described tests like Talis's comparator assay as "***low-sensitivity***" in his academic work—including in December 2020, shortly before the IPO.  ¶¶169-71.  Defendant Ismagilov's own words are a party admission—he co-founded Talis, presided over Talis One's development, and signed the Registration Statement.  ¶¶168, 170. And far from a "general comparison" (MTD at 28:7), Ismagilov's article provided a specific, quantitative definition:  he wrote that "low-sensitivity tests" had LoDs of at least 100,000 viral copies per milliliter ("$\sim10^5$–$10^7$ [100,000 to 10 million] RNA copies/mL").  ¶169.  Thus, Talis's comparator assay, at 180,000 NDU/mL, was a "low-sensitivity test[.]"  Because the FDA called for a "high sensitivity" comparator assay—but Talis used a "low-sensitivity" one according to its own co-founder—Item 105 and Item 303 required disclosure of the known, heightened risk and uncertainty that the FDA would reject Talis's comparator assay.[33]

In response, Defendants do not claim that Talis's comparator assay was "high sensitivity" under any definition.  Instead, they make four ancillary arguments.  Each fails.

First, Defendants wrongly claim that Talis "disclosed the precise information Plaintiffs accuse it of omitting."  (MTD at 26:12-13.)  Not so:  the Registration Statement omitted that Talis used a comparator assay contrary to the FDA's standard, and that this materially ***heightened*** the risk and uncertainty that the FDA would reject it.  ¶¶181-83.  A generic warning that Talis "could not ensure

---

[33] Ismagilov's April 2021 article defining "[h]igh-sensitivity" and "low sensitivity" assays also bolsters Defendants' violations of Item 303 and Item 105. ¶171.  While the article was released shortly after the IPO, it reiterated the December 2020 article's conclusions and was based on research started in September 2020, well before the IPO.  *Id.*  Defendants ignore the article's substance and merely cite the Court's Order, but the Court has not yet considered the April 2021 article.  (Order at 31 n.15.)

25

FDA approval" (MTD at 26:25) "did not fulfill [Defendants'] duty to inform the investing public of the particular, factually-based uncertainties of which [they were] aware." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 122 (2d Cir. 2012) (sustaining Item 303 omission); *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 769 n.4, 776 n.7 (N.D. Cal. 2020) (sustaining Item 105 and Item 303 omissions, despite "disclosures [of] hypothetical risk," where "severe risk" and "present reality" required disclosure). Defendants' inapposite cases involved specific disclosures, absent here.[34]

Further, Defendants cannot evade their disclosure duties by arguing that investors "would have been attuned" to Talis's violation of the FDA's standard (MTD at 26:20). Defendants never told investors that Talis's comparator assay was low-sensitivity, let alone that it violated the FDA's standard (or even that it had a heightened risk of doing so). As a result, this case bears no resemblance to *Tongue v. Sanofi*, 816 F.3d 199, 212-13 (2d Cir. 2016), where the defendants publicly stated that "they were relying on single-blind trials," and "the FDA ha[d] long made public its preference for double-blind trials."

Any suggestion that investors knew the truth because Talis reported the comparator assay's LoD as "180,000 NDU/mL" is an improper "truth on the market" argument and fails. The doctrine does not apply in Securities Act cases[35] and "is not available at the motion to dismiss stage." *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020) (rejecting defense). Moreover, investors are not required "to look beyond a given document to discover what is true and what is not." *Miller*, 519 F.3d at 887. Merely stating the comparator assay's LoD did not tell investors that it was "low-sensitivity" and violated FDA standards, which was "an omitted and "significant

---

[34] In *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017), the claimed omission was "the evolving regulatory regime in Hawaii," but the "registration statement included ample warning that [defendant's] business could be affected by evolving regulatory regimes, and named Hawaii in particular." *See also Belodoff v. Netlist*, 2009 WL 1293690, at *8 (C.D. Cal. Apr. 17, 2009) (no omission of "excessive" inventory where disclosures showed inventory levels "more than doubled"); *Berg v. Velocity Fin., Inc.*, 2021 WL 268250, at *9 (C.D. Cal. Jan. 25, 2021) (disclosures revealed "trends of increased short-term loans and nonperforming loans"). *Progenity*, 2023 WL 219345 at *14-15, involved deficient allegations of knowledge, which Defendants do not seriously challenge.

[35] As the Ninth Circuit has explained, unlike in "a 'fraud on the market' Rule 10b–5 class action, where reliance is presumed based on the price of a stock [and] availability to the public of truthful information may be relevant," under the Securities Act, "that truthful information is available elsewhere does not relieve a defendant from liability for misrepresentations." *Miller*, 519 F.3d at 887.

26

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

factor[] that make[s] an investment . . . risky." *Slack*, 445 F. Supp. 3d at 386-7 (sustaining Item 105 and 303 omissions where, "[a]lthough the disclosures do discuss the existence of Slack's SLAs," "the adequacy of Slack's disclosures [was] not so obvious that reasonable minds [could] not differ"; "[t]hat the SLA terms were already publicly available on Slack's website does not make its omission from the Offering Materials less material").

Second, the comparator assay's violation of the FDA standard was not "a difference in subjective scientific opinion." (MTD at 27:11-12.) Rather, the comparator assay simply did not meet the FDA's objective "high sensitivity" standard of 18,000 NDU/mL, and Defendant Ismagilov and the FDA *agreed* that such 180,000 NDU/mL assays are "low-sensitivity." That the FDA called its standard a "recommendation"[36] does not cure the omission; disclosure was required because doing the opposite of the FDA "recommendation" materially heightened the risk of rejection.[37] Nor can Defendants undermine the FDA's standard by citing an irrelevant test with an LoD of 600,000 NDU/mL. This extrinsic material cannot be considered (Pls.' RJN Opp. at 6), and Defendants do not claim this test was "high sensitivity" or that any manufacturer successfully used it as a comparator.[38]

Third, Plaintiffs do not allege omissions simply because the FDA posed questions or Talis pursued a second EUA. (MTD at 27:13-18.) Rather, to comply with Item 105 and 303, Defendants needed to disclose the heightened risk and uncertainty that were known to them at the time of the IPO, as detailed above. Defendants cannot dispute that they knew (a) the FDA's standard was "high sensitivity," and (b) Talis's comparator assay was "low-sensitivity" based on Ismagilov's research.

Fourth, in January 2021, shortly before Talis's IPO, Talis's competitor Lucira stated that "*[a]ll the FDA EUA authorized high sensitivity molecular assays have an LoD of 1,000 [copies]/mL VTM*

___

[36] FDA employees may "depart" from recommendations "only with appropriate justification and supervisory concurrence." 21 C.F.R. § 10.115(d)(3). Moreover, by statute, EUAs require "data from adequate and well-controlled clinical trials, if available." 21 U.S.C. § 360bbb-3(c)(2). It is far from clear that data based on a low-sensitivity comparator assay would meet this statutory requirement.

[37] Defendants cite an extrinsic statement from FDA Director Stenzel that "we don't look in particular at LOD" (MTD at 5:8-13) out of context. (Pls.' RJN Opp. at 7.) In all events, it does not overcome Stenzel's statement to use the "best possible standard" (¶178), the FDA's written "high sensitivity" standard, the AC's allegation that this required an LoD of 18,000 NDU/mL or lower (¶166), Ismagilov's articles (¶¶169, 171), or Lucira's statements (¶176).

[38] A test is not "high sensitivity" simply because it is FDA-approved. ¶174.

27

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

equivalent or lower" (¶176)—far more sensitive than Talis's 180,000 NDU/mL comparator assay.

In response, Defendants assert that in one clinical study, Lucira "used a comparator assay with the *same* [180,000 NDU/mL] sensitivity as Talis's" (MTD at 27:25-28 (emphasis in original)). But this is grossly misleading. Lucira *did not use* the 180,000 NDU/mL comparator assay to obtain its EUA. Instead, Lucira's EUA submission used a different comparator assay, the Hologic Panther Fusion, with an LoD of 600 NDU/mL (*see* Defs.' Ex. 4 at 7)—a "*high sensitivity*" test that was 300 times better than Talis's comparator assay. *See* ¶177. Defendants omit this fact. Despite filing other pages of Lucira's S-1, they selectively omitted the page stating that Lucira used "the Hologic Panther Fusion as a comparator assay" in its EUA submission. (Fonti Decl. Ex. 1 at 130; Pls.' RJN.)[39]

### 2. Omission of the Material, Known Risk and Uncertainty of Talis One's Unreliability

Defendants do not dispute that Talis One's unreliability threatened to foreclose and/or dramatically delay its commercial launch. Instead, they offer three unpersuasive arguments for why omitting this material, known risk and uncertainty did not violate Item 105 and 303.

First, Defendants claim Talis's disclosures were sufficient. However, Defendants solely point to general, hypothetical disclosures that delays and quality issues might arise in the *future*, while the omission is that the *existing*, known failure rate and invalid rate *heightened* the risk that of foreclosing or delaying launch. Nothing in the Registration Statement disclosed anything about that, making Defendants' disclosures inadequate. *See Lyft*, 484 F. Supp. 3d at 769 n.4, 776 n.7.

Second, as to Item 303, Defendants dispute knowledge, but this simply ignores the AC's allegations. As detailed above, the failure rate was up to 20% in February 2021; Defendants Coe and Moody knew this from personally attending weekly meetings where it was discussed. ¶132.[40]

Third, Defendants attack a straw man by disputing whether the FDA required invalid rates to be below 10%. Separate and apart from the FDA's standard, a failure rate of up to 20% and invalid

---

[39] Defendants also cite Lucira's statement that sensitivity "does not reflect an assay's LoD." But this cannot overcome the FDA's "high sensitivity" standard of an 18,000 NDU/mL LoD (¶166) or the fact that there were no "high sensitivity" tests over 1,000 copies/mL as of January 2021 (¶176).

[40] These facts are sharply different from *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir.), a fraud case where the allegations failed Rule 9(b) and the PSLRA's heightened standard because they did not connect specific information to the individual defendants.

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

rate of up to 15% are material—as Defendants do not dispute—and doomed Talis One. Where competing products had invalid rates of just 1-2% (¶126), a far less reliable product that cost $15,000 was dead on arrival. Indeed, Talis itself considered invalid rates over 10% to be unacceptable. ¶131. And as Talis CEO Kelley admitted in March 2022, the FDA said "you had to be below 10% to have a viable product." ¶227. Plaintiffs do not use this admission to "create knowledge in hindsight" or to show the invalid rate "at the time of the IPO" (MTD at 29:14-15), but simply to confirm that the unreliability FE-6 and 8 observed at the IPO was also unacceptable to the FDA—and the market.

## VI.    DEFENDANTS FAIL TO PROVE NEGATIVE CAUSATION

Under Section 11's statutory formula, damages are the "difference between" the security's offering price and "the value thereof at the time such suit was brought." 15 U.S.C. § 77k(e). "The affirmative defense of negative causation prevents recovery for losses that the defendant proves are not attributable to the alleged misrepresentation or omission in the registration statement." *Hildes*, 734 F.3d at 860 (reversing dismissal). Defendants bear the "burden of proof" on this defense, *id.*, which is "heavy." *Fitbit*, 216 F. Supp. 3d at 1036.

The Court need not address Defendants' "fact-intensive" argument now, as negative causation is "generally established . . . on a motion for summary judgment or at trial." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1171 (C.D. Cal. 2008) (rejecting defense on motion to dismiss); *Fitbit*, 216 F. Supp. 3d at 1036 (same). Nonetheless, Defendants fail to prove that Talis stock's entire decline in value was not attributable to the misstatements and omissions.

First, by the January 7, 2022 time of suit, Talis's share price had *already* declined from the $16.00 IPO price to $3.31. ¶208. Defendants fail to show that any—much less all—of this $12.69 decline "resulted from factors other than" their misstatements and omissions. *Hildes*, 734 F.3d at 860. In particular, Defendants fail to "prove[]," 15 U.S.C. § 77k(e), that this entire decline was unrelated to the misstatements and omissions. Standing alone, this forecloses their argument.

Second, Defendants wrongly assert that Talis One's high invalid rate and Talis's failure to order "instruments" were only revealed in a single disclosure after January 7, 2022. But "[o]vercoming a negative causation defense requires merely that 'the misrepresentation touches upon the reasons for an investment's decline in value.'" *Fitbit*, 216 F. Supp. 3d at 1036 (quoting *Hildes*,

29

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

734 F.3d at 860).  The AC meets this standard because "the same facts" Defendants misstated and concealed—Talis's failure to order 5,000 instruments, Talis One's unreliability, and the flawed comparator assay—left Talis unable to launch Talis One, and Talis's share price dropped.  ¶207.  The AC also alleges that "the concealed truth gradually emerged," with several corrective events starting shortly after the IPO.  ¶¶207-34.[41]  Defendants cite no case dismissing on negative causation grounds where multiple corrective disclosures caused a price decline *before* suit, as here.[42]

Third, Defendants cannot exploit the fact that they waited until March 15, 2022 to make their final corrective disclosure.  That is because Section 11 measures damages based on the security's "value" at the time of suit, rather than its "market price."  *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 165-66 (2d Cir. 2012).  "[T]he term 'value' in section 11(e) was intended to mean the security's true value *after* the alleged misrepresentations are made public."  *McMahan & Co. v. Wherehouse Ent., Inc.*, 65 F.3d 1044, 1048 (2d Cir. 1995).  Thus, where there is a "series of partial corrective disclosures," as here, "the market price may remain partially inflated" at the time of suit.  *In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209, 220 (C.D. Cal. 2019).  Here, on January 7, 2022, the market price of Talis stock remained partially inflated at $3.31, while its "actual value was significantly lower."  ¶208.  When Talis admitted the high invalid rates and removed the statement that it had "ordered 5,000 instruments" on March 15, 2022, its stock dropped 23%.  ¶228.  This material decline—together with the pre-suit decline—is recoverable under Section 11.

## VII.   CONCLUSION

The MTD should be denied.[43]  Alternatively, Plaintiffs respectfully request leave to amend.

---

[41] Notably, Defendants' negative causation argument wholly ignores their actionable omissions about the comparator assay, which drove a 12.3% stock drop in March 2021.  ¶¶211-12.

[42] *In re Velti Sec. Litig.*, 2015 WL 5736589, at *29 (N.D. Cal. Oct. 1, 2015), involved a single stock drop after the plaintiff "sold all of its" shares, while here, all Plaintiffs held shares through numerous drops.  (*See* ECF 74 Exs. A-C.)  *In re Merrill Lynch Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 254-55 (S.D.N.Y. 2003), involved an investment that lost most of its value before any corrective disclosure.

[43] Defendants raise no distinct arguments concerning the "control person" claims (MTD at 30:24-25).

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

Dated: March 24, 2023                           Respectfully submitted,


By: */s/ Joseph A. Fonti*                        By: */s/ Jonathan D. Park*
**BLEICHMAR FONTI & AULD LLP**                   **POMERANTZ LLP**
Joseph A. Fonti (*pro hac vice*)                 Jennifer Pafiti (Bar No. 282790)
jfonti@bfalaw.com                                1100 Glendon Avenue, 15th Floor
Evan A. Kubota (*pro hac vice*)                  Los Angeles, California 90024
ekubota@bfalaw.com                               Telephone: (310) 405-7190
7 Times Square, 27th Floor                       Facsimile: (212) 661-8665
New York, New York 10036                         jpafiti@pomlaw.com
Tel: (212) 789-1340
Fax: (212) 205-3960                              Jeremy A. Lieberman (*pro hac vice* application
                                                 forthcoming)
       – and –                                   J. Alexander Hood II (*pro hac vice*)
                                                 James M. LoPiano (*pro hac vice*)
Lesley E. Weaver (Bar No. 191305)                Jonathan D. Park (*pro hac vice*)
lweaver@bfalaw.com                               600 Third Avenue, 20th Floor
Matthew S. Melamed (Bar No. 260272)              New York, New York 10016
mmelamed@bfalaw.com                              Telephone: (212) 661-1100
555 12th Street, Suite 1600                      Facsimile: (212) 661-8665
Oakland, California 94607                         jalieberman@pomlaw.com
Tel.: (415) 445-4003                             ahood@pomlaw.com
Fax: (415) 445-4020                              jlopiano@pomlaw.com
                                                 jpark@pomlaw.com
*Counsel for Co-Lead Plaintiff Martin Dugan
and Co-Lead Counsel for the Putative Class*      *Counsel for Co-Lead Plaintiff Leon Yu
                                                 and Max Wisdom Technology Limited and
**THE SCHALL LAW FIRM**                          Co-Lead Counsel for the Putative Class*
Brian Schall (Bar No. 290685)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Co-Lead Plaintiff
Martin Dugan*

31

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT

**CERTIFICATION**

I, Joseph A. Fonti, am the ECF user whose identification and password are being used to file this **CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT**.  In compliance with Civil Local Rule 5-1(i), I hereby attest that all other signatories listed and on whose belief this filing is submitted have authorized this filing and concur in its content.

/s/ *Joseph A. Fonti*
Joseph A. Fonti

32

CO-LEAD PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT