COOLEY LLP
Patrick E. Gibbs (183174)
(pgibbs@cooley.com)
Shannon M. Eagan (212830)
(seagan@cooley.com)
Samantha A. Kirby (307917)
(skirby@cooley.com)
Jessie Simpson LaGoy (305257)
(jsimpsonlagoy@cooley.com)
3175 Hanover Street
Palo Alto, California 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

*Attorneys for Defendants Talis Biomedical Corporation,
Brian Coe, J. Roger Moody, Jr., Felix Baker, Raymond
Cheong, Melissa Gilliam, Rustem F. Ismagilov,
Kimberly J. Popovits, Matthew L. Posard, and Randal
Scott*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TALIS BIOMEDICAL SECURITIES LITIGATION | Case No. 22-cv-00105-SI |
| | CLASS ACTION |
| THIS DOCUMENT RELATES TO: | **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| ALL ACTIONS | |
| | Date:        May 5, 2023 |
| | Time:        10:00 A.M. |
| | Courtroom:   1 |
| | Judge:       Hon. Susan Illston |

COOLEY LLP

REPLY ISO DEFS.' MTD
CASE NO. 22-CV-00105-SI

TABLE OF CONTENTS

PAGE

I.      Introduction. ............................................................................................................ 1

II.     Rule 9(b) Should Apply Because the AC Sounds in Fraud. ................................... 3

III.    Plaintiffs Fail to State a Claim as to Statements 1-2. ............................................ 4

        A.      Plaintiffs' Claim Depends on an Implausible Reading of the Registration
                Statement. ................................................................................................... 4

        B.      Plaintiffs Failed to Plead a Materially False Statement. ........................... 6

                1.      Plaintiffs' Allegations and Removed Allegations Contradict Their
                        Claim. .............................................................................................. 6

                2.      Plaintiffs Unreliably Attack Immaterial Details Rather Than Plead
                        Falsity. ............................................................................................. 7

        C.      Plaintiffs Failed to Plead a Materially Misleading Statement. ............................... 10

IV.     Plaintiffs Fail to State a Claim as to Statements 3-7. ........................................... 11

        A.      Plaintiffs' Allegations Regarding Failure and Invalid Rates Are Conclusory
                and Untethered to Any Applicable Regulatory Standard. ..................................... 11

        B.      The Invalid and Failure Rate Allegations Lack Specificity and Are
                Unreliable. ................................................................................................ 12

        C.      Plaintiffs' Allegations Do Not Establish the Alleged Failure or Invalid Rates
                Were Known to Defendants at the Time of the IPO. ............................................. 13

        D.      The Challenged Statements Are Non-Actionable Opinions. ................................ 14

V.      Talis Did Not Omit Material Risks Regarding Talis One's Reliability. ........................... 16

VI.     Plaintiffs' Challenge to Comparator Assay Sensitivity Fails. ............................................ 16

VII.    The AC Fails Because of Negative Causation. .................................................... 17

VIII.   Conclusion ............................................................................................................ 18

**TABLE OF AUTHORITIES**

**PAGE(S)**

**Cases**

*In re Allied Nevada Gold Corp. Sec. Litig.*,
  743 F. App'x 887 (9th Cir. 2018) .................................................................. 13

*In re Atossa Genetics Inc Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017).......................................................................... 14

*Belodoff v. Netlist, Inc.*,
  2008 WL 2356699 (C.D. Cal. May 30, 2008) ................................................ 3

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008)................................................................... 10, 15

*Colyer v. Acelrx Pharms., Inc.*,
  2015 WL 7566809 (N.D. Cal. Nov. 25, 2015)............................................... 15

*Dubuque v. Boeing Co.*,
  325 F.R.D. 296 (E.D. Mo. 2018) ................................................................... 16

*In re Eventbrite, Inc. Sec. Litig.*,
  2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ......................................... 4, 5, 9, 10

*Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*,
  68 F. Supp. 3d 486 (S.D.N.Y. 2014)............................................................... 18

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ................................................................ 8, 12, 13, 14

*Hildes v. Arthur Andersen LLP*,
  734 F.3d 854 (9th Cir. 2013)..................................................................... 17, 18

*Hoang v. ContextLogic, Inc.*,
  21-cv-03930-BLF, ECF 98 (N.D. Cal. Mar. 10, 2023).............................. 4, 6, 11

*Howard v. Arconic Inc.*,
  395 F. Supp. 3d 516 (W.D. Pa. 2019)............................................................. 12

*In re Intrexon Corp. Sec. Litig.*,
  2017 WL 732952 (N.D. Cal. Feb. 24, 2017) .................................................. 11

*Katz v. China Century Dragon Media, Inc.*,
  2011 WL 6047093 (C.D. Cal. Nov. 30, 2011)................................................. 3

*Khoja v. Orexigen Therap., Inc.*,
  899 F.3d 988 (9th Cir. 2018)........................................................................... 9

COOLEY LLP

REPLY ISO DEFS.' MTD
CASE NO. 22-CV-00105-SI

**TABLE OF AUTHORITIES**
(continued)

PAGE(S)

*Kipling v. Flex Ltd.*,
2020 WL 7261314 (N.D. Cal. Dec. 10, 2020) ........................................................................ 12

*In re Lendingclub Sec. Litig.*,
282 F. Supp. 3d 1171 (N.D. Cal. 2017) ................................................................................. 18

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005)................................................................................................. 10

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016)............................................................................................... 13

*Lu v. Align Tech., Inc.*,
417 F. Supp. 3d 1266 (N.D. Cal. 2019) .................................................................................. 5

*Mallen v. Alphatec Holdings, Inc.*,
2013 WL 1294640 (S.D. Cal. Mar. 28, 2013) ...................................................................... 16

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
65 F.3d 1044 (2d Cir. 1995).................................................................................................. 18

*Miller v. Thane Intern., Inc.*,
519 F.3d 879 (9th Cir. 2008).................................................................................................. 10

*Mulquin v. Nektar Therapeutics*,
510 F. Supp. 3d 854 (N.D. Cal. 2020) .................................................................................. 12

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012).................................................................................................. 18

*Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
300 F. Supp. 3d 551 (S.D.N.Y. 2018)................................................................................... 15

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
780 F. App'x 480 (9th Cir. 2019) ......................................................................................... 10

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)....................................................................................................... 1, 4, 10

*In re Orange 21 Inc. Sec. Litig.*,
2006 WL 8455352 (S.D. Cal. Mar. 30, 2006) ........................................................................ 3

*Primo v. Pac. Biosciences of California, Inc.*,
940 F. Supp. 2d 1105 (N.D. Cal. 2013) .................................................................................. 7

*In re Progenity, Inc. Sec. Litig.*,
2023 WL 219345 (S.D. Cal. Jan. 13, 2023)........................................................................... 13

COOLEY LLP

iii

**TABLE OF AUTHORITIES**
**(continued)**

PAGE(S)

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022) ................................................................ 15

*In re Resonant Inc. Sec. Litig.*,
  2016 WL 1737959 (C.D. Cal. Feb. 8, 2016) ........................................................ 14

*Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ......................................................................... 4, 11

*Robb v. Fitbit Inc.*,
  216 F. Supp. 3d 1017 (N.D. Cal. 2016) ................................................... 15, 16, 18

*Rubke v. Capitol Bancorp Ltd*,
  551 F.3d 1156 (9th Cir. 2009) .............................................................................. 3

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
  485 F. Supp. 3d 1113 (N.D. Cal. 2020) ............................................................... 14

*SEC v. Enter. Solutions, Inc.*,
  142 F. Supp. 2d 561 (S.D.N.Y. 2001) ............................................................ 10, 11

*SEC v. Platforms Wireless Int'l Corp.*,
  617 F.3d 1072 (9th Cir. 2010) ............................................................................ 10

*In re Snap Inc. Sec. Litig.*,
  2018 WL 3816764 (C.D. Cal. Aug. 8, 2018) ........................................................ 18

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) .............................................................................. 17

*In re Stac Elec. Sec. Litig.*,
   89 F.3d 1399 .................................................................................................... 10

*Stack v. Lobo*,
  1995 WL 241448 (N.D. Cal. Apr. 20, 1995) ........................................................ 13

*In re Talis Biomedical Corp. Sec. Litig.*,
  2022 WL 17551984 (N.D. Cal. Dec. 9, 2022) ................................................. *passim*

*Tongue v. Sanofi*,
  816 F.3d 199 (2d Cir. 2016) ............................................................................... 17

*In re Velti PLC Sec. Litig.*,
  2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ........................................................ 18

**TABLE OF AUTHORITIES**
**(continued)**

PAGE(S)

*Weller v. Scout Analytics, Inc.*,
   230 F. Supp. 3d 1085 (N.D. Cal. 2017) ................................................................. 4, 5, 7

**Statutes**

15 U.S.C. § 77k(e) ........................................................................................................ 18

21 U.S.C. § 360bbb-3(e)(3) ............................................................................................ 9

**Other Authorities**

21 C.F.R. § 820 ............................................................................................................... 9

Fed. R. Civ. P.
   8.................................................................................................................................. 6
   9(b) ........................................................................................................................ 3, 6

COOLEY LLP

## I.    INTRODUCTION.

Plaintiffs' Opposition confirms that the Amended Complaint ("AC") depends on an implausible reading that strips the Registration Statement of all context, relies on vague and conclusory allegations from former employees, and invents FDA "standards" and "requirements" out of thin air. The AC should be dismissed with prejudice.[1]

**Manufacturing and Instrument Orders:** Plaintiffs claim that reasonable investors interpreted the "manufacturing" and "ordered 5,000 instruments" statements (Statements 1-2) to mean that Talis was manufacturing products at scale and would generate nearly $100 million in revenue soon after the IPO. ¶¶ 70-73, 81. But the Registration Statement said Talis was *not* manufacturing at scale, had just begun scaling its manufacturing lines for a key component (cartridges), had no sales team, had no products approved for sale, could not assure investors it would obtain an EUA, and "did not expect to generate any meaningful revenue unless and until [it] obtain[ed] regulatory approval." Ex. 7 at 105. Plaintiffs make no effort to reconcile their interpretation of the Registration Statement with these disclosures, merely waving them off as "irrelevant." ECF 109 ("Opp.") at 18. But courts and reasonable investors alike must assess statements "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). The surrounding disclosures and context are relevant and contrary to Plaintiffs' interpretation.

Plaintiffs' claim also fails because their allegations suffer from internal contradictions and fatal gaps. Plaintiffs simultaneously allege that Talis was both not manufacturing or ordering instruments, yet also had "different lots" of "devices" as of the IPO. ¶ 131. No FEs identify the source of the instruments that Talis had on hand, and none of them claims that Talis itself manufactured the instruments. Unable to explain where these devices came from if Talis had not ordered any, Plaintiffs again cast this vital pleading gap as "irrelevant." Opp. 14, n.15. The Court should not credit Plaintiffs' immaculate-conception theory of manufacturing.

Elsewhere, Plaintiffs quibble over minutiae—such as where Talis's manufacturer assembled instruments or whether Talis had paid for the orders—in hopes the Court will infer that Talis never

---

[1] All references to "¶" refer to the AC.  All emphases are added unless otherwise noted.

ordered 5,000 instruments, but Plaintiffs have not alleged facts plausibly suggesting falsity. The AC does ***not*** challenge as false or misleading the Registration Statement's disclosure that Talis had "non-cancellable contractual obligations" of "$33.0 million" in "Talis One instruments" and had secured a $33 million letter of credit "as terms of collateral that were required by one of [its] contract manufacturing organizations." Ex. 7 at 108. Instead, the Opposition speculates that Talis "entered 'purchase commitments' and obtained a LoC to bolster the appearance of a real product." But the AC alleges no such facts. Opp. 15 (citing no AC allegations).

**Accuracy and Reliability:** Plaintiffs next challenge five statements (Statements 3-7) about Talis's product design and value proposition as false or misleading by claiming the Talis One experienced high invalid rates or failure rates. Plaintiffs allege that "the FDA requires invalid rates to be below 10%," ¶ 125, but that standard—plucked from FDA guidance regarding *pooled samples*—is inapplicable to Talis's diagnostic test. Plaintiffs then fall back on alleged "failure rates"—an unsubstantiated, undefined term used only by an unreliable HR employee (FE-6). ¶¶ 124, 135. Regardless, Plaintiffs' claim fails because the AC does not allege any specific invalid or failure rates that existed as of the IPO and were known by management. Plaintiffs cite FE-6 to claim these failure rates were "discussed" at meetings but does not identify either the source or the content of any such discussions. Moreover, FE-6 said only that a "10-20%" "failure rate" existed in "***February 2021***," ¶ 132, which does not plausibly allege a known failure rate as of the ***February 11, 2021*** IPO date. Plaintiffs rely on FE-8's single-paragraph conclusion that Talis had invalid rates from "5% to 15%," without specifying where within that range Talis's invalid rates fell at the time of the IPO, when or how FE-8 arrived at that conclusion, or whether Defendants knew about those alleged invalid rates. ¶ 131.

**Sensitivity:** Plaintiffs' challenge to the sensitivity of the comparator assay used in Talis' EUA submission fails for the same reason as before: Plaintiffs failed to plausibly allege "that the FDA had set forth objective criteria for the sensitivity of a comparator assay." *In re Talis Biomedical Corp. Sec. Litig.*, 2022 WL 17551984, at *20 (N.D. Cal. Dec. 9, 2022) ("Order"). For the first time, Plaintiffs contend that the FDA set an objective sensitivity standard at 18,000 NDU/mL, but the

COOLEY LLP

REPLY ISO DEFS.' MTD
CASE NO. 22-CV-00105-SI

AC and Opposition *provide no FDA authority* to support this legal conclusion, let alone allege *when* this supposed standard took effect.

**Negative Causation:** Finally, Plaintiffs complain that negative causation is too "fact intensive" to decide now. But the Opposition nowhere confronts Plaintiffs' own allegation that two months after they filed suit, Talis made its "first public recognition … that the Talis One suffered from high invalid rates," ¶ 227, and disclosed "new" information that it had ordered 5,000 components rather than 5,000 instruments. ¶¶ 224-25. As a matter of law, those alleged corrective disclosures could not have caused the earlier stock drop before Plaintiffs filed suit—which coincided with Talis's failure to obtain an EUA and executive turnover.

Plaintiffs' attempt to cure their pleading has failed. Like the complaint that preceded it, the AC should be dismissed for failure to state a claim, this time with prejudice.

## II.    RULE 9(B) SHOULD APPLY BECAUSE THE AC SOUNDS IN FRAUD.

The AC sounds in fraud and is subject to Rule 9(b). ECF 107 ("Mot.") at 13-14. Plaintiffs offer no meaningful counter, and do not deny that the AC rehashes the same fraud-based allegations from the initial complaint. *See Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (courts may "assume" Section 11 claims "sound[] in fraud" when based on same allegations as 10(b) claims); Mot. 14, n.6.

Contrary to Plaintiffs' argument (Opp. 6), courts in this Circuit *do* apply Rule 9(b) to standalone Securities Act claims sounding in fraud. *See, e.g., Katz v. China Century Dragon Media, Inc.*, 2011 WL 6047093, at *3-4 (C.D. Cal. Nov. 30, 2011) (applying Rule 9(b) to Securities Act claims, noting a "complaint's disclaimer that its claims do not sound in fraud does not affect the requirement to plead in accordance with Rule 9(b) if the claims in fact sound in fraud"); *In re Orange 21 Inc. Sec. Litig.*, 2006 WL 8455352, at *2 (S.D. Cal. Mar. 30, 2006) (applying Rule 9(b) to Section 11 and 15 claims where the "gravamen of the … Complaint [was] fraud"); *Belodoff v. Netlist, Inc.*, 2008 WL 2356699, at *6-7 (C.D. Cal. May 30, 2008) (applying Rule 9(b) to Section 11 claim which was "grounded in fraud" and dismissing claim). Having previously asserted fraud claims challenging the same statements on the same basis, Plaintiffs cannot avoid Rule 9(b)'s heightened standard just by slapping a different label on their claims.

In any event, Plaintiffs still fail to plead a claim under any standard.

### III.    PLAINTIFFS FAIL TO STATE A CLAIM AS TO STATEMENTS 1-2.

Plaintiffs' challenge to Statements 1-2 (Ex. 7 at 118, 135) fails because it rests on an implausible reading of the Registration Statement. Moreover, the allegedly undisclosed "facts" do not render the Registration Statement false or misleading, much less materially so.

**A.   Plaintiffs' Claim Depends on an Implausible Reading of the Registration Statement.**

Plaintiffs claim the Registration Statement created the impression that Talis was manufacturing products at scale and would generate massive revenue soon after the IPO. ¶¶ 70-73; Opp. 19. But the Registration Statement made clear that Talis was not manufacturing at scale, had no products approved to sell or a sales force to sell them, and did not expect to generate revenue unless and until it obtained an EUA. Ex. 7 at 20, 135, 9, 105.

Plaintiffs ask the Court to ignore this and all other language in the Registration Statement, except for the two sentences they cite. But the proper inquiry is not whether challenged statements convey a false or misleading fact in isolation, but rather whether the Registration Statement as a whole conveys that fact. *See Omnicare,* 575 U.S. at 190; *Hoang v. ContextLogic, Inc.*, 21-cv-03930-BLF, ECF 98 at *20 (N.D. Cal. Mar. 10, 2023) (explaining court "must" "read[] the Registration Statement as a whole" and dismissing Section 11 claim based on implausible interpretation).

Applying the proper inquiry, courts regularly dismiss securities claims based on unreasonable interpretations of challenged statements. *See, e.g., Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1277 (9th Cir. 2017) ("It simply cannot be that a reasonable investor's decision would conceivably have been affected by [the statement]"). Investors do not ignore the context of a registration statement, nor do courts countenance claims based on implausible interpretations. *See In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at *13 (N.D. Cal. Apr. 28, 2020) (plaintiff's "suggestion … is simply not a plausible interpretation"); *Weller v. Scout Analytics, Inc.*, 230 F. Supp. 3d 1085, 1093-94 (N.D. Cal. 2017) (similar). This case should be no exception. Plaintiffs' strained reading of Statements 1-2 is untenable in the context of

COOLEY LLP

REPLY ISO DEFS.' MTD
CASE NO. 22-CV-00105-SI

the full Registration Statement.[2]

*First*, in arguing that the Registration Statement promised investors tens of millions of dollars in near-term revenue, Plaintiffs try to cast Talis's need for an EUA prior to generating revenue as "irrelevant" and a mere "hindsight argument." Opp. 18, 20. But that misses the point. Regardless of how long FDA authorization eventually took, the Registration Statement made clear that Talis "did ***not*** expect to generate any meaningful revenue unless and until [it] obtain[ed] regulatory approval." Ex. 7 at 105. Together with the many other hurdles and uncertainties that Talis disclosed, Order at *5-6, 12; Mot. 6-8, the lack of regulatory authorization—which Talis warned was uncertain—made it unreasonable for any investor to read "manufactured" and "ordered 5,000 instruments" as a promise that Talis would generate nearly $100 million in revenue shortly after the IPO. *See Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276 (N.D. Cal. 2019) (plaintiff cannot "cherry-pick[] portions of Defendants' statements and ignore[e] other portions," and then "ask[] the Court to make inferences contradicted by the statements viewed properly as a whole").

*Second*, the AC asserts that the "Registration Statement made clear that an 'instrument' is a complete, finished device" based on an *image* depicting the instrument portion of the Talis One. ¶ 74. The Opposition does not explain how an investor would reach that conclusion based on an image, particularly when Talis did not use the term "finished device" or "finished good." Instead, Plaintiffs pretend the term "finished device" appears in the challenged statements, and then extrapolate conclusions investors *would* reach if Talis *had* used that term based on GAAP principles and inapplicable FDA regulations. ¶¶ 79-81, 85; Opp. 17, 19. But the "reasons Plaintiff[s] offer[] as to 'why the statement is false or misleading' bear no connection to the substance of the statement itself." *See Weller*, 230 F. Supp. 3d at 1094 (N.D. Cal. 2017) (dismissing claim when statement did not mention the challenged term); *Eventbrite*, 2020 WL 2042078, at *12-13 (similar).

Plaintiffs try to misdirect by arguing that other portions of the Registration Statement provide

---

[2] Plaintiffs claim: the "FDA Authorization Process [i]s [i]rrelevant," Opp. 17; Talis's risk disclosures regarding manufacturing scale up and potential for an EUA mean nothing, *id.* at 18 ("Disclosures … are irrelevant"); Talis's numerous warnings to investors that the "future commercialization" and "future economic benefit" would not be "considered probable" "prior to obtaining an EUA," Mot. 16-17, is "irrelevant." Opp. 18; and the telling silence from FE-8 (and all other FEs) regarding who manufactured the "lots" of "devices" is "irrelevant." *id.* at 14 n.15; ¶ 131.

a basis for how reasonable investors would reach Plaintiffs' desired interpretation, but the statements they now invoke are all forward-looking and peppered with caveats. Opp. 16 (citing Ex. 7 at 8 ("We *intend to offer* … we *expect to* generate revenue" prior to risk disclosures)).[3] None of them bolsters Plaintiffs' otherwise implausible reading.

*Third*, Plaintiffs' interpretation ignores the commercial context. Plaintiffs falsely argue that the instrument was Talis's "sole product," Opp. 16, but ignore that Talis "intend[ed] to commercialize Talis One as an integrated platform comprising single use consumables [i.e. cartridges], *an instrument* and software," Ex. 7 at 96, and as of the IPO, Talis had not brought its cartridge manufacturing online. *Id.* at 20, 105. That matters because without scaling its cartridge lines, no reasonable investor "would have the misimpression" that that Talis was imminently expecting to sell instruments without cartridges. *See Hoang*, at *30 (dismissing securities claim).

## B. Plaintiffs Failed to Plead a Materially False Statement.

Plaintiffs' claim also fails because they have not pled a materially false statement. Plaintiffs' allegations suffer from internal contradictions, glaring gaps, conclusory allegations about irrelevant points, and the Opposition raises arguments they failed to plead.

### 1. Plaintiffs' Allegations and Removed Allegations Contradict Their Claim.

Plaintiffs' reliability claim—in which they allege that Talis had instruments on hand before the IPO—contradicts their manufacturing claim that no instruments had been ordered, manufactured, or delivered as of the IPO. That alone dooms this claim. *See Hoang*, at *18 ("Contradictory allegations such as these are inherently implausible, and fail to comply with Rule 8, *Twombly,* and *Iqbal*, much less Rule 9(b)'s heightened pleading standard.") (collecting cases).

Plaintiffs make no effort to explain these contradictions. For example, FE-8 contends that Talis had "different lots" of "devices" as of the IPO, but is silent as to *who* manufactured those products. ¶ 131. Plaintiffs deem their pleading gap "irrelevant," Opp. 14 n.15, hoping silence will redound to their benefit. But, tellingly, FE-8 is not alleged to have said that Talis itself manufactured these

---

[3] Similarly, Plaintiffs' suggestion that a reference to a "*potential* commercial launch" conveyed an expectation of near-term revenue ignores that this forward-looking statement directly followed statements that Talis would not generate revenue until it obtained an EUA and had not yet engaged third-party logistics providers to transport and warehouse products. Ex. 7 at 105; Opp. 2, 20.

devices. Similarly, FE-7, a former intern-turned-low-level software engineer, alleged there were "working prototypes" but no product to "manufacture *at scale*," ¶¶ 93, 110, but FE-7 never alleged that Talis manufactured the instruments that did exist.[4] Plaintiffs further argue "a prototype is not a finished product," Opp. 13, but whether the instrument was a "finished product" has no bearing on whether Talis had ordered or was manufacturing instruments. *See Weller*, 230 F. Supp. 3d at 1094.[5] At bottom, the FEs never actually say that Talis's manufacturer did not manufacture, assemble, or deliver the instruments that Talis had as of the IPO.

Indeed, FE-1 previously alleged that Talis had an internal production schedule "that indicated a Q4 2020 goal of *producing 1,000 instruments for beta testing* and to *prove Talis's manufacturing capability*," but Talis "*produced* far fewer *instruments in the quarter*." ECF 74, ¶ 50. Plaintiffs insist their removal of FE-1's contradictory allegation is innocuous because the prior complaint referred to "Talis's in-house pilot production of prototypes," but that is not what they alleged. Opp. 14 (omitting "1,000 instruments" goal); ECF 74, ¶ 50 (no reference to "in-house pilot production of prototypes"). Plaintiffs cannot credibly suggest that a company with no commercial manufacturing facilities intended to manufacture $15M worth of inventory to prove its *internal* manufacturing capability when its undisputed business plan was to outsource that production.[6]

### 2. Plaintiffs Unreliably Attack Immaterial Details Rather Than Plead Falsity.

Plaintiffs also raise a host of vague conclusions and non sequiturs that do not plausibly allege that Statements 1 and 2 were false or misleading.

---

[4] Plaintiffs' reliance on this software engineer FE also suffers from other internal contradictions: FE-7 says that Talis had "working prototypes," but also that "there was no working product." ¶ 93.
[5] Even if the Court were to accept Plaintiffs' characterization of the instrument as a "prototype," that is just another way of saying that Talis had not commercially launched its product. *See* "Prototype," *Merriam-Webster Dictionary* ("an original model on which something is patterned"; "an individual that exhibits the essential features of a later type"; "a standard or typical example"; or "a first full-scale and usually functional form of a new type or design of a construction"), *available at* https://www.merriam-webster.com/dictionary/prototype.
[6] Nor would it make sense for Talis to "beta test" products that were not manufactured by its third-party partner. "Customers and potential customers frequently perform beta testing, which is used to test a product in a non-laboratory setting to see how it will perform when used in actual, real world applications." *Primo v. Pac. Biosciences of California, Inc.*, 940 F. Supp. 2d 1105, 1121–22 (N.D. Cal. 2013) (collecting cases). "Alpha testing, by contrast, is done by a manufacturer, in its laboratory, using test equipment." *Id.* (citation omitted).

**Capacity Agreement**: FE-6, an HR professional who embellished his/her title, allegedly was "privy to information about Talis's third-party and manufacturers and vendors" and said that Talis had a "capacity agreement" with its manufacturer. ¶ 84; Opp. 12-13. But the existence of a capacity agreement is consistent with having ordered 5,000 instruments—both things can be true. Regardless, the AC alleges nothing about how FE-6 learned this information, what the capacity agreement actually said, or from whom FE-6 received this knowledge. FE-6's allegations thus come nowhere close to "describe[ing] conversations that they themself heard." Opp. 9 (quoting *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 771 (9th Cir. 2023)).[7]

Plaintiffs' other arguments to suggest instruments had not been manufactured or delivered as of the IPO are equally unavailing. For example, FE-4 contends that she was told that Talis "did not have an instrument" "to show hospitals and physicians" in February 2021. ¶ 111; Opp. 13. It is far from remarkable that Talis would not show an unauthorized product to potential customers and it does not suggest that Talis had not ordered or received instruments.

**Location of Assembly**: Plaintiffs rely on FE-6's conclusion that "where the instruments would be assembled" was "unresolved," without any explanation as to how FE-6 obtained that information or why it matters. But Talis disclosed that its third-party manufacturer assembled its instruments. Ex. 7 at 98. Even accepting FE-6's conclusion, *where* Talis's third-party contractor assembled the instruments does not inform the alleged falsity of *whether* Talis ordered 5,000 instruments.

**Post-IPO Payment**: Plaintiffs fail to explain (and cite no case to support) how Talis's disclosure that it had "payments due" in "less than one year" somehow corroborates Plaintiffs' conclusion that Talis had not ordered instruments as of the IPO. Ex. 7 at 108. No FEs allege, for example, that it was not customary in Talis's industry to order instruments on credit, and the failure to make advance payment lends no plausibility to the premise that no order occurred.

Furthermore, Talis's delayed payment makes perfect sense: Talis had "non-cancellable contractual obligations" for "$33.0 million" of "Talis One instruments" and secured an equivalent

---

[7] Indeed, in *Glazer*, 20 FE's provided consistent allegations that they "were pressured by senior executives" to falsely book deals as "committed," including detailed conversations that identified the speaker, place, and contents of the conversations. *See* 63 F.4th at 770-71 (alleging specific conversations that identified speaker by name and title, as well as contents of the conversations).

credit line "as terms of collateral that were required by one of [its] contract manufacturing organizations." Ex. 7 at 108. Plaintiffs urge the Court to ignore the Registration Statement because they purportedly dispute the validity of the letter of credit and Talis's non-cancellable contractual obligations. Opp. 14 (citing *Khoja v. Orexigen Therap., Inc.*, 899 F.3d 988 (9th Cir. 2018)). But the AC did not challenge the letter of credit or Talis's non-cancellable contractual obligations, and a stray reference to calling Talis's purchase commitments "purported," ¶ 107, is at best conclusory. *See Eventbrite*, 2020 WL 2042078, at *7 ("*Khoja* does not prevent a defendant from using the doctrines of judicial notice or incorporation by reference to create factual disputes with a plaintiff's *conclusory* allegations."). The incorporation-by-reference doctrine exists to "prevent[] plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* at *7, 13 (considering Registration Statement and finding that plaintiff's "suggestion … is simply not a plausible interpretation").

Plaintiffs speculate that it "is entirely plausible that Talis did not order 5,000 instruments, but—needing a successful IPO—entered 'purchase commitments' and obtained a LoC to bolster the appearance of a real product." Opp. 15 (citing no allegations). This speculation, not alleged in the AC, adds nothing beyond confirming that Plaintiffs' theory is based on fraud.

**FDA Regulations**: Plaintiffs simultaneously dismiss the FDA's EUA regime as "irrelevant," Opp. 17, while putting misplaced weight on Talis's alleged failure to follow traditional FDA validation requirements. Opp. 15. During the pandemic, the FDA relaxed the manufacturing requirements for EUA-authorized devices. Plaintiffs' citation to validation portions of the Quality System Regulations, 21 C.F.R. § 820, is thus flawed as they were not required for EUA-authorized devices. Plaintiffs nonsensically suggest that Talis had to comply with these requirements while seeking an EUA, but the EUA pathway was created as an exception to the typical pathway.[8] And Talis made clear to investors that it was pursuing an EUA, which waived 510(k) clearance, and that it depended on its contractors to comply with applicable manufacturing regulations. Ex. 7 at 6, 21. The suggestion that a LinkedIn profile trumps the then-existing EUA regime is absurd. Opp. 15.

---

[8] HHS had the discretion to waive manufacturing requirements, which it exercised for COVID-19 tests, so that products could come to market swiftly to meet the public health emergency. *See* Mot. 4, 19; 21 U.S.C. § 360bbb-3(e)(3); Ex. 1 at 4 (waiving manufacturing and cited QSR requirements).

### C.   Plaintiffs Failed to Plead a Materially Misleading Statement.

Having failed to plead falsity, Plaintiffs pivot and argue that regardless of their literal truth, Statements 1-2 are materially misleading. Again, Plaintiffs' argument relies on their implausible reading of the Registration Statement. *Supra*, Section III.A.

*First*, the argument that investors understood the Registration Statement to mean that Talis was manufacturing at scale and expected Talis to generate revenue fails for the reasons stated above. *Supra*, Section III.A; Ex. 7 at 105, 135, 20.[9]

*Second*, Plaintiffs try to avoid Talis's risk disclosures by suggesting they are "irrelevant" and "hypothetical." Opp. 18. But "contrary to Plaintiffs' argument, it is established that an alleged misstatement must be read 'in light of its surrounding text, including hedges, disclaimers, and apparently conflicting information.'" *Eventbrite*, 2020 WL 2042078, at *11 (rejecting argument that "disclosure [wa]s irrelevant" and quoting *Omnicare*, 575 U.S. at 190). Indeed, Plaintiffs' citation to suggest that risk disclosures are irrelevant, *In re Stac Elec. Sec. Litig.*, *affirmed* dismissal and expressly noted that it is "appropriate" to "consider[] the full text of the Prospectus" in resolving a motion to dismiss. 89 F.3d 1399, 1405, n.4; Opp. 18.[10] Plaintiffs may well wish to avoid the Registration Statement's full text. But context matters, and that context dooms Plaintiffs' case.

*Third*, Plaintiffs' reliance on *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010), and *SEC v. Enter. Solutions, Inc.*, 142 F. Supp. 2d 561 (S.D.N.Y. 2001), is misplaced. In *Platforms* and *Enterprises Solutions*, pink-sheet shell companies made statements touting new products when the defendant either "did not have prototypes built, nor even the money to build a prototype," *Platforms*, 617 F.3d at 1082, or had not "engaged in any product development at all."

---

[9] Plaintiffs' argument that the frequency of the term "instruments" in the S-1 somehow created the misimpression that Talis was manufacturing at scale is misplaced. Opp. 17 (citing *Miller v. Thane Intern., Inc.*, 519 F.3d 879 (9th Cir. 2008)). In *Miller*, the repeated reference to "NASDAQ," without other qualifying language, created the impression that a merged entity would be listed on the exchange, rather than merely apply for listing approval. *Id.* at 888. But here, "the Registration Statement did not say that the Talis One platform was currently low cost and manufactured at scale, and … contained lengthy disclosures about the manufacturing risks." Order at *15.

[10] This case bears no resemblance to *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480 (9th Cir. 2019), *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008), or *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940 (9th Cir. 2005), because Plaintiffs have failed to establish a materially misleading statement. But even still, these cases do not stand for the proposition that disclosures are irrelevant or cannot be considered.

*Enterprises Solutions*, 142 F. Supp. 2d at 577. Those cases are not remotely analogous to this one, and Plaintiff cannot make them so just by saying "prototype" over and over.

**Fourth**, Plaintiffs' argument that Talis's use of the word "instruments," rather than "components," was material because components "had no independent value, and could not be sold" misses the mark. Opp. 19. Talis made clear to investors that, as of the IPO, *neither* instruments nor components could be sold, and Plaintiffs allege no facts suggesting that the process of assembling components into instruments would result in a materially different time to market. *Id.* (citing ¶¶ 75-80, which contain no facts about assembly time); *see also Hoang*, at *39 (rejecting claim where it was "unclear that Plaintiffs pled this allegation").

**Fifth**, Plaintiffs cannot plead materiality by pointing to a stock drop years after the fact. The "contention that a slump in [a defendant's] stock indicates materiality is not well-taken." *Hewlett-Packard*, 845 F.3d at 1277; *see also In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952, at *4 (N.D. Cal. Feb. 24, 2017) (similar).

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM AS TO STATEMENTS 3-7.

Plaintiffs claim that Statements 3-7 are expressions of fact rendered misleading because "at the time of the IPO, Talis One failed up to 20% of the time." Opp. 21. That argument rests on a shaky foundation laid by unreliable FE allegations and, even if credited, does nothing to undercut Talis's expressions of opinion regarding the Talis One's design purpose, or demonstrate that these purported failure rates existed at the time of the IPO or were known by management.

### A.   Plaintiffs' Allegations Regarding Failure and Invalid Rates Are Conclusory and Untethered to Any Applicable Regulatory Standard.

Plaintiffs claim that "the FDA requires invalid rates to be below 10%," ¶ 125 (citing Ex. 2), but that standard was taken from FDA guidance regarding *pooled samples*, (i.e., multiple swabs in a single volume of transport media), not an "invalid rate" or "failure rate" for a diagnostic test. The Opposition appears to acknowledge that—contrary to what the AC claims—there is no FDA standard requiring invalid rates to be below 10%. *Compare* ¶¶ 130, 188 (claiming existence of "FDA[] requirement of an invalid rate below 10%" generated "material risks"), *with* Opp. 28 (calling Defendants' challenge to the applicability of the same standard a "straw man"). Indeed, the

Opposition does not even respond to the fact that Plaintiffs' alleged "standard" comes from a testing methodology not employed by Talis. *See* Mot. 29; *Mulquin v. Nektar Therapeutics*, 510 F. Supp. 3d 854, 866–67 (N.D. Cal. 2020) (rejecting allegations that company violated "clear industry and scientific norms against both the presentation of 'highly incomplete' and 'outlier-driven' data").

Plaintiffs' purported definition of "failure rate"—an invented term, new to the AC, and not used in the Registration Statement or any cited regulatory guidance—fares even worse. The AC cites no authority whatsoever for this metric, and the Opposition provides none. ¶ 132. Furthermore, Plaintiffs supply no facts that could give the Court confidence that FE-6—the HR professional who is the *only* FE who uses the term "failure rate"—or FE-8, who makes conclusions about "invalid rates," had personal knowledge of clinical or industry testing standards. *See Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 561 (W.D. Pa. 2019) (rejecting CW allegations which "lack[ed] a basis" for the source's knowledge of "and industry- or company-wide standards").

**B.    The Invalid and Failure Rate Allegations Lack Specificity and Are Unreliable.**

FE-8 alleges that Talis had "different lots" of "devices" with "invalid rates," which supposedly ranged "between 5% and 15%." ¶ 131. FE-8 offers nothing about Defendants' knowledge and provides no details about how FE-8 ascertained the supposed invalid rates such that the Court could infer broader knowledge. *See* Order at *18 (holding statements were not "false and misleading when made" based on invalid rates, where allegations "[did] not attribute the high invalid rate to any particular cause" or describe who knew of those rates at time of IPO). Plaintiffs suggest that alleging these basic facts imposes an "impossibly high burden," Opp. 21 (citing *Glazer*, 63 F.4th at 769), but identifying the factual basis for the Court to assess reliability is table stakes for a securities claim premised on confidential witnesses, especially when the alleged invalid "range" includes rates that Plaintiffs deem "acceptable." ¶ 131.

Perhaps in recognition that their "invalid rate" allegations falter, the Opposition pivots to the general assertion that the Talis One "failed up to 20% of the time." Opp. 21. But the *only* FE that uses the term "failure rate" allegedly learned this information at meetings the AC provides no details about. *See Kipling v. Flex Ltd.*, 2020 WL 7261314, at *11 (N.D. Cal. Dec. 10, 2020) (rejecting FE hearsay that did not "specify who gave them this alleged information," allege "dates

or details of the discussions," or "explain how these colleagues knew the information"). Plaintiffs acknowledge FE-6's "failure rate" conclusion is hearsay but insist it is reliable because FE-6 "described conversations that they themsel[f] heard." Opp. 9. But unlike their cited cases, Plaintiffs here never identify any source for FE-6's supposed knowledge, the contents of any alleged meetings, or provide details from which the Court could evaluate the veracity of the allegations. *Compare* ¶ 132 (conclusion without identifying speaker), *with Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1204, 1208 (9th Cir. 2016) (crediting allegation where former executive alleged CEO "Wright told the Board that Garrett had pleaded with [creditor] for more time" and described meeting with creditor to CW at company board meeting); *Glazer*, 63 F.4th at 771-74 (multiple CWs alleged specific conversations with identified sales executives to inflate sales).[11]

### C. Plaintiffs' Allegations Do Not Establish the Alleged Failure or Invalid Rates Were Known to Defendants at the Time of the IPO.

Setting aside unreliability, the allegations attributed to FE-6 and FE-8 are not specific enough in time. FE-6 merely asserts that Talis One's failure rate was "between 10% and 20%" as of "February 2021." ¶ 132. Talis's IPO occurred on February 11, 2021; the vague assertion that *sometime in February*, Talis had "discussed" the purported failure rate is insufficient to demonstrate that Talis knew that information *at the time of the IPO. See Stack v. Lobo*, 1995 WL 241448, at *7 (N.D. Cal. Apr. 20, 1995) (dismissing Section 11 claim in part for failing to plead "contemporaneous facts" that alleged "problems … were evident" at the time statements were made); *Glazer*, 63 F.4th at 776 (imprecise allegations about personnel turnover in "spring 2019," "summer 2019," or "2019" and "between 2019 and 2020" did "not establish that [Defendant] made such replacements *prior to March 4, May 9, or August 7, 2019*"). FE-8's naked assertion of invalid rates "at the time of the IPO," ¶ 131, is similarly insufficient because there is no allegation FE-8 *actually* informed Defendants of those supposed issues before the IPO.[12] *In re Progenity, Inc. Sec.*

---

[11] *In re Allied Nevada Gold Corp. Sec. Litig.*, 743 F. App'x 887 (9th Cir. 2018), an unpublished split decision, is unpersuasive. Though not specifically explained in the two-page order, the complaint in *Allied* (which relied on 15 CWs) made clear that the allegedly undisclosed issues were specifically discussed with a defendant at daily meetings, including "what they were going to do to see where the problems were and how they were going to deal with them." *In re Allied Nevada Gold Corp.*, 2016 WL 6661888 (D. Nev.) (Second Amended Complaint).

[12] Plaintiffs' vague allegation that FE-8 "reported to CEO Coe" does not change this equation, ¶ 131, as there is no allegation that FE-8 communicated knowledge regarding invalid rates to Coe.

*Litig.*, 2023 WL 219345, at *7 (S.D. Cal. Jan. 13, 2023) (general "speculat[ion]" based on CW allegations about whether Defendants knew of omitted information in "early 2020" did not render offering documents filed June 19, 2020 misleading); *In re Resonant Inc. Sec. Litig.*, 2016 WL 1737959, at *8 (C.D. Cal. Feb. 8, 2016) (dismissing claim for failure to "allege facts showing that Defendants were aware" of product specification issues at time of IPO).

Given Plaintiffs' failure to allege plausible facts showing contemporaneous knowledge at the time of the IPO, Plaintiffs' cited cases are unavailing. In *Glazer*, a statement of opinion as to whether a relevant merger would close was rendered misleading based on the counterparty's direct assertion it "was considering not closing the merger." 63 F.4th at 779. And in *In re Atossa Genetics Inc Sec. Litig.*, the court held that defendant's opinion statement that an "FDA clearance risk had been achieved" was actionable when no such clearance had been achieved. 868 F.3d 784, 802 (9th Cir. 2017).  No similar facts exist here, and Plaintiffs have not plausibly pled that Defendants knew of these supposed failure rates at the time of the IPO.

### D.   The Challenged Statements Are Non-Actionable Opinions.

Even assuming Plaintiffs' conclusory allegations can be credited, Plaintiffs' theory of falsity still rests on a false premise. Plaintiffs assert that Statements 3-7 are factual statements, rendered misleading based on supposedly undisclosed failure rates. But Plaintiffs ignore the actual language of Statements 3-7, all of which expressly relate to the Talis One's intended accuracy—what it was *designed* to do. Statements 3-5 explicitly disclosed that the Talis One is "designed" to provide, for example, "highly accurate results" and "central lab levels of accuracy." (Ex. 7 at 96, 126, 130). Statement 6 (*id.* at 117) specifically describes the "design" of Talis's cartridge and outlines the clinical data supporting Talis's opinion that the platform is highly accurate. Statement 7 (*id.* at 24) merely describes Talis's view that the commercialization of Talis One was dependent on collecting data on its accurate and reliable testing, a statement the Court was already "skeptical" could be construed as a statement of present fact. Order at *18 n.14. Plaintiffs cannot read these aspects out of the challenged statements—what Talis One was designed to do—simply because it does not match their narrative. *See SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1126 (N.D. Cal. 2020) (dismissing claim because plaintiffs' "interpretation … [was] implausible as a

matter of law" where is "selectively ignores [defendant's] statement and the surrounding context").

Plaintiffs do not address the Court's previous guidance on these statements, or even quibble with the accuracy of Talis's clinical data undergirding these expressions of belief. Instead, they simply conclude that these statements about the Talis One's design are "specific, quantitative observations" which are misleading solely because "Talis One failed up to 20% of the time." Opp. 21. But those arguments miss the point. Nowhere in their AC do Plaintiffs ascribe a cause to the supposed failure or invalid rates or explain how those alleged rates undermine the pre-commercial Talis One's design purpose. And to the extent Plaintiffs contend the invalid rates were the result of Talis's cartridge manufacturing, ¶¶ 134-135, at a time when Talis's manufacturing was still in the "scale-up" phase, *see* Ex. 7 at 105, those manufacturing issues still do not undercut Talis's statements about what its product was "designed" to do. *See Colyer v. Acelrx Pharms., Inc.*, 2015 WL 7566809, at *7 (N.D. Cal. Nov. 25, 2015) (finding statements about product design and intended use were not misleading despite failure to disclose error rates); *see also Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 577 (S.D.N.Y. 2018) (dismissing claim where plaintiff failed to identify any duty to disclose "implementation challenges" supposedly underlying opinions regarding performance).[13]

Plaintiffs' cases are not to the contrary. In *QuantumScape Sec. Class Action Litig.*, the challenged statements as to how the defendants' batteries were "designed" to perform was deemed misleading based on reports from four industry experts that the battery performance was "objective[ly]" "overstated" and "reported … only from compromised tests." 580 F. Supp. 3d 714, 732, 735–36 (N.D. Cal. 2022). But here Plaintiffs have not alleged that Talis's clinical performance data, which speaks to the Talis One's accuracy, was inaccurate or falsified. *Berson* did not even address whether statements about the "design" of a product could be misleading, dealing instead with whether the failure to disclose stop-work orders rendered statements about the company's pipeline misleading. 527 F.3d at 985-87. And in *Robb v. Fitbit Inc.*, the court held that specific

[13] Plaintiffs weakly try to distinguish *Colyer* by claiming that the "Talis One simply did not do what it was purportedly 'designed' to do." Opp. 23 n.31. But *Colyer*—which involved a medical device developer's statements regarding its product design and intended use, and whether the failure to disclose that product's error rate rendered those statements actionable—is directly on point.

statements regarding what the defendant's commercial product actually *did* was misleading based on reliable consumer evidence that showed the clinical results were false. 216 F. Supp. 3d 1017, 1029 (N.D. Cal. 2016). That is a far cry from the present case, where the statements merely informed investors as to what the pre-commercial Talis One was designed to do (and provided the clinical data supporting those assertions).

## V.    TALIS DID NOT OMIT MATERIAL RISKS REGARDING TALIS ONE'S RELIABILITY.

Plaintiffs' Items 105 and 303 claims regarding the "reliability" of the Talis One platform suffer the same deficiencies as their primary Section 11 arguments. Put simply, the AC's allegations regarding Talis One's reliability are themselves unreliable, and Plaintiffs plead no facts sufficient to show the supposed failure rates were known at the time of the IPO. *See Mallen v. Alphatec Holdings, Inc.*, 2013 WL 1294640, at *12 (S.D. Cal. Mar. 28, 2013), *aff'd sub nom.* 607 F. App'x 694 (9th Cir. 2015) (dismissing Section 11 claim where plaintiffs failed to "plausibly allege" "poor product quality" and other "inventory issues" were a known trend by Prospectus date). Nor can Plaintiffs invent an industry standard of "central lab accuracy" based on the purported invalid rate of a single diagnostic test from a single study, ¶ 146, particularly when there were dozens of FDA-approved central lab tests as of the IPO, and Plaintiffs do not dispute that Talis compared its COVID-19 test to a central lab. Plaintiffs cite no applicable case that could transform an anecdote into an industry standard, nor do they allege that Defendants had knowledge of this single study.

## VI.    PLAINTIFFS' CHALLENGE TO COMPARATOR ASSAY SENSITIVITY FAILS.

The Court previously dismissed Plaintiffs' sensitivity claim because Plaintiffs did not plausibly allege that the FDA had "set forth objective criteria for the sensitivity of a comparator assay" and "at the time of the offering" the FDA had not "determined that the comparator assay lacked sufficient sensitivity to support Talis's application and that the FDA had communicated that information to Talis." Order at *21. In response, Plaintiffs invented a standard. ¶¶ 166-167 (failing to cite **any** FDA source); *see also Dubuque v. Boeing Co.*, 325 F.R.D. 296, 320 (E.D. Mo. 2018) (dismissing complaint and rejecting "plaintiff's paraphrasing of or legal conclusions as to the meaning of regulations whose language is not quoted"), *aff'd*, 917 F.3d 666 (8th Cir. 2019). Defendants' Motion demonstrated that Plaintiffs concocted a purported FDA 18,000 NDU/mL

COOLEY LLP

REPLY ISO DEFS.' MTD
CASE NO. 22-CV-00105-SI

threshold to define "high sensitivity." Mot. 4-5, 9, 26-27. But tellingly, the Opposition does not cite to *any* FDA authority in support of its purported standard, let alone explain when such a regulation was enacted.   Opp. 25 (failing to cite *any* FDA source). Nor do Plaintiffs address Talis's Registration Statement, which noted the specific sensitivity of its comparator assay and explicitly warned that it could not assure that it would be granted an EUA. *See* Mot. 26-27.[14] Accordingly, Plaintiffs' omission claim fails for the same reason as before. *See* Order at *20-21.[15]

## VII.   THE AC FAILS BECAUSE OF NEGATIVE CAUSATION.

Plaintiffs' "5,000 instruments" and "reliability and accuracy" claims fail for the independent reason that Plaintiffs' own allegations demonstrate that the alleged corrective disclosures were not made until after Plaintiffs filed suit. Mot. 29-30. Plaintiffs ask the Court "not to address" negative causation because it is too "fact intensive," Opp. 29, but in doing so ignore their own pleadings.

Plaintiffs do not dispute that the first-filed date is January 7, 2022 and Plaintiffs cannot recover for losses *after* that date. Mot. 29. Nor can they seriously dispute that an alleged misstatement or omission cannot cause a stock drop *before* a corrective disclosure. Mot. 30 (citing cases). And it is well-accepted that a plaintiff can "plead himself out of a claim." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). That is what happened here. ¶ 227 (alleging that in March 2022, Talis made its "*first public recognition—over a year after the IPO—*that the Talis One suffered from high invalid rates"); ¶¶ 224-25 (alleging Talis disclosed "*new, negative information*" that Talis had ordered "components" rather than "instruments"). Rather than confront these allegations, Plaintiffs distort their own pleadings and cite inapposite cases. Opp. 29. *Hildes v. Arthur Andersen LLP*, concerned the technical import of an irrevocable voting proxy in a merger agreement not at

[14] Attempting to distinguish *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016), Plaintiffs suggest that the Defendants in *Tongue* stated "the FDA ha[d] long made public its preference for double-blind trials." Opp. 26 (citing *Tongue*, 816 F.3d at 212-13). But that "preference" came from the FDA, and the entire basis of the lawsuit was that Defendants failed to disclose those FDA concerns to investors. 816 F.3d at 211 (affirming dismissal based on alleged omission of "the FDA's repeated statements of concern about the use of single-blind studies"). Rather than a "truth on the market defense," Opp. 26, reasonable investors' presumed understanding of FDA testing methodology is part of the context in which they evaluate registration statements. *Tongue*, 816 F.3d at 211-13.

[15] Plaintiffs cannot demonstrate Defendants' knowledge of a nonexistent FDA standard based on a draft scientific article or a non-party's registration statement. Dr. Ismagilov's draft research article measured viral loads in people exposed to COVID-19 and has no bearing on the FDA's regulations. Similarly, a single competitor's securities filings cannot create an FDA standard where none exists.

COOLEY LLP

REPLY ISO DEFS.' MTD
CASE NO. 22-CV-00105-SI

issue here. 734 F.3d 854, 860 (9th Cir. 2013). And *Fitbit* involved a "corrective disclosure *prior to* the filing of their lawsuit," 216 F. Supp. 3d at 1035, rather than "the first public recognition" of the allegedly false statements *after* the filing of the lawsuit.

Plaintiffs next argue that "value" and "price" are not always identical. Opp. 30 (citing *In re Snap Inc. Sec. Litig.*, 2018 WL 3816764 (C.D. Cal. Aug. 8, 2018)). The Ninth Circuit has never blessed this theory of damages, and Plaintiffs apparently use it to end-run the statutory damages cap "at of the time such suit was brought." 15 U.S.C. § 77k(e). As courts in this district recognize, "the typical value used to measure Section 11 damages is the stock's price on the day a plaintiff files suit, and in an open market value is ordinarily synonymous with price." *In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1187 (N.D. Cal. 2017). Even if Plaintiffs' theory were true in an "unusual and rare" case, they do not allege any facts showing that this is an exceptional case. *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1048-49 (2d Cir. 1995). Indeed, the out-of-circuit cases Plaintiffs cite bear no resemblance to this stock-drop case. *Id*. at 1048-49 (addressing debentures); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 165-66 (2d Cir. 2012) (addressing illiquid mortgage-backed certificates).

In any event, a claim must be dismissed where Plaintiffs' own allegations show that *no* damages are recoverable under Section 11(e) for the instruments-order and reliability claims. *In re Velti PLC Sec. Litig.*, 2015 WL 5736589, at *27-29 (N.D. Cal. Oct. 1, 2015). Plaintiffs suggest that their allegation that "the concealed truth gradually emerged [and] Talis's stock price fell precipitously," ¶ 207, might "touch upon" the stock drop, but Plaintiffs themselves clarified that, as to the 5,000 instruments and invalid rate statements, the "truth" emerged in March 2022. ¶¶ 224-27. Plaintiffs now characterize these disclosures as the "final corrective disclosure," Opp. 30, but Plaintiffs pled that the reliability disclosures were made for the "first" time—not the "final" time—in March 2022. ¶ 227. Such post-suit declines cannot be the basis for statutory damages. 15 U.S.C. § 77k(e); *see also Fed. Hous. Fin. Agency v. Nomura Holding Am. Inc.*, 68 F. Supp. 3d 486, 491 (S.D.N.Y. 2014) (for purposes of Section 11 damages, "[p]ost-filing changes to the security's value are irrelevant").

## VIII.   CONCLUSION

The Court should dismiss Plaintiffs' Amended Complaint with prejudice.

Dated: April 14, 2023                                COOLEY LLP


                                                    By:    /s/ Patrick E. Gibbs
                                                              Patrick E. Gibbs

                                                    *Attorneys for Defendants Talis Biomedical
                                                    Corporation, Brian Coe, J. Roger Moody, Jr.,
                                                    Felix Baker, Raymond Cheong, Melissa
                                                    Gilliam, Rustem F. Ismagilov, Kimberly J.
                                                    Popovits, Matthew L. Posard, and Randal Scott*