COOLEY LLP
Patrick E. Gibbs (183174)
(pgibbs@cooley.com)
Shannon M. Eagan (212830)
(seagan@cooley.com)
Jessie Simpson LaGoy (305257)
(jsimpsonlagoy@cooley.com)
3175 Hanover Street
Palo Alto, California 94304-1130
Telephone:     (650) 843-5000
Facsimile:     (650) 849-7400

Zachary Sisko (*appearance pro hac vice*)
(zsisko@cooley.com)
500 Boylston Street, 14th Floor
Boston, Massachusetts 02116-3736
Telephone:     (617) 937-2300
Facsimile:     (617) 937-2400

*Attorneys for Defendants Talis Biomedical Corporation,
Brian Coe, J. Roger Moody, Jr., Felix Baker, Raymond
Cheong, Melissa Gilliam, Rustem F. Ismagilov,
Kimberly J. Popovits, Matthew L. Posard, and Randal
Scott*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TALIS BIOMEDICAL SECURITIES LITIGATION<br><br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Case No. 22-cv-00105-SI<br><br>CLASS ACTION<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Date:     February 9, 2024<br>Time:    10:00 a.m.<br>Crtm:    1<br>Judge:  Hon. Susan Illston |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ....................................................................................................... 1

II.   RELEVANT FACTS AND ALLEGATIONS ............................................................ 3

      A.    February 2021: Talis Goes Public .................................................................. 3

      B.    March 8, 2021: Talis Announces Withdrawal of EUA ................................... 3

      C.    March 26, 2021: Dugan Invests in Talis For its Women's Sexual Disease
            Test, Not its COVID-19 Test ......................................................................... 4

      D.    August 12, 2021: The Lock-Up Period Expires ............................................. 5

      E.    January-March 2022: the First Action is Filed and Dugan Moves to Be
            Appointed Lead Plaintiff ............................................................................... 6

      F.    April-May 2022: Dugan Invests in Talis After Alleged Corrective
            Disclosures .................................................................................................... 6

      G.    July 2022-April 2023: The AC Asserts Claims Only Under Sections 11 and
            15 ................................................................................................................... 6

      H.    The Class Certification Motion ...................................................................... 7

      I.    Dugan Fails to Monitor or Direct the Litigation ............................................ 7

      J.    Dugan Contradicts Sworn Statements ............................................................ 9

III.  THE COURT SHOULD DENY CLASS CERTIFICATION ................................... 10

      A.    The Class Should Not Be Certified Because Plaintiff Is Inadequate ............ 10

            1.    Dugan Is Not Directing or Monitoring the Litigation ........................ 10

            2.    Dugan's Lack of Candor Calls Into Doubt His Credibility ................ 13

            3.    Dugan's Investment Motivation Puts Him in Conflict With the
                  Class ................................................................................................ 14

      B.    The Class Should Not Be Certified Because Plaintiff Is Not Typical. ......... 16

      C.    The Class Should Not Be Certified Because Individualized Issues
            Predominate and a Class Action Is Not Superior ......................................... 18

            1.    Plaintiff Offers No Evidence that Common Questions Predominate ........ 19

            2.    Individualized Actual Knowledge Issues Predominate ...................... 20

            3.    This Proposed Class Action is Not Superior ..................................... 22

      D.    Any Class Should be Limited to Shareholders Who Purchased Talis Stock
            Prior to August 12, 2021 ............................................................................. 22

            1.    Section 11's Traceability Requirement is Strictly Construed .............. 23

            2.    The Traceability Requirement Cannot Be Met After August 11,
                  2021 ................................................................................................ 24

IV.   CONCLUSION ....................................................................................................... 25

COOLEY LLP

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbey v. Computer Memories, Inc.*,
  634 F. Supp. 870 (N.D. Cal. 1986) ...................................................................................... 24

*Alberghetti v. Corbis Corp.*,
  263 F.R.D. 571 (C.D. Cal. 2010), *aff'd*, 476 F. App'x 154 (9th Cir. 2012) .......................... 10

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ..................................................................................................... 17, 18

*Boston Retirement System v. Uber Technologies, Inc.*,
  2022 WL 2954937 (N.D. Cal. July 26, 2022) ................................................................. 21, 22

*Burkhalter Travel Agency v. MacFarms International, Inc.*,
  141 F.R.D. 144 (N.D. Cal. 1991) ........................................................................................ 11

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .............................................................................................................. 18

*Darvin v. International Harvester Co.*,
  610 F. Supp. 255 (S.D.N.Y. 1985) ...................................................................................... 12

*DeMaria v. Andersen*,
  318 F.3d 170 (2d Cir. 2003) ............................................................................................... 19

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ............................................................................................................ 19

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ............................................................................................. 19

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ......................................................................................... 16, 17

*In re Honest Co. Securities Litigation*,
  2023 WL 3190506 (C.D. Cal. May 1, 2023) ............................................................. 23, 24, 25

*In re Initial Public Offering Securities Litigation*,
  483 F.3d 70 (2d Cir. 2007) .................................................................................................. 19

*Kline v. Wolf*,
  702 F.2d 400 (2d Cir. 1982) ................................................................................................ 14

*Koenig v. Benson*,
  117 F.R.D. 330 (E.D.N.Y. 1987) .............................................................................. 13, 14, 16

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
22-CV-00105-SI

COOLEY LLP

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Kosmos Energy Ltd. Securities Litigation*,
     299 F.R.D. 133 (N.D. Tex. 2014) ................................................................................... 11, 20

*Krim v. pcOrder.com, Inc.*,
     402 F.3d 489 (5th Cir. 2005) ................................................................................................. 23

*In re Lyft Inc. Securities Litigation*,
     2021 WL 3711470 (N.D. Cal. Aug. 20, 2021) ................................................................ 21, 22

*McPhail v. First Command Financial Planning, Inc.*,
     247 F.R.D. 598 (S.D. Cal. 2007) .......................................................................... 1, 11, 12, 17

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*,
     272 F.R.D. 160 (S.D.N.Y. 2011), *aff'd*, 477 F. App'x 809 (2d Cir. 2012) ........................... 20

*Perrin v. Southwest Water Co.*,
     2014 WL 10979865 (C.D. Cal. July 2, 2014), *aff'd sub nom. Hemmer Group v.*
     *Sw. Water Co.*, 663 F. App'x 496 (9th Cir. 2016) ......................................................... 5, 23, 24

*Pruitt v. Personnel Staffing Group, LLC*,
     2020 WL 3050330 (N.D. Ill. June 8, 2020) ..................................................................... 11, 12

*In re Public Offerings Securities Litigation*,
     471 F.3d 24 (2d Cir. 2006) ..................................................................................................... 21

*In re Quarterdeck Office Systems, Inc. Securities Litigation*,
     1993 WL 623310 (C.D. Cal. Sept. 30, 1993) ................................................................... 12, 24

*In re Safeguard Scientifics*,
     216 F.R.D. 577 (E.D. Pa. 2003) ....................................................................... 14, 16, 17, 18

*Savino v. Computer Credit, Inc.*,
     164 F.3d 81 (2d Cir. 1998) ..................................................................................................... 14

*Searcy v. eFunds Corp.*,
     2010 WL 1337684 (N.D. Ill. Mar. 31, 2010) ......................................................................... 14

*Slack Technologies, LLC v. Pirani*,
     598 U.S. 759 (2023) ......................................................................................................... 23, 24

*Sundaram v. Freshworks, Inc.*,
     2023 WL 1819158 (N.D. Cal. Feb. 8, 2023) .......................................................................... 24

*Trim v. Mayvenn, Inc.*,
     2022 WL 17584237 (N.D. Cal. Dec. 12, 2022) ...................................................................... 13

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
22-CV-00105-SI

COOLEY LLP

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016)................................................................................................ 19

*In re Valence Technology Securities Litigation*,
    1996 WL 119468 (N.D. Cal. Mar. 14, 1996)........................................................ 18

*Vignola v. Fat Brands, Inc.*,
    2020 WL 1934976 (C.D. Cal. Mar. 13, 2020)........................................... 10, 21, 22

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ................................................................................................ 10

*Weisman v. Darneille*,
    78 F.R.D. 669 (S.D.N.Y.1978) ......................................................................... 12, 13

*Zinser v. Accufix Research Institute, Inc.*,
    253 F.3d 1180 (9th Cir. 2001)................................................................................ 22

**Statutes**

15 U.S.C. § 77k(a) ........................................................................................... 2, 17, 19

**Other Authorities**

Fed. R. Civ. P.
    23.......................................................................................................................... 2, 10
    23(a) ..................................................................................................... 2, 10, 13, 18
    23(a)(3)...................................................................................................................... 16
    23(a)(4)................................................................................................................. 10, 13
    23(b) .................................................................................................................... 10, 22
    23(b)(3) ..............................................................................................................*passim*

https://www.sec.gov/about/reports-publications/investor-publications/holding-
    your-securities-get-the-facts.................................................................................... 5

COOLEY LLP

## I. INTRODUCTION

Relying on allegations in the Amended Complaint (ECF 104, the "AC") and a boilerplate declaration, Lead Plaintiff Martin Dugan ("Plaintiff" or "Dugan") treats class certification as a foregone conclusion. But this is far from a garden-variety Section 11 case, and as demonstrated below, Dugan has failed to show that he is an adequate class representative, that his claims are typical of the proposed class, and that common issues predominate.

Dugan is not an adequate class representative for several reasons. *First*, he has failed to direct and monitor the litigation. At his deposition, he could not identify the parties to the suit, did not know the status of the litigation or the claims he is asserting, admitted he had not read the Registration Statement, and did not recall even reviewing the AC before it was filed. *Second*, Dugan has admitted making false statements under oath, repeatedly, in his verified interrogatory responses and in support of his request to be appointed lead plaintiff. *Finally*, Dugan has a significant conflict with the class. Plaintiff's case revolves around allegations that Talis Biomedical Corporation ("Talis" or the "Company") misstated or failed to disclose material facts about the development of its sole product at the time of its IPO: the Talis One COVID-19 test. But Dugan testified that he did *not* invest in Talis because of its COVID-19 test. In fact, when he first invested, he was unaware that a COVID-19 test was even a lead item for Talis, and he could not recall whether Talis's COVID-19 Emergency Use Authorization ("EUA") application even mattered to his investment decision. Rather, he invested in Talis because of its women's sexual disease test, a product that Talis had set aside as of the IPO in favor of its COVID-19 test. That testimony places Dugan directly in conflict with the class he seeks to represent and casts further doubt on his credibility, as it contradicts sworn interrogatory responses and the allegations in the AC, and undermines the entire theory of his case.

For similar reasons, Dugan is atypical of the class he seeks to represent because he is subject to unique defenses. Indeed, Dugan's atypical motivation for investing in Talis undermines the purported materiality of every alleged misstatement and omission. Dugan is also subject to an actual knowledge defense. Before he invested in Talis, the Company publicly disclosed (in a press release and an SEC filing) that it had withdrawn its EUA because of FDA concerns about the sensitivity

of the comparator assay Talis had used—one of the key facts that Plaintiff claims Talis failed to disclose in its Registration Statement. That is sufficient circumstantial evidence for actual knowledge, but in any event, Dugan concedes that it is "possible" he reviewed a news article reporting this event. Dugan is also atypical because of his unusual trading pattern: he doubled his position in Talis *after* the case was first filed, including eight separate trades after Talis allegedly made corrective disclosures about the remaining challenged statements.

Setting aside Rule 23(a), class certification is also improper because individual issues predominate over common questions. Talis's press release regarding its EUA withdrawal, which was widely covered in the news media, splits Plaintiff's proposed class into two drastically different groups of investors: those who purchased stock before the announcement and those who purchased after that information became public knowledge, and thus face an individualized inquiry whether "at the time of such acquisition [they] knew of such untruth or omission[.]" 15 U.S.C. § 77k(a). Because that individualized inquiry goes directly to standing and merits, it predominates over any common issues that remain.

Last, the proposed class is improper because it lacks a temporal boundary. As part of its IPO, Talis restricted stockholders from selling non-IPO shares on the public market for six months (the "Lock-Up"). On August 11, 2021, Talis's Lock-Up expired, and non-IPO shares became commingled with IPO-shares. For any purchases after that date, it is impossible to trace shares back to the Registration Statement. Indeed, this is true for shares Dugan himself purchased after the Lock-Up. Without a cut-off date that coincides with the expiration of the Lock-Up, the proposed class fails Rule 23's commonality and predominance elements because each purchaser after the Lock-Up expiration would be subject to an individualized tracing inquiry. Thus, no class could properly include any sock purchases on or after August 12, 2021.

Because Plaintiff fails to satisfy Rule 23(a) and Rule 23(b)(3), the Court should deny Plaintiff's Motion for Class Certification.

## II.    RELEVANT FACTS AND ALLEGATIONS

### A.    February 2021: Talis Goes Public

Since its inception, Talis has aimed to transform diagnostic testing for infectious diseases at the point-of-care. Declaration of Shannon Eagan ("Eagan Decl."),[1] Ex. 1, S-1/A, at 1-3. It spent years developing the Talis One ("Talis One"), a diagnostic platform comprised of an instrument, single-use test cartridges, and software. *Id.* At first, Talis was focused on tests for women's health and sexually transmitted infections, but when the COVID-19 pandemic hit, Talis "paused" that work "in order to focus on a COVID-19 test[.]" *Id.* at 126; *see also id.* at 5-6, 96. At the time of its IPO, Talis's only product in development was the Talis One COVID-19 test. *See id.* at 5-6.

Talis conducted its IPO of Talis common stock at $16 per share through a Registration Statement on Form S-1 (with amendments) filed February 11, 2021, and a Prospectus filed February 12, 2021 (the "Registration Statement"). As part of the IPO, stockholders who held Talis securities before the IPO entered into Lock-Up agreements with Talis's underwriters. Ex. 1 at 193; Declaration of Meghan Shevlin ("Shevlin Decl.") ¶ 2. With limited exceptions, the Lock-Up prevented stockholders from disposing of earlier-acquired non-IPO shares for 180 days after the date of the final prospectus. Ex. 1 at 193; Shevlin Decl., Exs. 2-4.

### B.    March 8, 2021: Talis Announces Withdrawal of EUA

On March 8, 2021, Talis issued a press release (and filed it on Form 8-K) announcing that "[i]n late February, the FDA informed the company that it cannot ensure that the comparator assay used in the primary study has sufficient sensitivity to support Talis's EUA application", and so Talis had "withdrawn its current application pursuing [an EUA] for the Talis One™ COVID-19 test in the CLIA moderate setting." (the "March 8 Announcement").[2] Exs. 2 & 3; *see also* AC ¶ 184 (acknowledging that "known uncertainty [about FDA approval] materialized only days after the IPO"). The March 8 Announcement (including both the withdrawal of the EUA and FDA concerns about the comparator assay) was covered extensively by popular media sources and analysts. This included same-day coverage in both Seeking Alpha (with 20 million unique monthly

---

[1] All "Ex. _" citations are attached the Declaration of Shannon Eagan, unless otherwise indicated.
[2] Talis also announced that it planned to submit a new EUA application based on a study designed with a different comparator assay. *Id.*

readers) and Yahoo! Finance (with 93 million unique monthly readers), among others. Eagan Decl. ¶¶ 5, 8, 10; Exs. 4, 5.

### C.    March 26, 2021: Dugan Invests in Talis For its Women's Sexual Disease Test, Not its COVID-19 Test

Plaintiff Martin Dugan first purchased Talis stock on March 26, 2021. Dugan "***did not invest in Talis One for COVID-19 initially***," Ex. 6, Dugan Deposition Tr., at 222:3-19, and in fact, "[a]t the time of the IPO, [he] ***didn't know that COVID was, like, a lead item for them***." *Id*. at 236:6-18.[3] Instead, Dugan "***invested in [Talis] for the Talis One system primarily for -- for women's sexual diseases***." *Id*. Dugan was drawn to Talis in part because he had been following the insider holdings of Felix Baker, a Talis director, based on Dugan's previous success investing in a different company in which Baker was an insider. *Id.* at 101:5-102:6. Moreover, he thought the stock was undervalued after its post-IPO drop. *Id.* at 106:19-24.

Dugan did not read the Registration Statement before investing in Talis or before lending his name to this lawsuit. *Id*. at 149:18-150:23. He testified that the challenged statement that Talis's "products are manufactured by several third parties" had no influence on his decision to invest. *Id*. at 166:14-167:16; AC ¶ 68 (quoting, in part, from page 135 of Registration Statement); Ex. 1 at 135. Dugan could not recall ever seeing the challenged statement "The Talis One Platform incorporates core proprietary technologies …, which are designed to work together to provide levels of testing accuracy equivalent to a central laboratory," and admitted "it would not have had any influence [on his decision to invest]." Ex. 6 at 182:1-183:3; AC ¶ 127 (quoting, in part, from Page 96 of the Registration Statement); Ex. 1 at 96. He further testified he could not "recall" whether Talis's EUA mattered to his investment decision. Ex. 6 at 138:10-16.

Before investing in Talis, Dugan was "actively looking" at Talis's press releases and information about the Company on public sources, *id*. at 246:19-24, as well as Talis's SEC filings. *Id*. at 131:1-6; *see also* Ex. 7, Supp. Resp. to Interrog. No. 5 ("Dugan generally consulted publicly available sources, including Talis's SEC filings and news about Talis, in connection with his transactions in Talis common stock.") & No. 8 ("Dugan has generally consulted publicly available

---

[3] Unless otherwise noted, all emphases are added, and internal quotations and citations are omitted.

sources, such as Bloomberg, CNBC, and company websites for market- and investment-related information."). Those public sources included Seeking Alpha. Ex. 6 at 30:1-5, 129:24-130:13. Dugan testified it was "possible" he had seen the Seeking Alpha article about the March 8 Announcement. *Id.* at 247:15-248:11; *see also* Ex. 4.

### D.    August 12, 2021: The Lock-Up Period Expires

The Lock-Up expired on August 11, 2021, at which point Talis instructed its transfer agent to remove restriction legends from over 2.3 million shares of Talis common stock. Ex. 8, 8/10/21 Deschaine Ltr. Once restrictions were lifted, those shareholders were free to transfer their non-IPO Talis common stock to personal brokerages. Shevlin Decl. ¶¶ 11-15; Declaration of Lia Ludwig ("Ludwig Decl.") ¶¶ 4-6. Three pre-IPO shareholders, Meridian Small Cap Growth Fund ("Meridian"),                               , and Matthew Lee ("Lee"), transferred their pre-IPO Talis shares to personal brokerages within six days of the Lock-Up expiring. Ludwig Decl. ¶¶ 4-6, Ex. A (8/13/21 Meridian transfer), Ex. B (8/17/21          transfer), Ex. C (8/17/21 Lee transfer); *see also* Shevlin Decl. ¶¶ 4-15 & Ex. 5 (2/17/21 All Holder list), Ex. 6 (8/11/21 All Holder List), Ex. 7 (8/13/21 All Holder list), Ex. 8 (8/17/21 All Holder list).

Shares belonging to customers of modern brokerages are held by the Depository Trust Company ("DTC"), a registered clearing agency, and **pooled** in those brokerages' accounts. *See* Ludwig Decl. ¶ 3; Shevlin Decl. ¶ 10. Other courts have helpfully described DTC:

> Securities deposited at DTC are registered by a company in "street name"–that is, the name of DTC's nominee, Cede & Co. Thus, Cede & Co., and not the shares' beneficial owner, appears on the issuer's stock records as the registered owner of the shares. Street name accounts allow changes in beneficial ownership to be effected through automated book entries rather than through the physical transfer of securities certificates.
>
> DTC holds deposited securities in "fungible bulk," such that its participants do not own specifically identifiable shares. Rather, participants own a "pro rata interest in the aggregate number of shares of a particular issuer held at DTC."

*Perrin v. Sw. Water Co.*, 2014 WL 10979865, at *2 (C.D. Cal. July 2, 2014), *aff'd sub nom. Hemmer Group v. Sw. Water Co.*, 663 F. App'x 496 (9th Cir. 2016).[4]

---

[4]  *See also* https://www.sec.gov/about/reports-publications/investor-publications/holding-your-securities-get-the-facts.

When the non-IPO shares held by Meridian, ███, and Lee were transferred to their personal brokerages, they were immediately "commingled" or "pooled" in street name, not only with all other Talis stock held by other brokerage customers, but with all other Talis stock held by DTC. Ludwig Decl. ¶ 3; Shevlin Decl. ¶¶ 3, 12-15 & Exs. 1, 6-8 (depicting and describing that the increase in Talis shares held by Cede & Co. from 8/11/21 to 8/17/21 corresponds to the amount transferred). By December 1, 2021, more than 5,000,000 non-IPO Talis shares had been commingled with IPO shares in street name. Ex. 13; Shevlin Decl. ¶ 16 & Ex. 9. On August 30, 2021, Lee sold his transferred non-IPO shares on E*TRADE. Lee Decl. ¶ 4 & Ex. A.

> **E.      January-March 2022: the First Action is Filed and Dugan Moves to Be Appointed Lead Plaintiff**

This action was first filed on January 7, 2022. ECF 1. On March 8, 2022, Martin Dugan moved to be appointed Lead Plaintiff. ECF 30. On June 3, 2022, the Court consolidated two class action complaints and appointed Dugan, Leon Yu, and Max Wisdom Technology, Ltd. ("Max Wisdom") as Co-Lead Plaintiffs. ECF 64.[5]

> **F.      April-May 2022: Dugan Invests in Talis After Alleged Corrective Disclosures**

Between February 22, 2022, and May 4, 2022, Dugan more than doubled his position, acquiring 19,500 Talis shares in ten separate purchases. Ex. 9, DUGAN_00001-00008 (purchasing 3,000 shares in February 2022, 1,000 shares in March 2022, 15,000 shares in April 2022; and 500 shares in May 2022). This included eight separate purchases totaling 15,500 shares—nearly equal the number of shares Dugan held as of the first-filed action (17,000 shares)—*after* March 15, 2022, a date when Plaintiff claims Talis corrected some of the alleged misstatements in the Registration Statement. *Id.*; Ex. 10, Dugan trades chart.

> **G.      July 2022-April 2023: The AC Asserts Claims Only Under Sections 11 and 15**

On July 1, 2022, Plaintiffs filed a Consolidated Class Action Complaint asserting claims under Sections 11 and 15 of the Securities Act, and Sections 10(b) and 20(a) of the Exchange Act.

---

[5] On November 30, 2023, Leon Yu and Max Wisdom withdrew as Co-Lead Plaintiffs, leaving Mr. Dugan as the sold Lead Plaintiff and the sole prospective class representative. ECF 131.

ECF 74. On December 9, 2022, the Court granted Defendants' Motion to Dismiss Plaintiffs' Consolidated Complaint, including the fraud claims brought under the Exchange Act. ECF 101.

One month later, Plaintiffs filed the AC, which drops the previously dismissed fraud claims and asserts only Section 11 and Section 15 claims. ECF 104. The AC challenges statements and omissions in the Registration Statement about Talis's "sole product after a decade of development: a molecular diagnostic device called Talis One, comprised of a box-shaped analyzer instrument and single-use cartridges for COVID-19 testing." AC ¶ 3. Defendants moved to dismiss the AC on February 17, 2023, ECF 107, and the Court denied the motion on April 23, 2023. ECF 115.

**H.    The Class Certification Motion**

On October 13, 2023, Plaintiff moved to certify a proposed class of: "All persons or entities that purchased or otherwise acquired common stock issued by Talis pursuant and/or traceable to the registration statement and prospectus (collectively, the 'Registration Statement') issued in connection with the Company's February 11, 2021 initial public offering and were damaged thereby." Motion for Class Certification at 2-3 (the "Motion"). Plaintiff seeks to recover "[f]or each share of Talis common stock" sold prior to, on or after, or retained through January 7, 2022. ECF 127-1, ¶ 15. But the Motion offers no mechanism for determining traceability to the Registration Statement for any Talis stock acquired after the expiration of the Lock-Up. Such purchasers include Dugan, who bought Talis stock from December 2021 to May 2022. Ex. 10.

**I.    Dugan Fails to Monitor or Direct the Litigation**

Dugan's deposition revealed that he is not monitoring or directing the litigation. Dugan could not identify his then-Co-Lead Plaintiffs. Ex. 6 at 267:2-12, 268:1-9 ("Q: Who is your co-lead plaintiff? A: *A fellow from China*… Q: Okay. Is there anyone else that is a co-lead plaintiff? A: *Not to my knowledge*…. Q: Are you aware of whether there's another entity that is co-lead plaintiff with you? A: When you say 'entity,' do you mean person? Q: Company. A: Company. *No, I'm not aware of that. It's -- to my understanding, it's myself and Mr. Wu* [sic]."); *cf.* ECF 54-3 ¶ 6 (stating on May 27, 2022 that he had been in contact with Mr. Yu and was "fully prepared to jointly prosecute this case" with him). Dugan was not involved in determining which Defendants to name, Ex. 6 at 47:20-48:1, and he could not identify them all. *Id.* at 42:2-4.

Dugan did not know how many complaints had been filed. *Id.* at 46:18-20. He was unaware that any of his claims had been dismissed. *Id.* at 56:5-12 ("Q: Are you aware of any claims in this lawsuit having been dismissed by the Court? … A: ***No, I'm not aware of that***."). He did not know why the AC had been filed. *Id.* at 275:17-19 ("Q: Do you know why you filed an amended complaint? A: ***I don't recall***."). And he believes (incorrectly) that he is pursuing a "fraud" claim. *Id.* at 55:14-19, 57:4-7. This is unsurprising given that Mr. Dugan had not a single meeting or call with his counsel between July 8, 2022, and May 18, 2023—during which time, his fraud claims were dismissed and he supposedly monitored the filing of an amended complaint. Ex. 11, Resp. to Interrog. No. 17.

Dugan also could not describe the nature of his Section 11 claim: he could not identify which document he believed was false or misleading. Ex. 6 at 56:17-20, 65:18-22. Nor could he articulate the alleged omissions. *Id.* at 277:24-278:9. In fact, he had "no opinion" as to whether the statements **he challenges** were actually false. *See, e.g.*, *id.* at 197:5-7 ("Q: Okay. Do you agree that the NAAT was designed for optimal sensitivity and specificity? A: ***I have no opinion on it***."). Dugan could not recall ever seeing the Registration Statement, before, during, or after he invested in Talis, or before filing the consolidated complaint. *Id.* at 149:18-150:23. He could not recall whether he met with his attorneys before filing his Lead Plaintiff motion. *Id.* at 263:20-24. And he could not recall whether he ever reviewed the AC before it was filed, or even whether he discussed its contents with counsel. *Id.* at 276:22-277:15 ("Q: Do you have any specific recollection of discussing the contents of the amended complaint before it was filed? A: ***I don't recall***.").

Dugan made little to no effort to learn these basic details of his case, even in advance of his deposition. Dugan spent less than an hour preparing for his deposition, attending two approximately 20-minute Zoom calls with counsel. *Id.* at 18:17-19; 19:5-10. Dugan did not look at any documents in those meetings, *id.* at 19:22-20:1, and could not "recall" whether counsel showed him any documents because he "was kind of multitasking" during these brief meetings. *Id.* at 21:1-6. Independently, he reviewed a single document, "[t]he general presentation of who I am and where I am from," *id.* at 23:4-24:10, and he did not conduct any preparation by email. *Id.* at 25:19-22. Dugan refused to travel ***12 miles*** for his own deposition. *Id.* at 307:25-308:7.

**J.    Dugan Contradicts Sworn Statements**

Dugan's deposition testimony contradicted sworn statements he has made to Defendants and to the Court. In his verified interrogatories, Dugan stated that "in deciding to purchase Talis common stock, [he] considered various factors, including the impression that Talis One was a real, working product *that could successfully detect COVID-19*." Ex. 7, Supp. Resp. to Interrog. No. 3. But at his deposition, Dugan testified, "*I did not invest in Talis One for COVID-19 initially*…So *I had no opinion on whether or not the FDA would authorize [Talis's COVID-19 product] or not*." Ex. 6 at 222:3-19. As Dugan explained, "*At the time of the IPO, I didn't know that COVID was, like, a lead item for them. I was invested in it for the Talis One system primarily for -- for women's sexual diseases*. It was shortly *after I got invested in Talis* that the -- *the whole COVID thing really blew up*[.]" *Id.* at 236:6-18; *see also id.* at 127:12-14 (testifying he did not provide complete answers to interrogatories because "[a]t some point, enough's enough.").

Dugan also verified that he "believe[d] he reviewed a portion of the Registration Statement before investing in Talis common stock[.]" Ex. 7, Supp. Resp. to Interrog. No. 7. But when shown the document, Dugan could not recall ever seeing the Registration Statement. Ex. 6 at 149:23-24. He further testified that the Registration Statement was "not something [he] would read," and he "[did not] recall this particular one[.]" *Id.* at 149:18-150:23. Dugan testified he did not recall reading the Registration Statement "prior and/or during" his investment in Talis and that he "had no reason to go back and look at [the Registration Statement]" before becoming involved in this case. *Id.* at 149:25-150:23.

Dugan also made misrepresentations in sworn statements to the Court. In a declaration signed under penalty of perjury to support his Lead Plaintiff bid, Dugan touted that "he earned a bachelor's degree from Elmira College" to bolster his claim he was the "most adequate" class representative. ECF 30-3, ¶ 2. But Dugan never earned a degree from Elmira College. Ex. 6 at 36:6-11. When asked, Dugan conceded the statement was false but claimed he made "a revision to this document." *Id.* at 265:4-20. The docket reflects no such revision. Instead, he perjured himself again in a second declaration that contained the same misstatement. ECF 54-3, ¶ 2 ("I earned a bachelor's

degree from Elmira College in New York").[6]

### III.    THE COURT SHOULD DENY CLASS CERTIFICATION

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-49 (2011). In a motion for class certification, "the burden is on the plaintiff[] to make a prima facie showing that class certification is appropriate[.]" *Vignola v. Fat Brands, Inc.*, 2020 WL 1934976, at *3 (C.D. Cal. Mar. 13, 2020). A plaintiff must satisfy all of Rule 23(a)'s requirements and at least one Rule 23(b) requirement—here Rule 23(b)(3). "Rule 23 does not set forth a mere pleading standard," meaning that any party "seeking class certification must affirmatively demonstrate his compliance with the Rule[.]" *Dukes*, 564 U.S. at 350-51. Thus, in considering whether to certify a class, courts must conduct a "rigorous analysis" to determine whether a plaintiff can prove each element of Rule 23(a) and 23(b)(3) by a preponderance of the evidence. *Id.* The Court should deny the Motion because Dugan is an inadequate and atypical class representative, individual issues predominate over common issues, and the proposed class lacks a temporal boundary.

### A.    The Class Should Not Be Certified Because Plaintiff Is Inadequate

A class may only be certified if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In assessing adequacy, the Court has the duty "to ensure that the parties are not simply lending their names to a suit controlled entirely by the class attorney." *Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 580 (C.D. Cal. 2010), *aff'd*, 476 F. App'x 154 (9th Cir. 2012). "Class representatives must satisfy the court that they, and not counsel are directing the litigation." *Id.* In this case, Dugan falls far short of showing that he is an adequate representative.

#### 1.    Dugan Is Not Directing or Monitoring the Litigation

To show adequacy, plaintiffs "must produce actual, credible evidence that the proposed class representatives are informed, able individuals, who are themselves—not the lawyers—

---

[6] Dugan also contradicted other portions of his declaration filed in support of his motion to be appointed Lead Plaintiff. He declared under penalty of perjury that "[p]rior to filing this motion, I spoke with counsel regarding this case." ECF 30-3. But at his deposition, he did not recall speaking with counsel before filing his motion to be appointed lead counsel. Ex. 6 at 263:20-24.

actually directing the litigation." *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 145 (N.D. Tex. 2014). "In considering the involvement and knowledge of a prospective class representative, the Court must feel *certain* that the class representative will discharge his fiduciary obligations by fairly and adequately protecting the interests of the class." *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991) (emphasis in original). A plaintiff with "little or no supervisory role in the litigation and little knowledge of the underlying facts of the law suit" is not adequate. *McPhail v. First Command Fin. Plan., Inc.*, 247 F.R.D. 598, 612 (S.D. Cal. 2007).

A declaration "contain[ing] little more than formulaic, boiler-plate assertions … presented to the Court through Lead Plaintiff's counsel … carries little weight." *Kosmos*, 299 F.R.D. at 146. Here, the declaration submitted by Dugan is nothing "more than formulaic, boiler-plate assertions" rejected by courts. *See* ECF 127-2. This self-serving, lawyer-drafted statement should be given no weight because it is directly contradicted by Dugan's own testimony. Far from "diligently purs[uing] the effective prosecution of this action and supervis[ing] counsel," ECF 127-2, ¶ 4, Dugan knows shockingly little about his own case and claims.

Dugan is unfamiliar with the most basic elements of his case, starting with his Co-Lead Plaintiffs and many of the Defendants—contrary to his declaration in support of this Motion, in which he identified his former Co-Lead Plaintiffs by name. ECF 127-2, ¶ 3; Ex. 6 at 267:2-12, 268:1-9, 42:2-4. Courts find that proposed class representatives like Dugan who do not even know the parties to their own suit are inadequate. *See Pruitt v. Pers. Staffing Grp., LLC*, 2020 WL 3050330, at *6 (N.D. Ill. June 8, 2020) (finding proposed class representative inadequate when he could not name all defendants in the case); *Kosmos*, 299 F.R.D. at 147 (holding same in Section 11 case). But Dugan's unfamiliarity with his own case is not a mere foot fault limited to his unfamiliarity with the parties. He could not name **the document** that is the source of his entire Section 11 lawsuit, Ex. 6 at 65:18-22, could not recall seeing the Registration Statement at all, *id.* at 149:18-150:23, and did not know what material information was allegedly omitted from it. *Id.* at 277:24-278:9; *see Kosmos*, 299 F.R.D. at 147 (finding inadequate Section 11 plaintiff who had never seen the registration statement at issue).

Dugan was also unfamiliar with the nature of his claims, the procedural history of the case,

and why (or if) an AC had been filed in his name. Indeed, Dugan was not aware that any of his claims had been dismissed by the Court, Ex. 6 at 56:5-12, did not know how many complaints had been filed, *id.* at 46:18-20, did not know why an amended complaint was filed, *id.* at 275:17-19, and thought he was asserting a fraud claim. *Id.* at 55:14-19, 57:4-7.[7] Dugan's lack of knowledge about his own case renders him inadequate. *See In re Quarterdeck Off. Sys., Inc. Sec. Litig.*, 1993 WL 623310, at *5-6 (C.D. Cal. Sept. 30, 1993) (denying class certification in Section 11 claim because "the named plaintiffs are not familiar with the changes in the various amended complaints filed on behalf of the class"); *Darvin v. Int'l Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (finding plaintiff inadequate when he testified that his "memory regarding the complaint" was "poor" and "[h]is deposition demonstrate[d] that his personal knowledge of many of the facts pleaded in the complaint is extremely limited or nonexistent").

Perhaps most critically, Dugan could not answer a basic yes-or-no question if he consulted with counsel about the contents of the AC. He could only "guess" that the AC was one of the documents he was consulted on, Ex. 6 at 276:22-277:10, but he had no specific recollection of discussing the AC. *Id.* at 277:12-15. Dugan's unfamiliarity with the AC reflects his failure to monitor the litigation: he had no meetings or calls with counsel five months before or after the filing of the AC. Ex. 11, Resp. to Interrog. No. 17. Simply put, uninvolved litigants like Dugan are not adequate. *See Pruitt*, 2020 WL 3050330, at *5 ("During his deposition, [plaintiff] would not give a clear answer to simple questions about whether he had seen the complaint in this case prior to its filing, but suggested that the answer was 'no.'"); *McPhail*, 247 F.R.D. at 612 (plaintiff inadequate when "she never recalled seeing the First Amended Complaint"); *Weisman v. Darneille*, 78 F.R.D. 669, 671 (S.D.N.Y. 1978) (plaintiff inadequate where he "was not even certain that he had seen a copy of the complaint before his deposition").

Dugan's inability to "recall" simple facts was not limited to whether he reviewed the AC. He testified "I don't recall" or "I don't know" ***over 140 times*** in a single deposition. Eagan Decl.

---

[7] A cursory review of the first page of the AC would have revealed in plain terms that Dugan had dropped his fraud claim. AC ¶ 2 ("***This Amended Complaint does not allege fraud*** and only asserts non-fraud Securities Act claims[.]"). This is further evidence that Dugan never reviewed the Amended Complaint filed in his name, which notably contains no declaration from Dugan.

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
22-CV-00105-SI

¶ 12. *Koenig v. Benson*, 117 F.R.D. 330, 337 (E.D.N.Y. 1987) (finding lead plaintiff inadequate where he "admit[ted] confusion or lack of knowledge frequently in his deposition"). Dugan took virtually no steps to fill in these sizable gaps in his knowledge, preparing for less than an hour, during which he was "multitasking." Ex. 6 at 18:17-19, 19:5-10, 21:1-6. Dugan could not even recall whether he spoke to counsel before moving to be appointed Lead Plaintiff. *Id.* at 263:20-24; *see Weisman*, 78 F.R.D. at 671 (denying class certification where "Plaintiff did not meet with his counsel in the ten months between the filing of the complaint and the day preceding his deposition"). "The class is entitled to a representative who is more than a key to the courthouse door dispensable once entry has been effected." *Id*. Because Dugan flouts this requirement, he is not adequate to represent the class.

### 2.  Dugan's Lack of Candor Calls Into Doubt His Credibility

Dugan is also an inadequate class representative because he has submitted false statements in this litigation that undermine both his credibility and the class's case. In assessing Rule 23(a)(4), the Court "must be concerned with the integrity of individuals it designates as representatives for a large class of plaintiffs." *Trim v. Mayvenn, Inc.*, 2022 WL 17584237, at *2 (N.D. Cal. Dec. 12, 2022). This principle applies because "the honesty and credibility of a class representative is a relevant consideration when performing the [Rule 23(a)] adequacy inquiry because an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims." *Id.* A "finding of inadequacy based on the representative's credibility problems is … appropriate where the representative's credibility is seriously questioned on issues directly relevant to the litigation[.]" *Id.*

Repeatedly, Dugan has lied in sworn statements both to Defendants and to this Court. *See supra*, Section II.J. Many of his false statements go directly to the merits of this case, including why Dugan invested in Talis (and thus what he found material and immaterial) and whether he read the Registration Statement at all. Ex. 6 at 222:3-19, 236:6-18, 149:18-150:23; Ex. 7, Supp. Resp. to Interrog. No. 3 & No. 7. And Dugan exposed himself to further credibility attacks by perjuring himself ***twice*** as to his educational background in filings with this Court. *Compare* ECF 30-3 ¶ 2 (touting that he "earned a bachelor's degree from Elmira College") *and* ECF 54-3 ¶ 2 (same) *with* Ex. 6 at 36:10-11 ("Q: Did you ever obtain a bachelor's degree? A: ***No.***").

COOLEY LLP

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
22-CV-00105-SI

When, as here, a plaintiff's testimony on a relevant issue is "subject to sharp attack," courts reasonably conclude that the plaintiff's "credibility in general [is] sufficiently in doubt to justify denying them a fiduciary role as [a] class representative[]." *Kline v. Wolf*, 702 F.2d 400, 403 (2d Cir. 1982) (affirming denial of class certification on adequacy grounds based on testimony about stock purchase motivation that contradicted the class's claims). In *Kline*, as here, the plaintiffs put their credibility directly at issue by submitting contradictory testimony as to the motivation of their investment that undermined one of their two claims. *Id.* In finding the plaintiffs inadequate, the Second Circuit held that a district court "cannot be expected to make a final determination" as to credibility; instead, a lead plaintiff is inadequate so long as evidence supports "a preliminary determination that [plaintiffs'] credibility [i]s vulnerable to attack." *Id.* That is the case here, where Dugan's credibility "cast[s] a shadow" on the class's case. *Id.* "Should the action proceed to trial, Defendants could present evidence of [Dugan's] misleading statement …, thus exposing class members to negative consequences from [Dugan's] individual conduct." *Searcy v. eFunds Corp.*, 2010 WL 1337684, at *5 (N.D. Ill. Mar. 31, 2010); *see also Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (affirming denial of class certification because "the fact that [plaintiff] offered differing accounts about the letters that form the very basis for his lawsuit surely would create serious concerns as to his credibility at any trial").

### 3.    Dugan's Investment Motivation Puts Him in Conflict With the Class

"The Court cannot evaluate a set of transactions alone without looking at the motives of the purchaser making them." *Koenig,* 117 F.R.D. at 336. When an investor purchases stock for reasons other than the challenged statements, it raises individual "materiality questions that make him unacceptable as a class representative." *Id.* This "undermines a crucial aspect of Plaintiffs' case" because it calls into doubt the materiality of the challenged statements, "and thereby place[s] [the lead plaintiff] in an antagonistic position from the class." *In re Safeguard Scis.*, 216 F.R.D. 577, 583 (E.D. Pa. 2003) (plaintiff inadequate and atypical when he testified he was not concerned with or aware of the subject matter of the alleged misstatements). Dugan's testimony presents exactly these questions and renders him an inadequate class representative.

The core of Plaintiff's claim is that Talis's Registration Statement included false statements

and material omissions about Talis' "sole product after a decade of development: a molecular diagnostic device called Talis One, comprised of a box-shaped analyzer instrument and single-use cartridges for COVID-19 testing." AC ¶ 3; Motion at 4. Indeed, according to the AC, *all* the challenged statements and omissions were material because "Talis's survival, let alone its value as a public company, depended entirely on both quickly obtaining FDA authorization and manufacturing the Talis One COVID-19 test quickly and at scale." AC ¶ 61. But Talis' statements and/or omissions on this topic could not have been material *to Dugan*, because he admits he "*did not invest in Talis One for COVID-19 initially*." Ex. 6 at 222:3-19. Indeed, Dugan did not even know that Talis's COVID-19 test was a "lead product," and instead "*invested in it for the Talis One system primarily for -- for women's sexual diseases*." Ex. 6 at 236:6-18. Critically, he testified that he "had *no opinion on whether or not the FDA would authorize [the EUA application] or not*." *Id.* at 222:3-19. This testimony "reveals an antagonistic interest to the class as a whole," and risks "derail[ing] the issues of materiality … based on [Dugan's] deposition, which would adversely impact the interests of the proposed class." *Safeguard*, 216 F.R.D. at 583.[8]

Indeed, Dugan testified that many of the specific challenged statements did not influence his investment decision, i.e., they were not material to him. The AC alleges that Talis's statement that "products are manufactured by several third parties, including a single contract manufacturer that provisions the parts and assembles our instrument," was false or misleading. AC ¶ 68 (quoting, in part, from page 135 of Registration Statement). But Dugan conceded that statement had no influence on his decision to invest in Talis. Ex. 6 at 166:14-167:16. Similarly, the AC challenges purported false statements about the Talis One's reliability and accuracy. AC ¶ 127 (quoting, in part, from page 96 of Registration Statement). But Dugan could not recall ever seeing that statement, and testified "it would not have had any influence on his decision to invest." *Id.* at 182:1-183:3. Indeed, Dugan testified *twelve times* that he had "no opinion" on the truth or falsity of parts of the challenged statements. *Id.* at 195:17-197:14, 206:23-211:1, 214:20-217:5, 222:9-15. *See*

---

[8] Although *Safeguard* and *Koenig* involved claims under the Exchange Act, the test for materiality is identical. *Rombach v. Chang*, 355 F.3d 164, 178 n.11 (2d Cir. 2004); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech. Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (noting that Section 10(b) and Section 11 share the materiality element).

*Safeguard*, 216 F.R.D. at 583 (plaintiff's testimony that he was not concerned with subject matter of alleged misstatements and omissions rendered him an inadequate class representative).

Aside from his testimony, Dugan's highly unusual stock purchase history creates additional conflict with the class. Dugan invested in Talis for the first time on March 26, 2021, weeks after the March 8 Announcement. Ex. 9. Dugan admits that he invested in Talis in part because its stock price had dropped by March 26, 2021. Ex. 6 at 106:19-24; *see also* Ex. 7, Supp. Resp. to Interrog. No. 3 (noting Talis's price-to-book ratio as a reason for purchasing Talis stock). Dugan's unusual trading patterns continued past the filing of the complaint and even after the alleged March 15, 2022, corrective disclosures relating to Talis's instrument orders and high invalid rates. AC ¶¶ 224-227. After those alleged corrective disclosures, Dugan purchased 15,500 shares of Talis stock in eight separate trades from April 12, 2022, to May 4, 2022. Ex. 9[9]; *see also supra*, Section II.F.

Here, Dugan's unusual purchase history demonstrates that he "would have made—and in fact did—purchase stock regardless of the fraudulent omission. [Dugan's] purchases also raise serious doubts as to the materiality of the alleged fraud disclosures." *Safeguard*, 216 F.R.D. at 582 (finding lead plaintiff was subject to "unique defenses" that "preclude[d] him from serving as a class representative" when he invested after public disclosure of fraudulent omission); *Koenig*, 117 F.R.D. at 336 (finding named plaintiff inadequate and atypical when he invested after public disclosure of allegedly false statements).

**B. The Class Should Not Be Certified Because Plaintiff Is Not Typical.**

A plaintiff may only serve as a class representative if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976

---

[9] Perhaps to avoid this conclusion, Dugan omitted these later purchases from his filings with the Court. *Compare id.* (revealing eight transactions in April and May 2022) *with* ECF 74 Ex. A, Schedule A, p. 83 (disclosing only transactions between February 11, 2021 and March 15, 2022). This omission raises issues of credibility that have a "likely adverse effect on the putative class'[s] interests." *Safeguard*, 216 F.R.D. at 582, n.4.

F.2d 497, 508 (9th Cir. 1992). Dugan is atypical because, for many of the same reasons that undermine adequacy, he is subject to unique defenses that will become the focal point of the case.[10]

*First*, as discussed above, Dugan did not invest in Talis because of its COVID-19 test, and instead did so because of its test to detect women's sexual diseases. *Supra*, Section II.C, III.A.3. This makes him "subject to unique defenses which threaten to become the focus of the litigation," which present "a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon*, 976 F.2d at 508 (affirming denial of class certification where lead plaintiff's "unique background and factual situation require[d] him to prepare to meet defenses that [we]re not typical of the defenses which may be raised against other members of the proposed class"); *Safeguard*, 216 F.R.D. at 583 (holding plaintiff that testified he "wasn't concerned" about alleged misleading statements and omissions was "antagonistic" to the class and risked "seriously derail[ing]" the materiality of the class's claims).

*Second*, Dugan first bought stock after Talis's March 8 Announcement, which was covered extensively by popular media sources and analysts such as Seeking Alpha. *Supra*, Section II.B-C. Dugan reviews press releases and SEC filings issued by companies he invests in and consumes Seeking Alpha as one of his primary news sources. Ex. 6 at 146:19-25, 131:1-6, 30:1-5, 129:24-130:13. Dugan testified it was "possible" prior to investing in Talis that he had read the Seeking Alpha article reporting on the March 8 Announcement. *Id.* at 247:15-248:11. Whether Dugan read it, or whether his knowledge can be imputed from other widespread publications, creates a unique defense "that at the time of [Dugan's] acquisition he knew of such untruth or omission[.]" 15 U.S.C. § 77k(a). The timing of Dugan's first purchase creates a further unique defense to his argument that the challenged statements were material because "Talis's survival … depended entirely on both quickly obtaining FDA authorization and manufacturing the Talis One COVID-19 test quickly and at scale." AC ¶ 61.

*Third*, discovery has revealed Dugan's unusual rationale for his investment and a highly unusual trading history. While a lead plaintiff's post-disclosure purchases do not automatically

---

[10] Because adequacy and typicality "tend[] to merge," courts often address these elements together. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626, n.20 (1997).

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
22-CV-00105-SI

defeat typicality, *In re Connetics Corp. Securities Litigation*, 257 F.R.D. 572, 577 (N.D. Cal. 2009), "[o]f course, *unusual* post-disclosure trading patterns present typicality problems." *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 603 & n.38 (C.D. Cal. 2009) (citing *In re Valence Tech. Sec. Litig.*, 1996 WL 119468, at *5 (N.D. Cal. Mar. 14, 1996), as an example of such a case). Here, Dugan first purchased Talis stock after the March 8 Announcement and doubled his holdings after the complaint was filed, including 15,500 shares after the March 15, 2022 alleged corrective disclosures. *See supra*, Section II.F., III.3; *In re Valence*, 1996 WL 119468, at *5 (finding plaintiffs in Section 10(b)(5) and 12 case who significantly increased holdings after first alleged corrective disclosure was made and after complaint was filed in conflict with class members who made no significant post-disclosure purchases); *Safeguard*, 216 F.R.D. at 582 (similar).

*Fourth*, "serious concerns with credibility leave [Dugan] vulnerable to further attacks that would impose an unnecessary disadvantage on the class." *Safeguard*, 216 F.R.D. at 582-83. *Supra*, Section II.J, III.A.2.

*Fifth*, Dugan seeks to recover for stock that cannot be traced to the Registration Statement. Dugan purchased significant Talis stock after the Lock-Up. Ex. 9. However, as set forth *infra*, Section III.D, after the Lock-Up expired on August 11, 2021, non-IPO shares became commingled with IPO shares, and any tracing exercise becomes impossible.

## C.     The Class Should Not Be Certified Because Individualized Issues Predominate and a Class Action Is Not Superior

Plaintiff moves to certify the proposed class under Rule 23(b)(3). Thus, in addition to satisfying Rule 23(a)'s prerequisites, this Court must "find[] that the questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3). The "same analytical principles" that govern Rule 23(a)—requiring that the Court apply a "rigorous analysis" to determine whether Plaintiff carried his burden to "prove" compliance—govern Rule 23(b)(3), and "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013).

A predominance inquiry tests whether proposed classes are "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. Because the predominance

analysis presumes Rule 23(a)(2) common questions exist, "the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998). Rather, the predominance inquiry "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). A question is "individual" if plaintiffs will need to present evidence that "varies from member to member" and common if "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* at 454.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Section 11 creates a right of action for any person who acquires a security in a public offering to recover for materially false statements or omissions made in a registration statement, "unless it is proved that at the time of such acquisition he ***knew*** of such untruth or omission[.]" 15 U.S.C. § 77k(a); *see also DeMaria v. Andersen*, 318 F.3d 170, 175 (2d Cir. 2003). The relevant time inquiry for actual knowledge is at the time of the acquisition, not the IPO. 15 U.S.C. § 77k(a). Accordingly, an issuer "can assert a defense that the plaintiff knew of the untruth or omission at the time of his or her acquisition of the security." *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 n.1 (2d Cir. 2007). Plaintiff's Motion ignores the actual knowledge issues that pervade this case, instead suggesting that class certification is presumptively granted in securities cases, but none of his cited cases address a Section 11 claim with similar facts. Motion at 9-10. Plaintiff's rubber-stamp approach fails.

**1.      Plaintiff Offers No Evidence that Common Questions Predominate**

Plaintiff does not offer any class-wide, common method of addressing Section 11's actual knowledge defense. Instead, the Motion baldly declares that "[n]o individual issues predominate over these Class-wide questions." Mot. at 10. But "[u]ltimately, it is Plaintiff['s] burden to demonstrate the predominance requirement is satisfied." *Vignola*, 2020 WL 1934976, at *5. Given the widely-known nature of the March 8 Announcement, Plaintiff must "provide[] sufficient evidence to carry [his] burden to affirmatively demonstrate that common issues predominate over individualized lack of knowledge issues." *Id*. But Plaintiff makes no mention of the March 8

Announcement and fails to address the public disclosure of the allegedly omitted information at issue. Where, as here, "Plaintiff[] ha[s] not proffered a viable method by which to test knowledge on a class-wide basis with common proof," he fails to meet his burden. *Id.*

### 2.    Individualized Actual Knowledge Issues Predominate

While it is true that "[i]n many cases, the knowledge of individual class members is not a major hurdle to certification *because* the information allegedly misstated or omitted concerns an IPO issuer's internal financial data or other internal non-public information that would suggest general lack of knowledge," it is equally true that "in some circumstances individualized issues regarding knowledge can be sufficient to defeat class certification in Section 11 and 12(a)(2) cases." *Vignola*, 2020 WL 1934976, at *5 (collecting cases). This is one of those cases.

Here, the Registration Statement allegedly omitted known, material uncertainties and risks regarding "the low-sensitivity comparator assay used in Talis's [EUA] application." Motion at 4; AC ¶¶ 16-19. But as Plaintiff admits, these risks "materialized" with the highly publicized March 8 Announcement. AC ¶ 184; *see also supra*, Section II.B. In cases where the allegedly misleading information contained in a registration statement was "publicly disclosed during the putative class period" "via conference calls and press releases," it raises individualized issues concerning whether "some investors within the putative class may or may not have been aware of this public[ly] available information[.]" *See Kosmos*, 299 F.R.D. at 143-44, 153 (holding individualized actual knowledge issues predominated common issues in Section 11 case where the allegedly misleading information about defendants' oil field production was disclosed in press releases and analyst calls).

The proposed class would include investors who purchased Talis common stock after March 8, 2021. Thus, the class includes two diametrically opposed categories of purchasers: those who knew about the allegedly insufficiently sensitive comparator assay and those who did not. For anyone who purchased after March 8, 2021, Defendants are entitled to explore the extent to which they had actual knowledge of the information disclosed on that date, which is necessarily an individual inquiry. *See N.J. Carpenters Health Fund v. Residential Cap., LLC*, 272 F.R.D. 160, 169 (S.D.N.Y. 2011) (denying class certification in Section 11 case because "different levels of knowledge" existed among the proposed class as a result of information that was "publicly

available, including reports of government actions or investigations, analysts reports, news items and raw data"), *aff'd*, 477 F. App'x 809 (2d Cir. 2012); *see also In re Pub. Offerings Sec. Litig.*, 471 F.3d 24, 43-44 (2d Cir. 2006) (vacating grant of class certification because "widespread knowledge [of allegedly omitted scheme to defraud] would precipitate individual inquiries as to the knowledge of each member of the class").

Faced with similar facts, courts have not hesitated to deny certification in Section 11 cases. In *Vignola*, for example, the court denied certification on predominance grounds because the allegedly omitted information that formed the basis of plaintiffs' claims was already in the public domain. 2020 WL 1934976, at *5. In that case, plaintiffs alleged that the defendant fast-casual restaurant chain made false statements and material omissions about its subsidiaries' bankruptcies, delisting, and the current CEO's management of those subsidiaries. *Id.* at *4-5. But those events had been disclosed in public filings, SEC Forms 8-K, and media reports. *Id.* Based on those public filings and news reports, the Court held that "Defendants' evidence … convincingly suggest[ed] that knowledge issues as to this publicly available and widely known omitted information would require individualized inquiries." *Id.* at *5. Accordingly, the plaintiffs failed to carry their burden to show that common issues of falsity and materiality predominated over individual knowledge issues. *Id.*

The evidence here stands in stark contrast to cases where courts have found that speculative individualized actual knowledge inquiries did not predominate. *See, e.g., In re Lyft Inc. Sec. Litig.*, 2021 WL 3711470, at *4 (N.D. Cal. Aug. 20, 2021); *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2022 WL 2954937, at *3-4 (N.D. Cal. July 26, 2022). The common thread in those cases is that media coverage of "general information" related to the subject matter of plaintiffs' claims does not predominate if it does not address the specific allegedly misleading or omitted information. In *Lyft*, the Court held that a "limited number of articles … concerning bike repair and maintenance issues … [did] not describe the specific brake problem at issue" and media reports "concerning the sexual assault issue reflect[ed] a general awareness that Lyft was subject to some allegations of sexual assault, rather than any knowledge about the alleged magnitude of the problem." 2021 WL 3711470, at *4-6. Similarly, in *Uber*, the court held that news coverage of sexual assault issues and

deposition testimony about "awareness of a general issue, not the magnitude of the problems alleged" were insufficient to demonstrate that class members had actual knowledge of the allegedly misstated or omitted information. 2022 WL 2954937, at *3-4.

In contrast to *Lyft* and *Uber*, the March 8 Announcement revealed the specific information that Plaintiff alleges was omitted. And contrary to those cases, where there was "no evidence … presented as to the reputation or breadth of readership of any of the cited news sources," *Lyft*, 2021 WL 3711470, at *6, n.5, the information here was published on reputable sites, like the SEC, and prominent news sources with millions of monthly readers. *See supra*, Section II.B.

### 3.    This Proposed Class Action is Not Superior.

Rule 23(b) also requires that the proposed class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). As part of this analysis, the Court must consider "the likely difficulties in managing a class action." *Vignola*, 2020 WL 1934976, at *6. "[W]hen the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the 'superior' method of adjudication." *Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001). Where, as here, Plaintiff has not proffered a "viable way to handle the potential for numerous individualized inquiries regarding knowledge," a class action is not superior. *Vignola*, 2020 WL 1934976, at *5. Further, without resolving those individualized issues, the class action is not superior because it would result in numerous "mini-trials," which "would pose serious manageability problems." *Id.* at *6. In such circumstances, it is "unclear that aggregation of claims would result in reducing litigation costs or promoting efficiencies, given the potential difficulties of the knowledge inquiry required for establishing liability," which "weighs against certification." *Id.* Plaintiff carries the burden to demonstrate superiority, and he has failed to account for how a class action would resolve the actual knowledge inquiry.

### D.    Any Class Should be Limited to Shareholders Who Purchased Talis Stock Prior to August 12, 2021

While Plaintiff has failed to carry his burden to certify any class, the proposed class also fails because it lacks a temporal boundary. At minimum, any certified class should be limited to

shareholders who purchased Talis's stock prior to August 12, 2021, the day after Talis's Lock-Up expired. At that time, Talis's stock transfer agent removed restrictive legends from non-IPO shares, allowing those shares to be commingled with IPO-registered shares. Ex. 8. Because traceability concerns the statutory standing of individual class members, it affects the membership of the proposed class and is appropriate for resolution at the class-certification stage. *In re Honest Co. Sec. Litig.*, 2023 WL 3190506, at *5 (C.D. Cal. May 1, 2023) (limiting proposed Section 11 class to date when post-IPO lock-up expired).

### 1.    Section 11's Traceability Requirement is Strictly Construed

As the Supreme Court recently explained, "[t]o bring a claim under § 11, the securities held by the plaintiff must be traceable to the particular registration statement alleged to be false or misleading." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 768 (2023). Section 11's tracing requirement is strictly construed, and a plaintiff carries the burden to "plead and prove that he purchased shares traceable to the allegedly defective registration statement[.]" *Id.* at 770. But after an IPO lock-up expires, "tracing a particular share to the IPO is impossible once non-IPO shares became commingled." *Honest Co.*, 2023 WL 3190506, at *5. Such a showing is impossible because in today's modern trading environment, where physical stock certificates are seldom-used, "most trading is done through brokers who neither know nor care whether they are getting newly registered or old shares, and many brokerages do not identify specific shares with particular accounts but instead treat the account as having an undivided interest in the house's position." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013); *Perrin*, 2014 WL 10979865, at *2 (finding traceability unmet because once securities are transferred to DTC, they are held "in 'fungible bulk,' such that its participants do not own specifically identifiable shares").[11]

In adopting the strict construction of traceability, courts steadfastly reject statistical approaches to prove traceability. *See Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 496-97 (5th Cir. 2005) (rejecting statistical approach because, if followed, "every aftermarket purchaser would have standing for every share, despite the language of Section 11, limiting suit to 'any person acquiring

---

[11] This case is no different. Dugan testified he never possessed physical stock certificates and did not know who held any of the shares before he purchased them. Ex. 6 at 253:17-254:1.

23                    DEFENDANTS' OPPOSITION TO
                     MOT. FOR CLASS CERTIFICATION
                     22-CV-00105-SI

*such* security'"); *Quarterdeck*, 1993 WL 623310, at \*2-3 (rejecting statistical analysis to show statutory standing); *Abbey v. Computer Memories, Inc.*, 634 F. Supp. 870, 874 (N.D. Cal. 1986) (traceability requirement unmet where IPO shares held by DTC commingled with non-IPO shares). That majority view is even stronger in light of the Supreme Court's decision in *Slack*, in which the Supreme Court confirmed that traceability must be strictly construed. 598 U.S. at 768-70.

### 2.    The Traceability Requirement Cannot Be Met After August 11, 2021

Between February 11, 2021, and August 11, 2021, the only Talis shares in the public market were those issued and registered to the IPO. The Lock-Up shares, by their nature, were issued prior to the IPO and thus never registered under the challenged Registration Statement. Shevlin Decl. ¶¶ 2, 4-6. On August 11, 2021, the restrictions on the non-IPO shares were removed, and certain Talis stockholders transferred their non-IPO holdings to personal brokerages. *Supra*, Section II.D. Once transferred to personal brokerages, those shares were commingled with all other Talis shares held in a "fungible bulk" by DTC, including shares issued in the IPO. *Perrin*, 2014 WL 10979865, at \*2; Ludwig Decl. ¶ 3; Shevlin Decl. ¶ 10.

From that date forward, any shares purchased on the open market can no longer be traced to the Registration Statement and must be excluded from any proposed class. *Honest* is directly on point. In that Section 11 case, plaintiffs challenged statements in the company's May 2021 IPO registration statement, pursuant to which the company issued millions of shares. Four months later, 6,740 Honest shares "issued prior to the IPO and never registered under the operative registration statement" were transferred to a personal brokerage that held shares in DTC. *Honest*, 2023 WL 3190506, at \*4. As the court recognized, "shares issued pursuant to the 'lock-up' agreements would not give their beneficial owners standing to bring a claim under Section 11," and accordingly limited the class period to when the lock-up shares were first commingled with IPO-shares. *Id.* at \*4-5; *see also Sundaram v. Freshworks, Inc.*, 2023 WL 1819158, at \*4 (N.D. Cal. Feb. 8, 2023) (rejecting proposed lead plaintiff who purchased shares after an IPO lock up period as inadequate).

Plaintiff's proposed class definition suffers from the same problem: by extending beyond the Lock-Up period, it necessarily includes purchasers whose shares cannot be traced back to the Registration Statement (and therefore are not entitled to recover under Section 11). This is true of

COOLEY LLP

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
22-CV-00105-SI

Dugan himself: from December 17, 2021 through May 4, 2022, Dugan purchased 26,000 Talis shares on E*TRADE. Ex. 9. But there is no way to trace those shares back to the Registration Statement.[12] Not only were there over 5,000,000 non-IPO shares commingled with IPO shares in street name at that time, *see supra*, Section II.D, but at least 349 non-IPO shares were directly sold ***on E*TRADE*** on August 30, 2021. Lee Decl. ¶ 4.

Given the commingling of registered and unregistered shares following the expiration of the Lock-Up, no class should be certified (if one is certified at all) beyond Lock-Up expiration date. *Honest Co.*, 2023 WL 3190506, at *5 (limiting class definition to pre-lock-up period notwithstanding Lead Plaintiff purchased all stock prior to Lock-Up expiration). "Without a properly cabined class definition, individual class members would be required to prove that they can trace their shares to the IPO," and "if all class members are required to provide individualized evidence that they suffered an injury, Lead Plaintiff's claims would not be capable of classwide resolution, because the individualized assessments regarding class members' injury, would overwhelm common ones." *Id.*

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion for Class Certification.

Dated: December 12, 2023                    COOLEY LLP


                                            By:    /s/ Patrick E. Gibbs
                                                    Patrick E. Gibbs

                                            *Attorneys for Defendants Talis Biomedical Corporation, Brian Coe, J. Roger Moody, Jr., Felix Baker, Raymond Cheong, Melissa Gilliam, Rustem F. Ismagilov, Kimberly J. Popovits, Matthew L. Posard, and Randal Scott*

---

[12] Plaintiff's purported expert, Dr. Zachary Nye, has no opinion on "how one might go about determining whether a given share of stock was purchased pursuant to or traceable to the registration statement" in this action, Ex. 12 at 46:15-20, 47:17-23, and has never offered such an opinion in his career. *Id.* at 49:16-20, 50:13-25. Dr. Nye further confirmed he has done no work to determine whether Mr. Dugan's shares of Talis common stock were purchased pursuant to or traceable to the Talis registration statement. *Id.* at 51:12-17.

COOLEY LLP

DEFENDANTS' OPPOSITION TO
MOT. FOR CLASS CERTIFICATION
22-CV-00105-SI