# EXHIBIT 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

_____
                                )
IN RE TALIS BIOMEDCAL           )
SECURITIES LITIGATION           )
                                )  Case No. 3:22-cv-00105-SI
                                )
THIS DOCUMENT RELATES TO:       )
ALL ACTIONS                     )
                                )
_____)

VIDEOTAPED DEPOSITION OF MARTIN DUGAN

Malibu, California

Friday, October 27, 2023

Volume I

Reported by:

NADIA NEWHART

CSR No. 8714

Job No. 6161726

PAGES 1 - 319

Page 1

please state them at the time of your appearance.

At this time, will counsel and all present please

state their appearances and affiliations for the

record, starting with the noticing party.

MS. SIMPSON LAGOY:  Good morning.                    11:03:14

Jessie Simpson LaGoy from Cooley on behalf of

defendants.  And with me on Zoom is Shannon Eagan

from Cooley, also on behalf of defendants.

MR. KUBOTA:  Evan Kubota from Bleichmar Fonti

& Auld for the witness, Mr. Dugan, and the class.    11:03:30

With me is Ross Shikowitz from my firm and

Rina Restaino from the Schall Law Firm.  On Zoom, we

have our co-counsel Jonathan Park from Pomerantz.

THE VIDEOGRAPHER:  Thank you.

THE REPORTER:  I will swear you in,                  11:03:46

Mr. Dugan.  Please raise your right hand.


MARTIN DUGAN,

having been administered an oath, was examined and

testified as follows:


EXAMINATION

BY MS. SIMPSON LAGOY:

    Q   Okay.  Good morning, Mr. Dugan.  We met just

a few moments ago, but would you please state and    11:04:03

Page 10

Q    Okay.    What did you do to prepare for your deposition today?

MR. KUBOTA:    Objection.

I would just caution the witness not to disclose the substance of communications or meetings 11:12:29 with counsel.    Basic things like when we met, how long we met are -- are fine to answer.

THE WITNESS:    I have met twice with counsel to review the matter and state my opinions on what happened.    And I have had email correspondence with 11:12:56 counsel.    And I would say that the sum total of the hours that I have invested in this are approximately 25 to 30.

BY MS. SIMPSON LAGOY:

Q    Okay.    Great.    Let's break that down just a 11:13:11 little bit.

So you said you met two times with counsel in preparation for today's deposition?

A    Correct.

Q    Were those meetings in person?    11:13:21

A    No.

Q    What -- what -- what forum, I guess --

A    Zoom call.

Q    Zoom call.    Okay.    And when did those take place?    11:13:35

Page 18

A    One was yesterday, if I recall correctly. And the other was last Friday, but I'm not a hundred percent sure of that.  I'd have to check my calendar.  Last -- let me say last week.

Q    And yesterday, how long did the Zoom call last?    11:13:53

A    Approximately 20 minutes.

Q    And the meeting last week, how long did that last?

A    About the same.    11:14:12

Q    The meeting yesterday, which -- who was present on the call?

A    Evan, Rina and Brian Schall.

Q    And the meeting last week, who was present for that?    11:14:37

A    I believe all three were present at that meeting as well.

Q    Was anyone else present yesterday?

A    Not to my knowledge.

Q    Was anybody else present last week?    11:14:49

A    Not to my knowledge.

Q    In your Zoom call yesterday, did you review any documents?

        MR. KUBOTA:  You can answer yes -- yes or no.

        THE WITNESS:  I personally did not look at    11:15:15

Page 19

any documents.  I -- I didn't look at any.

BY MS. SIMPSON LAGOY:

Q   Okay.  I take it from your answer, were some documents presented to you via --

A   I don't recall.                                    11:15:29

Q   -- share screen?

A   I don't recall.

Q   You don't remember looking at any documents in your prep --

A   Correct.                                           11:15:35

Q   -- preparation yesterday?

MR. KUBOTA:  I'm not sure that's quite what he said, but if you want to rephrase the question, maybe he can -- he can answer it.

BY MS. SIMPSON LAGOY:                                    11:15:49

Q   Okay.  Do you recall looking at any documents yesterday in your preparation for today's deposition?

A   I believe there documents that were presented, but I wasn't looking at the Zoom call the    11:15:59 whole time.  I was doing some other things and talking, so...

Q   I see.

A   Presented and me looking at, I think, are two different things.                                     11:16:12

Page 20

Q   So -- okay.  So during your prep, your 20-minute preparation yesterday over Zoom, your lawyers put certain documents up over share screen on Zoom; is that right?

A   I don't recall.  I was kind of multitasking    11:16:30 during this.

Q   Okay.  And so you don't -- you don't recall one way or the other whether your docu- -- whether your lawyers showed you any documents in --

A   Yesterday.    11:16:43

Q   -- preparation yesterday?

A   Correct.

THE REPORTER:  Could I ask you to wait for the whole question before you answer, please.  Thank you.    11:16:51

THE WITNESS:  Okay.

THE REPORTER:  Thank you.

BY MS. SIMPSON LAGOY:

Q   In the preparation last week over Zoom, do you recall reviewing any documents with your    11:17:07 lawyers?

A   I don't recall.

Q   Okay.  Do you recall whether your lawyers put certain documents on the -- made certain documents available --    11:17:22

Page 21

Q   Okay.  But -- but last week, you don't recall whether you looked at any documents?

A   Correct.

Q   Okay.  Outside of the two Zoom prep sessions that you had with your lawyers, did you review any documents independently in preparation for today?    11:18:55

A   Yes.

Q   Did those documents refresh your recollection?

A   Yes.    11:19:09

Q   What were they?

A   The general presentation of who I am and where I am from.  I don't know what the title of that document was, but I looked at that last week.  And I'm sure I have looked at and read every document that I have signed.    11:19:44

Q   You say you're sure you have looked at and read every document you've signed.

A   I would not have signed it if I had not looked at it.    11:20:05

Q   Understood.  Are you talking about at the time that you signed it is when you have read --

A   Correct.

Q   -- it, not in preparation for today?

A   Correct.    11:20:11

Page 23

Q   And you mentioned reviewing a document setting forth the general presentation of who you are and where you are from --

A   Correct.

Q   -- is that right?                                    11:20:28

But you don't remember what that's called?

A   Correct.

Q   Any other documents that you reviewed independently?

A   Not -- not to my recollection.                      11:20:38

Q   Okay.  Now, you mentioned that you have also emailed with your lawyers.  Was that in preparation for today that you emailed your lawyers?

MR. KUBOTA:  Objection to form.  If you understand the question, you can answer it.       11:20:58

But you might want to be more clear.

THE WITNESS:  Well, I guess I would say over what period of time?  I mean, this has gone on two years, so it's been two years of preparation.

BY MS. SIMPSON LAGOY:                                    11:21:13

Q   Okay.  Two years of preparing for the deposition today?

A   No.  Two years of preparing for the entire process.

Q   Okay.  In preparation for today, did you       11:21:26

Page 24

conduct any -- or let -- let me rephrase it.

Did you conduct any preparation with your lawyers for today over email?

MR. KUBOTA:  Objection to form.

I'm -- I'm not sure I understand the question.                                    11:21:41

MS. SIMPSON LAGOY:  Okay.  You're not testifying though, today, Mr. Kubota, so I'll -- I'll ask the witness.  And I -- you're not permitted to tell him how to answer.                    11:21:51

MR. KUBOTA:  I stated my objection.

You can answer.

THE WITNESS:  Can you repeat the question?

BY MS. SIMPSON LAGOY:

Q   Yes.  You mentioned that you had emailed with      11:21:58 your counsel in preparation for today's deposition. I'm just trying to understand whether any of those communications were substantive preparation.

So did you conduct any substantive preparation over email with your lawyers for today's      11:22:17 deposition?

A   Not to my recollection.

Q   Then you also mentioned that you've spent in total about 25 to 30 hours, I believe, on this matter; is that right?                               11:22:35

Page 25

Q    What kind of research?

A    The research comes from various and numerous information sources such as, an example, Bloomberg, CNBC, Seeking Alpha, StockTwits, things of that nature.                                             11:29:13

Q    Do you ever discuss in the newsletter your own personal investments?

A    No.

Q    Do you ever discuss in the newsletter companies in which you have invested?          11:29:32

A    Not to my recollection.

Q    With the newsletter, are you -- you are suggesting to your subscribers that they purchase stock -- certain stock in certain companies?

MR. KUBOTA:  Objection; misstates prior          11:29:50
testimony.

You can answer.

THE WITNESS:  We suggest options that they can buy in companies.

BY MS. SIMPSON LAGOY:                                     11:29:58

Q    But you've never purchased options in any of the companies that you write about in your newsletter?

A    Correct.

Q    Why not?                                          11:30:11

Page 30

A    Elmira, New York.

Q    What did you study there?

A    Economics, poly sci.

Q    When did you get your degree?

A    I left Elmira in 1977, I believe.                    11:37:34

Q    Did you get a degree from Elmira?

A    No.

Q    How long were you there?

A    Approximately three years.

Q    Did you ever obtain a bachelor's degree?          11:37:53

A    No.

Q    Have you ever worked for a company that --

        (Interruption in the proceedings.)

        MS. SIMPSON LAGOY:  There's an interruption

in the room.                                            11:38:13

        MR. KUBOTA:  Oh, we're --

        MS. SIMPSON LAGOY:  Let's go off the record.

        MR. KUBOTA:  We can stay on.  I'll just hit

"private."

        MS. SIMPSON LAGOY:  Let me try that again.      11:38:25

    Q    Have you ever worked for a company that was

seeking FDA approval?

    A    No.

    Q    Okay.  After you left -- well, I take it --

yeah, okay.                                             11:38:50

Page 36

A    Yes.

Q    Do you know who the defendants are?

A    I know some of them.   I may not know all of them.

Q    Who do you know?                                11:46:07

A    Brian Coe would be one.  Kim Popovits would be two.  Mr. Moody would be three.  Felix Baker would be four.  Rob Kelley would be five.  And there may be others, but those are the ones that come to mind.                                              11:46:29

Q    Do you have any understanding of the roles of those individuals you just listed?

A    I do.

Q    What -- what is Brian Coe's role at Talis?

A    He was the CEO and was, in my belief, fired.    11:46:42

Q    Did he have any other role?

A    I don't recall.

Q    What about Roger Moody?

A    CFO, I believe.

Q    Okay.  Felix Baker?                             11:47:01

A    Director.

Q    And what's your understanding of Kimberly Popovits' role?

A    Director and interim CEO.

Q    Okay.  And for -- for any of these             11:47:14

Page 42

MS. SIMPSON LAGOY:  No, I don't.  And that's not what I asked.

THE WITNESS:  Repeat the question.

BY MS. SIMPSON LAGOY:

Q   Uh-huh.  Which representations that Talis   11:52:20 made do you find to be inaccurate?

A   I would have you refer to the complaint.

Q   Which complaint is that?

A   All of the complaints that are associated with my filings.   11:52:39

Q   Do you know which complaint we're on, is the current?

MR. KUBOTA:  Objection to form.

MS. SIMPSON LAGOY:  I will rephrase that.

Q   Do you know which complaint is the current   11:52:48 complaint?

A   If I saw it, I would, I believe.

Q   Do you know how many complaints there have been in this action?

A   I don't recall.   11:52:58

Q   Do you recall when -- approximately when the most recent complaint was filed?

A   Approximately a year and a half ago, maybe two.

Q   Do you have an understanding that more than   11:53:15

Page 46

one complaint have been filed in this case?

A    I don't recall.

Q    Have the defendants in this lawsuit changed at all over time?

A    I don't believe so, but it is possible.    11:53:49 Not to my knowledge.

Q    Have you had any involvement in who is named as a defendant in this lawsuit?

MR. KUBOTA:  Objection.  I -- I don't think you're entitled to probe the substance of any    11:54:08 communications with counsel.

If you want to ask it --

MS. SIMPSON LAGOY:  I'm entitled to --

MR. KUBOTA:  -- as a -- a yes-or-no --

MS. SIMPSON LAGOY:  A yes-or-no question.    11:54:25

MR. KUBOTA:  If you want to ask it as a yes-or-no question, he can answer.

THE WITNESS:  Repeat the question.

BY MS. SIMPSON LAGOY:

Q    Without getting into the substance of any    11:54:33 communications with your counsel, have you had any involvement in determining which defendants would be named in this lawsuit?

MR. KUBOTA:  You can answer as a yes or no.

THE WITNESS:  To the best of my recollection,    11:54:50

Page 47

no.

BY MS. SIMPSON LAGOY:

Q    What is your understanding of Brian Coe's involvement in the alleged wrongdoing?

A    He was the CEO of the company, so he should    11:55:12 have known the path of the product's reliability and had -- and should have expressed that accurately to the shareholders of the company.

And he should have known and expressed in a reliable fashion to the shareholders of the company    11:55:39 the intricacies of the FDA's involvement in approvals for the product and its services, and I believe that the facts show differently.

Q    How did he express inaccurately the path of the product's reliability?    11:56:13

MR. KUBOTA:  Objection to form.

THE WITNESS:  Through various different news sources, I have read and/or understand that the reliability and accuracy of the tests were significantly below the levels that Talis expressed    11:56:31 to their shareholders.

BY MS. SIMPSON LAGOY:

Q    Did Talis express specific levels of accuracy to its shareholders?

MR. KUBOTA:  Objection to form.    11:56:50

Page 48

MS. SIMPSON LAGOY:  He's -- we've established he's not a lawyer, so yes.

THE WITNESS:  Repeat the question.

BY MS. SIMPSON LAGOY:

Q    What legal claims are you bringing with this    12:06:21
lawsuit?

A    Restitution for myself and the entire class.

Q    Do you have any other general understanding of the claims, the current claims in the lawsuit?

A    Yes.    12:06:47

Q    What are those?

A    I believe they're outlined in the correspondence and complaints.

Q    Okay.  As we sit here today, do you have any understanding of the complaints that you're alleging    12:06:58 as co-lead plaintiff?

A    Yes.

Q    And what are those?

A    Fraud.

Q    Anything else?    12:07:05

A    Infractions on securities laws.

Q    Do you know which securities laws?

A    I don't know the exact code number, no.

Q    Do you have any understanding that the claims in the lawsuit may have changed over time?    12:07:33

Page 55

A    My understanding is that the general nature of the claims of fraud and misleading the investors in Talis, while there may be miniscule changes in them, generally press forward as just that.

Q    Are you aware of any claims in this lawsuit having been dismissed by the Court?    12:07:58

MR. KUBOTA:    Objection to form.

You might want to clarify what you mean by "having been dismissed by the Court."

BY MS. SIMPSON LAGOY:    12:08:27

Q    You can answer.

A    No, I'm not aware of that.

Q    You mentioned the securities laws.  Have you ever been in a lawsuit alleging violation of the securities laws before?    12:08:50

A    No.

Q    Is there a particular document or documents that you believe was false or misleading?

MR. KUBOTA:    Objection to form.

THE WITNESS:    I don't recall exactly.    12:09:00

BY MS. SIMPSON LAGOY:

Q    Do you have an understanding of whether this lawsuit claims that any particular document or documents was false and misleading?

A    I believe it does.    12:09:18

Page 56

Q    Do you know which document or documents?

A    I believe they're referenced in the complaint.

Q    Do you have an under- -- a general understanding, as we sit here today, without looking at the complaint?                           12:09:27

A    In one word, fraud.

Q    Are there any particular statements that you understand were false at the time they were made?

MR. KUBOTA:  Objection to form.          12:09:54

Are you asking him which statements are challenged in the complaint?  Do you want to show him a copy?

MS. SIMPSON LAGOY:  I don't want to show him a copy right now.                           12:10:06

Q    Are you aware that -- do you have any understanding -- well, you mentioned several times that you believed that there were inaccuracies in -- in some of the statements that Talis made; is that right?                                        12:10:35

A    Correct.

Q    Okay.  What -- what statements are you referring to?

A    Public published information coming from the defendants about the progress of sales of the    12:10:51

Page 57

statements in this lawsuit?

        MR. KUBOTA:  Objection --

        THE WITNESS:  No --

        MR. KUBOTA:  -- misstates prior testimony.

        THE WITNESS:  No, no, I don't believe that.    12:20:25
I believe that the people -- the defendants are the
source of the misleading statements and fraud.

BY MS. SIMPSON LAGOY:

    Q    Okay.  And do you have any understanding
aside from -- that there is a particular document    12:20:37
that might -- or documents that is the source of --
that wrote down the statements that you're claiming
are inaccurate?

        MR. KUBOTA:  Objection to form, compound.  It
doesn't make sense as stated.                        12:20:55

        Do you want to rephrase the question?

        MS. SIMPSON LAGOY:  I'll say it again.

    Q    Do you have any understanding today that
there is a particular document or documents that is
the source of the false and misleading statements    12:21:15
that we've been discussing?

    A    No.

        MS. SIMPSON LAGOY:  Do you want to take a
break, Court Reporter?

        THE REPORTER:  Sure.                          12:21:38

Page 65

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q   Do you know when Talis had its IPO?

A   Not the exact date, no.  I don't recall.
I've seen -- I've seen what it is.  I just don't
recall the date.

Q   How did you learn about Talis?                    01:25:01

A   Through Felix Baker.

Q   How so?

A   He's a major insider buyer.

Q   How did you learn about the company from him?

A   He was also a major inside buyer for           01:25:14
BioCryst.

Q   How do you know that?

A   Public information.

Q   What public information?

A   It's on E-Trade insider buying.                01:25:27

Q   Do you look at -- can you -- can you explain
what -- how -- what you mean by that?  How do you
follow insider buying on E-Trade for specific
individuals?

A   Well, there's a tab, "Insider Buying," and     01:25:46
they list who the inside -- inside buyers are.

And there's also another tab that lists who
the major stockholders are.

And I believe he was -- I believe he was
considered an insider buyer, but he also was a major   01:26:01

Page 101

shareholder of BioCryst.

Q    Do you follow the trades that Felix Baker makes?

A    I do.

Q    How long have you been doing that?    01:26:14

A    Since -- approximately three years.

Q    How many other people's trade -- insider -- how many other people's trades do you follow on E-Trade?

A    I don't recall.    01:26:30

Q    Approximately?

A    I look at the insider buying on every stock that I buy.

Q    I understand that.

You said that you learned about Talis from    01:26:45
Felix Baker.  So can you explain what you mean?

Did you -- did you get his name from BioCryst?

A    Yes.

Q    Okay.  And so you saw his name on BioCryst    01:26:57
and then went to the -- the -- look at his other trades?

A    Correct.

Q    Did you buy BioCryst before you bought Talis stock?    01:27:10

Page 102

There is very often a resettling after an IPO of a more realistic price of a stock relative to the category in which it competes.

Q   Is it fair to say that you purchased Talis stock in part because the stock had dropped after the IPO?      01:31:26

MR. KUBOTA:  Objection; misstates prior testimony.

THE WITNESS:  That was not the primary driver of my purchasing of Talis.      01:31:38

BY MS. SIMPSON LAGOY:

Q   Would you have bought stock in the IPO?

A   No.

Q   Why not?

A   I've never purchased an IPO.      01:31:46

Q   Well, it could have been the first time.

Why -- why -- why not the first time?

A   It's just not my thing.

Q   Okay.  You mentioned that the book-to-value -- I'm sorry, the -- the price-to-book ratio had become more appealing; is that -- is that right?      01:32:02

A   It was appealing and became increasingly appealing as the stock price dropped.

Q   Okay.  So you say it's -- okay.  So you say      01:32:12

Page 106

interrogatory?

A    Yes.

Q    Okay.  Some of the things we've discussed already today?

A    Correct.                                02:34:29

Q    Is there a reason that you didn't include those in your interrogatory response?

MR. KUBOTA:  Objection; misstates -- misstates the interrogatory response.

THE WITNESS:  Repeat the question.          02:34:41

BY MS. SIMPSON LAGOY:

Q    Is there a reason that you didn't include those other reasons in your interrogatory response?

A    At some point, enough's enough.

Q    Okay.  Before you purchased Talis stock on    02:34:59
March 26, 2021, what public information did you consult?

A    As much as --

MR. KUBOTA:  Objection; asked and answered.

THE WITNESS:  Yeah, as much as I -- I could.    02:35:31

BY MS. SIMPSON LAGOY:

Q    Okay.  Let's look at page -- oh, page 6.  I'm looking at interrogatory 5, which starts at the begin- -- or, sorry, the middle of page 6.

Do you see that?                            02:35:58

Page 127

a precise or exhaustive list of documents or sources or identify specific portions, Plaintiff Dugan generally consulted publicly available sources including Talis's    02:37:13

SEC filings and news about Talis in connection with his transactions in Talis common stock."

Is that true?

A    Yes.    02:37:24

Q    Okay.  Which SEC filings did you review?

A    I don't recall the exact titles of them or the dates of them.  But those are things that I typically do look at.

Q    Okay.  And just to be clear, this question is    02:37:41 asking you to state the documents that you did consult or review, not the ones that you generally consult and review.

Do you understand that?

A    Yes.    02:37:51

Q    Okay.  What news about Talis did you review?

MR. KUBOTA:  Objection; asked and answered.

BY MS. SIMPSON LAGOY:

Q    Before March 26, 2021, what specific news sources are you referring to in your interrogatory?    02:38:03

Page 129

A    I've answered that, like, ten times.  Do I need to do it again?

Q    You've answered generally, many news sources. I want to know what articles you looked at.

What news source are you referring to in interrogatory --          02:38:14

A    I -- I don't recall exactly.  I can tell you typically, as I said before, I use all the public news sources, including but not limited to Bloomberg, Reuters, AP, CNBC, various analysts,          02:38:25 Wall Street Journal, Fox Business News, Seeking Alpha, StockTwits, Reddit.  I could go on and on and on.

Q    So is it your testimony that you reviewed all of those sources, read everything that they wrote          02:38:46 about Talis, before March 26 --

A    No.

Q    -- 2021?

MR. KUBOTA:  Objection; misstates prior testimony.  That's not what he said.          02:38:53

MS. SIMPSON LAGOY:  I'm trying to understand.

MR. KUBOTA:  Yeah, but that's misleading. That's not what he -- he said at all.

BY MS. SIMPSON LAGOY:

Q    Okay.  I'm trying to understand.          02:38:57

Page 130

So you wrote here in this interrogatory that you verified that you looked at and reviewed Talis's SEC's filings.

A    Yes.

Q    I want to know which ones.                    02:39:01

A    I don't recall.

MR. KUBOTA:  Objection; asked and answered.

BY MS. SIMPSON LAGOY:

Q    Okay.  And which news sources were you referring to?                                          02:39:07

A    I just answered you.

Q    All of them?  There's not a specific one?

A    I said not limited to, but I -- I look at those sources typically.

I don't recall which ones specifically I     02:39:18
looked at for Talis.

Q    Okay.  Is there any particular news that you recall reading about Talis before you made your first investment?

MR. KUBOTA:  Objection; asked and answered.    02:39:32

You can answer again.

THE WITNESS:  Yes.  I mean, I -- I was looking at all the -- the public information on E-Trade, which comes from hundreds of different sources, that talked about the ability for this    02:39:45

Page 131

investment on March 26, 2021?

A    I don't recall.

Q    Do you have an understanding of what an EUA is?

A    I think it's the abbreviation for emergency     02:48:29 use.

Q    Yes, I think that's right.  Authorization.  I think I said that wrong earlier.

A    Emergency use authorization, yeah.

Q    Before you made your investment in Talis, did     02:48:48 you understand that Talis had applied for UA -- an EUA with the FDA?

A    I don't recall.

Q    Did it matter to you one way or the other when you made your investment?     02:49:09

A    I don't recall.

Q    Did you know prior to purchasing stock for the first time in Talis on March 26, 2021 that Talis had withdrawn its EUA application?

A    I don't recall.     02:50:03

Q    You don't recall knowing that one way or the other?

A    Correct.

Q    Would it have influenced -- would it have changed your mind about investment if you had known?     02:50:08

Page 138

allegedly omitted?

A    Not all.

Q    Okay.  Do you understand that one of the --
one piece of information that is supposedly omitted
from the registration statement is that the          03:00:19
comparator assay that we were just discussing that
was used for Talis's clinical study was not
sufficiently -- was not high sensitive and that it
violated FDA requirements?

A    There was significant discussion on public    03:00:39
news sources about Talis -- Talis's accuracy of the
machine, the cartridges and the software, and that
accuracy being different than the reality of that.

        And it was -- it included, via public
information sources, inferences that the top          03:01:11
scientist at Talis who was -- had a lot to do with
developing these things made inferences that that
was the case.

Q    Did you review any other documents prior to
investing -- let me ask you more specifically since   03:01:51
you've answered that generally.

        Prior to investing in Talis, did you review
any FDA guidance on how they were handling COVID
testing at the time?

A    I don't recall.                                  03:02:09

Page 146

Which one?

MS. SIMPSON LAGOY:  Fair enough.

Q   Do you -- do you have an understanding after March 8th, 2021, when they announced that they had withdrawn their EUA application, of when they resubmitted an EUA application for the Talis One --    03:05:14

A   I don't recall --

Q   -- COVID-19 test?

A   I don't recall the dates and the presses.  I don't recall.    03:05:29

MS. SIMPSON LAGOY:  Okay.  I don't want to scare you too much with this giant document, but I promise I will direct you to where to look, but you're welcome to review it.

(Exhibit 6 was marked for identification    03:05:54
and is attached hereto.)

BY MS. SIMPSON LAGOY:

Q   Okay.  I'm handing you what has been marked as Exhibit 6.  I will represent to you that this is the Talis Form S-1 registration statement under the    03:06:20
Securities Act of 1933, filed with the Securities and Exchange Commission on February 11th, 2021.

Have you ever seen this document before?

A   I don't recall.

Q   Do you -- you don't recall seeing it at all?    03:06:58

Page 149

MR. KUBOTA:  Objection to form.

Do you -- do you want to direct him to particular statements?

BY MS. SIMPSON LAGOY:

Q   I'm -- just as a whole, the --                    03:07:13

A   I --

Q   -- the cover page.

A   Typically, this is something I may have come across.  Typically, it's not something I would read, this entire document.  And I -- frankly, I don't    03:07:27 recall this particular one, whether I perused parts of it or not.  I just don't recall.

Q   Do you -- I think you're talking about prior to the investment; is that right?

A   Prior and/or during.                             03:07:42

Q   Okay.  What about prior to becoming involved with this lawsuit?

A   No.  I had no reason to go back and look at this.

Q   Okay.  Did you ever review this document         03:07:58 before filing the complaint in -- the consolidated complaint in this case?

A   I don't recall doing so.

Q   Do you understand that this lawsuit alle- -- that the consolidated complaint alleges that certain   03:08:26

Page 150

Q    And then turning to page 18, it -- it start- -- it says "Risk factors" at the top there.

Do you see that?

A    Yes.

Q    This one does continue for several pages.    03:25:59

Do you have any recollection of reviewing these risk factors prior to --

A    I don't recall.

Q    -- your investment?

THE REPORTER:  Could I ask you to wait,    03:26:09 please, for the question to be completed.

THE WITNESS:  Okay.  Sorry.

BY MS. SIMPSON LAGOY:

Q    All right.  On page 18 -- actually, I'll take you somewhere else.    03:26:50

Let's turn to page 135.

A    135 it is.

Q    Okay.  It says "Operations" and then "Manufacturing process."

Do you see that?    03:27:19

A    I do.

Q    Okay.  The first sentence there says (as read):

"Our products are manufactured by several third parties, including a    03:27:26

Page 166

single contract manufacturer that
provides the parts and assembles our
instrument."

Do you see that?

A    I do.                                                        03:27:33

Q    Did you review this statement prior to your
investment?

A    I don't recall.

Q    Have you ever seen this statement before?

A    I'm sorry?                                                   03:27:40

Q    Have you ever seen this statement before?

A    I don't recall.

Q    Did this statement have any influence on your
decision whether or not to invest in Talis?

MR. KUBOTA:    Objection; relevance and form.                     03:27:53

THE WITNESS:    No.

BY MS. SIMPSON LAGOY:

Q    What is your -- do -- do you have any
understanding of -- of the truth of this statement
as you sit here today?                                            03:28:16

MR. KUBOTA:    Objection to form.    What does
that mean?

BY MS. SIMPSON LAGOY:

Q    Do you --

MS. SIMPSON LAGOY:    Actually, I -- I should          03:28:23

Page 167

Q    Okay.  All right.  So under where it says "Overview," there's a sentence, the second sentence of the second paragraph under "Overview," that states (as read):

"The Talis One platform incorporates    04:00:33 core proprietary technologies into a compact easy-to-use instrument, that utilizes single use test cartridges and software, including a central cloud database, which are designed    04:00:48 to work together to provide levels of testing accuracy equivalent to a central laboratory."

Can you see that?

A    I do.    04:01:00

Q    Did you review that statement prior to investing in Talis?

A    I don't recall.

Q    Did it have any influence on your decision on whether to invest in Talis?    04:01:08

MR. KUBOTA:  Objection to form.

THE WITNESS:  The question is, again?

BY MS. SIMPSON LAGOY:

Q    Oh, did -- did -- does that statement -- did that statement have any influence on your decision    04:01:23

Page 182

to invest in Talis?

A    If I hadn't seen it, it would not have had any influence.

Q    Okay.

A    It was my assumption that the testing    04:01:34
accuracy would be equal to or better than the laboratories that provide diagnosis for these diseases, not at point of service.

Q    Do you -- as you sit here today, do you --
you have any understanding about the truth of this    04:02:08
statement at the time it was made?

A    Yes, I questioned the truth of it.

Q    Which part?

A    The last part, "testing accuracy equipment to a central laboratory."    04:02:28

Q    Okay.  And let's just break it down a little bit.  So the -- it says -- that second clause says that the -- all right.  Let me ask -- let me say it this way.

Do you have -- do you see the word "designed"    04:03:01
in the sentence?

A    I see the word "designed."

Q    Yeah, that the Talis One platform that uses single test cartridges and software -- oh, do you have any understanding of how the -- the word    04:03:29

Page 183

A   Public news sources.

Q   Okay.  Did you gain that understanding from this document?

MR. KUBOTA:  Objection to form.

THE WITNESS:  No, I don't believe in this      04:15:12
document Talis would say that they're -- would claim that it would be 99 -- 90-some-odd percent accurate and then have it proved out to be significantly less than that.  I don't believe they put that in this document, but I don't recall.      04:15:29

BY MS. SIMPSON LAGOY:

Q   Okay.  Let's look at page 126.

A   126 it is.

Q   All right.  I'm looking at -- towards the bottom of the page, the second sentence of the last      04:16:09 paragraph (as read):

          "The test cartridge for COVID-19
          diagnosis contains a NAAT designed
          for optimal sensitivity and
          specificity to provide highly      04:16:25
          accurate results."
          Do you see that?

A   I do.

Q   Have you seen that statement before?

A   I don't recall.      04:16:45

Page 195

Q    Did that statement have any influence on your decision to invest?

MR. KUBOTA:  Objection to form.

THE WITNESS:  Parts of it.

BY MS. SIMPSON LAGOY:                                    04:17:14

Q    Which parts?

A    (As read):

"The COVID-19 diagnosis will provide highly accurate results."

Q    Okay.  Let's -- let's break that down.  So    04:17:27
the sentence says (as read):

"The COVID -- the test cartridge for COVID-19 diagnosis contains a NAAT designed for optimal and speci- -- sensitivity and specificity to    04:17:47 provide highly accurate results."

So what is -- do you agree that the -- that the test cartridge contained an NAAT, just looking at that first clause?

MR. KUBOTA:  Objection; assumes facts not in    04:18:17 evidence.

THE WITNESS:  The question again?

BY MS. SIMPSON LAGOY:

Q    The question was, do you agree that the test -- I'm just looking at the first part of that    04:18:40

Page 196

sentence.

Do you agree that the test cartridge for COVID-19 diagnosis contains an NAAT?

A    I have no opinion on that.

Q    Okay.  Do you agree that the NAAT was    04:18:55
designed for optimal sensitivity and specificity?

A    I have no opinion on it.

MR. KUBOTA:  Objection; assumes facts not in evidence.

BY MS. SIMPSON LAGOY:    04:19:10

Q    Do you agree that the NAAT was designed to provide highly accurate results?

MR. KUBOTA:  Same objection.

THE WITNESS:  I have no opinion on that.

BY MS. SIMPSON LAGOY:    04:19:20

Q    Okay.  You said that you read this sentence to say that the COVID-19 test provided highly accurate results; is that --

A    That's not --

MR. KUBOTA:  Objection --    04:19:32

BY MS. SIMPSON LAGOY:

Q    That's not what you said?

MR. KUBOTA:  -- misstates prior testimony.

THE WITNESS:  Yeah, that's not what I said.

MS. SIMPSON LAGOY:  Okay.    04:19:36

Page 197

paragraph.

A    Uh-huh.

Q    Starting with "Highly accurate."

Okay.  So it starts (as read):

"Highly accurate - The Talis One          04:30:47

platform incorporates a

shelf-stable, single-use test

cartridge that is designed to fully

integrate a nucleic acid

amplification test (NAAT) with          04:30:55

sample preparation, including

nucleic acid extraction and

purification."

Do you see that?

A    I do.                                      04:31:07

Q    Did you read that statement prior to

investing?

A    I don't recall.

Q    Have you ever seen it before today?

A    I don't recall.                           04:31:25

Q    Do you have an opinion one way or the other

of whether it's -- let me rephrase that.

Do you -- sitting here today, do you have an

understanding of whether that statement was true at

the time it was made?                         04:31:44

Page 206

MR. KUBOTA:  Objection to form.

THE WITNESS:  No opinion.

BY MS. SIMPSON LAGOY:

Q   Okay.  Jumping down in the same paragraph, two-thirds, the sentence starts "In a preclinical    04:32:05
assessment."

Do you see that?

A   Yes.

Q   Okay.  (As read):

"In a preclinical assessment    04:32:14
comparing the Talis One platform to
a reference lab test on 60 matched
anterior or mid-turbinate nasal
specimens, the Talis One test
exactly matched the referenced lab    04:32:27
results with 100 percent positive
percentage agreement (PPA) and
100 percent negative percentage
agreement (NPA) for detection of
SARS-CoV-19" -- sorry.  It doesn't    04:32:39
say -- "SARS-CoV-2, the virus that
causes COVID-19."

Did you see that statement prior to
investing?

A   I don't recall.    04:32:54

Page 207

Q   Have you seen it before today?

A   I don't recall.

Q   Did it have any influence on your decision to invest?

MR. KUBOTA:  Objection.  Objection to form.    04:33:01

THE WITNESS:  Parts of it.

BY MS. SIMPSON LAGOY:

Q   Which parts?

A   (As read):

"100 percent positive percentage    04:33:15

agreement for COVID-19."

Q   Uh-huh.  Okay.  And this is describing -- would you agree this is describing a -- a preclinical assessment that was conducted?

A   No, I don't necessarily -- I don't know.    04:33:27

MR. KUBOTA:  Yeah.

THE WITNESS:  I have no opinion on that.

BY MS. SIMPSON LAGOY:

Q   Do you have any reason to believe that that is false?    04:33:36

MR. KUBOTA:  Objection.  What's "that"?

MS. SIMPSON LAGOY:  Oh, the -- the data that's being reported here was -- was false.

THE WITNESS:  What's the question?

BY MS. SIMPSON LAGOY:    04:33:45

Page 208

Q    Do you have any reason to believe that the statement is false or misleading?

A    Parts of it.

MR. KUBOTA:  Objection; asked and answered.

BY MS. SIMPSON LAGOY:                                    04:33:53

Q    Which parts?

A    (As read):

"100 percent positive percentage agreement for COVID-19," the closest to COVID-19.                                    04:34:01

Q    You -- sitting here today, you think that was -- the way that -- that Talis is describing this preclinical assessment was false at the time?

A    I think during the process, promoting their -- their Talis One machine and its process,    04:34:17 they highly publicized their ability to penetrate the COVID-19 testing market and presented that as a significant monetary opportunity for its investors.

And I think this statement, "100 percent positive percentage agreement that causes COVID-19,"    04:34:33 implies that.

Q    Do you understand that the positive percentage agreement is referring to a match to a comparator assay that's being tested?

MR. KUBOTA:  Objection; assumes facts not in    04:34:45

Page 209

evidence.

THE WITNESS:    No opinion.

BY MS. SIMPSON LAGOY:

Q    Anything else that you consider false about this statement?                                      04:35:09

MR. KUBOTA:    Objection to form.

THE WITNESS:    No opinion on that.

BY MS. SIMPSON LAGOY:

Q    Do you agree that the hundred positive -- hundred percent positive percentage agreement is       04:35:46 referring to a comparison between the Talis One platform to a reference lab test?

MR. KUBOTA:    Objection; assumes facts not in evidence.

THE WITNESS:    No comment.    No opinion on       04:36:06 that.

BY MS. SIMPSON LAGOY:

Q    Okay.    But is it -- is it your opinion that the results of comparing the Talis One platform to a reference lab test was not a hundred percent       04:36:24 positive percentage agreement?

A    No --

MR. KUBOTA:    Objection --

THE WITNESS:    Go ahead.

MR. KUBOTA:    You can answer.       04:36:32

Page 210

THE WITNESS:  No opinion on that.

BY MS. SIMPSON LAGOY:

Q    You just told me that you thought this statement was false because of the language.

A    I thought part of the statement was false,    04:36:39 not that whole statement.  I didn't say that.  Don't put words in my mouth.

Q    Okay.  I'm trying to understand what -- what you're saying.

So I'm just -- so the -- the hundred    04:36:50 positive percent agreement is part of a larger sentence, you agree?

A    Yes.

Q    Okay.  And it's describing a comparison between -- it says, "comparing the Talis One    04:37:01 platform to a reference lab test."

Do you see that?

A    I'm not sure I see it that way.

Q    How -- how do you understand the 100 positive percentage agreement?    04:37:19

A    100 positive percentage agreement that causes COVID-19 is how I understand that sentence.

Q    And what do you mean?

A    100 percent means all of the sample. Positive means affirmative, that causes agreement --    04:37:36

Page 211

something to do with FDA.

Maybe the approv- -- the -- the lack of the approval, something to do with the lack of the effectiveness of their tests, something to do with the -- the lack of their ability to execute and have    04:41:20 the machine actually perform this test.  It was at that time where I believe that it became apparent that this statement was false.

Q   Okay.  Let's turn to page 24.

A   58, 30, 16, 13.    04:42:02

MR. KUBOTA:  Do you -- do you need my 24?

THE WITNESS:  May I borrow it?

MR. KUBOTA:  Yep.

THE WITNESS:  Okay.  Yes.

MS. SIMPSON LAGOY:  Thank you, Counsel.    04:42:20

THE WITNESS:  Page 24.

BY MS. SIMPSON LAGOY:

Q   24.  Okay.  Second paragraph, first sentence.

(As read):

"An important factor in our ability    04:42:28 to commercialize our products is collecting data that supports the value proposition of our products, and in particular that our tests are just as accurate and reliable as    04:42:37

Page 214

central lab testing."

Do you see that?

A    I do.

Q    Do you -- did you review that statement prior to investing?                                                    04:42:48

A    I don't recall.

Q    Have you seen that statement before today?

A    I don't recall.

Q    Do you have an understanding of the truth of that statement as you sit here today?                            04:42:58

A    Yes.

Q    What is that understanding?

A    That as the process unfolded, that this statement is inaccurate.  The tests were not just as accurate and reliable as central lab testing.          04:43:23

Q    The sentence says that the company is collecting data to support its position on accuracy and reliabity [sic] -- reliability.

Do you see that?

A    I see that.                                                   04:44:00

Q    Do you have an understanding of whether it was still conducting testing as to accuracy and reliability?

MR. KUBOTA:  Objection to form.  Calls for facts not in evidence.                                                 04:44:29

Page 215

THE WITNESS:  Repeat the question.

BY MS. SIMPSON LAGOY:

Q    Do you have an understanding of whether the company was still collecting -- conducting testing as to accuracy and reliability?                04:44:45

MR. KUBOTA:  Same objections.

THE WITNESS:  During what period of time?

MS. SIMPSON LAGOY:  Oh, when it made this statement, February 11th, 2021.

THE WITNESS:  No, I have no opinion of -- no    04:45:01 reason to believe or not believe that they were actually collecting data.

BY MS. SIMPSON LAGOY:

Q    The "accurate and reliable," the words here, do you agree that they're describing the tests?    04:45:37

MR. KUBOTA:  Objection to form.

THE WITNESS:  Partially.  I mean, there's more to it.  Their products and their tests are accurate and reliable.  They state both.

BY MS. SIMPSON LAGOY:                               04:46:02

Q    You have an understanding -- I think we talked about this earlier -- that the tests are different than the instrument, right?

A    Yes.

MR. KUBOTA:  Objection.                            04:46:12

Page 216

BY MS. SIMPSON LAGOY:

Q    Okay.   And Talis would need both in order to commercialize, as they say, right?

A    No opinion on that.   I don't know if that's right or wrong.                                                04:46:28

Q    Okay.

A    I'm stating that this says their products -- and in particular, their tests -- are just as accurate and reliable as central lab testing. That's not true.                                                             04:46:36

Q    And where does your belief -- your understanding that is not true come from?

A    Public news information sources that have been published about the -- the reliability of the products, the reliability of the tests.                          04:46:49

Q    And when those -- those public sources that are talking about reliability, those were after this statement was made; is that right?

A    I don't -- I don't know.

Q    Okay.  Do you have an understanding as to         04:47:04 whether this statement that they're collecting data is false at the time it was made?

          MR. KUBOTA:  Objection to form.

          Are you asking him about the entire sentence or just part of it?                                              04:47:18

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

Q    Okay.

A    "I don't recall" is a better answer.

Q    Okay.  Did you understand -- even if you didn't read this sentence specifically, did you understand when you invested that Talis could not assure that the FDA would authorize its product?

04:51:17

MR. KUBOTA:  Objection; assumes facts not in evidence.

THE WITNESS:  I did not invest in Talis One for COVID-19 initially, and that's what this refers to.  So I had no opinion on whether or not the FDA would authorize it or not.  I invested based on the Talis One machine, the process, the people, the board of directors, the other criteria which I mentioned to you.

04:51:28

04:51:48

Additional investments made by me down the road were based on the statements that they made that implied that the Talis One machine would be able to identify COVID-19 at the point of service.

BY MS. SIMPSON LAGOY:

04:52:13

Q    And did you understand when you were investing prior to November 2021 that Talis did not have FDA approval yet?

A    For COVID-19?

Q    For anything.

04:52:34

Page 222

test.  I'm just making sure that -- that you still --

A    Okay.

Q    Okay.

A    That's not exactly what I said, but similar.    05:09:17

Q    Okay.  All right.  So at the time of the IPO, you -- you understood that Talis was still working on its COVID-19 test?

A    No, I did not know they -- At the time of the IPO, I didn't know that COVID was, like, a lead item    05:09:42 for them.  I was invested in it for the Talis One system primarily for -- for women's sexual diseases.

It was shortly after I got invested in Talis that the -- the whole COVID thing really blew up and that Talis started promoting the Talis One system as    05:10:12 a highly probable solution and the best solution for identifying at the point of service a COVID information.

MS. SIMPSON LAGOY:  All right.  Let's mark -- I can't promise I won't come back --    05:10:30

THE WITNESS:  We have 15 more minutes left, right?

MR. KUBOTA:  Do you want to take a break for --

THE WITNESS:  Well, we have to 5:30, right?    05:10:39

Page 236

for the decision to buy any of these on these days?

A    I don't recall.

Q    What were you -- do you keep an eye on -- on the stock of your investments?

A    Yes.                                                    05:31:32

MR. KUBOTA:  Objection to form.

BY MS. SIMPSON LAGOY:

Q    So the -- so between each of these investments, can I assume that you're looking at what's going on with the price of Talis?          05:31:37

MR. KUBOTA:  Objection to form.

I don't think you can assume anything.

THE WITNESS:  Yeah.  I mean, I -- I was actively looking at the dynamics of this stock.

BY MS. SIMPSON LAGOY:                                       05:31:53

Q    Were you also actively reviewing any statements coming out of the company?

A    One more time.

Q    Were you also actively reviewing any statements made by the company?                            05:32:04

A    I was just actively looking at all of the press releases and the information that was available on all of the public sources that I used to understand and garner information.

Q    Okay.  And do you -- in this time period,          05:32:37

Page 246

March 26th, or earlier, through May 2021, do you have any recollection of seeing in those sources, news sources, that Talis had withdrawn its EUA application because the FDA deemed it -- determined that it was not sufficiently sensitive?          05:32:58

    A   I don't --

        MR. KUBOTA:  Objection; asked and answered.

        THE WITNESS:  Yeah.

        THE REPORTER:  What was your answer?

        THE WITNESS:  "I don't recall."          05:33:06

        MS. SIMPSON LAGOY:  Okay.  This is Exhibit 9.

        (Exhibit 9 was marked for identification

        and is attached hereto.)

BY MS. SIMPSON LAGOY:

    Q   This is a -- an article on Seeking Alpha,          05:33:38
news source, on March 8th, 2021, about Talis's press
release.

        Did you see this?

    A   I see it now.

    Q   Did you see this at the time that you were          05:33:51
reviewing --

    A   I don't recall.

    Q   -- public news from the company?

    A   I don't recall.

    Q   Is it possible that you saw it?          05:33:57

Page 247

MR. KUBOTA:  Objection; asked and answered.

THE WITNESS:  I don't recall.

BY MS. SIMPSON LAGOY:

Q  You don't recall if it's possible that you saw it?                                                    05:34:06

MR. KUBOTA:  Objection; asked and answered.

BY MS. SIMPSON LAGOY:

Q  You can still answer.

A  I -- I read probably 300,000 words a day.
It -- I guess it's possible that some of these words    05:34:18
crossed my path.

Q  Okay.  Turning back to Exhibit 7, you've got
two purchases on June 7th and June -- two on
June 8th, also for a thousand -- this is DUGAN 3.

A  Okay.                                              05:34:48

Q  Any understanding of the basis for those
decisions to buy on those days in June?

A  None that I recall.

Q  And any reason that they're for a thousand
shares?                                                  05:34:59

A  None that I recall.

Q  Why would they be different prices on the
same day?

A  Price changes every second.

Q  Next, you have four purchases on June 16th,    05:35:06

Page 248

through November 7th, 2022 if that's how you felt?

A    I just answered that question for you.

MR. KUBOTA:  Objection; asked and answered and also misstates the record.

I -- I don't think there were any purchases    05:41:09
through November 7th of 2022.

MS. SIMPSON LAGOY:  You're right.  I -- I misstated that.

Q    Okay.  So -- but you -- you did continue buying stock through at least May 4th, 2022; is that    05:41:32 right?

A    If that's what the record says.

Q    Do you have any other transactions in Talis stock that are not reflected in these documents here?    05:41:48

A    I don't believe so.

Q    For any of these purchases that are reflected here today, do you know who held the shares before you bought them?

A    No.    05:42:00

Q    Did you at any time possess hard copy of other stock certificates for these shares?

A    No.

Q    Do you have any other way of knowing who held the shares before you bought them?    05:42:09

Page 253

A    No.

Q    Do you contend that the price you paid to purchase your Talis shares was artificially inflated?

MR. KUBOTA:  Objection; calls for expert testimony and infringes on privilege and work product.

Can you rephrase the question?

MS. SIMPSON LAGOY:  I will rephrase the question.

Q    Is it your understanding that the price you paid to purchase Talis shares that we were just talking about was artificially inflated?

MR. KUBOTA:  Objection.  That's the same question.  You didn't rephrase it.

MS. SIMPSON LAGOY:  I -- I did.  I changed it to his --

MR. KUBOTA:  Okay.  Same -- same --

MS. SIMPSON LAGOY:  -- his current understanding.

MR. KUBOTA:  Same objections.  Calls for expert testimony and infringes on work product and privilege.

Do you want to ask him whether he thinks he paid too much for Talis shares?

Page 254

into question the fact that I am not calling the clerk right now to get an answer to this?

MR. KUBOTA:  We can each reserve our rights. That's fine.

MS. SIMPSON LAGOY:  So same agreement as we reached --    05:50:52

MR. KUBOTA:  Yes.

MS. SIMPSON LAGOY:  -- previously?  Okay.

Q    Prior to seeking to be appointed lead plaintiff, you -- do you recall filing a declaration in support of your application to be appointed lead plaintiff?    05:51:14

A    Can you say that again and much slower?

Q    Uh-huh.  Prior to seeking to be appointed lead plaintiff, do you recall filing a declaration in support of your application?    05:51:34

A    If you're asking me if I agreed to be the lead plaintiff and filed whatever paperwork is necessary in order to do that, I believe that I did.

Q    And is it right -- is it correct that you -- prior to filing the motion or instructing your lawyers to file the motion, you spoke with them about the case?    05:51:51

A    I don't recall.

Q    Did you discuss with counsel the claims    05:52:23

Page 263

(Exhibit 10 was marked for identification and is attached hereto.)

BY MS. SIMPSON LAGOY:

Q   All right.  I'm handing you what's been marked as Exhibit 10.  This is Exhibit A.  Let's -- it's ECF number 30-3, which is Exhibit A to your motion to be appointed lead plaintiff in the instant action.    05:53:51

Do you recognize this document?

A   I do.    05:54:18

Q   Okay.  Can you look at paragraph 2?

A   I -- I am.

Q   Okay.  Where it says, "I earned a bachelor's degree from Elmira College in New York," do you see that?    05:54:27

A   That was erroneous, and we had a revision to this document, which I'm guessing you have a copy of.

Q   When -- when was a revision sent?

A   I'm not sure of the date.  I don't recall.    05:54:44

Q   All right.  You signed --

A   It's -- it's somewhat semantics.

Q   How so?

A   I had enough credits to graduate, but the -- Elmira College required a public service work stint    05:54:58

Page 265

A    Yes.

Q    Okay.   Who is your co-lead plaintiff?

A    A fellow from China.

Q    What's his name?

A    I have to look at my records.   I don't    05:56:36
recollect his exact name.   He had a very Chinese
name, though.

Q    Okay.   Is there anyone else that is a co-lead
plaintiff?

A    Not to my knowledge.                        05:56:46

Q    Does Mr. Yu ring a bell?

A    Yes.

Q    Okay.   Do you know why you are a -- were
appointed a co-lead plaintiff?

A    I know part of the reason.                  05:57:05

Q    What's that?

A    I was, I believe, second in line in most
significant losses, and Mr. Yu's geographical
location and perhaps cultural and/or language
inabilities caused the judge to think that it would  05:57:27
be more practical for me to be the lead in this dual
plaintiff action.

Q    Are you aware of whether Mr. Yu has had any
trouble leaving China?

A    I'm not aware of that.                       05:57:48

Page 267

Q    Are you aware of whether there's another entity that is a co-lead plaintiff with you?

A    Repeat the question.

Q    Are you aware of whether there's another entity that is co-lead plaintiff with you?                05:58:03

A    When you say "entity," do you mean person?

Q    Company.

A    Company.  No, I'm not aware of that.  It's -- to my understanding, it's myself and Mr. Wu [sic].

Q    When's the last time you were in touch with      05:58:18
Mr. Yu?

A    We exchanged emails -- I don't recall the exact date, but in the beginning of all of this.

Q    Okay.  Maybe May 2022?

A    Maybe.                                           05:58:35

Q    When is the first time you were introduced to
Mr. Yu?

A    Via email on that date when we exchanged emails.

Q    Okay.  And did you -- do you recall filing a     05:58:42
declaration in support of a joint proposal concerning the appointment of lead plaintiff?

A    I don't recall.

Q    Were you in touch -- how many times have you
been in touch with Mr. Yu?                              05:59:27

Page 268

and is attached hereto.)

BY MS. SIMPSON LAGOY:

Q   Okay.  I've handed you what's been marked as Exhibit 11.

Do you recognize this document?                06:07:28

MR. KUBOTA:  Take a moment and review it, Mr. Dugan.

THE WITNESS:  Yes.

BY MS. SIMPSON LAGOY:

Q   And what is it?                              06:07:57

A   It is what it's stated to be here.

Q   What do you understand it to be?

A   Amended Consolidated Class Action Complaint for Violations of the Federal Securities Law.

Q   Okay.  When -- when did you see this before?   06:08:13

A   I don't recall the date.

Q   Okay.  Do you know why you filed an amended complaint?

A   I don't recall.

Q   Did you review this prior to filing?          06:08:33

A   I'm sure I looked at parts of it.

Q   And did you provide any input into it?

A   I'm sure that some of my experiences through my investment cycle in Talis went into the drafting of this complaint.                                    06:09:09

Page 275

MR. KUBOTA:  Jessie, I would just state, for the record, that this exhibit seems to have some highlighting.

MS. SIMPSON LAGOY:  Thank you.

MR. KUBOTA:  That's -- yeah, we didn't --                06:09:24
that's not from what we filed.

MS. SIMPSON LAGOY:  I apologize.  That was supposed to be removed.

Which page has highlighting?

MR. KUBOTA:  I'm not sure.  I -- I just saw a     06:09:33
couple of blips, yellow -- yellow blobs.

MS. SIMPSON LAGOY:  Okay.  Let's reflect, for the record, that any highlighting that appears in here is unintentional and -- that's weird.  I don't see any.                                                        06:09:57

MR. KUBOTA:  That's fine.  I just wanted to point it out.  We can --

MS. SIMPSON LAGOY:  I don't have any highlighting on my copy.

MR. KUBOTA:  We can move on.                            06:10:03

MS. SIMPSON LAGOY:  Okay.  All right.

Q   Okay.  Did you consult with anyone about the contents of this complaint?  Sorry, did you consult with counsel -- and this is a yes or no -- about the contents of the amended complaint?                         06:10:34

Page 276

MR. KUBOTA:  Objection to form.

I don't know what consult means.

THE WITNESS:  I mean, throughout the process, I've consulted with counsel on many, many documents, and my guess is this was one of them.  I mean, there's so many here, who -- you know, it's highly likely that this one -- yes, I do recognize this.

And many of the -- the -- much of the information that went into this are things that I've conveyed that that happened through the process.

BY MS. SIMPSON LAGOY:

Q   Do you have any specific recollection of discussing the contents of the amended complaint before it was filed?

A   I don't recall.

Q   Did you conduct any independent investigation into the allegations in the amended complaint?

MR. KUBOTA:  Objection; asked and answered.

THE WITNESS:  No, I did not do any independent detective work to -- undercover or anything that wasn't already evident through public sources.

BY MS. SIMPSON LAGOY:

Q   So we've -- we've already spent quite a bit of time talking through some of the statements in

06:10:49

06:11:05

06:11:20

06:11:34

06:11:53

Page 277

here that are alleged to be false and misleading.
I -- I referenced this earlier.  There's also
some -- are you aware that there are allegations in
the amended complaint that state that certain
material information was omitted from the                06:12:06
registration statement that should have been there?

A    I -- I do recall that.

Q    Okay.  Do you -- do you recall which?

A    No.

Q    Okay.  Let's look at paragraph 154, which is    06:12:20
on page 38.

A    Page 38?

Q    Okay.  It says (as read):

     "The Registration Statement violated

     Item 303 by omitting the known,                    06:12:52

     material uncertainty that the FDA

     would reject Talis's comparator

     assay because it was not 'high

     sensitivity' and violated FDA

     requirements."                                      06:13:02

     Do you see that?

A    Yes.

Q    Okay.  And would you agree, having reviewed
several press releases today, that that information
was known to the market on March 8th?                   06:13:22

Page 278

A    Yes.

Q    Okay.  Why were you not available in Santa Monica today?

A    It's a three-hour drive at this time to get home.                                                                    07:02:19

Q    How many miles is it from Malibu to Santa Monica?

A    About 20.

Q    About 20?

A    Yeah.  Welcome to L.A.                                                                    07:02:28

        (Exhibit 13 was marked for identification

        and is attached hereto.)

BY MS. SIMPSON LAGOY:

Q    All right.  I'm handing you what's been marked as Exhibit 13.  I will represent to you that    07:02:56 this is a Google Maps showing -- search showing the results from Malibu, California to Cooley's offices in Santa Monica.

A    Malibu is 21.1 miles long.

Q    Okay.  Can you see where the dot is?                                                          07:03:12

A    I see a bunch of dots here.

Q    Okay.  Do you -- were you willing to travel 20 miles to sit for deposition today?

A    Repeat the question.

Q    Were you willing to travel 20 miles to sit                                                     07:03:29

Page 307

for deposition today?

A   Not to Santa Monica.

Q   Okay.  Were you -- okay -- willing to travel 12 miles --

A   Not --                                        07:03:42

Q   -- 12.2?

A   -- to Santa Monica.

Q   You know this action is proceeding in the Northern District of California in San Francisco, correct?                                       07:03:49

A   Yes.

Q   Okay.  Will you -- are you going to be willing to travel 650 miles for trial?

A   Absolutely.  Friday -- if you know anything about traffic in L.A., Friday night from      07:04:00 Santa Monica to Malibu can be a three-hour drive, sometimes longer.

Q   Okay.

A   Had I been asked to do that on a Thursday or a Wednesday, I -- I, in all likelihood, would have   07:04:11 accommodated it.  But a lot of insensitivity went into asking me to do that on a Friday.

Q   Are you aware that you proposed the -- your lawyer proposed the dates that were for today?

A   No.                                           07:04:26

Page 308

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not requested.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 10/30/23

NADIA NEWHART

CSR NO. 8714

Page 316