# EXHIBIT A

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

IN RE TALIS BIOMEDICAL SECURITIES
LITIGATION

THIS DOCUMENT RELATES TO:
ALL ACTIONS

Case No. 3:22-cv-00105-SI

**<u>CLASS ACTION</u>**

**DECLARATION OF**

**PROFESSOR JOSHUA MITTS, PH.D.**

**January 12, 2024**

TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

    A.  **Qualifications** ...........................................................................................**1**

    B.  **Summary of Conclusions** ..........................................................................**2**

II.  FACTUAL OVERVIEW .........................................................................................4

III.  NEITHER THE SHEVLIN DECLARATION NOR THE LUDWIG DECLARATION ESTABLISHES THAT
     UNREGISTERED SHARES WERE COMMINGLED WITH REGISTERED SHARES OR SOLD TO
     MEMBERS OF THE PROPOSED CLASS, AND THE LEE DECLARATION SHOWS ONLY A
     DISCRETE SALE OF 349 SHARES THAT DOES NOT PRECLUDE TRACING .............................8

    A.  **The Shevlin and Ludwig Declarations Did Not Review DTC Records and Fail
        to Show "Commingling" of Unregistered and Registered Shares ...................9**

    B.  **The Transfer of Shares to Cede & Co. Does Not Establish "Commingling"
        Among DTC's 800-Plus Participants.................................................................15**

    C.  **Neither the Shevlin nor Ludwig Declaration Shows that Unregistered Shares
        Were Sold to a Member of the Proposed Class .................................................17**

    D.  **The Lee Declaration Does Not Preclude Tracing ............................................18**

IV.  EVEN IF UNREGISTERED SHARES WERE COMMINGLED WITH REGISTERED SHARES OR
     SOLD, OWNERSHIP OF SECURITIES IN "FUNGIBLE BULK" FORM DOES NOT PRECLUDE
     TRACING PURCHASES TO THE REGISTRATION STATEMENT USING STANDARD ACCOUNTING
     METHODS THAT ARE NOT "STATISTICAL TRACING" ........................................................18

V.  TRACING PURCHASES IS AMENABLE TO CLASS-WIDE PROOF ...........................................20

VI.  CONCLUSION ...................................................................................................21

# I.    INTRODUCTION

## A.    Qualifications

1.    I am the David J. Greenwald Professor of Law at Columbia University.  I am also the principal of M Analytics LLC, a consulting firm specializing in financial economics.  I hold a Ph.D. in Finance & Economics from Columbia University, a J.D. from Yale University, and a B.A. in Liberal Studies from Georgetown University.

2.    I have published extensively in the fields of economics, finance, and law.  My articles have appeared in peer-reviewed journals, including the *Journal of Finance* (winner of the Dimensional Fund Advisors Distinguished Paper Prize (2020)), the *Journal of Law and Economics*, the *Journal of Legal Studies*, the *Journal of Institutional and Theoretical Economics*, the *International Review of Law and Economics*, the *Journal of Financial Regulation*, the *Business Lawyer*, and the *Harvard Business Law Review*, among others.

3.    I have been invited to present my research at numerous conferences and workshops in finance and law and economics, including the Annual Meeting of the American Finance Association, the Annual Meeting of the American Law & Economics Association, the Conference on Empirical Legal Studies, the Columbia Business School Conference on News and Finance, and the 8th Symposium on Intelligent Investing at Ivey Business School, and at workshops at Harvard University, Columbia University, New York University, The University of Texas at Austin, and Vanderbilt University.

4.    I have reviewed articles for peer-reviewed journals in finance and law and economics, including *The Review of Financial Studies*, *The Journal of Law and Economics*, *The Journal of Legal Studies*, *International Review of Law and Economics*, and *Journal of*

1

*Empirical Legal Studies*.  My research and commentary have been featured in *The Wall Street Journal*, *Reuters*, *Bloomberg*, *The Washington Post*, *MarketWatch*, *Law360*, *Bloomberg Law*, *Bloomberg View*, *Bloomberg BNN*, and *The Globe and Mail*.

5.　　In addition to my research and teaching and academic responsibilities, I advise on the analysis of trading data in connection with securities violations.  I have extensive experience supporting the U.S. Department of Justice.  My research and expert opinions have been presented to the U.S. Securities and Exchange Commission and other regulatory bodies.

6.　　At Columbia University, I have taught courses on securities regulation, law and economics, data science, and contracts.  My courses encompass economic theory, quantitative methods of valuation, asset pricing, investments, and data analytics as well as the economics of securities fraud, market manipulation, and insider trading.

7.　　My qualifications, publications, and expert witness testimony over the past five years are summarized in detail in my *curriculum vitae*, attached as Appendix A.

**B.　　Summary of Conclusions**

8.　　I have been retained by counsel for Plaintiff in this matter to opine on the following questions:

　　i.　**First**, whether the Shevlin or Ludwig Declaration establishes that unregistered shares of Talis common stock were commingled with registered shares or sold to members of the Proposed Class, and whether the Lee Declaration precludes tracing;

ii. ***Second***, even if unregistered shares were commingled with registered shares or sold to members of the Proposed Class, whether ownership of securities in "fungible bulk" form precludes tracing purchases of Talis common stock to the registration statement using standard accounting methods and whether those methods amount to "statistical tracing" or employ probabilistic reasoning; and

iii. ***Third***, whether tracing purchases of Talis common stock to the registration statement is amenable to Class-wide proof.

9. In reaching these opinions, I have relied upon various materials, which are cited in this declaration. The research and analysis upon which my opinions are based has been conducted by me with the assistance of personnel working under my direction and supervision. I reserve the right to modify this declaration and my conclusions based on additional information and materials I might review, including materials that have not yet been made available for review. I am being compensated at a rate of $1,500 per hour for my work in this matter. I have been assisted in this matter by staff at M Analytics LLC working under my direction, and I receive further compensation based on those billings. M Analytics LLC and my compensation are not dependent on my opinions expressed in this declaration or the outcome of this matter.

10. Based on my analysis to date, my review of available materials, my experience, and my professional judgment, I have formed the opinion that:

i. Neither the Shevlin Declaration nor the Ludwig Declaration establishes that unregistered shares of Talis common stock were commingled with registered shares or

sold to members of the Proposed Class, and the single sale of 349 shares identified in the Lee Declaration does not preclude tracing;

ii. Even if unregistered shares were commingled with registered shares or sold to members of the Proposed Class, ownership of securities in "fungible bulk" form does not preclude tracing purchases of Talis common stock to the Registration Statement using standard accounting methods that do not amount to "statistical tracing" or employ probabilistic reasoning; and

iii. Tracing purchases of Talis common stock to the Registration Statement is amenable to Class-wide proof based on data available from DTC and other sources.

11.    The remainder of this declaration discusses these opinions in detail.

## II.    FACTUAL OVERVIEW

12.    In this section, I describe the relevant facts underlying this case as I understand them based on Plaintiff's amended consolidated complaint (the "Complaint"), filed on January 13, 2023,[1] the April 28, 2023 opinion of the U.S. District Court for the Northern District of California on Defendants' motion to dismiss[2] as well as Lead Plaintiff's motion for class certification, filed on October 13, 2023.[3]

---

[1] Amended Consolidated Class Action Compl. For Violations of the Federal Securities Laws, Jan. 13, 2023, ECF No. 104 (hereinafter "Compl."); Unless otherwise noted, emphasis is in the original.

[2] *In re Talis Biomedical Sec. Litig.*, 2023 WL 3167844 (N.D. Cal. Apr. 28, 2023).

[3] Co-Lead Pls.' Mot. For Class Certification and Mem. of P. & A. in Supp. Thereof, Oct. 13, 2023, ECF No. 126 (hereinafter "Mot. For Class Certification").

13.     In February 2021, Talis Biomedical Corporation ("Talis") went public via an initial public

offering ("IPO").[4]  Its Registration Statement was declared effective February 11, 2021,

and the IPO was completed that same day.[5]  Talis hired underwriters to help facilitate the

IPO.

14.     In its IPO, Talis sold 15,870,000 shares of its common stock at $16 per share, and raised

(before deducting underwriting discounts and commissions and offering expenses) $253.9

million.[6]  The 15,870,000 total included 2,070,000 shares "sold pursuant to the exercise in

full by the underwriters of their option to purchase additional shares."[7]

15.     Talis's value largely depended on its ability to execute a timely roll-out of its "sole

product"[8] – Talis One, a molecular diagnostic testing platform for diseases including

COVID-19.  At a high level, there are two types of COVID-19 tests: antigen tests and

molecular diagnostic tests.[9]  Antigen tests are quicker than molecular tests but tend to be

less accurate.[10]  Talis One, a molecular diagnostic test, was uniquely appealing based on

---

[4] Compl. at ¶ 1.

[5] Compl. at ¶ 203-204.

[6] Compl. at ¶ 204.

[7] *Id*.

[8] Compl. at ¶ 3.

[9] Compl. at ¶ 53.

[10] *Id*.

its claim to be able to deliver molecular-test accuracy at antigen-test speed (approximately twenty-five minutes).[11]

16.    By early 2021 – the immediate run-up to Talis's IPO – the window to launch a new COVID-19 test was already "rapidly closing" due to rising vaccination rates and other advances in treatment and testing.[12]

17.    Talis's Registration Statement directly acknowledged the urgency of getting Talis One to market in the near-term, stating the company's "success in the future depend[ed] on *the timing* of obtaining regulatory clearances and approvals, as well as *the timing* of [Talis's] ability to deliver instruments and consumables into the marketplace in significant volumes."[13]  To that end, the Registration Statement asserted Talis was preparing "for a potential commercial launch as early as the First Quarter of 2021."[14]

18.    The Court, in denying Defendants' motion to dismiss, found that the Complaint had plausibly alleged, among other things, false and misleading statements (and actionable omissions) in the Registration Statement related to Talis One's manufacturing, performance, and the comparator assay used in Talis's application for Emergency Use Authorization from the FDA.[15]

---

[11] Compl. at ¶ 4.

[12] Compl. at ¶ 3.

[13] Compl. at ¶ 61 (emphases added).

[14] Compl. at ¶ 58.

[15] *Talis*, 2023 WL 3167844, at *1 (holding that the operative Complaint "plausibly alleges that the Registration Statement contained false and misleading statements about the ordering and

19.     Specifically, I understand that Plaintiff has alleged the Registration Statement's claims that Talis One instruments were already being "manufactured" at scale and "5,000" instruments had already been "ordered" were materially false and misleading when made.[16]  This is because, according to Plaintiff, Talis One was "only in the earliest stages of development" at the time of the IPO.[17]  Plaintiff has also alleged that the Registration Statement's claims of a reliable product with "central lab levels of accuracy" were materially false and misleading when made, as "up to 15% of Talis One tests were invalid at the time of the IPO, while central lab tests had an invalid rate at or near zero."[18]  After the IPO, Talis One failed to launch, and Talis's stock price "fell precipitously"; by January 7, 2022, the date the original Complaint in this matter was filed, the "share price had fallen from the $16.00 offering price to $3.31 per share."[19]

20.     I understand that Plaintiff has brought claims under Sections 11 and 15 of the Securities Act of 1933 on behalf of "[a]ll persons or entities that purchased or otherwise acquired common stock issued by Talis pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's February 11, 2021 initial public offering and were damaged thereby."[20]  In this

---

manufacturing of instruments, the accuracy and reliability of the Talis One, and omissions about the weakness of Talis's comparator assay and Talis One's unreliability.").

[16] Compl. at ¶ 69-70.

[17] Compl. at ¶ 72.

[18] Compl. at ¶ 146.

[19] Compl. at ¶ 207-208.

[20] Mot. For Class Certification, at *2-3.

declaration, I refer to shares registered under the Registration Statement as "registered shares" and all other shares—such as those issued before the IPO pursuant to SEC Rule 144—as "unregistered shares."

**III.   NEITHER THE SHEVLIN DECLARATION NOR THE LUDWIG DECLARATION ESTABLISHES THAT UNREGISTERED SHARES WERE COMMINGLED WITH REGISTERED SHARES OR SOLD TO MEMBERS OF THE PROPOSED CLASS, AND THE LEE DECLARATION SHOWS ONLY A DISCRETE SALE OF 349 SHARES THAT DOES NOT PRECLUDE TRACING**

21.   I have reviewed the declarations and exhibits attached to Defendants' Opposition to Plaintiff's Motion for Class Certification, filed on December 12, 2023,[21] including the Declaration of Meghan Shevlin,[22] Associate Director, SEC Reporting and Corporate Accounting at Talis Biomedical Corporation (the "Shevlin Declaration"), the Declaration of Lia Ludwig,[23] employee of Broadridge Corporate Issuer Solutions, LLC (the "Ludwig Declaration"), and the Declaration of Matthew Lee,[24] a former Talis employee (the "Lee Declaration").[25]

22.   In my opinion, neither the Shevlin Declaration nor the Ludwig Declaration establishes that unregistered shares of Talis were commingled with registered shares at the Depository Trust Corporation ("DTC").  Relying on transfer agent records, both Declarations show (at

---

[21] Defs.' Opp'n To Pl.'s Mot. For Class Certification, Dec. 12, 2023, ECF No. 136.

[22] Decl. of Meghan Shevlin, Dec. 12, 2023, ECF No. 136-21 (hereinafter "Shevlin Decl.").

[23] Decl. of Lia Ludwig, Dec. 8, 2023, ECF No. 136-17 (hereinafter "Ludwig Decl.").

[24] Decl. of Matthew Lee, Dec. 11, 2023, ECF No. 136-15 (hereinafter "Lee Decl.").

[25] In describing the statements in the Declarations, which I understand have not yet been tested through discovery, I do not endorse their factual accuracy.

most) only a transfer of legal title to unregistered shares to DTC's nominee, Cede & Co., for the benefit of three DTC participants. They do not show that those shares were commingled with registered shares by a DTC Participant. DTC has over 800 participants and maintains separate account records for each, yet the Shevlin and Ludwig Declarations erroneously assume that unregistered shares cannot be segregated from registered shares in DTC records. And neither the Shevlin nor Ludwig Declaration shows that unregistered shares were sold to a member of the Proposed Class.

23. The Lee Declaration shows only a single, discrete sale of 349 shares on August 30, 2021. However, that discrete sale does not preclude tracing purchases using a methodology amenable to Class-wide proof.

**A.      The Shevlin and Ludwig Declarations Did Not Review DTC Records and Fail to Show "Commingling" of Unregistered and Registered Shares**

24. The Shevlin and Ludwig Declarations make general claims about the nature of legal title and electronic book-keeping by DTC, as well as specific claims about individual transfers of shares based on records maintained by Defendant's transfer agent, Broadridge Corporate Issuer Solutions, LLC ("Broadridge"). As I will explain, these general as well as specific claims ultimately amount to no more than a conclusion that legal title to unregistered shares was transferred to Cede & Co., which does not establish that any unregistered shares were "commingled" with registered shares by a DTC participant.

25. The Shevlin Declaration states, "[w]hen a stockholder initiates a transfer from Talis's stock transfer agent to their personal brokerage, those shares are electronically transferred to that brokerage's DTC account. Upon completion of the transfer into the brokerage's DTC

account, those shares are no longer held by the individual stockholder on Talis's records and are instead held in street name to Cede & Co."[26]  Similarly, the Ludwig Declaration states that "Broadridge records Direct Registration System ("DRS") transfer requests and confirmation of the delivery of transferred shares to the designated DTC account as part of its regular practice as a stock transfer agent. Upon delivery with the designated DTC account, the shares are pooled and held in street name by DTC's nominee Cede & Co., and Talis's shareholder records are updated accordingly."[27]

26.    Specifically, the Shevlin Declaration states that as of February 17, 2021, Meridian Small Cap Growth Fund ("Meridian") held 705,537 shares of Talis common stock; the California Institute of Technology ("Cal Tech") held 16,184 shares; and a former employee, Matthew Lee, held 349 shares.[28]  These shares were issued prior to Defendant's IPO and were subject to lock-up agreements made effective on February 11, 2021 that restricted the sale or transfer of these shares until August 11, 2021.[29]  As of August 13, Meridian transferred all of the 705,537 shares to "to a brokerage DTC account, at which point those shares were commingled with all other shares of Talis's common stock registered in street name to Cede & Co."[30]  And as of August 17, Cal Tech and Lee transferred their 16,184 and 349 shares,

---

[26] Shevlin Decl. at ¶ 10.

[27] Ludwig Decl. at ¶ 3.

[28] Shevlin Decl. at ¶ 8.

[29] *Id.* at ¶ 2, 4-6.

[30] *Id.* at ¶ 13.

respectively, "to brokerage DTC accounts, at which point those shares were commingled with all other shares of Talis's common stock registered in street name to Cede & Co."[31]

27.    As I will explain, both the Shevlin Declaration and the Ludwig Declaration show only a transfer of legal title to unregistered shares to Cede & Co.  Neither establishes that those shares were commingled with registered shares by a DTC participant, much less that unregistered shares were sold to a member of the Proposed Class.

28.    As a preliminary note, I observe that the Shevlin Declaration refers to "software" used by Talis that is "capable of generating reports showing the listing of Talis shareholders for a given historical date."[32]  A review of the exhibits attached to the Shevlin Declaration indicates that all of these reports were produced by Broadridge as transfer agent for Talis, and not Talis itself.[33]  As transfer agent, Broadridge maintains a list of the registered holders of shares, which reflects the ownership of legal title to those shares.[34]  Thus, it is

---

[31] *Id.* at ¶ 15.

[32] *Id.* at ¶ 7.

[33] *See, e.g.*, Shevlin Decl. Ex. 5, at *1 ("Shareholder List – All Shareholders" with Broadridge logo) ECF No. 136-26; Shevlin Decl. Ex. 6, at *1 ("Shareholder List – All Shareholders" with Broadridge logo) ECF No. 136-27; Shevlin Decl. Ex. 7, at *1 ("Shareholder List – All Shareholders" with Broadridge logo) ECF No. 136-28; Shevlin Decl. Ex. 8, at *1 ("Shareholder List – All Shareholders" with Broadridge logo) ECF No. 136-29; Shevlin Decl. Ex. 9, at *1 ("Shareholder List – All Shareholders" with Broadridge logo) ECF No. 136-30.

[34] *See, e.g.*, SEC, *Transfer Agents*, https://www.sec.gov/divisions/marketreg/mrtransfer (last visited Dec. 27, 2023) ("Transfer agents record change of ownership, maintain the issuer's security holder records, cancel and issue certificates, and distribute dividends."); *see also* DTCC, *Cross-Business Glossary of Terms*, https://dtcclearning.com/helpfiles/cross_bus/glossary/Content/Topics/gloss.htm (last visited Dec. 27, 2023) ("A transfer agent is a trust company, bank, or similar institution assigned by a corporation to process transfers and registration of shares of stock (stock certificates). Transfer agents record changes of ownership, maintain the issuer's security holder records, cancel and issue certificates, and distribute dividends. A transfer agent may also further act as an

clear that the Shevlin Declaration and Ludwig Declaration are based on the same underlying transfer agent records maintained by Broadridge.

29.     As the Shevlin Declaration and Ludwig Declaration acknowledge, most U.S. shareholders hold title to securities in "street name," which means that legal title is held by DTC's nominee, Cede & Co., for the benefit of the shareholders' custodian(s).[35]   When a purchaser acquires shares from a seller in the U.S. capital markets, legal title to the shares typically remains "immobilized" with Cede & Co.[36]  Delivery of the shares from the seller to the purchaser occurs when DTC records a book-entry transfer of shares from the seller's custodial account to the purchaser's custodial account.[37]   DTC's custodial and book-entry

---

intermediary for the company by acting as proxy agent (sending out proxy materials), exchange agent (exchanging a company's stock or bonds in a merger), tender agent (tendering shares in a tender offer), and mailing agent (mailing the company's quarterly, annual, and other reports).").

[35] The shareholder's property right is known as a *security entitlement* governed by Article 8 of the Uniform Commercial Code, which specifies conditions under which shareholders may enforce their rights against security intermediaries like DTC.  *See, e.g.*, UCC § 8-503(d).

[36] DTCC, *Cross-Business Glossary of Terms*, ("Immobilization occurs when securities certificates are placed in the custody of a central securities depository to reduce the movement of physical securities. Ownership records for immobilized securities are updated electronically using a book-entry system, first at the CSD and then at the participant firms whose clients are the beneficial owners.").  *Cf.* Br. of the Depository Tr. Co. as *Amicus Curiae* Not in Supp. of Any Party at 18, *In re Petrobras Sec. Litig.*, No. 16-1914-cv (2d. Cir. Sep. 16, 2016), ECF No. 293-1 ("Under the system in which DTC operates, securities remain "immobilized" at DTC, with registered (legal) ownership vested in DTC's nominee, Cede & Co. Marketplace transactions among the beneficial owners of the securities are "settled" at DTC by book-entry credits and debits in Participant's DTC accounts, which create and extinguish security entitlements on behalf of Participants against DTC.").  Some U.S. shareholders may choose to withdraw their shares from DTC and hold legal title to their shares directly.  In that special case, a sale of those shares would entail a transfer of legal title from Cede & Co. to the purchaser.

[37] Most U.S. broker-to-broker transactions are cleared through the National Securities Clearing Corporation (NSCC), which acts as a central counterparty to both the purchaser and seller.  In that case, shares are delivered from the U.S. seller's custodial account to the NSCC's custodial account (with DTC identifier 888), and from the NSCC's custodial account to the U.S. purchaser's custodial account, after multilateral "netting" of offsetting purchases and sales.

functions make it possible for clearance and settlement to be a digital rather than physical process.  Due to the frequency and volume of securities transactions on a given day, DTC's digital record-keeping supports the efficient functioning of the U.S. securities markets.[38]

30.    Defendants offer no evidence from DTC itself.  For shares held in street name, Broadridge, as transfer agent, can only observe transfers of legal title to and from Cede & Co.  While incoming transfers to Cede & Co. are designated for the benefit of a DTC participant,[39] the Ludwig Declaration does not suggest—nor would it have any basis to suggest—that Broadridge observes the book entries maintained by DTC.  For this reason, the Ludwig Declaration has no basis to conclude that shares are "pooled" or "commingled," except in the narrow, formal sense of legal title being held by Cede & Co.  ***The Ludwig Declaration cannot rule out, nor could it rule out, that DTC book-entry records may have segregated unregistered from registered shares.***

---

[38] In a process known as "immobilization," DTC participants deliver ownership of securities to DTC.  DTC then holds these immobilized securities and designates legal ownership of them to its partner entity, Cede & Company ("Cede").  Even as these securities are bought and sold, legal title remains with Cede, and DTC simply uses its electronic book-entry system to record changes in beneficial ownership.  *See* Virginia B. Morris*, Guide to Clearance and Settlement: An Introduction to DTCC* (2022) at *7, https://www.dtcc.com/-/media/Files/Downloads/DTCC-Connection/DTCC-Interactive-Guide-to-Clearance-and-Settlement-2022.pdf.  Equivalently, a transfer agent participating in the DTC's Fast Automated Securities Transfer Program (FAST) program maintains a record of Cede's legal title through a "balance certificate."  This system of ownership is known as an "indirect holding" system.  *See* UCC §§ 8-115; 8-501.  A DTC-participant-holder of securities holds an *entitlement* to those securities.  *See* Br. of the Depository Tr. Co. as *Amicus Curiae* Not in Supp. of Any Party at 18, *In re Petrobras Sec. Litig.*, No. 16-1914-cv (2d. Cir. Sep. 16, 2016), ECF No. 293-1.  Legal title for the entire pool of securities is held by the DTC in "fungible bulk" form.  *Id.* at 10 (under fungible bulk ownership model "each Participant to whose DTC account securities of that issue have been credited has a pro rata (proportionate) interest in DTC's entire inventory of that issue").

[39] Ludwig Decl. at ¶ 3.

31.     Because the Shevlin Declaration relies on Broadridge's records, the Shevlin Declaration
        likewise does not rule out, nor could it rule out, that DTC maintains internal records that
        segregate certain transfers of shares to Cede & Co. from other transfers, thereby making it
        possible to identify who purchased unregistered shares as opposed to registered shares.  To
        the extent that the Shevlin Declaration purports to draw a conclusion concerning
        commingling of unregistered with registered shares from the records that Broadridge
        maintains as transfer agent, that conclusion would be baseless.

32.     The Shevlin Declaration states, "Meridian transferred 705,537 shares that were not issued
        pursuant to the Registration Statement to a brokerage DTC account, at which point those
        shares were commingled with all other shares of Talis's common stock registered in street
        name to Cede & Co."[40]  That Declaration similarly claims, "as of August 17, 2021, Cal
        Tech transferred 16,184 shares that were not issued pursuant to the Registration Statement,
        and Lee transferred 349 such shares that were not issued pursuant to the Registration
        Statement, to brokerage DTC accounts, at which point those shares were commingled with
        all other shares of Talis's common stock registered in street name to Cede & Co."[41]

33.     Because the Shevlin Declaration is based solely on legal title records maintained by
        Broadridge and does not examine DTC book-entry records, it provides no basis to conclude
        that these transfers of unregistered shares were "commingled" in DTC's records "with all
        other shares of Talis's common stock registered in street name to Cede & Co."

---

[40] Shevlin Decl. at ¶ 13.

[41] *Id.* at ¶ 15.

34.     Similarly, the Ludwig Declaration attaches copies of direct registration system (DRS) transfer requests for Meridian, Cal Tech and Lee.[42]  These requests list the DTC participant number of the destination for the transfer request but do not contain any further information concerning DTC book entries for these accounts.  There is thus no basis for the conclusion in the Ludwig Declaration that these shares held by DTC for the benefit of these specific participants were "pooled," except in the narrow sense that legal title to those shares was held by Cede & Co.  The Ludwig Declaration cannot rule out the possibility that those specific unregistered shares were segregated from registered shares in DTC records.

**B.      The Transfer of Shares to Cede & Co. Does Not Establish "Commingling" Among DTC's 800-Plus Participants**

35.     DTC has over 800 participant firms, including broker-dealers and custodians such as Bank of New York.[43]

36.     In my experience reviewing clearing and settlement records, DTC maintains internal records which make it possible to segregate transfers of unregistered shares to a DTC participant account from transfers of registered shares.

37.     Specifically, DTC maintains Participant Daily Activity Statements which contain individual book-entry transactions by individual DTC participants in individual securities. Under the DTC's deposit/withdrawal at custodian (DWAC) procedures, a transfer of legal

---

[42] Ludwig Decl. Ex. A, ECF No. 136-18; Ludwig Decl. Ex. B, ECF No. 136-19; Ludwig Decl. Ex. C, ECF No. 136-20.

[43] DTCC, *DTC Member Directories*, https://www.dtcc.com/client-center/dtc-directories (last visited Jan. 8, 2024).

title to shares to Cede & Co. is recorded as a direct deposit book entry into a given DTC participant's account.[44]  Critically, shares directly deposited into a given DTC participant's account are ***not commingled*** with shares held by other DTC participants, because DTC maintains separate account records for each participant.[45]

38.   The Shevlin Declaration and Ludwig Declaration thus contain a fundamental error.  The transfer of legal title to shares to Cede & Co.—which is all that is observable to a transfer agent like Broadridge—has no bearing on whether those shares are commingled.  At the very minimum, those shares are segregated between DTC participants within DTC's records.

39.   The implications of this error in the Shevlin Declaration and Ludwig Declaration are wide-reaching.  For example, according to Defendants' filings, as of August 17, 2021, only 722,070 shares out of the 16,676,369 shares held in "street name" (by Cede & Co.) were unregistered shares.  That is, more than 95.6% of shares held by DTC were registered on that date.  It is thus highly likely that many DTC participants (of which there are more than

---

[44] DTCC, *Deposit / Withdrawal at Custodian*, https://www.dtcc.com/settlement-and-asset-services/securities-processing/deposit-withdrawal-at-custodian (last visited Dec. 27, 2023) ("For DWAC deposits, the requesting participant's position in its DTC account is increased."); *see also* DTCC, *Deposit / Withdrawal at Custodian (DWAC) Information*, https://www.dtcc.com/-/media/Files/Downloads/Settlement-Asset-Services/agent-services/DWAC-agreement.pdf (last visited Dec. 27, 2023) ("Upon the custodian's approval of a withdrawal request, DTC completes the withdrawal by decreasing the custodian's balance, while the custodian deducts the securities from DTC's FAST balance account in accordance with the Participant's instruction. Upon the custodian's approval of a deposit request, DTC increases the Participant's account versus an increase to the custodian's balance on DTC's books, while the custodian adds the securities to DTC's balance on its books.").

[45] The sum of shares in all DTC participants' individual, segregated accounts will equal the total number of shares registered to Cede & Co. at any given point in time.

800) never received unregistered shares on that date. The conclusion that these unregistered shares were "commingled with *all other shares* of Talis's common stock registered in street name to Cede & Co."[46] is plainly incorrect. Indeed, according to the Ludwig Declaration, all of the 722,070 unregistered shares held by Cede & Co. as of August 17, 2021 were delivered to the accounts of just three DTC participants, Bank of New York, Northern Trust, and E*Trade.[47]

40.    Thus, the Shevlin Declaration and Ludwig Declaration do not establish that any unregistered shares were commingled between DTC participants or that the DTC participant who deposited those shares mixed unregistered shares with registered shares in their segregated book-entry account maintained by DTC.

## C.    Neither the Shevlin nor Ludwig Declaration Shows that Unregistered Shares Were Sold to a Member of the Proposed Class

41.    The Shevlin and Ludwig Declarations rely on transfer agent records maintained by Broadridge to conclude that legal title to unregistered shares was transferred to Cede & Co. It is entirely possible that DTC book entries for these unregistered shares remained with the original custodians who performed the DRS requests. Indeed, the Declarations provide no evidence indicating that the DTC participants with whom unregistered shares were deposited engaged in sale transactions. In other words, neither Declaration shows that a single unregistered share was sold to a member of the Proposed Class.

---

[46] Shevlin Decl. at ¶ 13, 15 (emphasis added).

[47] Ludwig Decl. at ¶ 4-6.

**D.**      **The Lee Declaration Does Not Preclude Tracing**

42.      The Lee Declaration describes a sale of 349 purportedly unregistered shares on August 30, 2021 that settled on September 1, 2021.[48]  Even assuming that these were unregistered shares, Lee's sale does not preclude tracing because it is readily addressed using the Class-wide methodology I outline below.

43.      The Lee Declaration also underscores why the mere transfer of legal title of shares to Cede & Co. is not a reliable indication of whether or when those shares were ultimately sold. For example, the Shevlin and Ludwig Declarations assert that Lee's 349 shares were transferred to Cede & Co. for the benefit of E*Trade on August 17, 2021,[49] but Lee did not sell the shares until August 30, nearly two weeks later, and the trade did not settle until September 1.

**IV.**      **EVEN IF UNREGISTERED SHARES WERE COMMINGLED WITH REGISTERED SHARES OR SOLD, OWNERSHIP OF SECURITIES IN "FUNGIBLE BULK" FORM DOES NOT PRECLUDE TRACING PURCHASES TO THE REGISTRATION STATEMENT USING STANDARD ACCOUNTING METHODS THAT ARE NOT "STATISTICAL TRACING"**

44.      Even if unregistered shares were commingled with registered shares or sold to a member of the Proposed Class, records maintained by DTC and the Financial Industry Regulatory Authority ("FINRA") permit identifying and segregating those transfers and/or sales and tracing the remaining shares to the Registration Statement.  This is the case even though

---

[48] Lee Decl. Ex. A.

[49] Shevlin Decl. at ¶ 15; Ludwig Decl. at ¶ 6.

"securities deposited at DTC . . . are maintained in 'fungible bulk;' *i.e.*, each Participant to whose DTC account securities of that issue have been credited has a *pro rata* (proportionate) interest in DTC's entire inventory of that issue."[50]

45.    It is straightforward to trace purchases using records produced in discovery along with an accounting method such as first-in-first-out ("FIFO") or last-in-first-out ("LIFO").[51] Based on my professional experience, broker-dealers, exchanges, FINRA, and DTC maintain detailed, time-stamped transactional records which can be obtained through discovery.[52]  These records show when securities in one account are transferred to another account, whether within the same broker-dealer or between different broker-dealers.  This makes it possible to reconstruct a reliable "chain of title" using standard accounting methods like FIFO or LIFO.

---

[50] Br. of the Depository Tr. Co. as *Amicus Curiae* Not In Supp. of Any Party at 10, *In re Petrobras Securities Litigation*, No. 16-1914 (2d. Cir. Sep. 16, 2016), ECF No. 293-1.

[51] My opinions in this regard are consistent with the Br. for *Amicus Curiae* Law and Business Professors ISO Resp't, *Slack Techs., LLC v. Pirani*, 143 S. Ct. 1433 (2023), https://www.supremecourt.gov/DocketPDF/22/22-200/256386/20230306171423271_22-200%20Amicus%20Brief.pdf. Along with Jack C. Coffee, Jr., the Adolf A. Berle Professor of Law at Columbia University, I served as co-counsel to those amici.  *Id.*; *see also* Decl. of Dr. Jonathan A. Brogaard, Ex. J to Decl. of Matthew S. Kahn ISO Defs.' Opp'n to Pls.' Mot. for Class Certification - Public Redacted Version at 21, *In re Slack Technologies Inc. Stockholder Litigation*, Lead Case No. 19-Civ-05370 (Cal. Sup. Ct., San Mateo Cnty., Jan. 18, 2022), Doc. No. 273 (conceding that it may be "theoretically possible to trace a single putative class member's purchases of Slack Stock to a seller who held the shares prior to the Direct Listing").

[52] *See, e.g.*, DTCC, *Security Position Reports Templates*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/security-position-reports-templates (last accessed Dec. 27, 2023) (listing participant holdings of a security on a date); 17 CFR § 240.17a-3(a)(6)(i)(A) (broker-dealers maintain detailed records on individual orders including "the time the order was received, the time of entry, the price at which executed, the identity of each associated person, if any, responsible for the account . . . and, to the extent feasible, the time of execution or cancellation").

46.     Accounting methods like FIFO and LIFO do not amount to "statistical tracing" nor do they involve probabilistic reasoning.  They do not make inferences regarding specific purchases from statistics about the population as a whole.  Rather, the application of an accounting method yields a single conclusion regarding who owns each share at each point in time.  Nor is it the case that every aftermarket purchaser would have standing for every share— rather, only those who purchased the securities newly issued and registered under the Registration Statement, as determined by a deterministic tracing analysis.

47.     Moreover, here, these accounting methods are likely to yield the same, unambiguous conclusion regarding most of the Proposed Class, regardless of which accounting method is chosen, because the volume of unregistered shares that could have been commingled with registered shares is relatively small during the period from August 12, 2021 (the day after the lock-up expired) until the filing of the original Complaint in this matter on January 7, 2022.  As the Shevlin Declaration states, as of August 17, 2021, 15,870,000 out of 16,676,369 shares—over 95%—consisted of registered shares.[53]  Even by December 1, 2021—just over one month before the original Complaint in this matter was filed—the overwhelming majority of shares held by DTC custodial accounts were registered shares.[54]

## V.    TRACING PURCHASES IS AMENABLE TO CLASS-WIDE PROOF

48.     Critically, these methods can be applied on a Class-wide basis using data readily available in discovery and do not require an individualized inquiry into the circumstances of each

---

[53] Shevlin Decl. at ¶ 14.

[54] Shevlin Decl. at ¶ 16 (implying that as of December 1, 2021, at least 15,870,000 out of 21,591,325 shares held by Cede & Co.—or over 73%—were registered shares).

purchase and sale.  For example, as I previously explained, DTC produces a daily "participant daily activity statement" for individual participant accounts, which lists individual custodial transfers between accounts as well as to and from the National Securities Clearing Corporation ("NSCC").  These statements are available from DTC and NSCC in discovery.  Similarly, time-stamped transactional records are maintained by FINRA, exchanges and broker-dealers, which are also available in discovery.  These records may be used to reach a conclusive determination regarding who holds the shares issued pursuant to the Registration Statement without engaging in an individualized inquiry into the facts and circumstances of purchases by individual members of the Class.

49.   Moreover, accounting methods like FIFO and LIFO do not depend on facts and circumstances which are unique to each Plaintiff.  In my professional experience, records produced in discovery often show that no matter which accounting method is chosen, a given member of the Class holds shares registered under the Registration Statement.  That is especially likely to be the case here because the volume of unregistered shares that could have been commingled with registered shares is relatively small during the August 12, 2021 to January 7, 2022 period at issue.

50.   Even if different methods yield different conclusions regarding who holds those shares, the choice of an appropriate tracing methodology is a Class-wide determination which does not turn on individualized facts and circumstances of each member of the Class.

## VI.   CONCLUSION

51.   Based on my analysis to date, review of materials, my experience, and my professional judgment, it is my opinion that neither the Shevlin Declaration nor the Ludwig Declaration

establishes that unregistered shares were commingled with registered shares or sold to members of the Proposed Class, while the single sale of 349 shares identified in the Lee Declaration does not preclude tracing.  Moreover, even if unregistered shares were commingled with registered shares or sold to members of the Proposed Class, ownership of securities in "fungible bulk" form does not preclude tracing purchases of Talis common stock to the Registration Statement using standard accounting methods that do not amount to "statistical tracing" or employ probabilistic reasoning.  Finally, tracing purchases of Talis common stock to the Registration Statement is amenable to Class-wide proof.

52.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____

JOSHUA R. MITTS, PH.D.

January 12, 2024

# Appendix A

# C.V.

**JOSHUA R. MITTS**

435 West 116 Street • New York, NY 10027 • (202) 460-0003 • joshua.mitts@law.columbia.edu

Professor Joshua Mitts uses advanced data science for his research on corporate and securities law.  Mitts employs empirical methods, including statistical analysis and machine learning, to study short selling, insider trading on cybersecurity breaches and corporate disclosures, and information leakage following hedge-fund activism.  Professor Mitts also advises on the analysis of trading data in connection with high-frequency market manipulation and securities violations.  He has extensive experience supporting the U.S. Department of Justice.

### ACADEMIC APPOINTMENTS

**Columbia University**, New York, NY
*David J. Greenwald Professor of Law* (July 1, 2023 – present)
*Professor of Law* (July 1, 2022 – June 30, 2023)
*Associate Professor of Law* (2017 – 2022)
*Milton Handler Fellow* (2020-22)
Member, *Advisory Committee on Socially Responsible Investing* (2021-2023)
       Subcommittees: Racial Justice, Fossil Fuels

### EDUCATION

**Columbia Business School**, Ph.D. in Finance & Economics, 2018

**Yale Law School**, J.D., 2013

**Georgetown University**, B.A in Liberal Studies, *summa cum laude*, 2010

### PUBLICATIONS & WORKING PAPERS

Post-Appointment (2017 – present)

***Slack v. Pirani and the Future of Section 11 Claims*** (with John C. Coffee, Jr.) (working paper, 2023),
    https://ssrn.com/abstract_id=4644888

***Passive Exit***, 28 STAN. J.L. BUS. & FIN. 155 (2023), https://ssrn.com/abstract_id=3716249

***Calamity: Event-Driven Suits and the Rethinking of Securities Litigation*** (with Merritt B. Fox), 78 BUS. LAW. 1
    (2023).

***Index-Fund Governance: An Empirical Study of the Lending-Voting Tradeoff*** (revise & resubmit, J. LEG. STUD.,
    2021) (with Edwin Hu & Haley Sylvester), https://ssrn.com/abstract_id=3673531

***Insider Trading and Strategic Disclosure*** (working paper, 2020), https://ssrn.com/abstract_id=3741464

***Short and Distort,*** 49 J. LEG. STUD. 287 (2020), https://ssrn.com/abstract_id=3198384

***A Legal Perspective on Technology and the Capital Markets: Social Media, Short Activism and the Algorithmic***
    ***Revolution*** (conference article, COLUM. / FINRA TECH. CONF., 2019),
    https://ssrn.com/abstract_id=3447235

***Trading Against the Random Expiration of Private Information: A Natural Experiment***, 75 J. FIN. 5 (2020) (with
    Mohammadreza Bolandnazar, Robert J. Jackson, Jr. & Wei Jiang), https://ssrn.com/abstract_id=2544128

    *Winner, Journal of Finance Dimensional Fund Advisors Distinguished Paper Prize (2020)*

***Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets***, 74 BUS. LAW. 1015 (2019)
    (with Jonathan R. Macey), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3279838

    Cited and relied upon by the Delaware Supreme Court in *Fir Tree v. Jarden* (2020).

***I Promise to Pay***, 62 J. L. & ECON. 117 (2019), https://ssrn.com/abstract_id=2994192

***What Can we Learn from Stock Prices?: Cash Flow, Risk and Shareholder Welfare,*** 175 J. INST. & THEO. ECON. 178 (2019) (conference issue), https://ssrn.com/abstract_id=3285605

***Trial by Skype: A Causality-Oriented Replication Exploring the Use of Remote Video Adjudication in Immigration Removal,*** 59 INT'L REV. L. & ECON. 82 (2019) (with Dane Thorley) (replication issue), https://www.sciencedirect.com/science/article/abs/pii/S0144818818303326

***Informed Trading and Cybersecurity Breaches,*** 9 HARV. BUS. L. REV. 1 (2019) (with Eric Talley), https://www.hblr.org/wp-content/uploads/sites/18/2019/11/Final_MittsTalley.pdf

***Activist Directors and Agency Costs: What Happens When an Activist Director Goes on the Board?,*** 104 CORNELL L. REV. 381 (2019) (with Robert Bishop, John C. Coffee, Jr. & Robert J. Jackson, Jr.), https://www.cornelllawreview.org/2019/01/15/activist-directors-and-agency-costs-what-happens-when-an-activist-director-goes-on-the-board/

One of the Top 10 Corporate and Securities Articles of 2019 Chosen By *Corporate Practice Commentator*

***The Cost of Transparency*** (2019) (with Yifeng Guo)

Pre-Appointment (2012-2017)

***The 8-K Trading Gap*** (2016) (with Alma Cohen & Robert J. Jackson, Jr.)

***Systemic Risk and Managerial Incentives in the Dodd-Frank Orderly Liquidation Authority,*** 1 J. FIN. REG. 51 (2015)

***Finding Order in the Morass: The Three Real Justifications for Piercing the Corporate Veil,*** 100 CORNELL L. REV. 99 (2014) (with Jonathan R. Macey)

***Anti-Herding Regulation,*** 5 HARV. BUS. L. REV. 1 (2014) (with Ian Ayres)

***Mechanism Design in M&A Auctions,*** 38 DEL. J. CORP. L. 873 (2014) (with Steven J. Brams), *cited in* In re *Appraisal of Dell Inc.*, C.A. No. 9322-VCL (Del. Ch., May 31, 2016)

***Three Proposals for Regulating the Distribution of Home Equity,*** 31 YALE J. ON REG. 77 (2014) (with Ian Ayres)

***Law and Mechanism Design: Procedures to Induce Honest Bargaining,*** 68 NYU ANN. SURV. AM. L. 729 (2013) (with Steven J. Brams)

***Snake Oil Salesmen or Purveyors of Knowledge: Off-Label Promotions and the Commercial Speech Doctrine,*** 23 CORNELL J. L. & PUB. POL'Y 337 (2013) (with Constance E. Bagley & Richard Tinsley)

***A Private Ordering Solution to Blockholder Disclosure,*** 35 N.C. CENT. L. REV. 203 (2013)

Comment, ***Recoupment Under Dodd-Frank: Punishing Financial Executives and Perpetuating "Too Big to Fail,"*** 122 YALE L.J. 507 (2012)

## RULEMAKING PETITIONS

***SEC Rulemaking Petition on Short and Distort*** (filed on February 12, 2020) (co-drafted with John C. Coffee, Jr.), https://www.sec.gov/rules/petitions/2020/petn4-758.pdf

**Other Signatories: James D. Cox,** Brainerd Currie Professor of Law, Duke University School of Law; **Edward F. Greene,** General Counsel, Securities & Exchange Commission (1981-82); Director, Division of Corporation Finance (1979-81); Senior Counsel, Cleary Gottlieb Steen & Hamilton, Co-Director, Program on Law, Economics & Capital Markets, Columbia Law School; **Meyer Eisenberg,** Deputy General Counsel and Acting Director, Division of Investment Management Securities & Exchange Commission (1998-2006); **Colleen Honigsberg,** Associate Professor of Law, Stanford Law School; **Donald Langevoort,** Thomas Aquinas Reynolds Professor of Law, Georgetown University Law Center; **Peter Molk,** Associate Professor of Law, University of Florida Levin College of Law; **Randall Thomas,** John S. Beasley II Chair in Law and Business, Vanderbilt Law School, Professor of Management. Owen Graduate School of Management; **Robert B. Thompson,** Peter P. Weidenbruch, Jr. Professor of Business Law, Georgetown University Law Center; **Andrew Verstein,** Professor of Law, Wake Forest University School of Law; and **Charles K. Whitehead,** Myron C. Taylor Alumni Professor of Business Law, Cornell Law School.

OTHER PUBLICATIONS

*Petition for Rulemaking on Short and Distort*, COLUM. LAW SCH. BLUE SKY BLOG (Feb. 18, 2020) (with John C. Coffee, Jr.)

*Long-Run Short Selling*, COLUM. LAW SCH. BLUE SKY BLOG (Dec. 9, 2019) (with John C. Coffee, Jr.)

*Short Selling and the New Market Manipulation*, COLUM. LAW SCH. BLUE SKY BLOG (Mar. 18, 2019) (with John C. Coffee, Jr.)

*Why Investors Pay So Much for Dual Class Firms*, COLUM. LAW SCH. BLUE SKY BLOG (Jan. 2, 2019)

*What Can We Learn From Stock Prices?*, COLUM. LAW SCH. BLUE SKY BLOG (Dec. 18, 2018)

*Short and Distort*, COLUM. LAW SCH. BLUE SKY BLOG (Nov. 13, 2018)

*Asking the Right Question: The Statutory Right of Appraisal and Efficient Markets*, HARV. LAW SCH. FORUM ON CORP. GOV. & FIN. REG. (Nov. 12, 2018) (with Jonathan Macey)

*A Data-Driven Defense to "Short and Distort"*, NEW YORK LAW JOURNAL (Sep. 13, 2018)

*Quarterly Reporting and Market Liquidity*, COLUM. LAW SCH. BLUE SKY BLOG (Aug. 27, 2018)

*What Happens When an Activist Goes on the Board?*, COLUM. LAW SCH. BLUE SKY BLOG (Jan. 29, 2018) (with John C. Coffee, Jr.)

*Informed Trading and Cybersecurity Breaches*, HARV. LAW SCH. FORUM ON CORP. GOV. & FIN. REG. (Jan. 26, 2018) (with Eric Talley)

*Proactive Regulation*, REGBLOG: PENN PROGRAM ON REGULATION (Jun. 23, 2014)

*The Three Justifications for Piercing the Corporate Veil*, HARV. L. SCH. FORUM ON CORP. GOV. & FIN. REG. (Mar. 27, 2014) (with Jonathan R. Macey)

*Why the CFPB's Qualified Mortgage Rule Misses the Mark*, FREAKONOMICS BLOG (Jan. 17, 2014), *republished in* COLUM. L. SCH. BLUE SKY BLOG (Feb. 10, 2014) (with Ian Ayres)

*An Incentive-Compatible Alternative to "Don't Ask Don't Waive" Standstills*, COLUM. L. SCH. BLUE SKY BLOG (May 28, 2013) (with Steven J. Brams)

TEACHING EXPERIENCE

**Columbia Law School**, New York, NY                                                                              2017 – present
*Data and Predictive Coding for Lawyers (January 2018, January 2019, May 2021)*
*Corporations (Fall 2022, Fall 2023)*
*Securities Regulation (Spring 2018, Spring 2019, Spring 2020, Spring 2021, Spring 2022)*
*Contracts (Fall 2018, Fall 2019)*

PROFESSIONAL EXPERIENCE

**Sullivan & Cromwell LLP**, New York, NY                                                                              2013 – 2014
*Associate*

PRESENTATIONS

**2021-22**

Conference on Empirical Legal Studies Harvard Law School and the Program on International Financial Systems (PIFS) for Comissão de Valores Mobiliários (CVM); IOSCO/PIFS-Harvard Law School Global Certificate Program for Regulators of Securities Markets (GCP); Reichman University (Israel); Regulatory Fundamentals Group; Ira M. Millstein Center for Global Markets and Corporate Ownership

**2019-20**

2020 UF Business Law Conference; 2020 George A. Leet Symposium, Columbia Law School Blue Sky Workshop; Harvard-NYU Corporate Law Academic Workshop Series; Junior Corporate Law Academic Workshop; Columbia Law School Faculty Workshop; American Law & Economics Association Annual Meeting; Cornell Law & Tech Workshop; Cadwalader, Wickersham & Taft, New York, NY; Richards, Layton & Finger, Wilmington, DE; Columbia Business School News and Finance Conference, New York, NY; Texas Law & Economics Workshop, Austin, TX; Securities Law Roundtable at Tulane Corporate Law Institute, New Orleans, LA; Vanderbilt Law & Economics Workshop, Nashville, TN; 8th Symposium on Intelligent Investing at Ivey Business School, Toronto, Canada

**2017-18**

Conference on Empirical Legal Studies; Junior Corporate Law Scholars Workshop at Columbia Law School; American Law & Economics Association Annual Meeting; Seminar on Corporate and Capital Markets Law and Policy at Harvard Law School (February 2018 and October 2018); Experimental Methods in Legal Scholarship III Conference at Columbia Law School; Law, Economics & Organization Workshop at Harvard Law School; Penn Law School Corporate Roundtable; Symposium of Journal of Institutional and Theoretical Economics; UVA/Santa Fe. Institute Conference on Computational Study of the Law; Columbia Law Faculty Workshop; Columbia Law Blue Sky Workshop; Journal Corporate Law Scholars Workshop at NYU Law School

**2013-16**

American Law & Economics Association Annual Meeting (2016, 2015, 2014, 2013); Conference on Empirical Legal Studies (2015, 2014, 2013); Columbia Finance Faculty Workshop (2016); American Finance Association Annual Meeting (2016); Minnesota Law & Economics Seminar (2015); Georgetown Law & Economics Workshop (2014); Virginia Law Symposium on Disclosure (2014); Federal Reserve Conference on Community Banking in the 21st Century (2014); Symposium on Crises-Driven Regulation, University of St. Thomas School of Law (2014); University of Connecticut School of Law, Junior Scholars Workshop (2013)

## EXPERT TESTIMONY (PUBLIC)

*Crews v. Rivian* (C.D. Ca., 2023)
In re *Hewlett Packard Enterprise Co. Shareholder Litigation* (Ca. Sup. Ct., County of Santa Clara, 2023)
In re *Turquoise Hill Resources Securities Litigation* (S.D.N.Y., 2023)
In re *Bayer Securities Litigation* (N.D.C.A., 2022)
*Set Capital v. Credit Suisse* (S.D.N.Y., 2022)
In re *Tesla Inc. Securities Litigation*, Case No. 3:18-cv-04865-EMC (N.D.C.A)
*Brookfield v. IPL*, Alberta Securities Commission (2021)
*Burford v. LSE*, CL-2019-000604 (Business and Property Courts of England and Wales Commercial Court (QBD))
*Farmland Partners v. Fortunae*, No. 1:18-cv-02351-KLM (D. Colo.)
Additional nonpublic matters

## PEER REVIEW

Journal of Legal Studies
Journal of Law, Economics & Organization
International Review of Law & Economics
Review of Law & Economics
Review of Financial Studies
Conference on Empirical Legal Studies

## GRANTS, FELLOWSHIPS & AWARDS

Columbia Brown Institute for Media Innovation, 2016-17 Magic Grant (with Colleen Honigsberg)

Columbia Business School, Paul and Sandra Montrone Doctoral Fellowship, 2016

Yale Law School, Oscar M. Ruebhausen Fund, 2014 (with Ian Ayres)

## BAR ADMISSION

New York

# Appendix B

# Documents Considered

**Cases**

1. *In re Talis Biomedical Sec. Litig.*, 2023 WL 3167844 (N.D. Cal. Apr. 28, 2023).

**Court Filings**

1. Amended Consolidated Class Action Complaint For Violations of the Federal Securities Laws, *In re Talis Biomedical Sec. Litig.*, No. 3:22-cv-00105-SI, (N.D. Cal. Jan. 13, 2023), ECF No. 104.

2. Co-Lead Plaintiffs' Motion For Class Certification and Memorandum of Points and Authorities in Support Thereof, *In re Talis Biomedical Sec. Litig.*, No. 3:22-cv-00105-SI, (N.D. Cal. Oct. 13, 2023), ECF No. 126.

3. Defendants' Opposition To Plaintiff's Motion For Class Certification, *In re Talis Biomedical Sec. Litig.*, No. 3:22-cv-00105-SI, (N.D. Cal. Dec. 12, 2023), ECF No. 136.

4. Declaration of Lia Ludwig, *In re Talis Biomedical Sec. Litig.*, No. 3:22-cv-00105-SI, (N.D. Cal. Dec. 12, 2023), ECF No. 136-17.

5. Exhibits A, B, and C to Declaration of Lia Ludwig, *In re Talis Biomedical Sec. Litig.*, No. 3:22-cv-00105-SI, (N.D. Cal. Dec. 12, 2023), ECF Nos. 136-18, 136-19, 136-20.

6. Declaration of Meghan Shevlin, *In re Talis Biomedical Sec. Litig.*, No. 3:22-cv-00105-SI, (N.D. Cal. Dec. 12, 2023), ECF No. 136-21.

7. Exhibits 5, 6, 7, 8, and 9 to Declaration of Meghan Shevlin, *In re Talis Biomedical Sec. Litig.*, No. 3:22-cv-00105-SI, (N.D. Cal. Dec. 12, 2023), ECF Nos. 136-26, 136-27, 136-28, 136-29, 136-30.

8. Declaration of Matthew Lee, *In re Talis Biomedical Sec. Litig.*, No. 3:22-cv-00105-SI, (N.D. Cal. Dec. 12, 2023), ECF No. 136-15.

9. Brief of the Depository Trust Corporation as *Amicus Curiae* Not In Support of Any Party, *In re* Petrobras Securities Litigation, No. 16-1914-cv (2d. Cir. Sep. 16, 2016), ECF No. 293-1.

10. Brief for *Amicus Curiae* Law and Business Professors In Support of Respondent, *Slack Techs., LLC v. Pirani*, 2023 WL 2439655 (U.S.).

11. Declaration of Dr. Jonathan A. Brogaard, Exhibit J To Declaration of Matthew S. Kahn Iso Defendants' Opposition To Plaintiffs' Motion for Class Certification - Public Redacted Version, *In re* Slack Technologies Inc. Stockholder Litigation, Lead Case No. 19-Civ-05370 (Cal. Sup. Ct., San Mateo Cnty., Jan. 18, 2022), Doc. No. 273.

**Publications**

1. DEPOSITORY TRUST & CLEARING CORPORATION, *Security Position Reports Templates*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/security-position-reports-templates (last accessed Dec. 27, 2023).

2. DEPOSITORY TRUST & CLEARING CORPORATION, *Deposit / Withdrawal at Custodian*, https://www.dtcc.com/settlement-and-asset-services/securities-processing/deposit-withdrawal-at-custodian (last visited Dec. 27, 2023).

   DEPOSITORY TRUST & CLEARING CORPORATION, *Deposit / Withdrawal at Custodian (DWAC) Information*, https://www.dtcc.com/-/media/Files/Downloads/Settlement-Asset-Services/agent-services/DWAC-agreement.pdf (last visited Dec. 27, 2023).

3. DEPOSITORY TRUST & CLEARING CORPORATION, *Cross-Business Glossary of Terms*, https://dtcclearning.com/helpfiles/cross_bus/glossary/Content/Topics/gloss.htm (last visited Dec. 27, 2023).

4. DTCC, *DTC Member Directories*, https://www.dtcc.com/client-center/dtc-directories (last visited Jan. 8, 2024).

5. SEC, *Transfer Agents*, https://www.sec.gov/divisions/marketreg/mrtransfer (last visited Dec. 27, 2023).

6. Virginia B. Morris*, Guide to Clearance and Settlement: An Introduction to DTCC* (2022), https://www.dtcc.com/-/media/Files/Downloads/DTCC-Connection/DTCC-Interactive-Guide-to-Clearance-and-Settlement-2022.pdf.

**Statutes**

1. 17 C.F.R. § 240.17a-3(a)(6)(i)(A).

2. U.C.C. § 8-115.

3. U.C.C. § 8-501.

4. U.C.C. § 8-503(d).