COOLEY LLP
Patrick E. Gibbs (183174)
(pgibbs@cooley.com)
Shannon M. Eagan (212830)
(seagan@cooley.com)
Jessie Simpson LaGoy (305257)
(jsimpsonlagoy@cooley.com)
3175 Hanover Street
Palo Alto, California 94304-1130
Telephone:    +1 650 843 5000
Facsimile:    +1 650 849 7400

Zachary Sisko (*appearance pro hac vice*)
(zsisko@cooley.com)
500 Boylston Street
14th Floor
Boston, Massachusetts 02116-3736
Telephone:    +1 617 937 2300
Facsimile:    +1 617 937 2400

*Attorneys for Defendants Talis Biomedical Corporation, Brian Coe, J. Roger Moody, Jr., Felix Baker, Raymond Cheong, Melissa Gilliam, Rustem F. Ismagilov, Kimberly J. Popovits, Matthew L. Posard, and Randal Scott*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TALIS BIOMEDICAL SECURITIES LITIGATION | Case No. 22-cv-00105-SI |
| | CLASS ACTION |
| THIS DOCUMENT RELATES TO: | **DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |
| ALL ACTIONS | Date:    February 9, 2024 |
| | Time:    10:00 a.m. |
| | Crtm:    1 |
| | Judge:   Hon. Susan Illston |

## I.  INTRODUCTION

In opposing Plaintiff's Motion, Defendants argued in part that the class period should end at the expiration of the Talis Lock-Up, when pre-IPO shares were commingled with IPO shares held in street name at the Depository Trust Company ("DTC").[1]  In Reply, Plaintiff does not deny that commingling occurred, but seeks to avoid this issue on procedural and evidentiary grounds, and offers conclusory opinion testimony from a law professor who has publicly advocated to change existing law on tracing under Section 11. But none of this undermines Defendants' arguments: As courts have repeatedly recognized, the commingling of pre-IPO and IPO shares at DTC precludes tracing of those shares, which means that any tracing effort would require individual inquiries. If any class is certified, the class period should end when the Lock-Up expired.

## II.  ARGUMENT

### A.  Tracing Is Properly Addressed at Class Certification

Plaintiff argues that traceability is a "merits issue." Reply at 13. But the Supreme Court has made clear that, before certifying a class, courts must "determine[] that Rule 23 is satisfied, even when that requires inquiry into the merits." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *see also Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). That is why evaluating predominance under Rule 23 "begins, of course, with the elements of the underlying cause of action." *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020).  Tracing is an element of Plaintiff's claim.  *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 768 (2023).  As such, the impact of tracing on Rule 23's predominance requirement is properly considered at this stage. *See, e.g.*, *In re Honest Co. Sec. Litig.*, 2023 WL 3190506, at *5 (C.D. Cal. May 1, 2023) (addressing tracing and modifying class definition to satisfy "predominance and commonality requirements").

*Honest* is not an outlier. Numerous courts, including one cited by Plaintiff, have taken up tracing issues at class certification and, on that basis, either limited class periods or denied class certification altogether. *See In re LendingClub Sec. Litig.*, 282 F. Supp. 3d 1171, 1188 (N.D. Cal.

[1] Unless otherwise stated, capitalized terms remain as defined in the Opposition; "Opposition" or "Opp." refers to Defendants' Opposition (ECF 136); "Reply" refers to Plaintiff's Reply (ECF 137); "Ex. _" refers to exhibits to the Declaration of Patrick Gibbs ("Gibbs Decl.") (submitted herewith); all internal citations and quotations are omitted; and all emphasis is added.

2017) (limiting Section 11 class to those who purchased stock before lock-up ended to "head off" individual claims of traceability); *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 118-20 (S.D.N.Y. 2004) (limiting class on predominance grounds "to the periods between each IPO and the time when unregistered shares entered the market"), *vacated on other grounds by* 471 F.3d 24 (2d Cir. 2006); *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 492-93, 498-99 (5th Cir. 2005) (affirming denial of class certification where lead plaintiffs could not trace because they purchased stock after non-IPO insider shares "entered the street name certificate and intermingled with the IPO shares"); *cf. Pirani v. Slack Techs, Inc.*, 445 F. Supp. 3d 367, 378 (N.D. Cal. 2020) (noting that courts have resolved the tracing requirement by limiting claims to certain time periods).[2]

**B.    The Class Period Should End at the Expiration of the Talis Lock-Up**

Plaintiff argues that the tracing requirement does not undermine predominance, even after the Talis Lock-Up expired, because shares can supposedly be traced with common evidence by using standard "accounting methods such as first-in-first-out ('FIFO') or last-in-first-out ('LIFO')." Reply at 14 (citing ECF 138-1, the "Mitts Report"). This argument is based entirely on the opinion of a law professor, Joshua Mitts. *Id.* As discussed below, however, Prof. Mitts's opinion does not solve Plaintiff's problem because the method that Prof. Mitts advocates—a method that no federal court has ever approved for use in tracing shares pursuant to Section 11—is not "tracing" under Section 11. Instead, what Prof. Mitts proposes to do is to manufacture an artificial "chain of title" using arbitrary and incorrect assumptions, none of which begins to approximate the type of proof courts have held is necessary to "trace" for purposes of Section 11.

---

[2] Plaintiff's authorities (Reply at 13) do not support a different result. *In re Snap Inc. Sec. Litig.* declined to narrow the class date based on statistical sampling and policy grounds, 334 F.R.D. 209, 223-34 (N.D. Cal. 2019), but since then, the Supreme Court has clarified that Section 11 is strictly construed and rejected similar policy arguments. *See Slack,* 598 U.S. at 768-70. *In re Worlds of Wonder Sec. Litig.*, 1990 WL 61951, at *9 (N.D. Cal. Mar. 23, 1990) and *In re Eagle Computer Sec. Litig.*, 1986 WL 12574, at *8 (N.D. Cal. Mar. 31, 1986) suffer from the same problem, and additionally predate *Amgen* and *Comcast. In re Smart Technologies, Inc. S'holder Litig.*, an out-of-circuit case, did not address a post-lock-up class period, but rather whether secondary market and out-of-country share purchases impacted the predominance element of class certification. 295 F.R.D. 50 (S.D.N.Y. 2013). And *Sudunagunta v. NantKwest, Inc.*, failed to address predominance and merely concluded that the inclusion of "tracing" in the class definition resolved any concerns. 2018 WL 3917865, at *9 (C.D. Cal. Aug. 13, 2018). But if merely including "traceability" in the class definition could magically avoid predominance, Rule 23(b)(3) would become a mere pleading standard, a result that has been squarely rejected by the Supreme Court. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) ("Rule 23 does not set forth a mere pleading standard").

COOLEY LLP

### 1. Once IPO and Pre-IPO Shares Are Commingled, Tracing Requires Individual Inquiries

Section 11 requires Plaintiff to "plead and prove that he purchased shares traceable to the allegedly defective registration statement." *Slack*, 598 U.S. at 770. "Tracing shares back to a particular offering requires reconstructing the chain of title, 'starting with [plaintiff's] own purchases and ending with someone who bought directly in the … offering.'" *Hemmer Grp. v. Sw. Water Co.*, 663 F. App'x 496, 497-98 (9th Cir. 2016) (quoting *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106-07 (9th Cir. 2013)). As one widely quoted opinion explained: "Tracing may be established either through proof of a *direct* chain of title from the original offering to the [plaintiff] ... or through proof that the [plaintiff] bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 31 n.1 (2d Cir. 2006). "The purpose of section 11's tracing requirement is to limit standing to sue to those individuals who *actually* purchased shares issued pursuant to a defective registration statement." *Abbey v. Comput. Memories, Inc.*, 634 F. Supp. 870, 876 (N.D. Cal. 1986) (requiring showing of "direct tracing").

Tracing is simple when investors acquire shares in a market that only contains shares issued pursuant to the relevant registration statement. *See, e.g., Honest*, 2023 WL 3190506, at *5; Ex. 2, Expert Rebuttal Report of Jack R. Wiener ("Wiener Report") ¶ 82. But courts in the Ninth Circuit and elsewhere have consistently held that once such shares are commingled in street name with the issuer's shares from other sources (such as other registration statements, option exercises, or private placements), investors holding that issuer's shares in street name lose the ability to trace shares back to a specific registration statement. *See, e.g.*, *Hemmer*, 663 F. App'x at 498 (upholding finding of no standing because plaintiff's shares "were part of a fungible mass of SouthWest shares held by [its] transfer agent . . . from multiple offerings," which "effectively prevented any chain of title from ever being built because shares from several offerings were entirely indistinguishable."); *In re Century Aluminum*, 729 F.3d at 1107 (tracing impossible "because 'most trading is done through brokers who neither know nor care whether they are getting newly registered or old shares,' and 'many brokerage houses do not identify specific shares with particular accounts but instead treat

the account as having an undivided interest in the house's position'") (quoting *Barnes v. Osofsky*, 373 F.2d 269, 271-72 (2d Cir. 1967)) (rejecting argument that Section 11 does not require plaintiffs to "trace the lineage of their shares"); *In re Puda Coal Sec. Inc. Litig.*, 2013 WL 5493007, at *7-8 (S.D.N.Y. Oct. 1, 2013) (the "fungibility of shares is fatal" to tracing particular shares for any post-lock-up purchasers, and thus dooms any attempt to trace shares on a class-wide basis); *In re Initial Pub. Offering*, 227 F.R.D. at 118 ("The modern practice of electronic delivery and clearing of securities trades, in which all deposited shares of the same issue are held together in fungible bulk, makes it virtually impossible to trace shares to a registration statement once additional unregistered shares have entered the market."); Opp. at 23; *cf. Pirani*, 445 F. Supp. 3d at 377-78 (collecting cases similarly holding and explaining the narrow reading of Section 11's "such security").

These decisions were not based on a lack of records or on insufficient computing power. They were based, instead, on principles that are inherent in the DTC "indirect holding system." Under that system, many "beneficial owners[]" of a public company's stock do not hold title to any *specific* shares of that stock. Ex. 1, Br. of the DTC as *Amicus Curiae* Not in Supp. of Any Party at 9-10, *In re Petrobras Sec. Litig.*, No. 16-1914-cv (2d. Cir. Sep. 16, 2016). This is because legal title to the shares is held by Cede & Co. (also called "street name" ownership), as nominee for DTC, which operates an electronic book-entry system for securities deposited with DTC for the benefit of its Participants (such as banks and broker-dealers). *Id.* When a DTC Participant receives a position in shares of a given stock, whether for its own account or on behalf of a customer, the Participant does not take title to any particular shares of the stock. *Id.* at 20. Instead, it holds a "security entitlement," with rights to a *pro rata* portion of an undifferentiated "fungible bulk" of shares held by DTC. *Id.* at 4. Similarly, when a Participant's *customer* holds a position in shares through the Participant, it holds only a "security entitlement" to a *pro rata* portion of the shares held by the Participant. *Id.* at 12 n.10. *See also* Wiener Report ¶¶ 37-49 & n.61.

This system, which is governed by Article 8 of the Uniform Commercial Code, allows DTC to settle securities transactions through a series of book entries, thereby avoiding the many steps (and attendant paperwork) otherwise needed to transfer title to specific shares of stock. *See generally* U.C.C. § 8-101 *et seq.*; Ex. 1 at 9-10. Key to the system is the fact that beneficial owners

never hold legal title to any particular shares. *Id.* at 15. Among other things, this necessarily means that when a beneficial owner "sells," the seller is not transferring title to any particular shares to any particular "buyer." Instead, book entries are adjusted (at the DTC and/or Participant level) to reflect changes in holdings. *Id.* at 4. The SEC has confirmed this structure. *See Roundtable on Proxy Voting Mechanics Topic One: Share Ownership and Voting*, SEC (modified May 23, 2007), https://www.sec.gov/spotlight/proxyprocess/proxyvotingbrief.htm; Wiener Report ¶¶ 37-49.

Here, one day after the Talis Lock-Up expired, 705,537 pre-IPO Talis shares (not issued pursuant to the Registration Statement) were delivered to DTC, commingled with DTC's existing pool of shares issued in the IPO, and together held in a single "fungible bulk" of undifferentiated Talis shares. *See* Opp. at 5-6, 24; Supplemental Declaration of Lia Ludwig, filed herewith; Declaration of Ann Marie Bria ("Bria Decl."), filed herewith. From that point onward, it became impossible to trace Talis shares held in street name with DTC back to the Registration Statement, *see* Wiener Report ¶¶ 117(b), (d), and thus "individual class members would be required to prove that they could trace their shares to the IPO." *See Honest*, 2023 WL 3190506, at *5

### 2.     Prof. Mitts' Proposed Methodology Is Not Tracing Under Section 11

Despite decades of case law to the contrary, Prof. Mitts argues that unspecified "transactional records" from DTC, FINRA, and elsewhere, paired with "accounting methods" such as FIFO or LIFO "make[] it possible to reconstruct a reliable 'chain of title'" for Talis shares, even after the Lock-Up expired. Mitts Report ¶ 45; Reply at 14. But the fact that Prof. Mitts insists on using terms like "tracing" and "chain of title" to describe his method does not make it so, and his Report—which consists of sweeping conclusions without any supporting detail—makes clear that it is not. In fact, the method that Prof. Mitts advocates amounts to manufacturing an artificial "chain of title" that does not come close to meeting Section 11's strict standard for tracing.

Prof. Mitts relies heavily on his assertion that, for a given security, DTC holds "segregated" shares for each DTC "Participant." *See* Mitts Report ¶ 37. On that basis, Prof. Mitts posits that shares held by a substantial number of Participants can be treated as a "closed loop" of registered shares, that never "touched" unregistered shares. Ex. 3, Mitts Tr. at 47:10-48:6. It is not clear why he believes this, but in any event, the assertion is false: DTC itself has repeatedly noted that, for a

given security, it holds all shares for all Participants in a single "fungible bulk," and that no Participant owns any specific shares. *See supra*, Section II.B.1; *see also* Wiener Report ¶ 117(a). Indeed, DTC has confirmed that this is how it has at all times held all shares **of Talis stock**. Bria Decl. ¶ 6. This error alone substantially undermines Prof. Mitts' opinion and renders it unreliable.

But even setting that error aside, Prof. Mitts's opinion ignores the legal principles inherent in the indirect holding system and seeks to impose an artificial reality in its place. Prof. Mitts argues that a "chain of title" can be reconstructed using (for example) time-stamp records reflecting and/or matching individual "buy" and "sell" orders. Ex. 3, Mitts Tr. at 63:14-24, 72:20-73:6; Mitts Report ¶ 45. But this construction skips over the fact that, in an indirect ownership system, *the beneficial owners are not actually buying or selling specific shares to or from one another*. Under this system, the beneficial owner holds a "security entitlement," and when a beneficial owner increases or decreases its stake, it alters its pro rata entitlement with its broker, but it is not transferring any shares (let alone specifically identified shares) to or from any other beneficial owner. *See supra*. Thus, when Prof. Mitts purports to "trace" shares from one beneficial owner to another, he is not "tracing" anything, but instead creating a fictional transaction. *See* Wiener Report ¶ 117(c).

This is perhaps best illustrated by Prof. Mitts' resort to accounting concepts like FIFO and LIFO. Prof. Mitts admits that, for some meaningful number of investors (or putative class members), the choice between FIFO and LIFO will determine whether they have a Section 11 claim at all. In other words, an investor who can successfully "trace" under FIFO would fail to "trace" under LIFO. Ex. 3, Mitts Tr. at 74:23-75:3. By itself, this admission undermines any suggestion that Prof. Mitts is "actually" tracing a chain of title for specific shares. *See Abbey*, 634 F. Supp. at 876. Even worse, Prof. Mitts cannot cite any principled reason for choosing one of these two methods over the other. The choice is effectively arbitrary. *See, e.g.*, Ex. 5 at 24; Ex. 3, Mitts Tr. at 78:5-81:10, 118:17-119:12. The fact that some investors would see their claims stand or fall based entirely on an arbitrary choice between FIFO or LIFO underscores, forcefully, that this is not "tracing" at all, but rather is an exercise in manufacturing a "chain of title" where none exists.

### 3. Prof. Mitts Is an Advocate and Activist Trying to Change the Law

Prof. Mitts' opinion in this case (along with a nearly identical opinion in another Section 11

case[3]) appears to be part of his broader project to change the law in order to increase the potential damages available in Section 11 cases. Indeed, his opinions closely mirror arguments he has made in his academic writing, *see* Ex. 5, John C. Coffee, Jr. and Joshua Mitts, *Slack v. Pirani and the Future of Section 11 Claims* (December 1, 2023), http://dx.doi.org/10.2139/ssrn.4644888, and as counsel for *amicus* law professors in the *Slack* case before the Supreme Court.  Ex. 6, Br. for Amicus Curiae Law and Business Professors ISO Respondent*, Slack Techs. v. Pirani*, 2023 WL 2439655 (U.S. March 6, 2023).[4] In those settings, Prof. Mitts has been slightly more open about the fact that he seeks to change the existing law for policy reasons. Ex. 5 at 1-3 (criticizing the traditional approach to tracing as an outdated and narrow approach that unduly limits the damages available to plaintiffs in Section 11 cases and which (he claims) will weaken the protections afforded by Section 11); *see also* Ex. 6 at *5. That position is debatable as a matter of policy, but for present purposes, it is irrelevant: This Court's role is not to change the law to better fit Prof. Mitts' policy preferences, but rather to "apply[] the law as we find it." *Slack*, 598 U.S. at 770 (rejecting similar policy arguments for relaxing the tracing requirement). And the law as it currently exists plainly forecloses the method that Prof. Mitts proposes here. *See supra*, Section II.B.1. & 2.[5]

### C.      Plaintiff Cannot Avoid Traceability Through Rule 37

The Court should reject Plaintiff's attempt to exclude the Shevlin, Ludwig, and Lee Declarations (and related exhibits) because there has been no Rule 26 violation (Reply at 13-14), but even if there had been, it was "substantially justified or [] harmless." Fed. R. Civ. P. 37(c)(1).

**No Rule 26 Violation:** Shevlin, a recently former employee of Talis, and Ludwig, an employee of Talis's transfer agent Broadridge, are not themselves "individual[s] likely to have discoverable information" and were not required to be disclosed under Rule 26(a). Both declarants merely authenticated business records as corporate representatives to satisfy Federal Rule of

---

[3] Ex. 4, *Crews v. Rivian Auto., Inc.*, No. 2:22-cv-01524 (C.D. Cal. Dec. 1, 2023), ECF 218-4.

[4] Prof. Mitts is also financially incentivized by his proposed change in the law.  Indeed, he has filed a provisional patent application to implement his proposed "tracing using accounting methods." *See* Ex. 5 at 42; *Perfect 10, Inc. v. Giganews*, *Inc.*, 2014 WL 10894452, at *4 (C.D. Cal. Oct. 31, 2014) (rejecting expert opinion "where the expert's incentive structure crosses the threshold from an indirect incentive to reach a certain conclusion to a direct financial interest in doing so").

[5] For similar reasons, Prof. Mitts's opinions do not "reflect[] a reliable application of the principles and methods," Fed. R. Evid. 702, and seek to invade the province of the Court.  *See* ECF 141.

Evidence 803(6). And "[t]he text" of Rule 26 "is [] limited to individuals and exclusive of corporate entities, an exclusion which would necessarily apply to individuals who testify on behalf of corporate entities." *Moore v. Comput. Assocs. Int'l, Inc.*, 653 F. Supp. 2d 955, 960 (D. Ariz. 2009) (denying motion to strike undisclosed corporate representative's declaration that was "not rooted in [his] individual experience, but is corporate in nature and could have been elicited from a number of Defendant's executives"). As in *Moore*, both Shevlin and Ludwig could have been substituted with other company representatives. Indeed, Plaintiff seems to agree: In the 50 days since the Declarations were filed, Plaintiff has made no effort to depose either Shevlin or Ludwig (or Lee).

As Plaintiff acknowledges, Defendants first spoke to Lee on December 8, 2023, just two business days before they filed his declaration with their Opposition. To the extent Defendants were required to supplement their initial disclosures after they identified Lee as a potential witness, the filing of his declaration (a disclosure "in writing") qualifies, and was done "in a timely manner" (two business days after first contacting him). Fed. R. Civ. P. 26(e)(1)(A); *cf. Racies v. Quincy Bioscience, LLC*, 2020 WL 43115, at *1 (N.D. Cal. Jan. 4, 2020) (disclosure one week after learning about potential witness was "timely"). It would be absurd to exclude Lee's declaration here.[6]

**No Rule 37 Sanctionable Conduct:** In any event, no sanction is appropriate here because any purported delay was "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Courts consider five factors to determine harmlessness: (1) surprise to the other party; (2) the ability of that party to cure the surprise; (3) disruption to trial; (4) importance of the evidence; and (5) the explanation for the failure to disclose. *Utne v. Home Depot U.S.A., Inc.*, 2022 WL 4139256, at *4 (N.D. Cal. May 9, 2022). The ability of the moving party to cure surprise is the most important factor, and the Court may find harmlessness even where some factors weigh against it. *Id.*

Delay is deemed harmless where the complaining party could have anticipated the subject matter of the declaration and takes no steps to cure any alleged surprise. *See Ellis v. J.P. Morgan Chase & Co.*, 2015 WL 9178076, at *8 (N.D. Cal. Dec. 17, 2015) (denying motion to strike class

---

[6] Plaintiff's authorities are all inapposite. *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (excluding expert disclosed 2.5 years after deadline on the eve of trial); *Brown v. Wal-Mart Stores, Inc.*, 651 F. App'x 672, 674 (9th Cir. 2016) (defendant never responded to plaintiff's evidentiary objection and did not demonstrate substantial justification or harmlessness*); Day v. GEICO Cas. Co.*, 2022 WL 16556802, at *5 (N.D. Cal. Oct. 31, 2022) (same)

certification opposition declaration). Here, it should have come as no surprise that Defendants asserted a predominance argument where the proposed class definition expressly invoked tracing with no end date. But even assuming surprise, courts find late disclosures harmless when, as here, Plaintiff "could have, but chose not to, request more time to file their reply and seek to obtain discovery from [the declarant] in the interim," but instead "waited . . . to move to strike" and "never sought to depose [the declarant] or any other witness concerning the[] documents." *Id.*

Plaintiff first claimed outrage over the Shevlin, Ludwig, and Lee Declarations 50 days ago. ECF 138-9. In the seven-plus weeks that followed, Plaintiff:

- Ignored Defendants' offer to stipulate to an extension for Plaintiff's Reply. ECF 138-10.

- Demanded on December 19, weeks before substantial document completion (ECF 119) that Defendants produce "all discovery on the tracing issue immediately and no later than December 22," regardless of whether it related to the three declarants. ECF at 138-11 at 1.

- Ignored Defendants' invitation to discuss targeted productions "reasonably necessary for [Plaintiff] to respond to [the Opposition]," ECF 138-12 at 2.

- Received Defendant's productions of "documents relevant to the commingling of pre-IPO shares with shares issued pursuant to the Registration Statement" on December 22, 2023 and January 5, 2024. Gibbs Decl. ¶ 9.

- Served an undisclosed expert report responding to the three declarations. ECF 138-1.

- Did not make that expert available for deposition until January 29th, 2024. ECF 143.

- Never sought to depose Shevlin, Ludwig, Lee, or from any other witness about tracing.

Plaintiff's conduct thus suggests, not an effort to cure any purported surprise, but rather an effort to manufacture a dispute to avoid unfavorable evidence. *See Ellis*, 2015 WL 9178076, at *8 (denying Rule 37 motion as harmless where plaintiffs failed to seek more time to reply or depose declarant); *Temple v. Guardsmark, LLC*, 2011 WL 723611, at *3 n.3 (N.D. Cal. Feb. 22, 2011) (denying class certification and finding defendant's same-day disclosure of 96 declarants harmless because plaintiff "merely object[ed] to the declarations two months after they were filed," and did not "attempt[] to depose the declarants to test their assertions"). What's more, Defendants agreed to drop their timeliness objection to Mitts' Report, which addressed the evidence at issue. ECF 145.

## III.  CONCLUSION

For the reasons herein and in the Opposition, the Court should deny Plaintiff's Motion. But, if any class is certified, it should end when the Lock-Up expired.

Dated: February 2, 2024

COOLEY LLP

By: /s/ Patrick E. Gibbs

Patrick E. Gibbs

*Attorneys for Defendants Talis Biomedical Corporation, Brian Coe, J. Roger Moody, Jr., Felix Baker, Raymond Cheong, Melissa Gilliam, Rustem F. Ismagilov, Kimberly J. Popovits, Matthew L. Posard, and Randal Scott*