# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE TALIS BIOMEDICAL SECURITIES LITIGATION | Case No. 3:22-cv-00105-SI<br><br>**CLASS ACTION** |

**Expert Rebuttal Report of Jack R. Wiener**

**February 2, 2024**

**TABLE OF CONTENTS**

Contents

I.    Assignment..............................................................................................................1

II.   Qualifications........................................................................................................4

III.  Summary of Opinions............................................................................................6

IV.   Background on Talis IPO and Common Stock Offerings.........................................9

V.    History and Background of DTC ..........................................................................11

VI.   DTC's Intermediated System of Securities Holding..............................................15

    A.    Overview of the DTC System........................................................................15

    B.    The Nature of DTC's Fungible Bulk of Securities ..........................................22

    C.    Tracing Shares in the DTC System................................................................26

VII.  OPINIONS...........................................................................................................28

    A.    Opinion 1. Dr. Mitts misstates the nature of DTC's fungible bulk of securities. He claims that such securities registered in DTC's street name and credited to DTC Participants are held separately from one another by DTC in DTC Participant accounts, and further claims that some of such securities remain distinguishable from other securities bearing the same CUSIP number that are held by DTC in the same DTC fungible bulk. This is incorrect. Once deposited into DTC's fungible bulk of securities bearing the same CUSIP number, securities are wholly fungible and cannot be distinguished from one another, and DTC Participants who either hold securities for themselves or on behalf of their customers are simply credited a *pro rata* interest in DTC's fungible bulk of such fungible securities. ..............28

    B.    Opinion 2. Contrary to Dr. Mitts's assertion that tracing securities to a registration statement may be still possible even when both registered and unregistered securities are held in DTC's fungible bulk for that CUSIP, I am not aware of any method to trace shares of a security held at DTC or its sub-custodian, in the street name of DTC, to a particular registration statement where: (i) multiple issuances of the security represented by the same CUSIP number have been deposited at DTC; and (ii) one or more of the issuances were not made pursuant to the relevant registration statement. ....................................................................................36

    C.    Opinion 3. Dr. Mitts's suggestion that the LIFO/FIFO accounting methodology allows investors to trace shares held at DTC in DTC's fungible bulk even after the end of a lockup period following an IPO is incorrect. Further, Dr. Mitts does not set forth any realistic implementation of his proposed methodology that could actually trace Talis IPO Shares to the Registration Statement following the lockup period.....................................38

**TABLE OF CONTENTS**
(continued)

**Page**

  1. Dr. Mitts's Purported Tracing Approach Incorporates Unrealistic Assumptions ................................................................................. 40

  2. Dr. Mitts's Purported Tracing Approach Based on LIFO/FIFO is Methodologically Flawed ........................................................ 43

  3. Dr. Mitts's Purported Tracing Approach is Inapposite and Unproven in the Context of Section 11's Tracing ................................. 44

 D. Opinion 4. Contrary to Dr. Mitts's assertion that tracing of Talis IPO Shares may be possible after the expiration of the August 11, 2021 lockup, I find that all 15,870,000 Talis IPO Shares: (i) bore the same CUSIP number as the previously issued shares of Talis Stock that were delivered to DTC on August 13, 2021; (ii) were issued in book-entry-only form—without any physical certificates for beneficial owners—and were registered in DTC's street name; and (iii) were held in a single undifferentiated fungible aggregate bulk at DTC, since August 13, 2021, blended with thousands of other shares of Talis Stock that were previously issued by Talis separately from the IPO. In light of shares of Talis Stock from multiple issuances having been blended into a single undifferentiated fungible aggregate bulk at DTC, I do not believe that any method exists by which Plaintiff or any other alleged beneficial owners would be able to show that the shares of Talis Stock that they acquired since August 13, 2021, are traceable to the Registration Statement that is the subject of the Action. ..................................... 45

  1. February 17, 2021 ................................................................. 46

  2. August 11, 2021 .................................................................... 47

  3. August 13, 2021 .................................................................... 48

**VIII. Conclusion** ................................................................................................ 50

## I.   ASSIGNMENT

1.      I have been retained as an expert witness in the above-captioned action (the "Action") by Cooley LLP. The firm is counsel for Talis Biomedical Corporation ("Talis" or the "Company") and Brian Coe, Felix Baker, Raymond Cheong, Melissa Gilliam, Rustem F. Ismagilov, J. Roger Moody, Jr., Kimberly J. Popovits, Matthew L. Posard, and Randal Scott (collectively, the "Individual Defendants" and, together with Talis, "Defendants").[1]

2.      I have been asked to review and assess the opinions expressed by Professor Joshua Mitts in his January 12, 2024 expert declaration (hereinafter, "Mitts Report"),[2] including the accuracy of the facts underlying those opinions.

3.      Having determined that the Mitts Report makes incorrect assertions about how The Depository Trust Company ("DTC") holds securities that are registered in the name of DTC's partnership nominee, Cede & Co., in an undifferentiated manner known as a "fungible bulk,"[3] I have been asked to respond to those assertions by providing history and background information on DTC and DTC's intermediated system of securities holding, and discuss the nature of DTC's fungible bulk of securities.

4.      I have also been asked to review and assess Dr. Mitts's assertion regarding the use of standard accounting methods, which Dr. Mitts asserts would allow beneficial owners holding through the DTC intermediated system to trace their securities registered in DTC's fungible bulk (consisting of a blend of registered and unregistered shares), to a registration statement.[4] I have also been asked to review and examine whether it is factually possible for a beneficial owner to trace shares of Talis common stock ("Talis Stock") held at DTC or DTC's sub-custodian, in the

---

[1]   Amended Consolidated Class Action Complaint, Doc. No. 104, *In re Talis Biomedical Securities Litigation*, No. 3:22-cv-00105-SI (Jan. 13, 2023 N.D. Cal.) ("Amended Complaint").

[2]   Declaration of Professor Joshua Mitts, Ph.D., January 12, 2024 (Exhibit A to Declaration of Evan A. Kubota in Support of Lead Plaintiff's Motion for Class Certification, *In re Talis Biomedical Securities Litigation*, January 12, 2024, Doc. No. 138-1).

[3]   Mitts Report ¶¶ 21–43.

[4]   Mitts Report ¶¶ 44–47.

1

street name of DTC, to a particular registration statement (or prospectus which forms part of a registration statement) where: a) multiple issuances of shares of Talis Stock represented by the same CUSIP number have been deposited at DTC; and b) one or more of the issuances were not made pursuant to the registration statement that is the subject of this Action.[5]

5.      In connection with the Talis initial public offering ("Talis IPO") in February 2021,[6] Talis filed offering documents with the Securities and Exchange Commission ("SEC") that included: (i) a January 22, 2021, registration statement on Form S-1, which was subsequently amended by Talis on February 8, 2021, and February 11, 2021, and declared effective by the SEC on February 11, 2021 (the "Registration Statement");[7] and (ii) a February 12, 2021 prospectus on Form 424B4 (the "Prospectus," which formed part of the Registration Statement).[8] I have been asked, in regard to shares of Talis Stock, specifically to assess the traceability of the 15,870,000 shares issued in connection with the Talis IPO ("Talis IPO Shares") to the Registration Statement.[9]

6.      I understand that Lead Plaintiffs Martin Dugan, Leon Yu, and Max Wisdom Technology Limited claim that they "purchased or otherwise acquired Talis common stock

---

[5]   For purposes of clarity, I wish to mention that when a company issues shares of a security in multiple offerings, each offering of shares of that security constitutes an "issuance," and the multiple issuances collectively constitute the "issue" of a security. As I will discuss in Section VI, each issue of a company's securities held by DTC bears a 9-character CUSIP number, and the common practice (as is the case with Talis) is for different offerings (or "issuances") of a security, such as an IPO and a subsequent public offering made pursuant to different registration statements, to bear the same CUSIP number. DTC holds all securities that it custodies that bear the same CUSIP number in one fungible, aggregate bulk. Once deposited into the fungible bulk, the securities issued at different times pursuant to different registration statements are wholly commingled in such a manner that the securities cannot be distinguished from one another, not even by date of issuance pursuant to a particular registration statement.

[6]   February 12, 2021 was the first trading day on the NASDAQ. *See* Talis Biomedical Corporation, "Talis Announces Pricing of Initial Public Offering," February 11, 2021, https://www.globenewswire.com/news-release/2021/02/12/2174655/0/en/Talis-Announces-Pricing-of-Initial-Public-Offering.html?print=1 (last visited Jan. 29, 2024).

[7]   Talis Biomedical Corporation, "Form S-1," January 22, 2021; Talis Biomedical Corporation, "Amendment No. 1 to Form S-1," February 8, 2021; Talis Biomedical Corporation, "Amendment No. 2 to Form S-1," February 11, 2021; SEC, "Notice of Effectiveness as to Form S-1 filed by Talis Biomedical Corporation," February 11, 2021.

[8]   Talis Biomedical Corporation, "Form 424B4," dated February 11, 2021, filed February 12, 2021.

[9]   In its IPO, Talis offered to sell 13,800,000 shares of Talis common stock at a price of $16.00 and provided underwriters with an overallotment option to purchase up to 2,070,000 additional shares within 30 days from the completion of the offering. Such overallotment option was fully exercised on February 17, 2021, when Talis completed its IPO of 15,870,000 shares of Talis common stock. *See* Prospectus, 12; Talis Biomedical Corporation, "Form 8-K," February 17, 2021.

2

pursuant and/or traceable to the Registration Statement[.]"[10] I further understand that this Action was putatively brought on behalf of "[a]ll persons and entities that purchased or otherwise acquired common stock issued by Talis pursuant and/or traceable to the Registration Statement issued in connection with the Company's February 2021 [IPO], and were damaged thereby" (the "Class").[11] In connection with the purchases of shares of Talis Stock, Plaintiffs assert claims under Section 11 of the Securities Act of 1933 (the "Securities Act") against the Defendants, and under Section 15 of the Securities Act against the Individual Defendants.[12]

7.      In this report, as instructed by counsel, I have assumed that the terms "trace," "tracing," "traceable," and "traceability" refer to a shareholder's ability to prove that the shares of a security that the shareholder acquired are the same shares that were issued under a particular registration statement. A shareholder that can do so can "trace" its shares.

8.      I have prepared my report to respond to the Mitts Report, state my expert opinions, and describe the bases for those opinions; to disclose the facts and data on which I relied upon in reaching my opinions; and to make all other appropriate disclosures. I express no legal opinions in this report. The work that I performed in this matter has been informed by my education, knowledge, and experience in securities clearance and settlement, custody, and servicing.[13] The information in this report is based upon discovery to date and the information that is currently available to me.

9.      I will review, evaluate, and analyze additional information as it becomes available. I reserve the right to amend or supplement my opinions based upon further information learned, or produced, or in response to opinions raised in any reports, declarations, or depositions of any

---

[10]   Amended Complaint ¶¶ 27–30.

[11]   *Id.* ¶ 241.

[12]   *Id.* ¶¶ 251-267.

[13]   Clearance, settlement, and custody are all part of post-trade processing services. As I will discuss later in Section V and Section VI, before the era of high-speed digital networks and electronic recordkeeping, such services involved a mass migration of papers to record transfers of stock certificates. Nowadays, stock certificates are immobilized or held at a central location, with changes of ownership recorded electronically using a computerized book-entry system. *See* DTCC, *Equities Clearance and Settlement*, https://www.dtcc.com/clearance-settlement-guide/#/chapterTwo (last visited Jan. 29, 2024).

other expert put forward in this Action. Therefore, my analyses and opinions described herein are subject to change based upon future discovery or other developments.

10.    I am being compensated at a rate of $1,400 per hour. My compensation in this matter is not contingent on any opinion that I reach or on the outcome of this litigation. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.

## II.    QUALIFICATIONS

11.    I graduated from Brooklyn College *summa cum laude* (B.A., Phi Beta Kappa) in 1979. I subsequently graduated from the University of Pennsylvania Law School, where I was an editor of the *University of Pennsylvania Law Review*, with a J.D. in 1982. From 1982 to 1989, I practiced as a corporate and securities lawyer.

12.    From 1989 to 2005, I was an officer of and attorney for The Depository Trust & Clearing Corporation ("DTCC") and DTC, which is a wholly owned subsidiary of DTCC and the world's largest custodian of securities. I held a number of positions at these companies until I became Managing Director and Deputy General Counsel of both companies in 2001. At DTC and DTCC, I was largely responsible for supporting the companies' activities in the areas of securities clearance and settlement, custody, and servicing, as well as regulatory oversight.

13.    Those 17 years at DTC and DTCC constitute a significant portion of my four decades of professional experience, which has largely focused on securities clearance and settlement, custody, and servicing, primarily as they relate to the DTC system. While my time at DTC does not cover the period under review in this Action, the fundamentals of how DTC operates have not changed in any material way with respect to the matters on which I am opining. I remain current on how DTC operates through my ongoing conversations with DTC staff; my review of DTC rules, rule filings, and notices, as well as SEC orders related to DTC and coverage of DTC in the press; and my participation in litigation matters in which a DTC employee has testified or a declaration from DTC has been submitted.

4

14.    From 2007 to 2008, I was a Managing Director of the Securities Industry and Financial Markets Association ("SIFMA"), the largest securities industry lobbying organization in the United States. In that role, I represented the 650 largest brokers, banks, and asset managers before the SEC, the Financial Industry Regulatory Authority ("FINRA"), and the Federal Reserve Bank. One of my duties was representing broker-dealer and bank members on matters relating to custody, clearance and settlement, and servicing of securities, especially with regard to the DTC clearance and settlement system.

15.    Since 2009, I have been a U.S. State Department-appointed Delegate negotiating securities law treaties for the United States. I have negotiated two multilateral, 40-nation treaties on the law of the custody, transfer, and pledging of securities.

16.    Also since 2009, I have been the Chief Executive Officer of Financial Services Consulting. In that capacity, I have advised clients with regard to clearance and settlement, custody, transactions, regulation, compliance, and litigation in the areas of securities, derivatives, banking, and broker-dealer law and operations, and white-collar defense. I have advised banks, investment banks, broker-dealers, hedge funds, clearing firms, investment advisors, issuers, and regulators from the United States, Canada, France, Germany, the United Kingdom, Ireland, Sweden, Israel, China, and the Cayman Islands, and others in both securities structuring and litigation matters relating to DTC's clearance and settlement system. I have also advised the Israeli Ministry of Finance on restructuring its bond offerings in the United States in a manner that would most efficiently leverage DTC's clearance and settlement system. I have been retained by both plaintiffs and defendants in litigation matters.

17.    I have also served as an expert witness on DTC and on the clearance, settlement, and custody of securities through DTC for: (a) the United States Attorney's Office for the Southern District of New York, for which I also served as an expert on international securities law; (b) a Swedish hedge fund, with regard to litigation in Sweden; (c) two European banks, in litigation regarding the loss through fraud of $1.8 billion in asset-backed commercial paper; (d) a British

bank, with regard to multi-billion dollar litigation in Ireland and in the Cayman Islands related to the Madoff Ponzi scheme; (e) a U.S. clearing firm, regarding attempted manipulation of DTC's processes; (f) a French custodian bank, regarding the theft by means of fraud of $400 million in securities that were subsequently transferred through DTC's settlement system; and (g) various issuers and underwriters, regarding the ability to trace shares of a security held at DTC—in the street name of DTC—to a particular registration statement when multiple issuances of the security (not all issued under the same registration statement, but all represented by the same CUSIP number) have been deposited at DTC.

18.     I have taught as an adjunct Professor of Law at Brooklyn Law School since 2011, focusing, among other things, on the law of the sale, clearance and settlement, servicing, and custody of securities, especially through DTC.

19.     My qualifications are described in further detail in my *curriculum vitae*, which is attached as **Appendix A** to this report. A list of the cases in which I have testified as an expert at trial or by deposition in the last four years is attached as **Appendix B**.

## III.     SUMMARY OF OPINIONS

20.     In forming my opinions and preparing this report, I relied upon my education as well as on my expertise and professional experience as a practicing attorney, former managing director at DTC, and consultant on issues related to securities clearance and settlement, custody, and servicing, as well as regulatory oversight. I have reviewed the following documents in forming my opinions in this Action: the declaration of Meghan Shevlin, Associate Director, SEC Reporting and Corporate Accounting at Talis, dated December 12, 2023 ("Shevlin Declaration"); the declaration of Lia Ludwig, Relationship Manager at Broadridge Corporate Issuer Solutions, LLC, as successor-in-interest to Broadridge Corporate Issuer Solutions, Inc. ("Broadridge"), dated as December 8, 2023 ("Ludwig Declaration"); the declaration of Matthew Lee, a former employee of Talis, dated December 11, 2023 ("Lee Declaration"), and associated exhibits; and the exhibits annexed to the declaration of Jessie Simpson LaGoy, dated December 12, 2023 ("Simpson LaGoy

6

Declaration").[14] I also reviewed the supplemental declaration of Lia Ludwig, dated January 25, 2024 ("Supplemental Ludwig Declaration"), and the declaration of Ann Marie Bria, Managing Director for Asset Services Product Management at DTCC, dated January 30, 2024 ("Bria Declaration"), and I have considered the sources of information set forth in **Appendix C**.

21.    My principal conclusions are as follows:

a)    **Opinion 1.** Dr. Mitts misstates the nature of DTC's fungible bulk of securities. He claims that such securities registered in DTC's street name and credited to DTC Participants are held separately from one another by DTC in DTC Participant accounts, and further claims that some of such securities remain distinguishable from other securities bearing the same CUSIP number that are held by DTC in the same DTC fungible bulk. This is incorrect. Once deposited into DTC's fungible bulk of securities bearing the same CUSIP number, securities are wholly fungible and cannot be distinguished from one another, and DTC Participants who either hold securities for themselves or on behalf of their customers are simply credited a *pro rata* interest in DTC's fungible bulk of such fungible securities.

b)    **Opinion 2.** Contrary to Dr. Mitts's assertion that tracing securities to a registration statement may be still possible even when both registered and unregistered securities are held in DTC's fungible bulk for that CUSIP, I am not aware of any method to trace shares of a security held at DTC or its sub-custodian, in the street name of DTC, to a particular registration statement where: (i) multiple issuances of the security represented by the same CUSIP number have been deposited at DTC; and (ii) one or more of the issuances were not made pursuant to the relevant

---

[14]    Declaration of Meghan Shevlin, December 12, 2023, *In re Talis Biomedical Securities Litigation*, Doc. No. 136-21; Declaration of Lia Ludwig, December 8, 2023, *In re Talis Biomedical Securities Litigation*, Doc. No. 136-17; Declaration of Matthew Lee, December 11, 2023, *In re Talis Biomedical Securities Litigation*, Doc. No. 136-15; Declaration of Jessie Simpson LaGoy, December 12, 2023, *In re Talis Biomedical Securities Litigation*, Doc. No. 135-1.

registration statement.

c) **Opinion 3.** Dr. Mitts's suggestion that the LIFO/FIFO accounting methodology allows investors to trace shares held at DTC in DTC's fungible bulk even after the end of a lockup period following an IPO is incorrect. Further, Dr. Mitts does not set forth any realistic implementation of his proposed methodology that could actually trace Talis IPO Shares to the Registration Statement following the lockup period.

d) **Opinion 4.** Contrary to Dr. Mitts's assertion that tracing of Talis IPO Shares may be possible after the expiration of the August 11, 2021 lockup, I find that all 15,870,000 Talis IPO Shares: (i) bore the same CUSIP number as the previously issued shares of Talis Stock that were delivered to DTC on August 13, 2021; (ii) were issued in book-entry-only form—without any physical certificates for beneficial owners—and were registered in DTC's street name; and (iii) were held in a single undifferentiated fungible aggregate bulk at DTC, since August 13, 2021, blended with thousands of other shares of Talis Stock that were previously issued by Talis separately from the IPO. In light of shares of Talis Stock from multiple issuances having been blended into a single undifferentiated fungible aggregate bulk at DTC, I do not believe that any method exists by which Plaintiff or any other alleged beneficial owners would be able to show that the shares of Talis Stock that they acquired since August 13, 2021, are traceable to the Registration Statement that is the subject of the Action.

22.     Below, I further explain the basis for my opinions, providing background information about the Talis IPO, common stock offerings, DTC, and DTC's intermediated system of securities holdings. I then respond to Dr. Mitts's opinions regarding the nature of DTC's fungible bulk, and the possibility to employ an accounting methodology to trace individual shares deposited into the DTC intermediated system to a particular registration statement after the end of

8

the lockup restrictions. In response to Dr. Mitts's assertions, I also detail an analytical framework to trace individual shares to a particular registration statement. I then employ this framework, testing whether I can trace shares of Talis Stock that were issued pursuant to the Registration Statement since the expiration of the lockup ("Talis Lockup") on August 11, 2021, following the Talis IPO.

## IV.    BACKGROUND ON TALIS IPO AND COMMON STOCK OFFERINGS

23.    Previously known as SlipChip Corporation, Talis was incorporated in Delaware as a result of a reorganization between SlipChip LLC and SlipChip Corporation in 2013.[15] In February 2018, SlipChip Corporation changed its corporate name to Talis Biomedical Corporation.[16]

24.    Prior to the Talis IPO, Talis had conducted several rounds of financing and issued shares of common stock and convertible preferred stock pursuant to different exemptions from registration.[17] In the Registration Statement, Talis disclosed that, as of September 30, 2020, there were 2,124,444 shares of common stock issued and outstanding held of record by 53 stockholders.[18] Based on the number of shares of common stock outstanding as of September 30, 2020, and after giving effect to: (i) the issuance of 4,859,897 shares of Series F-1 convertible preferred stock and 9,958,539 shares of Series F-2 convertible preferred stock from October 2020 to November 2020; (ii) the conversion of all outstanding shares of convertible preferred stock; and (iii) the issuance of 13,800,000 shares of common stock in the Talis IPO, Talis estimated in the Registration Statement that there would be 21,179,876 shares of common stock and 29,863,674

---

[15]    Registration Statement, 10; Prospectus, 10.

[16]    Registration Statement, 10; Prospectus, 10.

[17]    Talis Biomedical Corporation, "Form D," August 20, 2013; Talis Biomedical Corporation, "Form D," March 6, 2015; Talis Biomedical Corporation, "Form D," October 17, 2017.

[18]    Registration Statement, 184; Prospectus, 183. This amount excluded (1) outstanding shares of convertible preferred stock as of September 30, 2020 and (2) the issuance of an aggregate of 4,859,897 shares of Series F-1 convertible preferred stock and 9,958,539 shares of Series F-2 convertible preferred stock from October 2020 to November 2020, which would convert into 7,555,432 shares of common stock and 29,863,674 shares of Series 1 convertible preferred stock in connection with the completion of the IPO. In addition, there were 7,424,661 shares of common stock subject to outstanding options under Talis equity incentive plan.

shares of Series 1 convertible preferred stock outstanding upon the completion of the Talis IPO.[19] In addition, as part of the Talis IPO, Talis provided underwriters with an overallotment option to purchase up to 2,070,000 additional shares within 30 days from the completion of the offering.[20]

25.    In total, 15,870,000 shares of Talis Stock were issued pursuant to the Registration Statement, the sum of the 13,800,000 initial shares issued in the IPO and the 2,070,000 additional shares provided to Talis's underwriters, which were ultimately issued. Hereinafter, I refer to the shares of Talis Stock other than the 15,870,000 shares issued pursuant to the Registration Statement as "Talis Non-IPO Shares." The Talis Non-IPO Shares included, among others, shares of Talis Stock outstanding prior to the Talis IPO, and those shares issued as a result of the conversion of convertible preferred stock prior to the completion of the Talis IPO. Talis IPO Shares were freely tradable in the public market immediately after the IPO,[21] while I understand that the Talis Non-IPO Shares were subject to lockup restrictions in the 180-day period following the completion of the Talis IPO ("Talis Lockup Period").[22]

26.    Talis's common stock was listed on the Nasdaq Global Market ("Nasdaq") under the symbol "TLIS,"[23] and the first day of trading for Talis Stock was February 12, 2021.[24]

27.    On February 17, 2021, Talis completed its IPO, in which it issued and sold 15,870,000 shares of Talis Stock at an offering price of $16 per share.[25]

28.    After the completion of the Talis IPO, and during the Talis Lockup Period, Talis issued shares of common stock under certain equity incentive plans subject to different vesting

---

[19]   Registration Statement, 184; Prospectus, 183, reporting 23,479,876 shares instead of 21,179,876 shares.

[20]   Registration Statement, cover page; Prospectus, cover page.

[21]   Registration Statement, 192; Prospectus, 191 ("All of the shares sold in this offering will be freely tradable in the public market without restriction or further registration under the Securities Act, unless held by an affiliate of ours.").

[22]   Registration Statement, 78, 192–193; Prospectus, 78, 191–192.

[23]   Registration Statement, cover page; Prospectus, cover page.

[24]   Talis Biomedical Corporation, "Talis Announces Pricing of Initial Public Offering," February 11, 2021, https://www.globenewswire.com/news-release/2021/02/12/2174655/0/en/Talis-Announces-Pricing-of-Initial-Public-Offering html?print=1 (last visited Jan. 29, 2024).

[25]   Talis Biomedical Corporation, "Form 8-K," February 17, 2021.

10

terms. On February 17, 2021, Talis filed a Form S-8 registration statement to register 13,390,904 shares of Talis Stock reserved for issuance pursuant to the 2013 Equity Incentive Plan, 2021 Equity Incentive Plan, and 2021 Employee Stock Purchase Plan.[26]

29.     On August 11, 2021, at 11:59 pm ET, the lockup restrictions on Talis Stock were lifted and Talis Non-IPO Shares were free to be traded, along with the Talis IPO Shares.[27]

## V.     HISTORY AND BACKGROUND OF DTC

30.     DTC was established in 1973 to provide securities clearance and settlement and custody services to buyers and sellers in an efficient, cost-effective, and streamlined manner.[28] Headquartered in New York City, DTC is the world's largest custodian and securities depository, serving as a custodian for over 3.5 million securities issues.[29] In 2022, DTC was the custodian of and provided asset servicing for $72 trillion in securities from over 150 countries and territories, and DTC handled $2.5 quadrillion in securities transactions.[30] The Talis securities issuance that is the subject of this Action constitute just one of those 3.5 million issues. As of December 29, 2023, DTC had 236 Participants,[31] which in turn acted both for themselves and for their customers.

---

[26] Talis Biomedical Corporation, "Form S-8," February 17, 2021, cover page.

[27] August 10, 2021 Letter from Karen Elizabeth Deschaine to Broadridge Corporate Issuer Solutions, Inc. (Doc. No. 136-9); Ludwig Declaration ¶ 2 (Doc. No. 136-17).

[28] *See* DTCC, *The Depository Trust Company (DTC)*, https://www.dtcc.com/about/businesses-and-subsidiaries/dtc (last visited Jan. 29, 2024).

[29] *See* VIRGINIA B. MORRIS & STUART Z. GOLDSTEIN, LIFE CYCLE OF A SECURITY, 5 (2010), https://books.google.com/books?id=Hv8ipHbVoGUC&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false (last visited Jan. 29, 2024) (referring to DTC as "the largest central securities depository in the world"); NASDAQ, *The Depository Trust Company*, https://www.nasdaq.com/glossary/d/depository-trust-company (last visited Jan. 29, 2024) (defining DTC as "the world's largest central securities depository."); DTCC, *Blanket Issuer Letter of Representations Template*, https://www.dtcc.com/-/media/Files/Downloads/legal/issue-eligibility/eligibility/BLOR-Template.pdf (last visited Jan. 29, 2024).

[30] Press Release, DTCC, *DTCC Comments on SEC Ruling around Expanded US Treasury Clearing* (Dec. 14, 2023), https://www.dtcc.com/news/2023/december/14/dtcc-comments-on-sec-ruling-around-expanded-us-treasury-clearing (last visited Jan. 29, 2024) ("In 2022, DTCC's subsidiaries processed securities transactions valued at U.S. $2.5 quadrillion and its depository subsidiary provided custody and asset servicing for securities issues from over 150 countries and territories valued at U.S. $72 trillion.").

[31] A DTC "Participant" is an entity that DTC has admitted to be a member of the depository and to maintain a securities account at DTC. DTC Participants include banks, broker-dealers, and other firms that act as underwriters of new issues, as well as other types of financial service institutions. *See* DTCC, *FAQ: How Issuers Work with DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Jan. 29, 2024). Applicants need to be approved to become a DTC Participant pursuant to DTC's bylaws. *See*

11

31.     Some Participants have more than 60 million customers.[32] As discussed below, shares of Talis common Stock were held by DTC, on behalf of DTC Participants, which in turn held shares ultimately on behalf of the Lead Plaintiff and others. For a sense of the scale of the industry, while only 236 institutions are DTC Participants, there are approximately 3,400 broker-dealer firms registered with FINRA,[33] and additionally 32,021 investment advisor firms overseen by the SEC or state regulators.[34] Many broker-dealers in turn act on behalf of independent investment advisors to clear trades. For example, Fidelity Institutional (a division of Fidelity Investments) provides such services to approximately 13,500 institutional clients, which in turn service 8.1 million end investor (beneficial owner) accounts.[35] Most large U.S. broker-dealers and banks are DTC Participants, meaning that they deposit and hold securities at DTC.[36] That system was created to provide an efficient means of clearing and settling securities transactions.

---

DTCC, *Rules, By-Laws and Organization Certificate of The Depository Trust Company* (Aug. 2023), at 11, 21–26, https://www.dtcc.com/~/media/Files/Downloads/legal/rules/dtc_rules.pdf (last visited Jan. 29, 2024). DTC sometimes refers to Participants as DTC's "Direct Participants," "customers," "clients," and "members." To avoid confusion, I refer to them in this report simply as Participants in order to draw a clear distinction between a DTC account holder (*i.e.*, a Participant) and any person who holds interests in securities indirectly through a Participant, such as the Participant's customers. For a list of DTC Participants, *see* DTCC, *DTC Member Directories* (updated Dec. 29, 2023), http://www.dtcc.com/client-center/dtc-directories (last visited Jan. 29, 2024). As of December 29, 2023, there were 863 DTC Participant accounts listed in DTC's member directory, but some entities have multiple DTC Participant accounts. Morgan Stanley, for example, has five DTC Participant accounts (account numbers 0050, 0101, 1821, 5127, and 5224). My above tally of 236 Participants counts Morgan Stanley as only one Participant, even though it has five Participant accounts, and does the same for other entities with multiple Participant accounts.

[32]    One Participant, J.P. Morgan Chase, served over 60 million households in 2022. *See* Amin, Rohan, *Chase's 2022 Digital Banking Trends*, J.P. MORGAN CHASE, https://www.jpmorgan.com/technology/news/chase-2022-digital-banking-trends (last visited Jan. 29, 2024).

[33]    *See* FINRA, *2023 FINRA Industry Snapshot* (Aug. 23, 2023), at 15, https://www finra.org/sites/default/files/2023-04/2023-industry-snapshot.pdf (last visited Jan. 29, 2024).

[34]    *Id.*

[35]    *See* Fidelity Investments, *About Fidelity Institutional* https://clearingcustody fidelity.com/app/item/RD_13569_42626/about.html (last visited Jan. 29, 2024). *See also* Fidelity Institutional, *Q3 2022 Business Update*, https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/about-fidelity/Q3-2022_BusinessUpdates.pdf (last visited Jan. 29, 2024). Throughout this report, I use the term "beneficial owner" to refer to an individual or entity that has the ultimate ownership interest in shares of a company's stock. Beneficial owners may be shareholders and/or investors.

[36]    *See, e.g.*, SEC, *DTC Chills and Freezes* (May 1, 2012), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_dtcfreezes html (last visited Jan. 29, 2024); DTCC, *FAQS: How Issuers Work with DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Jan. 29, 2024) ("DTC holds eligible securities on behalf of Participants").

12

32.     Since the 1700s, the most common way in which an interest in securities, such as shares of stock of a company, was transferred in the United States was by transferring a paper securities certificate that represented a beneficial interest in the stock. The certificate was evidence that the person whose name was reflected on the certificate as the owner was listed on the company's records (or the records of the company's registrar and transfer agent) as a security holder, holding rights represented by the certificate.[37]

33.     A sharp increase in the volume of securities traded in the late 1960s and early 1970s prompted the creation of DTC.[38] Daily trade volumes on the New York Stock Exchange ("NYSE") increased from an average of 3 million shares in 1960 to daily average volumes of over 19 million shares in some months in 1971, including a high of over 28 million shares traded on one day in 1971.[39] Each purchase and sale required the cancellation, creation, signing, and handling of engraved stock certificates and, typically, over 30 associated paper forms (including a transmittal letter, receipt, transfer instructions, power of attorney or stock power, guarantee, and transfer

[37]  SEC, *Transfer Agent Regulations*, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15, at 11–13 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf (last visited Jan. 29, 2024).

[38]  *See* DTC, *1997 Annual Report* (1997), https://www.sechistorical.org/collection/papers/1990/1997_0101_DTCAR.pdf (last visited Jan. 29, 2024). *See also* Press Release, DTCC, *DTCC Celebrates 40 Years of Service* (June 3, 2013), https://web.archive.org/web/20210507040651/https://www.dtcc.com/news/2013/june/03/dtcc-celebrates-40-years-of-service (last visited Jan. 29, 2024).

[39]  *See* DTC, 1997 Annual Report (1997), https://www.sechistorical.org/collection/papers/1990/1997_0101_DTCAR.pdf (last visited Jan. 29, 2024); New York Stock Exchange, Inc., *Crisis in the Securities Industry, A Chronology: 1967–1970* (Aug. 2, 1971), at 31, 50, http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45 r81.cf1 rackcdn.com/collection/papers/1970/1971_0730_NYSECrisis.pdf (last visited Jan. 29, 2024) ("A new record for a single day's trading was set on February 2, [1971,] when more than 22 million shares changed hands. That record fell on February 8, when volume soared to 25.6 million shares which, in turn, was eclipsed the next day by volume of more than 28 million shares."); Larry E. Bergmann, *The U.S. View of the Role of Regulation in Market Efficiency*, SPEECH BY SEC STAFF: INTERNATIONAL SECURITIES SETTLEMENT CONFERENCE (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb.htm (last visited Jan. 29, 2024); Terry Robards, *Stocks: Dam Is Holding*, N.Y. TIMES (Feb. 14, 1971), https://www nytimes.com/1971/02/14/archives/stocks-dam-is-holding-this-time-so-far-trading-flood-is-controlled html (last visited Jan. 29, 2024) ("For several weeks now, volume has been averaging over 20 million shares a day."). To put this in historical perspective and to explain how the old, pre-1970s method of securities clearance and settlement could not have handled the dramatic increases in trading that were to come, on October 11, 2008, *The Wall Street Journal* reported that the total trading volume of stocks listed on the NYSE hit a record of 11.16 billion shares—398 times 1971's highest daily trading volume of 28 million shares. *See* E.S. Browning, et al., *Wild Day Caps Worst Week Ever for Stocks*, WALL STREET J. (Oct. 11, 2008), https://www.wsj.com/articles/SB122368071064524779 (last visited Jan. 29, 2024).

13

journal).[40] Those documents were generally carried by messengers from the seller to the seller's broker, to the company's transfer agent, to the company's registrar, and from the company's transfer agent, to the buyer's broker, and eventually to the buyer. It was a cumbersome and time-consuming process.[41]

34.    The increase in the volume of securities trading caused what became known as the "paperwork crisis."[42] Banks, broker-dealers, and transfer agents and their messengers were unable to, in a timely manner, move and manually process the stock certificates and paper forms necessary to effect changes in ownership from seller to buyer. Stock certificates and associated documents "were piled 'halfway to the ceiling' in some offices."[43] Between 1968 and 1970, approximately 100 financial firms went out of business because they were not able to keep up with their paperwork, and thus failed to settle many of their trades.[44] The crisis compelled the NYSE to shorten its trading hours, and even to close completely on some days, so that the paper could be processed, and the clearance and settlement of securities could catch up with the trading volume.[45]

---

[40]  *See* SEC, *Transfer Agent Regulations*, Release No. 34-76743, File No. S7-27-15, at 13–17 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf (last visited Jan. 29, 2024); Larry E. Bergmann, *The U.S. View of the Role of Regulation in Market Efficiency*, SPEECH BY SEC STAFF: INTERNATIONAL SECURITIES SETTLEMENT CONFERENCE (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb.htm (last visited Jan. 29, 2024).

[41]  SEC, *Transfer Agent Regulations*, Release No. 34-76743, File No. S7-27-15, at 13–17 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf (last visited Jan. 29, 2024); Larry E. Bergmann, *The U.S. View of the Role of Regulation in Market Efficiency*, SPEECH BY SEC STAFF: INTERNATIONAL SECURITIES SETTLEMENT CONFERENCE (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb.htm (last visited Jan. 29, 2024).

[42]  Larry E. Bergmann, *The U.S. View of the Role of Regulation in Market Efficiency*, SPEECH BY SEC STAFF: INTERNATIONAL SECURITIES SETTLEMENT CONFERENCE (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb.htm (last visited Jan. 29, 2024).

[43]  Suellen M. Wolfe, *Escheat and the Challenge of Apportionment: A Bright Line Test to Slice a Shadow*, 27 ARIZ. ST. L.J. 173, 181 n.49 (1995) (citation omitted).

[44]  DTC, 1997 Annual Report (1997), https://www.sechistorical.org/collection/papers/1990/1997_0101_DTCAR.pdf (last visited Jan. 29, 2024); SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers*, H.R. Doc. No. 92-231 (Dec. 1971), at 28, http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45 r81.cf1 rackcdn.com/collection/papers/1970/1971_1201_SECUnsafe_01.pdf (last visited Jan. 29, 2024).

[45]  SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers*, H.R. Doc. No. 92-231 (Dec. 1971), at 28, http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45 r81.cf1 rackcdn.com/collection/papers/1970/1971_1201_SECUnsafe_01.pdf (last visited Jan. 29, 2024). In 1971, the SEC described the crisis as "the most prolonged and severe crisis in the securities industry" since the Great Depression. *See* SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers*, H.R. Doc. No. 92-231 (Dec. 1971), at 1, 27, http://3197d6d14b5f19f2f440-

14

35.     In response to this crisis, the U.S. government and the banking and securities industries launched an initiative to reduce reliance on paper certificates that were being delivered to settle securities transactions, and to thereby increase the speed, safety, and accuracy of the clearance and settlement of securities. They created a new system of clearance and settlement.[46]

## VI.    DTC'S INTERMEDIATED SYSTEM OF SECURITIES HOLDING

36.     DTC was created to address this paperwork crisis. Rather than physically move paper securities certificates from seller to buyer, as had historically been done, certificates were immobilized at DTC in an intermediated system of securities holding (also known as the "indirect holding system").[47] Today, as has been the case for a number of years, DTC holds the vast majority of publicly traded stock and corporate bonds issued in the United States, and nearly all U.S. municipal securities.[48]

### A.    Overview of the DTC System

37.     **Figure 1** illustrates the structure of DTC's intermediated system of securities holding.

---

5e13d29c4c016cf96cbbfd197c579b45 r81.cf1 rackcdn.com/collection/papers/1970/1971_1201_SECUnsafe_01. pdf (last visited Jan. 29, 2024).

[46] N.Y. Stock Exchange, Inc., *Crisis in the Securities Industry, A Chronology: 1967–1970* (Aug. 2, 1971), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45 r81.cf1 rackcdn.com/collection/papers/1970/1971_0730_NYSECrisis.pdf (last visited Jan. 29, 2024). *See also* DTC, *1989 Annual Report* (1989), at 6–10, http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45 r81.cf1 rackcdn.com/collection/papers/1980/1989_0101_DTCAR.pdf (last visited Jan. 29, 2024).

[47] DTCC, *Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures* (Mar. 2023), https://www.dtcc.com/-/media/Files/Downloads/legal/policy-and-compliance/DTC_Disclosure_Framework.pdf (last visited Jan. 29, 2024).

[48] *See* MORRIS & GOLDSTEIN, *supra* note 29, at 5.

**Figure 1 – DTC's Intermediated System of Securities Holding**



38.    In DTC's intermediated system of securities holding, one or more securities certificates (sometimes referred to as global certificates) are typically issued by a company in DTC's "street name"—that is, in the name of DTC's partnership nominee, Cede & Co.[49]

39.    This practice of financial companies issuing securities in "street name" has been a common one for over a century, going back to at least World War I, long preceding the 1933 enactment of the Securities Act.[50]

---

[49] A security held in "street name" is a security that is registered not in the name of the beneficial owner, but rather in the name of DTC, a brokerage firm, or another nominee. *See, e.g.*, John C. Wilcox et al., *"Street Name" Registration & The Proxy Solicitation Process*, in AMY GOODMAN ET AL., A PRACTICAL GUIDE TO SEC PROXY AND COMPENSATION RULES, 11-3 (6th ed. 2018), https://books.google.com/books?id=4FOEDwAAQBAJ&newbks=1&newbks_redir=0&printsec=frontcover&dq =A+PRACTICAL+GUIDE+TO+SEC+PROXY+AND+COMPENSATION+RULES&hl=en#v=onepage&q=A %20PRACTICAL%20GUIDE%20TO%20SEC%20PROXY%20AND%20COMPENSATION%20RULES&f=f alse (last visited Jan. 29, 2024) ("The vast majority of publicly traded shares in the United States are registered on companies' books not in the name of beneficial owners . . . but rather in the name of 'Cede & Co.' the nominee name used by [DTC]. Shares registered in this manner are commonly referred to as being held in 'street name.'"). *See also, e.g.*, SEC, *Glossary: Holding Your Securities*, https://www.investor.gov/introduction-investing/investing-basics/glossary/holding-your-securities (last visited Jan. 29, 2024) ("[Y]ou can hold your securities in 'street name' where your securities positions are recorded on the books of your brokerage firm.").

[50] *See, e.g.*, LEGISLATIVE HISTORY OF THE REVENUE ACT OF 1932: P.L. 72-154: 47 STAT. 169, 1229 (1932), https://books.google.com/books?id=BCjVAAAAMAAJ&pg=PA1229&lpg=PA1229&dq=%22%22Revenue+Ac t+of+1932%22+AND+%221229%22+AND+%22in+all+of+these+cases+it+is+necessary+for+the+broker+to+tr

16

40.     Thus, Cede & Co. becomes the registered owner of these securities on the books of the company (whose books are maintained by the company's registrar/transfer agent).[51] For example, when a company issues new shares of common stock of a book-entry-only issue[52] and delivers them to DTC (or DTC's sub-custodian), and those shares consist of all of the shares that the company has ever issued, the books and records of the company (or its registrar/transfer agent) reflect that the sole registered owner of all shares of common stock of the company is Cede & Co.

41.     The shares are then typically held by and reflected on the books of DTC (and sometimes of a sub-custodian of DTC, such as what DTC refers to as a FAST Agent).[53] As a result,

---

ansfer+the+certificate+into+a+street+name%22&source=bl&ots=S14dyJv8Yx&sig=ACfU3U0ajD4hxFywXnr8 wXaVhkF9wthdlg&hl=en&sa=X&ved=2ahUKEwjL1caz5IWEAxWUGTQIHSQwAmUQ6AF6BAgMEAM#v= onepage&q=%22%22Revenue%20Act%20of%201932%22%20AND%20%221229%22%20AND%20%22in%2 0all%20of%20these%20cases%20it%20is%20necessary%20for%20the%20broker%20to%20transfer%20the%2 0certificate%20into%20a%20street%20name%22&f=false (last visited Jan. 29, 2024) (discussing scenarios in which "it is necessary for the broker to transfer the certificate into a street name before he delivers it on a contract of sale"); MILTON N. NELSON, READINGS IN CORPORATION FINANCE, 338 (1st ed. 1926), https://books.google.com/books?hl=en&lr=&id=IQdDAAAAIAAJ&oi=fnd&pg=PA1&dq=Milton+nelson&ots= NXUvAB7FLR&sig=DCCmVmak3JwJz0dcHLjTvhU6_c8#v=onepage&q=Milton%20nelson&f=false (last visited Jan. 29, 2024) (noting that "no inconvenience results from leaving [an investor's] stock in 'street name'"); U.S. Congress, *Trading with the Enemy: Hearings before the Subcommittee of the Committee on Commerce, United States Senate*, Sixty-Fifth Congress, First Session on H. R. 4960, 67 (1917), https://books.google.com/books?id=pQgQAAAAIAAJ&printsec=frontcover#v=onepage&q&f=false (last visited Jan. 29, 2024) ("For convenience, the stocks, when bought, are generally registered in a street name, as we call it, either the name of a brokerage house or of some clerk in a brokerage house."); *Reichard v. Hutton*, 142 N.Y.S. 935, 941 (App. Div. 1913) (noting that certain stocks "stood in 'street names,' indorsed in blank, and were transferrable by delivery under the sage of Wall street."); Holohan, William V., *Contribution Among Securities Pledged by a Defaulting Stock Broker*, 4 S. CAL. L. REV. 1, 3 (1930) ("Frequently it happens that a broker has simply for safekeeping, and as bailee for a customer who has paid in full and owes the broker nothing, securities that are either in a 'street name' or in the customer's name and endorsed in blank by him. The broker's dealing with these securities other than as bailee, his exercising any dominion over them, or his using them for his own purposes is a conversion."); SEC, *Final Report of the Securities and Exchange Commission on the Practice of Recording the Ownership of Securities in the Records of the Issuer in Other Than the Name of the Beneficial Owner of Such Securities*, No. 80-014 (Dec. 3, 1976), at 1, https://original-ufdc.uflib.ufl.edu/AA00022450/00001 (last visited Jan. 29, 2024) ("American institutions first began extensively to register securities in nominee name in the 1930's in an effort to escape onerous transfer requirements placed on corporations and fiduciaries by issuers seeking to protect themselves from judicially imposed liability for improper transfers.").

51  DTCC, *FAQs: How Issuers Work With DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Jan. 29, 2024) ("When an investor holds shares [in street name] . . . DTC's nominee name (Cede & Co.) is listed as the registered owner on the records of the issuer maintained by its transfer agent.").

52  In a "book-entry-only" issue, beneficial owners do not receive certificates. Instead, they receive only statements containing "book entries" reflecting their position.

53  The DTC Fast Automated Securities Transfer Program ("FAST") is a contract between DTC and certain transfer agents that eliminates the movement of physical securities by allowing transfer agents to act as custodians for DTC. *See* DTCC, *The Fast Program*, https://www.dtcc.com/settlement-and-asset-services/agent-services/fast (last visited Jan. 29, 2024).

17

DTC directly or indirectly holds the position for those DTC Participants who are in turn holding positions in securities through DTC.[54]

42.    The company and its transfer agent have no visibility via DTC into the identities of the beneficial owners whose securities of the company are held at DTC. As shown in **Figure 1**, interests in those securities are held by DTC Participants. Those Participants are in turn holding interests in the securities either for themselves or for beneficial owners or intermediaries (with the interests in the securities potentially being held through a series of intermediaries before they reach the beneficial owner). Similarly, DTC has no visibility into the identity of its Participants' customers on whose behalf interests in the securities may be held. Nor can DTC tell how many of the shares owned by a Participant are held for that Participant's own account, as opposed to being held by the Participant on behalf of the Participant's customers.

43.    Each issue of a company's securities held by DTC bears a CUSIP number.[55] A CUSIP number is a 9-character alphanumeric code that uniquely identifies a security issue offered in the United States or in Canada.[56] It is possible that different offerings (or "issuances") of a security, such as an IPO and a subsequent public offering made pursuant to different registration statements, are structured so that they bear different CUSIP numbers; however, the common

---

[54]  A DTC Participant's position in the securities issue is sometimes referred to as a "book-entry" position, reflecting the fact that the Participant's position is reflected only on the books and records of DTC, rather than in the form of a paper certificate made available to the Participant.

[55]  CUSIP's database contains issue identifiers and related data for millions of issues of securities, including corporate securities. In 1964, the New York Clearing House Association asked the American Bankers Association ("ABA") to develop a standard method of identifying securities in order to improve securities clearance and settlement operating efficiencies. The Committee on Uniform Security Identification Procedures ("CUSIP") was created, the CUSIP system developed, the CUSIP Service Bureau was formed to administer the system, and now CUSIP Global Services ("CGS") is the overarching entity for CUSIP. CGS is managed on behalf of the ABA by FactSet Research Systems Inc. *See* CUSIP Global Services, *About Us*, https://www.cusip.com/about/index.html (last visited Jan. 29, 2024). The CUSIP system is endorsed by the SEC. *See* CUSIP Global Services, *Inside the CGS Identification System* (Aug. 2010), https://web.archive.org/web/20211102145159/https://www.cusip.com/pdf/CUSIP_Intro_03.14.11.pdf (last visited Jan. 29, 2024). When DTC holds shares as described above, it identifies them by their CUSIP number. *See* DTCC, *Operational Arrangements* (Oct. 2023) ("CUSIP Number Assignment"), https://www.dtcc.com/~/media/Files/Downloads/legal/issue-eligibility/eligibility/operational-arrangements.pdf (last visited Jan. 29, 2024).

[56]  CUSIP Global Services, *Universally Recognized Identifier for Financial Instruments*, https://www.cusip.com/identifiers html#/CUSIP (last visited Jan. 29, 2024).

18

practice—as is the case with Talis—is for such securities to bear the same CUSIP number across multiple offerings.[57]

44.     DTC holds all securities that it custodies that bear the same CUSIP number in one fungible, aggregate bulk.[58] All securities of an issue in such fungible bulk have the same core characteristics, although the securities that were deposited into what thereafter constitutes the blended fungible bulk may have been issued on different dates, pursuant to different registration statements. Once deposited into the fungible bulk, the securities issued at different times pursuant to different registration statements are wholly commingled in such a manner that the securities cannot be distinguished from one another, not even by date of issuance pursuant to a particular registration statement.[59]

45.     When a company uses the same CUSIP number for multiple offerings of the same security, and shares of that security bearing that CUSIP (from multiple offerings) are held by DTC in a fungible bulk, it is impossible to identify the date that any specific share of that security held by DTC was issued, because the nature of any interest in the blended fungible bulk is that of a *pro rata* interest in that commingled bulk, rather than an interest in any pre-commingling share of that security. For the same reason, it is likewise impossible to determine under which particular registration statement any specific share of that security held by DTC was issued, inasmuch as the

---

[57]   *See* Supplemental Ludwig Declaration.

[58]   *See* SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A, File No. S7-24-04, RIN 3235-AJ26 (Mar. 7, 2005), https://www.sec.gov/rules/final/34-50758a htm (last visited Jan. 29, 2024) ("Securities registered in the name of the securities intermediary or its nominee allows the securities to be immobilized and held in fungible bulk thereby significantly reducing the number of certificates that need to be delivered and transferred. This in turn reduces the risk and cost associated with transferring the securities. . . . The securities deposited with DTC are registered in DTC's nominee name and are held in fungible bulk for the benefit of its participants and their customers. Each participant having an interest in securities of a given issue credited to its account has a pro rata interest in the securities of that issue held by DTC.") (footnotes omitted). There are certain discrete exceptions to this general rule. For example, some securities may be restricted, and not available for open-market trading. *See also* SEC, Rule 144: Selling Restricted and Control Securities (Jan. 16, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144 (last visited Jan. 29, 2024). None of these exceptions apply to shares of Talis Stock that were sold in the IPO.

[59]   *See* SEC, *Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A, File No. S7-24-04, RIN 3235-AJ26 (Mar. 7, 2005) at n.23 ("Fungible bulk means that no participant or customer of a participant has any claim or ownership rights to any particular certificate held by DTC. Rather, participants have a securities entitlement to obtain a certificate representing securities held in their DTC accounts.").

19

originally deposited shares no longer exist in their prior form, but have instead been wholly blended with the other shares in that CUSIP that are held by DTC, and beneficial owners receive a *pro rata* interest in that fungible bulk, rather than an interest in any particular shares.

46.    Under the DTC system of intermediated holding of securities, the registrar of a book-entry-only issue may list only DTC's partnership nominee Cede & Co. as the owner of a position in the issue of the security on the registrar's register.[60] DTC acts as a securities intermediary and, in turn, maintains securities accounts for its Participants.[61] DTC knows only the identities of the DTC Participants that hold positions in the issue at DTC; DTC does not know the identities of those persons or entities who in turn may hold positions directly or indirectly through those Participants.[62] DTC, as a matter of operational clearance and settlement practice pursuant to Article 8 of the Uniform Commercial Code ("UCC"), which sets forth a set of rules regarding the ownership and transfer of securities under which DTC is a "clearing corporation,"[63] "holds the deposited securities in 'fungible bulk,' meaning that there are no specifically identifiable shares

---

[60]  DTCC, *FAQs: How Issuers Work with DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Jan. 29, 2024) ("When an investor holds shares this way, the investor's name is listed on its brokerage firm's books as the beneficial owner of the shares. The brokerage firm's name is listed in DTC's ownership records. DTC's nominee name (Cede & Co.) is listed as the registered owner on the records of the issuer maintained by its transfer agent.").

[61]  *Id.* ("The Depository Trust Company (DTC) . . . provides depository and book-entry services and operates a securities settlement system. In this regard, DTC holds eligible securities on behalf of Participants and its activities include transfers and pledges of securities, and the settlement of transactions for Participants by book-entry, free of payment or delivery versus payment."). For ease of discussion, I refer herein to Participants owning (whether as a nominee or as a beneficial owner) securities in their DTC accounts, but this refers technically to Participants having security entitlements. A "security entitlement" in the intermediated holding system is a bundle of property and contract rights in the contents of a security account that an entitlement holder—a customer of a securities intermediary, such as a Participant of DTC or a beneficial owner holding through such Participant—has with a securities intermediary.

[62]  *Id.* ("DTC is able to provide position information on a security at the DTC participant level."); *id.* ("DTC does NOT have beneficial owner information.").

[63]  DTCC, *Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures* (Mar. 2023), https://www.dtcc.com/-/media/Files/Downloads/legal/policy-and-compliance/DTC_Disclosure_Framework.pdf (last visited Jan. 29, 2024); UCC § 8 (2019), https://law.justia.com/codes/new-york/2019/ucc/article-8/ (last visited Jan. 29, 2024). *See also, e.g.*, SEC, *Self-Regulatory Organizations; The Depository Trust Company; Notice of Filing and Immediate Effectiveness of a Proposed Rule Change to Amend the DTC Deposits Service Guide Relating to Procedures for the Deposit of Nontransferable Securities*, Release No. 34-86897 (Sept. 6, 2019), https://www.sec.gov/rules/sro/dtc/2019/34-86897.pdf (last visited Jan. 29, 2024) ("Security certificates are eligible for Deposit at DTC when they are delivered to DTC in accordance with the Rules and Procedures and pursuant to Article 8 . . . of the NYUCC.").

20

directly owned by the DTC Participants."[64]

47.      As the SEC has explained, in the DTC indirect holding system, a beneficial owner does not own any specific share of stock:

> In the United States, most . . . investors hold their shares through brokers, and thus have an interest in a pool of shares. Approximately 85% of exchange-traded securities are held by securities intermediaries, such as broker-dealers and banks, on behalf of themselves or their customers. The vast majority of these securities are deposited with The Depository Trust Company (DTC) . . . and held in fungible bulk for the benefit of DTC participants. As a result, broker-dealer participants of DTC own a pro rata interest in the aggregate number of shares of an issue held by DTC, and their beneficial owners (*i.e.*, the broker-dealers' customers) own an interest in the shares in which their broker-dealers have an interest. Consequently there are no specific shares directly owned by either the broker-dealer participants or the underlying beneficial owner.[65]

Rather than direct ownership in particular shares of a security, beneficial owners hold a "pro rata interest" in the "fungible bulk" of securities bearing the same CUSIP and held by DTC on behalf of various Participants.[66]

48.      Consistent with this framework, as Comment 1 to Section 8-503 of the UCC points out, as an operational matter: "securities intermediaries generally do not segregate securities in such fashion that one could identify particular securities as the ones held for customers."[67] In the indirect holding system, a beneficial owner of a security does not have a direct right of ownership in any securities. A Participant holding position in an issue through DTC, or a beneficial owner

---

[64]  SEC, *Staff Legal Bulletin No. 14f (CF)* (Oct. 18, 2011), https://www.sec.gov/corpfin/staff-legal-bulletin-14f-shareholder-proposals? (last visited Jan. 29, 2024).

[65]  SEC, *Roundtable on Proxy Voting Mechanics* (May 23, 2007), https://www.sec.gov/spotlight/proxyprocess/proxyvotingbrief.htm (last visited Jan. 29, 2024). *See also supra* note 64.

[66]  SEC, *Roundtable on Proxy Voting Mechanics* (May 23, 2007), https://www.sec.gov/spotlight/proxyprocess/proxyvotingbrief.htm (last visited Jan. 29, 2024)*. See also* SEC, *Staff Legal Bulletin No. 14f (CF)* (Oct. 18, 2011), https://www.sec.gov/corpfin/staff-legal-bulletin-14f-shareholder-proposals? (last visited Jan. 29, 2024) ("[E]ach DTC participant holds a pro rata interest or position in the aggregate number of shares of a particular issuer held at DTC. Correspondingly, each customer of a DTC participant – such as an individual investor – owns a pro rata interest in the shares in which the DTC participant has a pro rata interest.").

[67]  UCC § 8-503, Property Interest of Entitlement Holder in Financial Asset Held by Securities Intermediary, Official Comment.

21

holding position in that issue through a Participant that in turn holds position in the issue at DTC, does not have a direct property and contract interest in any *specific* security certificate held by DTC. Instead, the holder has a *pro rata* property and contract interest in the fungible bulk of securities bearing the same CUSIP, which fungible bulk of securities is held by DTC on behalf of various entitlement holders, as discussed below.

49.    The benefit of the United States' system of intermediated securities holding is that it allows for the efficient and accurate clearance and settlement of over two quadrillion dollars' worth of securities transactions a year. Securities trading had ground to a halt and the NYSE was actually closed for periods of time years ago, because the then-existing system of direct certificated holding of securities could not handle the volume of securities transactions—even at a time when transaction volumes were merely a small fraction of today's volumes. The recasting of securities settlement into the intermediated system of holdings that I discuss in this report has allowed the United States not only to solve the paperwork crisis of the late 1960s and early 1970s, but also to handle massively larger volumes of transactions today. It has also enabled the United States to shorten the securities clearance and settlement time cycle, thereby reducing risk in the financial markets.[68]

**B.**    **The Nature of DTC's Fungible Bulk of Securities**

50.    To understand the nature of the blended, fungible, aggregate bulk of securities that DTC holds for each CUSIP, it may prove helpful to consider the following analogy. Let's imagine a deposit of wine, rather than the deposit of securities. It is as though a company, on behalf of three Participants, were to deposit with DTC 10 gallons of red wine from the same vineyard—but of different vintages—as follows:

- On behalf of Participant A – one gallon of Kieu Hoang Pinot Noir 2019;

- On behalf of Participant B – two gallons of Kieu Hoang Pinot Noir 2020; and

---

[68]    SEC, *Shortening the Securities Transaction Settlement Cycle*, Proposed Rule, Feb. 15, 2023 (Exchange Act Release No. 34-94196), at 9, 19–20, 146, 148–149, 161–162, https://www.sec.gov/rules/2023/02/shortening-securities-transaction-settlement-cycle#34-94196 (last visited Jan. 29, 2024).

22

- On behalf of Participant C – seven gallons of Kieu Hoang Pinot Noir 2021.

51.     DTC, in turn, pours the aggregate 10 gallons of Kieu Hoang Pinot Noir red wine, of three different vintages, into a single vat.

52.     As shown in **Figure 2**, the 10 gallons of red wine in the vat is the fungible, aggregate bulk that DTC holds. The gallons of wine from the three vintages are all commingled and blended in the vat. Each Participant has a right to its respective *pro rata* share of the contents of the vat (Participant A, for example, owns a 10% interest in the wine in the vat). But no Participant directly owns any specifically identifiable wine—indeed, due to the wine having all been commingled in the vat, none of the wine is specifically identifiable to one vintage, or to one gallon that had been poured into the vat. If Participant C were to seek to transfer one gallon of wine to Participant A, DTC would simply note on its records that Participant C now owned 60% of the wine in the vat, and Participant A now owned 20% of the wine in the vat. If, alternatively, Participant B seeks to withdraw from DTC its *pro rata* share of wine, in the event that withdrawal is allowed, DTC in effect simply dips a ladle into the vat and scoops out 20% of the wine that is in the vat—two gallons—and delivers it to Participant B, updating its records accordingly. Because the 10 gallons of Kieu Hoang Pinot Noir wine of three different vintages were all commingled in the vat, no Participant (or any other person) is able to determine that any particular drop or cup of wine in the vat came from a particular gallon or vintage.

23

**Figure 2 – Illustration of the Blended Nature of the DTC's Fungible Bulk**



53.    Using DTC's system, transfers of security entitlements from one Participant to another Participant are effected on DTC's computers through "book-entry" changes reflected on the "books" of DTC. Similarly, Participants acting (whether directly or indirectly) for a seller or buyer make book-entry changes on their own records, reflecting (directly or indirectly) the positions of the seller and the buyer. In the event that there are tiers of ownership, which is common today—as where a Participant holds for a bank, which holds for a prime broker, which holds for a corporation, which holds for an individual (the ultimate beneficial owner)—corresponding book-entry changes are reflected by the relevant intermediary entity on the entity's books at each tier, down to the entity holding for the ultimate beneficial owner.

54.    This system—in contrast to the certificated method of holding, by which physical certificates were held by beneficial owners—removes the need to: (a) obtain, cancel, and then destroy the seller's physical securities certificate; (b) create, sign, and transfer another physical securities certificate for the buyer; and (c) generate, process, and deliver all the otherwise-required associated paper forms.

55.    When securities, such as common stock, are held via DTC's intermediated system,

24

Participants, customers of Participants, and beneficial owners holding through such customers and/or Participants do not have their names reflected as the owners on any share certificates. Indeed, no Participant, customer of a Participant, or beneficial owner owns any particular, individual shares of a given issue of a security. The system of intermediated securities holding described above necessarily obviates the possibility of identifying any particular share of a security as being owned by any individual Participant, its customer, or any underlying beneficial owner holding through such a Participant or customer.

56.    At the end of each day, DTC debits from or credits to each Participant's account (or accounts, as the case may be) the net securities, and net dollar payments, for all of that Participant's activities that day in each securities issue. DTC does not know the identities of, nor does it track the activity of, any customer of any Participant, let alone any lower-tier holders—including beneficial owners. Rather, DTC records only net positions of each Participant, which represent the net activities of the Participant.

57.    For example, if a Participant begins a trading day with 10 shares of Company X in its DTC account, and one customer of the Participant buys five shares of Company X that day, while another customer of the same Participant sells five shares of Company X, the Participant would still have 10 shares of Company X in its DTC account at the end of the trading day. This netting occurs at each level of DTC's intermediated system of securities holding.

58.    In addition, many large brokerage firms hold inventory of securities of multiple companies on their own balance sheets. They often do this in order to help "make a market" in the securities and support liquidity.[69] When a customer of a broker seeks to buy a security that the broker is already holding on its own balance sheet, or the customer seeks to sell a security that the

---

[69] *See* CFI Team, *Market Maker*, CORPORATE FINANCE INSTITUTE, https://corporatefinanceinstitute.com/resources/career-map/sell-side/capital-markets/market-maker (last visited Jan. 29, 2024) ("Market maker refers to a firm or an individual that engages in two-sided markets of a given security. It means that it provides bids and asks in tandem with the market size of each security. A market maker seeks to profit off of the difference in the bid-ask spread and provides liquidity to financial markets."). *See also* Maureen O'Hara & George S. Oldfield, *The Microeconomics of Market Making*, 21 J. FIN. & QUANTITATIVE ANALYSIS 361, 361 (1986).

25

broker would like to buy, the broker may engage in a principal transaction with one of its other customers, buying or selling securities for its own account.[70] The resulting change in stock ownership is reflected only on the broker's own books between its principal account (shares that it owns for itself) and its custodial account (shares that it owns on behalf of its client). In a principal transaction, the total number of shares of a security held by the broker at DTC does not change; only the allocation on the broker's own books between its principal and custodial accounts changes. In that event, no net change in share ownership resulting from that transaction is even reported to DTC, let alone reflected on DTC's records.

### C.    Tracing Shares in the DTC System

59.    While the vast majority of publicly traded securities in the United States are held in DTC's street name[71]—that is, in the name Cede & Co.—there are nonetheless a number of scenarios in which shareholders might be able to trace their shares to a particular registration statement, prospectus, and/or offering. However, as I discuss below in Section VII.D, none of them are applicable to Talis stock after the expiration of the lockup.

60.    **One Single Issuance in the Market**. First, tracing is straightforward when all shares of an issue were issued under the same registration statement, such as when there is only an IPO, and ***there is no other issuance of the security in the market***. In such a situation, all shares of that single issuance of the security are traceable to the one registration statement. This is because all shares in the market necessarily came from that single issuance of the security under that single registration statement.

61.    **Physical Certificates**. Second, some companies still offer physical paper securities certificates to beneficial owners. When a company issues a physical certificate reflecting a

---

[70] *See* CFI Team, *Market Maker*, CORPORATE FINANCE INSTITUTE, https://corporatefinanceinstitute.com/resources/career-map/sell-side/capital-markets/market-maker (last visited Jan. 29, 2024).

[71] *See* Wilcox et al., *supra* note 49 at 11-3 ("The vast majority of publicly traded shares in the United States are registered on companies' books not in the name of beneficial owners . . . but rather in the name of 'Cede & Co.' the nominee name used by [DTC].").

beneficial owner's name directly to the beneficial owner, and the company's registrar registers the transaction including the beneficial owner's name on the company's books at the registrar, that certificate represents the beneficial owner's ownership of the security.[72] It is therefore possible in such an instance for the beneficial owner to trace its shares of the security to a particular registration statement.

62.    **Direct Registration**. Third, some companies allow for the possibility of "direct registration." Direct registration provides beneficial owners with an alternative to holding their securities in street name. Under this method of registration, beneficial owners can elect—indirectly, through DTC's Direct Registration System—to have their securities registered in their name or in the name of a third-party custodian, such as a broker or bank, on the company's (or transfer agent/registrar's) books and records.[73] It is theoretically possible that beneficial owners who have directly registered their shares of a security might be able to trace them to a particular registration statement, if their shares were never part of a fungible bulk containing shares from multiple offerings, held by DTC or another intermediary. But whether someone who has directly registered their shares can in fact trace those shares to a particular registration statement depends on whether those shares were ever commingled with shares issued other than to the allegedly defective registration statement.

63.    **Different CUSIP Numbers**. Finally, a company may apply for a different unique CUSIP number identifier for each offering. If such a request were granted by CUSIP Global Services, and each offering were given a unique CUSIP number, a beneficial owner receiving shares in an offering would be able to trace its shares to that offering by virtue of the unique CUSIP.

---

[72]  SEC, *Investor Bulletin: Holding Your Securities* (July. 12, 2023), https://www.sec.gov/reportspubs/investor-publications/investorpubsholdsechtm.html (last visited Jan. 29, 2024).

[73]  *Id.*

27

## VII.   OPINIONS

**A.    Opinion 1. Dr. Mitts misstates the nature of DTC's fungible bulk of securities. He claims that such securities registered in DTC's street name and credited to DTC Participants are held separately from one another by DTC in DTC Participant accounts, and further claims that some of such securities remain distinguishable from other securities bearing the same CUSIP number that are held by DTC in the same DTC fungible bulk. This is incorrect. Once deposited into DTC's fungible bulk of securities bearing the same CUSIP number, securities are wholly fungible and cannot be distinguished from one another, and DTC Participants who either hold securities for themselves or on behalf of their customers are simply credited a *pro rata* interest in DTC's fungible bulk of such fungible securities.**

64.    In his report, Dr. Mitts asserts that the Shevlin Declaration and the Ludwig Declaration do not establish that, after the expiration of the Talis Lockup, the unregistered shares that were deposited at DTC commingled with registered shares issued pursuant to the Registration Statement. Dr. Mitts asserts that the transfer of unregistered shares of Talis Stock to DTC is merely a transfer of legal title to Cede & Co., DTC's partnership nominee, but such transfer "does not establish that any unregistered shares were 'commingled' with registered shares by a DTC participant."[74]

65.    Dr. Mitts also asserts "the Ludwig Declaration has no basis to conclude that shares are 'pooled' or 'commingled,' except in the narrow, formal sense of legal title being held by Cede & Co."[75] He does not provide any evidence from DTC to support this assertion. He goes on to claim that the Ludwig Declaration cannot rule out that "DTC book-entry records may have segregated unregistered from registered shares."[76] While Dr. Mitts claims that DTC maintains internal records that segregate certain transfers of shares to Cede & Co. from other transfers, and while all but two of the documents that he considered were DTCC documents, he does not put forth any evidence at all of the existence of such records to support his claims.

66.    As an initial matter, Dr. Mitts offers no evidence in support of his claims about

---

[74]  Mitts Report ¶ 24.

[75]  Mitts Report ¶ 30.

[76]  Mitts Report ¶ 30.

28

DTC's operations and record-keeping practices. I understand that Dr. Mitts has never worked at DTC, and therefore his knowledge of DTC's operations appears to be based on information that he has read on the DTC website. For example, Dr. Mitts claims on several occasions in his report that DTC has more than 800 participant firms—based on the DTC Member Directories that is available on DTC website.[77] He appears to have arrived to the 800-plus figure by simply counting the number of rows in these Directories.[78] However, he either ignores or does not realize that most of the rows in the DTC Member Directories contain information not about DTC Participants themselves, but rather about the accounts of DTC Participants, as many Participants have more than one account. As of December 29, 2023, the number of DTC Participants was 236, a much lower number than the 800-plus claimed by Dr. Mitts, something he would have known if his knowledge of and expertise on DTC's operations and functions had actually extended beyond a cursory non-practitioner's perusal of the DTC website.

67.    Without any direct experience, and contrary to practitioner and DTC regulator writings on DTC's intermediated system of securities holding,[79] Dr. Mitts puts forth an inaccurate description of the nature of DTC's fungible bulk holdings. Strangely, Dr. Mitts acknowledges that DTC holds such securities in a fungible bulk as to which participants own a *pro rata* share, but ultimately arrives at the incorrect conclusion that in fact the bulk is not really fungible at all because, in his view, one can somehow trace a security interest in that fungible mass.[80] In my experience, DTC holds all securities that bear the same CUSIP number and are registered in the name of DTC's partnership nominee, Cede & Co., in an undifferentiated manner in one fungible, aggregate bulk. My experience and views are in line with the views of a senior officer at DTCC, as stated in the Bria Declaration:

---

[77]    Mitts Report ¶¶ 22, 35, 39.

[78]    Mitts Report ¶ 35; DTCC, *DTC Member Directories*, https://www.dtcc.com/client-center/dtc-directories (last visited Jan. 29, 2024).

[79]    *See supra* note 64, 65.

[80]    Mitts Report ¶¶ 22, 24, 27–31, 33–34, 38.

> *At all times*, shares of Talis Stock deposited at DTC and registered in the name of Cede & Co. were held by DTC *in an undifferentiated manner known as a "fungible bulk."*
>
> Each DTC participant that has held a position in Talis Stock credited to its DTC account, has held a pro-rata beneficial interest in Cede & Co.'s aggregate holding of Talis Stock.[81] (emphasis added)

68.     As I explained in Section VI above, once securities are deposited into the fungible bulk at DTC, securities issued at different times pursuant to different registration statements that bear the same CUSIP number are wholly commingled or blended in such a manner that individual securities cannot be distinguished from one another. As I illustrated in my analogy of red wine from the same vineyard but from different vintages in **Figure 2**, once the three vintages of wine are poured in the vat, they are fully blended and indistinguishable.

69.     At deposition, Dr. Mitts offered an analogy to demonstrate his view of how tracing should be conducted, analogizing cans of Campbell's Chicken Noodle soup to shares.[82] This analogy demonstrates the flaw in Dr. Mitts's understanding of fungible bulk. Unlike *cans* of soup, shares held in fungible bulk are more akin to the soup itself. But Dr. Mitts's analogy fails to take the necessary step that would make the cans of soup a fungible mass akin to DTC held shares: pouring all their contents into one vat. All the camera coverage of the cans that he imagines in his

---

[81]    Bria Declaration ¶¶ 6–7.

[82]    Deposition of Joshua Mitts, January 29, 2024, 79:5–80:19 ("And I think it's helpful to think of an analogy. Imagine cans of soup that are put on a store shelf. Cans of soup could come from two different factories, but they are otherwise identical in appearance. We can imagine tracing at its core as an attempt to reconstruct the sequence and thus to attribute which can of soup came from which factory. Suppose, for example, there was a recall. Let's hope it's not for Campbell's Chicken Noodle Soup, but imagine that these are cans of Campbell's Chicken Noodle Soup and they could come from factory 1 or factory 2. And there's a recall for all the cans of chicken noodle soup that come from factory 1. If we had a closed circuit TV camera continuously recording the store clerk as they placed cans of soup from the box from factory 1 and the box from factory 2, even though the cans are otherwise identical in appearance and they are commingled on the store's shelf, if we could observe the sequence in which those cans were actually placed on the shelf, we could reconstruct the order in which they were taken off the shelf, assuming we could also observe that sequence. If a factory 1 can was put in the back, followed by a factory 2 can, follow by a factory 1 can, we observe the in order in which they went on the shelf, and we observe the order in which they went off the shelf, then there's simply no question which factory cans ended up where. The challenge is that in many situations our ability to reconstruct this exact order is likely to be limited, but not in all situations. And sometimes we have evidence that provides greater precision. So at a general level, my view is that the appropriate way to conduct tracing is to use all available information to reconstruct the order that the soup cans were placed on the shelf to the best of our ability.").

30

example, and all of the ingestion of data points,[83] would be immaterial—the cameras would simply record the pouring of cans into a vat, creating the indistinguishable fungible blend of soup.

70.    Dr. Mitts also contends that securities registered in the name of Cede & Co. are credited to DTC Participants in a segregated manner such that securities issued at different times pursuant to different registration statements are distinguishable between DTC Participants accounts. This is also incorrect. DTC Participants do not hold the securities, but rather only a *pro rata* interest in DTC's fungible bulk representing those securities—elsewhere in his report, Dr. Mitts actually acknowledges this fact.[84] DTC maintains records of DTC Participants' interests in DTC's fungible bulk, but does not know whether DTC Participants hold interests in the securities for themselves or instead for beneficial owners or other intermediaries (with the interests in the securities potentially being held through a series of intermediaries before they reach the beneficial owner, as shown in **Figure 1**). Similarly, DTC has no visibility into the identity of its Participants' customers on whose behalf interests in the securities may be held. Nor can DTC tell how many of the shares owned by a Participant are held for that Participant's own account, as opposed to being held by the Participant on behalf of the Participant's customers.

71.    This is consistent with Comment 1 to Section 8-503 of the UCC.[85] In the indirect holding system, a beneficial owner of a security does not have a direct right of ownership in any securities. A Participant holding position in an issue through DTC, or a beneficial owner holding position in that issue through a Participant that in turn holds position in the issue at DTC, does not have a direct property and contract interest in any *specific* security certificate held by DTC. Instead, the holder has a *pro rata* property and contract interest in the fungible bulk of securities bearing the same CUSIP, which fungible bulk of securities is held by DTC on behalf of various entitlement holders, as discussed below. In his report, Dr. Mitts himself concedes that each

---

[83]    Deposition of Joshua Mitts, January 29, 2024, 99:2–22.

[84]    *See* Mitts Report ¶ 44 ("[E]ach Participant to whose DTC account securities of that issue have been credited has a *pro rata* (proportionate) interest in DTC's entire inventory of that issue.").

[85]    UCC § 8-503, Property Interest of Entitlement Holder in Financial Asset Held by Securities Intermediary, Official Comment ("[S]ecurities intermediaries generally do not segregate securities in such fashion that one could identify particular securities as the ones held for customers.").

Participant to whose DTC account securities of an issue have been credited has a *pro rata* interest in DTC's entire inventory of that issue.[86]

72.    Dr. Mitts further suggests that "DTC maintains internal records that segregate certain transfers of shares to Cede & Co. from other transfers, thereby making it possible to identify who purchased unregistered shares as opposed to registered shares."[87] I am not aware of any such internal records maintained by DTC that segregate transfers. Dr. Mitts refers, for example, to "internal records" such as Participant Daily Activity Statements, but as explained below, those statements only reflect holdings at the Participant level, and therefore could not be used to construct a "chain of title" at the beneficial owner level. In my experience, once securities are deposited in DTC, which in turn holds the securities in its fungible bulk, and a *pro rata* interest in such a fungible bulk is credited to DTC Participants by DTC, as I discuss below, I am not aware of any method to trace individual securities held by a shareholder to a particular registration statement given the undifferentiated and blended nature of the fungible bulk.

73.    In this regard, Dr. Mitts discusses Meridian Small Cap Growth Fund ("Meridian")'s transfer of 705,537 shares of Talis Stock that were not issued pursuant to the Registration Statement ("Meridian Shares") to DTC Participant Bank of New York's account on August 13, 2021. He disagrees with the Shevlin Declaration stating that, on August 13, 2021, those unregistered Meridian Shares "were commingled with all other shares of Talis's common stock registered in street name to Cede & Co."[88] In particular, Dr. Mitts asserts that one "cannot rule out the possibility that those specific unregistered shares were segregated from registered shares in DTC records."[89] One can in fact rule out Dr. Mitts's purported possibility because, to the extent that the Meridian Shares were registered in the name of Cede & Co. and deposited in DTC's fungible bulk which previously had registered shares deposited into it, they commingled with all

---

[86]    Mitts Report ¶ 44, n. 38, n. 50, citing Brief of Amicus Curiae the Depository Trust Company Not in Support of Any Party at 10, *In re Petrobras Securities Litigation*, No. 16-1914 (2d. Cir. Sep. 16, 2016), Doc. No. 293-1.

[87]    Mitts Report ¶ 31.

[88]    Shevlin Declaration ¶ 13.

[89]    Mitts Report ¶ 34.

other shares in the fungible bulk.

74.     This "commingling effect" is not simply a byproduct of transferring legal title to Cede & Co. As I explained above, holding securities in DTC's fungible bulk allows for an efficient and accurate clearance and settlement of securities transactions. If one were to follow Dr. Mitts's idea of segregating unregistered shares in a DTC Participant account, it would undermine the purpose of registering the shares in DTC's street name and depositing them in DTC's fungible bulk as it would generate the same "certificated" records issue the DTC holding system was created to replace. Moreover, Dr. Mitts incorrectly states that "[u]nder the DTC's deposit/withdrawal at custodian (DWAC) procedures, a transfer of legal title to shares to Cede & Co. is recorded as a direct deposit book entry into a given DTC participant's account," and that "shares directly deposited into a given DTC participant's account are ***not commingled*** with shares held by other DTC participants, because DTC maintains separate account records for each participant."[90] Because the transfer of the Meridian Shares to DTC was executed through DWAC, Dr. Mitts is under the false impression that such shares were not delivered to DTC which put them into DTC's fungible bulk. Instead, he imagines—incorrectly—that they were kept separate from the remaining shares registered to Cede & Co., which is again incorrect.

75.     Contrary to Dr. Mitts's misconception that DWAC results in deposits or withdrawals in accounts segregated from DTC's fungible bulk, DWAC is instead a service provided by DTC that allows DTC Participants to instruct DTC regarding deposit and withdrawal transactions into and out from their DTC book-entry accounts that hold *pro rata* interests in fungible securities that are part of the fungible bulk. For securities to be eligible for deposit or withdrawal via the DWAC service, a participant must use the services of a transfer agent that participates in DTC's FAST program, which eliminates the movement of physical securities certificates for transfers of securities registered in the name of DTC's nominee, Cede & Co. In the case of DWAC deposits, the requesting participant's position in its DTC account is increased; and

---

[90]    Mitts Report ¶ 37 (emphasis in original).

33

in the case of DWAC withdrawals, the requesting participant's position in its DTC account is debited. DTC and FAST transfer agents reconcile the results of participants' deposit and withdrawal activities electronically on a daily basis, so that the Participants' positions reflect a *pro rata* interest in DTC's fungible bulk.[91] The key point, which renders Dr. Mitts's conclusion inaccurate, is that executing transfers through DWAC has no bearing on how the underlying shares are held at DTC—*i.e.* in fungible bulk form.

76.     Dr. Mitts also attempts to put forth a probabilistic argument that, on August 17, 2021, there were only 722,070 unregistered shares (4.3%) out of the 16,676,369 shares of Talis Stock held in street name by Cede & Co. Thus, in his view, it is "highly likely that many DTC participants (of which there are more than 800) never received unregistered shares on that date."[92] Such a probabilistic contention reflects Dr. Mitts's misconstrued notion of DTC's "fungible bulk" as a shelf of "non-fungible" "non-bulk" (but rather individual) cans of soup made in different factories. But DTC Participants are not assigned hypothetical cans from factory 1 and/or cans from factory 2 as a result of movements in their accounts, because DTC Participants are not assigned *specific* shares. Nor are they assigned a *pro rata* interest in any *specific* shares registered in the name of Cede & Co. and deposited in DTC's fungible bulk. Instead, DTC Participants receive a *pro rata* interest in DTC's ***fungible bulk***, which consists of a commingled, undifferentiated, and indistinguishable mass formed by the amalgamation of security interests in formerly distinguishable registered and unregistered shares.

77.     Finally, in his report, Dr. Mitts takes issue with the Shevlin Declaration and the Ludwig Declaration because, in his view, they do not show that "unregistered share[s] were sold to a member of the Proposed Class.[93] Under the false impression that Talis Non-IPO Shares, such as the Meridian Shares or Matthew Lee's shares,[94] were registered to Cede & Co. only to be kept

---

[91] DTCC, *Deposit/Withdrawal at Custodian*, https://www.dtcc.com/settlement-and-asset-services/securities-processing/deposit-withdrawal-at-custodian (last visited on Jan. 29, 2024).

[92] Mitts Report ¶ 39. *See also* Exhibit 8 to the Shevlin Declaration (Doc. No. 136-29); Exhibit H to the Simpson LaGoy Declaration.

[93] Mitts Report ¶ 41.

[94] Mitts Report ¶¶ 42–43. *See* Lee Declaration ¶¶ 2–4 (stating that "[Matthew Lee] acquired Talis shares by exercising

segregated in DTC Participant accounts, Dr. Mitts expects to see evidence of movements of Talis Non-IPO Shares sold to a member of the Proposed Class. Not only does such evidence not exist but, as discussed above, the premise is inaccurate. From the time Talis Non-IPO Shares were delivered to DTC and deposited into DTC's fungible bulk, they commingled and blended with Talis IPO Shares. At that time, any sale of Talis Stock became a sale of a *pro rata* interest in DTC's fungible bulk, which consists of a commingled, undifferentiated, and indistinguishable blend of Talis IPO Shares and Talis Non-IPO Shares.

78.      For instance, Mr. Lee's 349 shares of Talis Stock were registered to Cede & Co. after the expiration of the Talis Lockup, on August 17, 2021, inclusive.[95] Broadridge's lists of registered owners as of August 13, 2021, and August 17, 2021, show that Mr. Lee held his 349 shares in direct registration as of August 13, 2021, and no longer held them as of August 17, 2021.[96] This evidence is consistent with the inference that his shares were registered to Cede & Co. and held by DTC for the benefit of E*Trade, which in turn held a position for the benefit of Mr. Lee.[97] Once registered to Cede & Co. and deposited at DTC, Mr. Lee's shares—which were Talis Non-IPO Shares—commingled with IPO Shares in DTC's fungible bulk. On August 30, 2021, Mr. Lee sold his beneficial interest in 349 shares of Talis Stock, which were already blended and indistinguishable in DTC's fungible bulk, making it impossible for an investor who purchased Mr. Lee's beneficial interest to trace those individual shares of Talis Stock to the Registration Statement.[98]

79.      If Dr. Mitts expects to see Mr. Lee's individual shares transferred to a buyer like cans of soups moving from one shelf to another shelf, this "evidence" does not exist and cannot

---

employee stock options before Talis's IPO. After the IPO lock-up ended, [Mr. Lee] transferred those shares to E*TRADE. On August 30, 2021, [Mr. Lee] sold 349 shares of Talis common stock" through E*TRADE.)

[95] Exhibit 8 to the Shevlin Declaration (Doc. No. 136-29); Shevlin Declaration ¶ 15; Exhibit C to the Ludwig Declaration (Doc. No. 136-20); Ludwig Declaration ¶ 6. *See also* Exhibits C, H to the Simpson LaGoy Declaration.

[96] Exhibit 7 and Exhibit 8 to the Shevlin Declaration (Doc. No. 136-28 and 136-29); *see also* Exhibits G, H to the Simpson LaGoy Declaration.

[97] Exhibit C to the Ludwig Declaration (Doc. No. 136-20).

[98] Mitts Report ¶ 43; Lee Declaration ¶ 4.

exist in DTC's intermediated system of securities holding, for one simple reason: that is not what happened. Nor is this "evidence" necessary to show that the buyer who acquired shares from Mr. Lee—through E*Trade—acquired shares that were not traceable to the Registration Statement.

> **B.     Opinion 2. Contrary to Dr. Mitts's assertion that tracing securities to a registration statement may be still possible even when both registered and unregistered securities are held in DTC's fungible bulk for that CUSIP, I am not aware of any method to trace shares of a security held at DTC or its sub-custodian, in the street name of DTC, to a particular registration statement where: (i) multiple issuances of the security represented by the same CUSIP number have been deposited at DTC; and (ii) one or more of the issuances were not made pursuant to the relevant registration statement.**

80.     Dr. Mitts asserts that "[e]ven if unregistered shares were commingled with registered shares or sold, ownership of securities in 'fungible bulk' form does not preclude tracing purchases to the registration statement using standard accounting methods that are not 'statistical tracing.'"[99] He suggests that last-in-first-out ("LIFO") or first-in-first-out ("FIFO") methodology can permit "tracing" shares to a registration statement.[100] While I address the issues with such a methodology below more directly, I here respond to Dr. Mitts's claim that there is a way to trace shares of a security held at DTC in its fungible bulk, even when registered shares and unregistered shares commingled after the expiration of the lockup following an IPO. In my experience, I am not aware of any method to trace shares of a security held at DTC or its sub-custodian, in the street name of DTC, to a particular registration statement where: i) multiple issuances of the security represented by the same CUSIP number have been deposited at DTC; and ii) one or more of the issuances were not made pursuant to the registration statement.

81.     As I discussed in Section VI, the vast majority of publicly traded securities in the United States are held in DTC's street name[101]—that is, in the name Cede & Co. There are nonetheless a number of scenarios in which shareholders might be able to trace their shares to a

---

[99]  Mitts Report Section IV.

[100]  Mitts Report ¶ 45.

[101]  *See* Wilcox et al., *supra* note 49 ("The vast majority of publicly traded shares in the United States are registered on companies' books not in the name of beneficial owners . . . but rather in the name of 'Cede & Co.' the nominee name used by [DTC].").

36

particular registration statement, prospectus, and/or offering. However, these circumstances are different from those imagined by Dr. Mitts. Moreover, none of these circumstances are applicable to Talis Stock held in street name at DTC after the Non-IPO Shares were deposited at DTC following the end of the Talis Lockup Period.

82.    **First**, for example, tracing is straightforward when all shares of an issue were issued under the same registration statement, such as when there is only an IPO, and *there is no other issuance of the security in the market*. In such a situation, all shares of that single issuance of the security are traceable to the one registration statement. This is because all shares in the market necessarily came from that single issuance of the security under that single registration statement. This is again not a circumstance applicable to Talis after the lockup because, as discussed in Section IV, Talis IPO Shares were not the only issuance of shares of Talis Stock outstanding. Talis had previously issued Non-IPO Shares, which included, among others, shares of Talis Stock outstanding prior to the Talis IPO and those shares issued as a result of the conversion of convertible preferred stock upon the completion of the Talis IPO.

83.    **Second**, some companies still offer physical paper securities certificates to beneficial owners. When a company issues a physical certificate reflecting a beneficial owner's name directly to the beneficial owner, and the company's registrar registers the transaction including the beneficial owner's name on the company's books at the registrar, that certificate represents the beneficial owner's ownership of the security.[102] It is therefore possible in such an instance for the beneficial owner to trace its shares of the security to a particular registration statement. I am not aware of any evidence indicating that Talis delivered physical certificates to any beneficial owner, and in any event it should be noted that all the Talis IPO Shares were registered in the name of Cede & Co. and delivered to DTC as a book-entry only issue.[103]

84.    **Third**, some companies allow for the possibility of "direct registration." Direct

---

[102] SEC, *Investor Bulletin: Holding Your Securities* (July. 12, 2023), https://www.sec.gov/reportspubs/investor-publications/investorpubsholdsechtm.html (last visited Jan. 29, 2024).

[103] Exhibit 1 to Shevlin Declaration (Doc. No. 136-22); Supplemental Ludwig Declaration ¶ 3.

37

registration provides beneficial owners with an alternative to holding their securities in street name. Under this method of registration, beneficial owners can elect—indirectly, through DTC's Direct Registration System—to have their securities registered in their name or in the name of a third-party custodian, such as a broker or bank, on the company's (or transfer agent/registrar's) books and records.[104] It is theoretically possible that beneficial owners who have directly registered their shares of a security might be able to trace them to a particular registration statement, if their shares were never part of a fungible bulk containing shares from multiple offerings held by DTC or another intermediary. But whether someone who has directly registered their shares can in fact trace those shares to a particular registration statement depends on whether those shares were ever commingled with shares issued other than to the allegedly defective registration statement. This is not applicable to Talis after the lockup. Because, as discussed above, as of August 13, 2021, all Talis IPO Shares were registered in the street name of Cede & Co. and held by DTC.

85.    **Fourth**, and finally, a company may apply for a different unique CUSIP number identifier for each offering. If such a request were granted by CGS, and each offering were given a unique CUSIP number, a beneficial owner receiving shares in an offering would be able to trace its shares to that offering by virtue of the unique CUSIP. This is also inapplicable to Talis, as both Talis IPO Shares and Talis Non-IPO Shares use the same unique CUSIP number.[105]

> C.    **Opinion 3. Dr. Mitts's suggestion that the LIFO/FIFO accounting methodology allows investors to trace shares held at DTC in DTC's fungible bulk even after the end of a lockup period following an IPO is incorrect. Further, Dr. Mitts does not set forth any realistic implementation of his proposed methodology that could actually trace Talis IPO Shares to the Registration Statement following the lockup period.**

86.    Dr. Mitts claims that even if unregistered shares were commingled with registered shares in DTC's fungible bulk, it does not preclude the tracing of purchases to the registration statement by relying on "detailed, timestamped transactional records" and "an accounting method

---

[104] *Id.*

[105] Supplemental Ludwig Declaration ¶¶ 2–7; Bria Declaration ¶¶ 3–7.

such as first-in-first-out ('FIFO') or last-in-first-out ('LIFO')."[106] According to Dr. Mitts, "broker-dealers, exchanges, FINRA, and DTC maintain detailed, time-stamped transactional records which can be obtained through discovery. These records show when securities in one account are transferred to another account, whether within the same broker-dealer or between different broker-dealers. This makes it possible to reconstruct a reliable 'chain of title' using standard accounting methods like FIFO or LIFO."[107]

87.    For all the reasons discussed herein, Dr. Mitts's opinion evidences a lack of understanding of how a trade is made in the DTC system. No amount of records will enable an investor to trace their specific *shares* to the Registration Statement, because you cannot trace specific *shares* held in fungible bulk. What Dr. Mitts proposes to do is an alternative to tracing by creating an artificial "chain of title"—but critically, not a direct or actual chain of title. And once again, his mistaken belief that DTC holds interests of securities as individual cans of soup, where the soup is not fungible because it has not been all mixed with soup in the other cans held by DTC, leads him to an elaborate explanation of an imaginary possibility that is based entirely on his misunderstandings. And without a grounding in reality, there is little to discuss.

88.    In the following subsections, I review the issues inherent to Dr. Mitts's assumptions needed in his tracing approach for purportedly creating a "chain of title," *i.e.*, (a) the detailed, time-stamped transactional records, and (b) the use of LIFO/FIFO methods. I also discuss the fundamental flaws of applying the LIFO/FIFO methods in Section 11 claims. I further discuss that, in many circumstances, even assuming that the detailed transaction data are readily available (which is not true), the purported LIFO/FIFO method cannot construct an unambiguous, reliable "chain of title;" nor can it unambiguously and reliably determine whether a certain plaintiff held registered or unregistered shares. Importantly, LIFO/FIFO is an accounting method that is not applicable to Section 11's tracing analysis. In addition, Dr. Mitts does not provide any actual analysis in his report supporting that the purported tracing approach is practically feasible, so the

---

[106] Mitts Report ¶ 45.

[107] *Id.*

approach is unproven, and at best, speculative.

### 1.    Dr. Mitts's Purported Tracing Approach Incorporates Unrealistic Assumptions

89.    Dr. Mitts does not provide any details about the purported tracing approach in his report. By contrast, he states that his opinions in this regard are consistent with the Brief for *Amicus Curiae* in *Slack Technologies v. Pirani*, 143 S. Ct. 1433, in March 2023, along with Jack C. Coffee, Jr. ("Coffee and Mitts Amicus Curiae").[108] Dr. Mitts also coauthors, with Jack C. Coffee, Jr., a manuscript entitled "*Slack v. Pirani* and the Future of Section 11 Claims," in December 2023 ("Coffee and Mitts (2023)").[109] After reviewing these materials, I understand that the purported tracing approach described in the Mitts Report is the same approach discussed in Coffee and Mitts Amicus Curiae and in Coffee and Mitts (2023).

90.    **Detailed, Timestamped Transactional Records**.[110] Because all securities at issue in this Action are held in a fungible bulk, it matters not how many detailed timestamped records Dr. Mitts imagines he may be able to obtain because tracing would be impossible, for the reasons described above. In addition, looking at just one slice of what he refers to as the records he would build his inquiry on, Dr. Mitts incorrectly assumes that such transactional records are available at DTC and refers to DTC's Security Position Reports that "list[] participant holdings of a security on a date."[111] However, such reports only show the end-of-day balance of holdings of a security by DTC participants holding the security on a daily (or weekly) basis, and do not show any transactions of the security during the day (or the week).[112] Therefore, it is impossible to observe

---

[108] Mitts Report ¶ 45, note 51. John C. Coffee, Jr. & Joshua Mitts, *Brief for Amicus Curiae Law and Business Professors ISO Respondent, Slack Technologies v. Pirani*, 143 S. Ct. 1433 (March 6, 2023), https://www.supremecourt.gov/DocketPDF/22/22-200/256386/20230306171423271_22-200%20Amicus%20Brief.pdf ("Coffee and Mitts Amicus Curiae") (last visited Jan. 29, 2024).

[109] John C. Coffee, Jr. & Joshua Mitts, *Slack v. Pirani and the Future of Section 11 Claims* (December 1, 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4644888 ("Coffee and Mitts (2023)") (last visited Jan. 29, 2024).

[110] Mitts Report ¶ 45.

[111] Mitts Report ¶ 45, note 52.

[112] *See*, DTC, Security Position Reports Templates, https://www.dtcc.com/settlement-and-asset-services/issuer-services/security-position-reports-templates (last visited Jan. 29, 2024)

"securities in one account are transferred to another account" with the DTC Security Position Reports.[113]

91.     **LIFO/FIFO Methods**. Dr. Mitts's purported tracing approach relies upon another unrealistic assumption, that of ease of choosing a logic between use of the LIFO and FIFO methods. Dr. Mitts agrees that given the same transactional records, the choice between the LIFO and FIFO method can lead to different tracing results.[114] This is because of a fundamental difference between the two approaches: FIFO treats the first incoming security as the first one to go out, while LIFO treats the last incoming security as the first one to go out.[115] The determination of which method to use will lead to different tracing results for the same potential plaintiffs.[116]

92.     Importantly, I note that, in Dr. Mitts's work, he states that "the validity of a tracing method's conclusions can be bolstered by a showing that the results hold across different accounting methods."[117] In this regard, Dr. Mitts claims in his report that, specifically in this

---

[113] To illustrate the idea, suppose that a transaction instructed by an investor ("Investor X1") is executed at 10 AM on a day, which would require a DTC participant ("Participant A") to move 10 shares of common stock to another DTC participant ("Participant B"), and the shares would be beneficially owned by another investor ("Investor X2") as a result of this transaction. Further suppose that at 2 PM on the same day, another transaction is executed between two different investors ("Investor X3" and "Investor X4"), which would require Participant B to move 10 shares of the same stock to Participant A. If no other transactions of the same stock happened during the day involving Participants A and B, then the two transactions net out, and the DTC Security Position Reports will not show any changes in the holdings of this stock by Participant A and Participant B at the end of the day. The existence and identities of Investors X1, X2, X3, and X4 will also not appear on such reports. As a result, the two aforementioned transactions among the four beneficial owners of the stock are unobservable from the DTC Security Position Reports, and such reports cannot be used to create a "chain of title" among beneficial owners of this stock. Dr. Mitts also refers to DTC's "Participant Daily Activity Statement" that would "list[] individual custodial transfers between [individual participant] accounts." *See* Mitts Report ¶ 48. However, such statements are still at the DTC participants' level and cannot be used to construct a "chain of title" among beneficial owners of a security.

[114] Coffee and Mitts (2023), 22.

[115] Coffee and Mitts (2023), 22.

[116] As an example of LIFO and FIFO leading to different tracing results, suppose that Broker A received 10 unregistered shares at 9 AM on a day, and then received 10 registered shares at 12 PM on the same day. Further suppose that Broker A sold 10 shares to Broker B at 3 PM on that day. If there were no other transactions of the stock on that day by these two brokers, then using LIFO, Broker B would receive 10 registered shares, because those shares came into Broker A's account last, thus should come out of Broker A's account and flow to Broker B's account first. By contrast, using FIFO, Broker B would receive 10 unregistered shares, because those shares came into Broker A's account first, therefore should come out of Broker A's account and flow to Broker B's account first. Following this example, Broker B could have standing under Section 11 by holding registered shares if LIFO is chosen but could not have standing by holding unregistered shares if FIFO is adopted. The two approaches lead to opposite tracing results.

[117] Coffee and Mitts (2023), 26.

41

Action, the LIFO and FIFO methods "are likely to yield the same, unambiguous conclusion regarding most of the Proposed Class, regardless of which accounting method is chosen, because the volume of unregistered shares that could have been commingled with registered shares is relatively small … as of August 17, 2021, 15,870,000 out of 16,676,369 shares—over 95%—consisted of registered shares."[118] As I illustrate in the counterexample below, Dr. Mitts's probabilistic claim is, however, unsupported in this Action.

93.    As a counterexample, suppose that Broker A received 806 unregistered shares of Talis Stock at 9 AM on a day, and then received 15,870 registered shares of Talis Stock at 12 PM on the same day. That is, the size of the two transactions account for 1‰ of 806,369 unregistered and 15,870,000 registered shares outstanding, respectively.[119] Further, suppose that Broker A sold 500 shares to Broker B at 3 PM on that day. Despite the number of unregistered shares of Talis Stock is smaller than the number of registered shares of Talis Stock, the choice between LIFO and FIFO still leads to different tracing results. In fact, using LIFO, Broker B will receive 500 registered shares and have potential standing under Section 11; however, using FIFO, Broker B will receive 500 unregistered shares and not have standing under Section 11.

94.    This counterexample demonstrates that Dr. Mitts's statement that, specifically in this Action, the LIFO and FIFO methods are likely to yield the same, "unambiguous conclusion" regarding most of the Proposed Class lacks supports. In contrast, it is easy to find circumstances in which the two methods can lead to opposite tracing conclusions. Thus, following the same line of reasoning in Coffee and Mitts (2023) that "the validity of a tracing method's conclusions can be bolstered by a showing that the results hold across different accounting methods,"[120] the purported tracing method applied to this Action is thus invalid.

---

[118]  Mitts Report ¶ 47.

[119]  Specifically, as of August 17, 2021, there were in total 16,676,369 shares, including 15,870,000 registered shares, meaning that there were 806,369 unregistered shares. The assumption of Broker A transacting 1‰ of shares outstanding is for illustrative purpose and is not essential to my conclusion.

[120]  Coffee and Mitts (2023), 26.

42

### 2.    Dr. Mitts's Purported Tracing Approach Based on LIFO/FIFO is Methodologically Flawed

95.    Dr. Mitts's purported tracing approach relies on unrealistic assumptions of having readily access to detailed and time-stamped transactional records and choosing between LIFO and FIFO methods, which can lead to different tracing results. In this section, I further discuss that, even if the assumptions underlying Dr. Mitts's purported tracing approach were realistic, his approach based on LIFO/FIFO has an important methodological flaw in that such an approach is inapposite to deal with those circumstances where both registered and unregistered shares are transacted in a single transaction.

96.    In Dr. Mitts's own work, he presents an example in which LIFO and FIFO lead to the same tracing result.[121] I propose a similar example here to illustrate the issues with Dr. Mitts approach. Specifically, suppose that Broker A received 10 unregistered shares at 9 AM, 10 registered shares at 9:15 AM, and 10 unregistered shares at 9:30 AM; and Broker A sold 20 shares to Broker B at 9:45 AM. If there were no other transactions of the stock on the same day by the two brokers, then LIFO and FIFO would both lead to the conclusion that Broker A sold Broker B 10 registered and 10 unregistered shares, so Broker B would have potential standing under Section 11.

97.    Even assuming the fictional reality that underlies Dr. Mitts's hypothetical in the previous paragraph (namely, that shares held by DTC can be so identified as registered and unregistered) once they are in street name, the following counterexample demonstrates that tracing breaks down if after all the aforementioned transactions, Broker B sold five shares to Broker C at 3 PM on the same day. This is because before selling to Broker C, Broker B held 10 registered and 10 unregistered shares that were transacted in one single transaction. It is impossible for LIFO or FIFO to determine whether the five shares sold by Broker B to Broker C would contain only registered shares, or only unregistered shares, or both. It is, therefore, impossible to determine whether Broker C (and anyone Broker C would sell to subsequently) should have potential

---

[121] *Id.*

43

standing under Section 11.

98.     This counterexample is simple, straightforward, and based on Dr. Mitts's own work. The example, however, clearly shows that Dr. Mitts's approach cannot deal with situations where registered and unregistered shares are simultaneously transacted in a single trade. The example also shows that it takes only five trades among three brokers for such situations to happen. Given the tremendous amount of transactions and large number of brokers involved in everyday trading, I expect the situations where registered and unregistered shares are simultaneously transacted in a single trade are common. Because Dr. Mitts's purported tracing approach cannot address such common situations, it is fundamentally flawed in terms of methodology.

### 3.     Dr. Mitts's Purported Tracing Approach is Inapposite and Unproven in the Context of Section 11's Tracing

99.     In his report, Dr. Mitts also fails to include any actual tracing analysis, but simply states that "[i]t is straightforward to trace purchases[.]"[122] This statement is unsupported and unproven. Given the unrealistic assumptions and methodological flaws I discussed above, and the fact that Dr. Mitts does not provide any concrete analysis and/or evidence to even potentially overcome such unrealistic assumptions and methodological flaws, his statement that "[i]t is straightforward to trace purchases" is at best speculation.

100.     Methods of LIFO and FIFO are not new; instead, as Dr. Mitts states in his own work, these accounting methods are adopted in various areas of law.[123] However, because the LIFO/FIFO methods cannot deal with the common situations where registered and unregistered shares are simultaneously transacted in a single trade, such methods are not applicable to Section 11's tracing analysis. Based on my professional experience, I am not aware of any previous matters in which tracing was established by LIFO/FIFO methods. This is expected given the fundamental inapplicability of such methods to tracing analysis in Section 11's claims.

---

[122]  Mitts Report ¶ 45.
[123]  Coffee and Mitts (2023), 23.

**D.      Opinion 4. Contrary to Dr. Mitts's assertion that tracing of Talis IPO Shares may be possible after the expiration of the August 11, 2021 lockup, I find that all 15,870,000 Talis IPO Shares: (i) bore the same CUSIP number as the previously issued shares of Talis Stock that were delivered to DTC on August 13, 2021; (ii) were issued in book-entry-only form—without any physical certificates for beneficial owners—and were registered in DTC's street name; and (iii) were held in a single undifferentiated fungible aggregate bulk at DTC, since August 13, 2021, blended with thousands of other shares of Talis Stock that were previously issued by Talis separately from the IPO. In light of shares of Talis Stock from multiple issuances having been blended into a single undifferentiated fungible aggregate bulk at DTC, I do not believe that any method exists by which Plaintiff or any other alleged beneficial owners would be able to show that the shares of Talis Stock that they acquired since August 13, 2021, are traceable to the Registration Statement that is the subject of the Action.**

101.    As discussed above, the intermediated system of holding securities at DTC does not allow for identification of any share as being owned by any individual participant, its customer, or any underlying beneficial owner holding through such a participant or customer. In today's intermediated system, in which a large percentage of publicly traded securities in the United States are held in the street name of Cede & Co. at DTC, I am not aware of any method to trace shares of a security held at DTC or its sub-custodian, in the street name of DTC, to a particular registration statement when multiple issuances of the security represented by the same CUSIP number have been deposited at DTC, where one or more of the issuances were not made pursuant to the registration statement. As discussed in Section VI.C, there are a number of specific circumstances when shareholders might be able to trace their shares to a particular registration statement. In this section, I apply the analytical framework discussed in Section V to assess the traceability of the 15,870,000 Talis IPO Shares (CUSIP number 87424L108) to the Registration Statement, and assess whether these specific circumstances are relevant for the Talis IPO Shares.

102.    For purposes of my traceability assessment, I considered two periods: (a) the lockup period between February 12, 2021 and August 11, 2021, inclusive ("Talis Lockup Period"); and (b) the post-lockup period between August 12, 2021 and August 17, 2021, inclusive ("Talis Post-Lockup Period"). As I discuss below, my analysis confirms that Talis IPO Shares indeed

45

commingled with a large number of other shares in the Talis Post-Lockup Period.[124]

103.    Below I describe the results of my traceability analysis. For this analysis, I reviewed the Registration Statement and other materials listed in **Appendix C**, and I also relied, in addition to my education and professional experience, on the following declarations:

    i.    Supplemental Declaration of Lia Ludwig ("Supplemental Ludwig Declaration"), dated January 25, 2024.

    ii.    Declaration of Ann Marie Bria, Managing Director for Asset Services Product Management at DTCC, dated January 30, 2024 ("Bria Declaration").

### 1.    February 17, 2021

104.    On February 17, 2021, Talis authorized Broadridge as the Transfer Agent and Registrar of Talis Stock to create a new reserve for 15,870,000 shares of Talis Stock (CUSIP number 87424L108).[125] The instruction to Broadridge indicated that the shares in such "IPO Reserve" were free to trade.[126] Per instruction, Broadridge registered the Talis IPO Shares to Cede & Co., DTC's partnership nominee. Broadridge's list of all shareholders of Talis Stock reported that Cede & Co. was the registered owner of 15,870,000 shares Talis Stock as of February 17, 2021.[127]

105.    The Supplemental Ludwig Declaration confirmed that, as instructed by Talis, at the close of business on February 17, 2021, a total of 15,870,000 shares of Talis Stock, CUSIP number 87424L108, were issued by Broadridge in the name of Cede & Co. in connection with the Talis

---

[124] I note that Talis IPO Shares could have already commingled during the Talis Lockup Period. This could happen if any, or even one share, of the Talis Non-IPO Shares was deposited at DTC during the Talis Lockup Period and held in the street name of Cede & Co. in DTC's fungible bulk. Once the IPO Shares became commingled, it would be impossible for investors who purchased shares of Talis Stock in the public market to trace their shares to the Registration Statement. However, I have seen no evidence to date suggesting that any Talis Non-IPO Shares were deposited at DTC during the Talis Lockup Period.

[125] Exhibit 1 to Shevlin Declaration (Doc. No. 136-22).

[126] *Id.*

[127] Exhibit 5 to Shevlin Declaration (Doc. No. 136-26); *see also* Exhibit E to the Simpson LaGoy Declaration.

46

IPO and were delivered by Broadridge to DTC.[128]

106.    The Bria Declaration confirmed that, at close of business on February 17, 2021, DTC held 15,870,000 shares of Talis Stock, CUSIP number 87424L108, registered in the name of Cede & Co., for the benefit of DTC Participants.[129]

### 2.    August 11, 2021

107.    On August 11, 2021, the last day of the Talis Lockup Period, Broadridge's list of all shareholders of Talis Stock reported that Cede & Co. was the registered owner of 15,900,843 shares of Talis Stock.[130] Also on August 11, 2021, Broadridge's list of all shareholders of Talis Stock reported that Meridian was the registered owner of 705,537 shares of Talis Stock; Mr. Lee was the registered owner of 349 shares of Talis Stock; and The California Institute of Technology ("Caltech") was the registered owner of 16,184.[131] Meridian, Mr. Lee, and Caltech held Talis Non-IPO Shares in direct registration as of August 11, 2021.

108.    The Supplemental Ludwig Declaration confirmed that, as of the close of business on August 11, 2021, 30,843 additional shares of Talis Stock, CUSIP number 87424L108, previously issued to Talis employees in connection with Talis's employee incentive plan ("Talis Employee Incentive Shares"), were registered to Cede & Co. Such Talis Employee Incentive Shares were delivered by Broadridge to DTC.[132] Accordingly, at the close of business on August 11, 2021, a total of 15,900,843 shares of Talis Stock were registered to Cede & Co. and had been delivered to DTC.[133] Also as of the close of business on August 11, 2021, Meridian held 705,537 shares of Talis Stock ("Meridian Shares"), CUSIP number 87424L108, through the Direct Registration System ("DRS").[134]

---

[128] Supplemental Ludwig Declaration ¶ 3.

[129] Bria Declaration ¶ 3.

[130] Exhibit 6 to the Shevlin Declaration (Doc. No. 136-27).

[131] *Id.*

[132] Supplemental Ludwig Declaration ¶ 4.

[133] *Id.*

[134] *Id.* ¶ 5.

47

109.    The Bria Declaration confirmed that, at the close of business on August 11, 2021, 15,900,843 shares of Talis Stock registered in the name of Cede & Co. were held by DTC for the benefit of DTC Participants.[135]

### 3.    August 13, 2021

110.    On August 13, 2021, the second day of the Talis Post-Lockup Period, Broadridge's list of all shareholders of Talis Stock reported that Cede & Co. was the registered owner of 16,610,744 shares Talis Stock.[136] On August 13, 2021, Meridian instructed Broadridge to register the Meridian Shares in the name of Cede & Co., and to transfer them to DTC, for an account of DTC participant Bank of New York. Broadridge registered and delivered the Meridian Shares, on August 13, 2021, as instructed.[137] Also between August 12, 2021 and August 13, 2021, 4,364 additional Talis Employee Incentive Shares were registered to Cede & Co. and delivered to DTC, so that at the close of business on August 13, 2021, a total of 16,610,744 shares of Talis Stock were registered to Cede & Co. and held by DTC.[138]

111.    The Bria Declaration confirms that, at the close of business on August 13, 2021, 16,610,744 shares of Talis Stock registered in the name of Cede & Co. were held by DTC for the benefit of DTC Participants.[139]

112.    Figure 3 reports the total number of shares of Talis Stock registered to Cede & Co. and deposited at DTC on February 17, 2021, August 11, 2021, and August 13, 2021.

**Figure 3 – Total Number of Shares Registered to Cede & Co. and Deposited at DTC**

| As of Date | Total Number of Shares of Talis Stock |
|---|---|
| February 17, 2021 | 15,870,000 |
| August 11, 2021 | 15,900,843 |
| August 13, 2021 | 16,610,744 |

[135] Bria Declaration ¶ 4.

[136] Exhibit 7 to the Shevlin Declaration (Doc. No. 136-28); *see also*, Exhibit G to the Simpson LaGoy Declaration.

[137] Supplemental Ludwig Declaration ¶ 6; Exhibit A to Ludwig Declaration (Doc. No. 136-18).

[138] Supplemental Ludwig Declaration ¶ 7.

[139] Bria Declaration ¶ 5.

48

113.    As shown in **Figure 3**, on August 13, 2021, after the end of the Talis Lockup, the number of shares deposited in DTC's fungible bulk was greater than the 15,870,000 Talis IPO Shares. As attested in the Bria Declaration:

> ***At all times***, shares of Talis Stock deposited at DTC and registered in the name of Cede & Co. were held by ***DTC in an undifferentiated manner known as a "fungible bulk."***
>
> Each DTC participant that has held a position in Talis Stock credited to its DTC account, has held a pro-rata beneficial interest in Cede & Co.'s aggregate holding of Talis Stock.[140] (emphasis added)

114.    On August 13, 2021, Meridian Shares—which were Talis Non-IPO Shares—were deposited at DTC's fungible bulk and wholly commingled and blended with Talis IPO Shares and other shares issued in connection with Talis's employee incentive plan, making it impossible for an investor who purchased shares of Talis Stock to trace those specific shares to the Registration Statement.

115.    Contrary to Dr. Mitts's claim that tracing is possible using an accounting methodology, I do not believe that tracing is possible since August 13, 2021 because shares of Talis Stock: (i) bore the same CUSIP number as the shares of Talis Stock previously outstanding and held at DTC; (ii) were issued in book-entry-only form—without any physical certificates for beneficial owners—and were registered in DTC's street name; and (iii) were held in a single undifferentiated fungible aggregate bulk at DTC, blended with thousands of other identical, indistinguishable shares of Talis Stock issued by Talis separately from the IPO, since August 13, 2021. In light of shares of Talis Stock from multiple issuances having been blended into a single undifferentiated fungible aggregate bulk at DTC, I do not believe that, since August 13, 2021, any method exists by which Plaintiffs or any other alleged beneficial owners would be able to show that the shares that they acquired of Talis Stock are traceable to and were issued pursuant to the Registration Statement that is the subject of this Action.

---

[140] Bria Declaration ¶¶ 6–7.

49

## VIII.    CONCLUSION

116.    Based on the above, as well as my expertise, experience, and in-depth understanding of DTC and its processes as well as the intermediated system of securities holdings, my principal conclusion is that I am not aware of any method to trace shares of a security held at DTC or its sub-custodian, in the street name of DTC, to a particular registration statement when multiple issuances of the security represented by the same CUSIP number have been deposited at DTC, where one or more of the issuances were not made pursuant to the registration statement that is the subject of the Action.

117.    Additionally, it is my opinion that:

a)    **Opinion 1.** Dr. Mitts misstates the nature of DTC's fungible bulk of securities. He claims that such securities registered in DTC's street name and credited to DTC Participants are held separately from one another by DTC in DTC Participant accounts, and further claims that some of such securities remain distinguishable from other securities bearing the same CUSIP number that are held by DTC in the same DTC fungible bulk. This is incorrect. Once deposited into DTC's fungible bulk of securities bearing the same CUSIP number, securities are wholly fungible and cannot be distinguished from one another, and DTC Participants who either hold securities for themselves or on behalf of their customers are simply credited a *pro rata* interest in DTC's fungible bulk of such fungible securities.

b)    **Opinion 2.** Contrary to Dr. Mitts's assertion that tracing securities to a registration statement may be still possible even when both registered and unregistered securities are held in DTC's fungible bulk for that CUSIP, I am not aware of any method to trace shares of a security held at DTC or its sub-custodian, in the street name of DTC, to a particular registration statement where: (i) multiple issuances of the security represented by the same CUSIP number have been deposited at DTC; and (ii) one or more of the issuances were not made pursuant to the relevant

50

registration statement.

c)      **Opinion 3.** Dr. Mitts's suggestion that the LIFO/FIFO accounting methodology allows investors to trace shares held at DTC in DTC's fungible bulk even after the end of a lockup period following an IPO is incorrect. Further, Dr. Mitts does not set forth any realistic implementation of his proposed methodology that could actually trace Talis IPO Shares to the Registration Statement following the lockup period.

d)      **Opinion 4.** Contrary to Dr. Mitts's assertion that tracing of Talis IPO Shares may be possible after the expiration of the August 11, 2021 lockup, I find that all 15,870,000 Talis IPO Shares: (i) bore the same CUSIP number as the previously issued shares of Talis Stock that were delivered to DTC on August 13, 2021; (ii) were issued in book-entry-only form—without any physical certificates for beneficial owners—and were registered in DTC's street name; and (iii) were held in a single undifferentiated fungible aggregate bulk at DTC, since August 13, 2021, blended with thousands of other shares of Talis Stock that were previously issued by Talis separately from the IPO. In light of shares of Talis Stock from multiple issuances having been blended into a single undifferentiated fungible aggregate bulk at DTC, I do not believe that any method exists by which Plaintiff or any other alleged beneficial owners would be able to show that the shares of Talis Stock that they acquired since August 13, 2021, are traceable to the Registration Statement that is the subject of the Action.

51

Executed this 2nd day of February, 2024

Jack R. Wiener

52

Appendix A

# JACK R. WIENER

300 E. 74th St.; 19G                                                    C:  (917) 626-0154
NY, NY 10021-3715                                         Jackrwiener@gmail.com

**EXPERIENCE:**

**FINANCIAL SERVICES CONSULTING,** New York, NY                    2009-present
    **Chief Executive Officer**

> Founded consulting firm that provides advice and expert witness support with regard to transactions, clearance & settlement, custody, regulation, compliance, and litigation in the areas of securities, derivatives, banking, and white collar defense.  Advise banks, investment banks, broker-dealers, hedge funds, investment advisors, clearing firms, regulators, governments, individuals, and issuers from the US, Canada, France, Germany, the United Kingdom, Sweden, Israel, China, and the Cayman Islands in structuring and litigation matters.  Serve as expert witness for US Attorney's Office (SDNY) on clearance & settlement and international securities law, for law firms and global custodian banks at trials in Ireland and the Cayman Islands in multi-billion dollar Madoff-related litigation, for European banks in litigation regarding loss of $1.8 billion in asset-backed commercial paper, for clearing firm in dividend litigation, and for various parties in Section 11 securities class action litigation.  Advise Israel Ministry of Finance on restructuring bond offerings. In addition, represent athletes in sports law and SafeSport matters.

> - **US Delegate**.  Represent the US in two multi-lateral, 40-nation treaty negotiations on the law of custody and transfer of securities.  Negotiating the Hague Securities Convention (cross-border pledging of securities) and the Unidroit Securities Convention (harmonizing substantive international securities law/regulation).  Appointed by US State Department.

> - **Adjunct Professor of Law** at Brooklyn Law School, 2012-present. Teach International Securities Regulation & Compliance, International Sales of Securities and Goods, and the Law of War.

**SECURITIES INDUSTRY & FINANCIAL MARKETS ASSN,** New York, NY          2007-08
    **Managing Director & Associate General Counsel**

> **Legal, Regulatory, Compliance, Advocacy, and Market Practice Activities:**  Headed securities, fixed income, and derivatives market practice, legal, regulatory, and compliance initiatives of corporate credit market, primary market, and money market divisions for the largest securities industry lobby organization in the US. Advised the general counsels and investment advisors committees on securities and custody law, practice, regulation, and compliance.  Represented interests of 650 largest global underwriters and asset managers

1

Appendix A

with the Federal Reserve Bank, CFTC, SEC, FINRA, and European Commission.  Liaised with ISDA on derivatives matters.  Led various international initiatives.

**Credit Rating Agencies, Rule 144A, and MAAU:**  Led global industry task force that developed credit rating agency recommendations agreed upon by underwriters, buy-side firms, banks, and issuers.  Recommendations have driven global advocacy in the US and Europe, and are Presidents Working Group-endorsed.  Liaised with senior members of the PWG, Treasury Department, and US and European regulators.  Led task force of 16 largest global underwriters that developed an industry Guidance for Rule 144A issues, and an industry-wide Master Agreement Among Underwriters.

**THE DEPOSITORY TRUST & CLEARING CORPORATION,** New York, NY

| | |
|---|---|
| **Deputy General Counsel & Managing Director** | 2001-05 |
| **General Counsel, Global Asset Solutions LLC** | 2003-05 |
| **Senior Counsel & Vice President** | 1999-2001 |
| **Associate Counsel & Vice President** | 1995-99 |
| **Associate Counsel** | 1989-95 |

*DTCC is the parent company of DTC, GSCC, NSCC, and GAS.  Custodies $87 trillion in securities, handles $2.4 quadrillion in transactions annually, and operates Deriv/SERV for derivative.*
*Regulated by the Fed, SEC, and NYS Banking Dept.*

**Corporate Support:**  Responsible for the company's activities in the areas of securities custody and transfer. Provided strategic legal counsel to senior management, the Board of Directors, and the Underwriting, Operations, Derivatives, Compliance, Risk, Internal Audit, International, Strategy, Dividends, Reorganization, Membership, Human Resources, and Systems Departments, and to subsidiaries (DTC, Deriv/SERV, GSCC, NSCC, and GAS).  Structured broad range of transactions.  Negotiated and drafted various agreements, including custodian and sub-custodian agreements with some of the world's largest custodians of securities, and MOUs and membership, joint venture, acquisition, and technology agreements.  Represented DTC on the Securities Clearing Group and the Unified Clearing Group, comprised of the US clearance and settlement self-regulatory organizations, which focus on identifying and minimizing risk. Participated in the design and implementation of several systems critical to the custody and processing of securities. Managed 12 staff members.

**Regulatory:**  Liaised with regulators on application of existing and proposed banking and securities laws and regulations, risk, compliance, audits, reviews, company practices, clearance-and-settlement offerings, changes in services, regulatory filings, derivatives, and anti-money-laundering. Responsible for regulatory examinations and investigations. Interfaced with the SEC, Federal Reserve Bank of NY, and NY State Banking Dept., as well as the Treasury Department, OFAC, NASD, NYSE, GAO, and the UK's Financial Services Authority ("FSA").  Submitted comment letters to and worked closely with regulators on revisions, relating to the custody of securities, to the '40 Act (Rule 17f) and the '34 Act (Section 17A).  Advised management on existing and proposed SEC, Fed, and CFTC rules and regulations.

2

Appendix A

**Compliance/Risk:**   Developed and oversaw the enforcement of compliance and risk management rules, controls, policies, and procedures for securities custody and transactions, haircuts, underwritings, counter-party exposure, capital requirements, credit risk, stress-testing, Basel II, and membership. Performed investigations of fraud and breaches of compliance policies. Liaised with regulators as to appropriate risk control measures, including standards for Participant admissions.

**International:**  Headed international clearance-and-settlement law practice.  Structured and negotiated cross-border links and transactions with U.S. and non-US regulators, and with non-US custodian banks, broker-dealers, and depositories, supporting global trading for issues such as ordinary shares of UBS and DaimlerChrysler. Established, obtained regulatory approval of, and handled legal issues for UK and China offices.  Negotiated new international securities processing standards to standardize global practices, as a member of the G-30 Legal Working Group.

**Underwriting:**  Headed staff providing counsel on securities law aspects of debt and equity global offerings.  Advised with regard to clearance & settlement, including IPOs, exchanges, book-entry-only and uncertificated issues, and private placements.

**General Counsel of Global Asset Solutions LLC:**  General Counsel to major operating subsidiary handling all start-up business of parent, including a corporate actions validation service.

**Treaty Negotiations:**   Serve on US Delegations negotiating the Hague Securities Convention and the Unidroit Securities Convention with 40 nations. Appointed by the US State Department.

**WEBSTER & SHEFFIELD,** New York, NY                                            1987-89

**WILLKIE FARR & GALLAGHER,** New York, NY                                 1985-87

**PEPPER, HAMILTON & SCHEETZ,** Philadelphia, PA                         1982-85

As a securities associate, negotiated and drafted agreements for a wide range of securities, banking, and corporate transactions.  Worked primarily on mergers & acquisitions, leveraged buy-outs, and divestitures.  Represented bidders, purchasers, and sellers.  Drafted and filed a variety of SEC filings, including '33 & '34 Act filings.

**EDUCATION:**

**J.D., UNIVERSITY OF PENNSYLVANIA LAW SCHOOL,** Philadelphia, PA             1982

Honors:    Editor, **University of Pennsylvania Law Review**
Activities:  Morris Fellow; Phi Delta Phi

3

Appendix A

**B.A., BROOKLYN COLLEGE,** Brooklyn, NY                                              1979

| | |
|---|---|
| Class Standing: | 3.98 G.P.A.; *summa cum laude* |
| Double Major: | Political Science & Psychology (with honors) |
| Honors: | Phi Beta Kappa; Dean's List; Scholars Program |
| Awards: | Sive Award; Regents Scholarship; Social Science Scholarship |
| Activities: | Fencing – NCAA épée semi-finalist 1977, 1979; Team MVP Captain, 1978-79 |

**ADMITTED:** New York, DC, and Pennsylvania

**PRESENTATIONS:**

Presented speeches in the US, United Kingdom, Germany, Switzerland, Israel, China, Peru, and Argentina on various topics, including on the custody and transfer of securities, derivatives, Rule 144A/Reg. S offerings, Rule 17f of the '40 Act, credit ratings, bitcoins, and international legal harmonization.

4

Appendix B

**Deposition, Trial, and Arbitration Testimony**

I have not provided trial or arbitration testimony in the last four years.  I have provided deposition testimony in the last four years as follows:

1.    Deposition testimony in *In re AdaptHealth Corp., Sec. Litig.*, Case No. 2:21-cv-03382-HB (E.D. Pa.) (May 8, 2023).

2.    Deposition testimony in *In re Cloudera, Inc. Sec. Litig.*, Case No. 19-CV-03221-LHK (N.D. Cal.) (August 1 & August 3, 2022).

3.    Deposition testimony in *Hound Partners Offshore Fund LP et al v. Valeant Pharmaceuticals International, Inc.*, Case No. 18-8705 (D. NJ.) (June 24 & June 27, 2022).

4.    Deposition testimony in *Hayden v. Portola Pharm.*, Case No. 20-cv-00367-VC (N.D. Cal) (May 18, 2022).

5.    Deposition testimony in *In re Evoqua Water Technologies Corp. Securities Litigation*, Case No. 1:18-cv-10320-JPC (S.D.N.Y.) (March 25, 2021).

6.    Deposition testimony in *In re American Realty Capital Properties, Inc. Litigation*, Case No. 1:15-mc-00040-AKH (S.D.N.Y.) (June 28, 2019).

7.    Deposition testimony in *Oklahoma Law Enforcement Retirement System v. Adeptus Health Inc., et al.*, Case No. 4:17-cv-0449 (E.D. Tx.) (March 7, 2019).

1

Appendix C

# List of Documents and Materials Considered

**Pleadings**

- Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws, *In re Talis Biomedical Securities Litigation*, 3:22-cv-00105-SI (N.D. Cal. Jan. 13, 2023), Doc. No. 104.

**Academic Sources**

- Coffee, John C., & Joshua Mitts, *Slack v. Pirani and the Future of Section 11 Claims*, WORKING PAPER (2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4644888 (last visited Jan. 29, 2024).

- Holohan, William V., *Contribution Among Securities Pledged by a Defaulting Stock Broker*, 4 S. CAL. L. REV. 1 (1930).

- LEGISLATIVE HISTORY OF THE REVENUE ACT OF 1932: P.L. 72-154: 47 STAT. 169 (Jun. 6, 1932), https://books.google.com/books?id=BCjVAAAAMAAJ&pg=PA1229&lpg=PA1229&dq=%22%22Revenue+Act+of+1932%22+AND+%221229%22+AND+%22in+all+of+these+cases+it+is+necessary+for+the+broker+to+transfer+the+certificate+into+a+street+name%22&source=bl&ots=S14dyJv8Yx&sig=ACfU3U0ajD4hxFywXnr8wXaVhkF9wthdlg&hl=en&sa=X&ved=2ahUKEwjL1caz5IWEAxWUGTQIHSQwAmUQ6AF6BAgMEAM#v=onepage&q=%22%22Revenue%20Act%20of%201932%22%20AND%20%221229%22%20AND%20%22in%20all%20of%20these%20cases%20it%20is%20necessary%20for%20the%20broker%20to%20transfer%20the%20certificate%20into%20a%20street%20name%22&f=false (last visited Jan. 29, 2024).

- MORRIS, VIRGINIA B. & STUART Z. GOLDSTEIN, LIFE CYCLE OF A SECURITY (2010), https://books.google.com/books?id=Hv8ipHbVoGUC&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false, (last visited Jan. 29, 2024).

- NELSON, MILTON N., READINGS IN CORPORATION FINANCE (1st ed. 1926), https://books.google.com/books?hl=en&lr=&id=IQdDAAAAIAAJ&oi=fnd&pg=PA1&dq=Milton+nelson&ots=NXUvAB7FLR&sig=DCCmVmak3JwJz0dcHLjTvhU6_c8#v=onepage&q=Milton%20nelson&f=false (last visited Jan. 29, 2024).

- O'Hara, Maureen & George S. Oldfield, *The Microeconomics of Market Making*, 21 J. FIN. & QUANTITATIVE ANALYSIS 361 (1986).

- Wolfe, Suellen M., *Escheat and the Challenge of Apportionment: A Bright Line Test to Slice a Shadow*, 27 ARIZ. ST. L.J. 173 (1995).

1

Appendix C

- WILCOX, JOHN C., ET AL., *"Street Name" Registration & The Proxy Solicitation Process*, in A PRACTICAL GUIDE TO SEC PROXY AND COMPENSATION RULES (6th ed. 2018), https://books.google.com/books?id=4FOEDwAAQBAJ&newbks=1&newbks_redir=0&printsec=frontcover&dq=A+PRACTICAL+GUIDE+TO+SEC+PROXY+AND+COMPENSATION+RULES&hl=en#v=onepage&q=A%20PRACTICAL%20GUIDE%20TO%20SEC%20PROXY%20AND%20COMPENSATION%20RULES&f=false (last visited Jan. 29, 2024).

**Depositions**

- Joshua R. Mitts, Ph.D., Deposition, January 29, 2024.

**Declarations and Exhibits**

- Broadridge Shareholder List (Ex. 5 to Shevlin Declaration), Feb. 17, 2021, Doc. No. 136-26.

- Broadridge Shareholder List (Ex. 6 to Shevlin Declaration), Aug. 11, 2021, Doc. No. 136-27.

- Broadridge Shareholder List (Ex. 7 to Shevlin Declaration), Aug. 13, 2021, Doc. No. 136-28.

- Broadridge Shareholder List (Ex. 8 to Shevlin Declaration), Aug. 17, 2021, Doc. No 136-29.

- Declaration of Ann Marie Bria, *In re Talis Biomedical Securities Litigation*, 3:22-cv-00105-SI (N.D. Cal. Jan. 30, 2024).

- Declaration of Jessie Simpson LaGoy in Support of Defendants' Administrative Motion to Consider Whether Another Party's Material Should Be Sealed, *In re Talis Biomedical Securities Litigation*, 3:22-cv-00105-SI (N.D. Cal. Dec. 12, 2023), Doc. No. 135-1, and associated exhibits.

- Declaration of Lia Ludwig, *In re Talis Biomedical Securities Litigation*, 3:22-cv-00105-SI (N.D. Cal. Dec. 8, 2023), Doc. No. 136-17.

- Declaration of Matthew Lee, *In re Talis Biomedical Securities Litigation*, 3:22-cv-00105-SI (N.D. Cal. Dec. 11, 2023), Doc. No. 136-15.

- Declaration of Meghan Shevlin, *In re Talis Biomedical Securities Litigation*, 3:22-cv-00105-SI (N.D. Cal. Dec. 12, 2023), Doc. No. 136-21.

- Declaration of Joshua Mitts, Ph.D. (Ex. A to Kubota Declaration), Jan. 12, 2024, Doc. No. 138-1.

2

Appendix C

- Letter from J. Roger Moody, Jr. (Talis) to Broadridge, Re: Talis Reserve Setup (Ex. 1 to Shevlin Declaration), Feb. 17, 2021, Doc. No. 136-22.

- Letter from Karen Elizabeth Deschaine to Broadridge Corporate Issuer Solutions, Inc. (Ex. 8 to Eagan Declaration), Aug. 10, 2021, Doc. No. 136-9.

- Status Inquiry Detail (Ex. A to Ludwig Declaration), Aug. 13, 2021, Doc. No. 136-18.

- Status Inquiry Detail (Ex. C to Ludwig Declaration), Aug. 17, 2021, Doc. No. 136-20.

- Supplemental Declaration of Lia Ludwig, *In re Talis Biomedical Securities Litigation*, 3:22-cv-00105-SI (N.D. Cal. Jan. 25, 2024).

**Rules, Court Filings, and Case Law**

- Brief of Amicus Curiae Law and Business Professors in Support of Respondent, *Slack Technologies v. Pirani*, No. 22-200, 143 S. Ct. 1433 (Mar. 6, 2023), https://www.supremecourt.gov/DocketPDF/22/22-200/256386/20230306171423271_22-200%20Amicus%20Brief.pdf (last visited Jan. 29, 2024).

- Brief of Amicus Curiae The Depository Trust Company Not in Support of Any Party, *In re Petrobras Securities Litigation*, No. 16-1914, 2d. Cir. (Sep. 16, 2016), ECF No. 293-1.

- *Reichard v. Hutton*, 142 N.Y.S. 935 (App. Div. 1913)

- SEC, Issuer *Restrictions or Prohibitions on Ownership by Securities Intermediaries*, 17 C.F.R. Part 240, Release No. 34-50758A, File No. S7-24-04, RIN 3235-AJ26 (Mar. 7, 2005), https://www.sec.gov/rules/final/34-50758a.htm (last visited Jan. 29, 2024).

- SEC, *Self-Regulatory Organizations; The Depository Trust Company; Notice of Filing and Immediate Effectiveness of a Proposed Rule Change to Amend the DTC Deposits Service Guide Relating to Procedures for the Deposit of Nontransferable Securities*, Release No. 34-86897, File No. SR-DTC-2019-007 (Sept. 6, 2019), https://www.sec.gov/files/rules/sro/dtc/2019/34-86897.pdf (last visited Jan. 29, 2024).

- SEC, *Shortening the Securities Transaction Settlement Cycle*, 87 FR 10436, Proposed Rule, Release No. 34-94196, File No. S7-05-22 (Feb. 24, 2022), https://www.sec.gov/rules/2023/02/shortening-securities-transaction-settlement-cycle#34-94196 (last visited Jan. 29, 2024).

- SEC, *Transfer Agent Regulations*, 17 C.F.R. Part 240, Release No. 34-76743, File No. S7-27-15 (Dec. 22, 2015), https://www.sec.gov/rules/concept/2015/34-76743.pdf (last visited Jan. 29, 2024).

3

Appendix C

- UCC § 8 (2019), https://law.justia.com/codes/new-york/2019/ucc/article-8/ (last visited Jan. 29, 2024).

- UCC § 8-503, Official Comment, Property Interest of Entitlement Holder in Financial Asset Held by Securities Intermediary.

**SEC Filings**

- SEC, Notice of Effectiveness for Talis Biomedical Corporation Form S-1 (Feb. 11, 2021).

- Talis Biomedical Corporation, Amendment No. 1 to Form S-1 (Form S-1A) (Feb. 8, 2021).

- Talis Biomedical Corporation, Amendment No. 2 to Form S-1 (Form S-1A) (Feb. 11, 2021).

- Talis Biomedical Corporation, Current Report (Form 8-K) (Feb. 17, 2021).

- Talis Biomedical Corporation, Notice of Exempt Offering of Securities (Form D) (Aug. 20, 2013).

- Talis Biomedical Corporation, Notice of Exempt Offering of Securities (Form D) (Mar. 6, 2015).

- Talis Biomedical Corporation, Notice of Exempt Offering of Securities (Form D) (Oct. 17, 2017).

- Talis Biomedical Corporation, Prospectus (Form 424B4) (February 12, 2021).

- Talis Biomedical Corporation, Registration Statement (Form S-1) (Jan. 22, 2021).

- Talis Biomedical Corporation, Registration Statement (Form S-8) (Feb. 17, 2021).

**Public Press**

- Browning, E.S., et al., *Wild Day Caps Worst Week Ever for Stocks*, WALL STREET J. (Oct. 11, 2008), https://www.wsj.com/articles/SB122368071064524779 (last visited Jan. 29, 2024).

- Bergmann, Larry E., *The U.S. View of the Role of Regulation in Market Efficiency*, SPEECH BY SEC STAFF: INTERNATIONAL SECURITIES SETTLEMENT CONFERENCE (Feb. 10, 2004), https://www.sec.gov/news/speech/spch021004leb.htm (last visited Jan. 29, 2024).

- Press Release, DTCC, *DTCC Celebrates 40 Years of Service* (June 3, 2013), https://web.archive.org/web/20210507040651/https://www.dtcc.com/news/2013/june/03/dtcc-celebrates-40-years-of-service (last visited Jan. 29, 2024).

4

Appendix C

- Press Release, DTCC, *DTCC Comments on SEC Ruling around Expanded US Treasury Clearing* (Dec. 14, 2023), https://www.dtcc.com/news/2023/december/14/dtcc-comments-on-sec-ruling-around-expanded-us-treasury-clearing (last visited Jan. 29, 2024).

- Robards, Terry, *Stocks: Dam Is Holding*, N.Y. TIMES (Feb. 14, 1971), https://www.nytimes.com/1971/02/14/archives/stocks-dam-is-holding-this-time-so-far-trading-flood-is-controlled.html (last visited Jan. 29, 2024).

- Talis Biomedical Corporation, *Talis Announces Pricing of Initial Public Offering* (Feb. 11, 2021), https://www.globenewswire.com/news-release/2021/02/12/2174655/0/en/Talis-Announces-Pricing-of-Initial-Public-Offering.html?print=1 (last visited Jan. 29, 2024).

**Publicly Available Materials**

- CFI Team, *Market Maker*, CORPORATE FINANCE INSTITUTE, https://corporatefinanceinstitute.com/resources/career-map/sell-side/capital-markets/market-maker/ (last visited Jan. 29, 2024).

- CUSIP Global Services, *About Us*, https://www.cusip.com/about/index.html (last visited Jan. 29, 2024).

- CUSIP Global Services, *Inside the CGS Identification System* (Aug. 2010), https://web.archive.org/web/20211102145159/https://www.cusip.com/pdf/CUSIP_Intro_03.14.11.pdf (last visited Jan. 29, 2024).

- CUSIP Global Services, *Universally Recognized Identifier for Financial Instruments*, https://www.cusip.com/identifiers.html#/CUSIP (last visited Jan. 29, 2024).

- DTC, *1989 Annual Report* (1989), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/papers/1980/1989_0101_DTCAR.pdf (last visited Jan. 29, 2024).

- DTC, *1997 Annual Report* (1997), https://www.sechistorical.org/collection/papers/1990/ 1997_0101_DTCAR.pdf (last visited Jan. 29, 2024).

- DTCC, *Blanket Issuer Letter of Representations Template*, https://www.dtcc.com/-/media/Files/Downloads/legal/issue-eligibility/eligibility/BLOR-Template.pdf (last visited Jan. 29, 2024).

- DTCC, *Deposit/Withdrawal at Custodian*, https://www.dtcc.com/settlement-and-asset-services/securities-processing/deposit-withdrawal-at-custodian (last visited on Jan. 29, 2024).

5

Appendix C

- DTCC, *Disclosure Framework for Covered Clearing Agencies and Financial Market Infrastructures* (Mar. 2023), https://www.dtcc.com/-/media/Files/Downloads/legal/policy-and-compliance/DTC_Disclosure_Framework.pdf (last visited Jan. 29, 2024).

- DTCC, *DTC Member Directories*, http://www.dtcc.com/client-center/dtc-directories (last visited Jan. 29, 2024).

- DTCC, *Equities Clearance and Settlement*, https://www.dtcc.com/clearance-settlement-guide/#/chapterTwo (last visited Jan. 29, 2024).

- DTCC, *FAQS: How Issuers Work with DTC*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/how-issuers-work-with-dtc (last visited Jan. 29, 2024).

- DTCC, *Operational Arrangements* (Oct. 2023), https://www.dtcc.com/~/media/Files/Downloads/legal/issue-eligibility/eligibility/operational-arrangements.pdf (last visited Jan. 29, 2024).

- DTCC, *Rules, By-Laws and Organization Certificate of The Depository Trust Company* (Aug. 2023), https://www.dtcc.com/~/media/Files/Downloads/legal/rules/dtc_rules.pdf (last visited Jan. 29, 2024).

- DTCC, *Security Position Reports Templates*, https://www.dtcc.com/settlement-and-asset-services/issuer-services/security-position-reports-templates (last visited Jan. 29, 2024).

- DTCC, *The Depository Trust Company (DTC)*, https://www.dtcc.com/about/businesses-and-subsidiaries/dtc (last visited Jan. 29, 2024).

- DTCC, *The Fast Program*, https://www.dtcc.com/settlement-and-asset-services/agent-services/fast (last visited Jan. 29, 2024).

- Fidelity Institutional, *Q3 2022 Business Update*, https://www.fidelity.com/bin-public/060_www_fidelity_com/documents/about-fidelity/Q3-2022_BusinessUpdates.pdf (last visited Jan. 29, 2024).

- Fidelity Investments, *About Fidelity Institutional*, https://clearingcustody.fidelity.com/app/item/RD_13569_42626/about.html (last visited Jan. 29, 2024).

- FINRA, *2023 FINRA Industry Snapshot* (Aug. 23, 2023), https://www.finra.org/sites/default/files/2023-04/2023-industry-snapshot.pdf (last visited Jan. 29, 2024).

- J.P. Morgan Chase, *Chase's 2022 Digital Banking Trends*, https://www.jpmorgan.com/technology/news/chase-2022-digital-banking-trends (last visited Jan. 29, 2024).

Appendix C

- NASDAQ, *The Depository Trust Company*, https://www.nasdaq.com/glossary/d/depository-trust-company (last visited Jan. 29, 2024).

- New York Stock Exchange, Inc., *Crisis in the Securities Industry, A Chronology: 1967–1970* (Aug. 2, 1971), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/papers/1970/1971_0730_NYSECrisis.pdf (last visited Jan. 29, 2024).

- SEC, *DTC Chills and Freezes* (May 1, 2012), https://www.sec.gov/oiea/investor-alerts-bulletins/ib_dtcfreezes.html (last visited Jan. 29, 2024).

- SEC, *Final Report of the Securities and Exchange Commission on the Practice of Recording the Ownership of Securities in the Records of the Issuer in Other Than the Name of the Beneficial Owner of Such Securities*, No. 80-014 (Dec. 3, 1976), https://original-ufdc.uflib.ufl.edu/AA00022450/00001 (last visited Jan. 29, 2024).

- SEC, *Glossary: Holding Your Securities*, https://www.investor.gov/introduction-investing/investing-basics/glossary/holding-your-securities (last visited Jan. 29, 2024).

- SEC, *Investor Bulletin: Holding Your Securities* (Jul. 12, 2023), https://www.sec.gov/reportspubs/investor-publications/investorpubsholdsechtm.html (last visited Jan. 29, 2024).

- SEC, *Roundtable on Proxy Voting Mechanics* (May 23, 2007), https://www.sec.gov/spotlight/proxyprocess/proxyvotingbrief.htm (last visited Jan. 29, 2024).

- SEC, *Rule 144: Selling Restricted and Control Securities* (Jan. 16, 2013), https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144 (last visited Jan. 29, 2024).

- SEC, *Study of Unsafe and Unsound Practices of Brokers and Dealers*, H.R. Doc. No. 92-231 (Dec. 1971), http://3197d6d14b5f19f2f440-5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/papers/1970/1971_1201_SECUnsafe_01.pdf (last visited Jan. 29, 2024).

- SEC, *Trading with the Enemy: Hearings before the Subcommittee of the Committee on Commerce, United States Senate, Sixty-Fifth Congress, First Session on H. R. 4960* (1917), https://books.google.com/books?id=pQgQAAAAIAAJ&printsec=frontcover#v=onepage&q&f=false (last visited Jan. 29, 2024).

- SEC, *Shareholder Proposals: Staff Legal Bulletin No. 14F (CF)* (Oct. 18, 2011), https://www.sec.gov/corpfin/staff-legal-bulletin-14f-shareholder-proposals? (last visited Jan. 29, 2024).