# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

)

IN RE TALIS BIOMEDICAL          )

SECURITIES LITIGATION           )

)

)

THIS DOCUMENT RELATES TO:       )   CASE NO.

)   22-CV-00105-SI

)

ALL ACTIONS                     )

)

_____)

REMOTE PROCEEDINGS OF

VIDEOTAPED DEPOSITION OF

JOSHUA R. MITTS, PH.D.

MONDAY, JANUARY 29, 2024

JOB NO. SF 6433664

REPORTED BY:  REAGAN EVANS, RPR, RMR, CRR, CCRR,

CLR, CRC, CA CSR NO. 8176

Page 1

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

VIDEOTAPED DEPOSITION OF JOSHUA R. MITTS, PH.D.,
TAKEN REMOTELY ON BEHALF OF THE DEFENDANTS AT
12:04 P.M., EASTERN STANDARD TIME, MONDAY,
JANUARY 29, 2024, AT SCARSDALE, NEW YORK, BEFORE
REAGAN EVANS, CA CSR NO. 8176, RPR, RMR, CRR, CCRR,
CLR, CRC.

APPEARANCES OF COUNSEL

FOR CO-LEAD PLAINTIFF MARTIN DUGAN AND CO-LEAD
COUNSEL FOR THE PUTATIVE CLASS:
     BLEICHMAR FONTI & AULD LLP
     BY:  EVAN A. KUBOTA, ESQ.
     BY:  JOSEPH A. FONTI, ESQ.
          (APPEARING REMOTELY)
     TIMES SQUARE TOWER
     7 TIMES SQUARE, 27TH FLOOR
     NEW YORK, NEW YORK 10036
     (212) 789-1340
     EKUBOTA@BFALAW.COM
     JFONTI@BFALAW.COM

Page 2

APPEARANCES OF COUNSEL (CONTINUED)


FOR CO-LEAD PLAINTIFFS LEON YU AND MAX WISDOM

TECHNOLOGY LIMITED AND CO-LEAD COUNSEL FOR THE

PUTATIVE CLASS:

POMERANTZ LLP

BY:  JONATHAN D. PARK, ESQ.

(APPEARING REMOTELY)

600 THIRD AVENUE

20TH FLOOR

NEW YORK, NEW YORK 10016

(212) 661-1100

JPARK@POMLAW.COM

Page 3

APPEARANCES OF COUNSEL (CONTINUED)


FOR DEFENDANTS TALIS BIOMEDICAL CORPORATION,

BRIAN COE, J. ROGER MOODY, JR., FELIX BAKER,

RAYMOND CHEONG, MELISSA GILLIAM, RUSTEM F.

ISMAGILOV, KIMBERLY J. POPOVITS, MATTHEW L. POSARD,

AND RANDAL SCOTT:

    COOLEY LLP

    BY:  PATRICK E. GIBBS, ESQ.

    BY:  SHANNON M. EAGAN, ESQ.

    BY:  JESSIE SIMPSON LAGOY, ESQ.

         (APPEARING REMOTELY)

    3175 HANOVER STREET

    PALO ALTO, CALIFORNIA  94304-1130

    (650) 843-5000

    PGIBBS@COOLEY.COM

    SEAGAN@COOLEY.COM

    JSIMPSONLAGOY@COOLEY.COM


ALSO PRESENT:  STEVEN TOGAMI, VIDEOGRAPHER

               (APPEARING REMOTELY)

Page 4

                              I N D E X


WITNESS                  EXAMINATION                        PAGE

JOSHUA R. MITTS,     BY MR. GIBBS                        9

PH.D.






                         E X H I B I T S


NO.                PAGE      DESCRIPTION

EXHIBIT 60      12    DECLARATION OF PROFESSOR

                     JOSHUA R. MITTS, PH.D.,

                     DATED JANUARY 12, 2024,

                     33 PAGES


EXHIBIT 61      27    UNITED STATES COURT OF

                     APPEALS SECOND CIRCUIT AMICUS

                     CURIAE IN RE PETROBRAS

                     SECURITIES LITIGATION,

                     DOCKET NO. 16-1914, 40 PAGES

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

                              I N D E X

                            (CONTINUED)

                        E X H I B I T S


NO.                PAGE      DESCRIPTION

EXHIBIT 62      82    SUPREME COURT OF THE UNITED

                     STATES SLACK TECHNOLOGIES,

                     LLC, VERSUS PIRANI BRIEF FOR

                     AMICI CURIAE, 13 PAGES

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

SCARSDALE, NEW YORK

MONDAY, JANUARY 29, 2024; 12:04 P.M.

THE VIDEOGRAPHER:  We are on the record at 12:04 p.m., on January 29th, 2024.                    12:04:01

Please note that this deposition is being conducted virtually.  Quality of recording depends on the quality of camera and Internet connection of participants.

What is seen from the witness and heard on   12:04:17 screen is what will be recorded.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit No. 1 of the             12:04:29 video-recorded deposition of Joshua Mitts, Ph.D., taken by counsel for the defendants In Re Talis Biomedical Securities Litigation, filed in the United States District Court for the Northern District of California.                          12:04:52

Case No. 3:22-cv-00105-SI.

My name is Steven Togami representing Veritext Legal Solutions.  And I am the videographer.

The court reporter is Reagan Evans from the  12:05:09

Page 7

firm Veritext Legal Solutions.

I am not related to any party in this action; nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.    12:05:19

At this time, will counsel and all present please state their appearances and affiliations for the record, starting with the noticing party.

MR. GIBBS:  This is Patrick Gibbs from Cooley on behalf of the defendants.    12:05:36

MS. SIMPSON LAGOY:  Jessie Simpson LaGoy from Cooley on behalf of Defendants.

MR. KUBOTA:  Evan Kubota for Bleichmar Fonti & Auld for Plaintiff and the proposed class.    12:05:49

MR. FONTI:  Joseph Fonti from Bleichmar Fonti & Auld for Plaintiff and the class.

MR. PARK:  Jonathan Park of Pomerantz LLP for Plaintiff and the class.

THE VIDEOGRAPHER:  Thank you.    12:06:07

THE REPORTER:  Shall I swear in the witness?

///

///

///

Page 8

JOSHUA R. MITTS, PH.D.,

having been first duly sworn by the reporter,

was examined and testified as follows:


THE WITNESS:  Yes, I do.                    12:06:28

THE REPORTER:  Thank you.


EXAMINATION

BY MR. GIBBS:

Q   Good morning.                            12:06:33

A   Good morning.

Q   Is it okay if I address you as Professor
Mitts?

A   Yes.

Q   All right.                               12:06:43

Professor Mitts, my name is Patrick Gibbs.
I am a partner with Cooley LLP representing the
defendants in this case.

Have you ever been deposed before?

A   Yes.                                     12:06:57

Q   Approximately how many times?

A   In between five and ten --

Q   And have you been -- sorry.  Go ahead.

A   Approximately seven.

Q   Okay.                                    12:07:16

Page 9

transferred to, if they were transferred at all, out of E*Trade, they were not transferred at that moment to all the other places to which they were not transferred.

Meaning, if, for example, they were                13:14:38 transferred from E*Trade to JPMorgan Chase, at least as of that moment, we can still conclude that they were transferred to JPMorgan Chase and not anywhere else.

So the first point is that the mere fact              13:14:57 that there was a transfer out of unregistered shares from one account to another account does not necessarily preclude concluding with certainty that maybe a large number of DTC accounts never received unregistered shares.                                          13:15:28

We could refer to those as a closed loop, if you will.  To the extent that registered shares remained on a close loop, we can similarly infer that those DTC participants never received unregistered shares.                                          13:15:49

So, in my opinion, before we can seriously consider whether a given hypothetical even presents questions around tracing, we first have to evaluate the extent to which the DTC participant accounts formed what I might call a closed loop of registered    13:16:19

Page 47

shares.

And with over 800 DTC participants, there could very well be -- and this would, again, depend on the data -- a large number of closed loops between DTC participant accounts, none of which ever touched an unregistered share. 13:16:41

Q   Just to be clear, though, you have not done any of this work or reviewed any of these records for Talis in particular; correct?

A   That's correct.  I have not received 13:17:06 nonpublic records from DTC.

Q   Okay.

And my hypothetical was not actually trying to get at movements between different participants, but you went there anyway.  So let me just pick up 13:17:17 on that for a moment.

You have a whole bunch of participants, many of them have got Talis shares in their DTC -- reflected in their DTC accounts.

You have trading going on.  People buying, 13:17:34 people selling across lots of different participants.

Is it your testimony that DTC's records actually show an E*Trade customer selling his shares to a Morgan Stanley customer? 13:17:51

Page 48

transfers.  Sometimes those transfers are made from individual brokerage customers to a general account that the broker maintains.

And other times those transfers are very clearly made from one brokerage account to the other.  And the mere fact that many brokerage customers are trading with each other does not undermine the ability to identify a buyer and a seller.

13:42:42

And, of course, if you think about this, each broker in your hypothetical is almost maintaining a market between its customers, those who want to buy and those who want to sell.

13:43:01

The broker, in many cases, will end up matching a buy order from one customer against a sell order from another customer.

13:43:22

And so what that allows us to do is to conclude, in fact, that Mr. Lee sold to Josh and Evan sold to Patrick because we'll have a buy order from one customer matching against a sale order from another customer.  Both the orders will be recorded at the customer level, as well as any other order events, like modifications and cancellations and so forth, as will the executions of those orders.

13:43:41

That, all of those records I have

13:44:01

Page 63

whose DTC account securities of

that issue have been credited as a

pro rata (proportionate) interest

in DTC's entire inventory of that

issue.                                          14:18:01

And here in paragraph 44, I am quoting the

amicus brief and in context of this paragraph making

the point we just discussed that these records

permit identifying and segregating transfers even

though -- and then I explain and quote the language    14:18:18

from the amicus brief.

Paragraph 45, in the context of this

discussion of the commingling of unregistered with

registered shares or the sale of unregistered shares

to a member of the proposed class, paragraph 45        14:18:44

explains that it is straightforward to trace records

produced in discovery, along with an accounting

method, such as first in, first out, FIFO, or last

in, first out, LIFO.

So my opinion, in paragraph 45, is that,           14:19:07

first, there are a number of detailed time stamped

transactional records, which can be obtained through

discovery.

These records show when securities in one

account are transferred to another account whether    14:19:30

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

within the same broker-dealer or different broker-dealers.

I then explain that these records make it possible to reconstruct a reliable chain of title using standard accounting methods like FIFO and LIFO.    14:19:45

Q    And in a situation where you're going to use FIFO or LIFO, you have to choose one or the other; correct?

A    No.    14:20:03

Q    No?

A    There are a wide range of situations which produce the same conclusion regarding whether a given member of the proposed class holds registered shares regardless of whether FIFO or LIFO is    14:20:24 employed.

Q    That's not my question.

Pardon me, that's not my question.

I'm saying "ab initio," at the start of this process, you decide I'm going to use a FIFO    14:20:43 approach or I'm going to use a LIFO approach.  You can't use both simultaneously against the same set of facts; right?

MR. KUBOTA:  Objection.  Misstates prior testimony.  Asked and answered.    14:20:53

Page 73

THE WITNESS:  You asked me two different questions, I believe.  Ab initio, my answer to your first question is, there's no need to choose FIFO or LIFO ab initio.

And whether or not you can use FIFO or LIFO against the same set of facts is also a question that depends on the facts in front of you and what the data indicate.

And before you cut me off earlier, I was about to explain that, in fact, there are a wide range of circumstances in which regardless of which method one employs, the conclusion is the same both with respect to the broker-dealer or DTC custodian holding registered shares, as well as the individual customer.

And in a situation where one reaches the same conclusion regardless of which accounting method is chosen, then the choice of the accounting method need not be made ab initio because it would be immaterial, or more precisely irrelevant to the conclusion.

BY MR. GIBBS:

Q   Are there some circumstances where the choice between FIFO and LIFO leads to different outcomes in terms of who is deemed to have purchased

Page 74

registered and who is deemed to have purchased unregistered shares?

A    Yes.

Q    And in a situation like that, where a given shareholder's right to bring a claim under Section 11 or not turns on whether you apply FIFO or you apply LIFO, how does one choose between those two alternatives?

14:23:02

A    So the first point to understand is that the choice between FIFO and LIFO, as I have explained in academic writing on this question, is akin to other methodological choices, which are routinely made in connection with securities litigation.

14:23:23

In my academic writing, I give the analogy and compare this methodological choice to methodological choices made in the construction of an events study.

14:23:52

In an events study, one employs a regression analysis to measure what, as a financial economist, we would refer to as the expected return.

14:24:16

The expected return is the product of a model in which one makes various judgments concerning the appropriate inputs to evaluate what the stock price of a publicly traded company would

14:24:43

Page 75

reach that determination is based on the sorts of records that we have been discussing, brokerage records, DTC records, and other records that are easily obtainable in discovery.

Q    How would you figure out whether FIFO or LIFO better represents what happened in the real world?  What facts would you consider?

A    So the best way, I think, to understand what facts are relevant and those facts will vary from case to case, I can't emphasize that enough because in many situations, as we previously discussed, the relevant evidence might be confined to a very small set of broker-dealers or custodians making this exercise one that may or may not have any practical implications.

And by "this exercise," I mean our discussion concerning the appropriate choice of FIFO or LIFO.

So the first question, in my view, is to determine whether and to what extent this methodological choice matters at all.  Much like the choice of control variables in an events study may not, in fact, change the outcome.  And in that situation, one would not be too concerned about the appropriate choice if it made no difference to the

14:29:19

14:29:43

14:30:10

14:30:26

14:30:47

Page 78

outcome.

Having concluded that this choice matters, the next question is, what sort of information is needed?

And I think it's helpful to think of an analogy.  Imagine cans of soup that are put on a store shelf.  Cans of soup could come from two different factories, but they are otherwise identical in appearance.

We can imagine tracing at its core as an attempt to reconstruct the sequence and thus to attribute which can of soup came from which factory.

Suppose, for example, there was a recall. Let's hope it's not for Campbell's Chicken Noodle Soup, but imagine that these are cans of Campbell's Chicken Noodle Soup and they could come from factory 1 or factory 2.  And there's a recall for all the cans of chicken noodle soup that come from factory 1.

If we had a closed circuit TV camera continuously recording the store clerk as they placed cans of soup from the box from factory 1 and the box from factory 2, even though the cans are otherwise identical in appearance and they are commingled on the store's shelf, if we could observe

14:30:59

14:31:17

14:31:47

14:32:01

14:32:24

Page 79

the sequence in which those cans were actually placed on the shelf, we could reconstruct the order in which they were taken off the shelf, assuming we could also observe that sequence.

If a factory 1 can was put in the back, followed by a factory 2 can, follow by a factory 1 can, we observe the in order in which they went on the shelf, and we observe the order in which they went off the shelf, then there's simply no question which factory cans ended up where.

The challenge is that in many situations our ability to reconstruct this exact order is likely to be limited, but not in all situations.

And sometimes we have evidence that provides greater precision. So at a general level, my view is that the appropriate way to conduct tracing is to use all available information to reconstruct the order that the soup cans were placed on the shelf to the best of our ability.

What would be inappropriate and inconsistent, in my view, with a faithful attempt to describe the real world and reconstruct what actually happened, would be to conclude that no soup cans came from one of the factories. Or the context of a Section 11 claim that no registered shares were

Page 80

sold.

Because, in fact, in many situations those shares are sufficiently segregated that there's simply no question which factory they came from, to use the soup can analogy, or whether they were registered or unregistered shares.

14:34:32

And in many situations, we have enough information to reconstruct the sequence in which those shares, like the soup cans, were deposited and withdrawn.

14:34:50

Q    Have you finished your answer?

A    Yes.

Q    Okay.

Are you familiar with an amicus brief filed in the "Slack Technologies versus Pirani,"   14:35:09 P-i-r-a-n-i, case before the United States Supreme Court on your behalf?

A    Well, as I explain in my report, in my declaration in this case, I served as co-counsel to the amici along with Professor Jack Coffee at   14:35:32 Columbia Law School.

We were co-counsel.  It was not a brief that we signed, but we were co-counsel in preparing the brief that I reference in Footnote 51 of my report.   14:35:50

Page 81

administration setting because it could very well be

that we conclude that the analysis ultimately yields

the exact same result or almost -- 99 percent of the

class is identical, but this analysis might be

useful also for determining the damages award that    15:30:56

each class member is entitled to.

And that's another example of the

application of this methodology in a way that really

is, you know, using this information to, you know,

to reach the most accurate measure we can as to the    15:31:15

extent of not only who's in the class but the extent

to which they were injured.

Q    Okay.

Let me just -- and you want a break and I

will get to that, but let me try to refine my    15:31:28

question to get a clear answer, if I could.

So in a case where for 80 percent of the

class members you get the same answer to whether

they have registered shares or not, regardless of

what methodological choices you make, am I correct    15:31:41

that that means that for some portion of the

remaining 20 percent, the answer to whether or not

they purchased registered shares will turn on one or

more methodological choices, such as do we use FIFO

or do we use LIFO?    15:32:01

Page 118

A    It is possible given a particular set of data that there would be variation in that group. And as we previously discuss, that's the point where expert analysis is needed to evaluate which method is most appropriate and to make sure that the choice is not an arbitrary choice in a manner disconnected from any criteria, but recognizing like the choice of a control variable one has to ultimately sometimes make methodological choices. And there's going to be a need to make a methodological choice that is as consistent with the totality of the evidence that's available.

Q    Okay.

MR. GIBBS:  I understand, you know, I think this is a good time for a break.  So why don't we take 10 or 15 minutes or so.  It's lunchtime here so I'm going to grab a bite to eat.

THE VIDEOGRAPHER:  This marks the end of Media No. 2.

Going off the record at 3:34 p.m.

(At 3:34 p.m., the deposition of JOSHUA R. MITTS, PH.D., was adjourned for noon recess.)

///

///

Page 119