# EXHIBIT 6

2023 WL 2439655 (U.S.) (Appellate Brief)
Supreme Court of the United States.

SLACK TECHNOLOGIES, LLC, fka Slack Technologies, Inc., et al., Petitioners,

v.

Fiyyaz PIRANI, Respondent.

No. 22-200.
March 6, 2023.

On Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit

**Brief for Amici Curiae Law and Business Professors in Support of Respondent**

John C. Coffee, Jr., Joshua Mitts, Columbia Law School, 435 West 116th Street, New York, NY 10027.

Ira A. Schochet, Labaton Sucharow LLP, 140 Broadway, New York, NY 10005.

Laura Posner, Counsel of Record, Cohen Milstein Sellers & Toll PLLC, 88 Pine Street, 14th floor, New York, NY 10005, (212) 838-7797, lposner @cohenmilstein.com.

Carol V. Gilden, Cohen Milstein Sellers & Toll PLLC, 190 S. La Salle Street, Suite 1705, Chicago, IL 60603, for Amici Curiae.

### *i  TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................... i
TABLE OF CITED AUTHORITIES ........................................................................................... iii
INTEREST *OF AMICI CURIAE* ............................................................................................. 1
SUMMARY OF ARGUMENT .................................................................................................... 3
ARGUMENT ............................................................................................................................... 6
A. It is straightforward to trace purchases of securities in the secondary market using account-level data on transaction times and an accounting method such as first-in-first-out (FIFO) or last-in-first-out (LIFO) ............................................................................................................... 6
B. Accounting methods are ubiquitously employed in the law to trace the transfer of assets through commingled accounts ........................................................................................................... 11
C. Accounting methods like FIFO and LIFO do not amount to "statistical tracing" nor do they involve probabilistic reasoning ......................................................................................................... 15
D. The tracing requirement is being deliberately manipulated through the tactic of commingling registered and unregistered shares in order to hide their lineage ............................................. 17
 *ii  E. The Court should remand to allow the plaintiffs to obtain evidence of tracing through reasonable discovery ..................................................................................................................... 20
CONCLUSION ........................................................................................................................... 23

### *iii  TABLE OF CITED AUTHORITIES

**Cases**

*Abbey v. Computer Memories, Inc.,* 634 F. Supp. 870 (N.D. Cal. 1986) ......................................................................................... 16
*Barnes v. Osofsky,* 373 F.2d 269 (2d Cir. 1967) .................... 4, 7
*Bodri v. Gopro, Inc.,* No. 16-CV-00232, 2016 WL 1718217 (N.D. Cal. Apr. 28, 2016) ...................................................... 14
*Brown & Williavnson Tobacco Corp. v. First Nat. Bank of Blue Island,* 504 F.2d 998 (7th Cir. 1974) ........................... 11
*Cent. States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.,* 230 F.3d 934 (7th Cir. 2000), *cert.* 21

*denied,* 532 U.S. 943, 121 S. Ct. 1406, 149 L. Ed. 2d 348 (2001) ................................................................... 

*Davidson v. Comm'r,* 305 U.S. 44 (1938) ............................... 12

*Hansen v. Neumueller GmbH,* 163 F.R.D. 471 (D. Del. 1995) ............................................................................. 21

*In re Baan Co. Sec. Litig.,* 81 F. Supp. 2d 75 (D.D.C. 2000) . 21

**\*iv** *Cited Authorities*

*Page*

*In re Century Aluminum. Co. Sec. Litig.,* 729 F.3d 1104 (9th Cir. 2013) .............................................................. 4, 7, 8

*In re eSpeed, Inc. Sec. Litig.,* 232 F.R.D. 95 (S.D.N.Y. 2005) ............................................................................. 14

*In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. 65 (S.D.N.Y. 2004), *vacated and remanded sub nom. In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24 (2d Cir. 2006) 21

*In re Lendingclub Sec. Litig.,* 282 F. Supp. 3d 1171 (N.D. Cal. 2017) .......................................................... 14

*In re Quarterdeck Office Sys. Sec. Litig.,* No. CV-92-3970, 1993 WL 623310 (C.D. Cal. Sept. 30, 1993) .................. 16

*In re Snap Inc. Sec. Litig.,* 334 F.R.D. 209 (C.D. Cal. 2019) . 15

*In re Vivendi Universal, S.A. Sec. Litig.,* 284 F.R.D. 144 (S.D.N.Y. 2012) .................................................. 14

*Jaffe Pension Plan v. Household Int'l, Inc.,* 756 F. Supp. 2d 928 (N.D. Ill. 2010) ............................................. 14

*Krim v. pcOrder.com, Inc.,* 402 F.3d 489 (5th Cir. 2005) ....... 15, 16

**\*V** *Cited Authorities*

*Nicolow v. Hewlett Packard Co.,* No. 12-05980 CRB, 2013 WL 792642 (N.D. Cal. Mar. 4, 2013) ...................... 14

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* 575 U.S. 175 (2015) ............................ 22

*Pirani v. Slack Techs., Inc.,* 445 F. Supp. 3d 367 (N.D. Cal. 2020), *aff'd,* 13 F.4th 940 (9th Cir. 2021) ................. 20-21

*Rauch v. Vale S.A.,* 378 F. Supp. 3d 198 (E.D.N.Y. 2019) ..... 13

*Sudunagunta v. NantKwest, Inc.,* No. CV-16-1947, 2018 WL 3917865 (C.D. Cal. Aug. 13, 2018) ........................ 15

*Tracinda Corp. v. Daimlerchrysler AG,* 197 F. Supp. 2d *86* (D. Del. 2002) ................................................ 21

*Turan v. Comm'r of Internal Revenue,* 114 T.C.M. (CCH) 65 (T.C. 2017) ................................................... 12

*U.S. v. Banco Cafetero Panama,* 797 F.2d 1154 (2d Cir. 1986) ........................................................ 11

**\*vi** *Cited Authorities*

*Page* Statutes & Other Authorities 15 U.S.C. § 78u-4(a)(3)(B)(iii)(1)(bb) ............................................... 13

15 U.S.C. § 78u-4(b)(3)(B) .................................................. 21

17 C.F.R. § 240.17a-3(a)(6) ................................................. 7

Boris Feldman, *A Modest Strategy for Combatting Frivolous IPO Lawsuits,* HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE, March 13, 2015 ........................................................ 17, 18

California Community Property Law § 6:22 (2022 ed.) ........ 12

FINRA Regulatory Notice 11-35, https://www. finra.org/ sites/default/files/NoticeDocument/ p124062.pdf ................. 12-13

Interactive Brokers, Tax Information and Reporting, **Error! Hyperlink reference not valid.**en/support/tax-us-forms.php ................................................................ 12

*Joint Industry Plan; Order Approving the National Market System Plan Governing the Consolidated Audit Trail,* Rel. 8

No. 34-79318, Nov. 15, 2016, https://www. sec.gov/rules/
sro/nms/2016/34-79318.pdf ...................................................

**\*vii** *Cited Authorities*

| | |
|---|---|
| Joseph A. Grundfest, *Morrison, the Restricted Scope of Securities Act Section 11 Liability, and Prospects for Regulatory Reform,* 41 J. CORP. L. 1 (2015) ........................ | 7 |
| Louis Loss, Joel Seligman and Tory Parades, FUNDAMENTALS OF SECURITIES REGULATION (7th ed. 2018) ................................................ | 19 |
| Nicki Locker and Laurie Smilan, *Carving Out IPO Protections,* HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (February 25, 2020) ........... | 18 |
| Regulation SHO Rule 203(b)(3) ............................................ | 12-13 |
| Restatement (Second) of Trusts § 202 (1959) ........................ | 11 |
| SEC, Division of Market Regulation, Responses to Frequently Asked Questions Concerning Regulation SHO, Question 6.8, https://www.sec.gov/divisions/marketreg/ mrfaqregshol204.htm .............................................. | 13 |
| Secutities Act § 4(a)(1) ............................................... | 18 |
| Secutities Act of 1933, § 11 ................................................ | 1, 3, 4, 5, 14, 15, 16, 17, 18, 19, 20, 21, 23 |
| Secutities Act of 1933, § 11(a) ........................................... | 4 |

**\*viii** *Cited Authorities*

| | |
|---|---|
| Willkie Farr & Gallagher, The Modified LIFO Method: SEC Staff Interprets Rule 203(b) (3) of Regulation SHO Regarding Aging Failures to Deliver, New Frequently Asked Question 5.8 (April 2006), https://www.willkie. com/-/ media/files/publications/2006/04/the- modified-lifo-method- sec-staff-interprets-ru_____/ files/modifiedlifomethodpdf/ fileattachment/ modified_lifo_method.pdf ........................... | 13 |

## \*1  INTEREST OF AMICI CURIAE [1]

[1]    No party or counsel for a party - nor any person other than amici and their counsel - authored this brief in whole or in part or contributed any money intended to fund its preparation or submission.

Amici are law and business professors who focus their teaching and scholarship on federal securities law, the financial markets and accounting. They submit this brief to clarify the contours of the modern securities market for the Court's benefit, and explain how modern computing power and well established and accepted accounting methodologies make it feasible to trace shares, using the detailed, time-stamped transactional records that broker-dealers, exchanges, and the Financial Industry Regulatory Authority ("FINRA") are required to maintain and which are obtainable through subpoenas in discovery. Amici also submit to explain how Petitioners' position would effectively bar investors from tracing their shares, not only in direct listings but in all contexts that Congress intended for Section 11 to apply, thereby resulting in a significant loss of investor protection. Amici are:

William W. Clayton is a Francis R. Kirkham Associate Professor of Law at BYU Law School.

James D. Cox is the Brainerd Currie Professor of Law at Duke Law School.

Wendy Gerwick Couture is the James E. Wilson Distinguished Professor of Law at the University of Idaho College of Law.

 **\*2**  Merritt B. Fox is the Arthur Levitt Professor of Law at Columbia University Law School.

Jeffrey Gordon is Richard Paul Richman Professor of Law and co-director of the Ira M. Millstein Center for Global Markets and Corporate Ownership at Columbia University Law School.

Thomas Lee Hazen is the Cary C. Boshamer Distinguished Professor of Law at the University of North Carolina School of Law.

Michael J. Kaufman is Dean and Professor of Law at Santa Clara University School of Law

Donald Langevoort is the Thomas Aquinas Reynolds Professor at Georgetown University Law Center.

James Park is a Professor of Law at UCLA School of Law.

Hillary Sale is the Associate Dean for Strategy and the Agnes Williams Sesquicentennial Professor of Leadership and Corporate Governance at Georgetown Law Center, and a Professor of Management at Georgetown University's McDonough School of Business.

Joel Seligman is President Emeritus at the University of Rochester and Dean Emeritus and Professor at Washington University School of Law.

Marc Steinberg is the Radford Professor of Law at SMU Dedman School of Law.

 **\*3** Daniel J. Taylor is the Arthur Andersen Chaired Professor at The Wharton School, and Director of the Wharton Forensic Analytics Lab.

David H. Webber is a Professor of Law and Paul M. Siskind Research Scholar at Boston University School of Law.

Charles K. Whitehead is the Myron C. Taylor Alumni Professor of Business Law at Cornell Law School.

Arthur E. Wilmarth, Jr. is a Professor Emeritus of Law at The George Washington University School of Law.

**SUMMARY OF ARGUMENT**

We submit this amicus brief because we are concerned that this Court may be influenced by a myth: namely, that it is impossible to "trace" shares for purposes of establishing standing under Section 11 of the Securities Act of 1933. Although many courts and practitioners may have sincerely believed that this barrier was insurmountable, their belief was at best "folk wisdom." Even if it was reasonable once upon a time, this "impossibility myth" is now demonstrably false, as modern computing power makes it feasible to trace shares, using the detailed, time-stamped transactional records that broker-dealers, exchanges, and the Financial Industry Regulatory Authority ("FINRA") are required to maintain (and are subject to subpoena in discovery). [2]

[2]     Looking to the future, we also believe that distributed ledger technology - an emerging technology which produces an immutable record of transactions - should make it even simpler to trace shares at low cost, thus making the "impossibility myth" even more dated and archaic.

 **\*4** Worse yet, the tracing requirement can be (and apparently is being) manipulated by companies, at the advice of skilled practitioners, to deliberately commingle registered and unregistered securities seeking to block tracing and thereby nullify Section 11. This should be unacceptable. If permitted, this tactic could bar Section 11 actions in both the initial public offering and seasoned offering contexts, thereby effectively precluding Section 11 litigation across the board.

Nonetheless, we do not challenge the legitimacy of the tracing requirement and believe that Judge Henry Friendly was correct in *Barnes v. Osofsky* [3] in holding that Section 11 should apply only to the shares registered under the registration statement. In effect, we agree with Judge Friendly, but believe his approach needs to be updated in light of technological progress that can make tracing feasible and cost-efficient.

[3] 373 F.2d 269 (2d Cir. 1967) (finding that the term "such security" in Section 11(a) of the Securities Act of 1933 meant securities registered under the statute and not all shares trading in the market). Judge Friendly's analysis had the impact of reducing the damages potentially available under Section 11, which otherwise might have been very high in some cases. Of course, standing is also available to those who purchased directly in the offering. *In re Century Alum. Co. Sec. Litig.,* 729 F.3d 1104, 1106 (9th Cir. 2013).

Nor do we argue that a statistical estimate of the likelihood that shares sold by plaintiffs were registered is an adequate substitute for proving actual tracing. Rather, we much more modestly assert that, as Petitioner's own **\*5** expert acknowledged in parallel litigation, [4] it is possible to use accounting methods like first in-first out (FIFO) or last in-first out (LIFO) to identify in discovery the chain of title by which securities flow from one account to another. The best answer is to enable tracing (not assume its impossibility) through a modern procedure reflective of the technology available today.

[4] Declaration of Dr. Jonathan A. Brogaard, Exhibit J To Declaration of Matthew S. Kahn Iso Defendants' Opposition To Plaintiffs' Motion for Class Certification - Public Redacted Version, In re Slack Technologies Inc. Shareholder Litigation, at \*21, Lead Case No. 19-Civ-05370 (Ca. Sup. Ct., Jan. 18, 2022) ("Thus, while it may be theoretically possible to trace a single putative class member's purchases of Slack Stock to a seller who held the shares prior to the Direct Listing, as a practical matter, it would be a time-intensive and complex process to attempt to perform this tracing exercise for all putative class members ...."). As we explain *infra,* we believe this task is less time-intensive and complex than Dr. Brogaard suggests, especially with the emergence of the Consolidated Audit Trail.

Given the attempts by some to expand the tracing requirement so that it can block all Section 11 actions (as discussed below), we particularly fear that any decision in this case that uses the traditional, outdated language of tracing (or assumes its impossibility) will incentivize practices that deliberately seek to "commingle" some modest amount of unregistered securities with a much larger pool of registered securities in order to contaminate that larger pool. This approach, if tolerated, could bar standing across the board and imply the death of Section 11 litigation. Such an outcome would result in a significant loss in investor protection.

**\*6** Accordingly, if this Court is dissatisfied with the decision of the Ninth Circuit below, it still would be premature and ill-advised to simply overturn that decision and order dismissal. Given the prevailing confusion over the feasibility of tracing, the better and traditional rule would be to remand the case to give plaintiffs an opportunity to demonstrate that they can trace the actual passage of the securities, using existing records, time-dated tracing, and conventional accounting rules. Such a showing should not only enable respondents to demonstrate their own standing as the holders of registered shares, but also would chart a clear path for securities litigation for the future. Any other outcome will preserve a myth that invites exploitation and will eventually embarrass courts in the future.

Ultimately, if a standing issue can be simply resolved (and not cynically exploited), it benefits all to resolve it efficiently so that the parties can proceed at low cost to the real merits of the case.

**ARGUMENT**

**A. It is straightforward to trace purchases of securities in the secondary market using account-level data on transaction times and an accounting method such as first-in-first-out (FIFO) or last-in-first-out (LIFO).**

The decades-old folk wisdom is that tracing securities to a newly issued registration statement is "often impossible" because "most trading is done through brokers who neither know nor care whether they are getting newly registered or old shares," and "many brokerage houses do **\*7** not identify specific shares with particular accounts but instead treat the account as having an undivided interest in the house's position." *In re Century Aluminum Co. Sec. Litig.,* 729 F.3d 1104, 1107 (9th Cir. 2013); *see also Barnes v. Osofsky,* 373 F.2d 269, 271-72 (2d Cir.1967); Grundfest Amicus at \* 7 ("[W]hen the lock-up expires and exempt shares legally enter the market, all subsequent purchasers lose Section 11 standing because no purchaser can then trace her shares to the allegedly defective registration statement"). [5]

[5]    We have considerable respect for Professor Grundfest, but his article - published in 2015 - appears to misunderstand the capabilities of modern-day computing technology to analyze electronic brokerage records. *See* Grundfest Amicus at \*1 n. 2 (citing Joseph A. Grundfest, *Morrison, the Restricted Scope of Securities Act Section 11 Liability, and Prospects for Regulatory Reform,* 41 J. CORP. L. 1 (2015)). Not only have technological advances over the past decade been substantial, but FINRA Electronic Blue Sheets and, most importantly, the Consolidated Audit Trail (which did not exist at the time his article was published), provide a *centralized* repository for these data as we explain *infra.*

These pronouncements were, at one time, reasonable. But today they rest on antiquated assumptions. Modern computing power makes it technologically feasible to trace the purchase of securities to an allegedly misleading registration statement. Broker-dealers, exchanges and FINRA are required by law to maintain detailed, time-stamped transactional records which can be obtained through discovery. *See, e.g.,* 17 CFR § 240.17a-3(a)(6) (requiring broker-dealers to maintain detailed records on individual orders including "the time the order was received, the time of entry, the price at which executed, **\*8** the identity of each associated person, if any, responsible for the account… and, to the extent feasible, the time of execution or cancellation"). These records show exactly when securities in one account are transferred to another account, whether within the same broker-dealer or between different broker-dealers. Moreover, today all these records are contained in a central repository known as the Consolidated Audit Trail (CAT), such that there is no need for plaintiffs to subpoena individual broker-dealers. [6] This makes it possible to reconstruct a reliable "chain of title," *Century Aluminum,* 729 F.3d at 1106, using standard accounting methods like first in-first out (FIFO) or last-in-first out (LIFO).

[6]    Information in the CAT, which includes customer identifying information, is discoverable. *See* Joint Industry Plan; Order Approving the National Market System Plan Governing the Consolidated Audit Trail, Rel. No. 34-79318, Nov. 15, 2016, https:// ww.sec.gov/rules/sro/nms/2016/34-79318.pdf ("[T]he CAT NMS Plan provides that the confidentiality provision does not restrict disclosures required by:… an order, subpoena or legal process;"). Similar records are also collected by FINRA in a form known as the Electronic Blue Sheets, which are also subject to subpoena.

While this analysis might seem complex at first glance, it is no more than a straightforward accounting calculation. Consider a simple example. Suppose A receives 100 unregistered shares on Monday and 100 registered shares on Tuesday. [7] On Wednesday, A sells 100 shares to **\*9** B. On Thursday, B sells 100 shares to C. Applying a "first in-first out" (FIFO) accounting method, we can conclude that on Wednesday, A sold 100 unregistered shares to B, who sold them to C on Thursday. On Friday, A holds 100 registered shares and C holds 100 unregistered shares.

[7]    This generic example encompasses the facts of the matter before the Court. For example, suppose A receives 100 shares on June 19, 2018 and 100 shares on June 21, 2018, both subject to the one-year holding period under Rule 144. On June 19, 2019, the holding period for the shares awarded on June 19, 2018 expires and these unregistered shares are free to trade. These shares remain unregistered the next day, June 20, 2019, the date of Slack's direct listing. By contrast, the 100

shares awarded on June 21, 2018 are still within the one-year holding period as of June 20, 2019, and thus are registered under the registration statement. We can thus conclude that as of June 20, 2019, the date of Slack's direct listing, A received 100 unregistered shares followed by 100 registered shares. As an aside, while issuing separate CUSIPs for registered and unregistered shares may be technically feasible in some situations, it presents certain practical difficulties, and it is not necessary to engage in tracing.

This reasoning applies within the same trading day as well. Suppose A receives 100 unregistered shares on Monday and 100 registered shares on Tuesday. On Wednesday at 10:00:01.578913971 (i.e., 10:00am, 1 second and 578913971 nanoseconds), A sells 100 shares to B. On Wednesday at 10:00:01.593210046 (i.e., 10:00am, 1 second and 593210046 nanoseconds), A sells 100 shares to C. Applying the FIFO accounting method leads to the conclusion that on Wednesday at 10:00:02, B owns 100 unregistered shares and C owns 100 registered shares.

In parallel litigation in state court, Petitioner's expert acknowledged that it is possible to trace shares by employing "an allocation rule (such as last-in first-out ("LIFO") or first-in first-out ("FIFO")) to choose a tracing path for [each] seller's shares."[8] Petitioner's expert **\*10** identified the sort of data which would be required to conduct this analysis, conceding that it is "theoretically possible" if the data were obtained from individual broker-dealers[9] (a task that is, in fact, no longer necessary because these records are discoverable from the Consolidated Audit Trail).[10]

[8]     *See* Brogaard, *supra* note 3, at \*16. In his report, Dr. Brogaard acknowledges that it is "theoretically possible to trace a single putative class member's purchases of Slack Stock to a seller who held the shares prior to the Direct Listing" but suggests that tracing is a complicated task which could "potentially involve" a large number of broker-dealers. *Id.* at \*21. Dr. Brogaard's report does not mention FINRA Electronic Blue Sheets the Consolidated Audit Trail, which as discussed, constitute a centralized repository of this information. *See supra* note 5 and accompanying text.

[9]     *See id.* at \*21 (conceding that "it may be theoretically possible to trace a single putative class member's purchases of Slack Stock to a seller who held the shares prior to the Direct Listing" while asserting that "as a practical matter, it would be a time-intensive and complex process to attempt to perform this tracing exercise for all putative class members").

[10]    *See supra* note 5 and accompanying text.

To be sure, it is computationally demanding to perform this analysis across tens or hundreds of millions of purchases at nanosecond intervals. But computing power and algorithmic sophistication have come a long way since the 1960s and 1970s when courts concluded that it is "impossible" to trace the purchase and sale of securities in this manner. As technology evolves, so should the law. Certainly, developments with offerings and its regulations have changed dramatically from the earlier paper-based process; our counsel here is that the forensics for stabling an investor's claim involving "such security" is equally amendable to deciding if the security is "such security" without doing violence to Congress' intent.

### *11  B. Accounting methods are ubiquitously employed in the law to trace the transfer of assets through commingled accounts.

Using accounting methods to trace assets transferred through commingled accounts is commonplace. In trust law, a beneficiary may enforce a constructive trust on a wrongful transfer of trust assets, tracing the property through successive transfers among commingled accounts. Restatement (Second) of Trusts § 202 cmt. j (1959). Similarly, it is well-settled law that the holder of a security interest is entitled to trace property transferred through commingled bank accounts: "If proceeds of collateral could be traced into a bank account, such proceeds would be deemed identifiable, and subject to the security interest." *Brown & Williamson Tobacco Corp. v. First Nat. Bank of Blue Island,* 504 F.2d 998, 1002 (7th Cir. 1974).

In criminal forfeiture, courts routinely apply accounting methods to trace the proceeds of illegal activity among fungible, commingled assets. To take one example, the U.S. Court of Appeals for the Second Circuit rejected a claim that the "fungibility

of money makes it impossible to consider any portion of the depositor's credit balance to be "traceable proceeds" because the credit balance does not represent just the proceeds of drug sales but is instead the net result of various deposits and withdrawals." Rather, "the Government is correct in its view that it can establish a prima facie case for forfeiture in the context of bank accounts by relying on either the "drugs-in, last-out" approach or the "drugs-in, first-out" approach." *U.S. v. Banco Cafetero Panama,* 797 F.2d 1154, 1159 (2d Cir. 1986). Similar principles are applied by courts in community property states in divorce proceedings when tracing the transfer of assets through commingled joint **\*12** accounts. *See, e.g.,* California Community Property Law § 6:22 (2022 ed.).

Accounting methods like first in-first out (FIFO) are not only ubiquitous in the law but are routinely employed by broker-dealers to determine share ownership for purposes of tax liability, allocating options exercise notices and closing out positions under Regulation SHO. "As a general rule, when taxpayers hold multiple lots or shares of identical stock, they must compute their gains or losses against the basis of those shares actually sold, not the shares the taxpayer intended to sell.... Under the regulations, by default, taxpayers owning blocks of identical stock acquired on different dates or for different prices determine their stock's basis by using the FIFO method." *Turan v. Comm'r of Internal Revenue,* 114 T.C.M. (CCH) 65, 2 (T.C. 2017) (quoting *Davidson v. Comm'r,* 305 U.S. 44, 46 (1938)). [11]

[11] Consistent with this rule, most broker-dealers adopt FIFO by default. *See, e.g.,* Interactive Brokers, Tax Information and Reporting, https://www.interactivebrokers.com/en/support/ tax-us-forms.php Transactions are paired (sells matched with buys) according to the tax basis declaration method selected in Account Management or Client Portal at time of sale, or using the IBKR Tax Optimizer lot selection designated at the time of the trade. FIFO is the default methodology.")

When allocating options exercise notices to short options positions, brokers are generally free to choose an accounting method they prefer (first in-first out or otherwise); moreover, that choice is binding and can only be changed with FINRA's approval. [12] Under Rule 203(b) **\*13** (3) of Regulation SHO, broker-dealers are required to close out any fail to deliver position in a threshold security that has remained open for 13 consecutive settlement days by purchasing a security of like kind and quantity. To determine the age of a position, the SEC has required that broker-dealers employ a modified form of last in-first out (LIFO). [13]

[12] FINRA Regulatory Notice 11-35, https://www.finra.org/ sites/default/files/NoticeDocument/p!24062.pdf ("FINRA Rule 2360(b)(23)(C) requires member firms conducting transactions in exchange-listed options to establish fixed procedures for allocating options exercise notices to short options positions in its customer accounts. Firms may elect to allocate exercise assignment notices on: (1) a "first in-first out" basis (FIFO); (2) a random selection basis, as described in Attachment B of this Notice; or (3) another equally random selection basis determined by the firm. However, firms must receive prior FINRA approval for the method selected. Any changes to a firm's allocation method must be reported to and approved by FINRA.").

[13] See, e.g., Willkie Farr & Gallagher, The Modified LIFO Method: SEC Staff Interprets Rule 203(b)(3) of Regulation SHO Regarding Aging Failures to Deliver, New Frequently Asked Question 5.8 (April 2006), https://www.willkie.com/-/media/ files/publications/2006/04/the-modified-lifo-method-sec-staff-interprets-ru_____/files/modifiedlifomethodpdf/ fileattachment/modified_lifo_method.pdf; SEC, Division of Market Regulation, Responses to Frequently Asked Questions Concerning Regulation SHO, Question 6.8, https://www.sec.gov/divisions/marketreg/ mrfaqregshol204.htm.

Accounting methods are similarly employed in securities class actions to determine which plaintiff "has the largest financial interest in the relief sought by the class" as required by the Private Securities Litigation Reform Act (PSLRA). 15 U.S.C. § 78u-4(a)(3)(B)(iii)(l) (bb). *See, e.g., Rauch v. Vale S.A.,* 378 F. Supp. 3d 198,208 (E.D.N.Y. 2019) (applying LIFO to PSLRA lead plaintiff **\*14** calculation); *In re eSpeed, Inc. Sec. Litig.,* 232 F.R.D. 95, 101 (S.D.N.Y. 2005) (LIFO preferred to FIFO); *Bodri v. Gopro, Inc.,* No. 16-CV-00232, 2016 WL 1718217, at *3 (N.D. Cal. Apr. 28, 2016); *Nicolow v. Hewlett Packard Co.,* No. 12-05980 CRB, 2013 WL 792642, at *4 (N.D. Cal. Mar. 4, 2013) ("The weight of authority puts the most emphasis on the competing movants' estimated losses, using a "last in, first out ("LIFO") methodology."). FIFO and LIFO are also employed at

the settlement and post-trial stage of securities cases for calculating damages. *See, e.g., In re Vivendi Universal, S.A. Sec. Litig.,* 284 F.R.D. 144, 160 (S.D.N.Y. 2012) ("damages will be computed using LIFO"); *Jaffe Pension Plan v. Household Int'l, Inc.,* 756 F. Supp. 2d'928, 938 (N.D. Ill. 2010) (applying FIFO to calculate damages).

Moreover, at least one lower court recently applied such accounting methods to trace the ownership of securities to a registration statement when adjudicating a Section 11 claim. In *In re Lendingclub Sec. Litig.,* the U. S. District Court for the Northern District of California applied the last in-first out (LIFO) accounting method to trace a plaintiff's retention of securities purchased under an allegedly misleading registration statement. 282 F. Supp. 3d 1171, 1180 (N.D. Cal. 2017). In *Lendingclub,* the shares at issue were purchased by the plaintiff in an initial public offering (IPO) but commingled with other shares in its account which came into the market after the IPO. The court nonetheless applied LIFO to conclude that the plaintiff retained shares issued under the IPO at the time the suit was filed and thereby established Section 11 standing.

### *15  C. Accounting methods like FIFO and LIFO do not amount to "statistical tracing" nor do they involve probabilistic reasoning.

If the volume of shares issued pursuant to an allegedly misleading registration statement is high relative to those which were not, the probability that any given plaintiff purchased the former may be very high. Some courts have found that a probability alone suffices to establish Section 11 standing. *See, e.g., In re Snap Inc. Sec. Litig.,* 334 F.R.D. 209, 224 (C.D. Cal. 2019) (standing established when 99.95% of shares were issued in the IPO); *Sudunagunta v. NantKwest, Inc.,* No. CV-16-1947, 2018 WL 3917865 (C.D. Cal. Aug. 13, 2018) (standing established when 98% of shares were issued pursuant to an initial public offering).

The U.S. Court of Appeals for the Fifth Circuit, however, found that the problem with "statistical tracing" is that if that probability is high enough for any given plaintiff, then logically it must be high enough for *all plaintiffs:* "Because any share of pcOrder.com stock chosen at random in the aftermarket has at least a 90% chance of being tainted … every aftermarket purchaser would have standing for every share, despite the language of Section 11, limiting suit to any person acquiring such security." *Krim v. pcOrder.com, Inc.,* 402 F.3d 489, 496-97 (5th Cir. 2005). [14]  This reasoning has caused certain courts **\*16** to reject "statistical tracing" arguments when evaluating a plaintiffs claim to Section 11 standing. *See, e.g., In re Quarterdeck Office Sys. Sec. Litig.,* No. CV-92-3970, 1993 WL 623310 (C.D. Cal. Sept. 30, 1993) (rejecting statistical tracing even when 97% of shares were issued pursuant to an initial public offering); *Abbey v. Computer Memories,* Inc., 634 F. Supp. 870, 874 (N.D. Cal. 1986). Regardless, we are not advocating for statistical tracing, but instead for tracing in fact.

[14]     The *Krim* court pointed to the so-called ecological fallacy as an example of the problem with statistical tracing: "Taking a United States resident at random, there is a 99.83% chance that she will be from somewhere other than Wyoming. Does this high statistical likelihood alone, assuming for whatever reason there is no other information available, mean that she can avail herself of diversity jurisdiction in a suit against a Wyoming resident? Surely not." Krim, 402 F.3d at 497. To reiterate, accounting methods do not make inferences regarding specific purchases from statistics about the population as a whole - rather, accounting methods identify who holds each share at each point in time.

Accounting methods like FIFO and LIFO do not amount to "statistical tracing" nor do they involve probabilistic reasoning. They do not make inferences regarding specific purchases from statistics about the population as a whole - rather, accounting methods identify who holds each share at each point in time. As the preceding examples illustrate, and as is widely accepted in numerous other areas of law, the application of an accounting method yields a single conclusion regarding who owns "such security" at each point in time, including at the time that the suit is filed. And contrary to statistical tracing, it is not the case that "every aftermarket purchaser would have standing for every share." Rather, only those who purchased "such security" in the aftermarket which was issued pursuant to the registration statement would have standing, as determined by a deterministic tracing analysis.

**\*17  D. The tracing requirement is being deliberately manipulated through the tactic**
**of commingling registered and unregistered shares in order to hide their lineage.**

Under Petitioners' view of the law, not only direct listings but also initial public offerings and secondary offerings can be structured so as to eliminate all shareholders' rights under Section 11. Experienced and able practitioners have recently urged clients to employ various techniques by which commingling can be extended to cancel Section 11, even in the context of an initial public offering. Ironically, one of the most vocal proponents of such a technique serves as Counsel of Record for amici The Honorable Jay Clayton and The Honorable Joseph Grundfest in this action. In 2015 (well before this case was in view), he published an article in the *Harvard Law Forum on Corporate Governance* that explained how "a minor change to the customary lock-up agreement" could "prevent Section 11 strike-suiters from tracing their shares to the IPO."[15] Although acknowledging that the conventional wisdom was that shares registered in an IPO could be traced back to the registration statement because there were at that point no other shares available in the market, he showed that lock-up procedures could be easily redesigned to ensure that unregistered shares were always in the market.

[15]     See Boris Feldman, *A Modest Strategy for Combatting Frivolous IPO Lawsuits,* HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE, March 13, 2015.

Specifically, because the standard lock-up agreement used by underwriters in IPOs precluded sales of the issuer's stock by its management, board, employees, and  **\*18**  associated venture capital firms "usually, until 180 days after the IPO,"[16] one only had to shorten this period to eclipse Section 11. As the article states, "Absent the lock-up, an employee could sell her shares, pursuant to Rule 144, into the market as the IPO had gone effective (provided she held those shares for one year)."[17]

[16]     *Id*. at p.2

[17]     *Id.*

Accordingly, this article recommends that underwriters shorten or eliminate the lock-up agreement for lower ranking employees - with the result that, as of the time of the IPO, both registered and unregistered shares would be contemporaneously offered in the market, thereby in its view denying the ability of the buyers of the registered shares to trace them to the registration statement. Thus, even in the case of immediate trading in the after-market of an IPO, access to Section 11 would also be denied.

This article does not stand alone, and others have advanced similar proposals.[18] Creative minds can probably design many other variations on this theme.[19] To the extent that Petitioners' position in this case is upheld, namely, that the sale of shares from a pool or common  **\*19**  fund which contains both registered and unregistered shares requires (without further inquiry) that a suit based on Section 11 be dismissed for failure to satisfy the tracing requirement, the position advocated by these commentators also becomes correct; they are only carrying Petitioners' position to the next logical step. But the result is to enable underwriters and broker-dealers to insulate themselves from liability by nullifying Section 11 in *all cases,* both in IPOs and seasoned offerings.

[18]     For a later similar article, also written by attorneys at Wilson Sonsini Goodrich and Rosati (a firm known for its expertise in IPOs), see Nicki Locker and Laurie Smilan, *Carving Out IPO Protections,* HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE (February 25, 2020).

[19]     Rule 144 is not exclusive, and other attempts to permit non-affiliates of the issuer to sell their unregistered shares immediately with the IPO could be designed to fit under the exemption afforded by Section 4(a)(1) of the Securities Act.

Given that respected securities litigators and one of the leading firms specializing in public offerings are publicly recommending this course of action to their clients, we expect that a number of issuers have already taken their recommendation. Predictably, those cases will come next.

The loss in terms of investor protection is deeply concerning. Congress clearly intended Section 11 to be a principal protector of the market's integrity and to permit secondary market investors to use it. As Professors Loss, Seligman and Parades observe in their two volume study:

> It is in its assault on privity that §11 marks its greatest departure from precedent. In the first place, §11… permits the underlying investor to sue both the issuer and the underwriter notwithstanding a chain of title from issuer to underwriter to dealer to investor, and gives the same right of action even to a buyer in the open market, all without the plaintiff's proving that the misrepresentation was addressed to or intended to influence him or her. [20]

[20] See Louis Loss, Joel Seligman and Troy Parades, FUNDAMENTALS OF SECURITIES REGULATION (7th ed. 2018) at 1795.

**\*20** Congress clearly intended that Section 11 reach registered shares, even in the hands of subsequent holders. However, if Petitioners succeed in this case, the above statement will likely have to be deleted from future editions of the Loss, Seligman and Parades treatise.

The common denominator in efforts to restrict or nullify Section 11 is a *deliberate* attempt to create a common pool or fund containing both registered and unregistered securities, so that the latter securities contaminate the former and deny shareholders the ability to trace their securities back to the registration statement.

To defeat these efforts, we do not argue that this Court should change the law or reverse precedents. All that is needed is that plaintiffs should be given a feasible opportunity to prove tracing and not be stopped by the claim that because some unregistered shares were in the same fund or pool, proof of tracing is impossible. The answer to these problems is simply to make clear that tracing is possible, using standard accounting methods like FIFO or LIFO, and not adopt a per se rule of exclusion. At the moment, Section 11, long the special deterrent that caused corporate defendants to conduct elaborate due diligence in public offerings, is now in jeopardy of becoming irrelevant.

### E. The Court should remand to allow the plaintiffs to obtain evidence of tracing through reasonable discovery.

Lower courts, including the district court here, have often held that, as a matter of law, tracing after unregistered shares have been distributed into the market is "virtually impossible." *Pirani v. Slack Techs., Inc.,* 445 F. Supp. 3d 367, 379 (N.D. Cal. 2020), *aff'd,* **\*21** 13 F.4th 940 (9th Cir. 2021) (quoting *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. 65, 118 (S.D.N.Y., 2004)).'But as we have explained, this legal conclusion rests on erroneous, antiquated assumptions - in fact, blindness to the facts which as discussed earlier show that with timestamped records, tracing is possible and reliable. It would be undesirably premature to dismiss this case without giving the plaintiffs the opportunity to demonstrate that they can satisfy the "tracing" requirement under Section 11 of the Securities Act and thereby demonstrate their standing to sue. [21]

[21] We take no position on whether discovery for purposes of tracing may constitute a permissible form of jurisdictional discovery exempt from the restrictions under the Private Securities Litigation Reform Act. Some courts have allowed

such discovery, notwithstanding the prohibition on discovery prior to resolution of a motion to dismiss under 15 U.S.C. § 78u-4(b)(3)(B). *See, e.g., Tracinda Corp. v. Daimlerchrysler AG,* 197 F. Supp. 2d 86, 94 (D. Del. 2002); *Cent. States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.,* 230 F.3d 934, 946 (7th Cir. 2000), *cert. denied,* 532 U.S. 943, 121 S.Ct. 1406, 149 L.Ed.2d 348 (2001); *In re Baan Co. Sec. Litig.,* 81 F.Supp.2d 75, 76-77 (D.D.C. 2000); *Hansen v. Neumueller GmbH,* 163 F.R.D. 471, 475-476 (D.Del. 1995)).

Moreover, tracing purchases using accounting methods is not, as some lower courts have suggested, "a necessarily individualized inquiry." *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. 65, 118 (S.D.N.Y. 2004), *vacated and remanded sub nom. In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24 (2d Cir. 2006). Rather, a tracing analysis can be performed for the entire class at once, over the entire Class Period. Indeed, with timestamped records, tracing not only can occur on a Class-wide basis utilizing a single methodology, but the end result will yield a single, deterministic conclusion **\*22** regarding who owns "such security" at each point in time up until the moment the suit is filed. Notwithstanding the apparent complexity of this analysis, it is straightforward to perform using modern computing technology. Once sufficient data have been obtained in discovery to conduct the tracing analysis, no further individualized inquiry is necessary to determine whether a given individual holds "such security" issued pursuant to the allegedly misleading registration statement.

In recent cases involving securities litigation, this Court has ruled that when the lower court has not considered the critical issue or applied the "right standard," the better approach is to remand and not dismiss. For example, in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,* this Court ruled, after finding the wrong standard to have been applied: "We therefore follow our ordinary practice of remanding for a determination of whether the [plaintiffs] have stated a viable omissions claim (or, if not, whether they should have a chance to replead)." 575 U.S. 175,195 (2015),

Because the courts below understood tracing to be impossible, this case should be remanded in order to permit plaintiffs to trace their shares. [22] Such a showing will not **\*23** only enable them to demonstrate their own standing, but can chart a well-marked path for securities litigation under Section 11 to follow in the future. Ultimately all will benefit if standing issues can be simply resolved, and the parties can then proceed to the real merits of the case.

[22]    In fact, it is unclear whether *any* unregistered shares were sold in Slack's direct listing. Defendant's expert in parallel litigation identified only 500,000 unregistered shares sold at 12:08pm on June 20, 2019 - well after the Opening Auction and an infinitesimal fraction of the 165 million unregistered shares eligible for sale. Brogaard, *supra* note 3, at \*29. If there is no evidence that unregistered shares were actually commingled with registered shares at the time of the Direct Listing, it is even more likely that plaintiffs acquired registered shares when purchasing on that date. This distinct possibility is another reason to remand.

## CONCLUSION

As this is a case that could effectively curtail or even nullify Section 11 and also one that would incentivize broker-dealers and others to commingle securities to ensure that Section 11 could not be asserted, we urge this Court to remand this case to enable plaintiffs to show that tracing is feasible in this and other cases. The myth of tracing impossibility should not be perpetuated based on antiquated facts and assumptions.

Respectfully Submitted,

JOHN C. COFFEE, JR.

JOSHUA MITTS

COLUMBIA LAW SCHOOL

435 West 116th Street

New York, NY 10027

IRA A. SCHOCHET

LABATON SUCHAROW LLP

140 Broadway

New York, NY 10005

LAURA POSNER

*Counsel of Record*

COHEN MILSTEIN SELLERS &

TOLL PLLC

88 Pine Street, 14th floor

New York, NY 10005

(212) 838-7797

lposner@cohenmilstein.com

CAROL V. GILDEN

COHEN MILSTEIN SELLERS &

TOLL PLLC

190 S. La Salle Street,

Suite 1705

Chicago, IL 60603

*Counsel for Amici Curiae*

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.