# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


-------------------------------x

IN RE:

TALIS BIOMEDICAL

SECURITIES LITIGATION


Case No. 3:22-cv-00105-SI

CLASS ACTION

-------------------------------x

THIS DOCUMENT RELATES TO:

ALL ACTIONS

-------------------------------x


        VIDEOTAPE DEPOSITION OF

             JACK WIENER

      VIA ZOOM VIDEOCONFERENCE

          February 5, 2024

             12:35 p.m.

JACK WIENER

those people who I've mentioned.

Q.    Okay. And which individuals did you communicate with in forming opinions about how clearance and settlement work?

A.    Bill Dentzer and Bill Jaenike.

Q.    And who are they?

A.    The former CEOs of DTC.

Q.    Okay. And when did you communicate with them?

A.    Probably around three years ago, most recently.

Q.    And those communications contributed to your opinions in this report?

A.    Well, I just confirmed my opinions. They didn't contribute beyond that.

Q.    Okay. And what exactly did they confirm?

A.    The nature of the holding of securities by DTC.

Q.    Did you ask Mr. Dentzer or Mr. Jaenike about tracing?

JACK WIENER

A.    I don't recall.

Q.    You don't recall either way?

A.    Right.

Q.    Any other communications that you think contributed to your opinions?

A.    Karl Urist.

Q.    Can you spell that?

A.    Karl Urist, U-r-i-s-t.

Q.    E-u-r-i-s-t?

A.    No, Karl, K-a-r-l, Urist, U-r-i-s-t.

Q.    And who is Karl Urist?

A.    He was my fellow deputy general counsel at DTC.

Q.    And what communications did you have with him relevant to your opinions in this report?

A.    I just think we discussed the general -- probably, I believe we discussed the general nature of the holding of securities at DTC.

Q.    Did you discuss tracing?

A.    I don't recall us discussing tracing, per se.

JACK WIENER

the United States, which differs from how tracing works and the holding of securities works in various other jurisdictions worldwide.

Q.    Okay. So you mentioned that you were describing to them how tracing works.

Did they provide any information to you about how tracing works in the United States?

A.    No. I was the expert providing it to them, but we didn't discuss it in detail.

Q.    Changing topics, do you have a Ph.D.?

A.    No. I point you to my CV, you'll note that there is no mention of a Ph.D. there.

Q.    Okay. And do you have a master's degree?

A.    Same answer.

Q.    Do you have any formal academic training in economics or finance?

JACK WIENER

MS. LAGOY:  Object to form.

Q.    You can answer.

A.    Yes.

Q.    And what training is that?

A.    I studied economics in university.

Q.    You have a degree in economics?

A.    No. You asked if I have any formal training in economics and the answer is yes.

Q.    Okay. And what does your study of economics in university consist of?

A.    Taking an economics course.

Q.    One or more than one?

A.    One that was wholly focused on economics.

Q.    And that was when you were an undergraduate?

A.    Correct.

Q.    Okay. Have you authored any publications in the last ten years?

A.    No.

Q.    Have you authored any

JACK WIENER

publication at any point?

A.    No academic publications.

Q.    Are there other publications that you've authored?

A.    I authored all manner of DTC publications in terms of published rule applications, in terms of service guides, in terms of operational arrangements, in terms of letters of representation, in terms of exhibits thereto, as well as publications on such diverse subjects as credit rating agencies in the world of finance and on Rule 144A for SIFMA, but those were, to be clear, those were publications of the companies for which I worked.

Q.    Okay. And all that happened with respect to DTC in 2005 or earlier, correct?

A.    No.

Q.    When was the last time you published something for DTC?

A.    Oh, I don't know, I would imagine 2005.

JACK WIENER

A.     No.

Q.     Okay. Do you consider yourself to be an economist?

A.     No.

MS. LAGOY:  Objection, vague.

Q.     Okay. Are you currently admitted to the bar of any state?

A.     Yes.

Q.     Which states?

A.     New York.

Q.     Any others?

A.     I don't remember the status, whether I've kept up my bar status or not, but I've been admitted to -- as well my first admission was to the bar in Pennsylvania, I started my career there, and concurrently with coming to New York, I believe, so that would have been 15 years ago or so, I obtained admission to the DC bar.

Q.     Are you currently a member of the DC bar?

A.     As I just said, I don't recall.

JACK WIENER

Q.    You haven't worked at DTC for almost 20 years at this point, correct?

A.    Yes.

Q.    Do you currently have access to DTC's internal systems?

MS. LAGOY:  Objection, vague.

A.    What do you mean by that?

Q.    Can you go into DTC's electronic systems and look at their data today?

A.    Not without going through a DTC employee.

Q.    Okay. So in other words, the same level of access as me?

MS. LAGOY:  Objection, form, argumentative.

A.    I don't know what level of access you have at home.

Q.    Can you call up DTC and get them to send you daily participant activity reports today?

A.    If I do so on behalf of a client who has those rights, I can.

Q.    Okay. But setting aside a

JACK WIENER

records in this case?

A.    I don't know offhand if it was publicly filed or not.  But the records of moment here are the DTC records that involve information, that's some of the information that's not publicly available otherwise is the declaration of Ann Marie Bria.

Q.    Other than the declaration of Ann Marie Bria, you didn't review any DTC records or data in this case, correct?

MS. LAGOY:  Object to form.

A.    I would have to go back and look at my list of documents referred to. But other than anything listed there, unless there's something listed there, the answer is no, I haven't.

Q.    Okay. And you didn't speak to Ms. Bria in connection with this case, correct?

A.    That's correct.

Q.    Did you review any FINRA records in connection with this case?

MS. LAGOY:  Object to form.

JACK WIENER

A.    The only records that I reviewed are those that I indicated in my report. And to the extent I didn't indicate that I reviewed any FINRA records, then I did not.

Q.    Are you able to answer the question without looking at your report?

A.    I don't recall any, but I think you don't want me -- I'm sure you don't want me to engage in a memory test. You know there were thousands of pages of documents that I reviewed, so I'll stand on my answer.

Q.    Did you review any broker-dealer records in forming your opinions in this case?

MS. LAGOY:  Object to form.

A.    It's the same answer.

Q.    Did you speak to anyone from FINRA in connection with this case?

A.    I did not.

Q.    What about broker-dealers?

MS. LAGOY:  Object to form.

A.    I did not.

JACK WIENER

preceded that started on line 17.

The answer to the question if we were to marry the two questions together; have you ever worked as a plaintiff in a private securities class action in which you offered an opinion that an investor could trace her shares to a registration statement in a litigation, my answer would be no and it would still be no.

Q.    Does the transcript say what you just read?

A.    Could you clarify --

Q.    On page 133, line 14 of the transcript of your deposition in the Evoqua Water case, did you say that the two questions should be married together?

A.    No. This is a simple matter, we all went to law school here, this is a simple matter of you having cut out the context and me providing the context so that my answer there could be understood in that context.

Q.    Okay. You've never been

JACK WIENER

qualified as an expert by any Federal Court, correct?

MS. LAGOY:  Object to form.

A.    I don't know offhand.   I haven't testified -- though I've testified at trials and at arbitrations, I haven't testified in any Federal case.

Q.    So the answer is no, you've never been qualified as an expert by any Federal Court, correct?

A.    I don't recall because sometimes -- I don't know if prior to actually testifying in court -- I know I've been submitted as an expert in a number of Federal cases, and I know I've never been disqualified as an expert, but I don't recall offhand whether there was any actual assertion that I was an expert, if that is helpful.

Q.    Do you know what it means to be qualified as an expert?

A.    Yes.

Q.    What does that mean?

A.    It means that a court says

JACK WIENER

that the individual in question may testify as an expert in the case before the court.

Q.    If you look at the transcript of your deposition that's in front of you, page 132, line 21, the question asked:  "It's true that you've never been qualified as an exert in any Federal Court, correct?" And your answer, page 33 line 6 was "Yes".

A.    Okay.

Q.    Was that true?

A.    Well, I'm sure at the time what I was saying was true.

Q.    And it's still true today?

A.    I think that I've answered that, haven't I?

Q.    I'm looking for a yes or no.

MS. LAGOY:  Objection, asked and answered.

Q.    Is it your testimony that any Federal Court has qualified you as an expert since March of 2021?

MS. LAGOY:  Objection, asked

JACK WIENER

and answered.

Q.    You can answer.

A.    I believe I've already answered you, Evan.

Q.    You said something about you don't think a court has disqualified you. I'm asking about whether you have been affirmatively qualified as an expert by any Federal Court.

Is there some problem that's preventing you from answering that question with a yes or no?

MS. LAGOY:  Objection, asked and answered, argumentative.

A.    I think the only problem is you're not listening to my answer, you're not happy with it, so you keep on asking it but I've already answered.

Q.    Why don't you give a clear answer again?  Because the only question that you answered was whether you've been disqualified, which is not what I asked.

MS. LAGOY:  Objection, misstates prior testimony, asked

JACK WIENER

and answered, argumentative.

A.    Evan, you know that's untrue. You know that I said not only that I've never been disqualified, but that I'm unaware of any time that there was a submission made to qualify me that has been -- that has been reacted to negatively by a court, but I also indicated that I've never testified in a Federal trial, just in arbitrations and in matters other than U.S. Federal trials.

Q.    Has any Federal Court ever found your opinions to be reliable?

MS. LAGOY:   Object to form.

A.    I did represent the Department of Justice in a matter 15 to 20 years ago in which I gave an expert report on behalf of the Department of Justice relating to clearance and settlement of securities in the United States through the DTC system, and it was a long time ago, but I believe that that report was accepted by the court, but I did not

JACK WIENER

testify in that trial.

Q.    When you say you believe the report was accepted by the court, are you aware of a judicial decision or an order saying that your opinions were reliable in that case?

A.    I can't remember with specificity.

Q.    Okay. And was that case about Section 11 tracing?

A.    No, that case was about how clearance and settlement of securities in the United States works, specifically the nature of how DTC holds securities, which was relevant because it was a cross-border transaction that was involved and the manner in which securities were held in the European country at issue was different, so the nature of the securities changed from a securities entitlement to the nature of securities under the European system at issue, and the court was seeking clarification for how clearance and

Page 69

JACK WIENER

numbers and keeping the numbers small.

If there's an IPO with two shares issued under CUSIP X, and then there is a secondary offering or an offering pursuant to or shares are issued pursuant to an exemption, three shares in that secondary offering are issued pursuant to an exemption, DTC holds those five shares together in the fungible bulk in a manner that as to which a beneficial owner holding through DTC would not be able to prove that the shares that they have were issued under a particular registration statement.

Q.    So is it your opinion that beneficial ownership cannot be traced?

MS. LAGOY:  Objection, misstates testimony, outside the scope of legal opinions.

Q.    You can answer.

A.    I'm not sure how you came to understand that from what I said.

Q.    I'm asking you the question. Is it your opinion that beneficial

JACK WIENER

ownership cannot be traced? Is that outside the scope of your report?

A.    Under any circumstance? You're being less clear than I need you to be for me to answer your question.

Q.    Okay. In the situation you just described, two shares issued in an IPO, three additional shares issued in a secondary offering, is it your opinion that beneficial ownership can or cannot be traced?

A.    Okay. So this is a highly fact-specific question.

MS. LAGOY:  I'm going to object to incomplete hypothetical, but continue.

A.    The way you asked the question the first time is at odds than the way you just asked the question, so I want to be clear which one I'm answering.

Obviously, as I mentioned before, and as you know having read my report, there are a number of fact patterns in which beneficial ownership

JACK WIENER

Q.    I think you just restated what is in paragraph 60. What I'm asking is a little different.

How would you actually engage in tracing of the beneficial owners' interest in the situation described in paragraph 60?

A.    I would --

MS. LAGOY:  Objection, outside the scope of the report.

MR. KUBOTA:  Well, he testified that he describes a tracing methodology and I'm asking him what that would entail in the situation described in paragraph 60.

MS. LAGOY:  I think that mischaracterizes the prior testimony, but you can answer to the best of your ability.

A.    I would engage in a very careful methodological review of the facts of the case to determine if, in fact, ingesting all relevant data, the

JACK WIENER

and I am not aware of any method, having read his report and considered any other comments on the subject that I've heard set forth in the past decades, none of those methodologies, none of those methods, including that of Dr. Mitts, are methods where they can actually trace shares of a security held at DTC or its subcustodian in DTC's street name, which is Cede & Co., to a particular registration statement where there have been multiple issuances of the security represented by the same CUSIP number that were deposited at DTC and one or more of the issuances was not made pursuant to the registration statement.

Q.    Let me break that down. You mentioned your experience, correct?

A.    I did.

Q.    When you were at DTC did you ever attempt to trace shares to a specific offering?

MS. LAGOY:    Object to form.

A.    When I was at DTC I did speak

Page 80

JACK WIENER

to securities attorneys with regard to the nature of the holding of securities at DTC where the tracing or possible tracing of securities was a question. And also since I've been at DTC I've also had similar discussions, not as to specific issues, but as to the general method of holding of such securities by DTC with many practitioners as we sought to create treatise that would work in multiple countries with different systems of clearance and settlement that lend themselves, depending on their nature, to different possibilities of tracing.

Q.    So, again, let's break that down.

You said when you were at DTC you spoke to securities attorneys with regard to the nature of the holding of securities where tracing was a question. Which attorneys did you speak to?

A.    This is many years ago, obviously. I don't remember their names.

Q.    You don't remember their

JACK WIENER

names.

Were they DTC inhouse attorneys or were they in law firms?

A.    Oh, I mean within DTC. It's, of course, the sort of fodder that would be common discussion at lunch, as we sat down, but the inquiries would come from people who were securities lawyers, either at securities firms, banks or brokers or exchanges or depositories or at law firms.

Q.    And do you remember any of those individuals or firms who made these inquiries that you're talking about?

A.    I think I already answered.

Q.    This is all more than 20 years ago, which is why you don't remember names?

A.    I don't know if that's a good reason. I'm also capable of forgetting things from yesterday, but that would add to it, sure.

Q.    Okay. And when you were working at DTC and the issue of tracing

JACK WIENER

arose, did you reach any conclusions in that regard?

A.    What do you mean by "any"?

MS. LAGOY:  Yeah.  Objection, vague.

Q.    When did you form the view that you describe in the last sentence of paragraph 80 of your report?

A.    Well, that's been my view since -- for decades.  That's what the SEC has said.  You can read that in the early 2000s, that's what the Uniform Commercial Code says, that's well known.

Q.    So I just want to understand very specifically the basis for what you said has been your view for decades.

Did you learn that in law school?

A.    No, I don't believe I learned that in law school.

Q.    Did you learn that when you were an associate in private practice?

A.    I may have. I don't recall.

Q.    And did you learn that when

JACK WIENER

you started working at DTC?

A.    Certainly I knew that then because that would have been the first time that I would have read DTC's rules, bylaws and Article 8, all one after the other in my first three months at DTC.

Q.    And so is it your testimony that within a few months of starting to work at DTC you formed the opinion expressed in the last sentence of paragraph 80?

A.    Well, I mean, that's been the case since then. It's less an issue of forming an opinion. I mean, I guess you could look at it that way but it's a question of knowing how things work, it's a question of reading Article 8 and the Uniform Commercial Code, and reading the comments in the Uniform Commercial Code. It's a matter of reading DTC's operational arrangements and bylaws and rules.

It's less an opinion than knowledge of what the rules are and how

Page 84

JACK WIENER

things work and it's something that came up more certainly as an issue over time, as there might be inquiries or as we were trying to come to a common treaty in the Hague Securities Convention and in the Unidroit Securities Convention and discuss what issues we could discuss and what we couldn't touch to harmonize securities laws worldwide.

Q.    You mentioned the UCC and Article 8 of the UCC a few times.

What's the relationship between the UCC Article 8 and what you say in the last sentence of paragraph 80?

A.    Dr. Mitts did accurately talk about DTC's -- the nature of DTC's holding of securities being that of a fungible bulk and he got that from -- and that's -- that is something that stems from what Article 8 of the UCC says.

Q.    Okay. So we've now covered your period at DTC and what you described as inquiries from unnamed law firms and individuals as well as lunchtime

JACK WIENER

clearance and settlement, the nature of the holding of securities, everything that underpins the statement made at the end of paragraph 8, and that's at odds with the core of what Dr. Mitts' declaration says.

Q.    You mentioned in one of your prior answers that your review on tracing is what the SEC has said. Do you recall that?

A.    Yes.

Q.    Has the SEC ever said what you assert in the last sentence of paragraph 80 of your report?

A.    I don't know, but they've certainly said that the nature of what DTC holds, and it's probably best for me to look for their actual language, if I can find it, but the essence of it is that the nature of what DTC holds is consistent with my statement at the end of paragraph 80 and inconsistent with the declaration of Dr. Mitts as to the ability to identify specific security

JACK WIENER

MS. LAGOY:  Hold on. I'd like to object to -- what is the pending question?

Q.    Did you ever sit down and actually write something about how to tackle the problem that you describe in paragraph 80 of your report or did you just criticize other people who did the work?

MS. LAGOY:  Objection, argumentative, mischaracterizes testimony, outside the scope of opinions offered. You can answer.

Q.    You can answer.

A.    As you know, and as I've said repeatedly, I did the work of determining over the last decades when tracing would be possible in the DTC system. I did this work, including all the means I described to you. I delineated, even in this report, ways in which tracing can be done. That's the result of work I did to determine how my tracing be done.

The fact that it's not

JACK WIENER

possible, to my knowledge, in this area doesn't mean I didn't do any work. I mean, I can't imagine how you come to that conclusion. It's just a result of my understanding, and I would hope you would understand, having read my report, that under these circumstances I am not aware of any method to trace shares of a security held at DTC.

Just because you don't like the answer, doesn't mean that -- there are four other ways in which one can trace. This way I'm not aware of any method in which one can trace, there's no reason to -- for you to describe that as not doing work.

Q. You started that answer by saying that you did the work of determining over the last decades when tracing would be possible in the DTC system, correct?

A. Yes.

Q. Did you generate any documents showing what you did?

JACK WIENER

A.    No. I entered into negotiations with other delegations with regard to that and the outcome of that were treatise which included some language proposed and didn't include other language proposed.

I engaged in discussions with counsel.  Whether I wrote them emails when I was at DTC saying what I said here or not, I can't recall, but I didn't publish anything in that regard. But what I'm saying is based on my two decades at DTC, my time teaching this clearance and settlement of securities specifically at DTC in law school as an adjunct law professor, my time at SIFMA explaining this to regulators, as well as to banks and brokers, my time at DTC discussing this with lawyers, my time discussing it with you --

Q.    And when we covered this --

A.    -- and Dr. Mitts report.

Q.    When we covered this before you couldn't name a single person at DTC

Page 101

JACK WIENER

like you to read what you are referring to.

Q.    Let me start again.

Did you discuss this notion that tracing is impossible with anyone when you worked at DTC?

A.    Okay. So you're withdrawing your assertion, am I clear?

Q.    I'm asking you a new question, sir.

A.    Because it troubles me that you mischaracterized what I say.

Q.    Answer the question.

A.    You're withdrawing your other question?

Q.    I'm asking you a new question.

Did you discuss this notion that tracing is impossible, this view that you claim to have held for decades, with anyone when you worked at DTC?

A.    Sure.

MS. LAGOY:    Objection, argumentative.

Q.    Okay. And with whom did you

Page 102

JACK WIENER

discuss that notion?

A.    With Bill Jaenike.

Q.    And when was that?

A.    Oh, numerous times from three years ago to 20 years ago.

Q.    And were any of those communications in writing?

A.    I don't think so.

Q.    Anyone other than Bill Jaenike?

A.    Bill Denser.

Q.    And when did that occur?

A.    Anywhere from four to 20 years ago.

Q.    And were any of those communications in writing?

A.    I would guess not.

Q.    And anyone else that you want to add other than those two individuals named Bill?

A.    Paul Urist.

Q.    You can probably guess my next question.  When did you communicate with him and were any of those communications

Page 103

JACK WIENER

in writing?

MS. LAGOY:  Objection, compound.

A.    Well, I actually couldn't anticipate your next question because sometimes they go -- they take a circuitous route.

Probably anywhere, a number of times, three to 25 years ago, in that range.

Q.    And was any of that in writing?

A.    Not that I recall.

Q.    Okay. With respect to Talis common stock, the security at issue in this case, you didn't obtain any data from DTC, FINRA or broker-dealers, correct?

MS. LAGOY:  Objection, asked and answered.

A.    I believe we went over this.

Q.    Okay. Just to confirm, you didn't obtain the data and perform the calculations that Dr. Mitts is describing

Page 104

JACK WIENER

to see if his methodology worked, correct?

A.    Oh, I know his methodology doesn't work. There is no way it can work. It doesn't matter how many tens of millions of data points he inputs, because all he's inputting is data points -- as to ingesting, I should say, is data points as to what is held in a fungible bulk, which he himself admits in his declaration and he evidences a clear misunderstanding, despite his parroting of the words of Article 8, he parrots a clear lack of understanding as to how that works and a lack of understanding as to DTC. So there is no need to repeat what he did. It's just completely disconnected from reality.

Q.    Did you have the ability to repeat and test Dr. Mitts' methodology for tracing?

A.    I have the ability to comment that his -- that his report is based on a misapprehension, that's a fatal flaw that

JACK WIENER

makes it a waste of time to go beyond that.

It doesn't matter, as I said, how many tens of millions of data points you ingest, if what you have here, which is what you do have here, is a fungible bulk.  That's what those holding through the DTC hold under these circumstances, is a security entitlement, that's a pro rata share in a fungible bulk as to which one could not identify any particular shares being one that they have.  And yes, I do believe that if you read Article 8, and the comments to 8503, and if you read the pronouncements by the SEC, you will see that is stated very clearly.

Q.    Are you an expert on Article 8?

A.    I'm not giving a legal opinion here, but that's what drives our operations at DTC.

Q.    Article 8 of the UCC is what drives DTC's operations?

JACK WIENER

Do you have the ability to test and apply Dr. Mitts' methodology?

MS. LAGOY:  Object to form, asked and answered.

A.    I think I've answered that.

Q.    Do you claim to be an expert on data analytics?

MS. LAGOY:  Objection, vague.

A.    No, but I claim to be -- have common sense to know that if I -- well, let me withdraw that.

Q.    You can finish.

A.    No, I choose to withdraw it.

Q.    Okay. You are withdrawing everything after "no"?

A.    Yes.

Q.    Do you claim to be an expert on machine learning?

A.    No.

MS. LAGOY:  Objection, vague.

THE WITNESS:  Sorry.

Q.    Have you ever had to do any computer coding in your prior expert work?

JACK WIENER

A.      No.

Q.      Have you had to do computer coding in any other capacity?

A.      Yes, but nothing relevant here.

Q.      Okay. You said something earlier to the effect of Professor Mitts has a fatal flaw in his report.

What principle or methodology did you apply to reach that conclusion?

A.      I applied my understanding of how DTC holds securities in fungible bulk and I compared that to Dr. Mitts' supposition, which is completely incorrect, that the way DTC holds securities is akin to holding cans of soup unopened from different factories and the ability of one to trace would be like tracing to one of those unopened cans of soup, the contents of which were 100 percent from factory A versus factory B, and how that was at complete odds with reality.

Q.      And you don't need to apply

JACK WIENER

cans of soup but as a fungible bulk.

Q.    You haven't done anything to obtain or analyze any trading data for Talis common stock, correct?

A.    Correct.

Q.    Please turn to paragraph 87 of your report. I want to ask you about the third sentence that starts, "What Dr. Mitts proposes to do".  Do you see that?

A.    Yes.

Q.    And you say, "What Dr. Mitts proposes to do is an alternative to tracing by creating an artificial chain of title but critically not a direct or actual chain of title." Do you see that?

A.    Right.

Q.    What's the difference between a direct or actual chain of title and what you call an artificial one?

A.    Well, as I -- as I said at length, his --

MS. LAGOY:  Objection, calls for a legal conclusion, but you can answer.

JACK WIENER

reports, which is not transaction data, which is not readily available.

Q.    It's your testimony that DTC's daily participant reports are not readily available?

A.    Well, so some of them, depending on what year it is, you might not be able to even get it for every day but just for one day a week, for example. Things like that.

Q.    That's based on your experience working at DTC in the 1990s and early 2000s?

A.    That's based on this month.

Q.    This month you had an experience where you were not able to get daily participant reports for each day of the week?

A.    I should say when I say "this month" I should say over the past 12 weeks.  Right, depending on what year I wanted in another matter.

Q.    So you asked DTC and they said it wasn't available?

Page 192

C E R T I F I C A T E

I, MAUREEN M. RATTO, a Registered Professional Reporter, do hereby certify that prior to the commencement of the examination, JACK WIENER was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

*MaureenRatto*

-------------------------------

MAUREEN M. RATTO, RPR

License No. 817125