UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE TALIS BIOMEDICAL CORPORATION SECURITIES LITIGATION, | Case No. 22-cv-00105-SI<br><br>**ORDER RE: PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Re: Dkt. No. 126 |

On February 9, 2024, the Court held a hearing on plaintiff's motion for class certification. For the reasons set forth below, the Court GRANTS the motion.

**BACKGROUND**[1]

In 2022, two class actions were filed in this court on behalf of investors who purchased securities of Talis Medical Corporation ("Talis") in its February 2021 initial public offering ("IPO"). The cases were consolidated, and the Court appointed Martin Dugan, Leon Yu, and Max Wisdom Technology Ltd. as co-lead plaintiffs.[2] The defendants include Talis Corporation and current and former Talis officers and board members who signed Talis's Registration Statement for the IPO.

Talis is a biotechnology company that was founded in 2010 to develop point-of-care ("POC") diagnostic tests for infectious diseases. Talis developed the Talis One System, a diagnostic

---

[1] A more detailed statement of the factual background is contained in prior orders and is incorporated herein.

[2] On November 30, 2023, Yu and Max Wisdom Technology Ltd. withdrew as co-lead plaintiffs.

platform comprised of (1) single-use test cartridges that prepare and store patient samples, (2) a box-shaped instrument that analyzes the samples, and (3) software. In 2018, Talis was developing rapid POC diagnostic tests for sexually transmitted infections such as chlamydia and gonorrhea. After the onset of the COVID-19 pandemic in early 2020, Talis abandoned its original focus on sexually transmitted diseases, and by summer 2020 started to develop a molecular test for COVID-19. Talis's COVID-19 test was slated to be the source of substantially all of Talis's initial revenue.

On February 11, 2021, Talis conducted its IPO of Talis common stock at $16 per share, raising $253.9 million. The amended consolidated complaint ("AC") alleges that the Registration Statement filed the same day contained multiple false and misleading statements and two omissions of known, material uncertainties and risks. Plaintiff claims that the Registration Statement falsely claimed that Talis's "products are manufactured by several third parties, including a single contract manufacturer that provisions the parts and assembles our instrument," and Talis had "ordered 5,000 instruments from our instrument contract manufacturing partners to be delivered" from "the fourth quarter of 2020 through the first quarter of 2021" and that these statements were false because at the time of the IPO, "Talis had not 'ordered' any instruments, but merely had a capacity agreement with its third-party manufacturer" and "the manufacturer had not started to produce Talis One instruments, and none of the 5,000 instruments had been delivered to Talis." AC ¶¶ 8-9. Plaintiff also claims that the Registration Statement falsely "touted Talis One as 'reliable,' 'highly accurate,' and designed 'to provide central lab levels of accuracy at the point-of-care,'" and that these statements were false because at the time of the IPO, "Talis One had a high failure rate of up to 20% (meaning one in five results was unusable) and high invalid rates of up to 15%, which were viewed as unacceptable both internally and by the FDA." *Id*. ¶¶ 12-13. As to material omissions, the AC alleges that the Registration Statement omitted the known, material uncertainty and material risk that the FDA would reject the comparator assay in Talis's submission for Emergency Use Authorization ("EUA") because it lacked "high sensitivity" and violated FDA requirements, and that the Registration Statement omitted the known, material risk posed by Talis One's unreliability at the time of the IPO. *Id*. ¶¶ 16, 20.

In late February 2021, the FDA informed Talis that the comparator assay was not sufficiently

sensitive to support Talis's EUA application, and on March 8, 2021, Talis issued a press release stating that it had withdrawn its application. The Talis One has never launched, and on the day this lawsuit was filed, the share price was $3.31. The AC asserts claims under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77o.

As part of the IPO, stockholders who held Talis securities before the IPO entered into Lock-Up agreements with Talis's underwriters. Shevlin Decl. ¶ 2. Those agreements restricted the sale or transfer of pre-IPO shares until August 11, 2021 at 11:59 p.m. *Id.* ¶ 9. After that date, the lock-up restrictions were removed, and both IPO and pre-IPO shares were available on the open market. *Id.*

Lead plaintiff Dugan seeks certification of the following class:

> All persons or entities that purchased or otherwise acquired common stock issued by Talis pursuant and/or traceable to the registration statement and prospectus (collectively the "Registration Statement") issued in connection with the Company's February 11, 2021 initial public offering and were damaged thereby.[3]

At the hearing, plaintiff's counsel clarified that the end date of the proposed class is January 7, 2022, the date that the first lawsuit was filed. In support of the class certification motion, Dugan has submitted the expert report of Zachary Nye, Ph.D., an economist who opines on whether damages under Section 11 for investors who purchased or otherwise acquired Talis common stock pursuant and/or traceable to the Registration Statement can be calculated using a method common to the class. Dkt. No. 127-1. Dugan also submitted, with the reply brief, the expert declaration of Professor Joshua Mitts, who addresses tracing.[4] Dkt. No. 138-1.

Defendants oppose class certification, contending that lead plaintiff Dugan is inadequate and

---

[3] Excluded from the Class are (i) defendants and any affiliates or subsidiaries thereof, (ii) present and former officers and directors of Talis and its subsidiaries or affiliates, and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any defendant has or has had a controlling interest; (v) Talis's employee retirement and benefits plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories.

[4] After the filing of the reply brief, defendants filed objections to Professor Mitts' declaration, including that the declaration was untimely. The parties have since resolved the timeliness objection by stipulation permitting defendants to take Professor Mitts' deposition and file a sur-reply.

3

1  atypical and that individualized issues predominate. Defendants also argue that if the Court certifies
2  a class, it should be limited to shareholders who purchased Talis stock prior to August 12, 2021,
3  when pre-IPO shares became available on the open market. Defendants have submitted expert and
4  percipient declarations regarding tracing, as well as other evidence in support of their opposition.

## LEGAL STANDARD

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. Plaintiff bears the burden of showing that he has met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014), *citing Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

The Court's "class certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 465-66 (2013) (*quoting Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (internal quotation marks omitted)). These analytical principles govern both Rule 23(a) and 23(b). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. 568 U.S. at 466. "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id*.

Under Rule 23(a), the class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable, (2) questions of law or fact exist that are common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a). A plaintiff must also establish that one or more of the grounds for maintaining the suit are met under Rule 23(b): (1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate and the class action is superior to other available methods of adjudication. *See* Fed. R. Civ. P. 23(b).

4

**DISCUSSION**

**I.      Rule 23(a)**

      **A.      Numerosity**

The class must be so numerous that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1). There is no fixed numerical threshold, but generally courts have found the requirement satisfied when the class contains forty or more members. *See City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, Case No. 18-cv-04844-BLF, 2022 WL 1459567, at *3 (N.D. Cal. May 9, 2022) (citing cases). "In cases involving securities traded on national stock exchanges, numerosity is practically a given." *In re VeriSign, Inc. Sec. Litig.*, No. C 02-02270 JW, 2005 WL 7877645, at *4 (N.D. Cal. Jan. 13, 2005).

The Court finds that this requirement is met. Talis sold 15,870,000 shares of common stock in its IPO, and Talis common stock was actively traded on a national securities exchange (NASDAQ) during the proposed class period, with an average weekly trading volume of approximately 1.27 million shares. Nye Report ¶ 7. Based on these metrics, plaintiff estimates that there are hundreds, if not thousands, of class members. Mtn. at 6. Further, defendants do not oppose class certification on numerosity grounds.

      **B.      Commonality**

Defendants likewise do not challenge certification based on Rule 23(a)'s commonality requirement. Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. Proc. 23(a)(2). Commonality exists where "the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978-79 (9th Cir. 2008).

The Court concludes that this requirement is satisfied. Common questions include whether the Registration Statement contained untrue statements of material fact or material omissions, whether the individual defendants were controlling persons under Section 15, and whether defendants can meet their burden to prove affirmative defenses. Courts have found Rule 23(a)(2) met based on similar common questions in Section 11 cases. *See, e.g.*, *In re Lyft Inc. Sec. Litig.*,

5

Case NO. 19-cv-02690-HSG, 2021 WL 3711470, at *3 (N.D. Cal. Aug. 20, 2021) ("Common questions include whether the IPO Registration Statement contained untrue statements of material fact or omitted to disclose material facts . . . ."); *McFarland v. Memorex Corp.*, 96 F.R.D. 357, 362 (N.D. Cal. 1982) ("The presence of any misstatements or omissions in the registration statement is capable of litigation as a class question and does indeed present a common question of fact.").

### C. Typicality and Adequacy

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. Proc. 23(a)(3). Rule 23(a)(4) permits the certification of a class only if the "representative parties will fairly and adequately protect the interests of the class." "The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Amchem Prods. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157, n. 13 (1982)).

Representation is adequate if: (1) the class representative and counsel do not have any conflicts of interest with other class members; and (2) the representative plaintiff and counsel will prosecute the action vigorously on behalf of the class. *Staton v. Boeing, Co.*, 327 F.3d 938, 954 (9th Cir. 2003). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiff[ ], and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quotations omitted). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Class certification is inappropriate, however, if a putative class representative is subject to "unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

6

1    Defendants contest Dugan's adequacy and typicality. They assert essentially the same arguments under both factors, and thus the Court analyzes these requirements together.[5] Defendants contend that (1) Dugan is not directing or monitoring the litigation and he lacks credibility; and (2) Dugan's investment motivation and history puts him in conflict with the class; and (3) Dugan seeks to recover for stock that cannot be traced to the Registration Statement because he purchased "significant" stock after the lock-up expired on August 11, 2021.

### 1. Directing or Monitoring Litigation and Candor

On the first point, defendants cite Dugan's deposition testimony in which, for example, he could not name all of the individual defendants and stated that his co-lead plaintiff (prior to Yu's withdrawal) was "a fellow from China" named "Mr. Wu" and that he was not aware of any other co-lead plaintiffs; that he was not aware of how many complaints had been filed and referred to this case as a "securities fraud" case despite the fact that the AC dropped the Section 10(b) claims; and he stated that he spent less than an hour preparing for his deposition, including one zoom session during which he was "multitasking." These examples are illustrative of those cited by defendants.

Defendants also attack Dugan's candor. They argue that his deposition testimony contradicted his interrogatory responses with regard to his reasons for investing in Talis. Dugan's interrogatory responses stated that "in deciding to purchase Talis common stock, I considered various factors, including the impression that Talis One was a real, working product that could successfully detect COVID-19," while at his deposition he testified that he initially invested in Talis because of the Talis One system for "women's sexual diseases," and it was later that he invested due to the COVID-19 test. Defendants also cite Dugan's deposition testimony stating he was not sure whether he had read the Registration Statement as being inconsistent with his interrogatory response stating that he "believed he reviewed a portion" of the Registration Statement prior to investing. Defendants also highlight that Dugan's deposition testimony revealed that he had not in fact earned a bachelor's degree from Elmira College, as stated in two declarations to this Court.

---

[5] Defendants do not challenge adequacy of counsel and Court finds that proposed class counsel are adequate.

7

1    The Court has read the entire Dugan deposition transcript and finds that when the excerpts
2    cited by defendants are read in context, Dugan's deposition testimony shows that he is sufficiently
3    involved and knowledgeable about this lawsuit and that he is willing to perform his duties as a class
4    representative. Dugan is not an attorney and cannot be expected to distinguish between Section 11
5    claims based on false and misleading statements and "securities fraud" claims, or to be able to
6    recount the procedural history of this case. Dugan could identify a number of the individual
7    defendants by name; testified that he had spent approximately 25-30 hours on this case prior to his
8    deposition and regularly communicated with counsel; and stated that he is "a fiduciary for the class,"
9    that all class members "should be made whole," and that he is committed to prosecuting this case.
10   He could articulate on a general level the alleged misrepresentations and omissions – for example,
11   stating that "the reliability and accuracy of the tests were significantly below the levels that Talis
12   expressed to their shareholders"; that defendant Coe, when he was CEO, "should have known and
13   expressed in a reliable fashion to the shareholders of the company the intricacies of the FDA's
14   involvement in approvals for the product and its services, and I believe the facts show differently";
15   and that Coe "expressed . . . publicly to shareholders that the machine and cartridges were being
16   manufactured and sold in significant faction to the distribution points when, in fact, they were not";
17   that the company "implied that they were going to get FDA approval . . . and they had reason to
18   believe FDA approval was not imminent"; and that Talis made inaccurate statements about "their
19   ability . . . to build these machines, to actually get them built, the reliability of the machine . . . and
20   their implied ability to quickly and meaningfully compete in COVID diagnosis." Dugan Depo. at
21   48-49, 51, 62-63. "The record indicates clearly that [Dugan] understands his duties and is currently
22   willing and able to perform them. The Rule does not require more." *Loc. Joint Exec. Bd. of*
23   *Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc*., 244 F.3d 1152, 1162 (9th Cir. 2001); *see*
24   *also In re Lendingclub Sec. Litig.*, 282 F. Supp. 3d 1171, 1182 (N.D. Cal. 2017) ("To establish
25   adequacy lead plaintiffs need only be familiar with the basis for the suit and their responsibilities as
26   lead plaintiffs" and rejecting challenge to adequacy based on lead plaintiff's inability to "say exactly
27   what alleged misstatements LendingClub had made in its registration statement without looking at
28   the complaint" and inability to "name each defendant in this action from memory").

8

The Court also finds that defendants have not raised serious questions about Dugan's credibility that would render him inadequate or atypical. Dugan testified that after his initial investment, the COVID-19 test was a factor in his subsequent investments in Talis, and he testified consistently that he believed that Talis had a working "machine." There is no inconsistency between this testimony and the interrogatory answer stating that Dugan considered "various factors" when he invested in Talis, including his belief that it had a working product that could detect COVID-19. As to the Registration Statement, while Dugan could not recall if he had read the document, he testified that "typically, this is something that I may peruse parts of." Dugan Depo. at 152. In any event, as discussed above, Dugan could articulate the alleged misstatements and omissions in laymen's terms. Finally, Dugan testified at his deposition that he had completed all of the credits for his bachelor's degree but did not complete a public service work-study requirement needed for graduation because his financial situation required that he get a job and make money. *Id*. at 36, 265-66. Numerous courts have held that credibility issues only render a plaintiff inadequate when those problems are "directly relevant" to the claims at issue. *See Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1015-16 (N.D. Cal. 2010) (discussing cases). Here, the inconsistency between Dugan's declaration statements that he had a bachelor's degree and his deposition testimony are not directly relevant to the claims in this lawsuit, and do not make him inadequate. *See id*. (finding named plaintiff adequate despite credibility problems because those issues did not relate to claims at issue).

### 2. Investment Motivations and History

Defendants contend that Dugan is inadequate and atypical because (1) he primarily invested in Talis because of its tests for "women's sexual diseases," and not COVID-19; (2) because Dugan first bought Talis stock on March 26, 2021, after Talis's March 8, 2021 press release announcing that Talis had withdrawn its application with the FDA for EUA, he is subject to the actual knowledge affirmative defense under Section 11, *see* 15 U.S.C. § 77k(a); and (3) Dugan continued to invest in Talis past the filing of the complaint, including after a March 15, 2022 corrective disclosure relating to Talis's instrument orders and high invalid rates. Defendants argue that these facts render Dugan

9

1    vulnerable to unique defenses and show that the alleged misstatements and omissions were not
2    material to him.

3            As discussed, above, Dugan testified that after his initial investment, he became aware of
4    the Talis COVID-19 test and that was a factor in his investments, and Dugan testified consistently
5    that he believed that Talis's machine – used for any test – was working and reliable. Dugan also
6    testified that he continued to invest in Talis as the stock price declined because as it became "a dollar
7    stock" he "averaged down," in an effort to minimize losses. Dugan Depo. at 251-52. More
8    importantly, Dugan's subjective reasons for investing are irrelevant because "materiality is judged
9    according to an objective standard," *Amgen*, 568 U.S. at 459, and "[s]ince reliance is irrelevant in a
10   § 11 case, a § 11 case will never demand individualized proof as to an investor's reliance or
11   knowledge (except where more than twelve months have passed since the registration statement
12   became effective)." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859–60 (9th Cir. 2013) (quoting
13   *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 784 (3d Cir. 2009)).[6]

14           As to the actual knowledge defense based on the March 8, 2021 press release, defendants
15   argue that the press release "was covered extensively by popular media sources and analysts such
16   as Seeking Alpha," Opp'n at 17, and they cite Dugan's deposition testimony that it was "possible"
17   that he read the Seeking Alpha article prior to investing. The Court finds that the possibility that
18   Dugan saw reports about the press release is not sufficient to render him inadequate or atypical. If
19   the press release was in fact "covered extensively," Dugan and class members who purchased stock
20   after March 8, 2021 are similarly situated as to this affirmative defense (and notably, this affirmative
21   defense only applies to one of the alleged misstatements and omissions alleged in the AC). Further,
22   as other courts have noted when considering an actual knowledge defense in the context of class
23   certification, whether the press release conveyed all of the information that plaintiff alleges was
24   misstated or omitted presents a common question. *See, e.g.*, *In re Lyft Inc. Sec. Litig.*, Case No. 19-

---

[6] "The plain text of Section 11 thus imposes a reliance element only as to investors who purchased a security at least twelve months after the registration statement became effective." *Hildes*, 734 F.3d at 859. This lawsuit was filed on January 7, 2022, less than twelve months after the IPO.

10

cv-02690-HSG, 2021 WL 3711470, at *6-7 (N.D. Cal. Aug. 20, 2021) (discussing cases and holding "that there are common facts and questions as to the content of publicly available sources, including the news articles cited by Defendants" and that "Defendants' assertion that investors had actual knowledge of the alleged misrepresentations and omissions based on these media reports also can be resolved on a class-wide basis.").

Plaintiff also cites cases, which this Court finds persuasive, holding that an actual knowledge defense did not preclude class certification where the information at issue consisted of "snippets of information" or "awareness of a general issue," and not the totality of the allegedly omitted information. *See id.*; *see also Boston Retirement Sys. v. Uber Tech., Inc.*, Case No. 19-cv-06361 RS, 2022 WL 2954937, at *3 (N.D. Cal. July 26, 2022). The March 8, 2021 press release, titled "Talis Provides Update on Regulatory Pathway for Emergency Use Authorization (EUA) of its Talis One™ COVID-19 Test," stated,

> - Talis Biomedical Corporation (Nasdaq: TLIS), a company dedicated to developing innovative molecular diagnostic tests for infectious diseases at the point of-care, today announced that it has withdrawn its current application pursuing U.S. Food and Drug Administration (FDA) Emergency Use Authorization (EUA) for the Talis One™ COVID-19 test in the CLIA moderate setting, in favor of focusing on its planned EUA application in the CLIA waived setting. In late February, the FDA informed the company that it cannot ensure the comparator assay used in the primary study has sufficient sensitivity to support Talis's EUA application.
>
> Talis intends to initiate its previously planned clinical validation study in a point-of-care environment, with plans to submit an EUA application for the Talis One COVID-19 test in CLIA waived settings early in the second quarter of 2021. The planned clinical validation study was designed with a different comparator assay, which Talis believes will address the FDA's concerns.
>
> "The company's business priority remains focused on serving health care providers and their patients in the point-of-care setting, where we continue to see the greatest need for high quality testing," said Brian Coe, Chief Executive Officer of Talis. "Given the recent correspondence from the Agency and its stated prioritization of point-of-care platforms, we feel this course of action offers a faster path to market."

Eagen Decl. Ex. 2; *see also id*. at Ex. 4 (Seeking Alpha article summarizing press release). As plaintiff notes, this press release did not disclose that prior to the IPO, the FDA had informed Talis that the comparator assay was not sufficiently sensitive and that Talis's EUA application had been placed on hold.[7] Thus, unlike the cases cited by defendants in which the pre-IPO disclosure of

---

[7] Plaintiff has submitted evidence obtained in discovery showing that before the IPO, the

11

1   information included most or all of the allegedly omitted information, here the press release did not
2   contain some of the allegedly omitted, material information regarding Talis's initial FDA
3   application. *See, e.g.*, *Vignola v. Fat Brands, Inc.*, Case No. CV 18-7469 PSG (PLAx), 2020 WL
4   1934976, at *4-5 (C.D. Cal. Mar. 13, 2020) (finding no predominance where all of the allegedly
5   omitted information was "widely reported" in print and online media during eight year period
6   leading up to IPO); *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D.
7   160, 168-69 (S.D.N.Y. 2011) (finding no predominance where, *inter alia*, there was a "good deal of
8   documentary evidence imputing knowledge" to the lead plaintiff's investment advisor about
9   underwriting guidelines and practices for mortgage-backed securities and "many putative class
10  members are sophisticated investors with significant experience in asset-backed securities markets,"
11  including JP Morgan Chase who allegedly "had knowledge regarding originators' systematic
12  disregard of underwriting guidelines in another lawsuit"); *see also In re Kosmos Energy Ltd. Sec.*
13  *Litig.*, 299 F.R.D. 133, 152-53 (N.D. Tex. 2014) (denying certification where defendants presented
14  "un-refuted" "107–page Expert Report demonstrating the need for individual inquiries into investor
15  knowledge" and plaintiffs did not challenge expert report and produced "zero" evidence).

### 3.     Recovery for Post-August 11, 2021 Purchases

In addition to his purchases on March 26, 2021, Dugan purchased Talis stock in April-June 2021, December 2021, February 2022, and April-May 2022. Dugan seeks to recover for all purchases through January 7, 2022, the date the first lawsuit was filed (and thus defendants' arguments about Dugan's purchases made after January 7, 2022 are moot).

Defendants argue that Dugan is not typical because his post-August 11, 2021 purchases cannot be traced to the Registration Statement because after that date non-IPO shares became commingled with IPO shares. The Court finds that this does not present a typicality problem, as Dugan indisputably purchased IPO shares during the lock-up period. The Court addresses the

---

FDA informed Talis that its comparator assay was "not an acceptable comparator" and "not considered a high sensitivity test," and that Talis's EUA submission had been placed "on hold." Kubota Decl. Ex. F, G.

1  question of tracing *infra* in connection with the class period.

**II.  Rule 23(b)(3)**

Along with the requirements of Rule 23(a), plaintiff must also establish that one or more of the grounds for maintaining the suit under Rule 23(b) are met. Here, plaintiff seeks certification under Rule 23(b)(3), which provides that a case may be certified as a class action if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P 23(b)(3). For the reasons that follow, the Court finds that plaintiff has met both the predominance and superiority requirements of Rule 23(b).

**A.  Predominance**

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. Proc. 23(b)(3). The predominance analysis "focuses on the relationship between the common and individual issues in the case and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wang v. Chinese Daily News*, 737 F.3d 538, 545 (9th Cir. 2013) (quoting *Hanlon*, 150 F.3d at 1022) (internal quotation marks omitted)).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc.*, v. *Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*"). "The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). "[M]ateriality is judged according to an objective standard." *Amgen*, 568 U.S. at 459. These are common questions that will be resolved on common evidence. Similarly, whether the individual defendants are control persons under Section 15 present

13

common factual and legal questions. And "[t]he plain language of section 11(e) prescribes the method of calculating damages, *see* 15 U.S.C. § 77k(e), and the court must apply that method in every case." *McMahan & Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1048 (2d Cir. 1995).

Defendants argue that individualized issues regarding actual knowledge about the March 8, 2021 press release predominate over these common questions. The Court disagrees. As an initial matter, this actual knowledge defense only applies to one of the alleged misstatements and omissions at issue. Thus, even if this affirmative defense raises individual issues about class members' knowledge, those individual issues do not predominate because there are numerous other alleged misstatements and omissions alleged in the AC. Further, as discussed above, whether the March 8, 2021 press release was "extensively covered" and whether it contained a full disclosure of relevant information are questions that can be resolved as to the class a whole.

### B.   Superiority

"Rule 23(b) also requires that class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy." *Hanlon*, 150 F.3d at 1023 (quoting Fed. R. Civ. P. 23(b)(3)). The Court must determine "whether the objectives of the particular class action procedure will be achieved in the particular case." *Id*. (citation omitted). The four factors for the Court's examination are: (1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190-92 (9th Cir. 2001).

Defendants challenge superiority on the same grounds as predominance, and for the same reasons, the Court disagrees. A class action is the superior method of adjudication in this case. The alternative methods of resolution are individual claims by individual plaintiffs. Class treatment would increase the class members' access to redress by unifying what otherwise may be multiple small claims. Further, to the Court's knowledge, there is no other pending litigation involving these

14

claims. *Id.* at 1191. Each class member will not have to litigate "numerous and substantial separate issues to establish his or her right to recover individually." *Id*. at 1192. Here, the complexities of class action treatment do not outweigh the benefits of considering common issues in one trial; thus, class action treatment is the superior method of adjudication. *Id*.

### III.   Class Period/Tracing

Defendants contend that any class period should end on August 11, 2021, when a 180-day contractual lock-up period expired and pre-IPO shares became commingled with IPO shares.

Plaintiff argues that a cut-off date is unnecessary because the class definition requires that class members purchase stock in or traceable to the IPO, and they contend that discovery will show that it is possible to trace post-August 11, 2021 purchases to the IPO. Plaintiff argues that his expert, an economist and law professor (Dr. Mitts) will apply reliable accounting techniques such as FIFO and LIFO to trading data available through discovery from sources including DTC and FINRA, such as the Consolidated Audit Trail, which contains "every customer transaction in a centralized repository for every security with complete identifying information for every customer." Mitts Decl. ¶¶ 44–50 & Kubota Decl. Ex. B (Mitts Tr.) at 53:10–13; 71:11–73:6. Plaintiff has issued subpoenas to these entities to obtain the relevant data. Plaintiff argues that Dr. Mitts' methodology will show the chain of title so that it is possible to trace to IPO shares, and that his methodology is not "statistical tracing" because it yields a definite conclusion on ownership, and thus the cases cited by defendants involving statistical tracing are irrelevant.

Defendants argue that Dr. Mitts' methodology is unreliable and that it is impossible to trace shares after the lock up period expired because of the way the DTC indirect holding system works. According to defendants, under that system, legal title to shares is held by Cede & Co. (the "street name) as nominee for DTC, which operates an electronic book entry system for securities deposited with DTC for the benefit of its participants. Defendants argue that when a DTC participant receives a position in shares of a given stock, whether for its own account or on behalf of a customer, the participant does not take title to any particular shares of the stock. Instead, it holds a "security entitlement," with rights to a pro rata portion of an undifferentiated "fungible bulk" of shares held

15

by DTC, and that when a participant's customer holds a position in shares through the participant, it holds only a "security entitlement" to a pro rata portion of the shares held by the participant.

As discussed at the hearing, because the ability to trace stock to an IPO is required for standing under Section 11, the Court finds it appropriate to certify a class of shareholders who purchased Talis stock between February 11, 2021 and August 11, 2021, as there is no question that those purchases were pursuant to the IPO and there are no issues with tracing during this time period. *See In re Lending Club Sec. Litig.*, 282 F. Supp. at 1188 (certifying Section 11 class with date cut-off when lock-up period expired); *see also In re Honest Co. Sec. Litig.*, Case No. 2:21-cv-07405-MCS-PLA, 2023 WL 3190506, at *3-5 (C.D. Cal. May 1, 2023) (same, and discussing tracing and how stocks are held by DTC). After plaintiff has received the discovery that he contends will show that he can demonstrate tracing on a classwide basis for August 12, 2021 to January 7, 2022, plaintiff may renew the request for certification regarding that time period.[8]

**CONCLUSION**

The Court certifies the following class:

All persons or entities that purchased or otherwise acquired common stock issued by Talis pursuant and/or traceable to the registration statement and prospectus issued in connection with the Company's February 11, 2021 initial public offering between February 11, 2021 and August 11, 2021, inclusive, and were damaged thereby. Excluded from the Class are (i) Defendants and any affiliates or subsidiaries thereof, (ii) present and former officers and directors of Talis and its subsidiaries or affiliates, and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant has or has had a controlling interest; (v) Talis's employee retirement and benefits plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories.

---

[8] As such, the Court finds it unnecessary to resolve the parties' objections to each other's experts and evidence regarding tracing at this time. At the hearing, plaintiff's counsel argued that if the Court expands the class at a subsequent date, putative class members who purchased Talis stock between August 12, 2021 and January 7, 2022, may be prejudiced because defendants may assert that the claims of those putative class members are untimely. Defense counsel indicated that he thought such concerns were unfounded. In any event, it is the Court's view that if plaintiff demonstrates that these later purchases can be traced to the IPO on a classwide basis, thus leading to a supplemental class certification order, there will not be any prejudice to those class members and that their claims will be timely.

Lead plaintiff Martin Dugan is appointed as Class Representative.

Bleichmar Fonti & Auld LLP and Pomerantz LLP are appointed as Co-Class Counsel.

**IT IS SO ORDERED**.

Dated: February 9, 2024

SUSAN ILLSTON
United States District Judge

17