**BLEICHMAR FONTI & AULD LLP**
Lesley E. Weaver (Bar No. 191305)
1330 Broadway, Suite 630
Oakland, California 94612
Telephone: (415) 445-4003
Facsimile: (415) 445-4020

*Counsel for Lead Plaintiff Martin Dugan*
*and Lead Counsel for the Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE TALIS BIOMEDICAL SECURITIES LITIGATION<br><br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Case No. 22-cv-00105-SI<br><br>CLASS ACTION<br><br>**DECLARATION OF EVAN A. KUBOTA IN SUPPORT OF CLASS REPRESENTATIVE'S MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND LEAD PLAINTIFF'S REASONABLE COSTS AND EXPENSES**<br><br>Judge:  Hon. Susan Illston<br>Date:  March 14, 2025<br>Time:  10:00 a.m.<br>Courtroom:  1 – 17th Floor |

I, Evan A. Kubota, hereby declare as follows:

1.      I am a Partner with the law firm Bleichmar Fonti & Auld LLP ("BFA" or "Lead Counsel"), counsel for Lead Plaintiff and Class Representative Martin Dugan ("Plaintiff") and Co-Lead Counsel for the Class in the above-captioned action (the "Action" or "Litigation").  I am an attorney duly licensed to practice in the State of New York and have been admitted to practice *pro hac vice* in this matter.  I have knowledge of the matters stated herein and, should I be called upon, I could and would competently testify thereto.[1]

2.      I submit this declaration and the attached exhibits in support of (1) Class Representative's Motion for Final Approval of Class Action Settlement, and (2) Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses, and Lead Plaintiff's Reasonable Costs and Expenses.

3.      I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of the Action.

4.      Attached hereto are true and correct copies of the following documents:

- Exhibit A – The Declaration of Lead Plaintiff Martin Dugan in Support of: (I) Class Representative's Motion for Final Approval of Proposed Class Action Settlement and (II) Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses, and Lead Plaintiff's Reasonable Costs and Expenses (the "Dugan Declaration").

- Exhibit B – A list of BFA attorneys and professional support staff who worked on the case, as well as information about each individual's qualifications, experience, and role.

- Exhibit C – A schedule summarizing the amount of time spent by each attorney and professional support staff employee of BFA from inception of the Litigation through January 3, 2025, the rates applicable to each individual, and a lodestar calculation for each individual.

---

[1] Capitalized terms not defined herein shall have the same meaning as set forth in the Stipulation of Settlement dated September 30, 2024 (the "Stipulation").

1

- Exhibit D – BFA's firm resume.

- Exhibit E – The Declaration of Rochelle J. Teichmiller Regarding (I) Mailing of Notice; (II) Publication of Summary Notice; (III) the Settlement Website and Contact Center Services; (IV) Claim Filing; and (V) Requests for Exclusion and Objections Received to Date (the "Teichmiller Declaration").

- Exhibit F – A summary of expenses incurred in connection with Lead Plaintiff's prosecution of the Action.

- Exhibit G – The Declaration of Michelle Yoshida of Phillips ADR.

- Exhibit H – The Declaration of Jonathan D. Park in Support of Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses, and Lead Plaintiff's Reasonable Costs and Expenses, Filed on Behalf of Pomerantz LLP.

- Exhibit I – The Declaration of Brian Schall in Support of Lead Counsel's Motion for Attorneys' Fees, Litigation Expenses, and Lead Plaintiff's Reasonable Costs and Expenses, Filed on Behalf of The Schall Law Firm.

## I.    LEAD PLAINTIFF'S PROSECUTION OF THE ACTION

### A.    Commencement of the Action

5.    The initial complaint in this Action was filed on January 7, 2022.  (ECF No. 1.)

6.    On March 8, 2022, Martin Dugan moved for appointment as Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").  (ECF No. 30.)  Competing motions were filed by Leon Yu and Max Wisdom Technology Limited; Nikolas Touras; and Adriana Belli.

7.    On April 22, 2022, the Court held a hearing on the motions, and on May 27, 2022, Yu and Dugan filed a joint proposal seeking appointment as co-lead plaintiffs.  (ECF No. 54.)

8.    On June 3, 2022, the Court appointed Dugan, Yu and Max Wisdom Technology Limited as co-lead plaintiffs and BFA and Pomerantz LLP as co-lead counsel.  (ECF No. 64.)

### B.    Lead Plaintiffs' Investigation and Filing of the Consolidated Class Action Complaint

9.    Upon appointment, Lead Plaintiffs, through co-lead counsel, immediately commenced

an extensive investigation that included interviews with confidential witnesses; comprehensive analysis of publicly available information such as SEC filings, news articles, industry publications, analyst reports, and academic literature; and review of Talis's government contracts, patents, and relevant federal regulations.  In addition, counsel utilized freedom of information act laws to issue requests for information and documents to federal regulators.

10.     On July 1, 2022, Lead Plaintiffs filed a Consolidated Class Action Complaint for Violations of the Federal Securities Laws, which alleged violations of Sections 11 and 15 of the Securities Act of 1933 as well as Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder (the "Complaint").  (ECF No. 74.)   The Complaint incorporated information from five former Talis employees, among other facts.

### C.      Defendants' First Motion to Dismiss

11.     On August 5, 2022, Defendants moved to dismiss the Complaint.  (ECF No. 83.) Defendants' motion, which included a 30-page memorandum of law and 21 exhibits, argued that the Complaint did not adequately allege any misstatements or omissions and that the Exchange Act allegations failed to raise a strong inference of scienter.

12.     On September 16, 2022, Lead Plaintiffs opposed Defendants' motion to dismiss (ECF No. 88), objected in part to Defendants' request for judicial notice (ECF No. 89), and filed a request for judicial notice of eight exhibits (ECF No. 90).  Lead Plaintiffs argued that the statements and omissions at issue were actionable and adequately alleged to have been false and misleading when made, and that the Exchange Act allegations collectively gave rise to a strong inference of scienter.

13.     On October 14, 2022, Defendants filed an 18-page reply brief (ECF No. 91), opposed Lead Plaintiffs' request for judicial notice (ECF No. 92), and filed a reply in support of Defendants' own request for judicial notice (ECF No. 93).

14.     On October 21, 2022, Lead Plaintiffs filed a reply in support of their request for judicial notice (ECF No. 94).

15.     On November 2, 2022, Defendants filed a statement of recent decision that, Defendants argued, "may be relevant to the Court's consideration of whether Plaintiffs have adequately alleged falsity."  (ECF No. 96.)

3

16. On November 4, 2022, the Court heard oral argument on Defendants' motion to dismiss and provided an oral tentative ruling to grant the motion with leave to amend. (ECF No. 97.)

17. On December 9, 2022, the Court dismissed the Complaint with leave to amend. (ECF No. 101.) As to the Securities Act claims, the Court held that "the allegations in support of falsity are based on FE allegations that are conclusory, state opinions without factual support, sometimes based on vague hearsay and rumors, and are often vague or silent as to time period, and thus plaintiffs have not alleged facts showing that the challenged statements were false or misleading at the time of the IPO. In addition, the Court concludes that many of the challenged statements appear to be protected by the bespeaks caution doctrine, as the Registration Statement contained fulsome risk disclosures." (*Id.* at 19.)

18. As to the Exchange Act claims, the Court concluded that "plaintiffs have failed to allege falsity" and that certain statements "appear to be protected by the PSLRA's safe harbor" for forward-looking statements (*id.* at 36), were "inactionable vague corporate optimism and opinions" (*id.* at 42), or otherwise failed to plead falsity with particularity (*id.* at 43). The Court directed Lead Plaintiffs to file an amended complaint by January 13, 2023. (*Id.* at 44.)

**D.    The Amended Complaint**

19. On January 13, 2023, after further investigation, Lead Plaintiff filed an Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Amended Complaint"). (ECF No. 104.)

20. The Amended Complaint significantly streamlined the case and bolstered Lead Plaintiffs' allegations of material falsity.

21. First, the Amended Complaint solely alleged non-fraud violations of Sections 11 and 15 of the Securities Act subject to Rule 8 notice pleading.

22. Second, the Amended Complaint removed any potentially forward-looking statements, and instead focused on five alleged misstatements of present or historical fact, and two alleged omissions, concerning Talis One's manufacturing; performance; and submission for FDA Emergency Use Authorization.

23. Third, the Amended Complaint bolstered the allegations of material falsity, informed

4

by three additional former employees ("FEs") and new details regarding the five prior FEs. Importantly, the three new FEs directly observed key facts supporting falsity, including that at the time of the IPO, Talis allegedly had not ordered 5,000 instruments and had only received five to ten prototypes (¶¶83-84, 93-94), and Talis One allegedly failed up to 20% of the time based on reports in weekly meetings with Talis's senior executives, including Defendants Coe and Moody (¶¶131-32).

24.     The Amended Complaint also included other specific details gleaned from further investigation, including that Talis had not paid its purported instrument manufacturer until five months after the IPO (¶¶107-08); FDA regulations and industry standards prohibited Talis's manufacturer from delivering any instruments at the time of the IPO because Talis One's design and manufacturing process had not been validated (¶¶97-102); under GAAP, only completed Talis One instruments were "finished goods" that could be sold to generate revenue, underscoring materiality (¶¶79-81); the FDA's "high sensitivity" standard required a LoD of 18,000 NDU/mL or lower, but Talis's comparator assay was 180,000 NDU/mL (¶¶166-7); and Defendant Ismagilov called comparator assays above 100,000 copies/mL "low-sensitivity" in his own research shortly before the IPO (¶169).

### E.     The Court Denies Defendants' Second Motion to Dismiss

25.     On February 17, 2023, Defendants moved to dismiss the Amended Complaint with prejudice.  Defendants' 30-page brief (ECF No. 107) argued that all of the FE allegations are unreliable; that Rule 9(b) applied to the Amended Complaint's allegations of material falsity; that no alleged misstatement was adequately alleged to be false or misleading, including because certain statements were opinions under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*, 575 U.S. 175 (2015); that the Amended Complaint failed to plead any actionable omission in violation of Item 303 or Item 105 of SEC Regulation S-K; and that negative causation barred the manufacturing and performance statements because, in Defendants' view, the alleged corrective disclosures "occurred two months ***after*** Plaintiffs initially filed suit." (*Id.* at 35 of 37 (emphasis in original).)

26.     On March 24, 2023, Lead Plaintiffs filed a 30-page opposition to Defendants' motion, arguing that Rule 8's plausibility standard applies; all of the FEs are reliable; and the Amended Complaint plausibly alleged material misstatements and omissions. (ECF No. 109.)  Lead Plaintiffs highlighted the new, specific allegations from additional FEs and other sources (*id.* at 20-29 of 40)

5

and argued that Defendants' efforts to recast the performance statements as opinions failed (*id.* at 30-32 of 40). As to the Item 105 and 303-based claims, Lead Plaintiffs highlighted Defendant Ismagilov's academic literature defining "low-sensitivity" tests, the FDA's objective "high sensitivity" standard, and the inadequacy of generic warnings that Talis could not ensure FDA approval (*id.* at 33-36 of 40). Finally, as to negative causation, Lead Plaintiffs noted Defendants' "heavy" burden of proof and failure to demonstrate at the pleading stage that Talis stock's entire decline in value was not attributable to the alleged misstatements and omissions (*id.* at 37-38 of 40).

27. On April 14, 2023, Defendants filed an 18-page reply brief (ECF No. 112).

28. Lead Counsel then turned to preparing for the hearing on Defendants' motion to dismiss, scheduled for May 5, 2023.

29. Before oral argument, on April 28, 2023, the Court denied Defendants' motion to dismiss the Amended Complaint, finding that it "states claims under Sections 11 and 15 of the Securities Act." (ECF No. 115.) The Court ruled that "Rule 8's plausibility standard applies" and that the Amended Complaint "plausibly alleges that the Registration Statement contained false and misleading statements about the ordering and manufacturing of instruments, the accuracy and reliability of the Talis One, and omissions about the weakness of Talis's comparator assay and Talis One's unreliability." (*Id.* at 2.)

30. The Court noted several "examples of the many new, specific allegations that plaintiffs have added that address the issues discussed in the Court's prior order," concluding that the Amended Complaint "alleges with specificity why the challenged statements were false and misleading when made" and that "[m]any of defendants' challenges to the amended complaint raise factual disputes that are not appropriate for resolution on the pleadings." (*Id.*) Further, the Court rejected Defendants' negative causation arguments as "premature and not suitable for resolution on the pleadings." (*Id.*)

### F.    Lead Plaintiffs' Substantial Discovery Efforts

31. Upon denial of Defendants' motion to dismiss the Amended Complaint, the Court set an initial case management conference for June 2, 2023. The parties filed a proposed schedule with fact discovery to conclude by May 15, 2024, expert discovery to conclude by June 28, 2024, and summary judgment motions due July 26, 2024 (ECF No. 118).

6

32.    Immediately after the PSLRA discovery stay was lifted, Lead Plaintiffs, through Co-Lead Counsel, engaged in extensive discovery. Lead Plaintiffs served initial document requests on May 11, 2023 and additional requests on October 20, 2023 and December 6, 2023.

33.    Enforcing these requests required extensive correspondence and meet-and-confers concerning the scope and manner of productions. Ultimately, Defendants agreed to search 27 individual custodians and various centralized sources, including Talis's data room and other systems. Co-Lead Counsel carefully monitored the progress and status of Defendants' production to obtain documents in a timely manner before beginning fact depositions.

34.    In addition, to obtain relevant documents about Talis's IPO and the manufacturing, performance, and regulatory issues, as well as discovery relevant to Section 11 "tracing" (discussed below), Lead Plaintiffs served subpoenas on 11 key third parties:

- Zollner Electronics Inc.
- J.P. Morgan Securities LLC
- BofA Securities, Inc.
- DeWitte Hoff
- Torchiana, Inc.
- CapLinked, Inc.
- Baker Bros. Advisors LP
- Cambria Regulatory Consulting, Inc.
- Broadridge Financial Solutions, Inc.
- Depository Trust & Clearing Corporation
- Financial Industry Regulatory Authority

35.    These efforts ultimately allowed Co-Lead Counsel to secure over 865,000 pages of documents from Talis and third parties, including key evidence that Co-Lead Counsel leveraged at depositions and in connection with expert discovery. The document productions included:

- 780,979 pages (171,203 documents) from Talis
- 59,409 pages (5,183 documents) from J.P. Morgan Securities LLC
- 3,149 pages (369 documents) from Baker Bros. Advisors LP

7

- Additional documents from Zollner Electronics Inc.; DeWitte Hoff; Torchiana, Inc.; and other subpoena recipients

36.     As to written discovery, Lead Plaintiffs served two sets of interrogatories and one set of requests for admission (containing 74 individual requests).  These written discovery requests yielded valuable information to frame the issues in dispute, culminating in Defendants' July 2, 2024 responses to Plaintiffs' contention interrogatories, which spanned 177 pages, and Lead Plaintiff's July 2, 2024 responses to Defendants' contention interrogatories, which spanned 24 pages.

37.     To obtain relevant testimony for summary judgment and trial, Co-Lead Counsel conducted 14 fact depositions, comprised of all nine Individual Defendants; three Talis manufacturing and regulatory executives; and Rule 30(b)(6) depositions of the contract manufacturer of Talis One instruments and the lead underwriter for Talis's IPO.

38.     Preparing for and taking these fact depositions was a tightly coordinated effort that started with a focused review of the available evidence for each deponent.  This review used targeted searches, analytics, and other means to efficiently identify high-value documents, which Lead Counsel assembled into a record of the relevant events.  Notably, many of the documents in this case were highly technical and complex, including granular records of Talis One's manufacturing; detailed engineering documentation and data; and scientific correspondence with the FDA and within Talis.

39.     The 14 fact depositions occurred during a compressed period, with nine of them conducted between April 19, 2024 and May 23, 2024.  The 14 fact depositions are set forth below:

| WITNESS | DATE | LOCATION | TAKING ATTORNEY |
|---|---|---|---|
| Defendant Brian Coe | January 23, 2024 | Chicago | Evan A. Kubota |
| Rule 30(b)(6) Deposition of Zollner Electronics Inc. | March 25, 2024 | Virtual | Evan A. Kubota |
| Defendant Matthew L. Posard | April 19, 2024 | Virtual | Evan A. Kubota |
| Defendant Rustem Ismagilov, Ph.D. | April 24, 2024 | Virtual | Evan A. Kubota |
| Defendant Kimberly Popovits | May 1, 2024 | Virtual | Evan A. Kubota |
| Defendant Roger Moody | May 3, 2024 | Virtual | Evan A. Kubota |
| Tony Cunningham (former Talis Senior Director, Supply Chain) | May 7, 2024 | Virtual | Evan A. Kubota |
| Defendant Raymond Cheong, M.D., Ph.D. | May 9, 2024 | Virtual | Joseph W. Baier |
| Defendant Randal Scott, Ph.D. | May 16, 2024 | Virtual | Joseph W. Baier |

8

| WITNESS | DATE | LOCATION | TAKING ATTORNEY |
|---|---|---|---|
| Defendant Felix Baker, Ph.D. | May 17, 2024 | New York | Joseph A. Fonti |
| Douglas J. Liu (former Talis COO) | May 23, 2024 | Virtual | Evan A. Kubota |
| Rainer Ziermann (former Talis VP, Regulatory Affairs) | June 7, 2024 | Virtual | Evan A. Kubota |
| Rule 30(b)(6) Deposition of J.P. Morgan | June 11, 2024 | Virtual | Jonathan Park |
| Defendant Melissa Gilliam, M.D. | June 12, 2024 | Virtual | Joseph W. Baier |

40.     To ensure efficiency and centralized knowledge of the rapidly developing testimonial record, Lead Counsel's core team of three attorneys conducted 13 of the 14 fact depositions.  As indicated above, I conducted nine depositions myself.  Defendant Coe was deposed in-person in Chicago, while Defendant Baker was deposed in-person in New York.  For efficiency, the remaining fact depositions were conducted remotely.

41.     Lead Counsel also pursued a Rule 30(b)(6) deposition of Defendant Talis—a task significantly complicated by, among other things, Talis's deteriorating financial condition (discussed below) and termination of many personnel with knowledge during the litigation.  Lead Counsel conferred extensively with Defendants' counsel about the timing and scope of the Talis Rule 30(b)(6) deposition, and these discussions were ongoing at the time of settlement.

**G.     Lead Plaintiff Achieves Class Certification over Intense Opposition**

42.     On October 13, 2023, Lead Plaintiffs moved for class certification (ECF No. 126). Lead Plaintiffs' motion included the Expert Report of Zachary Nye, Ph.D. (ECF No. 127-1).  Dr. Nye was deposed in-person on December 8, 2023 in Menlo Park, CA; I defended the deposition.

43.     Defendants aggressively pursued discovery from Lead Plaintiffs to oppose class certification.  For example, Defendants served Lead Plaintiff Dugan with two sets of document requests (totaling 47 individual requests), three sets of interrogatories (totaling at least 25 interrogatories), and one set of requests for admission (containing 13 individual requests).

44.     In response to Defendants' requests, Mr. Dugan produced over 240 pages of documents; provided five sets of interrogatory responses (dated Sept. 18, 2023; Oct. 20, 2023; Nov. 17, 2023; Dec. 4, 2023; and July 2, 2024); and responded to Defendants' requests for admission.

9

DECL. OF EVAN A. KUBOTA IN SUPPORT OF CLASS REPRESENTATIVE'S MOT.
FOR FINAL APPROVAL AND LEAD COUNSEL'S MOT. FOR FEES AND EXPENSES      Case No. 3:22-cv-00105-SI

45.    Lead Plaintiff Dugan was deposed in-person for a full day in Malibu, CA on October 27, 2023.  I defended the deposition, which concluded at 7:10 PM.

46.    Mr. Yu and Max Wisdom withdrew in November 2023, leaving Mr. Dugan as sole Lead Plaintiff.  (ECF 131.)

47.    Defendants vigorously opposed Lead Plaintiff's motion for class certification.  On December 12, 2023, Defendants filed their opposition brief (ECF No. 136), including 13 exhibits and declarations from three fact witnesses (with 13 additional exhibits).  Defendants challenged, among other things, Lead Plaintiff Dugan's adequacy and typicality; the predominance and superiority elements of Rule 23(b)(3); and whether Section 11 "tracing" affected the length of the proposed class period.

48.    On January 12, 2024, Lead Plaintiff filed a reply brief in further support of class certification (ECF No. 137) with 19 exhibits.  Lead Plaintiff's reply addressed each of Defendants' arguments, reiterating Mr. Dugan's adequacy and typicality and rebutting Defendants' arguments about predominance and superiority.  As to Section 11 tracing, Lead Plaintiff argued that Rule 37(c)(1) precluded Defendants' reliance on three new fact witnesses, and submitted an expert declaration from Professor Joshua Mitts describing a Class-wide tracing methodology.

49.    On January 18, 2024, the Court ordered Lead Plaintiff to file a complete copy of the Dugan deposition transcript (ECF No. 139), which Lead Plaintiff filed that day (ECF No. 140).

50.    Defendants objected to Professor Mitts' declaration and to certain other documents Lead Plaintiff filed on reply (ECF No. 141).  The parties then stipulated to Defendants' filing of a sur-reply (ECF No. 142) and each side's ability to file an expert report on "tracing," while preserving objections other than timeliness (ECF No. 146).

51.    On January 29, 2024, Defendants deposed Professor Mitts; I defended the deposition.

52.    On February 2, 2024, Defendants filed a 10-page sur-reply on tracing (ECF No. 149), including the Expert Rebuttal Report of Jack R. Wiener and two additional witness declarations.

53.    On February 5, 2024, Lead Plaintiff deposed Mr. Wiener; I took the deposition.

54.    On February 6, 2024, Lead Plaintiff filed objections to Defendants' sur-reply evidence (ECF No. 151), arguing that Mr. Wiener is unqualified and his opinions should be excluded as unreliable, and that Defendants' new witness declarations should be excluded under Rule 37.

55.    In total, in connection with class certification, the parties exchanged reports from three experts (Dr. Nye, Professor Mitts, and Mr. Wiener), each of whom was deposed.

56.    On February 9, 2024, the Court held a hearing on the class certification motion (ECF No. 152).  The Court certified a Class consisting of all persons or entities (with certain exceptions) who purchased or otherwise acquired common stock issued by Talis pursuant and/or traceable to the registration statement and prospectus issued in connection with the Company's February 11, 2021 initial public offering between February 11, 2021 and August 11, 2021, inclusive, and were damaged thereby.  (ECF No. 153.)

57.    On May 22, 2024, the Court entered the parties' Stipulation and Order Regarding Dissemination of Class Notice (ECF No. 166), and the Notice Administrator A.B. Data, Ltd. ("A.B. Data") thereafter disseminated notice of class certification (*see* ECF No. 174).

**H.    The Parties Conduct Substantial Expert Discovery**

58.    On March 1, 2024, the Court held a further case management conference (ECF No. 161) and entered a schedule for the remainder of the litigation, including expert discovery, summary judgment motions, and a trial date of February 24, 2025 (ECF No. 162).

59.    On June 7, 2024, the parties filed a joint case management conference statement that reported two outstanding discovery issues:  (1) a dispute over certain topics for the Talis Rule 30(b)(6) deposition, and (2) Lead Plaintiff's request for documents and information concerning Talis's May 8, 2024 disclosure that "we may cease all operations and seek a voluntary reorganization, liquidation or dissolution of the Company, which may be in the form of a voluntary bankruptcy petition under Chapters 7 or 11 of the United States Code . . . ."  (ECF No. 167.)

60.    On June 14, 2024, the Court held a case management conference (ECF No. 169).  On June 18, 2024, the parties filed a stipulation to extend the deadlines for certain outstanding discovery issues (ECF No. 171).  On July 9, 2024, the parties extended the deadlines for opening and rebuttal expert reports to July 26, 2024 and August 30, 2024, respectively (ECF No. 173).

11

61.     On July 26, 2024, the partes exchanged opening expert reports.  Lead Plaintiff served three opening expert reports:

- Zachary Nye, Ph.D. opined on damages under Section 11's statutory formula;

- Dr. Morten Jensen, Ph.D., Dr. Med., an associate professor of biomedical engineering at the University of Arkansas, opined on medical device manufacturing and engineering standards.  Dr. Jensen's 57-page report provided extensive analysis of relevant industry standards, documents, and data.

- J. Lawrence Stevens, RAC, with regulatory experience at the U.S. Food and Drug Administration and in the private sector, opined on Talis's January 2021 submission to the FDA for Emergency Use Authorization, Talis One's market readiness, and Talis One's invalid rate.  Mr. Stevens' report was 47 pages.

62.     Defendants also served three opening expert reports:  from Steven R. Grenadier, Ph.D. (Section 11 negative causation); Professor Steven Davidoff Solomon (Talis's disclosure practices); and Richard A. Lewis, Ph.D. (FDA background and Talis's January 2021 EUA submission).

63.     At the time of settlement, the parties were in the midst of expert discovery, and Lead Counsel was working with experts on rebuttal reports due August 30, 2024.

**I.      Two Mediations Finally Yield an Agreement in Principle**

64.     The parties' mediation efforts spanned five months.  On March 14, 2024, following certification of the Class, the parties engaged in a full-day mediation session with Michelle Yoshida of Phillips ADR via Zoom.  Prior to the March 14 session, the parties submitted and exchanged detailed mediation statements and exhibits.  On March 14, the parties engaged in good faith, arm's-length negotiations supervised by Ms. Yoshida, but did not agree on a resolution.

65.     After the March 14, 2024 mediation, Lead Counsel continued vigorously prosecuting the case, and (among other things) completed 13 additional fact depositions and began preparing for expert discovery, as detailed above.

66.     In June 2024, the parties resumed settlement discussions, and on July 30, 2024, the parties participated in a second full-day mediation session with Ms. Yoshida, held in-person in

Chicago. Prior to the July 30 session, Lead Plaintiff submitted a supplemental mediation statement for exchange with Defendants and a further mediation statement for the mediator's eyes only. Lead Plaintiff's bankruptcy counsel attended the July 30 session given the risk of a potential Talis bankruptcy filing. On July 30, the parties again engaged in good-faith, arm's-length negotiations and made progress, but did not agree on a resolution.

67.    After the July 30 session, negotiations continued under Ms. Yoshida's auspices for several weeks. Finally, after further negotiations, including inquiry into Talis's financial condition and a potential bankruptcy filing, Ms. Yoshida presented a mediator's proposal to resolve the matter for $32.5 million in cash.

68.    The parties accepted the mediator's proposal on August 21, 2024 and then negotiated and finalized a term sheet for the Settlement.

**J.      The Parties Negotiate and Finalize the Stipulation of Settlement, and Lead Plaintiff Moves for Preliminary Approval**

69.    On August 30, 2024, the parties advised the Court of their agreement in principle (ECF No. 175).

70.    The parties then negotiated the Stipulation of Settlement, a process that was more complex than usual given Talis's potential bankruptcy filing. On September 10 and 16, 2024, the parties advised the Court of the ongoing work to finalize the Stipulation (ECF Nos. 177, 178).

71.    On October 1, 2024, the parties finalized the Stipulation, and Lead Plaintiff moved for preliminary approval (ECF No. 181). In response to the Court's order (ECF No. 184), Lead Plaintiff filed a supplemental brief and revised preliminary approval papers on November 14, 2024 (ECF No. 185).

72.    The Court granted preliminary approval on November 22, 2024 (ECF No. 186).

**II.     RISKS OF CONTINUED LITIGATION**

73.    This litigation posed significant risks, both on the merits and with respect to Talis's deteriorating financial condition.

DECL. OF EVAN A. KUBOTA IN SUPPORT OF CLASS REPRESENTATIVE'S MOT.
FOR FINAL APPROVAL AND LEAD COUNSEL'S MOT. FOR FEES AND EXPENSES          Case No. 3:22-cv-00105-SI

74. At the outset, litigating any federal securities class action presents risks; more than half (54%) of motions to dismiss securities class actions are granted.[2] Indeed, the Court granted Defendants' first motion to dismiss here. A motion resulting in dismissal with prejudice would have ended the case and foreclosed any recovery.

75. While Lead Plaintiff defeated Defendants' second motion to dismiss, further litigation nonetheless posed significant risks. On the merits, Defendants vigorously denied that Talis's Registration Statement contained any material misstatement or omission. Further, Defendants likely would have sought to portray Talis and its officers and directors as working in good faith to launch a complex new medical device during the COVID-19 pandemic—an urgent public health imperative.

76. Further, Defendants likely would have argued that any alleged misstatement or omission was immaterial in the context of other language in the Registration Statement, including lengthy risk factors as to Talis One's manufacturing, performance, and the uncertainty of FDA approval. In this regard, Defendants likely would have argued that Talis's disclosures in the Registration Statement were consistent with similar companies. Defendants also likely would have challenged materiality by arguing, for example, that any alleged misstatements or omissions about the Talis One instrument or FDA approval were immaterial in light of other factors that delayed or prevented a commercial launch.

77. While Lead Plaintiff was prepared to advance strong factual and legal responses to these arguments at summary judgment or trial, the absence of a material misstatement or omission would defeat liability entirely.

78. The Individual Defendants also would have asserted so-called "due diligence" defense to liability under Section 11, arguing that they conducted a reasonable investigation and had reasonable grounds to believe the Registration Statement was accurate and complete. *See* 15 U.S.C. § 77k(b)(3).

79. As to damages, Defendants' negative causation defense threatened to foreclose the majority of statutory damages—or eliminate damages entirely. Defendants likely would have argued

---

[2] *See* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation, 2023 Full-Year Review*, NERA, at 16 (Jan. 23, 2024).

14

that Talis's post-IPO decline in share price was not related to any of the alleged misstatements or omissions, but instead was the result of extrinsic factors, such as broader pressures on the medical diagnostics industry as the COVID-19 pandemic ended. Under Lead Plaintiff expert's estimate, negative causation arguments would have reduced recoverable damages to at most $44.6 million, while under Defendants' view, their negative causation defense would have foreclosed any recoverable damages if litigation had continued. If Defendants successfully demonstrated that damages were zero, the Class would recover nothing.

80. Even if Lead Plaintiff successfully demonstrated material falsity, defeated Defendants' negative causation arguments, and prevailed at summary judgment or trial, Defendants could overturn any judgment on appeal. At minimum, resolving any appeal could take years.

81. Importantly, Talis's financial condition and the real prospect of a near-term Talis bankruptcy materially heightened the complexity and risk of further litigation.

82. With no commercial product, Talis suffered a declining cash position throughout this Action. For example, shortly after the Court denied Defendants' second motion to dismiss on April 28, 2023, Talis reported $113 million in cash and cash equivalents as of March 31, 2023.[3] A year later (as of March 31, 2024), Talis's cash and cash equivalents had dwindled to $70 million.[4] By June 30, 2024, Talis's cash and cash equivalents had further diminished to $59.9 million.[5] This figure was significantly lower by the time of the Settlement in August 2024. In parallel, defense costs significantly reduced the insurance available to Talis and the Individual Defendants.

83. These circumstances presented a substantial risk that this action would never reach summary judgment motions (due October 19, 2024), much less trial in February 2025. Indeed, Talis warned in its August 19, 2024 Form 10-Q—filed shortly before the parties reached their agreement in

---

[3] Talis Form 10-Q for the quarterly period ended March 31, 2023, at 3, *available at* https://investors.talisbio.com/static-files/a68ee399-2a9b-42a0-8973-57be7d59b287

[4] Talis Form 10-Q for the quarterly period ended March 31, 2024, at 2, *available at* https://investors.talisbio.com/static-files/d11f30ea-ef2d-471d-a78b-6832fff3f48f

[5] Talis Form 10-Q for the quarterly period ended June 30, 2024, at 2, *available at* https://investors.talisbio.com/static-files/0d97e096-a3c1-4d78-9654-074ef05fef4c

15

principle—that "the Company anticipates commencing a voluntary petition under Chapter 11 (the "Chapter 11 Case") of the United States Code (the "Bankruptcy Code") in the near future to seek resolution of all claims against the Company and an orderly liquidation of its assets and dissolution of the Company."[6]

84.    A Talis Chapter 11 filing would, at minimum, trigger an automatic stay of the Class's strict liability claims against Talis, likely preventing those claims from reaching trial.  At the same time, additional expenses during a Chapter 11 proceeding would accelerate the depletion of Talis's cash and further constrain any possible recovery.

85.    Nonetheless, Lead Counsel achieved a $32.5 million Settlement that exhausts all of Talis's remaining insurance and more than half of Talis's remaining cash.

## III.    COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER AND REACTION OF THE CLASS TO DATE

86.    At Lead Counsel's direction, immediately after the Preliminary Approval Order, the Court-appointed notice and claims administrator, A.B. Data, began implementing the Court-approved notice program.  Lead Counsel has received, and continues to receive, regular updates from A.B. Data on the status of the notice and claims process.

87.    On December 23, 2024, the Court-approved Summary Notice was published in *Investor's Business Daily* and *The Wall Street Journal* and transmitted over *PR Newswire*.  (Ex. D ¶ 14.)  On December 13, 2024, A.B. Data began mailing Notices to potential Settlement Class Members using the information obtained from the notice of pendency stage; as of January 16, 2025, a total of 19,384 Notices have been disseminated to potential Settlement Class Members.  (*Id.* ¶¶ 4–13.) On December 13, 2024, A.B. Data posted the Notice, Summary Notice, Long-Form Notice, Proof of Claim form, and important case documents, as well as information on the exclusion, objection, and claim filing deadlines, and instructions on how to submit claims, to the Settlement Website (www.TalisSecuritiesLitigation.com).  (*Id.* ¶ 15.)

---

[6] *Id.* at 14.

88.    Pursuant to the Preliminary Approval Order, the deadline for Settlement Class Members to opt out of the Settlement or object to the Settlement is February 21, 2025.  (*See* ECF No. 186 ¶¶ 12, 13(a).)  As of January 16, 2025, A.B. Data has not received any objections (Ex. D ¶ 20), and to date, no objections have been provided to Lead Counsel or docketed with the Court.  Lead Counsel will file reply papers by March 7, 2025 to respond to any objections that may be received.

## IV.    THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

89.    The Plan of Allocation set forth in the Long-Form Notice, which was prepared with expert assistance, allocates each Authorized Claimant their *pro rata* share of the Net Settlement Fund based on their recognized losses in transactions in Talis common stock.  (*See* ECF 185-3 at 14 of 16.)

90.    Those recognized losses are calculated under the Plan of Allocation using share prices at the time of purchase and sale, consistent with Section 11's statutory formula.  For example, the Recognized Loss Amount for a share of Talis common stock purchased during the Class Period and sold before January 7, 2022 is the purchase price (not to exceed the $16.00 IPO price) minus the sale price.  (*See* ECF 185-3 at 14 of 16.)

91.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants.  Lead Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate, and should be approved.

## V.    LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND REASONABLE COSTS AND EXPENSES TO LEAD PLAINTIFF

92.    As stated in the Notice and Long-Form Notice, Lead Counsel seeks (i) an award of attorneys' fees of 28% of the Settlement Fund, plus interest at the same rate and for the same period as earned by the Settlement Fund, until paid (the "Fee Application"); and (ii) payment for litigation expenses in the amount of $1,268,366.35, plus interest at the same rate and for the same period as earned by the Settlement Fund, until paid (the "Expense Application").  The Notice and Long-Form Notice informed Class Members that Lead Counsel would seek fees up to 28% and reimbursement of expenses not to exceed approximately $1,800,000, plus interest.  (ECF No. 185-2 at 3 of 3; ECF No. 185-3 at 2-3 & 11 of 16.)

### A.    Fee Application

#### (1)    The Result Achieved

93.    The Settlement is an exceptional result that represents a significant benefit to the Class. The $32.5 million Settlement Amount represents 20% of Plaintiff's estimate of maximum recoverable damages of $162 million.  This 20% recovery is nearly three times the median 7.5% recovery in Securities Act cases between 2014 and 2023, and 4.4 times higher than the 4.5% median recovery for Securities Act cases of comparable size (over $150 million in damages).[7]

94.    If Defendants' negative causation defense had prevailed, constraining recoverable damages to at most $44.6 million under Lead Plaintiff's estimate, the Settlement Amount would constitute a 72% recovery—nearly three-quarters of recoverable damages.[8]

95.    This result—recovering between 20% and 72% of estimated damages, and multiples higher than median recoveries in Securities Act settlements around the country—is exceptional by any measure.  It is especially noteworthy given Talis's material financial constraints, worsening financial condition, and resulting risk of a near-term Chapter 11 filing, which greatly diminished the prospect of any cash recovery meaningfully larger than the proposed Settlement, as detailed above.

#### (2)    The Risk of Nonpayment and Contingent Nature of Counsel's Fee

96.    The requested fee award is also reasonable in light of the significant risks assumed by Lead Counsel in prosecuting this complex class action on a fully contingent basis.

97.    Lead Counsel undertook the representation of the Settlement Class knowing that the Litigation could last for years, would require the substantial investment of time that would otherwise have been devoted to other cases, and provided no guarantee of any compensation.  Lead Counsel also assumed the risk of advancing all costs and expenses necessary to successfully prosecute the Litigation with no guarantee of any reimbursement.

---

[7] *See Cornerstone Research, Securities Class Action Settlements – 2023 Review and Analysis*, at 8, *available at* https://www.cornerstone.com/wp-content/uploads/2024/03/Securities-Class-Action-Settlements-2023-Review-and-Analysis.pdf.

[8] $44.6 million is Plaintiff's estimate of damages after negative causation.  Defendants' position is that their negative causation defense would have foreclosed any recoverable damages if litigation had continued.

98.    The risk of litigating this Action on a fully contingent basis for over two and a half years was substantial.  Lead Counsel faced significant risk at the pleading stage, where Defendants' first motion to dismiss was granted; at class certification; and (had litigation continued) at summary judgment and trial.  Beyond the risks to liability and damages (detailed above), unlike many corporate defendants in securities class actions, Talis had no commercial product and a rapidly depleting cash position throughout the Action.  These circumstances—culminating in the prospect of a near-term Chapter 11 filing, as discussed above—significantly raised the risk that Lead Counsel would receive no compensation, even for prevailing on the merits had litigation continued.

**(3)    The Novelty and Difficulty of the Questions Presented by the Litigation and Counsel's Skills in Representing the Class**

99.    The difficulties presented by this complex securities class action, and the skill required to successfully navigate them, favor approval of the requested fee award.

100.    This was a complex and technical case involving alleged misstatements and omissions about Talis One's manufacturing and performance, and Talis's FDA submission for Emergency Use Authorization.  At the outset, Plaintiff's Counsel was required to analyze, among other things, the medical device manufacturing process; complex federal regulations and industry standards governing medical device design, manufacturing, and FDA approval; the FDA Emergency Use Authorization framework during the COVID-19 pandemic; COVID-19 test sensitivity and failure rates; the nuances of Talis's engineering, manufacturing, and regulatory activities for Talis One; and how those facts applied to the alleged violations of securities laws.

101.    The pleadings, briefs and other papers in this action reflect Lead Counsel's skill, experience, and investment of extensive work to develop highly technical and scientific allegations. Plaintiff's Counsel leveraged the strength of these allegations to secure a significant recovery for the Settlement Class.

102.    Plaintiff's Counsel's reputation and experience also support the requested fee.  BFA partners have litigated dozens of securities actions that have contributed to the recovery of billions of dollars for investors, including nearly $2 billion since BFA's founding in 2014.  Securities class actions that BFA has prosecuted and successfully resolved include a $420 million recovery in *In re*

19

*Teva Securities Litigation*, No. 3:17-cv-0558 (D. Conn.); a $234 million recovery in *In re MF Global Holdings Securities Litigation*, No. 11-cv-07866-VM (S.D.N.Y.); a $219 million recovery in *In re Genworth Financial Inc. Securities Litigation*, No. 14-cv-00682-JAG (E.D. Va.); a $129 million recovery in *Greene v. Granite Construction Inc.*, No. 19-cv-04744 (N.D. Cal.); a $120 million recovery in *Freedman v. Weatherford Int'l, Ltd.*, No. 12-cv- 02121-LAK (S.D.N.Y.); and a $21 million recovery in *Bilinsky v. Gatos Silver, Inc.*, No. 1:22-cv-00453-PAB-KAS (D. Colo.).

103.    BFA also serves as lead counsel in a number of significant pending securities class actions around the country, including *Lozada v. TaskUs, Inc.*, No. 22-cv-01479 (S.D.N.Y.); *Peters v. Twist Bioscience Corp.*, No. 22-cv-08168 (N.D. Cal.); and *Chow v. Enochian Biosciences Inc.*, No. 22-cv-01374 (C.D. Cal.) (settlement pending).

104.    Co-Lead Counsel Pomerantz LLP ("Pomerantz") and additional counsel The Schall Law Firm ("Schall") are also highly experienced in prosecuting complex securities class actions and brought their skill and experience to bear in this case.  (*See* Exs. H & I.)

### (4)    The Time and Labor Expended

105.    Plaintiff's Counsel (BFA, Pomerantz, and Schall) devoted significant time and effort to the prosecution of this Litigation.

106.    In total, Plaintiff's Counsel has devoted 8,234.86 hours and $6,351,918.25 in lodestar to prosecuting the Litigation.  Lead Counsel BFA spent 6,897.95 hours with a total lodestar of $5,327,736.75.  (*See* Exhibit C.)  The time and lodestar for Pomerantz and Schall are set forth in the declarations attached as Exhibits H and I, respectively.

107.    As detailed above, this extensive work included, among other things, (i) investigating, drafting, and filing two complaints; (ii) briefing two motions to dismiss and preparing for oral argument; (iii) obtaining class certification after extensive briefing, responding to discovery requests to Lead Plaintiffs, the deposition of Lead Plaintiff Dugan, and three expert depositions; (iv) securing and analyzing over 865,000 pages of documents from Defendants and third parties; (v) serving extensive written discovery requests; (vi) preparing for and taking 14 fact depositions; (vii) serving three expert reports and preparing to serve rebuttal reports to Defendants' three experts; (viii) participating in a lengthy mediation process, with two full-day sessions, briefing, and numerous

20

additional calls over a period of five months; and (ix) preparing and finalizing the Stipulation of Settlement and related documentation. This work was focused on advancing the Litigation towards summary judgment and trial to secure a highly favorable resolution for the Settlement Class.

108. Plaintiff's Counsel worked efficiently and with appropriate staffing. For example, BFA's three lead attorneys committed 3,668.25 hours, or approximately 53% of the total lodestar among BFA timekeepers. This efficient staffing ensured that knowledge of key information was centralized among a core group of attorneys without duplication of effort. As between Plaintiff's Counsel, Pomerantz focused on obtaining discovery from J.P. Morgan Securities LLC and taking its Rule 30(b)(6) deposition, while Schall focused on coordinating Lead Plaintiff Dugan's discovery responses.

109. Litigation work was handled by attorneys of appropriate seniority. For example, I took the lead on dispositive motions, oral arguments, fact and expert depositions, and class certification, while more junior attorneys focused on legal research, drafting discovery requests and correspondence, reviewing productions, and supporting depositions. BFA associate Joseph Baier took three depositions (Defendants Cheong, Scott and Gilliam).

110. Attached as Exhibit B is a list of BFA attorneys and professional support staff who worked on the case, with information about each individual's qualifications, experience, and role.

111. Attached as Exhibit C is a schedule summarizing the amount of time spent by each attorney and professional support staff employee of BFA from inception of the Litigation through January 3, 2025, the rates applicable to each individual, and a lodestar calculation for each individual.

112. Pursuant to the Northern District's Procedural Guidance, Exhibit C includes a billing category-based summary chart of the work performed by BFA's attorneys and staff in connection with this action.[9] The chart contains the following categories:

- Case Management and Administration: Includes day-to-day tasks such as organizing files and docket entries.

---

[9] Comparable charts or other information regarding the work performed by Pomerantz and Schall are provided in their respective declarations.

- <u>Class Certification</u>:  Includes work related to Lead Plaintiff's Motion for Class Certification and related expert work and depositions.

- <u>Depositions and Deposition Preparation</u>:  Includes preparing for and taking 14 fact depositions.

- <u>Discovery Analysis</u>:  Includes the review and analysis of documents produced by Defendants and other third parties.

- <u>Discovery from Plaintiff</u>:  Includes the review, analysis, and production of Lead Plaintiff's documents.

- <u>Discovery Litigation</u>:  Includes research, writing, and correspondence related to discovery disputes with Defendants and third parties.

- <u>Experts and Consultants</u>:  Includes working with experts to facilitate the drafting of reports.

- <u>Lead Plaintiff</u>:  Includes work related to Martin Dugan's Motion for Appointment as Lead Plaintiff.

- <u>Litigation Strategy</u>:  Includes work related to overall litigation strategy.

- <u>Mediation</u>:  Includes preparation for, and attending, mediation meetings with opposing counsel and related follow-up negotiations.

- <u>Motion to Dismiss</u>:  Includes work related to Plaintiffs' oppositions to Defendants' two motions to dismiss and related preparation for oral argument.

- <u>Pleadings and Complaint</u>:  Includes work related to the two complaints filed in the Action.

- <u>Settlement</u>:  Includes work related to the Stipulation of Settlement and motions for preliminary and final approval.

113.    Exhibit C is based on contemporaneous time records prepared and maintained by BFA in the ordinary course.  As a partner responsible for supervising BFA's work on this case, I supervised the review of these time records to prepare this declaration.  The purpose of this review was to confirm both the accuracy of the time entries and the necessity for, and reasonableness of, the time committed to the Litigation.

22

114. BFA excluded from the lodestar calculations reflected in Exhibit C all time related to the preparation of the Fee and Expense Applications. In the exercise of billing judgment, BFA also eliminated all time from timekeepers with fewer than 5 hours billed to the matter (which amounted to 9 hours and $5,338).

115. As reflected in Exhibit C, the hourly rates for BFA attorneys and professional support staff range from $395 for paralegal support to $1,250 for founding firm partners. Current rates are used for current personnel; for attorneys and professional support staff who are no longer employed by BFA, the hourly rate used is the hourly rate for such employee in his or her final year of employment by BFA.

116. BFA's rates are the usual and customary rates set by BFA for each individual. Different timekeepers within the same employment category (*e.g.*, partner, associate) may have different rates depending on their respective years of experience, years at the firm, years in current position, relevant experience, relevant expertise, and/or rates of similarly situated individuals at BFA or at peer firms. BFA's rates are comparable to the rates set by peer firms for attorneys and staff of similar skill and experience.

117. Courts across the country have consistently held that BFA's hourly rates are reasonable. For instance, the District of Colorado recently approved rates that are identical to the rates applicable here. *See Bilinsky v. Gatos Silver, Inc.*, No. 1:22-cv-00453-PAB-KAS, ECF Nos. 91-7 & 97 (D. Colo. Oct. 15, 2024); *see also* Settlement Approval Hearing Transcript, *In re Teva Sec. Litig.*, No. 3:17- cv-00558 (SRU) (D. Conn.) (June 2, 2022), 28-29 (granting fee request and accepting BFA's rates); *Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, No. C 19-04744 WHA, 2022 WL 816473, at *9 (N.D. Cal. Mar. 17, 2022) ("This order accepts [BFA's] claimed rates as generally tracking the going rate for those with the same levels of skill and experience in our geographic region.").

**(5)     The Reaction of the Lead Plaintiff and Class Supports the Fee Application**

118. Lead Plaintiff Dugan supports the fee request, which is consistent with his retention agreement with counsel. (Ex. A (Dugan Decl.) ¶¶8-11.) Lead Plaintiff's support and *ex ante* agreement regarding the fee request weigh heavily in favor of approval of the requested fee.

23

119. The reaction of the Settlement Class to the proposed Settlement, including the fee request, further supports approval. As of January 16, 2025, no Settlement Class Members have objected to the fee request or the Settlement. (Ex. E (Teichmiller Decl.) ¶ 20.)

**B.  Expense Application**

**(1)  Plaintiff's Counsel's Litigation Expenses**

120. BFA respectfully requests $1,268,366.35 in litigation expenses that Plaintiff's Counsel incurred in the prosecution of the Action. Plaintiff's Counsel incurred these expenses with full knowledge that they might not recover any of them if the litigation was not successful.

121. Given the fully contingent representation and the risks of litigation, Plaintiff's Counsel were incentivized to prosecute this Action as efficiently as possible while achieving the best possible result. Notably, the requested amount of expenses is substantially lower than the maximum amount of approximately $1,800,000 estimated in the Notice disseminated to the Settlement Class. To date, no Settlement Class Member has objected to the maximum amount of expenses set forth in the Notice, confirming the reasonableness of the requested expenses.

122. Attached as Exhibit F is a summary of Plaintiff's Counsel's expenses incurred in connection with the prosecution of the Litigation. Exhibit F identifies each category of expense and the amount incurred in each category. Certain expenses were incurred directly by BFA and Pomerantz, while other expenses were incurred by a joint litigation fund to which BFA and Pomerantz contributed.

123. Exhibit F and this Declaration are based on information maintained contemporaneously and in the ordinary course by BFA and/or Pomerantz, including receipts, invoices, expense vouchers, check records, and similar documents. I have reviewed Exhibit F and believe it to be an accurate record of the expenses incurred by Plaintiff's Counsel related to this matter.

124. The expenses set forth in Exhibit F consist of the following costs and expenses:

- Expert Fees: $754,114.10. This category includes the fees for Lead Plaintiff's testifying experts (Dr. Nye, Dr. Jensen, Mr. Stevens, and Professor Mitts), who collectively prepared five expert reports, as well as rebuttal reports that were in process at the time of settlement. Dr. Nye and Professor Mitts were also deposed. This category also includes fees for Lead Plaintiff's consulting

24

experts from Peregrine and Global Economics Group to analyze damages in connection with the mediation and develop the Plan of Allocation.

- Outside Counsel: $216,572.98. This category includes the fees for Lead Plaintiff's bankruptcy counsel (Lowenstein Sandler LLP) and counsel for certain witnesses (Wheeler Trigg O'Donnell LLP).

- Court Reporting Services: $87,788.85. This category includes fees for Veritext, a court reporting vendor that provided transcripts and video recordings for the 18 depositions in this matter.

- E-Discovery Vendor Fees: $65,747.38. This category includes fees for TrustPoint, an e-discovery vendor that hosted document collections and productions.

- Notice Administration: $58,848.67. This category includes fees for A.B. Data to disseminate notice of class certification.

- Mediation Fees: $30,412.50. This category includes fees paid to Phillips ADR Enterprises for the retention of Ms. Yoshida.

- Case-Related Travel: $15,594.51. This category (detailed below) includes travel by attorneys for depositions and mediation.

- Subpoena-Related Fees: $19,300. This category consists of fees paid to two non-parties, DTCC and Broadridge, to obtain information relevant to Section 11 tracing.

- Computer Research: $8,115.04. This category includes vendors such as PACER and Thomson Reuters, used to obtain access to legal research and factual databases.

- Service & Filing Fees: $7,350.70. This category includes Court filing fees and fees for *pro hac vice* admissions.

- Copying/Postage/Materials/Communications: $4,521.62. This category consists of fees related to FedEx and other shipping, as well as press releases.

25

DECL. OF EVAN A. KUBOTA IN SUPPORT OF CLASS REPRESENTATIVE'S MOT.
FOR FINAL APPROVAL AND LEAD COUNSEL'S MOT. FOR FEES AND EXPENSES         Case No. 3:22-cv-00105-SI

125. All travel and meals involved BFA attorneys and were necessary for the effective prosecution of the Action. Specifically, all travel related to depositions and mediation, as summarized below, and the submitted expenses relate to travel by one or two attorneys (with the exception of the final mediation session, where three BFA attorneys attended). A further detailed breakdown of travel and meals is provided in Exhibit F.

| TRAVEL DATES | PURPOSE | ATTENDEES | EXPENSES |
|---|---|---|---|
| Oct. 25-28, 2023 | Travel to Malibu, CA for deposition of Lead Plaintiff Dugan on October 27, 2023 | E. Kubota, R. Shikowitz | $3,521.88 |
| Dec. 6-9, 2023 | Travel to Menlo Park, CA for deposition of Dr. Nye on December 8, 2023 | E. Kubota | $1,474.65 |
| Jan. 22-24, 2024 | Travel to Chicago, IL for deposition of Defendant Coe on January 23, 2024 | E. Kubota, S. Slayton | $2,739.40 |
| July 15-16, 2024 | Travel to Chicago, IL for mediation meeting with defense counsel and Talis's bankruptcy counsel on July 16, 2024 | J. Fonti, E. Kubota | $2,583.98 |
| July 29-31, 2024 | Travel to Chicago, IL for mediation with Ms. Yoshida on July 30, 2024 | J. Fonti, J. Bleichmar, E. Kubota | $5,274.60 |

126. In addition, BFA's standard expense caps applied to travel: hotels are capped at $500 per night for large cities and $400 per night for small cities; meals are capped at $55 for dinner, $30 for lunch, $25 for breakfast, and $15 for snacks or beverages. (No alcohol is included in the expenses.) All flights were booked as economy (or premium economy for flights over four hours).

### (2) Lead Plaintiff's Reasonable Costs and Expenses

127. Finally, Lead Plaintiff Dugan seeks an award, pursuant to 15 U.S.C. § 77z-1(a)(4), of his costs and expenses directly related to his representation of the Class. As detailed in the Dugan Declaration (Exhibit A), based on Mr. Dugan's time devoted to this Action, he seeks an award of $36,000, below the amount that the Notice advised the Settlement Class could be requested.

128. I respectfully submit that this award is consistent with Congress's intent, as expressed in the PSLRA, of encouraging investors to take active roles in supervising securities actions. As set forth in his Declaration, Mr. Dugan has been committed to pursuing this Action and diligently and

26

effectively fulfilled his obligations as a representative plaintiff, having invested significant time and effort to oversee Plaintiff's Counsel since early 2022 to reach the Settlement.

129.    Among other things, Mr. Dugan participated extensively in discovery, including by providing his electronic devices and email for document collection, participating in a full-day deposition (resulting in a 314-page transcript), and verifying interrogatory responses.  Mr. Dugan also regularly communicated with Plaintiff's Counsel throughout the mediation process, and, after carefully considering the risks of further litigation and Talis's financial condition, authorized Plaintiff's Counsel to accept the mediator's recommendation for the $32.5 million Settlement.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 17, 2025                     _/s/ Evan A. Kubota_____
                                            Evan A. Kubota

DECL. OF EVAN A. KUBOTA IN SUPPORT OF CLASS REPRESENTATIVE'S MOT.
FOR FINAL APPROVAL AND LEAD COUNSEL'S MOT. FOR FEES AND EXPENSES                     Case No. 3:22-cv-00105-SI